UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:  Chapter 11

TAYLOR, BEAN & WHITAKER  Case No. 3:09-bk-07047-JAF
MORTGAGE CORP.,

Debtor.  *Emergency Relief Requested*
_____/

# DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 363, 541 AND 552 AND BANKRUPTCY RULE 4001

> **STATEMENT OF RELIEF REQUESTED**
>
> The Debtor seeks authority to use cash collateral to fund its operating expenses and the costs of administering this Chapter 11 case in accordance with a proposed budget attached hereto and to provide replacement liens as described below as adequate protection for the interests in the cash collateral. The Debtor believes that the parties listed herein may assert a valid and perfected security interest in the Cash Collateral. As adequate protection, the Debtor proposes to grant to those parties replacement liens to the same extent, validity, and priority as the security interests held by the parties as of the Petition Date.

TAYLOR, BEAN & WHITAKER CORP. (the "**Debtor**" or "**TBW**"), by and through its undersigned counsel, hereby files its Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to 11 U.S.C. §§ 105(a), 361, 363, 541 and 552 and Bankruptcy Rule 4001 (the "**Motion**") and requests that this Court authorize the Debtor to use cash collateral in accordance with the budget attached hereto. In support of its Motion, the Debtor respectfully represents as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are Sections 105, 363, and 541 of the Bankruptcy Code.

## Background

### A. Chapter 11 Filing

3. On August 24, 2009, (the "**Petition Date**"), TBW filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. TBW continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee or examiner has been appointed in this case and no official committee has yet been appointed pursuant to Section 1102 of the Bankruptcy Code.

### B. Company Background

6. Until very recently, TBW was the largest independent (i.e. non-depository owned) mortgage lender in the United States. Headquartered in Ocala, Florida, TBW employed approximately 2,500 people across the country in its main business and employs another 1,500 people in various subsidiaries. The largest offices are in Ocala, Atlanta, and Tampa. TBW's principal business comprised the following operations:

- Origination, underwriting, processing, and funding of conforming conventional and government-insured residential mortgage loans;

- Sales of mortgage loans into the "secondary market" to government-sponsored enterprises such as the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") or the Government National Mortgage Association ("**Ginnie Mae**"); and

- Mortgage payment processing and loan servicing.

TBW's servicing and origination functions are described below.

*Servicing*

7. TBW's mortgage servicing operation has involved the collection of monthly mortgage payments from individual borrowers and, in turn, the appropriate disbursement of those funds. In general, the principal and interest portions of mortgage payments are paid to the owners of the related mortgages, net of servicing fees. The insurance and tax portions of mortgage payments are paid into an escrow distribution account and paid to the appropriate insurers and taxing authorities.

8. TBW's mortgage servicing operations, employing some 400 people, have been substantial. As of June 30, 2009, TBW serviced approximately 488,000 mortgage loans (primarily first-lien, fixed-rate mortgages) having aggregate unpaid principal balances ("**UPB**") totaling in excess of $80 billion. These mortgages were ultimately owned by various investors. The primary investors, constituting approximately 95% of the total UPB, were Freddie Mac and Ginnie Mae. There were also loans serviced by TBW (roughly 5% of total UPB) that were owned by "private label" mortgage investors such as Wells Fargo Bank and U.S. Bank. TBW also serviced mortgages for its own portfolio and those of related entities such as Platinum Community Bank ("**Platinum Bank**").

9. TBW's principal banking relationship was with Colonial Bank ("**Colonial**"). In addition to maintaining operating accounts at Colonial, TBW maintained numerous other accounts necessary to its mortgage servicing operation and the appropriate disbursement of mortgage payments on behalf of borrowers and investors.

10. In general, borrowers make mortgage payments to TBW in one of the following ways:

- By check delivered directly to TBW;

- By check delivered to lock boxes maintained by Colonial;

- By Automated Clearing House ("**ACH**") transfer—i.e., electronic draft/transfer from the borrower's bank account into TBW's Custodial Funds Clearing account located at Colonial;

- By bank-by-phone payment;

- By third-party vendors; and

- By Internet banking whereby customers authorize TBW to draft funds from their accounts to investor custodial accounts at Colonial by bank-by-phone payment.

11. Until very recently, the vast majority of borrower payments were initially deposited into a single Custodial Funds Clearing Account. From the Custodial Funds Clearing Account, monies were disbursed to various Colonial depository custodial accounts for principal and interest. Monies were also transferred to other TBW accounts at Colonial and other banks for payment of mortgage servicing fees and borrowers' real estate taxes and insurance premiums. Tax and insurance excess balances were refunded to borrowers.

12. The calculation of the amounts to be disbursed into the sub-accounts and other TBW accounts was performed by TBW, in conjunction with Colonial, using its FICS servicing system. TBW has various software systems such as EDW, MyBI, Mortgage Accountant, Mortgage Servicer, TBW Rule, and LS ware and other systems to process loan origination, mortgage payment collection, and other servicing functions.

13. Additionally, TBW made advances to investors' depository accounts in the event that the mortgage borrowers failed either to make payment of principal and interest or to maintain sufficient escrow balances for taxes and insurance. TBW's advances of its own on behalf of investors included approximately $104.2 million in taxes and insurance and $70.1 million in deficient principal and interest. The requirements for TBW to advance funds on the investors' behalf depended upon the terms of the respective investor's servicing agreement with TBW. Additionally, TBW as servicer advanced approximately $52.1 million on behalf of certain investors for expenses related to foreclosure, borrower bankruptcy, and attendant property preservation.

*Origination*

14. TBW originated loans through mortgage brokers and purchased loans from correspondents. The company financed its loan originations with funds obtained through mortgage warehouse lines maintained at Colonial Bank, Bank of America, and other lending institutions. After origination, the Debtor customarily sold originated loans and paid off the warehouse line portions associated with the originated loans. TBW originated approximately $30 billion in aggregate new principal amount of loans in 2008.

*New Corporate Board and Chief Restructuring Officer*

15. Following the precipitous events of early August, the members of TBW's board of directors and the company's corporate officers, including the Chairman, Vice Chairman, Chief Executive Officer, and Chief Financial Officer, resigned. New, independent members have been appointed to the board, and the new board has appointed Neil F. Luria as the company's Chief Restructuring Officer. The business and financial affairs and ongoing operations of the company are under the direction and control of the new board and the Chief Restructuring Officer. As a result of its ownership interest in Platinum Bank, the Debtor is subject to regulation by the Office of Thrift Supervision ("**OTS**") as a savings and loan holding company, including approval of those selected to serve as officers and directors of the Debtor. On or about August 20, 2009, the OTS approved the candidates for the new board and Mr. Luria to serve in their capacities for the Debtor, subject to completion of final background checks.

**C.   Reasons for Filing Bankruptcy**

16. TBW's fall has been sudden and dramatic. On Monday, August 3, 2009, in connection with an ongoing investigation of Colonial, federal agents executed a search warrant at TBW's headquarters in Ocala, Florida. The following day, August 4, 2009, the United States Department of Housing and Urban Development ("**HUD**") suspended TBW's HUD/FHA origination and underwriting approval, Ginnie Mae terminated TBW's authority to act as a Ginnie Mae issuer and to service its $26 billion mortgage portfolio, and Freddie Mac terminated TBW's eligibility to sell loans and to service its $51.2 billion portfolio.

17.     Although Taylor Bean has rights of appeal, the suspension and terminations by these agencies dealt a death blow to TBW's business operation. Left with no other choice, in the afternoon of August 5, 2009, TBW laid off approximately 2,000 employees, reduced its business operations to the minimum level believed necessary to preserve the value of its assets, and began planning for an orderly restructuring or liquidation of the company, resulting in the filing of this Chapter 11 case.

18.     From TBW's perspective, the August 5, 2009 shutdown of the majority of TBW's business operations was the result of a perfect storm of events that had begun on March 31, 2009. On that date, which was also the last day of TBW's 2008-2009 fiscal year, a group of investors led by TBW signed a definitive agreement with Colonial BancGroup, Inc. ("**BancGroup**"), the holding company of Colonial Bank, to participate in a $300 million equity infusion into BancGroup. BancGroup is a publicly held bank holding company that is the parent of Colonial. Colonial was struggling, and the $300 million equity investment would make BancGroup eligible to receive federal Troubled Asset Relief Program ("**TARP**") funds pursuant to an application previously filed by BancGroup. The closing of the investment by TBW and the other investors was subject to a variety of conditions. The transaction also required the approval of banking regulatory authorities, including the OTS and the Alabama Banking Department, which imposed extensive conditions on the closing of the transaction. The parties to the agreement anticipated that BancGroup would continue to operate as a publicly traded company with an independent board of directors and management team separate and apart from TBW following the closing of the transaction. Under the terms of the

agreement, which were publicly disclosed by BancGroup on March 31, 2009, the equity investment was to be completed by July 31, 2009.

19. Historically, TBW and Colonial have had an extensive banking relationship. Colonial maintained virtually all of TBW's bank accounts, including approximately 108 custodial accounts necessary to TBW's servicing business. Significantly, Colonial was party to participation facility agreements with a cumulative purchasing capacity in excess of $3 billion, along with a $20 million line of credit, all of which were critical to TBW's business operation.

20. In connection with the close of TBW's fiscal year on March 31, 2009, the company's auditor, Deloitte LLP ("**Deloitte**"), performed work necessary to the preparation and issuance of TBW's audited financial statements. Pursuant to HUD regulations and TBW's agreements with Ginnie Mae, Freddie Mac, and various lenders, TBW was required to deliver its year-end audited financial statements to the agencies and its lenders within 90 days of its fiscal year-end (i.e., by June 30, 2009). As the audit was underway, banking regulators were reviewing the proposed investment in Colonial by TBW and others in the investor group. Colonial had previously applied for TARP funds in connection with the proposed transaction, and that application was apparently under consideration.

21. On June 16, 2009, members of Deloitte's audit team met with TBW and expressed concerns that they were encountering delays in obtaining information and documentation from TBW regarding TBW's accounting treatment and presentation of owned real estate (**"REO"**) on its balance sheet. REO assets of TBW for the most part

are properties that have come on to its balance sheet as a result of foreclosures. An asset becomes REO when the collateral, residential real estate, securing a defaulted mortgage loan is foreclosed. Specifically, Deloitte was focused on REO assets that were originally funded using one of Colonial's purchase facilities with TBW. Deloitte's concerns derived from its belief that a conversation may have occurred between individuals at TBW and Colonial regarding the accounting treatment for REO on TBW's balance sheet.

22. Acting on its belief that TBW and Colonial employees had engaged in potentially inappropriate communications regarding TBW's accounting treatment of REO assets, Deloitte recommended that TBW retain outside counsel, independent from any aspect of TBW's relationship with Colonial and the pending transaction with Colonial, to examine the nature and extent of the perceived communications between TBW and Colonial regarding the REO issue. As a result, TBW retained Troutman Sanders LLP ("**Troutman Sanders**"), TBW's proposed special counsel in this Chapter 11 case, to look into these issues.

23. In a letter dated July 2, 2009, Ginnie Mae notified TBW that its failure timely to submit audited financial statements by June 30, 2009, as was required by TBW's Guarantee Agreement as well as the Mortgage Backed Securities Guide, constituted an event of default. In its July 2 letter, Ginnie Mae required TBW to provide a written response to Ginnie Mae's July 2 letter that satisfactorily addressed this issue.

24. Subsequently, in a letter dated July 6, 2009, TBW's Chief Executive Officer, Paul Allen, provided an explanation to Ginnie Mae of the reasons for the delay in delivering audited financials and stated there were no unresolved issues with the TWB's

auditors. This letter was not reviewed by TBW's counsel, Deloitte, or TBW's Chairman. Two weeks later, when TBW had not delivered audited financial statements, Ginnie Mae requested TBW's permission to speak with Deloitte about the audit. TBW consented, and on or about July 20, 2009, Ginnie Mae spoke with Deloitte. It appears that Ginnie Mae drew the conclusion that Mr. Allen's July 6 letter had somehow been misleading. Consequently, on July 22, 2009, Ginnie Mae demanded a prompt explanation, which was provided by a letter from TBW's Chairman dated July 27, 2009. Following TBW's receipt of Ginnie Mae's July 22, 2009 letter, TBW, through Troutman Sanders, was in ongoing communication with Ginnie Mae and HUD's Office of Inspector General.

25. Apparently, as these events unfolded at TBW, Colonial was communicating with various regulators and federal agencies. Though unknown to TBW at the time, it also appears that Colonial was the subject of civil and criminal investigations by the Department of Justice, as well as other federal agencies.

26. By a press release issued July 31, 2009, Colonial announced that the $300 million equity investment transaction would not close and that "substantial doubt" existed about its continued viability as a going concern. The following day, Saturday, August 1, 2009, a search warrant was issued for the search of TBW's headquarters in Ocala, Florida. Federal agents executed the search warrant at TBW's headquarters the following Monday, August 3, 2009. On that same day, federal agents executed a search warrant at Colonial's offices in Orlando, Florida.

27. Though not a cause of TBW's collapse, it should also be noted that on June 22, 2009, TBW entered into a Settlement Agreement and Consent Order with the

attorneys general of 14 states regarding its loan origination and underwriting practices. In the wake of the HUD suspension and the Ginnie Mae and Freddie Mac terminations on August 4, 2009, these and other states filed cease and desist actions against TBW (and, in a few cases, certain individual employees) following the August 5, 2009 shutdown of TBW's lending operations.

28. Beginning on or about August 5, 2009, Colonial froze all of TBW's accounts and refused to accept deposits, honor checks, receive wire transfers, or permit disbursements. Colonial's actions further crippled TBW by hindering its ability to conduct business and meet its servicing obligations. Furthermore, not only have Colonial's actions damaged TBW, but also individual borrowers and TBW customers are being harmed by this freeze as well.

**D. Borrowing Structure**

29. Prior to the Petition Date, the Debtor entered into various loan agreements and executed various loan documents memorializing the terms of such borrowings with certain lenders, including Colonial, Henley Holdings, LLC, Natixis Real Estate, Plainfield Specialty Holdings, RBC a/k/a Florida Choice Bank, and Sovereign Bank (collectively, the **"Secured Parties"**) to fund various mortgage and construction loans and to fund advances of monies in accordance with various servicing agreements.

30. The Debtor's credit structure consists of the following primary debt facilities:

    a. **Repurchase Facility** Pursuant to that certain Amended and Restated Master Purchase Agreement, dated as of June 30, 2009 (the "**Repurchase**

**Agreement**"), by and between TBW, as Seller, and Colonial, as Buyer, the Debtor utilizes a revolving repurchase facility with Colonial to finance the origination of residential mortgage loans. A summary of the transactions underlying this facility, as it existed prior to the events described above, is as follows: TBW would deliver the underlying loan documents to Colonial which would then fund to TBW the monies necessary for the closing of the particular loan. The underlying loan documents were then generally sold to a third party within thirty to sixty days. TBW utilized the proceeds from the sale to pay down the facility line. Any loans that were not sold were to be repurchased by TBW on or before one year after the delivery date to Colonial. Because of this repurchase obligation, transfers of loans under the Repurchase Agreement were not "true sales" at law.

Prior to purchase by a third party or repurchase by TBW, loans transferred to Colonial under the Repurchase Agreement could go into default and be foreclosed or conveyed to TBW by deed-in-lieu. In that event, this real estate now owned by TBW was pledged by TBW to collateralize TBW's obligations to Colonial by virtue of what is referred to as an REO line of credit. This line of credit is evidenced by an Amended and Restated Mortgage Loan Warehouse Loan and Security Agreement (REO Line of Credit), dated as of June 30, 2009, by and between TBW, as Borrower, and Colonial, as Lender (the "**REO Line of Credit**"). The REO Line of Credit and the Repurchase Agreement, collectively, comprise what is referred to as the "**Overline Facility.**" The REO Line of Credit is a committed credit line by which Colonial would advance to TBW 70% of a broker's price opinion of eligible real estate owned by TBW ("**Eligible REO Property**").

Eligible REO Property is real property (i) that originally secured a mortgage loan included in a transaction under the Repurchase Agreement, (ii) that is owned solely in TBW's name and free of other liens, (iii) as to which Colonial shall have obtained a first-priority mortgage on the real property, and (iv) that is aged not longer than 364 days from the earlier of (a) the date Colonial made an advance under the Repurchase Agreement for the related mortgage loan or (b) the date Colonial made an advance under this line of credit.

The commitment under the Overline Facility (for both purchases of loans under the Repurchase Agreement and advances secured by REO under the REO Line of Credit) is $19.8 million. On information and belief, as of the Petition Date, Colonial asserts that it is owed approximately $16 million under the Overline Facility with the Debtor.

      b.     **Participation Facilities** The Debtor is party to several loan participation and sale agreements, including the following: (1) that certain Mortgage Loan Participation Sale Agreement (AOT Program—Agency Securities), dated as of April 1, 2007, by and between Colonial and TBW; (2) that certain Mortgage Loan Participation Sale Agreement (AOT Program—Whole Loan Trades and Private Issuer Securities), dated as of April 1, 2007, by and between Colonial and TBW; (3) that certain Amended and Restated Loan Participation Sale Agreement (COLB Wet and Dry Mortgage Loans Program), dated December 10, 2008, by and between TBW, Colonial, and Seaside National Bank; (4) that certain Loan Participation Sale Agreement (COLB Wet & Dry Mortgage Loans program, dated December 18, 2007, by and between TBW

and Colonial; (5) that certain Mortgage Loan Participation Sale Agreement (AOT Program—Agency Securities), dated July 30, 2009, by and between Colonial, Cole Taylor Bank, and TBW; (6) that certain Mortgage Loan Participation Sale Agreement (AOT Program—Agency Securities), dated June 30, 2009, by and between Colonial Bank, USAmeriBank, and TBW; (7) that certain Mortgage Loan Participation Purchase and Sale Agreement, dated March 31, 2009, by and between TBW and Bank of America, N.A.; and (8) that certain Second Amended and Restated Loan Purchase and Servicing Agreement, dated June 30, 2008, by and between TBW and Ocala Funding, LLC.

The transactions embodied in the foregoing agreements purport to be true sales and can best be described generally as follows: TBW would sell to a mortgage purchaser normally a 99% or 100% undivided interest in certain mortgage loans and all payments and recoveries of principal and interest due on the mortgage loans after the purchase date. Contemporaneously therewith, TBW would deliver a takeout commitment to the purchaser. The takeout commitment is a forward commitment made by an investor to TBW to purchase a pool of mortgage loans or a mortgage-backed pass-through security on a specific date. After the mortgage was funded, TBW would become the servicer of the mortgage loans at issue and retained the right to enforce directly against the mortgagor the remedies allowed under applicable law.

c. **Servicing Facilities** The Debtor's revolving working capital facilities were used primarily to finance the Debtor's mortgage servicing obligations. Such facilities are collateralized by the eligible accounts receivable arising from the servicing agreements, including reimbursements owed to the Debtor for advances made by the Debtor under the servicing agreements, as well as servicing fees owed to the Debtor. As of the Petition Date, the Debtor had servicing facilities with Sovereign Bank, Natixis, and Plainfield Specialty Holdings II, Inc. On information and belief, as of the Petition Date, Sovereign Bank asserts that it is owed approximately $152 million. Additionally, as of the Petition Date, NATIXIS asserts that it owed approximately $46 million. Moreover, as of the Petition Date, Plainfield Specialty Holdings II, Inc. asserts it is owed approximately $20.5 million.

d. **Credit Facilities**

i. *Construction Facility.* The Debtor utilized a construction facility with RBC Bank to finance the origination of single-family residential construction-to-permanent mortgage loans. On information and belief, as of the Petition Date, RBC Bank asserts that it is owed approximately $619,000 under its construction line with the Debtor. The collateral for this facility are the underlying construction loans and mortgages.

ii. *Credit Line.* Moreover, on information and belief, the Debtor had a line of credit facility with Henley Holdings, LLC. As of the Petition Date, Henley Holdings, LLC asserts that it is owed approximately $77,500,000. The collateral for this facility are certain mortgages and notes. However, it does not appear that Henley

Holdings, LLC has a perfected security interest and therefore is not entitled to adequate protection.

**Relief Requested and Grounds for Relief**

31. As of the Petition Date, the Debtor had funds on deposit in various bank accounts as well as various accounts/notes receivable which may constitute cash collateral ("**Cash Collateral**"), as defined in Section 363(a) of the Bankruptcy Code. By this Motion, the Debtor requests the entry of an order authorizing the Debtor's use of Cash Collateral in accordance with the budget attached hereto as Exhibit A ( the "**Budget**") and for purposes which include the following:

    (a)    care, maintenance and preservation of the Debtor's assets;

    (b)    payment of necessary business expenses including, without limitation, payroll, utilities, rent, etc.

    (c)    other payments necessary to sustain limited continued business operations; and

    (d)    costs of administration in this Chapter 11 case.

32. The Debtor's business operations are primarily limited to conserving as much as possible the value of its servicing rights—which compose the vast majority of the Secured Parties' collateral. The Debtor continues to service loans under servicing agreements that have not been properly terminated or transferred. With respect to the servicing agreements that were properly terminated, the Debtor is cooperating with the investors to effectuate a smooth transfer of the servicing rights and to obtain payment of substantial amounts owed to the Debtor under the servicing agreements. The Debtor requests authority to use Cash Collateral immediately to pay operating expenses

necessary to continue the limited operation of the Debtor's business and to maintain its estate, to maximize the return on its assets, and to otherwise avoid irreparable harm and injury to its business and its estate. The Debtor reserves its rights to contest the validity and priority of the Secured Parties' liens.

33. There is insufficient time for a full hearing pursuant to Bankruptcy Rule 4001(b)(2) to be held before the Debtor must use the Cash Collateral. If this Motion is not considered on an expedited basis and if the Debtor is denied the ability to immediately use the Cash Collateral, there will be a direct and immediate material and adverse impact on the continuing operations of the Debtor's business and on the value of its assets. In order to achieve a successful reorganization, the Debtor must use the Cash Collateral in the ordinary course of business. The inability of the Debtor to meet its ordinary business expenses will require the Debtor to completely discontinue its operations, which will result in irreparable injury to the Debtor and creditors. Any such discontinuation would also materially and adversely impact upon the value of the collateral. Indeed, it is in the best interest of the Secured Parties that the Debtor use Cash Collateral, as such usage will preserve the value of the collateral.

34. In exchange for the Debtor's ability to use Cash Collateral in the operation of its business, as adequate protection, the Debtor proposes to grant to the Secured Parties replacement liens to the same extent, validity, and priority as existed prior to the Petition Date. In other words, the Debtor proposes that the Secured Parties' "floating" liens on such collateral continue to "float" to the same extent, validity, and priority as existed prior to the Petition Date, notwithstanding Section 552 of the Bankruptcy Code.

35. The Debtor submits that, upon information and belief, any interest the Secured Parties have in Cash Collateral will be adequately protected by the proposed replacement liens. Moreover, the creditors asserting liens on servicing rights arising from the servicing facilities described above are adequately protected by an equity cushion because the value of the servicing rights and claims owned by TBW exceeds the debt at issue. Further, on information and belief, Colonial's interest in cash collateral arising from the repurchase facility described above is adequately protected by an equity cushion. Additionally, RBC Bank's interest in cash collateral arising from the construction facility is adequately protected as the result of an equity cushion. Henley Holdings, LLC is not entitled to adequate protection because it does not have a perfected security interest. Accordingly, no further adequate protection is required for the Secured Parties. The Debtor further submits that all conditions precedent to the use of the Cash Collateral have been performed or have occurred.

36. If allowed to use Cash Collateral, the Debtor believes that it can maintain the value of the collateral at issue. Otherwise, the value of the Debtor's assets will depreciate markedly. As a result, the Debtor's proposed use of Cash Collateral will in and of itself provide adequate protection of the interests of Secured Parties.

WHEREFORE, the Debtor respectfully requests that this Court:

A. enter an order:

  i. granting this Motion;

  ii. authorizing the Debtors' interim use of Cash Collateral in substantial conformity with the Budget; and

iii. granting adequate protection in the form of replacement liens to the Secured Parties; and

iv. providing such other and further relief as is just and proper; and

B. schedule a final hearing on the Motion.

Dated this 24th day of August, 2009.

/s/Edward J. Peterson, III
Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
Amy Denton Harris (FBN 0634506)
aharris@srbp.com
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Attorneys for Debtor

# EXHIBIT A

**Taylor, Bean & Whitaker Mortgage Corporation ("TBW", or "the Company")**
Cash Budget
$ in 000s (unless otherwise noted)

| | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Total 5 Wk. Period Ending |
|---|---|---|---|---|---|---|
| Period Number: Week Ending: | 28-Aug-09 | 4-Sep-09 | 11-Sep-09 | 18-Sep-09 | 25-Sep-09 | 25-Sep-09 |
| **RECEIPTS** | | | | | | |
| *Servicing Related:* | | | | | | |
| Recovery of Servicing Fees | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery of T&I and Corporate Advances | - | - | 2,600 | - | - | 2,600 |
| Recovery of P&I Advances | - | - | - | - | - | - |
| Reimbursement of Servicing Exp. | 500 | 200 | 200 | 200 | 200 | 1,300 |
| Other Servicing Recoveries | - | - | - | - | - | - |
| **Subtotal Servicing Receipts** | $ 500 | $ 200 | $ 2,800 | $ 200 | $ 200 | $ 3,900 |
| | | | | | | |
| *Non-Servicing Related:* | | | | | | |
| Loans Held for Sale | $ - | $ - | $ - | $ - | $ - | $ - |
| REO | - | - | - | - | - | - |
| Cash Margin Accounts | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| **Subtotal Non-Servicing Related** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| *Fixed Assets:* | | | | | | |
| Real Estate | $ - | $ - | $ - | $ - | $ - | $ - |
| Computer Equipment | - | - | - | - | - | - |
| Equipment | - | - | - | - | - | - |
| Furniture & Fixtures | - | - | - | - | - | - |
| Vehicles | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| **Subtotal Fixed Assets** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| Other | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Receipts** | $ 500 | $ 200 | $ 2,800 | $ 200 | $ 200 | $ 3,900 |
| | | | | | | |
| **DISBURSEMENTS** | | | | | | |
| *Operating Expenses:* | | | | | | |
| *Payroll & Related Expenses* | | | | | | |
| Corporate Payroll & Payroll Taxes [1] | $ 335 | $ 870 | $ 335 | $ 620 | $ 335 | $ 2,497 |
| Servicing Payroll & Payroll Taxes | - | - | - | - | - | - |
| Director Fees | - | 40 | - | - | - | 40 |
| Other payroll related expenses | - | - | - | - | - | - |
| **Subtotal Payroll & Related Expenses** | $ 335 | $ 910 | $ 335 | $ 620 | $ 335 | $ 2,537 |
| Facilities | $ - | $ 298 | $ - | $ - | $ - | $ 298 |
| Utilities & Telecommunications | - | 50 | - | 92 | 15 | 157 |
| Equipment Leases | - | 14 | - | - | - | 14 |
| Postage & Shipping | 7 | 7 | 7 | 7 | 7 | 37 |
| Insurance | - | 1,000 | - | - | - | 1,000 |
| Other | 15 | 15 | 15 | 15 | 15 | 75 |
| **Total Operating Expenses** | $ 358 | $ 2,295 | $ 357 | $ 735 | $ 372 | $ 4,117 |
| | | | | | | |
| **Bankruptcy Related Fees/Expenses [2]** | | | | | | |
| Troutman Sanders - Legal Professionals | $ - | $ - | $ - | $ 900 | $ - | $ 900 |
| Strichter Reidel - Legal Professionals | - | - | - | 315 | - | 315 |
| US Trustee | - | - | - | 50 | - | 50 |
| Claims Agent | - | - | - | 50 | - | 50 |
| Other | - | - | - | 50 | - | 50 |
| **Subtotal Bankruptcy Fees/Expenses** | $ - | $ - | $ - | $ 1,365 | $ - | $ 1,365 |
| | | | | | | |
| **First Day Motions & Other** | | | | | | |
| Utilities | $ 50 | $ - | $ - | $ - | $ - | $ 50 |
| Pre-petition wages, Retained Employee | - | - | - | - | - | - |
| Pre-petition critical vendors | 75 | - | - | - | - | 75 |
| Pre-petition D&O Insurance Tail | 280 | - | - | - | - | 280 |
| Pre-petition Taxes (S&U/Property/Regul | - | - | - | - | - | - |
| Other | 150 | - | - | - | - | 150 |
| **Subtotal First Day Motions** | $ 555 | $ - | $ - | $ - | $ - | $ 555 |
| | | | | | | |
| **Total Disbursements** | $ 913 | $ 2,295 | $ 357 | $ 2,100 | $ 372 | $ 6,037 |
| | | | | | | |
| **Total Net Cash Flow** | $ (413) | $ (2,095) | $ 2,443 | $ (1,900) | $ (172) | $ (2,137) |
| | | | | | | |
| **Cash Balance** | | | | | | |
| Beginning Cash Balance [3] | $ 4,243 | $ 3,830 | $ 1,735 | $ 4,177 | $ 2,278 | $ 4,243 |
| **Ending Cash Balance** | $ 3,830 | $ 1,735 | $ 4,177 | $ 2,278 | $ 2,105 | $ 2,105 |

**Notes:**
1. Corporate payroll includes NCA CRO and support personnel.
2. Assumes a 10% holdback on attorneys' fees and no holdback on expenses.
3. Beginning cash balance represents identifiable operating cash per management and does not include any amounts associated with borrower payments received and funded into Debtor's accounts since the freezing of the Debtor's accounts at Colonial Bank.
   The Debtor reserves the right to offset against said amounts not included in Beginning and Ending Cash Balances to recover servicing advances to which the Debtor is entitled.