UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                    Chapter 11

TAYLOR, BEAN & WHITAKER                   Case No. 3:09-bk-07047-JAF
MORTGAGE CORP.,

        Debtor.                           *Emergency Relief Requested*
_____/

## DEBTOR'S EMERGENCY APPLICATION FOR APPROVAL OF AGREEMENT WITH NAVIGANT CAPITAL ADVISORS, LLC TO PROVIDE THE SERVICES OF NEIL F. LURIA AS CHIEF RESTRUCTURING OFFICER AND OTHER SUPPORT PERSONNEL

        TAYLOR, BEAN & WHITAKER MORTGAGE CORP. (the "**Debtor**" or

"**TBW**"), by and through its undersigned counsel, hereby files its Emergency Application

for Approval of Agreement with Navigant Capital Advisors, LLC to provide the Services

of Neil F. Luria as Chief Restructuring Officer and Other Support Personnel (the

"**Application**") and requests that this Court authorize the Debtor's appointment of Neil

Luria of Navigant Capital Advisors, LLC as Chief Restructuring Officer of the Debtor in

the above-captioned case and approve the aforementioned agreement with Navigant

Capital Advisors, LLC. In support of its Application, the Debtor respectfully represents

the following:

## Jurisdiction and Venue

1.     This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§157 and 1334. The subject matter of this Application is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

2.     The statutory predicates for the relief requested herein are 11 U.S.C. §§105 and 363.

## Background

### A.     Chapter 11 Filing

3.     On August 24, 2009, (the "**Petition Date**"), TBW filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.     TBW continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No trustee or examiner has been appointed in this case and no official committee has yet been appointed pursuant to Section 1102 of the Bankruptcy Code.

### B.     Company Background

6.     Until very recently, TBW was the largest independent (i.e. non-depository owned) mortgage lender in the United States. Headquartered in Ocala, Florida, TBW employed approximately 2,400 people across the country. The largest offices were in Ocala, Florida; Atlanta, Georgia; and Tampa, Florida. TBW's principal business was comprised of:

- Origination, underwriting, processing and funding of conforming conventional and Government-insured residential mortgage loans;

2

- Sale of mortgage loans into the "secondary market" to government-sponsored enterprises such as the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") or the Government National Mortgage Association ("**Ginnie Mae**"); and

- Mortgage payment processing and loan servicing.

7. For a detailed description of the Debtor's business operations and the reasons for this bankruptcy filing, please see the description contained in the Debtor's Emergency Motion For Entry of Interim and Final Orders Authorizing Use Of Cash Collateral and Granting Replacement Liens Pursuant to 11 U.S.C. §§ 105(a), 361, 363, 541 and 552 and Bankruptcy Rule 4001 (Docket No. 5).

## **Relief Requested and Grounds for Relief**

8. Immediately prior to the filing of the bankruptcy petition, an independent board of directors of the Debtor authorized the appointment of Neil F. Luria of Navigant Capital Advisors, LLC ("**Navigant**") as Chief Restructuring Officer ("**CRO**") and the entry into the agreement with Navigant to provide the services of Mr. Luria and other support personnel.

9. By this Application, the Debtor requests approval, pursuant to Section 363 of the Bankruptcy Code, of its appointment of Neil F. Luria of Navigant as CRO pursuant to the terms of that certain engagement letter (the "**Agreement**") dated as of August 24, 2009. A copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

10. Navigant is a leading advisory services firm with extensive experience in Chapter 11 cases and assisting clients in negotiations with lenders, debt holders,

3

creditors, Chapter 11 committees, and other constituencies. Attached hereto as **Exhibit B** and incorporated herein by reference is the curriculum vitae ("CV") for Neil Luria, Managing Director of Navigant's Restructuring Group. As is evident from Mr. Luria's CV, Mr. Luria has extensive expertise in the financial services sector and has served as an interim manager (i.e. Chief Restructuring Officer, President, and Liquidating Trustee) for a number of Chapter 11 debtors. Accordingly, the Debtor submits that Mr. Luria is well qualified to serve as Chief Restructuring Officer for the Debtor in this case.

11. The services to be rendered by Navigant include, but are not limited to, the following:

a. Overall turnaround or liquidation plan development and implementation;

b. Management of the "working group" of professionals who are assisting the Debtor in the reorganization process or who are representing the Debtor's various stakeholders to enhance coordination of their efforts and individual work product consistent with the Debtor's overall restructuring goals;

c. Liquidity, cash flow, and working capital management;

d. Oversight of financial reporting and reconciliation support analysis as may be required by the Debtor in reporting to the Court or other constituencies;

e. Structuring, restructuring, and negotiation of secured and unsecured debt facilities, securitized financings, and other credit agreements;

f. Analysis and implementation of cost reductions and operating efficiencies;

g. Assistance with raising new capital, including debtor-in-possession financing or exit financing;

h. Financial review and valuation analysis for collateral, cancellation of indebtedness income, and general corporate purposes;

4

i.  Calculation of lease and executory contract rejection analyses;

j.  Preparation for and coordination of any disposition of assets under Section 363 of the Bankruptcy Code;

k.  Assistance with the creation, analysis, negotiation and confirmation of a plan of reorganization;

l.  Expert testimony; and

m.  Such other matters as may be requested consistent with Navigant's expertise and as mutually agreed upon by the Debtor and Navigant.

12.     It is necessary for the Debtor to appoint a CRO to perform the above-mentioned services.

13.     The Debtor has agreed to pay Navigant in accordance with the following compensation scheme: For the services provided by the CRO, including the services of Neil Luria as the Chief Restructuring Officer with the aforementioned duties, and Edward R. Casas, responsible for oversight of strategy, recoveries and asset dispositions for the Debtor, the Debtor will pay to Navigant a monthly fee of $250,000.00, plus a Deferred Restructuring Fee calculated on a small percentage of recoveries (i.e. 1% to 0.25% (or 25 basis points), of recovered amounts depending on the nature of the asset and total amounts recovered) realized on behalf of the estate pursuant to the terms of the Agreement.

14.     In addition to the monthly fee, the Debtor will pay Navigant for services provided by other Navigant personnel at their standard hourly rates that range from $95 per hour to $875 per hour. The standard hourly rates for the other Navigant personnel who will initially support the Debtor on this case are as follows:

| Name | Responsibilities | Hourly Rate |
|---|---|---|
| Paul Noring | Reporting and Reconciliation | $675 |
| Joe Blalock | Servicing and Capital Markets | $575 |
| George Koutsonicolis | Finance and Disposition | $575 |
| Mathew Rubin | Treasury and Cash Management | $525 |
| Francesco DiGiannatonio | Restructuring and Dispositions | $575 |
| Joseph Oriti | Reporting & Project Management | $350 |
| Other Personnel as Required | To be determined based on needs of the Debtor | $95 up to $875 |

Navigant also reserves the right to supplement or replace the individuals listed above as appropriate.

15.     The Agreement also contains certain customary indemnity provisions. The Debtor requests approval of such provisions and authorization to compensate Navigant for services rendered, without further order of the Court, upon the submission by Navigant to the Debtor of invoices summarizing in reasonable detail the services for which compensation is sought.

16.     The Debtor understands that the hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions.

17.     The Debtor has also agreed to reimburse Navigant for the actual and necessary expenses Navigant incurs in connection with this engagement.

18.     Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue an order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides in part that a debtor-in-possession "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b). Under applicable case law, in this and other circuits, if a

debtor's proposed use of its assets pursuant to Section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Gulf States, Steel, Inc.* 285 B.R. 497 (Bankr. N.D. Ala. 2002); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1983); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns Manville Corp.)*; 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to debtor's conduct").

19.    The retention of interim corporate officers and other temporary employees is proper under Section 363 of the Bankruptcy Code. Numerous courts have authorized the retention of officers utilizing this provision of the Bankruptcy Code. For example, the United States Bankruptcy Court for the District of Delaware, the United States Bankruptcy Court for the Northern District of Illinois, as well as courts within this state have approved the retention of temporary employees to provide restructuring services and interim management services under Section 363 of the Bankruptcy Code. *See In re AT&T Latin America Corp., et al.*, Case No. 03-bk-13538-RAM (Bankr. S.D. Fla. June 11, 2003); *In re Exide Technologies, Inc., et al.*, Case No. 02-bk-11125-JCA (Bankr.

D.Del. May 10, 2002); *In re Kmart Corporation, et al.*, Case No. 02-bk-B02474-SPS (Bankr. N.D. Ill. May 22, 2002); *In re Piccadilly Cafeterias*, Case No. 03-bk-27976--RBR (Bankr. S.D. Fla. October 31, 2003); and *In re WorldCom Group, et al.*, Case No. 02-bk-13533-AJG (Bankr. S.D.N.Y. September 17, 2002).

20.      In the exercise of its business judgment, the Debtor has determined that the appointment of Neil Luria of Navigant is in the best interests of the Debtor, its estate, and its creditors. Furthermore, attached hereto as **Exhibit C** is an Affidavit of Neil F. Luria which represents that Navigant is disinterested and does not hold or represent any interest adverse to the Debtor or its estate with respect to the matters upon which it is to be engaged.

21.      Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that, except to the extent that relief is necessary to avoid immediate and irreparable harm, the Court shall not, within twenty (20) days after the filing of the voluntary petition, grant relief regarding an application under Bankruptcy Rule 2014. The Debtor submits that, absent appointment of Navigant as of the Petition Date, it will suffer immediate and irreparable harm because it needs advisory services of a chief restructuring officer immediately to assist in proceeding in this Court and preserving the value of its assets. Therefore, pursuant to Bankruptcy Rule 6003, interim relief is appropriate pending final approval of this Application. Consequently, the Debtor requests that the Court enter an order approving this Application subject to any party in interest filing an objection and request for hearing prior to or on the 20th day after the Petition Date and, if no such

8

objection and request for hearing is timely filed with the Court, providing that such order shall become final on the 21st day after the Petition Date.

22.    If this Court should find that interim relief is not appropriate, the Debtor respectfully requests that the Debtor's appointment of Neil F. Luria and Navigant be approved *nunc pro tunc* to the Petition Date.

WHEREFORE, the Debtor respectfully requests that this Court enter an order:

      A.    approving this Application;

      B.    approving the Debtor's appointment of Neil Luria of Navigant Capital Advisors, LLC as Chief Restructuring Officer;

      C.    approving the Agreement and authorizing the Debtor to compensate Navigant for services rendered, without further order of this Court, upon the submission by Navigant to the Debtor of invoices summarizing in reasonable detail the services for which compensation is sought;

      D.    providing that such order shall be subject to any party in interest filing an objection and request for hearing prior to or on the 20th day after the Petition Date and, if no such objection and request for hearing is timely filed with the Court, providing that such order shall become final on the 21st day after the Petition Date; and

      E.    providing such other and further relief as is just and proper.

If this Court finds that interim relief is not appropriate, the Debtor respectfully requests that this Court enter an order after the expiration of the twenty day period following the Petition Date *nunc pro tunc* to the Petition Date:

A.     approving this Application;

B.     approving the Debtor's appointment of Neil Luria of Navigant Capital Advisors, LLC as Chief Restructuring Officer;

C.     approving the Agreement and authorizing the Debtor to compensate Navigant for services rendered, without further order of this Court, upon the submission by Navigant to the Debtor of invoices summarizing in reasonable detail the services for which compensation is sought; and

D.    providing such other and further relief as is just and proper.

Dated this 24th day of August, 2009.

/s/ Edward J. Peterson, III
Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
Amy Denton Harris (FBN 0634506)
aharris@srbp.com
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Attorneys for Debtor



**Navigant Capital Advisors, LLC**
Member FINRA
5215 Old Orchard Road
Suite 850
Skokie, IL 60077
847.583.1618 phone
847.583.1719 fax

August 24, 2009

Personal and Confidential
Taylor, Bean & Whitaker Mortgage Corp.
Attn: General Counsel

Re:    Engagement of Navigant Capital Advisors, LLC ("NCA")

Gentlemen:

Effective August 13, 2009 (the "Original Effective Date"), Taylor, Bean & Whitaker Mortgage Corp. and its subsidiaries listed on the signature pages hereto (collectively, the "Company") entered into an Engagement Letter (the "Original Engagement Letter") with NCA. The parties hereby desire to amend and restate the Original Engagement Letter pursuant to this agreement (this "Engagement Letter"). This letter outlines the understanding between NCA and the Company for the engagement of NCA to perform certain services to the Company in connection with its ongoing restructuring efforts.

NCA understands that a bankruptcy filing by the Company may be imminent. Pursuant to the Original Engagement Letter, NCA was engaged to serve as the financial advisor to the Company to coordinate, oversee, and direct the internal (e.g. operations and financial management) and external resources (e.g. investment bankers, outside counsel, independent auditors, etc.) necessary to support the restructuring process. The parties desire to amend and restate the Original Engagement Letter to provide for the expansion of NCA's role upon a bankruptcy filing. Under the terms of this engagement, NCA will act under the authority of the Company's Board of Directors (or any special committee appointed by the Company's Board of Directors with authority to address such matters), in conjunction with the Company's management, to coordinate, oversee, and direct the resources necessary to support the restructuring initiative. NCA will work in consultation and coordination with the Company and the Company's counsel to ensure effective strategy formulation and decision-making.

1.    <u>Scope of Services</u>

Pursuant to this engagement ("Engagement"), NCA's role will specifically include working with the Company's Board and its officers and employees with respect to the following:

- Management of the "working group" of professionals who are assisting the Company in the re-organization process or who are representing the Company's various stakeholders to enhance coordination of their efforts and individual work product consistent with the Company's overall restructuring goals.

- Supervision of both short-term as well as long-term liquidity optimization initiatives, as well as stabilization of the Company's operations in order to maximize disposition value(s).

- Critical review of the Company's budgets and cash flow forecasts, with proactive management in conjunction with management of the Company's associated cost structure and disbursement controls.

- Communication and/or negotiation with outside constituents, including creditors and their advisors.

- Preparation for and coordination of contemplated Section 363 asset dispositions.

- Determination of viable reorganization/rehabilitation alternatives and development of any associated plan of reorganization.

- Such other matters as may be requested consistent with our expertise and as are mutually agreed upon by the parties.

The NCA team will be led by Edward R. Casas, a NCA Senior Managing Director, who will have general oversight responsibilities with respect to the engagement, and Neil F. Luria, Managing Director. Post-petition, NCA will, subject to bankruptcy court approval, provide the services of Neil F. Luria as Chief Restructuring Officer, as well as the other individuals described below. In addition, on a post-petition basis, NCA will (i) continue to provide the services described above, (ii) monitor the Company budgets, (iii) act as the "designated representative" for the Company in the Company's chapter 11 case, (iii) assist in the administration of the Company's chapter 11 case, including assistance with respect to the preparation of bankruptcy schedules, statement of financial affairs and any plan of reorganization or liquidation relating to the Company, (iv) and such additional duties set forth by the Bankruptcy Court or the Company's Board of Directors.

NCA and the Chief Restructuring Officer shall be authorized to make decisions with respect to all aspects of the management and operation of the Company's business, including without limitation organization and human resources, marketing and sales, logistics, finance and administration and such other areas as they deem necessary or appropriate in their sole discretion in a manner consistent with the business judgment rule and the provisions of local law and the United States Bankruptcy Code applicable to the obligations of persons acting on behalf of corporations, subject only to appropriate governance by the Board of Directors in accordance with the Companies" charters, Bylaws or other governing documents and applicable law. In view of the Company's precarious present circumstances, the Company acknowledges that NCA and the Chief Restructuring Officer may be required to make decisions with respect to extraordinary measures quickly and the depth of analysis of information on which such decisions will be based may be limited in some respects due to the availability of information, time constraints and other facts.

In addition to the Chief Restructuring Officer, NCA will provide the services of the following individual professionals to lead the functional areas set forth next to their names:

| | |
|---|---|
| Edward R. Casas | Strategy, Recovery and Disposition |
| Paul Noring | Reporting and Reconciliation |
| Joe Blalock | Servicing and Capital Markets |
| George Koutsonicolis | Finance and Dispositions |

| Matthew Rubin | Treasury & Cash Management |
| Francesco DiGiannatonio | Restructuring & Dispositions |
| Joseph Oriti | Reporting & Project Management |

Given the dynamic state of the Company's affairs and the need for additional forensic and other support services, NCA will supplement the foregoing from time to time, as necessary. Furthermore, NCA reserves the right to supplement or replace the individuals listed above as appropriate to provide the required support of the Debtor.

NCA's ability to perform this Engagement will depend upon the extent of cooperation that it receives from the Company, and the Company's advisors and representatives, including its legal counsel and accountants. In this regard, the Company agrees to provide NCA full cooperation and access to financial, business and other information concerning the Company which NCA reasonably deems appropriate. In addition to open access to all such information (including documents and financial records (or projections)), NCA will have full use and access to all work performed by prior investment banking advisors and management consultants, as well as any outside accounting and analyst reports and work papers, all valuation analyses, due diligence materials and other related materials which are (or could be) available to the Company (all such information and materials, documents and records being referred to as "Company Information"). The Company will also provide NCA with full access to the Company's officers, directors, employees, advisors and representatives. NCA agrees that, except as may otherwise be required by law, NCA will keep confidential and not disclose to third parties (other than representatives or independent contractors retained by NCA) all Company Information that is confidential or propriety to the Company and that NCA will use the same only in the performance of its duties under this Engagement.

The Company represents and warrants that all Company Information made available to NCA will be complete and correct and that any projections, forecasts or other Company Information provided by the Company to NCA will have been prepared in good faith and will be based upon reasonable assumptions. The Company agrees to promptly notify NCA if the Company believes that any Company Information which was previously provided to NCA has become materially misleading. The Company acknowledges and agrees that, in rendering its services hereunder, NCA will be using and relying on the Company Information (and information available from public sources and other sources deemed reliable by NCA) without independent verification thereof or independent appraisal or evaluation of the Company, or any other party. NCA does not assume responsibility for the accuracy or completeness of the Company Information or any other information regarding the Company.

NCA will periodically discuss with the Company, its advisors and directors, the business conclusions and restructuring recommendations resulting from the investigation and negotiations.

NCA will begin this Engagement immediately upon (i) receipt of this executed engagement letter and the attached Indemnity Agreement, (ii) receipt of the Retainer as referenced below, (iii) receipt of the first Monthly Fee (as defined below) payment described below, and (iii) the receipt from the Company of insurance policies described below (which policies must be satisfactory to NCA).

1.     Hourly Fees and Expenses

NCA's compensation hereunder shall consist of the following:

For the services provided by Messrs. Casas and Luria, NCA will charge a monthly fee (the "Monthly Fee") of $250,000 cash payable in immediately available funds upon execution of this Engagement Letter and on the first day of each month thereafter through the term herof commencing.

In addition, to the Monthly Fee, NCA shall be paid for the services provided by other NCA professionals at their standard hourly rates. The billing rates for professionals who may be assigned to this Engagement, including those listed above are as follows:

Base Hourly Rates:[1]

| | |
|---|---|
| Senior Managing Directors/ Senior Advisors | $675-875/hr |
| Managing Directors | $600-675/hr |
| Directors | $525-600/hr |
| Associate Directors | $425-525/hr |
| Managing Consultants | $350-425/hr |
| Consultants/Associates | $245-350/hr |
| Paraprofessionals | $95-125/hr |

The standard rates for such other NCA professionals is set forth on Annex A hereto. The Monthly Fees will be paid as described above. In addition, the Company agrees to pay NCA's reasonably incurred hourly fees (the "Fees") in connection with this Engagement based upon the rates set forth above; however, the Company expressly agrees that the hourly rates set forth in this engagement letter are subject to periodic adjustment upon notice to the Company to reflect economic and other conditions. The Company paid to NCA upon execution of the Original Engagement Letter a retainer (the "Retainer") in the amount of $500,000, and, subject to the following paragraph, NCA will charge against such Retainer its reasonably incurred and unpaid Fees and expenses on a monthly basis. NCA will provide the Company with reasonably detailed bi-weekly bills and such bills will be due upon receipt and payable, as set forth below, within three (3) days of receipt (after which point they will be charged against the Retainer and if the Retainer is not sufficient to cover such bills, the Company will promptly wire the deficiency plus the amount necessary to replenish the Retainer in accordance with the following paragraph). If the Company fails to comply with its obligations under this paragraph, then NCA shall have the right to cease work until the Company does so comply without incurring any liability whatsoever.

The Company further agrees that the amount of the Retainer held by NCA will at all times be not less than $500,000, and that the Company will, from time to time, remit to NCA such additional amounts as may be necessary to maintain the total amount of the Retainer currently held by NCA at or above $500,000. In the event the Company determines to file for Chapter 11 bankruptcy protection, the amount of the Retainer will be replenished to at least $500,000 immediately prior to such filing if requested by NCA.

NCA's expenses as incurred will be billed separately. Generally these expenses include any travel-related expenses, document production, fax transmissions, teleconferencing charges, outside legal expenses incurred by NCA associated with this Engagement (including, fee application expenses, discovery costs and defense costs) and other expenses of this type which are associated with this Engagement. All professional fees and expenses will be paid and reimbursed via wire transfer (per instructions set forth on Exhibit A attached hereto) within three (3) days of receipt of the applicable NCA invoices by the

---

[1] NCA may utilize independent contractors under the direct supervision of NCA; the hourly rate for such personnel will be billed based upon the qualifications of the professional.

Company (after which point they will be charged against the Retainer and if the Retainer is not sufficient to cover such bills, the Company will promptly wire the deficiency in accordance with the provisions hereof).

In addition to the Monthly Fee and the Fees described above, NCA will receive a deferred restructuring Fee equal to the Applicable Percentage (as defined below) of the Aggregate Value (as defined below) of asset and other recoveries received by the Company (the "Deferred Restructuring Fee Payments") from divestiture transactions, including the realization of proceeds from the divestiture of assets (by sale merger or otherwise) involving the Company or any of its subsidiaries or affiliates. For purposes of this agreement, Aggregate Value shall mean gross sale proceeds to which the Company is entitled from the sale of assets plus any litigation related settlements or payments received or other similar recoveries (including, without limitation, recoveries on servicing advances, due from balances and investments in subsidiaries); provided, however, notwithstanding anything contained herein to the contrary, the Applicable Percentage for any Aggregate Value from the sale or disposition of "REO" shall be 0.25%. The Deferred Restructuring Fee Payments will be made in immediately available funds at the closing of each respective transaction, recovery or payment (and related definitive agreements governing such transactions, recoveries, or payments shall disclose and acknowledge the Company's liability to NCA for such Deferred Restructuring Fee Payments). It is expressly agreed that the cumulative amount of the Deferred Restructuring Fee Payments shall not be less than $500,000 in the aggregate; any deficiency in the total amount of Deferred Restructuring Fee Payments paid to NCA shall be paid upon the earlier of the Conclusion (as defined below) of the case or upon the termination of NCA's services hereunder. For purposes of this Agreement, the term "Conclusion" shall mean the earlier of (i) the date on which the sale of substantially all of the assets of the Company has been consummated or (ii) an order has been entered approving a plan of reorganization or liquidation of the Company. The Applicable Percentage will change based upon sliding scale of Aggregate Value as outlined below.

| Aggregate Value | % of Incremental Amount | Maximum Deferred Re-structuring Fee Payments[2] |
|---|---|---|
| ≤ $50 MM | 1.0% | $500,000 |
| > $50 MM ≤ $100 MM | 0.75% | $875,000 |
| >$100 MM ≤ $200 MM | 0.50% | $1,375,000 |
| > $200 MM | 0.25% | ∞ |

2.    Miscellaneous

NCA will act under this engagement letter as an independent contractor with duties solely to the Company with liability limited to the fees paid to NCA hereunder. Because we will be acting on your behalf in this capacity, it is our practice to receive indemnification. A copy of our standard indemnity form is attached hereto as Exhibit B ("Indemnity Agreement") and must be executed concurrently with this engagement letter. The terms of the Indemnity Agreement are incorporated by reference into this engagement letter. This Engagement is intended to amend and restate the Original Engagement Letter, provided, however, that NCA will continue to be provided the protections contained in the Indemnity Agreement signed in conjunction with the Original Engagement Letter in connection with all services provided under the Original Engagement Letter (such continuing indemnity shall be retroactive to the Original Effective Date).

---

[2] The Maximum Deferred Restructuring Fee Payments column is for illustrative purposes (for instance, if Aggregate Value equals $100 MM, the amount of the Deferred Restructuring Fee Payments would equal $875,000 which represents the sum of (i) 1% * $50 MM, and (ii) 0.75% * $50 MM).

Any advice or opinions provided by NCA may not be disclosed or referred to publicly or to any third party except in accordance with NCA's prior written consent. It is further understood that any advice rendered by NCA pursuant to this Engagement, including any advice rendered during the course of participating in negotiations and meetings with management or the Board of Directors of the Company, as well as any written materials provided by NCA, are intended solely for the benefit and confidential use of the Company and the Board of Directors and will not be reproduced, summarized, described or referred to or given to any other person for any purpose without NCA's prior written consent.

The Company acknowledges and agrees that (i) NCA is not being retained to advise the Company on, or to express any opinion as to, the wisdom, desirability or prudence of consummating a recapitalization, restructuring, reorganization or other transaction, (ii) NCA is not and will not be construed as a fiduciary of the Company or any affiliate thereof and will have no duties or liabilities to the equityholders or creditors of the Company, any affiliate of the Company or any other person by virtue of this Engagement and the retention of NCA hereunder, all of which duties and liabilities are hereby expressly waived, and (iii) any advice rendered by NCA does not constitute a recommendation to any equityholder that such equityholder might or should take in connection with a possible recapitalization, restructuring, reorganization or other transaction. Neither equityholders nor creditors of the Company are intended beneficiaries hereunder. The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

NCA and its officers, employees, representatives and agents will be entitled to the benefit of the most favorable indemnities provided by the Company to its officers and directors, whether under the Company's by-laws, certificates of incorporation, by contract or otherwise. The Company agrees that it will use its best efforts to specifically include and cover NCA and its employees or agents providing services to the Company under the Company's liability policy for directors' and officers' insurance. In the event that the Company (i) is unable to include NCA and such individuals under the Company's policy, or (ii) does not maintain first dollar liability coverage, in effect for at least $10 million, it is agreed that NCA may in its discretion attempt to purchase a separate directors' and officers' policy or other such insurance policy that will cover NCA employees and representatives providing services to the Company only and that the cost of same shall be invoiced to the Company and reimbursed by the Company as an out-of-pocket cash expense. If NCA is unable to purchase such insurance, then NCA reserves the right to terminate this agreement.

The terms of this engagement letter shall be construed, interpreted and applied in accordance with the laws of the State of Illinois applicable to contracts entered into and wholly to be performed in Illinois by Illinois residents. The Company irrevocably submits to the jurisdiction of any court of the State of Illinois or the United States District Court of the Northern District of the State of Illinois for the purpose of any suit, action or other proceeding arising out of this engagement letter which is brought by or against the Company. Each of the Company (and, to the extent permitted by law, on behalf of the Company's equity holders and creditors) and NCA hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim based upon, arising out of or in connection with this engagement letter.

Because NCA and its affiliates serve clients on a national basis in numerous cases, both in and out of court, it is possible that NCA or its affiliates may have rendered services to, or have business associations with, other entities which had, or have, relationships with the Company, including creditors of the Company. Nonetheless, NCA and affiliates have not, and will not perform services for, or have business connections with, any of these aforementioned entities in this matter involving the Company. Notwith-

standing the foregoing, NCA wishes to disclose that its affiliate, Navigant Consulting, Inc., has been providing services to the Company through its counsel, Troutman Sanders.

The Company agrees that it will not enter into an agreement with respect to a possible transaction involving a recapitalization, restructuring, reorganization or other transaction, including a transaction involving a sale of all or substantially all of the Company's assets or operations, unless such agreement expressly provides for the unconditional assumption of the Company's obligations to NCA under this engagement letter and the Indemnity Agreement. This engagement letter, and any modification or amendment thereto, may be executed in counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. NCA reserves the right to attend the closing of any transaction involving the sale of all or a part of the Company's assets or any other recapitalization, restructuring, reorganization, merger or other transaction and issue a tombstone announcement with respect to such transaction and NCA's involvement with the Company.

Either the Company or NCA may terminate this engagement letter upon 3 days written notice, provided however that (i) all fees and expenses reimbursement due through the effective date of termination will be paid within 3 days of the effective date of termination and the Retainer will be deemed earned, (ii) no termination of this engagement letter will affect NCA's right to payment of fees or expense reimbursement pursuant to Section 1 or the indemnification contemplated by the Indemnity Agreement, and (iii) NCA will be entitled to any Deferred Restructuring Fee Payments it would have otherwise been entitled to related to any divestiture or other event that would have triggered the payment of a Deferred Restructuring Fee Payment occurring within 12 months of termination. Notwithstanding the foregoing, NCA may terminate this Engagement Letter at anytime in the event that Navigant determines, in its sole discretion, that the Company does not have enough unencumbered cash in order to fund any accrued but unpaid payroll, payroll taxes or other trust fund taxes of the Company.

All notices required or permitted to be delivered under this engagement letter shall be sent, if to us, to the address of NCA's Skokie, Illinois office as set forth at the head of this letter, to the attention of Mr. Edward R. Casas, and if to you, to the address for you set forth above, to the attention of your Chief Executive Officer, or to such other name or address as may be given in writing to the other party. All notices under this engagement letter shall be sufficient if delivered by facsimile or overnight mail. Any notice shall be deemed to be given only upon actual receipt.

This engagement letter may only be modified, amended or waived by a writing signed by the parties hereto.

All obligations of the Company herein are intended to be joint and several amongst the Company and subsidiaries listed on the signature pages hereto.

In the event the Company determines it is necessary to file for protection under Chapter 11 of the U.S. Bankruptcy Code, the Company agrees that it will promptly apply to the Bankruptcy Court to obtain approval of our retention and Retainer nunc pro tunc to the date of the filing. The Company agrees that in connection with the bankruptcy process, it will reimburse NCA for its reasonable attorney's fees and expenses related to such retention matters, including the filing and preparation of any fee applications and any preparation or attendance at hearings related thereto. Notwithstanding anything to the contrary contained herein, after the Company files for bankruptcy protection, the fees and expenses of NCA set forth herein shall be reimbursed and paid in accordance with the Bankruptcy Code and any fee procedures established by order of the Bankruptcy Court.

If the terms of our engagement as set forth in this letter are satisfactory, kindly sign the enclosed copy of this letter along with the attached Indemnity Agreement and return executed copies to me by fax with originals by overnight mail accompanied with a wire transfer in the amount of the Retainer.

We look forward to working with you.

Very truly yours,

NAVIGANT CAPITAL ADVISORS, LLC

By:_____
　　　Edward R. Casas
　　　Senior Managing Director

Accepted, acknowledged and agreed to:

TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
CDF TAX AND FLOOD SERVICES, LLC
COMPLETE MORTGAGE SOLUTIONS, LLC
HOME AMERICA MORTGAGE, INC.
HMC-HOME MORTGAGES CO.
MASLOW INSURANCE AGENCY, LLC
OCALA FUNDING, LLC
REO SPECIALISTS, LLC
SECOND STREET INSURANCE CORPORATION

By:_____

Title: DIRECTOR

Date:_____



## Annex A

| Name | Functional Area | Rate/Hr. |
|------|-----------------|----------|
| Paul Noring | Reporting and Reconciliations | $675 |
| Joe Blalock | Servicing and Capital Markets | $575 |
| George Koutsonicolis | Finance and Dispositions | $575 |
| Matthew Rubin | Treasury & Cash Management | $525 |
| Fancesco DiGiannatonio | Restructuring & Dispositions | $575 |
| Joseph Oriti | Reporting & Project Management | $350 |

Fees associated with Messrs. Luria and Casas will be included in the fixed Monthly Fee in lieu of hourly rates. In addition, NCA reserves the right to add, replace, eliminate, or supplement staff, as determined necessary by the CRO, at standard rates.



**Exhibit A**

## Wiring Instructions

Please direct wire to:

Navigant Capital Advisors, LLC
LaSalle Bank
135 S. LaSalle St
Chicago, IL 60674
ABA # 071000505
Account # 5800151127



August 24, 2009

Navigant Capital Advisors, LLC
5215 Old Orchard Road
Suite 850
Skokie, IL 60077

Ladies and Gentlemen:

This letter will confirm that in connection with the engagement (the "Engagement") of Navigant Capital Advisors, LLC ("NCA") by Taylor, Bean & Whitaker Mortgage Corp. and certain of its subsidiaries and affiliates ( together the "Company") as reflected in the engagement letter dated the date hereof (all capitalized terms used but not otherwise defined herein having meanings described in such engagement letter) the Company agrees to indemnify and hold harmless NCA and its affiliates and their respective members, officers, directors, employees and agents and each other person, if any, controlling NCA or any of its affiliates (each referred to herein as an "Indemnified Person") to the fullest extent permitted by law from and against any losses, claims, damages, obligations, penalties, judgments, awards, costs, disbursements or liabilities, including amounts paid in settlement (collectively, "Losses"), based upon, related to, arising out of or in connection with the Engagement or any recapitalization, restructuring, reorganization, or other transaction involving the Company (a "Restructuring"), and will reimburse each Indemnified Person for all expenses (including fees and expenses of counsel) ("Expenses") as they are incurred in connection with investigating, preparing, pursuing or defending any action, claim, suit, investigation, or proceeding related to, arising out of or in connection with the Engagement or any Restructuring, whether or not pending or threatened and whether or not any Indemnified Person is a party. Furthermore, the Company will pay NCA at its standard hourly rates for any NCA professional time incurred in connection with any action, claim, suit, investigation or proceeding described in the foregoing sentence. Notwithstanding the foregoing, in no event shall the Company be responsible for any Losses or Expenses that arise out of or in connection with the Engagement or any Restructuring, and which are finally judicially determined to have resulted primarily and directly from the willful misconduct or gross negligence of NCA.

If any litigation, investigation or proceeding is commenced as to which NCA proposes to demand indemnification, NCA will notify the Company with reasonable promptness; provided, however, that any failure by NCA to notify the Company will relieve the Company from its obligations hereunder only to the extent the Company has been materially prejudiced by such failure or delay. NCA will have the right to retain counsel (and local counsel, if appropriate) of its own choice to represent it, and the Company will pay the fees, expenses and disbursements of such counsel. The Company retains the right to participate in the defense of such litigation, investigation or proceeding as to which NCA seeks indemnification through counsel of the Company's choice (the cost of which will be paid by the Company) and NCA will reasonably cooperate with such counsel and the Company (including, to the extent possible and consistent with its own interests, keeping the Company



reasonably informed of such defense). The Company will be liable for any settlement of any claim against NCA made with the Company's written consent, which consent will not be unreasonably withheld.

If, for any reason, the foregoing indemnification is unavailable to any of the Indemnified Parties or is insufficient to hold them harmless in respect of any Losses or Expenses, then the Company will contribute to the amount paid or payable by any of the Indemnified Parties as a result of such Losses and Expenses in such proportion as is appropriate to reflect the relative benefits (or anticipated benefits) to the Company and its members on the one hand and the Indemnified Parties on the other hand from the possible recapitalization, restructuring, reorganization or other transaction, or if such allocation is not permitted by applicable law, then in such proportion as is appropriate to reflect not only the relative benefits received by the Company and its equityholders and creditors on the one hand and the Indemnified Parties on the other hand, but also the relative fault of the Company, its directors, officers, employees, agents and advisers (other than NCA) on the one hand and the Indemnified Parties on the other hand, as well as any other relevant equitable considerations. The relative benefits received (or anticipated to be received) by the Company and its equityholders and creditors on the one hand and by the Indemnified Parties on the other hand will be deemed to be in the same proportion as such benefit bears to the total fees paid to NCA pursuant to the Engagement. The relative fault of any party or other person will be determined by reference to such party's or person's knowledge, access to information and opportunity to prevent or correct any misstatement, omission, misconduct or breach of duty. In no event will the amount required to contributed by the Indemnified Parties hereunder exceed the total amount of fees paid to NCA pursuant to the Engagement. You and we agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above.

The reimbursement, indemnity and contribution obligations of the Company hereunder will (i) be in addition to any liability which the Company may otherwise have, (ii) survive the completion or termination of NCA's engagement under the Engagement and (iii) shall be binding upon any successors and assigns of the Company.

The Company agrees that without the prior written consent of NCA, it will not consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claims, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless (i) such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from any and all claims and liabilities arising out of such action, claim, suit or proceeding and (ii) there is no statement in connection therewith as to an admission of fault culpability or failure to act by or on behalf of any Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification thereof signed by the parties and shall remain in full force and effect regardless of any termination or the completion of NCA's services under the Engagement.


NAVIGANT
CAPITAL-ADVISORS

All obligations herein of the Company are intended to be joint and several amongst Taylor, Bean & Whitaker Mortgage Corporation and and the subsidiaries listed on the signature page hereto

This agreement will be deemed made in Illinois. The validity and interpretation of this agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Illinois applicable to agreements made and to be fully performed therein (excluding the conflicts of laws rules). The Company irrevocably submits to the jurisdiction of any court of the State of Illinois or the United States District Court of the Northern District of the State of Illinois for the purpose of any suit, action or other proceeding arising out of this agreement which is brought by or against the Company. Each of the Company (and, to the extent permitted by law, on behalf of the Company's equity holders and creditors) and NCA hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim based upon, arising out of or in connection with this agreement.

Very truly yours,

TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
CDF TAX AND FLOOD SERVICES, LLC
COMPLETE MORTGAGE SOLU-TIONS, LLC
HOME AMERICA MORTGAGE, INC.
HMC-HOME MORTGAGES CO.
MASLOW INSURANCE AGENCY, LLC
OCALA FUNDING, LLC
REO SPECIALISTS, LLC
SECOND STREET INSURANCE CORPORATION

By: _____
Title: DEREK T BK
Date: _____

Accepted, acknowledged and agreed to:

NAVIGANT CAPITAL ADVISORS LLC

By: _____
Edward R. Casas
Senior Managing Director

Date: 08/24/2009



**Neil F. Luria**
Managing Director

**Navigant Capital Advisors**
15900 South Park Boulevard
Cleveland, OH 44120
216 321-5606 (o)
216.244.3367 (c)
nluria@ncacf.com

**Education and professional**

- Bachelor of Science, 1989, The Wharton School, University of Pennsylvania
- Bachelor of Arts, 1989, University of Pennsylvania
- Juris Doctorate, 1992, Boston University School of Law
- Ohio Bar Admission, 1992
- Certified Insolvency & Restructuring Advisor (CIRA)

**Employment**

- Navigant Capital Advisors, LLC
- Casas, Benjamin & White, LLC
- BMJ Medical Management, Inc.
- Jones Day Reavis & Pogue

**Professional associations**

- The Association of Insolvency and Restructuring Advisors
- Ohio State Bar Association

# Neil F. Luria

## Current Position

Neil Luria serves as a Managing Director with Navigant Capital Advisors, the Corporate Finance practice group of Navigant Consulting, Inc., in Cleveland, Ohio.

## Professional Experience

Neil specializes in capital restructuring and operational support on behalf of the firm's clients. He has significant experience negotiating and structuring acquisitions, divestitures and structured settlements, overseeing asset liquidations and restructuring leases. Neil joined Casas Benjamin & White, LLC a predecessor of Navigant Capital Advisors, LLC in 1999. While at Navigant Capital Advisors, LLC (and its predecessor), Neil has structured and overseen the successful disposition of over 100 business units, with a particular emphasis in financial services, real estate, healthcare business services, and distribution. In addition, Mr. Luria has overseen operating and capital restructurings in the capacity of Chief Restructuring Officer.

Before joining Navigant Capital Advisors, LLC (and its predecessor), Neil served as President of BMJ Medical Management, Inc., an operator of ambulatory surgery centers, imaging centers and physician practices, where he had previously served as Executive Vice President and General Counsel. While at BMJ, he oversaw the company's liquidation efforts that realized a 100% recovery to its Senior Secured Lenders. Prior to BMJ, he was engaged in the private practice of law at the firm of Jones Day Reavis & Pogue. Neil's practice involved the representation of venture capital and leverage buyout funds in connection with their portfolio investments, related add-on acquisitions and subsequent divestiture transactions. In addition, he was involved in numerous securities offerings ranging from global initial public offerings to private placements.

Neil has been involved in a number of high profile hedge fund restructuring matters where he has been directly involved in oversighting asset divestitures, litigation strategy and other strategic alternatives. Neil has recently been involved in the restructuring of a $12 BB+ portfolio of mortgage related assets on behalf of a major holder of whole loans and subprime warehouse credit lines.

Neil has significant experience in bankruptcies and liquidations

related to residential mortgage orginators and homebuilders. He has served as the Chairman of the Official Committee of Unsecured Creditors of Neumann Homes, Inc., as well as Chairman of the Creditors Committees for subprime originators MILA, Inc. and Oak Street Mortgage. Neil also sat on the Official Committee of Unsecured Creditors of New Century Financial and People's Choice, two of the largest independent subprime originators—Neil currently sits on the Liquidating Trust Committee of both New Century and People's Choice. Mr. Luria also currently serves as the Liquidating Trustee of the Orthodontic Centers of America Liquidating Trust (the largest domestic orthodontic practice management company) and Mortgage Lenders Network Liquidating Trust (formerly a $25 BB per year subprime mortgage originator).

Neil was a member of the Board of Directors of Spectrum Diagnostic Imaging, LLC, one of the largest regional operators of diagnostic imaging centers, and was previously a Director of Stampede Meats, Inc., a major producer of processed meats, and Liquidating BMJ Medical Management, Inc., a post-bankruptcy liquidating entity.

Neil received his Juris Doctorate from the Boston University School of Law where he served on the *Boston University Law Review* and his Bachelor of Science in Economics from the Wharton School of the University of Pennsylvania. Mr. Luria also holds a CIRA certification as a Certified Insolvency Restructuring Advisor.

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                                      Chapter 11

TAYLOR, BEAN & WHITAKER                          Case No. 3:09-bk-07047-JAF
MORTGAGE CORP.,

                    Debtor.
_____/

## AFFIDAVIT OF DISINTERESTEDNESS

Personally appeared before the undersigned officer duly authorized to administer oaths, Neil F. Luria, who, after being duly sworn, stated as follows:

1.      I am over the age of 18 years and am a Managing Director at Navigant Capital Advisors, LLC (the "**Firm**" or "**Navigant**") and in that capacity I have personal knowledge and authority to speak on behalf of the Firm with respect to the matters set forth herein. This Affidavit is offered in support of the Debtor's Application to Employ Navigant Capital Advisors, LLC to provide the services of Neil F. Luria as Chief Restructuring Officer as well as other Navigant support personnel (the "**Application**") as of the Petition Date. Upon information and belief, the matters set forth in this Affidavit are true and correct. Certain information contained in this Affidavit is based on information provided to me by others.

2.      Taylor, Bean & Whitaker Mortgage Corp. ("**Client**") seeks to retain Navigant pursuant to the terms of the engagement letter attached as **Exhibit "1."**

3. Neither I nor the Firm has agreed to share any compensation or reimbursement awarded in this case with any other third party persons.

4. The Firm has made the following investigation prior to submitting this declaration. The Firm has requested, through electronic mail, Navigant's professionals to advise of any connections that the Firm has with the parties disclosed in Exhibit "2" (collectively, the "**Searched Parties**[1]"). Further, the Firm has undertaken a review of its computer database which contains the names of clients and other parties interested in particular matters. The Firm requires all of its professionals, before accepting the representation of a new client, or the representation of an existing client in a new matter, to perform a conflicts check through the Firm's database and to enter into that database conflict information regarding new clients or new matters. In particular, under my supervision, the parties disclosed in Exhibit "2" were searched in Navigant's database.

5. To the best of my knowledge, information, and belief, neither the Firm nor any of the professionals of the Firm has any connection with the Searched Parties other than as disclosed in the body of this Affidavit or in Exhibit "3."

6. The Firm has approximately 1,900 professionals. As a result, the Firm may have in the past and may in the future from time to time, in matters unrelated to the Debtor or the captioned bankruptcy case, represent other parties which are either debtors or creditors of the Debtor, members of the creditors' committee, or parties listed as Searched Parties. While the Firm has represented creditors of the estate and parties in interest in matters unrelated to this case, the Firm does not currently represent any entity

---

[1] The representations contained in this Affidavit are limited to the Searched Parties.

other than the Client with regard to the estate and/or matters affecting the estate. No other relationship will affect the Firm's representation of the Client, and the firm is qualified as a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code. At this time, the Firm is unaware of any current representation of the Searched Parties except as set forth in the body of this Affidavit or in Exhibit "3."

7.　　　As part of its practice, the Firm appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, including other professionals representing the debtors, creditors and other parties in interest in these cases. Various professionals at Navigant have worked with, against, are friends with, serve on boards with, may be related to individuals, may have referred clients, and/or received referrals from individuals at professional firms identified on Exhibit "2" and other professionals appearing in this case. All of the other cases, proceedings and transactions in which the Firm is involved and professionals representing parties in this case are also involved are totally unrelated to the Debtor and this Chapter 11 case.

8.　　　There are numerous persons and entities listed on Exhibit "2." However, I anticipate that a review of the Firm's client database with regard to all of the Debtor's creditors and parties in interest would disclose that the Firm previously represented and/or currently represents one or more creditors or parties in interest (or one or more of their respective parent companies, subsidiaries, and affiliates) in addition to those of the parties who are specifically identified in Exhibit "2." Other than as disclosed in the body of this Affidavit or in Exhibit "3," I am unaware, however, of any clients the Firm has

represented or represents which are related in any way to the Debtor or this Chapter 11 case.

9. Upon information and belief, except as disclosed in the body of this Affidavit or in Exhibit "3," neither the Firm, nor any of its professionals has any of the following affiliations with the Debtor: (1) as a creditor, equity security holder, or insider; (2) as a director, officer or employee of the Debtor within the last two years prior to the date of the filing of the petition in this case; or (3) as a holder of an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor. Notwithstanding the foregoing, as described in Paragraph 1 above, the Application and the engagement letter in Exhibit "1," Navigant Capital Advisors, LLC and the Debtor have entered into an agreement to provide the services of Neil Luria as Chief Restructuring Officer of the Debtor and other support personnel, immediately prior to the filing of the petition in this case, and in such capacity, will be serve as an officer and director of the Debtor.

10. Further, based upon current information, according to Navigant's books and records, during the last 180 days prior to the Petition Date, Navigant and its affiliate, Navigant Consulting, Inc., received a total of $1,275,614.20 from the Debtor. Of such amount, (i) Navigant Consulting, Inc. received $280,614.22 of which $130,000.00 represents a retainer with the balance having been paid for services rendered pre-petition, and (ii) Navigant received $995,000 of which $500,000 represents a retainer received in connection with pre-petition services and post-petition services described in this

Application. The prepetition services provided by Navigant Consulting, Inc. and Navigant are disclosed in Exhibit "3."

11. To the best of my knowledge, information, and belief formed after reasonable inquiry, except as disclosed in the body of this Affidavit or in Exhibit "3," neither I nor the Firm holds or represents any interest adverse to the Debtor or its estate.

12. Employment of Neil F. Luria and Navigant as Chief Restructuring Officer for Taylor, Bean & Whitaker Mortgage Corp. is appropriate under sections 327, 328, and 1103 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure.

13. Navigant reserves the right to supplement this Affidavit if new information comes to light.

FURTHER AFFIANT SAYETH NOT.

Neil F. Luria

SWORN TO AND SUBSCRIBED BEFORE ME this ___ day of August, 2009, by Neil F. Luria, who personally known to me and who did not take an oath.

Notary Public

D. SKUHROVEC
MY COMMISSION # DD 776796
EXPIRES: May 24, 2012
Bonded Thru Notary Public Underwriters

Donna Skuhrovec

Printed Name
My Commission Expires:

# *EXHIBIT 1*
# *Engagement Letter*

EXHIBIT 1



Navigant Capital Advisors, LLC
Member FINRA
5215 Old Orchard Road
Suite 850
Skokie, IL 60077
847.583.1618 phone
847.583.1719 fax

August 24, 2009

Personal and Confidential
Taylor, Bean & Whitaker Mortgage Corp.
Attn: General Counsel

Re:    Engagement of Navigant Capital Advisors, LLC ("NCA")

Gentlemen:

Effective August 13, 2009 (the "Original Effective Date"), Taylor, Bean & Whitaker Mortgage Corp. and its subsidiaries listed on the signature pages hereto (collectively, the "Company") entered into an Engagement Letter (the "Original Engagement Letter") with NCA. The parties hereby desire to amend and restate the Original Engagement Letter pursuant to this agreement (this "Engagement Letter"). This letter outlines the understanding between NCA and the Company for the engagement of NCA to perform certain services to the Company in connection with its ongoing restructuring efforts.

NCA understands that a bankruptcy filing by the Company may be imminent. Pursuant to the Original Engagement Letter, NCA was engaged to serve as the financial advisor to the Company to coordinate, oversee, and direct the internal (e.g. operations and financial management) and external resources (e.g. investment bankers, outside counsel, independent auditors, etc.) necessary to support the restructuring process. The parties desire to amend and restate the Original Engagement Letter to provide for the expansion of NCA's role upon a bankruptcy filing. Under the terms of this engagement, NCA will act under the authority of the Company's Board of Directors (or any special committee appointed by the Company's Board of Directors with authority to address such matters), in conjunction with the Company's management, to coordinate, oversee, and direct the resources necessary to support the restructuring initiative. NCA will work in consultation and coordination with the Company and the Company's counsel to ensure effective strategy formulation and decision-making.

1.    <u>Scope of Services</u>

Pursuant to this engagement ("Engagement"), NCA's role will specifically include working with the Company's Board and its officers and employees with respect to the following:

- Management of the "working group" of professionals who are assisting the Company in the re-organization process or who are representing the Company's various stakeholders to enhance coordination of their efforts and individual work product consistent with the Company's overall restructuring goals.

- Supervision of both short-term as well as long-term liquidity optimization initiatives, as well as stabilization of the Company's operations in order to maximize disposition value(s).

- Critical review of the Company's budgets and cash flow forecasts, with proactive management in conjunction with management of the Company's associated cost structure and disbursement controls.

- Communication and/or negotiation with outside constituents, including creditors and their advisors.

- Preparation for and coordination of contemplated Section 363 asset dispositions.

- Determination of viable reorganization/rehabilitation alternatives and development of any associated plan of reorganization.

- Such other matters as may be requested consistent with our expertise and as are mutually agreed upon by the parties.

The NCA team will be led by Edward R. Casas, a NCA Senior Managing Director, who will have general oversight responsibilities with respect to the engagement, and Neil F. Luria, Managing Director. Post-petition, NCA will, subject to bankruptcy court approval, provide the services of Neil F. Luria as Chief Restructuring Officer, as well as the other individuals described below. In addition, on a post-petition basis, NCA will (i) continue to provide the services described above, (ii) monitor the Company budgets, (iii) act as the "designated representative" for the Company in the Company's chapter 11 case, (iii) assist in the administration of the Company's chapter 11 case, including assistance with respect to the preparation of bankruptcy schedules, statement of financial affairs and any plan of reorganization or liquidation relating to the Company, (iv) and such additional duties set forth by the Bankruptcy Court or the Company's Board of Directors.

NCA and the Chief Restructuring Officer shall be authorized to make decisions with respect to all aspects of the management and operation of the Company's business, including without limitation organization and human resources, marketing and sales, logistics, finance and administration and such other areas as they deem necessary or appropriate in their sole discretion in a manner consistent with the business judgment rule and the provisions of local law and the United States Bankruptcy Code applicable to the obligations of persons acting on behalf of corporations, subject only to appropriate governance by the Board of Directors in accordance with the Companies" charters, Bylaws or other governing documents and applicable law. In view of the Company's precarious present circumstances, the Company acknowledges that NCA and the Chief Restructuring Officer may be required to make decisions with respect to extraordinary measures quickly and the depth of analysis of information on which such decisions will be based may be limited in some respects due to the availability of information, time constraints and other facts.

In addition to the Chief Restructuring Officer, NCA will provide the services of the following individual professionals to lead the functional areas set forth next to their names:

| Edward R. Casas | Strategy, Recovery and Disposition |
| --- | --- |
| Paul Noring | Reporting and Reconciliation |
| Joe Blalock | Servicing and Capital Markets |
| George Koutsonicolis | Finance and Dispositions |

| Matthew Rubin | Treasury & Cash Management |
| Francesco DiGiannatonio | Restructuring & Dispositions |
| Joseph Oriti | Reporting & Project Management |

Given the dynamic state of the Company's affairs and the need for additional forensic and other support services, NCA will supplement the foregoing from time to time, as necessary. Furthermore, NCA reserves the right to supplement or replace the individuals listed above as appropriate to provide the required support of the Debtor.

NCA's ability to perform this Engagement will depend upon the extent of cooperation that it receives from the Company, and the Company's advisors and representatives, including its legal counsel and accountants. In this regard, the Company agrees to provide NCA full cooperation and access to financial, business and other information concerning the Company which NCA reasonably deems appropriate. In addition to open access to all such information (including documents and financial records (or projections)), NCA will have full use and access to all work performed by prior investment banking advisors and management consultants, as well as any outside accounting and analyst reports and work papers, all valuation analyses, due diligence materials and other related materials which are (or could be) available to the Company (all such information and materials, documents and records being referred to as "Company Information"). The Company will also provide NCA with full access to the Company's officers, directors, employees, advisors and representatives. NCA agrees that, except as may otherwise be required by law, NCA will keep confidential and not disclose to third parties (other than representatives or independent contractors retained by NCA) all Company Information that is confidential or propriety to the Company and that NCA will use the same only in the performance of its duties under this Engagement.

The Company represents and warrants that all Company Information made available to NCA will be complete and correct and that any projections, forecasts or other Company Information provided by the Company to NCA will have been prepared in good faith and will be based upon reasonable assumptions. The Company agrees to promptly notify NCA if the Company believes that any Company Information which was previously provided to NCA has become materially misleading. The Company acknowledges and agrees that, in rendering its services hereunder, NCA will be using and relying on the Company Information (and information available from public sources and other sources deemed reliable by NCA) without independent verification thereof or independent appraisal or evaluation of the Company, or any other party. NCA does not assume responsibility for the accuracy or completeness of the Company Information or any other information regarding the Company.

NCA will periodically discuss with the Company, its advisors and directors, the business conclusions and restructuring recommendations resulting from the investigation and negotiations.

NCA will begin this Engagement immediately upon (i) receipt of this executed engagement letter and the attached Indemnity Agreement, (ii) receipt of the Retainer as referenced below, (iii) receipt of the first Monthly Fee (as defined below) payment described below, and (iii) the receipt from the Company of insurance policies described below (which policies must be satisfactory to NCA).

1.    Hourly Fees and Expenses

NCA's compensation hereunder shall consist of the following:

Taylor, Bean & Whitaker Mortgage Corp.
August 24, 2009
Page 4

For the services provided by Messrs. Casas and Luria, NCA will charge a monthly fee (the "Monthly Fee") of $250,000 cash payable in immediately available funds upon execution of this Engagement Letter and on the first day of each month thereafter through the term herof commencing.

In addition, to the Monthly Fee, NCA shall be paid for the services provided by other NCA professionals at their standard hourly rates. The billing rates for professionals who may be assigned to this Engagement, including those listed above are as follows:

Base Hourly Rates:[1]

| Senior Managing Directors/ | |
|---|---|
| Senior Advisors | $675-875/hr |
| Managing Directors | $600-675/hr |
| Directors | $525-600/hr |
| Associate Directors | $425-525/hr |
| Managing Consultants | $350-425/hr |
| Consultants/Associates | $245-350/hr |
| Paraprofessionals | $95-125/hr |

The standard rates for such other NCA professionals is set forth on Annex A hereto. The Monthly Fees will be paid as described above. In addition, the Company agrees to pay NCA's reasonably incurred hourly fees (the "Fees") in connection with this Engagement based upon the rates set forth above; however, the Company expressly agrees that the hourly rates set forth in this engagement letter are subject to periodic adjustment upon notice to the Company to reflect economic and other conditions. The Company paid to NCA upon execution of the Original Engagement Letter a retainer (the "Retainer") in the amount of $500,000, and, subject to the following paragraph, NCA will charge against such Retainer its reasonably incurred and unpaid Fees and expenses on a monthly basis. NCA will provide the Company with reasonably detailed bi-weekly bills and such bills will be due upon receipt and payable, as set forth below, within three (3) days of receipt (after which point they will be charged against the Retainer and if the Retainer is not sufficient to cover such bills, the Company will promptly wire the deficiency plus the amount necessary to replenish the Retainer in accordance with the following paragraph). If the Company fails to comply with its obligations under this paragraph, then NCA shall have the right to cease work until the Company does so comply without incurring any liability whatsoever.

The Company further agrees that the amount of the Retainer held by NCA will at all times be not less than $500,000, and that the Company will, from time to time, remit to NCA such additional amounts as may be necessary to maintain the total amount of the Retainer currently held by NCA at or above $500,000. In the event the Company determines to file for Chapter 11 bankruptcy protection, the amount of the Retainer will be replenished to at least $500,000 immediately prior to such filing if requested by NCA.

NCA's expenses as incurred will be billed separately. Generally these expenses include any travel-related expenses, document production, fax transmissions, teleconferencing charges, outside legal expenses incurred by NCA associated with this Engagement (including, fee application expenses, discovery costs and defense costs) and other expenses of this type which are associated with this Engagement. All professional fees and expenses will be paid and reimbursed via wire transfer (per instructions set forth on Exhibit A attached hereto) within three (3) days of receipt of the applicable NCA invoices by the

[1] NCA may utilize independent contractors under the direct supervision of NCA; the hourly rate for such personnel will be billed based upon the qualifications of the professional.

Company (after which point they will be charged against the Retainer and if the Retainer is not sufficient to cover such bills, the Company will promptly wire the deficiency in accordance with the provisions hereof).

In addition to the Monthly Fee and the Fees described above, NCA will receive a deferred restructuring Fee equal to the Applicable Percentage (as defined below) of the Aggregate Value (as defined below) of asset and other recoveries received by the Company (the "Deferred Restructuring Fee Payments") from divestiture transactions, including the realization of proceeds from the divestiture of assets (by sale merger or otherwise) involving the Company or any of its subsidiaries or affiliates. For purposes of this agreement, Aggregate Value shall mean gross sale proceeds to which the Company is entitled from the sale of assets plus any litigation related settlements or payments received or other similar recoveries (including, without limitation, recoveries on servicing advances, due from balances and investments in subsidiaries); provided, however, notwithstanding anything contained herein to the contrary, the Applicable Percentage for any Aggregate Value from the sale or disposition of "REO" shall be 0.25%. The Deferred Restructuring Fee Payments will be made in immediately available funds at the closing of each respective transaction, recovery or payment (and related definitive agreements governing such transactions, recoveries, or payments shall disclose and acknowledge the Company's liability to NCA for such Deferred Restructuring Fee Payments). It is expressly agreed that the cumulative amount of the Deferred Restructuring Fee Payments shall not be less than $500,000 in the aggregate; any deficiency in the total amount of Deferred Restructuring Fee Payments paid to NCA shall be paid upon the earlier of the Conclusion (as defined below) of the case or upon the termination of NCA's services hereunder. For purposes of this Agreement, the term "Conclusion" shall mean the earlier of (i) the date on which the sale of substantially all of the assets of the Company has been consummated or (ii) an order has been entered approving a plan of reorganization or liquidation of the Company. The Applicable Percentage will change based upon sliding scale of Aggregate Value as outlined below.

| Aggregate Value | % of Incremental Amount | Maximum Deferred Re-structuring Fee Payments[2] |
|---|---|---|
| ≤ $50 MM | 1.0% | $500,000 |
| > $50 MM ≤ $100 MM | 0.75% | $875,000 |
| >$100 MM ≤ $200 MM | 0.50% | $1,375,000 |
| > $200 MM | 0.25% | ∞ |

2.    Miscellaneous

NCA will act under this engagement letter as an independent contractor with duties solely to the Company with liability limited to the fees paid to NCA hereunder. Because we will be acting on your behalf in this capacity, it is our practice to receive indemnification. A copy of our standard indemnity form is attached hereto as Exhibit B ("Indemnity Agreement") and must be executed concurrently with this engagement letter. The terms of the Indemnity Agreement are incorporated by reference into this engagement letter. This Engagement is intended to amend and restate the Original Engagement Letter, provided, however, that NCA will continue to be provided the protections contained in the Indemnity Agreement signed in conjunction with the Original Engagement Letter in connection with all services provided under the Original Engagement Letter (such continuing indemnity shall be retroactive to the Original Effective Date).

---

[2] The Maximum Deferred Restructuring Fee Payments column is for illustrative purposes (for instance, if Aggregate Value equals $100 MM, the amount of the Deferred Restructuring Fee Payments would equal $875,000 which represents the sum of (i) 1% * $50 MM, and (ii) 0.75% * $50 MM).

Any advice or opinions provided by NCA may not be disclosed or referred to publicly or to any third party except in accordance with NCA's prior written consent. It is further understood that any advice rendered by NCA pursuant to this Engagement, including any advice rendered during the course of participating in negotiations and meetings with management or the Board of Directors of the Company, as well as any written materials provided by NCA, are intended solely for the benefit and confidential use of the Company and the Board of Directors and will not be reproduced, summarized, described or referred to or given to any other person for any purpose without NCA's prior written consent.

The Company acknowledges and agrees that (i) NCA is not being retained to advise the Company on, or to express any opinion as to, the wisdom, desirability or prudence of consummating a recapitalization, restructuring, reorganization or other transaction, (ii) NCA is not and will not be construed as a fiduciary of the Company or any affiliate thereof and will have no duties or liabilities to the equityholders or creditors of the Company, any affiliate of the Company or any other person by virtue of this Engagement and the retention of NCA hereunder, all of which duties and liabilities are hereby expressly waived, and (iii) any advice rendered by NCA does not constitute a recommendation to any equityholder that such equityholder might or should take in connection with a possible recapitalization, restructuring, reorganization or other transaction. Neither equityholders nor creditors of the Company are intended beneficiaries hereunder. The Company confirms that it will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

NCA and its officers, employees, representatives and agents will be entitled to the benefit of the most favorable indemnities provided by the Company to its officers and directors, whether under the Company's by-laws, certificates of incorporation, by contract or otherwise. The Company agrees that it will use its best efforts to specifically include and cover NCA and its employees or agents providing services to the Company under the Company's liability policy for directors' and officers' insurance. In the event that the Company (i) is unable to include NCA and such individuals under the Company's policy, or (ii) does not maintain first dollar liability coverage, in effect for at least $10 million, it is agreed that NCA may in its discretion attempt to purchase a separate directors' and officers' policy or other such insurance policy that will cover NCA employees and representatives providing services to the Company only and that the cost of same shall be invoiced to the Company and reimbursed by the Company as an out-of-pocket cash expense. If NCA is unable to purchase such insurance, then NCA reserves the right to terminate this agreement.

The terms of this engagement letter shall be construed, interpreted and applied in accordance with the laws of the State of Illinois applicable to contracts entered into and wholly to be performed in Illinois by Illinois residents. The Company irrevocably submits to the jurisdiction of any court of the State of Illinois or the United States District Court of the Northern District of the State of Illinois for the purpose of any suit, action or other proceeding arising out of this engagement letter which is brought by or against the Company. Each of the Company (and, to the extent permitted by law, on behalf of the Company's equity holders and creditors) and NCA hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim based upon, arising out of or in connection with this engagement letter.

Because NCA and its affiliates serve clients on a national basis in numerous cases, both in and out of court, it is possible that NCA or its affiliates may have rendered services to, or have business associations with, other entities which had, or have, relationships with the Company, including creditors of the Company. Nonetheless, NCA and affiliates have not, and will not perform services for, or have business connections with, any of these aforementioned entities in this matter involving the Company. Notwith-

standing the foregoing, NCA wishes to disclose that its affiliate, Navigant Consulting, Inc., has been providing services to the Company through its counsel, Troutman Sanders.

The Company agrees that it will not enter into an agreement with respect to a possible transaction involving a recapitalization, restructuring, reorganization or other transaction, including a transaction involving a sale of all or substantially all of the Company's assets or operations, unless such agreement expressly provides for the unconditional assumption of the Company's obligations to NCA under this engagement letter and the Indemnity Agreement. This engagement letter, and any modification or amendment thereto, may be executed in counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. NCA reserves the right to attend the closing of any transaction involving the sale of all or a part of the Company's assets or any other recapitalization, restructuring, reorganization, merger or other transaction and issue a tombstone announcement with respect to such transaction and NCA's involvement with the Company.

Either the Company or NCA may terminate this engagement letter upon 3 days written notice, provided however that (i) all fees and expenses reimbursement due through the effective date of termination will be paid within 3 days of the effective date of termination and the Retainer will be deemed earned, (ii) no termination of this engagement letter will affect NCA's right to payment of fees or expense reimbursement pursuant to Section 1 or the indemnification contemplated by the Indemnity Agreement, and (iii) NCA will be entitled to any Deferred Restructuring Fee Payments it would have otherwise been entitled to related to any divestiture or other event that would have triggered the payment of a Deferred Restructuring Fee Payment occurring within 12 months of termination. Notwithstanding the foregoing, NCA may terminate this Engagement Letter at anytime in the event that Navigant determines, in its sole discretion, that the Company does not have enough unencumbered cash in order to fund any accrued but unpaid payroll, payroll taxes or other trust fund taxes of the Company.

All notices required or permitted to be delivered under this engagement letter shall be sent, if to us, to the address of NCA's Skokie, Illinois office as set forth at the head of this letter, to the attention of Mr. Edward R. Casas, and if to you, to the address for you set forth above, to the attention of your Chief Executive Officer, or to such other name or address as may be given in writing to the other party. All notices under this engagement letter shall be sufficient if delivered by facsimile or overnight mail. Any notice shall be deemed to be given only upon actual receipt.

This engagement letter may only be modified, amended or waived by a writing signed by the parties hereto.

All obligations of the Company herein are intended to be joint and several amongst the Company and subsidiaries listed on the signature pages hereto.

In the event the Company determines it is necessary to file for protection under Chapter 11 of the U.S. Bankruptcy Code, the Company agrees that it will promptly apply to the Bankruptcy Court to obtain approval of our retention and Retainer nunc pro tunc to the date of the filing. The Company agrees that in connection with the bankruptcy process, it will reimburse NCA for its reasonable attorney's fees and expenses related to such retention matters, including the filing and preparation of any fee applications and any preparation or attendance at hearings related thereto. Notwithstanding anything to the contrary contained herein, after the Company files for bankruptcy protection, the fees and expenses of NCA set forth herein shall be reimbursed and paid in accordance with the Bankruptcy Code and any fee procedures established by order of the Bankruptcy Court.

If the terms of our engagement as set forth in this letter are satisfactory, kindly sign the enclosed copy of this letter along with the attached Indemnity Agreement and return executed copies to me by fax with originals by overnight mail accompanied with a wire transfer in the amount of the Retainer.

We look forward to working with you.

Very truly yours,

NAVIGANT CAPITAL ADVISORS, LLC

By:_____
Edward R. Casas
Senior Managing Director

Accepted, acknowledged and agreed to:

TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
CDF TAX AND FLOOD SERVICES, LLC
COMPLETE MORTGAGE SOLUTIONS, LLC
HOME AMERICA MORTGAGE, INC.
HMC-HOME MORTGAGES CO.
MASLOW INSURANCE AGENCY, LLC
OCALA FUNDING, LLC
REO SPECIALISTS, LLC
SECOND STREET INSURANCE CORPORATION

By:_____

Title:  DIRECTOR

Date:_____



### Annex A

| Name | Functional Area | Rate/Hr. |
|------|-----------------|----------|
| Paul Noring | Reporting and Reconciliations | $675 |
| Joe Blalock | Servicing and Capital Markets | $575 |
| George Koutsonicolis | Finance and Dispositions | $575 |
| Matthew Rubin | Treasury & Cash Management | $525 |
| Fancesco DiGiannatonio | Restructuring & Dispositions | $575 |
| Joseph Oriti | Reporting & Project Management | $350 |

Fees associated with Messrs. Luria and Casas will be included in the fixed Monthly Fee in lieu of hourly rates. In addition, NCA reserves the right to add, replace, eliminate, or supplement staff, as determined necessary by the CRO, at standard rates.


NAVIGANT
CAPITAL·ADVISORS

**Exhibit A**

**Wiring Instructions**

Please direct wire to:

Navigant Capital Advisors, LLC
LaSalle Bank
135 S. LaSalle St
Chicago, IL 60674
ABA # 071000505
Account # 5800151127



Exhibit B

August 24, 2009

Navigant Capital Advisors, LLC
5215 Old Orchard Road
Suite 850
Skokie, IL 60077

Ladies and Gentlemen:

This letter will confirm that in connection with the engagement (the "Engagement") of Navigant Capital Advisors, LLC ("NCA") by Taylor, Bean & Whitaker Mortgage Corp. and certain of its subsidiaries and affiliates ( together the "Company") as reflected in the engagement letter dated the date hereof (all capitalized terms used but not otherwise defined herein having meanings described in such engagement letter) the Company agrees to indemnify and hold harmless NCA and its affiliates and their respective members, officers, directors, employees and agents and each other person, if any, controlling NCA or any of its affiliates (each referred to herein as an "Indemnified Person") to the fullest extent permitted by law from and against any losses, claims, damages, obligations, penalties, judgments, awards, costs, disbursements or liabilities, including amounts paid in settlement (collectively, "Losses"), based upon, related to, arising out of or in connection with the Engagement or any recapitalization, restructuring, reorganization, or other transaction involving the Company (a "Restructuring"), and will reimburse each Indemnified Person for all expenses (including fees and expenses of counsel) ("Expenses") as they are incurred in connection with investigating, preparing, pursuing or defending any action, claim, suit, investigation, or proceeding related to, arising out of or in connection with the Engagement or any Restructuring, whether or not pending or threatened and whether or not any Indemnified Person is a party. Furthermore, the Company will pay NCA at its standard hourly rates for any NCA professional time incurred in connection with any action, claim, suit, investigation or proceeding described in the foregoing sentence. Notwithstanding the foregoing, in no event shall the Company be responsible for any Losses or Expenses that arise out of or in connection with the Engagement or any Restructuring, and which are finally judicially determined to have resulted primarily and directly from the willful misconduct or gross negligence of NCA.

If any litigation, investigation or proceeding is commenced as to which NCA proposes to demand indemnification, NCA will notify the Company with reasonable promptness; provided, however, that any failure by NCA to notify the Company will relieve the Company from its obligations hereunder only to the extent the Company has been materially prejudiced by such failure or delay. NCA will have the right to retain counsel (and local counsel, if appropriate) of its own choice to represent it, and the Company will pay the fees, expenses and disbursements of such counsel. The Company retains the right to participate in the defense of such litigation, investigation or proceeding as to which NCA seeks indemnification through counsel of the Company's choice (the cost of which will be paid by the Company) and NCA will reasonably cooperate with such counsel and the Company (including, to the extent possible and consistent with its own interests, keeping the Company



reasonably informed of such defense). The Company will be liable for any settlement of any claim against NCA made with the Company's written consent, which consent will not be unreasonably withheld.

If, for any reason, the foregoing indemnification is unavailable to any of the Indemnified Parties or is insufficient to hold them harmless in respect of any Losses or Expenses, then the Company will contribute to the amount paid or payable by any of the Indemnified Parties as a result of such Losses and Expenses in such proportion as is appropriate to reflect the relative benefits (or antici-pated benefits) to the Company and its members on the one hand and the Indemnified Parties on the other hand from the possible recapitalization, restructuring, reorganization or other transaction, or if such allocation is not permitted by applicable law, then in such proportion as is appropriate to reflect not only the relative benefits received by the Company and its equityholders and creditors on the one hand and the Indemnified Parties on the other hand, but also the relative fault of the Company, its directors, officers, employees, agents and advisers (other than NCA) on the one hand and the Indem-nified Parties on the other hand, as well as any other relevant equitable considerations. The relative benefits received (or anticipated to be received) by the Company and its equityholders and creditors on the one hand and by the Indemnified Parties on the other hand will be deemed to be in the same proportion as such benefit bears to the total fees paid to NCA pursuant to the Engagement. The rela-tive fault of any party or other person will be determined by reference to such party's or person's knowledge, access to information and opportunity to prevent or correct any misstatement, omission, misconduct or breach of duty. In no event will the amount required to contributed by the Indemni-fied Parties hereunder exceed the total amount of fees paid to NCA pursuant to the Engagement. You and we agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable consid-erations referred to above.

The reimbursement, indemnity and contribution obligations of the Company hereunder will (i) be in addition to any liability which the Company may otherwise have, (ii) survive the completion or termination of NCA's engagement under the Engagement and (iii) shall be binding upon any suc-cessors and assigns of the Company.

The Company agrees that without the prior written consent of NCA, it will not consent, set-tle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claims, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless (i) such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from any and all claims and liabilities arising out of such action, claim, suit or proceeding and (ii) there is no statement in connection therewith as to an admission of fault culpability or failure to act by or on behalf of any Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modifica-tion thereof signed by the parties and shall remain in full force and effect regardless of any termina-tion or the completion of NCA's services under the Engagement.



NÀVIGANT
CAPITAL·ADVISORS

All obligations herein of the Company are intended to be joint and several amongst Taylor, Bean & Whitaker Mortgage Corporation and and the subsidiaries listed on the signature page hereto

This agreement will be deemed made in Illinois. The validity and interpretation of this agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Illinois applicable to agreements made and to be fully performed therein (excluding the conflicts of laws rules). The Company irrevocably submits to the jurisdiction of any court of the State of Illinois or the United States District Court of the Northern District of the State of Illinois for the purpose of any suit, action or other proceeding arising out of this agreement which is brought by or against the Company. Each of the Company (and, to the extent permitted by law, on behalf of the Company's equity holders and creditors) and NCA hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim based upon, arising out of or in connection with this agreement.

Very truly yours,

TAYLOR, BEAN & WHITAKER MORTGAGE
CORP.
CDF TAX AND FLOOD SERVICES, LLC
COMPLETE MORTGAGE SOLU-
TIONS, LLC
HOME AMERICA MORTGAGE,
INC.
HMC-HOME MORTGAGES CO.
MASLOW INSURANCE AGENCY,
LLC
OCALA FUNDING, LLC
REO SPECIALISTS, LLC
SECOND STREET INSURANCE
CORPORATION

By: _____
Title: DIRECTOR
Date: _____

Accepted, acknowledged and agreed to:

NAVIGANT CAPITAL ADVISORS LLC

By: _____
    Edward R. Casas
    Senior Managing Director

Date: 08/24/2009

# *EXHIBIT 2*
# *Searched Parties*

| Debtor and Majority/Wholly Owned Subsidiaries | Non-Majority Owned Investments |
|---|---|
| **Taylor, Bean & Whitaker Mortgage Corp.** | Security One Valuation Services, LLC – 50% owned |
| Ocala Funding, LLC – 100% owned (SPE issuing commercial paper to finance mortgages held for sale) | |
| | Sparta Special Servicing, LLC – 30% owned |
| TBW Funding Company, LLC – 100% owned (bankruptcy remote for financing) | HomesFindMe.com – 34% owned |
| | 24/7 Call Capture, LLC – 20% owned |
| TBW Funding Company II, LLC – 100% owned (bankruptcy remote for financing) | |
| | **Servicing Clients** |
| TBW Funding Company III, LLC – 100% (bankruptcy remote for financing) | DLJ Mortgage Capital, Inc. |
| | Wells Fargo Bank, N.A. |
| Magnolia Street Funding, Inc. – 100% owned (bankruptcy remote for financing) | U.S. Bank National Association |
| Magnolia Street Funding II, Inc. – 100% owned (bankruptcy remote for financing) | |
| TBALT Corp. – 100% owned (bankruptcy remote for financing) | **Financing Relationships** |
| | Colonial Bank (Overline, COLB, and AOT Facilities) |
| Complete Mortgage Solutions– 100% owned | |
| Home America Mortgage, Inc. – 100% owned | Bank of America, N.A. (Gestation Purchase Facility 2009) |
| HMC-Home Mortgages Co. – 100% owned (retail arm) | USAmeriBank (Purchaser under AOT Program 2009) |
| Second Street Insurance Corporation – 100% owned (insurance captive – earns premiums on mortgage ins.) | Cole Taylor Bank (Purchaser under AOT Program 2009) |
| REO Specialists, LLC – 100% owned (maintenance, marketing and sale of REO) | Sovereign Bank (Servicing Facility 2009) |
| | The Farmers Bank (Servicing Facility 2009) |
| Maslow Insurance Agency, LLC – 100% owned (offers homeowners' and other insurance) | The Bank of New York Mellon (Servicing Facility 2009) |
| CDF Tax and Flood Services, LLC – 100% owned (collection of borrower tax and flood insurance premiums) | Guaranty Bank (Servicing Facility 2009) |
| | U.S. Bank National Association (Servicing Facility 2009) |
| Platinum Bancshares, Inc. – 82.6% owned (thrift holding company) | Franklin Bank, SSB acting through its receiver the FDIC (Servicing Facility 2009) |
| Platinum Community Bank (wholly owned subsidiary of Platinum Bancshares, Inc.) | Harris N.A. (Servicing Facility 2009) |

**Shareholders**
Lee B. Farkas – 79.2%
LBF Holdings, LLC – 14.7%

**Equipment Lessors**
PBCC

PBCC-Global Financial Services

Great America-Lin Walsh

Citicorp Vendor Finance

Banc of America Leasing

GE Capital

Pitney Bowes

Toshiba Financial Services

Neopost Leasing

Office Equipment Financial Services

CIT Technology Fin. Serv.

Lease Group Resources

Great American Leasing
Canon Financial Services

DeBow Mailing Machine

**Real Property Lessors**

ALFA Properties, Inc.

Martin Myrick of Fairhope, AL

Coats & Co.

JHPW, LLC

Wilshire Plaza, LLC

MSKP Ramblewood Square, LLC

Daniels-International Venture, LLP

KBC Bank NV (Servicing Facility 2009)

Seaside National Bank & Trust (Servicing Facility 2009) (COLB Facility 2008)

Natixis Real Estate Capital, Inc. (Working Capital Facility)

Florida Choice (Construction Line)

Mercantile Bank (Construction Line)

Plainfield Specialty Holdings II Inc. (Term Loan to LBF Holdings LLC with TBW as guarantor 2007)

Deutsche Bank and BNP Paribas (commercial paper line with Ocala Funding, LLC)

**Banking and Custodial Relationships**
Colonial Bank

Federal Deposit Insurance Company

BB&T Bank

The Bank of New York Mellon Trust Company, N.A.

**Relationships with Bankruptcy Professionals**
Navigant Capital Advisors, LLC

Stichter Riedel, Blain & Prosser, P.A.

Troutman Sanders LLP

| | |
|---|---|
| CLW R.E. Services Grp. | |
| Spotswood Partners, LLC | |
| AKJ Enterprises, LLC | |
| CSR Electronics, Inc. | |
| Tifton Land, Inc. | |
| KRG – The Paddocks, LLC | |
| CRP-2 Holdings AA, L.P. | |
| Catalona & Associates | |
| 443 Building Corp. | |
| SAAF Properties, LLC | |
| McVadon & Associates | |
| Parkway Properties, LP | |
| Bank of America, N.A. | |
| Salisbury Mall Ltd. Partnership | |
| 5041 Associates | |
| LTL, Inc. Agent for 21st Avenue Prop. | |
| Univel Mgmt. Copr. Agt. For Voss Houston Properties, LP | |
| ADK & RKR LLC | |
| Colonade Corporate Center | |
| Skotdal Brothers LLC | |
| Corner Office, Inc. | |
| 3413 56th St. NW LLC | |
| Little Rock Properties | |
| Principles Equity Properties, LP | |
| Lakehills Center at Laguna, LLC | |

| | |
|---|---|
| Douglas Emmett | |
| Premier Business Centers | |
| Neasham Investments, LLC | |
| Ellison Property Mgmt. | |
| Dorchester Group, LLC | |
| Quietwater Ltd. Partnership | |
| Suburban Owners LLC | |
| Arlington Management | |
| Kimberly A. Porter | |
| 315 NE 14th Street, LLC | |
| Edward Chchilglio | |
| Alarion Bank Centre | |
| 3201 Partnership | |
| West Central Florida Driver Improvement, Inc. L & L Properties, LLC | |
| Deerwood II, LLC | |
| 3201 Partnership | |
| Ellison Property Mgmt. | |
| Deichman Properties | |
| Veranda I Partners, Ltd. | |
| Stow Gunn, LLC | |
| R.G. Colling Apts, Inc. | |
| Wharton Management, Inc. | |
| Destiny Metropolitan Worship Church | |
| Palladian Properties, LLC | |
| Mulberry Company | |
| Courtyard Properties, LLC | |

Gary Mankin

Donald Amerson

Palm Creek Partners, LLC

443 Building Corp.

The Flatley Company

The Pines Corp.

HQ Global New Jersey Park

116 Morlake Drive Partners, LLC

Margaret Segura

Davinci Albuquerque

Colfax Koehler, LLC

REMAX of Lawton

G&I VI 655/755 Business Center FE LLCA

Access Title, LLC

Daryl J. Corbin

Corporate Office Centers

Regus Business Centres Corp.

Sun Life/Holt Lunsford Commercial, Inc.

Interstate Terra Development, Inc.

Hawthorne Capital, LLC

**Directors, Officers, Members (Current & Former)**
Lee Farkas – Director, Chairman, and Secretary

Paul Allen – Director and Chief Executive Officer

Ray Bowman – Director and President

| | |
|---|---|
| Sherry Dickinson – Director and Vice Chairman | |
| Danny Gaekwad – Director | |
| Stuart Scott – Director | |
| Jeff Cavender – non-voting Director and General Counsel | |
| Delton de Armas – Chief Financial Officer | |
| Jeremy Collett – Executive Vice President | |
| Erla Carter-Shaw – Executive Vice President | |
| Desiree Brown – Treasurer | |
| **Government Sponsored Entities**<br>Federal Home Loan Mortgage Corporation ("Freddie Mac") | |
| Government National Mortgage Association ("Ginnie Mae") | |
| U.S. Department of Housing and Urban Development ("HUD") | |
| **Regulatory Bodies/Governmental Agencies**<br>Office of Thrift Supervision | |
| Special Inspector General TARP | |
| Securities Exchange Commission | |

# *EXHIBIT 3*
# *Disclosure of Connections*

## DISCLOSURE OF CONNECTIONS

| Parties | Connection |
|---|---|
| Taylor, Bean & Whitaker Mortgage Corp. | Navigant Consulting, Inc., an affiliate of Navigant Capital Advisors, LLC was engaged pre-petition, by Troutman Sanders LLP, counsel on behalf of Taylor, Bean &Whitaker Mortgage Corp, to conduct forensic accounting, financial analysis and general consulting services. |
| Taylor, Bean & Whitaker Mortgage Corp. | Navigant Capital Advisors, LLC is currently retained by Taylor, Bean & Whitaker Mortgage Corp, prior to filing, to provide financial advisory services to coordinate, oversee and direct the internal and external resources necessary to support the firm's restructuring. |
| Colonial Bank | Navigant Consulting, Inc. currently provides services to other parties adverse to Colonial Bank. |