# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**In re:**

**TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,**

**Case No.: 3:09-bk-07047-JAF**

**Chapter 11**

        **Debtor.**

                                    /        **EMERGENCY HEARING REQUESTED**

_____

## MOTION OF FEDERAL HOME LOAN MORTGAGE CORPORATION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D) AND REQUEST FOR EMERGENCY HEARING

Federal Home Loan Mortgage Corporation ("Freddie Mac"), by and through its undersigned counsel and pursuant to 11 U.S.C. § 362(d), files this *Motion of Federal Home Loan Mortgage Corporation for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) and Request for Emergency Hearing* (the "Motion"), and moves this Court for the entry of an Order granting Freddie Mac relief from the automatic stay. In support hereof, Freddie Mac states:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334.

2.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O).

3.     Venue in this Court is proper pursuant to 28 U.S.C. § 1408.

# FACTUAL BACKGROUND

## The Bankruptcy Case

4.      On August 24, 2009 (the "Petition Date"), Taylor, Bean & Whitaker Mortgage Corp. ("TBW" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The Debtor is operating its business as a debtor-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## Freddie Mac and its Business

6.      Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress under the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59. Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers via the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans.   To achieve this congressionally mandated purpose, Freddie Mac, among other activities, purchases conventional mortgage loans from mortgage seller/servicers approved by Freddie Mac, pools those loans into mortgage-backed securities, and then sells those securities to investors.   Capital from investors is then used to buy more mortgage loans, and in this way, Freddie Mac facilitates the flow of funds from investors to homebuyers.

7.      Freddie Mac purchases mortgage loans from approved mortgage loan originators or "seller/servicers" and contracts with those seller/servicers to service the loans.  Mortgage seller/servicers agree to sell and service mortgages pursuant to the terms

and conditions contained in certain purchase documents (collectively, the "Purchase Documents") consisting of, *inter alia*, a purchase contract, Freddie Mac's Sellers and Servicers Guide (the "Guide"), and bulletins issued periodically by Freddie Mac to its seller/servicers which supplement the parties' agreement as set forth in the Purchase Documents.

8.       The Guide, which consists of several hundred pages[1], sets forth in detail the terms and conditions of the transactions between Freddie Mac and its seller/servicers. The Guide expressly provides that seller/servicers agree to sell mortgage loans to and agree to service mortgage loans for Freddie Mac in accordance with the standards set forth in the Guide.  See Guide Sections 1.2 and 50.2.  The Guide further provides that it and the other Purchase Documents constitute the entire agreement between Freddie Mac and its seller/servicers.  Id.

9.       In sum, the Guide is the basic contract between Freddie Mac and its sellers and servicers.  The seller/servicers agree to all terms, requirements and conditions set forth in the Guide.  Specifically, pursuant to the Guide, a seller/servicer agrees and warrants at all times that it, *inter alia*, be able to demonstrate to Freddie Mac's satisfaction that it has sufficient capitalization, profitability, liquidity, and funding sources to support its ongoing operations and its commitments to Freddie Mac.  See Guide Section 4.2.

---

[1]       Due to its size, the Guide is not attached as an Exhibit.  Rather, relevant portions of the Guide are cited herein.

10.     For each mortgage purchased by Freddie Mac (hereinafter, the "Freddie Mac Loans"), the Freddie Mac seller/servicer agrees that it will maintain a mortgage file and all underlying books and records (the "Mortgage Loan Files"), which are owned by Freddie Mac, pertaining to any mortgages serviced by the servicer in accordance with the terms and conditions of the Guide.  See Guide § 52.1.  The Mortgage Loan Files must be maintained during the time Freddie Mac retains any ownership interest in the mortgage and for a period thereafter.  See Guide § 52.3.

11.     Each Freddie Mac seller/servicer also warrants that all information submitted to Freddie Mac is true, complete and accurate, and agrees to allow Freddie Mac to inspect all of the mortgage loan origination files.  See Guide §§ 6.1 and 6.3.  In addition, all sellers and servicers agree, on request, to deliver original documents from the Mortgage Loan Files to Freddie Mac.  See Guide § 73.3.

12.     Pursuant to the Guide, the seller/servicer coordinates virtually all transactions related to each loan.  It invoices and collects principal and interest payments from each borrower, and calculates and collects monthly tax, insurance and other escrow payments, so that real estate taxes, annual or semi-annual hazard insurance payments and other property related charges may be paid.  The monies received by the seller/servicer are ultimately deposited into various custodial accounts that hold payments attributable to Freddie Mac Loans only, chiefly a principal and interest custodial account and a tax and insurance custodial account.  See Guide §§ 52.1 through 52.6.  Prior to deposit into the custodial accounts, it is possible that the payments may be placed for a short period of time into intermediate clearing accounts containing payments attributable to loans owned

by other lenders or investors. Freddie Mac requires that all Clearing Account Funds (as defined below) be moved into the custodial accounts within two business days of receipt.

13.     After deposit into the principal and interest custodial account, the total amount of the principal and interest payments are thereafter remitted to Freddie Mac on a regular basis, except for a small so-called "servicing strip", which is a small portion of the monthly payment and constitutes the fee paid to the seller/servicer for its services (hereinafter, the "Servicing Fee").  The tax and insurance custodial account is maintained by the seller/servicer for payment of periodic real estate taxes and insurance.  Draws are made on those accounts when such payments are due.

14.     The seller/servicer also handles, among other things, funds received for payoffs of Freddie Mac Loans.  These funds go through a similar deposit process before they are ultimately remitted to Freddie Mac.

15.     From time to time, Freddie Mac determines that it is necessary to terminate a particular company as an approved Freddie Mac seller/servicer.  When this happens, the Freddie Mac Loans need to be transferred to another seller/servicer for continued servicing of the loans.  This may be accomplished by immediate transfer of the loans to another seller/servicer on a permanent basis or may be done on an interim basis, with a permanent transfer to be concluded later.  In the latter instance, the seller/servicer is referred to as an interim servicer.  The Mortgage Loan Files and the related monies in the custodial or other accounts must be transferred to the new seller/servicer (whether interim or permanent) so that the loan may be properly serviced going forward.

16.     The Guide contains detailed provisions related to the termination of a seller/servicer, including the following:

§ 5.2   Without limiting Freddie Mac's right to take whatever other action it deems appropriate to protect its interests and enforce its rights (including disqualification or suspension for reasons not listed below), Freddie Mac may disqualify or suspend a Seller or a Servicer for any of the following reasons:

* * * *

9.      Any weakness or notable change in the financial or organizational status of the Seller or the Servicer that, in the opinion of Freddie Mac, could adversely affect Freddie Mac.

10.     The failure of the Seller or the Servicer to meet any requirement as may be prescribed by Freddie Mac for eligibility as a Seller or a Servicer.

11.     The placement of the Seller or the Servicer on probation or restriction of its activities in any manner by a federal or State government agency.

12.     Any judgment, order, finding or regulatory action to which the Seller or Servicer (or its management) is subject that would adversely affect the Seller's or Servicer's ability to comply with the terms and conditions of the Purchase Documents.

13.     Freddie Mac's determination that the Seller's or Servicer's warranty obligations are disproportionate to its capital and/or assets.

* * * *

15.     The Seller or the Servicer's failure to observe or comply with any term or provision of the Purchase Documents.

* * * *

§ 73.1  Freddie Mac may terminate Servicing by the Servicer at any time with cause for any of the reasons for disqualification cited in Section 5.2 ... . Termination of servicing with cause is a basis for immediate disqualification as a Seller/Servicer ... .

§ 73.2  If Freddie Mac transfers the Servicing of any Mortgage, the Servicing Compensation ... is paid to the new Servicer.

§ 73.3  Upon termination of the Servicing of any Mortgage, the Servicer is responsible for supplying ... all reports, documents and information ... requested by Freddie Mac on the date specified by Freddie Mac.

§ 73.4 The remittance to Freddie Mac of Mortgage collections for each Mortgage for which Servicing is terminated must be made on the date specified by Freddie Mac ... . Additionally, all Escrow Funds, Escrow Accounts and prepared installments ... must be transferred to the new Servicer on the date specified by Freddie Mac.

The Servicer must use its best efforts to effect the orderly and efficient Transfer of Servicing to the new Servicer.

**Freddie Mac's Seller/Servicer Agreement with Taylor, Bean & Whitaker**

17.     Up until on or about August 4, 2009, TBW was an approved Freddie Mac seller/servicer. TBW serviced approximately Two Hundred Ninety-One Thousand Five Hundred Twenty-Five (291,525) Freddie Mac mortgage loans with a total value of approximately Fifty Billion Six Hundred Forty-Six Million Three Hundred Sixty Thousand One Hundred Thirty Seven Dollars ($50,646,360,137.00) (the "Mortgage Loans").

18.     Freddie Mac is the owner of approximately seventy percent (70%) of all of the loans serviced by TBW.

**TBW's Default and Freddie Mac's Termination of TBW**

19.     On or prior to August 3, 2009, TBW's financial condition deteriorated dramatically. On Monday, August 3, 2009, on information and belief, investigators from the Special Inspector General's Office for the Troubled Assets Relief Program, together with the FBI and the inspector general of the Department of Housing and Urban Development, raided TBW's offices in Ocala, Florida. On August 4, 2009, the Federal Housing Administration ("FHA") suspended TBW from making loans insured by the federal agency. Additionally, the Government National Mortgage Association ("Ginnie

Mae") defaulted TBW's participation in its Mortgage-Backed Securities program and terminated TBW's Ginnie Mae loan servicing rights. A true and correct copy of the FHA press release announcing the FHA suspension and Ginnie Mae termination is attached hereto and incorporated herein by reference as "Exhibit A". The FHA suspension and Ginnie Mae termination further contributed to the deterioration of TBW's financial condition. The deterioration of TBW's financial condition resulted in a breach of its obligations under the Guide.

20.     In addition, TBW breached its obligations under the Guide in numerous other respects, including but not limited to, repurchase obligations for loans determined to be of non-investment quality.[2]

21.     By overnight letter dated August 4, 2009 (the "Termination Notice"), Freddie Mac notified TBW that TBW's eligibility to sell and/or service Freddie Mac mortgages was terminated immediately. A true and correct copy of this letter is attached hereto and incorporated herein by reference as "Exhibit B". The Termination Notice was also sent via electronic delivery on August 4, 2009 (hereinafter, the "Termination Date") to TBW.

22.     The Termination Notice constituted a valid termination pursuant to the Purchase Documents and the Guide.

---

[2]     Freddie Mac's investigation into other potential breaches is ongoing.

23.     On August 5, 2009, TBW released a press release stating that it was ceasing all loan origination operations effective immediately.  A true and correct copy of the press release is attached hereto and incorporated herein by reference as "Exhibit C".

24.     On August 7, 2009, the Florida Office of Financial Regulation issued an emergency cease and desist order, effectively barring TBW from originating any mortgages in the State of Florida.  On August 21, 2009, the Florida Office of Financial Regulation issued a second emergency cease and desist order, barring TBW from, among other things, depositing funds from Florida consumers into non-custodial accounts, prosecuting or commencing any foreclosure actions, assessing any late fees and/or reporting Florida consumers to credit bureaus for August, 2009 and later payments.[3]

### The Post-Termination Transfer of Servicing to Interim Servicers

25.     When Freddie Mac terminates a seller/servicer, all loan servicing functions must be quickly transferred to a replacement servicer so that the day-to-day servicing activities such as collecting payments from borrowers, remitting principal and interest payments to Freddie Mac, paying borrowers' tax and insurance obligations and handling borrower defaults and requests for loan modifications can continue smoothly without interruption.  As noted above, often the initial transfer of servicing is done on an interim basis to an interim servicer, pending ultimate transfer to a new servicer on a permanent basis.

---

[3]     To date, Florida, Connecticut, Massachusetts, Michigan, New Jersey, Tennessee, Kentucky, North Carolina, Pennsylvania, Maryland, Washington, Mississippi and Illinois have issued cease and desist orders, prohibiting TBW from engaging in mortgage related activities.  True and correct copies of these cease and desist orders are attached hereto and incorporated herein by reference as "Composite Exhibit D".  Further, upon information and belief, the FBI, HUD and FHA are conducting ongoing investigations into TBW.

26.     In this case, the portfolio is so large that Freddie Mac selected three interim servicers: Saxon Mortgage Services, Inc., Ocwen Loan Servicing, LLC and Cenlar FSB, (collectively, the "Interim Servicers") to which Freddie Mac's mortgage funds, the Mortgage Loan Files and related loan servicing documents will be transferred. The interim servicers are capable of handling the immediate transfer of mortgage funds and records in large quantities and are well qualified and capable of servicing Freddie Mac's mortgage loans.

**The Freddie Mac Loan Files**

27.     On the afternoon of August 5, 2009, a team of Freddie Mac employees went to the Magnolia Street offices of TBW in Ocala, Florida to retrieve the Mortgage Loan Files, other relevant documentation related to the portfolio of loans, and additional property entrusted by Freddie Mac to TBW in its capacity as a Freddie Mac seller/servicer (collectively, the "Freddie Mac Property").

28.     Apparently due to ongoing federal and state investigations, the team was unable to immediately obtain the Freddie Mac Property.

29.     On August 5, 2009, Freddie Mac employees began discussing with TBW officials the logistics of the file and servicing transfers, and obtained TBW's agreement to effect the transfer of the electronic files and records immediately necessary for interim servicing. However, on information and belief, TBW has terminated approximately seventy five percent (75%) of its employees, over nine hundred (900) people. Only a skeleton staff remains to assist Ginnie Mae and Freddie Mac with the transfer of

servicing from TBW to other entities, many of whom, on information and belief, are not being paid by TBW.

30.     From August 6, 2009 to the Petition Date, Freddie Mac attempted to remove its loan servicing and collateral loan files from TBW's offices.  As of the Petition Date, Freddie Mac has only been able to obtain approximately ten percent (10%) of the collateral loan files and has obtained none of the hard-copy loan servicing files.  Freddie Mac has, however, obtained electronic versions of some of the loan servicing files.  The hard-copy loan servicing files are located at a warehouse rented by TBW and the collateral loan files are at TBW's offices.  All files related to Freddie Mac loans are owned by Freddie Mac, pursuant to the Guide and all agreements between Freddie Mac and TBW.  These files are needed for numerous servicing related issues, including, but not limited to: (i) accessing the loan application and related documents signed by the borrower at loan origination; and (ii) accessing documents evidencing borrower correspondence.  Freddie Mac's and the Interim Servicers' possession of these documents is essential to proper servicing of the loans, and allows the Interim Servicers to address issued raised by borrowers, to timely make real estate tax, insurance and related payments in connection with the loans and to properly apply monthly loan payments and pay-offs, as well as protect Freddie Mac's interest in the serviced loans.

31.     On August 11, 2009, TBW commenced transferring Freddie Mac's electronic files and records as directed by Freddie Mac, completing the initial transfers on August 14, 2009.  Thereafter, numerous electronic files have been identified as being faulty and additional information must be provided to support the reconciliation of the electronic data.  While the Interim Servicers continue to reconcile the files and loan

information, additional electronic files must be provided. Without the electronic files on each loan, the Interim Servicers are unable to continue orderly servicing of each borrower account.

**Mortgage Loan Payments and Payoffs Not Yet Transferred to Freddie Mac**

32.     On August 6, 2009, and on each business day thereafter, as Freddie Mac employees returned to TBW to manage the transfer process, they identified additional Freddie Mac Property not yet transferred to it or to the Interim Servicers, including, but not limited to: a) checks in TBW's vault (hereinafter, the "Vault Checks"), b) certain clearing accounts at Colonial Bank ("Colonial") containing monthly principal and interest remittances, tax and insurance escrow funds and loan pay-off funds (collectively, the "Clearing Account Funds"),[4] c) unendorsed checks at Colonial payable to TBW for Freddie Mac loans (hereinafter, the "Unendorsed Checks"), and d) certain Automated Clearing House ("ACH") payments for borrowers' payments which had not been debited as scheduled (hereinafter, the "ACH Payments"). Freddie Mac needs to gain access to all of this Freddie Mac Property in connection with the transfer of the servicing.

33.     **Vault Checks.** Prior to its termination as a seller/servicer, TBW utilized Colonial as a depository for loan payments received in connection with the Freddie Mac

---

[4]     Concurrent with the Termination Notice and with the approval of FDIC, Freddie Mac re-titled in its own name certain TBW custodial bank accounts at Colonial in which borrower funds related to Freddie Mac loans were held. These accounts contained borrower principal and interest payments, insurance and tax escrow funds, pay-off proceeds, repurchase proceeds and make-whole payments owed to Freddie Mac. Funds in the custodial accounts were withdrawn from Colonial by Freddie Mac on or about August 21, 2009, and are not a subject of the request for relief.

Loans and loans owned by other entities.[5]  Subsequent to its receipt of the Termination Notice, TBW altered its normal business practice of depositing checks from Freddie Mac's borrowers for mortgage/taxes/insurance payments into separate bank accounts at Colonial and instead bundled and commingled those checks with checks from other lenders in TBW's vault.   As of August 10, 2009, Freddie Mac has identified approximately four thousand two hundred twenty (4220) checks relating to its loans with a face value of approximately Forty Three Million One Hundred Seventeen Thousand One Hundred Eighty Nine Dollars and eighty three cents ($43,117,189.83).   The checks represent borrower pay-off funds, principal and interest payments and tax and insurance escrow funds received by TBW.   Upon information and belief, additional checks are received daily.   These checks must be timely obtained by Freddie Mac so that the borrowers' loans may be timely credited with payments of principal and interest or tax and insurance escrow monies.

34.   **Unendorsed Checks.**   Colonial also received checks directly from borrowers.   As of August 10, 2009, Colonial had received directly from borrowers approximately thirty thousand (30,000) Unendorsed Checks.   The Unendorsed Checks effectively represent commingled funds belonging to Freddie Mac and other investors, of which, upon information and belief, approximately eighty percent (80%) belong to Freddie Mac.   The aggregate value of the Unendorsed Checks is Thirty Five Million to Fifty Million Dollars ($35,000,000.00 - $50,000,000.00).   As their defined name implies, the Unendorsed Checks were never endorsed by TBW or deposited into any account.

---

[5]        On or about August 14, 2009, Colonial Bank was placed in receivership by FDIC and its assets sold to BB&T.

35.     The Unendorsed Checks represent borrower principal and interest payments, and tax and insurance escrow funds.  These funds must be transferred to the Interim Servicers so that the funds can be applied to the borrowers' principal, interest, tax and insurance obligations as they become due[6].   BB&T, as successor-in-interest to Colonial, has not deposited the Unendorsed Checks, nor have they released them to the respective investors.

36.     As with Vault Checks, if these borrower funds are not properly endorsed and remitted to the respective loan owner, Borrower loan remittances may not be correctly credited and loan pay-offs may not be properly applied in a manner discharging the loan.  Borrower insurance policies will lapse for non-payment, and real property tax bills will go unpaid, resulting in increased tax liabilities and possible tax deed/foreclosure sales.

37.     **ACH Payments.**  On or about August 12, 2009, Freddie Mac employees discovered that since the Termination Notice, as many as thirty five thousand (35,000) ACH automatic debit payments authorized by borrowers were not executed as scheduled.  Such ACH payments include standing authorizations, as well as one-time payments, from borrowers.  The value of the ACH payments is currently unknown.  Although Freddie Mac has repeatedly asked TBW for the ACH information, they have not provided sufficient information needed to allow the Interim Servicers to authorize such

---

[6]     The Interim Servicers have received a small number of additional unendorsed checks on which TBW is the named payee.  These checks need to be endorsed and transferred to the Interim Servicers so that the funds can likewise be applied as necessary.

ACH payment debits. Freddie Mac is attempting to extract that information from the electronic files transferred as described below.

38. **Clearing Account Funds.** Since the Termination Date, some monthly mortgage payments received from borrowers via electronic debit, wire transfer or via check have accumulated in clearing accounts at Colonial, each titled in TBW's name (collectively, the "Clearing Account Funds"). The subject accounts include commingled borrower funds attributable to loans owned by numerous lenders and investors. Upon information and belief, the amount of current Clearing Account Funds attributable to Freddie Mac Loans total approximately One Hundred Sixty One Million Dollars ($161,000,000.00). Freddie Mac requires access to its funds in these accounts in order to identify borrowers' principal and interest payments and escrow funds used to pay property taxes and insurance and to allow for uninterrupted and orderly loan servicing.[7]

39. **Other Funding Issues.** On information and belief, as of August 3, 2009, TBW ceased making advances in payment of Freddie Mac's borrowers' insurance premiums or periodic real property tax liabilities. There is, therefore, the imminent risk that borrowers' insurance policies may lapse for non-payment, and real property tax bills will go unpaid, resulting in increased tax liabilities and possible tax deed/foreclosure sales. As well, it is also believed that borrowers' hazard insurance and property tax payments made by TBW, prior to the Termination Notice, are being returned unpaid by

---

[7] Concurrent with the Termination Notice and with the approval of FDIC, Freddie Mac re-titled in its own name certain TBW custodial bank accounts at Colonial Bank ("Colonial") in which borrower funds related to Freddie Mac loans were held. These accounts contained borrower principal and interest payments, insurance and tax escrow funds, pay-off proceeds, repurchase proceeds and make-whole payments owed to Freddie Mac. Funds in the custodial accounts were withdrawn from Colonial by Freddie Mac on or about August 21, 2009, and are not a subject of the request for relief.

Colonial due to the freeze on such custodial bank accounts. The continued hold on these funds is causing real property tax bills to go unpaid and insurance policies to lapse.

## RELIEF REQUESTED

40.     By this Motion, Freddie Mac seeks entry of an order granting relief from the automatic stay to permit Freddie Mac to exercise and enforce all of its rights and remedies against its property in accordance with the provisions of the Purchase Documents, the Guide, and applicable law, including, without limitation, obtaining possession of the Mortgage Loan Files, obtaining its funds, obtaining an accounting from TBW, completing the orderly transfer of servicing to the Interim Servicers and obtaining endorsements of, and delivery to the respective Interim Servicers, of Freddie Mac's borrowers' checks (the Unendorsed Checks, currently in the possession of BB&T, as successor-in-interest to Colonial), and requiring delivery of the Vault Checks and Clearing Account Funds to Freddie Mac or its designee.

## BASIS FOR RELIEF REQUESTED

**TBW Has No Property Rights in the Mortgages Sold to Freddie Mac or the Servicing Rights Related to Loans Owned by Freddie Mac**

41.     Due to Freddie Mac's valid prepetition termination of TBW's eligibility to sell mortgages to and to service mortgages for Freddie Mac under the Purchase Documents, the Debtor maintains no interest with respect to the servicing rights relating the Freddie Mac Mortgage Loans. Property rights do not arise under the Bankruptcy Code. In re Pinetree, Ltd., 876 F.2d 34 (5th Cir. 1989). Rather, those rights arise under

applicable non-bankruptcy law.  <u>Butner v. United States</u>, 440 U.S. 48, 56 (1979); <u>Commerce Bank v. Mountain View Village, Inc</u>., 5 F.3d 34, 37 (3d Cir. 1993).  Under applicable non-bankruptcy law, once Freddie Mac terminates a servicing agreement and the seller/servicer's eligibility to service its mortgages, all of the seller/servicer's rights under the servicing agreement are extinguished.

42.     Section 5.1 of the Guide provides that Freddie Mac may terminate a seller/servicer's eligibility to be a seller/servicer at its discretion and upon any breach by the seller/servicer.  <u>Mortgage Network Corp. v. Federal Home Loan Mortgage Corp</u>, Case No. SACV 93-303 at 5, 9 (C.D. Cal. Dec. 20, 1993), <u>aff'd.</u>, 77 F.3d 489 (table), 1996 WL 64984 (9th Cir.), <u>cert. denied</u>, 519 U.S. 812 (1996).

43.     Once eligibility is terminated, the seller/servicer ceases to be a seller/servicer and has no right to service mortgages owned by Freddie Mac.  <u>American Bankers Mtge. Corp. v. Federal Home Loan Mtge. Corp.</u>, 75 F.3d 1401, 1412 (9th Cir. 1995), <u>cert. denied</u>, 519 U.S. 812 (1996); <u>Mortgage Network</u>, 1996 WL 64984 at 1.  The terminated seller/servicer has "no remaining possessory rights in the servicing rights to its mortgage portfolio ... ."  <u>American Bankers</u>, 75 F.3d at 1412; <u>see also</u> <u>Mortgage Network</u>, 1996 WL 64984 at 1 ("Upon termination, TMNI ceased to be a "Seller/Servicer" as defined in [the] *Guide* ... and by the terms of the contract ... had no right to service mortgages owned by Freddie Mac.  Therefore, it had no remaining possessory interest in the servicing rights").  Actually, "the contractual rules for the change of servicing on the termination of a servicer with cause display an unmistakable intention to terminate all of that servicer's rights under the contract as of the time of termination."  <u>Mortgage Network</u>, 1996 WL 64984 at 9.

44.     As the court held in <u>In re LiTenda Mortgage Corp.</u>, 246 B.R. 185 (Bankr. D.N.J. 2000), <u>affirmed</u> 276 F.3d 578 (Table) (3d Cir. 2001):

> § 5.2 of the Guide gives Freddie Mac the right to take whatever action it deems necessary to protect its interests, including disqualification or suspension of a seller or servicer.  Under § 5.2, Freddie Mac may suspend or disqualify a seller or servicer either for cause or without cause, and such action is effective immediately upon notice of suspension or disqualification.  Significantly, § 5.2 also states that the decision to suspend or disqualify a seller without cause, to terminate a service without cause is conclusive ... .  [W]hen Freddie Mac gave the notice of termination, [Defendant's] right to service the Freddie Mac portfolio ceased to exist.

<u>Id.</u> at 192.

45.     Pursuant to the Termination Notice, Freddie Mac terminated TBW's eligibility to service Freddie Mac's loans pre-petition.  Accordingly, TBW does not have any property interests in the mortgages or the income derived therefrom for those loans that were sold to Freddie Mac pre-petition or any interest in the servicing rights for the Mortgage Loans owned by Freddie Mac.

**Cause Exists to Lift the Automatic Stay as to Freddie Mac**

46.     To the extent that the automatic stay applies to TBW's mere possession of the Mortgage Loan Files, cause exists to lift the automatic stay to enable Freddie Mac to exercise its right to recover the Mortgage Loan Files.  Section 362(d) of the Bankruptcy Code provides for circumstances under which this Court may terminate, annul, modify, or condition the automatic stay.  Section 362(d)(1) of the Bankruptcy Code provides that

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay --

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1). Under Section 362(d)(1), Freddie Mac "bears the burden of establishing a prima facie case of cause, at which point the burden of proof shifts to debtor" to demonstrate the absence of cause. See In re Aardvark, Inc., No. 96-412-SLR, 1997 U.S. Dist. LEXIS 3304, at *13 (D.Del. Mar. 4, 1997) (quoting In re Phoenix Pipe & Tube, L.P., 154 B.R. 197, 198 (Bankr. E.D.Pa. 1993)); 11 U.S.C. § 362(g).

47.     The Bankruptcy Code specifically provides that "cause" includes a lack of adequate protection. 11 U.S.C. § 362(d)(1). A lack of adequate protection, however, does not constitute the sole basis for "cause" for relief from the stay. See 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). Thus, Section 362(d)(1) leaves "courts to consider what constitutes cause based on the totality of the circumstances in each particular case." In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997) (citing In re Trident Assocs., 52 F.3d 127 (6th Cir. 1995)).

48.     The Bankruptcy Code does not define "cause" and it must therefore be "determined on a case-by-case basis." Izzarelli v. Rexene Products Co. (In re Rexene Products Co.), 141 B.R. 574, 576 (Bankr. D.Del. 1992); Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D.Del. 1996); In re Wedgewood, 878 F.2d 693, 697 (3d Cir. 1989); In re Pro Football Weekly, Inc., 60 B.R. 824, 826 (N.D. Ill. 1986).

49.     The totality of the circumstances present in this case constitute sufficient "cause" to warrant relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code.

50.     "[I]t is a well 'recognized principle of bankruptcy law that an executory contract or lease validly terminated prior to the institution of the bankruptcy proceedings, is not resurrected by the filing of the petition in bankruptcy and cannot therefore be included among the debtor's assets.'" McDaniel v. Metropolis Towers Apartment Corp., 2002 WL 106587 at 3 (D.N.J. Feb. 26, 2002) (quoting In re Robertson, 147 B.R. 358, 361 (Bankr. D.N.J. 1992).

51.     It follows that if an agreement is terminated prepetition, "cause" exists to lift the automatic stay to enable the terminating party to recover possession of any underlying property.  See In re Nasir, 217 B.R. 995, 997 (Bankr. E.D.Va. 1997) ("a landlord's desire to evict a debtor tenant whose lease has been terminated prepetition is sufficient cause for the bankruptcy court to grant relief from stay under § 362(d)(1)."); see also In re Greenfield Dry Cleaning & Laundry, Inc., 249 B.R. 634, 644 (Bankr. E.D.Pa. 2000); Bell v. Alden Owners, Inc., 199 B.R. 451, 463 (S.D.N.Y. 1996) ("cause exists for granting relief from the automatic stay when an executory contract is validly terminated prior to the commencement of a bankruptcy case."); In re Knight Jewelry, 168 B.R. 199, 201 (Bankr. W.D.Mo. 1994) ("Since the lease was terminated before the bankruptcy case was filed, cause exists to grant relief from the automatic stay."); In re Syndicom Corp., 268 B.R. 26, 45 (Bankr. S.D.N.Y. 2001); In re Hill, 307 B.R. 821, 824 (Bankr. W.D.Pa. 2004) (possessory interest in property "is not sufficient to preclude annulment of the stay, at least where no lease exists."); In re Fitzgerald, 237 B.R. 252, 262 (Bankr. D.Conn. 1999) ("Based upon FNMA's showing [that the Debtor was left only with a bare possessory interest in the Property at the commencement of the case], the court finds that FNMA has satisfied its initial burden under Section 362(d)(1).").

52.     Under the above authorities, Freddie Mac's valid prepetition termination of TBW as a seller/servicer as well as its undeniable right of ownership of the Mortgage Loan Files, each constitute sufficient "cause" for relief from the automatic stay to the extent applicable to TBW's mere possession of the Mortgage Loan Files.

53.     Although courts have found "cause" for stay relief under Section 362(d)(1) of the Bankruptcy Code based solely upon a prepetition termination of the parties' agreement, "cause" is further established in this case by the inability of TBW to properly service the Mortgage Loans.   Due to the termination of employment of substantially all its employees and the cessation of all business activity, TBW has no financial or human resources to continue servicing loans.   Any former TBW employees remaining on site are retained temporarily by Ginnie Mae to assist that agency, not to continue TBW's business.

54.     The Interim Servicers do not yet have all of the documents necessary to service all of the loans, and to determine when insurance premiums or real estate taxes must be made.   Therefore, there is the imminent risk that borrowers' insurance policies may lapse for non-payment, subjecting the borrowers to a risk of loss of their mortgaged properties (and Freddie Mac's collateral).   In the event of a loss due to failure to maintain insurance, the borrower could potentially assert claims against Freddie Mac and/or the Interim Servicers for the uncompensated loss occurring to his/her home due to failure to maintain insurance.   In addition, real property tax bills may go unpaid resulting in increased tax liabilities and possible tax foreclosure sales.   Stay relief is proper to avoid these serious consequences.

55. Due to Freddie Mac's pre-petition termination under the Guide and the Purchase Documents, cause exists for relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code. Additionally, the totality of the circumstances mandates that the automatic stay should be lifted to enable Freddie Mac to enforce its rights to recover the Mortgage Loan Files, all Vault Checks, the Unendorsed Checks and any Clearing Account Funds in TBW's possession, custody or control, and to complete the orderly transfer of servicing to the Interim Servicers.

56. Direct, immediate and substantial harm will occur to the interests of Freddie Mac and hundreds of thousands of Freddie Mac's borrowers if this Motion is not granted promptly.

WHEREFORE, Freddie Mac requests that the Court enter an Order:

(i)     granting this Motion;

(ii)    terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to exercise its rights under the Guide and the Purchase Documents to recover the Mortgage Loan Files and related documents;

(iii)   terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to access the Vault Checks, identify the checks corresponding to its Mortgage Loans Files, obtain endorsements of the checks, as appropriate, and deposit the checks into Freddie Mac accounts, protecting borrowers' payments and funds;

(iv)    terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to access the Clearing Account Funds, identify the funds corresponding to its Mortgage Loan Files and deposit them into Freddie Mac accounts, protecting borrowers' payments and funds;

(v)     terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac employees and agents of Freddie Mac, and its designees, to obtain access to Debtor's offices and storage areas for the purpose of obtaining and retrieving the Mortgage Loan Files;

(vi)    terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to obtain and retrieve its Mortgage Loan Files, Vault Checks,

Unendorsed Checks and to determine the amount of the Clearing Account Funds attributable to Freddie Mac loans;

(vii)    terminating the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable Freddie Mac to obtain the endorsement and delivery by TBW to the respective Interim Servicer of the Unendorsed Checks currently in the possession, custody or control of BB&T, as successor-in-interest to Colonial; and

(viii)    granting such other further relief this Court deems just and proper.

Respectfully submitted,

*/s/ Jason Ward Johnson        /*
/s/ Jason Ward Johnson
Gary R. Soles
Florida Bar No.: 0616149
Jason Ward Johnson
Florida Bar No.: 0186538
**LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.**
450 South Orange Avenue, Suite 800
Orlando, Florida 32803
Telephone: (407) 843-4600
Facsimile: (407) 843-4444
e-mail: jason.johnson@lowndes-law.com

and

George Kielman, Managing Associate General Counsel
Kenton W. Hambrick, Associate General Counsel
Soha Mody, Associate General Counsel
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive - MS 202
McLean, Virginia  22102
Telephone: (703) 903-2640
Facsimile: (703) 903-3691

Attorneys for Federal Home Loan Mortgage Corporation

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 25th day of August, 2009, the foregoing Motion of Federal Home Loan Mortgage Corporation for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(D) and Request for Emergency Hearing was filed and served via the Court's ECF/Electronic Filing System, and to the extent that the foregoing was not served electronically via the CM/ECF System, I caused a copy of same to be served on August 26, 2009 via first class mail postage prepaid to: **Debtor**: Taylor, Bean & Whitaker Mortgage Corp., 315 N.E. 14th Street, Ocala, Florida 34470; **Counsel for Debtor**: Edward J. Peterson, III, Stichter, Riedel, Blain & Prosser, PA, 110 East Madison Street, Suite 200, Tampa, FL 33602; **Special Counsel for Debtor**: J. David Dantzler, Esq., Troutman Sanders, LLP, 600 Peachtree Street, NE Suite 5200, Atlanta, Georgia 30308-2216; **United States Trustee**: Kenneth C. Meeker, Assistant U.S. Trustee, 135 West Central Boulevard, Suite 620, Orlando, Florida 32801; and the parties listed on the Local Rule 1007-2 Parties in Interest List attached hereto.


*/s/ Jason Ward Johnson*
Jason Ward Johnson

Label Matrix for local noticing
113A-3
Case 3:09-bk-07047-JAF
Middle District of Florida
Jacksonville
Tue Aug 25 10:34:44 EDT 2009

AT&T Universal Biller
P.O. Box 13148
Newark, NJ 07101-5648

American International Company
22427 Network Place
Chicago, IL 60673-1224

Cadwalader, Wickersham & Taft
General Post Office
P.O. Box 5929
New York, NY 10087-5929

Deutsche Bank Securities, Inc.
60 Wall St., 19th Floor
New York, NY 10005-2836

Dimension Data
P.O. Box 403667
Atlanta, GA 30384-3667

Fidelity National Title
3007 N.DELTA HWY # 206
EUGENE, OR 97408-7119

First American
2490 PASEO VERDE PKWY SUITE 10
HENDERSON, NV 89074-7120

First American CoreLogic
P.O. Box 847239
Dallas, TX 75284-7239

First American Real Estate Tax
Service
PO BOX 200079
Dallas, TX 75320-0079

First National Bank of Layton
136 W 12300 S Ste 201
Draper, UT 84020-8368

Hadlock Title Services, Inc.
679 Worcester Road
Natick, MA 01760-1824

James G. Hicks
950 Grayson Highway
Lawrenceville, GA 30046-6340

Lamb & Browne
531 Concord Street
Holliston, MA 01746-3312

LandAmerica Tax and Flood
1123 S Parkview Drive
Accounting Department
Covina, CA 91724-3748

Locke Lord Bissell & Liddell LLP
111 S. Wacker Dr.
Chicago, IL 60606-4302

McKenna Long & Aldridge, LLP
P.O. Box 116573
Atlanta, GA 30368-6573

NDS USA LLC
406 E Silver Springs Blvd
Ocala, FL 34470-5828

Edward J. Peterson III
Stichter, Riedel, Blain & Prosser, PA
110 East Madison Street, Suite 200
Tampa, FL 33602-4718

RBC Capital Markets
One Liberty Plaza
165 Broadway
New York, NY 10006-1428

Sam Solutions
11511 Abercorn Box 285
Savannah, GA 31419-1901

Robert A. Soriano
Greenberg Traurig, P.A.
625 East Twiggs Street
Suite 100
Tampa, FL 33602-3925

Sovereign Bank
c/o Robert Soriano, Esq.
625 E. Twiggs St., #100
Tampa, FL 33602-3925

Taylor, Bean & Whitaker Mortgage Corp.
315 N.E. 14th St.
Ocala, FL 34470-4112

United States Trustee - JAX
135 W Central Blvd, Suite 620
Orlando, FL 32801-2440

Wright Express Financial
33548 Treasury Center
Chicago, IL 60694-3500

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(d)United States Trustee - Jax          End of Label Matrix
135 W Central Blvd, Suite 620           Mailable recipients    25
Orlando, FL 32801-2440                  Bypassed recipients     1
                                        Total                  26
```