

SIXTH AMENDED AND RESTATED

SERVICING FACILITY LOAN AND SECURITY AGREEMENT


Dated as of May 15, 2009


by and among


**TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**
as Borrower,


**THE LENDERS PARTY HERETO**


and


**SOVEREIGN BANK,**
as Agent

B # 935671 v.9

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..................................................................................................2
    Section 1.1    Defined Terms ......................................................................................2
    Section 1.2    Terms Generally ..................................................................................18

ARTICLE II AMOUNT AND TERMS OF SERVICING FACILITY REDUCTION ...............19
    Section 2.1    Servicing Facility Reduction .............................................................19
    Section 2.2    Reaffirmation of Notes and Loan Documents. ...................................19
    Section 2.3    [Intentionally left blank]....................................................................19
    Section 2.4    Notes...................................................................................................19
    Section 2.5    Interest ...............................................................................................20
    Section 2.6    Acknowledgement of Termination of Commitments ...........................20
    Section 2.7    Mandatory Repayments......................................................................20
    Section 2.8    Optional Prepayments.........................................................................22
    Section 2.9    Fees.....................................................................................................22
    Section 2.10   Payments, Etc. ....................................................................................22
    Section 2.11   Indemnity............................................................................................23
    Section 2.12   Inability to Determine Interest Rate ...................................................23
    Section 2.13   Illegality.............................................................................................24
    Section 2.14   Increased Costs ..................................................................................24
    Section 2.15   Taxes..................................................................................................25
    Section 2.16   Sharing of Setoffs ..............................................................................26
    Section 2.17   Mitigation of Obligations; Replacement of Lenders...........................26

ARTICLE III CONDITIONS ..............................................................................................27
    Section 3.1    [Intentionally left blank].....................................................................27
    Section 3.2    General................................................................................................27

ARTICLE IV SECURITY....................................................................................................27
    Section 4.1    Grant of Security Interest...................................................................27
    Section 4.2    Collateral............................................................................................27
    Section 4.3    Standard of Care of Agent; Indemnification.......................................29
    Section 4.4    Fees and Expenses of Agent...............................................................30
    Section 4.5    Availability of Documents..................................................................30
    Section 4.6    Representations and Warranties of Borrower With Regard to the Servicing
                  Collateral. ..........................................................................................30
    Section 4.7    Covenants of Borrower With Regard to the Servicing Collateral.........32
    Section 4.8    Collection of Collateral Payments.....................................................33
    Section 4.9    Authorized Action by Agent...............................................................33
    Section 4.10   Release of Collateral ..........................................................................34
    Section 4.11   FHLMC/GNMA Agency Guide Required Language. ..........................34
    Section 4.12   Negative Pledge .................................................................................34
    Section 4.13   Banker's Lien .....................................................................................34

ARTICLE V REPRESENTATIONS AND WARRANTIES ....................................................35
    Section 5.1    Corporate Existence; Compliance with Law and Contractual Obligations........35
    Section 5.2    Corporate Power; Authorization; Enforceable Obligations ................35
    Section 5.3    No Legal or Contractual Bar...............................................................35
    Section 5.4    Financial Information .........................................................................35
    Section 5.5    No Material Litigation ........................................................................36
    Section 5.6    Taxes..................................................................................................36
    Section 5.7    Investment Company Act ...................................................................36
    Section 5.8    Subsidiaries; Capitalization ...............................................................36
    Section 5.9    Use of Proceeds .................................................................................36

i

| | | |
|---|---|---|
| Section 5.10 | ERISA | 36 |
| Section 5.11 | Security Interests | 36 |
| Section 5.12 | Agency Approvals | 37 |
| Section 5.13 | Principal Place of Business and Chief Executive Office; Location of Records | 37 |
| Section 5.14 | Name; Trade Name | 37 |
| Section 5.15 | Anti-Terrorism Laws | 37 |
| Section 5.16 | Subservicers | 38 |
| Section 5.17 | Ocala Funding | 38 |

**ARTICLE VI COVENANTS** .... 38

| | | |
|---|---|---|
| Section 6.1 | Affirmative Covenants | 38 |
| Section 6.2 | Negative Covenants | 42 |
| Section 6.3 | Special Financial Covenants | 46 |

**ARTICLE VII EVENTS OF DEFAULT; REMEDIES** .... 46

| | | |
|---|---|---|
| Section 7.1 | Events of Default | 46 |
| Section 7.2 | Remedies | 49 |
| Section 7.3 | Setoff | 51 |
| Section 7.4 | Cumulative Rights | 51 |
| Section 7.5 | Waiver | 51 |
| Section 7.6 | Collections and Costs | 51 |
| Section 7.7 | Agent Appointed Attorney-in-Fact | 52 |
| Section 7.8 | Rights of Individual Lenders | 52 |
| Section 7.9 | Limitation on Liability of Agent and Lenders | 52 |
| Section 7.10 | Notice of Default | 52 |

**ARTICLE VIII AGENT** .... 53

| | | |
|---|---|---|
| Section 8.1 | Appointment of Agent | 53 |
| Section 8.2 | Nature of Duties of Agent | 53 |
| Section 8.3 | Lack of Reliance on Agent | 53 |
| Section 8.4 | Certain Rights of Agent | 53 |
| Section 8.5 | Reliance by Agent | 54 |
| Section 8.6 | Indemnification of Agent | 54 |
| Section 8.7 | Agent in its Individual Capacity | 54 |
| Section 8.8 | Holders of Notes | 54 |
| Section 8.9 | Successor Agent | 54 |
| Section 8.10 | Right of Inspection | 55 |

**ARTICLE IX MISCELLANEOUS PROVISIONS** .... 55

| | | |
|---|---|---|
| Section 9.1 | Notices | 55 |
| Section 9.2 | Amendments, Etc. | 55 |
| Section 9.3 | No Waiver; Remedies Cumulative | 56 |
| Section 9.4 | Payment of Expenses, Indemnification, Etc. | 56 |
| Section 9.5 | Right Of Setoff | 57 |
| Section 9.6 | Benefit of Agreement | 57 |
| Section 9.7 | Governing Law; Submission to Jurisdiction | 58 |
| Section 9.8 | Confidentiality | 59 |
| Section 9.9 | Counterparts | 59 |
| Section 9.10 | Effectiveness | 59 |
| Section 9.11 | Headings Descriptive | 61 |
| Section 9.12 | Survival of Representations and Indemnities | 61 |
| Section 9.13 | Severability | 61 |
| Section 9.14 | Release of Claims | 61 |
| Section 9.15 | WAIVER OF TRIAL BY JURY | 61 |
| Section 9.16 | Amendment and Restatement of Existing Agreement | 62 |
| Section 9.17 | NO CONSEQUENTIAL DAMAGES | 62 |

B # 935671 v.9

Schedule 1      Servicing Facility Commitments
Schedule 2      Notice Addresses
Schedule 3      Approved Investors
Schedule 4      Approved Purchasers
Schedule 5      List of Subsidiaries
Schedule 6      List of Servicing Contracts
Schedule 7      List of Servicing Sale Agreements
Schedule 8      List of Shareholders and Ownership Interests
Schedule 9      List of Authorized Representatives
Schedule 10     List of Other Approved Facilities


EXHIBIT A       Form of Borrowing Base Certificate
EXHIBIT B       Agent's Wire Instructions
EXHIBIT C       Lenders' Wire Instructions
EXHIBIT D       Principal Place of Business; Chief Executive Office
EXHIBIT E       Form of Private Investor Acknowledgment Agreement
EXHIBIT F       Form of Change of Authorized Representative(s)

B # 935671 v.9

## SIXTH AMENDED AND RESTATED
## SERVICING FACILITY LOAN AND SECURITY AGREEMENT

THIS SIXTH AMENDED AND RESTATED SERVICING FACILITY LOAN AND SECURITY AGREEMENT (this "Agreement") is made, dated and effective (subject to Section 9.10) as of May 15, 2009, by and among **SOVEREIGN BANK**, a Federal savings bank ("Sovereign"), **COLONIAL BANK**, an Alabama banking corporation, formerly known as Colonial Bank, N.A., a national banking association ("Colonial"), **THE FARMERS BANK**, a Georgia banking corporation ("Farmers"), **THE BANK OF NEW YORK MELLON**, formerly known as The Bank of New York, a New York banking corporation ("BNYM"), **GUARANTY BANK**, a Federal savings bank ("Guaranty Bank"), **U.S. BANK NATIONAL ASSOCIATION**, a national banking association ("US Bank"), **FRANKLIN BANK, SSB**, a state savings bank ("Franklin") acting through its receiver the **FEDERAL DEPOSIT INSURANCE CORPORATION**, **HARRIS N.A.**, a national banking association ("Harris"), **KBC BANK NV**, a Naamloze vennootschap (public company of limited liability) organized under the laws of Belgium ("KBC"), **SEASIDE NATIONAL BANK & TRUST**, a national banking association ("Seaside", and together with Sovereign, Colonial, Farmers, BNYM, Guaranty Bank, US Bank, Franklin, Harris, KBC and any other lenders from time to time party hereto, individually, a "Lender", and collectively, the "Lenders"), as lenders, Sovereign, as agent for the Lenders (in such capacity, the "Agent"), and **TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**, a Florida corporation, as borrower (the "Borrower"). Capitalized terms not otherwise defined herein are defined in Article 1 hereof.

### R E C I T A L S

A.      Each of the Lenders, Agent and Borrower are parties to a Fifth Amended and Restated Servicing Facility Loan and Security Agreement dated as of October 31, 2008, as amended by that certain First Amendment to Fifth Amended and Restated Servicing Facility Loan and Security Agreement dated as of January 29, 2009, and as further amended by that certain Second Amendment to Fifth Amended and Restated Servicing Facility Loan and Security Agreement dated as of April 30, 2009 (collectively, the "Existing Agreement").

B.      Pursuant to the Existing Agreement and any earlier agreements related thereto (including, without limitation, the Prior Amended and Restated Agreement referred to below), the Lenders previously established a servicing line of credit facility for Borrower (the "Existing Servicing Facility") pursuant to which each Lender has made Advances to Borrower, all upon the terms and conditions, and subject to the limitations, set forth in the Existing Agreement.

C.      Pursuant to the Existing Agreement, the Lenders are no longer required to make any additional Advances to Borrower under the Existing Servicing Facility.

D.      The Maturity Date, as defined in the Existing Agreement, is May 15, 2009, and Borrower has requested that the Agent and Lenders agree to extend such Maturity Date.

E.      Pursuant to that certain Amended and Restated Master Repurchase Agreement by and among Borrower, as seller, Colonial, individually and as agent (the "Repurchase Agent") and certain of the Lenders a party thereto, as buyers (each a "Buyer" and collectively, the "Buyers"), the "Extended Repurchase Facility" as defined therein has expired and is terminated, and such Buyers have been paid in full.

F.      By execution hereof, but subject to the further terms and conditions set forth herein, Lenders and Agent have agreed to Borrower's foregoing request. As part of such terms and conditions, (i) all Advances (as defined in and under the Existing Servicing Facility) that are outstanding on the date hereof shall be continued, on a non-revolving basis, as Advances hereunder (the outstanding principal amount of such Advances on the date hereof, but prior to giving effect to the Borrower's mandatory payment required under Section 2.7(i) of this Agreement, totals $236,354,564.67 (the amount and allocation of these Advances among the Lenders being more fully set forth on Schedule 1 to this Agreement) and such Advances are referred to herein as the "Existing Advances")).

G.      As a condition of Agent's and Lenders' agreements to the matters set forth in paragraph F above, Agent and Lenders require that Borrower agree to certain other amendments to the Existing Agreement and, in order

B # 935675: v.9

to provide for such amendments, that the Existing Agreement be amended and restated in its entirety, and Borrower has agreed to such amendments upon the terms and conditions set forth herein.

H. Accordingly, Borrower, Agent and Lenders have agreed to amend and restate the Existing Agreement in its entirety to provide for the foregoing modification and extension of the Existing Servicing Facility and to make the requested amendments to the Existing Agreement in connection therewith, all upon the terms and conditions, and subject to the limitations, set forth herein.

I. The parties have consulted with, and obtained the representation and advice of, their respective legal counsel with regard to the terms and conditions of this Agreement, and each party has had the opportunity to participate fully in the drafting of this Agreement.

J. This Agreement is intended by the parties to completely amend, restate and supersede the Existing Agreement and from and after the Effective Date shall govern the relationship of the parties with regard to the Servicing Facility and the other matters set forth herein.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1    Defined Terms.

For purposes of this Agreement, the terms set forth below shall have the following meanings:

"Accumulated Funding Deficiency" shall mean a funding deficiency described in Section 302 of ERISA.

"Acknowledgment Agreement" shall mean a tri-party agreement by and among Borrower, Agent (or, as applicable, the Predecessor Agent) and an Approved Investor whose Mortgage Loans are the subject of Servicing Rights and which (a) in the case of FNMA, FHLMC or GNMA Servicing Rights, is on the standard FNMA, FHLMC or GNMA form, as the case may be, or (b) in the case of Servicing Rights other than FNMA, FHLMC or GNMA Servicing Rights, is either (i) on the form of Private Investor Acknowledgment Agreement attached hereto as Exhibit E, or (ii) is otherwise in form and substance acceptable to Agent; provided, however, that with respect to any Acknowledgment Agreement with the Predecessor Agent, the Agent shall have received a letter agreement, or other form of amendment, from the appropriate parties thereto (in form and substance acceptable to Agent) confirming that such Acknowledgment Agreement shall apply to Agent and the rights of Lenders hereunder. If Borrower shall hereafter acquire Servicing Rights, the Mortgage Loans for which are owned by an Approved Investor who has previously entered into an Acknowledgment Agreement with Agent (or as applicable the Predecessor Agent) in respect of this Agreement or the Existing Agreement, then the term "*Acknowledgment Agreement*" shall include a letter from such Investor (in form and substance acceptable to Agent) confirming that the Acknowledgment Agreement previously delivered to Agent (or as applicable Predecessor Agent) continues to apply to this Agreement and the rights of Lenders hereunder, if the Acknowledgment Agreement then in effect does not specifically apply to the Agent or cover this Agreement and all future acquired Servicing Rights of such Approved Investor, or as otherwise requested by Agent.

"Adjusted Tangible Net Worth" shall mean, as of any date of determination thereof, an amount equal to the difference of (a) the sum of (i) Tangible Net Worth as of such date and (ii) Subordinated Debt as of such date, *minus* (b) any note or other receivables from Borrower's Affiliates, officers, directors and stockholders as of such date, all determined in accordance with GAAP.

"Advance" shall mean each advance or deemed advance of proceeds by Lenders to Borrower under the Existing Agreement consisting of (i) the Servicing Rights Advance and (ii) the PITI Advances, each of which shall be deemed, for purposes of this Agreement to constitute an "Advance" under this Agreement (the amount and allocation of the outstanding principal amount of these Advances among the Lenders being more fully set forth on Schedule 1 to this Agreement).

2

"Advance Date" shall mean, with respect to each Advance, the date on which Lenders made such Advance to Borrower under the Existing Agreement.

"Advance Period" shall mean the period commencing on October 31, 2008, and ending on the Second Amendment Effective Date.

"Affiliate" shall mean, as to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such Person, whether through the ownership of voting securities, by contract or otherwise. "*control*" as used herein means the power to direct the management and policies of such Person.

"Agency" shall mean FNMA, FHLMC, GNMA, FHA or VA.

"Agency Approvals" shall mean the approval of Borrower as a seller, servicer, issuer and mortgagee by FNMA, FHLMC, GNMA, FHA and VA, or any similarly characterized capacity.

"Agency Fee" shall mean the fee payable by Borrower to Agent pursuant to Section 2.9(a).

"Agency Guides" shall mean the FHLMC Guide, the FNMA Guide and the GNMA Guide.

"Agent" shall mean Sovereign Bank, a Federal savings bank, in its capacity as Agent for Lenders hereunder, and any successor agent appointed pursuant to Section 8.9.

"Agreement" shall mean this Agreement, as modified, amended, supplemented or restated from time to time.

"Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Applicable Margin" shall mean the margin set forth in Section 2.5(a).

"Applicable Servicing Rights Percentage" shall mean: (i) for the period commencing on the Effective Date and ending on July 31, 2009, forty-six percent (46%); (ii) for the period commencing on August 1, 2009, and ending on October 31, 2009, forty-two percent (42%); (iii) for the period commencing on November 1, 2009, and ending on December 31, 2009, thirty-five percent (35%); and (iv) on and after January 1, 2010, twenty-seven percent (27%).

"Appraisal" shall mean an appraisal of the Servicing Rights, in form and substance acceptable to Agent, prepared by an Approved Appraiser.

"Appraised Value" shall mean, with respect to any determination of the Servicing Rights Collateral Value, the product of (a) the market value, expressed as a percentage of the principal balance of Mortgage Loans which are the subject of such Servicing Rights, as set forth in the Appraisal most recently delivered to and accepted by Agent pursuant to Section 6.1(a)(vi), *times* (b) the outstanding principal balance of the Mortgage Loans which are the subject of such Servicing Rights, as of the Effective Date or the delivery of a Borrowing Base Certificate (whichever is applicable) for which such determination is being made (or any earlier date approved by Agent), less any payments due sellers of Eligible Servicing Rights included in the Servicing Rights Borrowing Base. For purposes of the foregoing, the "*market value*" (as such term is used in clause (a) of this definition) of Eligible Servicing Rights as set forth in each such Appraisal shall be the value of such Eligible Servicing Rights as of the date of such Appraisal. To the extent that the "*market value*" of Eligible Servicing Rights is set forth in any Appraisal as a range of values, then "*market value*" shall mean the average of such range of values (expressed as a percentage of the principal balance of Mortgage Loans with respect to such Servicing Rights). By way of illustration and not limitation, if the range of values set forth in the Appraisal is 1.2739% to 1.4402%, the "*market value*" shall be 1.35705%.

"Approved Appraiser" shall mean an appraiser of any Servicing Rights pre-approved by Agent from time to time.

3

B # 935671 v.9

"Approved Investors" shall mean FHLMC, GNMA or any other Person listed on Schedule 3 for whom Borrower is servicing Mortgage Loans under a Servicing Contract. At the request of Borrower, Agent, in its sole discretion, may from time to time agree in writing to add Persons to the list set forth on Schedule 3 and each Person approved by Agent shall be an Approved Investor as of the date of such approval (Agent's written approval must be given before any Servicing Contract may be entered into by Borrower with such Person). Following the addition of any Person as an Approved Investor hereunder, Agent shall provide notice thereof to Lenders by delivery to Lenders of a revised Schedule 3.

"Approved Purchasers" shall mean any Person listed on Schedule 4 to whom Borrower is selling (or has agreed to sell) Servicing Rights under a Servicing Sale Agreement. At the request of Borrower, Agent, in its sole discretion, may from time to time agree in writing to add Persons to the list set forth on Schedule 4 and each Person approved by Agent shall be an Approved Purchaser as of the date of such approval (Agent's written approval must be given before any Servicing Sale Agreement may be entered into by Borrower with such Person). Following the addition of any Person as an Approved Purchaser hereunder, Agent shall provide notice thereof to Lenders by delivery to Lenders of a revised Schedule 4.

"Article 9" shall mean Article 9 - Secured Transactions of the Uniform Commercial Code as adopted and applicable in the State of Florida from time to time.

"Authorized Officer" shall mean the Chairman, the Vice Chairman, the President, the Chief Executive Officer, any Vice President, the Treasurer or the Chief Financial Officer of Borrower.

"Authorized Representative" shall mean each person identified in Schedule 9; provided that Borrower, by written notice to Agent in the form of Exhibit F, may add or delete any person from such list of Authorized Representatives set forth on said Schedule.

"Banking Day" shall mean any day other than a Saturday, Sunday and any other day on which any Lender at its office for receiving notice under this Agreement is required or authorized to close.

"Blocked Person" shall have the meaning given such term in Section 5.15(b).

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States and any successor thereto.

"Borrower" shall mean Taylor, Bean & Whitaker Mortgage Corp., a Florida corporation, and its legal representatives and permitted successors and assigns.

"Borrowing Base Certificate" shall mean a certificate executed by the Chief Financial Officer, Chief Accounting Officer, Treasurer or other officer of Borrower acceptable to Agent, in its sole discretion, substantially in the form attached hereto as Exhibit A and delivered to Agent.

"Buyers" shall have the meaning given such term in the Recitals hereto.

"Capital Lease Obligations" of any Person shall mean all obligations of such Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" shall mean (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" shall mean and include, on any day:

4

(i)       any evidence of debt issued by the United States government, or guaranteed as to the timely payment of principal and interest by the United States government, and maturing twelve (12) months or less after that day;

(ii)       commercial paper issued by a corporation (other than an Affiliate of the Borrower) organized under the laws of any state of the United States of America or of the District of Columbia, rated A1 by Standard & Poor's (a division of The McGraw-Hill Companies), Prime-1 by Moody's Investors Service, Inc. or the equivalent rating by another nationally-recognized ratings service acceptable to the Agent, and having a stated maturity date nine (9) months or less after its issue date;

(iii)       any certificate of deposit or banker's acceptance issued by a commercial bank that is a member of the Federal Reserve System and has a combined unimpaired capital and surplus and unimpaired undivided profits of not less than Five Hundred Million Dollars ($500,000,000), and maturing not more than twelve (12) months after that day; and

(iv)       any repurchase agreement (a) entered into with any Federal Reserve System member commercial bank of the size referred to in clause (iii) above and (b) secured by any obligation of the type described in any of clauses (i)-(iii) above and (c) having a market value on its date of at least one hundred percent (100%) of the repurchase obligation of that commercial bank.

"CDF" shall mean CDF Tax, Flood & Insurance Services, LLC, a Florida limited liability company, and it successors.

"CMS" shall mean Complete Mortgage Solutions, LLC, a Florida limited liability company, and its successors.

"Change in Law" shall mean (a) the adoption of any applicable law, rule or regulation after the date of this Agreement, (b) any change in any applicable law, rule or regulation, or any change in the interpretation or application thereof, by any Governmental Authority after the date of this Agreement, or (c) compliance by any Lender (or for purposes of Section 2.14(b), by such Lender's holding company, if applicable) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Change of Control" shall mean the occurrence of any one or more of the following events without the prior written consent of Required Lenders:

(a)       any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of Borrower to any Person or "group" (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules of the Securities and Exchange Commission thereunder in effect on the date hereof);

(b)       the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or "group" (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of 10% or more of the outstanding shares of the voting stock of Borrower; provided, however, this paragraph (b) shall not be applicable to LBF Holdings' contribution of shares of voting stock of Borrower to Borrower's employee stock ownership plan;

(c)       occupation of a majority of the seats (other than vacant seats) on the board of directors of Borrower by Persons who were neither (i) nominated by the current board of directors or (ii) appointed by directors so nominated; or

(d)       Lee B. Farkas ceases for any reason to be the Chairman of the Board of Borrower, Sherry D. Dickinson ceases for any reason to be the Vice Chairman of Borrower, Ray E. Bowman ceases for any reason to be the President of Borrower or Paul Allen ceases for any reason to be the CEO of Borrower, each with substantially the same responsibilities and job functions as he or she has as of the date hereof unless, in each case, such officer is replaced within thirty (30) days following the date he or she so ceases

5

to be such officer by a new officer acceptable to, and approved in writing by, Required Lenders in their sole discretion.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations issued thereunder as from time to time in effect.

"Collateral" shall mean the Servicing Collateral.

"Collateral Payment Account" shall mean Account No. 17600100873 maintained in the name of Borrower with Agent at the office of Agent located at 75 State Street, Boston, MA 02109, into which Collateral Payments shall be deposited and applied to repayment of Advances in accordance with Sections 2.7, 2.8 and 2.10, as applicable. The Collateral Payment Account shall be a "blocked account" under Agent's sole control and Borrower shall not have access to monies on deposit therein until transfer from time to time of surplus monies (after repayment of Advances as set forth above) to the Operating Account. The Collateral Payment Account shall not be subject to deductions, set-off or any other right in favor of any Person other than Agent.

"Collateral Payments" shall mean all payments and other sums due or to become due with respect to any Collateral.

"Collateral Value" shall mean the sum of (i) the PITI Collateral Value *plus* (ii) the Servicing Rights Collateral Value.

"Colonial" shall mean Colonial Bank, an Alabama banking corporation, formerly known as Colonial Bank, N.A., a national banking association, its legal representatives and, subject to this Agreement, its successors and permitted assigns.

"Commitment Percentage" shall mean, for each Lender, the percentage set forth on Schedule 1 or as otherwise determined by Agent in connection with a replacement of such Lender or a permitted assignment of Advances by such Lender under this Agreement.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound.

"Current Assets" shall mean those assets which in the regular course of business of Borrower will be readily and quickly realized, or converted into cash, all in accordance with GAAP within the applicable accounting or time period together with such additional assets as may readily be converted into cash without impairing the business of Borrower, and shall include, without limitation, cash, temporary investments, receivables (net of allowance for doubtful accounts), inventories and prepaid expenses but shall exclude (a) loans and advances to or receivables due from employees, officers or directors of Borrower and between Borrower and an Affiliate, (b) all deferred assets, other than prepaid items for insurance, taxes, and rents, and (c) any properties or assets located outside the continental United States and Canada.

"Current Liabilities" shall mean those liabilities of Borrower, or any portion thereof, the maturity of which will not extend beyond one year from the date said determination is to be made.

"Current Ratio" shall mean, as of any date of determination thereof, the ratio of (a) Current Assets as of such date to (b) Current Liabilities as of such date, all determined in accordance with GAAP.

"Default Rate" shall mean the LIBOR Rate plus 15.00% (1500 basis points), floating daily; provided, however, that if the LIBOR Rate has been suspended due to the application of Section 2.12 or 2.13, then during the period of any such suspension the "Default Rate" shall mean the Prime Rate plus 15.00% (1500 basis points), floating daily.

"Depository Obligations" shall mean any and all debts, obligations and liabilities of Borrower to Agent arising out of or in connection with Agent's role as depository bank for Borrower including, but not limited

6

to, any and all overdrafts (provided, however, nothing herein shall be construed to require Agent to permit any overdrafts).

"Dollars" and the symbol "$" shall mean lawful money of the United States of America.

"Effective Date" shall have the meaning given such term in Section 9.10.

"Eligible P&I Receivables" shall mean, as of any date, each P&I Receivable which meets the following requirements:

(a) such P&I Receivable is reflected on the books and records of Borrower as a current receivable;

(b) such P&I Receivable is not advanced in respect of a Mortgage for which any payment thereunder is more than thirty (30) days past due;

(c) such P&I Receivable has not aged more than thirty (30) days;

(d) such P&I Receivable is not subject to a right of set off, defense or counterclaim;

(e) such P&I Receivable is subject to a first priority security interest in favor of Agent, on its behalf and on behalf of the Lenders, and is free and clear of all other Liens, except for any Lien otherwise permitted by Section 6.2(a); and

(f) such P&I Receivable otherwise is acceptable to Agent, in its sole discretion, for inclusion in the PITI Borrowing Base.

"Eligible Servicing Rights" shall mean, as of any date, any Servicing Rights which meet the following requirements:

(a) the representations contained in Section 4.6 as to the Servicing Contracts included in said Servicing Rights shall be true and correct as of the date such Servicing Contracts became Collateral hereunder and as of each day thereafter as if made on that date;

(b) there is no recourse to Borrower under any such Servicing Contract, except for fraud or misrepresentation by Borrower;

(c) unless otherwise disclosed to and approved by Agent, in its sole discretion, no Mortgage Loans which are the subject of such Servicing Rights are serviced by another Person under a "subservicing" arrangement between such Person and Borrower;

(d) such Servicing Rights are subject to a first priority security interest in favor of Agent, on its behalf and on behalf of the Lenders, and are free and clear of all other Liens, except for any Lien otherwise permitted by Section 6.2(a);

(e) such Servicing Rights (i) pertain to Mortgage Loans serviced under contracts and agreements between Borrower and FHLMC, GNMA or another Approved Investor, and (A) in the case of FHLMC and GNMA, Borrower has delivered to Agent an Acknowledgment Agreement and, if required by Agent, a Power of Attorney, in respect thereof, and (B) in the case of any other Approved Investor (other than an Agency), if required by Agent, Borrower has delivered to Agent an Acknowledgment Agreement and a Power of Attorney; provided, that Agent shall have been provided with Acknowledgment Agreements relating to not less than fifty percent (50%) of all Servicing Rights at any time included in the Servicing Rights Borrowing Base, (ii) consist of Servicing Rights retained by Borrower with respect to Mortgage Loans sold to Ocala Funding, LLC in connection with Borrower's securitization program, or (iii) consist of such other Servicing Rights as are acceptable to Agent, in it sole discretion; and

7

(f)     such Servicing Rights otherwise are acceptable to Agent, in its sole discretion, for inclusion in the Servicing Rights Borrowing Base.

"Eligible T&I Receivables" shall mean, as of any date, each T&I Receivable which meets the following requirements:

(a)     such T&I Receivable is reflected on the books and records of Borrower as a current receivable;

(b)     such T&I Receivable is not advanced in respect of a Mortgage for which any payment thereunder is more than thirty (30) days past due;

(c)     such T&I Receivable has not aged more than thirty (30) days;

(d)     such T&I Receivable is not subject to a right of set off, defense or counterclaim;

(e)  .   such T&I Receivable is subject to a first priority security interest in favor of Agent, on its behalf and on behalf of the Lenders, and is free and clear of all other Liens, except for any Lien otherwise permitted by Section 6.2(a); and

(f)     such T&I Receivable otherwise is acceptable to Agent, in its sole discretion, for inclusion in the PITI Borrowing Base.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor thereto, and the rules and regulations issued thereunder as from time to time in effect.

"ERISA Affiliate" shall mean each trade or business, including Borrower, whether or not incorporated, that together with Borrower would be treated as a single employer under section 4001 of ERISA.

"Event of Default" shall have the meaning given such term in Article VII.

"Existing Advances" shall have the meaning given such term in the Recitals hereto.

"Existing Agreement" shall have the meaning given such term in the Recitals hereto.

"Existing Servicing Facility" shall have the meaning given such term in the Recitals hereto.

"Facility Fee" shall have the meaning given such term in Section 2.9(c).

"FASB" shall mean the Financial Accounting Standards Board of the American Institute of Certified Public Accountants and any successor thereto.

"FAS 133" shall mean Statement No. 133 under the Statements of Financial Accounting Standards issued by FASB, as modified or amended from time to time.

"FDIC" shall mean the Federal Deposit Insurance Corporation and any successor thereto.

"Fees" shall mean all fees payable by Borrower to Agent and/or Lenders pursuant to Section 2.9 or otherwise.

"FHA" shall mean the Federal Housing Administration and any successor thereto.

"FHLB Indebtedness" shall mean indebtedness of Second Street Insurance Corp., a Vermont corporation and Subsidiary of Borrower, to the Federal Home Loan Bank of Boston in an amount not to exceed $150,000,000.

"FHLMC" shall mean the Federal Home Loan Mortgage Corporation and any successor thereto.

8

"FHLMC – Approved Servicer" shall mean an institution that is approved by FHLMC to act as servicer of FHLMC Mortgage Loans.

"FHLMC Guide" shall mean the *"Sellers' & Servicers' Guide"* published by FHLMC, as modified, amended, supplemented or restated from time to time.

"First Amendment" shall mean the First Amendment to the Prior Amended and Restated Agreement dated as of January 29, 2009, by and among the Borrower, the Guarantors, the Predecessor Agent and the Lenders.

"First Reaffirmation and Amendment of Loan Documents" shall mean that certain Reaffirmation and Amendment of Loan Documents dated as of October 31, 2008, by and among the Borrower, Colonial, the Predecessor Agent, the Lenders and the other signatories thereto.

"FNMA" shall mean the Federal National Mortgage Association and any successor thereto.

"FNMA – Approved Servicer" shall mean an institution that is approved by FNMA to act as servicer of FNMA Mortgage Loans.

"FNMA Guide" shall mean, collectively, the *"Selling Guide"* and the *"Servicing Guide"* published by FNMA, as modified, amended, supplemented or restated from time to time.

"Foreign Lender" shall mean any Lender or Participant that is organized under the laws of a jurisdiction other than that of Borrower. For purposes of this definition and of Section 2.15(b), the United States of America or any State thereof or the District of Columbia shall constitute one jurisdiction.

"Funded Liabilities" shall mean and include, without duplication:

(a)     any liability or obligation payable more than one year from the date of creation thereof, which under GAAP is required to be shown on a balance sheet as a liability,

(b)     indebtedness payable more than one year from the date of creation thereof which is secured by any security interest on property owned by Borrower whether or not the indebtedness secured thereby shall have been assumed by Borrower,

(c)     guarantees, endorsements (other than endorsements of negotiable instruments for collection in the ordinary course of business), and other contingent liabilities (whether direct or indirect) in connection with the obligations, stock, or dividends of any Person,

(d)     obligations under any contract providing for the making of loans, advances, or capital contributions to any Person in order to enable such Person primarily to maintain working capital, net worth, or any other balance sheet condition or to pay debts, dividends, or expenses, and

(e)     obligations under any contract which, in economic effect, is substantially equivalent to a guarantee,

all as determined in accordance with GAAP; provided, however, that any such obligation shall be treated as a Funded Liability, regardless of its term, if such obligation is renewable pursuant to the terms thereof or arises under a revolving credit or similar agreement effective for more than one year after the date of creation of such obligation, or may be payable out of the proceeds of a similar obligation pursuant to the terms of such obligation or of any such agreement.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of FASB or in such other statement by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

9

"GNMA" shall mean the Government National Mortgage Association and any successor thereto.

"GNMA – Approved Servicer" shall mean an institution that is approved by GNMA to act as servicer of GNMA Mortgage Loans.

"GNMA Guide" shall mean collectively, the "*GNMA I Mortgage-Backed Securities Guide*" and the "*GNMA Mortgage-Backed Securities Guide*" published by HUD, as modified, amended, supplemented or restated from time to time.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantee" of or by any Person (the "*guarantor*") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such indebtedness of other obligation or (d) as an account party or applicant in respect of any letter of credit or letter of guaranty issued in support of such indebtedness or obligation; provided, that the term "*Guarantee*" shall not include endorsements for collection of deposits in the ordinary course of business with respect to checks or other items for collection. The term "*Guarantee*" used as a verb has a corresponding meaning.

"Guarantor" shall mean Personal Guarantor and/or any Subsidiary Guarantor, individually or collectively, as the context requires or permits.

"Guaranty" shall mean either the Personal Guaranty or the Subsidiary Guaranty, or both, as the context requires or permits.

"Hedging Arrangement" shall mean any agreement or other arrangement (including without limitation, an interest rate swap agreement, an interest cap agreement, and a forward sale agreement) entered into by Borrower to protect itself against changes in interest rates or the market value of assets.

"HAM" shall mean Home America Mortgage, Inc., a Florida corporation, and its successors.

"HMC" shall mean HMC-Home Mortgages Co., a Texas corporation, and its successors.

"HUD" shall mean the Department of Housing and Urban Development and any successor thereto.

"Intangible Assets" shall mean those assets of Borrower which are (a) deferred assets, other than prepaid insurance and prepaid taxes; (b) patents and applications therefor, copyrights, trademarks, service marks, trade names, copyright, trademark, service mark and trade name registrations and applications, goodwill, franchises, permits, experimental expenses and other similar assets which would be classified as "intangible assets" under GAAP; (c) treasury stock and any write-up of the value of any assets after the date of Borrower's most recent year end financial statements provided to Agent and Lenders; and (d) any other assets which would be classified as "intangible assets" under GAAP.

"Intercreditor Agreement" shall mean that certain Second Amended and Restated and Consolidated Intercreditor and Lien Subordination Agreement, dated as of November 30, 2007, by and among Plainfield, the Predecessor Agent and the Repurchase Agent, with the joinder and acknowledgment of Borrower, all Lenders, the Buyers, Personal Guarantor, LBF Holdings, and Colonial, individually, as modified, amended, supplemented or restated from time to time.

10

"Interest Coverage Ratio" shall mean, for any period ending on the date of computation thereof, the ratio of (a) the sum of (i) Operating Cash Flow for such period *plus* (ii) Interest Expense for such period, to (b) Interest Expense for such period, all determined in accordance with GAAP.

"Interest Expense" shall mean, for any period ending on the date of computation thereof, determined in accordance with GAAP, the sum of (a) total interest expense of Borrower, including without limitation, the interest component of any payments in respect of Capital Lease Obligations during such period (whether or not actually paid during such period) *plus* (b) the net amount payable (or *minus* the net amount receivable) by Borrower under Hedging Arrangements during such period (whether or not actually paid or received during such period).

"Interim Default Rate" shall mean the LIBOR Rate plus 12.00% (1200 basis points), floating daily; provided, however, that if the LIBOR Rate has been suspended due to the application of Section 2.12 or 2.13, then during the period of any such suspension the "Interim Default Rate" shall mean the Prime Rate plus 12.00% (1200 basis points), floating daily.

"Investments" shall have the meaning given such term in Section 6.2(g).

"LBF Holdings" shall mean LBF Holdings LLC, a Florida limited liability company, and its successors.

"Lenders" shall have the meaning given to such term in the introductory paragraph of this Agreement, and their respective legal representatives and, subject to this Agreement, their respective successors and permitted assigns.

"Leverage Ratio" shall mean, as of any date of determination thereof, the ratio of (a) Total Debt as of such date to (b) Adjusted Tangible Net Worth as of such date, all determined in accordance with GAAP.

"LIBOR Rate" shall mean the rate that appears on the display designated as *Reuters Screen LIBOR01 Page* (or such other page as may replace this page) as of 11:00 a.m., Orlando time, on each Banking Day or, if not so reported on such service for any reason, then on any other interest rate reporting service of recognized standing designated in writing by Agent to Borrower and Lenders, as the one-month LIBOR Rate, adjusted daily with each change in the one-month LIBOR Rate.

"Lien" shall mean any security interest, mortgage, pledge, lien, claim on property, charge or encumbrance (including any conditional sale or other title retention agreement), any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Loan Documents" shall mean this Agreement, the Notes, the Guaranty, the Reaffirmation and Amendment of Loan Documents, any Subordination Agreement, any Acknowledgment Agreement, the Intercreditor Agreement and any other document, instrument or agreement executed, or previously executed, by Borrower or any Guarantor in connection herewith or therewith (excluding, however, any Hedging Arrangement relating to Obligations entered into with any counterparty that was a Lender or an Affiliate thereof at the time such Hedging Arrangement was entered into), as any of the same may be modified, amended, supplemented or restated from time to time.

"Maslow" shall mean Maslow Insurance Agency, LLC, a Florida limited liability company, and its successors.

"Margin Stock" shall have the meaning given such term in Regulation U of the Board.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, property, operations, financial condition or results of operations of Borrower or of Borrower and, if applicable, its Subsidiaries taken as a whole, (b) the ability of Borrower to pay and perform the Obligations, or (c) Agent's and/or, if applicable, Lenders' rights in respect of any of the Collateral.

11

"Material Amount" shall mean, at any time, ten percent (10%) or more of Tangible Net Worth (determined based on the most recent monthly balance sheet delivered to Agent and each Lender pursuant to Section 6.1(a)(ii)).

"Maturity Date" shall mean the earlier to occur of (i) the Obligations becoming due and payable pursuant to Section 7.2(b) or (ii) May 14, 2010; provided, however, that upon the written request of Borrower to Agent, Lenders may elect to extend the Maturity Date on such terms and conditions as they deem appropriate in their sole and absolute discretion subject to Section 9.2(a)(v).

"Maximum Rate" shall mean the maximum non-usurious rate of interest that, under applicable law, any Lender is permitted to contract for, charge, take, reserve, or receive on its portion of the Obligations.

"Mortgage" shall mean a mortgage, deed of trust, deed to secure debt or other security device which is customary and serves the same function as a mortgage under law and practice in the jurisdiction in which the real property subject to the mortgage is located to create a valid and enforceable lien on the fee simple estate of a Residential Dwelling. For all Mortgage Loans secured by real property located in states in which it is customary to use deeds of trust or security deeds as the security device, a deed of trust or security deed, as the case may be, shall be used as the security device.

"Mortgage Loan" shall mean a loan evidenced by a Mortgage Note and secured by a Mortgage constituting a first or second lien on a completed Residential Dwelling.

"Mortgage Note" shall mean, at any time, a negotiable promissory note or other evidence of indebtedness executed by a competent party which is secured by a Mortgage and conforms to such additional underwriting standards as may be in existence in the secondary market at such time as determined by FNMA, FHLMC, GNMA, FHA or VA, as applicable (or, but for the original unpaid principal amount thereof, would so conform).

"Mortgage-Backed Security" shall mean any security (including a participation certificate) issued by FHLMC, GNMA or any other Person that represents an interest in a pool of Mortgage Loans.

"Multiemployer Plan" shall mean a plan described in section 4001 (a)(3) of ERISA to which Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Net Income" shall mean, for any period ending on the date of computation thereof, the excess (deficiency) of revenues over expenses of Borrower for such period (taken as a single accounting period) determined in accordance with GAAP.

"Notes" shall mean, collectively, the PITI Advance Notes and the Servicing Rights Notes.

"Obligations" shall mean (a) any and all debts, obligations and liabilities of Borrower to Lenders and/or Agent (whether now existing or hereafter arising, voluntary or involuntary, whether or not jointly owed with others, direct or indirect, absolute or contingent, liquidated or unliquidated, and whether or not from time to time decreased or extinguished and later increased, created or incurred), under or arising out of this Agreement or any other Loan Document, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, indemnification and reimbursement payments, costs and expenses (including all fees, costs and expenses of counsel to Agent or, if permitted hereunder, any Lender, incurred pursuant to or in connection with this Agreement or any other Loan Document, whether incurred at trial, on appeal, in bankruptcy, or otherwise), together with all renewals, extensions, modifications or refinancings thereof, (b) all obligations of Borrower, monetary or otherwise, under any Hedging Arrangement relating to the Obligations referred to in the preceding clause (a) entered into with any counterparty that was a Lender (or an Affiliate thereof) at the time such Hedging Arrangement was entered into, and (c) any and all Depository Obligations.

"Ocala Funding" shall mean Ocala Funding, LLC, a Delaware limited liability company, and its legal representatives, successors and assigns.

12

"Operating Account" shall mean Account No. 17600100907 maintained in name of Borrower with Agent at the office of Agent located at 75 State Street, Boston, MA 02109, into which any funds transferred from the Collateral Payment Account shall be deposited and made available to Borrower as set forth herein.

"Operating Cash Flow" shall mean, for any period ending on the date of computation thereof, an amount equal to the *difference* of, without duplication, (a) the sum of (i) Net Income before taxes for such period and (ii) to the extent deducted in determining Net Income for such period, (A) depreciation and amortization and (B) all other non-cash charges, *minus* (b) to the extent included in determining Net Income for such period, any non-cash credits, all determined in accordance with GAAP.

"Other Approved Facilities" shall mean the Overline Facility, the existing credit facilities listed on Schedule 10 and any other credit facility of Borrower that is approved in writing by Agent and Required Lenders.

"Overline Facility" shall mean the revolving mortgage loan purchase facility that has been or may be made available from time to time to Borrower by Colonial, in Colonial's sole discretion, under the Restated Repurchase Agreement, and any and all renewals, extensions or modifications thereof.

"Overline Facility Obligations" shall mean any and all Liabilities of Borrower at any time outstanding under the Overline Facility, and any and all renewals, extensions or modifications thereof.

"P&I Receivables" shall mean accounts arising from Borrower's right to be reimbursed for the amount that Borrower has advanced on behalf of Obligors as servicer of Mortgage Loans included in the Pledged Servicing Portfolio in respect of due but uncollected principal and interest payments in connection with the servicing of such Mortgage Loans, which advanced amount is fully reimbursable by the Obligors under such Mortgage Loans or any other Person (including any Agency).

"Payment Office" shall mean Agent's office located at 75 State Street, Boston, MA 02109, or such other office as Agent shall specify to Borrower and Lenders in writing in accordance with Section 9.1.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA and any successor thereto.

"Permitted Liens" shall mean, with respect to (a) the Servicing Collateral, (i) Liens held by Colonial under the Restated Repurchase Agreement or the Repurchase Facility Security Agreement, so long as, and to the extent that, all such Liens are and shall be expressly junior and subordinate to the Lien of this Agreement pursuant to the Intercreditor Agreement and (ii) Liens held by Plainfield under the Plainfield Security Agreement to secure the Plainfield Indebtedness, so long as, and to the extent that, all such Liens are and shall be expressly junior and subordinate to the Lien of this Agreement pursuant to the Intercreditor Agreement and (b) the collateral under any Other Approved Facilities, Liens held by any creditor under such Other Approved Facilities; provided, in the case of any such Permitted Liens under this clause (b), such Permitted Liens shall not encumber, at any time, any of the Collateral, except as otherwise permitted herein.

"Person" shall mean any corporation, natural person, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government or any political subdivision, department, agency or instrumentality of any government.

"Personal Guarantor" shall mean Lee B. Farkas, individually.

"Personal Guaranty" shall mean the Amended and Restated Unlimited Guaranty Agreement, dated as of May 15, 2009, executed by Personal Guarantor in favor of the Agent for the benefit of the Lenders, as modified, amended, supplemented, restated, reaffirmed or replaced from time to time.

"PITI Advance" shall mean an advance of proceeds against PITI collateral value, previously made by Lenders to Borrower under the Existing Agreement (the amount and allocation of the outstanding principal amount of such PITI Advances among Lenders being more fully set forth on Schedule 1 to this Agreement).

B # 935671 v.9

"PITI Advance Notes" shall mean collectively the promissory notes in favor of each Lender dated January 29, 2009, evidencing Borrower's obligation to repay PITI Advances.

"PITI Advance Sublimit" shall mean $22,461,004.55.

"PITI Borrowing Base" shall mean, as of any date of determination, the aggregate PITI Collateral Value of all Eligible P&I Receivables and all Eligible T&I Receivables that are acceptable to Agent, in its sole discretion, for inclusion in the PITI Borrowing Base pursuant to this Agreement.

"PITI Collateral Value" shall mean, as of the date of any determination, the sum of: (a) as to any Eligible P&I Receivables, an amount equal to eighty five percent (85%) of the face value of such Eligible P&I Receivables, and (b) as to any Eligible T&I Receivables, an amount equal to eighty five percent (85%) of the face value of such Eligible T&I Receivables (provided, however, for purposes of this definition, the sum of the preceding clauses (a) and (b) shall not at any time exceed, in the aggregate, the PITI Advance Sublimit). Notwithstanding any provisions herein to the contrary, any P&I Receivables that were, but cease to be, Eligible P&I Receivables, and any T&I Receivables that were, but cease to be, Eligible T&I Receivables, shall have no PITI Collateral Value. PITI Collateral Value shall in no event include any amount attributable to any Mortgage Loan which is subject to a repurchase demand or claim for indemnification.

"Plainfield" shall mean Plainfield Specialty Holdings V Inc., a Delaware corporation, as assignee of Plainfield Specialty Holdings II Inc., and its successors and assigns.

"Plainfield Indebtedness" shall mean the existing $31,000,000.00 term loan by Plainfield to LBF Holdings pursuant to that certain Term Loan Agreement, dated as of July 31, 2007, between Plainfield and LBF Holdings, and any and all permitted renewals, extensions or modifications (but not increases) thereof.

"Plainfield Security Agreement" shall mean that certain Security Agreement, dated as of July 31, 2007, by and between Borrower and Plainfield, pursuant to which Borrower granted to Plainfield, as security for the Plainfield Indebtedness and Borrower's guarantee thereof, a Lien on certain of the Collateral, which Lien is subordinate to the Liens of Agent and Repurchase Agent in the same Collateral pursuant to the Intercreditor Agreement.

"Plan" shall mean any plan (other than a Multiemployer Plan) subject to Title IV of ERISA maintained for employees of Borrower or any ERISA Affiliate (and any such plan no longer maintained by Borrower or any of its ERISA Affiliates to which Borrower or any of its ERISA Affiliates has made or was required to make any contributions during the five years preceding the date on which such plan ceased to be maintained).

"Pledge Agreement" shall mean that certain Sixth Amended and Restated Pledge Agreement, dated as of November 30, 2007, by and between Personal Guarantor, as pledgor, and Colonial, and as modified, amended, supplemented, restated, reaffirmed or replaced from time to time.

"Pledged Servicing Portfolio" shall mean the Servicing Portfolio of outstanding Mortgage Loans that are owned by an Approved Investor or are included in pools of Mortgage Loans with respect to which FHLMC or GNMA has issued a Mortgage-Backed Security.

"Potential Default" shall mean an event that with the lapse of time or the giving of notice, or both, would, unless cured or waived, constitute an Event of Default.

"Power of Attorney" shall mean a power of attorney made by Borrower in favor of Agent in connection with an Acknowledgment Agreement and which (a) in the case of the pledge or assignment of FNMA, FHLMC or GNMA Servicing Rights, is on the standard FNMA, FHLMC or GNMA form, as the case may be, or (b) in the case of the pledge or assignment of Servicing Rights other than FNMA, FHLMC or GNMA Servicing Rights, is otherwise in form and substance acceptable to Agent.

"Predecessor Agent" shall mean Colonial, in its capacity as agent under the Prior Amended and Restated Agreement (as amended by the First Amendment), and any all earlier agreements relating thereto.

14

"Prime Rate" shall mean the rate per annum publicly announced by the Person serving as Agent from time to time as its Prime Rate (which interest rate is only a benchmark, is purely discretionary and is not necessarily the best or lowest rate charged borrowing customers the Person serving as Agent); provided, however, in no event shall such rate be less than a floor rate per annum equal to 5.50% (550 basis points), which floor rate is subject to change at any time with the approval of the Agent and the Lenders.

"Prior Amended and Restated Agreement" shall mean that certain Fifth Amended and Restated Servicing Facility Loan and Security Agreement dated as of October 31, 2008, by and among the Borrower, the Predecessor Agent and the Lenders.

"Proceeds" shall have the meaning given such term in Article 9.

"Products" shall have the meaning given such term in Article 9.

"Prohibited Transaction" shall mean any transaction described in section 406 of ERISA that is not exempt by reason of section 408 of ERISA or the transitional rules set forth in section 414(c) of ERISA and any transaction described in section 4975(c)(1) of the Code that is not exempt by reason of section 4975(c)(2) or section 4975(d) of the Code, or the transitional rules of section 2003(c) of ERISA.

"Reaffirmation and Amendment of Loan Documents" shall mean the First Reaffirmation and Amendment of Loan Documents.

"Related Party" shall have the meaning given such term in Section 9.8.

"REO" shall mean REO Specialists, LLC, a Florida limited liability company, and its successors.

"Reportable Event" shall mean any of the events set forth in section 4043(b) of ERISA or the regulations thereunder, a withdrawal from a Plan described in section 4063 of ERISA, a cessation of operations described in section 4068(f) of ERISA, an amendment to a Plan necessitating the posting of security under section 401(a)(29) of the Code, or a failure to make a payment required by section 412(m) of the Code and section 302(e) of ERISA when due.

"Repurchase Agent" shall have the meaning given such term in the Recitals hereto.

"Repurchase Facility Obligations" shall mean any and all liabilities and obligations of Borrower at any time outstanding under the Overline Facility, and any and all renewals, extensions or modifications thereof.

"Repurchase Facility Security Agreement" shall mean that certain Security Agreement, dated as of November 30, 2007, by and between the Borrower and Colonial, as secured party, and as the same may be modified, amended, supplemented or restated from time to time, pursuant to which the Borrower grants to Colonial a security interest and Lien on certain Collateral (as such term is defined therein) to secure the Obligations (as such term is defined therein).

"Required Lenders" shall mean, at any time, Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the then aggregate unpaid principal amount of all Advances.

"Requirements of Law" shall mean as to any Person the Articles or Certificate of Incorporation and Bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or a final and binding determination of an arbitrator or a determination of a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residential Dwelling" shall mean any one of the following that is completed and owner occupied: (a) a detached, one-family dwelling, (b) a detached two-to-four family dwelling, (c) a one-family dwelling in a condominium project, or (d) a detached one-family dwelling in a planned unit development, none of which (x) is a co-operative or a mobile or manufactured home unless, in the case of a mobile or manufactured home, it is affixed to the real property and is encumbered by a first priority mortgage (or deed of trust) both on such real property and on such mobile or manufactured home that has priority over any other Lien on such mobile or manufactured home,

15

whether or not arising under applicable real property law; (y) does not constitute real property under applicable state law, or (z) contains any commercial operations (other than in the nature of an in-home office).

"Restated Repurchase Agreement" shall mean that certain Amended and Restated Master Repurchase Agreement, dated as of October 31, 2008, by and between Colonial and the Borrower, as modified, amended, supplemented or restated from time to time.

"Second Amendment" shall mean the Second Amendment to the Prior Amended and Restated Agreement dated as of April 30, 2009, by and among the Borrower, the Guarantors, the Agent and the Lenders.

"Second Amendment Effective Date" shall have the meaning assigned to such term in the Second Amendment.

"Servicing Collateral" shall mean the Collateral referred to in Section 4.2(a).

"Servicing Contract" shall mean all contracts and agreements between Borrower and an Approved Investor, whether now existing or hereafter entered into, for the servicing by Borrower of Mortgage Loans owned by such Approved Investor, including without limitation, all such contracts and agreements listed on Schedule 6, as modified, amended, supplemented or restated from time to time, but excluding any Servicing Contract with respect to Mortgage Loans or pools containing Mortgage Loans covered by or associated with Borrower's FHLMC Seller/Servicer number 142080.

"Servicing Facility" shall mean the repayment and other financial accommodations in respect of Advances made available to Borrower by Lenders under this Agreement, and the payment and performance obligations of Borrower to Agent and/or Lenders arising therefrom, as more particularly defined and described in the Loan Documents.

"Servicing Portfolio" shall mean, at any time, the portfolio of outstanding Mortgage Loans with respect to which the Borrower has direct Servicing Rights.

"Servicing Receivables" shall mean all amounts at any time payable to Borrower under any Servicing Contract (other than (i) Servicing Receivables which are included in the collateral under the Repurchase Facility Security Agreement, and which do not constitute Servicing Receivables under Servicing Contracts for which Servicing Rights Advances have been made in respect of such Servicing Contract's related Servicing Rights and (ii) Servicing Receivables with respect to Mortgage Loans or pools containing Mortgage Loans covered by or associated with Borrower's FHLMC Seller/Servicer number 142080), including, without limitation, any proceeds arising from the sale of all or any part of Borrower's right, title and interest in such Servicing Contract.

"Servicing Rights" shall mean all Mortgage Loan servicing rights of Borrower (other than (i) the servicing rights in which Colonial has a first priority ownership interest pursuant to the Restated Repurchase Agreement or the Repurchase Facility Security Agreement, in each case, so long as, and to the extent that, such Servicing Rights are not related to Servicing Rights Advances and (ii) with respect to Mortgage Loans or pools containing Mortgage Loans covered by or associated with Borrower's FHLMC Seller/Servicer number 142080) and all interests of Borrower in Servicing Contracts, including without limitation, the right to (a) collect all payments due under Mortgage Loans which are the subject of any such Servicing Contract, (b) retain servicing compensation, termination fees and other payments in connection with its servicing of such Mortgage Loans, (c) exercise the rights and remedies of a "mortgagee" generally under such Mortgage Loans and (d) assign or terminate any such Servicing Contracts or servicing rights.

"Servicing Rights Advance" shall mean an advance or deemed advance of proceeds against servicing rights collateral value, previously made by Lenders to Borrower under the Prior Amended and Restated Agreement and any earlier agreements related thereto (the amount and allocation of the outstanding principal amount of such Servicing Rights Advances among Lenders being more fully set forth on Schedule 1 to this Agreement).

B # 935671 v.9

"Servicing Rights Borrowing Base" shall mean, as of any date of determination, the aggregate Servicing Rights Collateral Value of all Eligible Servicing Rights that are acceptable to Agent, in its sole discretion, for inclusion in the Servicing Rights Borrowing Base pursuant to this Agreement.

"Servicing Rights Collateral Value" shall mean, as of the date of any determination, an amount equal to the Applicable Servicing Rights Percentage multiplied by the Appraised Value of the Eligible Servicing Rights as of such date (provided, however, if no current Appraisal has been timely delivered to Agent in accordance with Section 6.1(a)(vi), and Required Lenders have waived the Event of Default resulting therefrom in accordance with Section 9.2, then the Collateral Value of the Eligible Servicing Rights shall be an amount determined by Agent in its sole discretion; provided, that the amount so determined by Agent shall not exceed the Collateral Value based on the most recent prior Appraisal delivered to Agent in accordance with Section 6.1(a)(vi)). Notwithstanding any provisions herein to the contrary, any Servicing Rights that were, but cease to be, Eligible Servicing Rights, shall have no Collateral Value unless the Required Lenders, in their sole discretion, determines otherwise. Servicing Rights Collateral Value shall in no event include: (x) amounts payable to a seller of any of the underlying Servicing Rights, or (y) amounts payable to subservicers of any of the underlying Servicing Rights.

"Servicing Rights Notes" shall mean collectively the promissory notes in favor of each Lender dated as of January 29, 2009, evidencing Borrower's obligation to repay the Servicing Rights Advances.

"Servicing Sale Agreement" shall mean all contracts and agreements between Borrower and an Approved Purchaser, whether now existing or hereafter entered into, for the sale by Borrower, and the purchase by such Approved Purchaser, of any of the Servicing Rights, including without limitation, all such contracts and agreements listed on Schedule 7, as modified, amended, supplemented or restated from time to time.

"Servicing Sale Receivables" shall mean all amounts at any time payable to Borrower under any Servicing Sale Agreement including any proceeds arising from the sale of all or any part of Borrower's right, title and interest in the Servicing Rights.

"Subordinated Creditor" shall mean each creditor holding indebtedness or other obligations of Borrower that are subordinated to the Obligations pursuant to the terms and conditions of the Subordination Agreement applicable to such creditor.

"Subordinated Debt" shall mean any indebtedness and stockholder payables of Borrower subordinated in writing pursuant to a Subordination Agreement (or other agreement acceptable to Agent) to the Obligations on terms and conditions satisfactory in all respects to Agent, in its sole discretion, including without limitation, with respect to interest rates, payment terms, maturities, amortization schedules, collateral, covenants, defaults, remedies, and subordination provisions, as evidenced by the written approval of Agent.

"Subordination Agreement" shall mean each Subordination Agreement from a Subordinated Creditor to Agent, on behalf of Lenders, relating to the Subordinated Debt, as any of the same may be modified, amended, supplemented or restated from time to time.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, association or other business entity of which more than fifty percent (50%) of the securities or other ownership interests having ordinary voting power is, or with respect to which rights to control management (pursuant to any contract or other agreement or otherwise) are, at the time as of which any determination is being made, owned, controlled or held by the parent or one or more subsidiaries of the parent.

"Subsidiary Guarantor" shall mean any or all of CDF, CMS, HAM, HMC, Maslow and REO, as the context requires or permits.

"Subsidiary Guaranty" shall mean the Amended and Restated Unlimited Guaranty Agreement, dated as of May 15, 2009, executed by the Subsidiary Guarantors, jointly and severally, in favor of the Agent for the benefit of the Lenders, as modified, supplemented, amended, restated, reaffirmed or replaced from time to time.

"T&I Receivables" shall mean accounts arising from Borrower's right to be reimbursed for the amount that Borrower has advanced on behalf of Obligors as servicer of Mortgage Loans included in the Pledged

B # 935671 v.9

Servicing Portfolio in respect of tax and insurance payments in connection with the servicing of such Mortgage Loans, which advanced amount is fully reimbursable by the Obligors under such Mortgage Loans or any other Person (including any Agency).

"Tangible Assets" shall mean all assets of Borrower on a consolidated basis, determined in accordance with GAAP, including the value of Borrower's capitalized servicing rights but excluding Intangible Assets.

"Tangible Net Worth" shall mean, as of any date of determination thereof, an amount equal to the difference of (a) Tangible Assets as of such date *minus* (b) Total Liabilities as of such date, all determined in accordance with GAAP.

"Taxes" shall have the meaning given such term in Section 2.15(a).

"Total Debt" shall mean, as of any date of determination thereof, (a) the sum of (i) Total Liabilities as of such date and (ii) all indebtedness or other obligations for borrowed money or for the deferred purchase price of property or services as of such date, *minus* (b) the sum of, to the extent included in clause (a)(i) or (ii) above, (i) if outstanding at any time, Subordinated Debt, and (ii) one hundred percent (100%) of the liabilities of Ocala Funding, all as of such date, all determined in accordance with GAAP.

"Total Liabilities" or "Liabilities" shall mean all liabilities and obligations of Borrower on a consolidated basis, determined in accordance with GAAP, and shall include, without limitation, Funded Liabilities and/or Current Liabilities, as the case may be.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"VA" shall mean the Veterans Administration and any successor thereto.

Section 1.2    Terms Generally.

The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restates or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "hereof," "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (d) all references to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles, Sections, Exhibits and Schedules to this Agreement and (e) all references to a specific time shall be construed to refer to the time in the city and state of Agent's principal office, unless otherwise indicated. Except as otherwise provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP or, if applicable, FAS 133, as in effect from time to time; provided, that for purposes of determining compliance with any covenant set forth in Article VI, such term shall be construed in accordance with GAAP as in effect on the date of this Agreement applied on a basis consistent with the financial statements referred to in Section 5.4(a); and further provided, that if Borrower notifies Agent that Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or if Agent or any Lender notifies Borrower that Agent or such Lender wishes to amend Article VI for such purpose), then Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to Borrower, Agent and Lenders.

B # 935671 v.9

# ARTICLE II
## AMOUNT AND TERMS OF SERVICING FACILITY REDUCTION

Section 2.1    Servicing Facility Reduction.

(a)    PITI Advances. Borrower acknowledges, confirms and agrees that no additional PITI Advances are required to be made under this Agreement and, once repaid or prepaid, in whole or in part, no portion of the PITI Advances may be reborrowed. All outstanding PITI Advances shall be repaid by Borrower in accordance with the terms of this Agreement.

(b)    Servicing Rights Advance. Borrower acknowledges, confirms and agrees that no additional Servicing Rights Advances are required to be made under this Agreement and, once repaid or prepaid, in whole or in part, no portion of the Servicing Rights Advances may be reborrowed. The outstanding Servicing Rights Advances shall be repaid by Borrower in accordance with the terms of this Agreement.

(c)    Outstanding Advances. Borrower acknowledges, confirms and agrees that the outstanding principal amount of all Advances on the date hereof, but prior to giving effect to the mandatory payment required under Section 2.7(i), totals $236,354,564.67, and is in the amount and allocation among the Lenders as more fully set forth on Schedule 1 to this Agreement.

Section 2.2    Reaffirmation of Notes and Loan Documents.

The Borrower fully ratifies, approves, confirms and reaffirms the Notes and other Loan Documents (other than this Agreement), as amended hereby or in connection herewith, in their entirety and acknowledges and agrees that (i) the Notes and such other Loan Documents are in full force and effect, and (ii) the Notes and such other Loan Documents to which it is a party are legal, valid and binding obligations of the Borrower and are enforceable by the Agent and the Lenders against the Borrower in accordance with their respective terms, without set-off, counterclaim, deduction or other claim of avoidance of any nature.

Section 2.3    [Intentionally left blank].

Section 2.4    Notes.

(a)    Borrower's obligation to pay the principal of and interest on the PITI Advances made by each Lender is evidenced by the PITI Advance Notes. Borrower's obligation to pay the principal of and interest on the Servicing Rights Advances made by each Lender is evidenced by the Servicing Rights Notes.

(b)    For the avoidance of doubt, for purposes of the Notes, (i) any and all references to "COLONIAL BANK, as Agent" shall be deemed amended by replacing such references with "Sovereign Bank, as Agent", (ii) any and all references to "201 East Pine Street, Suite 730, Orlando, Florida 32801" shall be deemed amended by replacing such references with "75 State Street, Boston, MA 02109", which address shall be the payment office of Agent and (iii) any and all references to "Fifth Amended and Restated Servicing Facility Loan and Security Agreement, dated as of October 31, 2008, as amended by that certain First Amendment thereto dated as of the date hereof" shall be amended by replacing such references with "Sixth Amended and Restated Servicing Facility Loan and Security Agreement, dated as of May 15, 2009", and all references to the "Loan Agreement" shall be construed accordingly.

(c)    Each Lender is hereby authorized by Borrower to endorse on the schedule attached to each Note delivered to such Lender (or on a continuation of such schedule attached to such Note and made a part thereof), or otherwise to record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Advance from such Lender in respect of such Note, as applicable, each payment and prepayment of principal of each such Advance, each payment of interest on any such Advance, and applicable interest rates, and other information with respect thereto, and any such recordation shall absent manifest error constitute prima facie evidence of the accuracy of the information so recorded; provided that the failure of a Lender to make such a notation or any error therein shall not affect the Obligations of Borrower, including the obligation of Borrower to repay the Advances made by such Lender in accordance with the terms of this Agreement and the related Note.

19

Section 2.5     Interest.

(a)     Except as otherwise provided in this Agreement, the principal amount of each Advance owed to any Lender shall bear interest at an annual interest rate equal to the lesser of: (i) the Maximum Rate or (ii) the LIBOR Rate plus 9.00% (900 basis points) (the "Applicable Margin"), floating daily.

(b)     Overdue principal and interest in respect of each Advance and all other overdue amounts owing hereunder shall bear interest for each day that such amounts are overdue at a rate per annum equal to the Interim Default Rate; provided, however, if any such amounts are overdue for a period in excess of ten (10) days, Required Lenders or Agent, at their or its option, may elect, without notice to Borrower, to have all such overdue amounts bear interest for each day that such amounts are overdue (after as well as before judgment) at a rate per annum equal to the Default Rate.

(c)     Interest on each Advance shall accrue from and including the Advance Date thereof to but excluding the date of any repayment thereof and shall be payable (i) monthly on or before the fifth (5th) day after receipt of the billing statement referred to in subsection (d) below, (ii) upon any prepayment of all or any part of outstanding Advances, (iii) at maturity (whether by acceleration or otherwise) and (iv) after maturity, on demand.

(d)     Agent shall deliver to Borrower and each Lender an interest billing statement for each month on or before the fifth (5th) day of the next succeeding month, which interest billing statement shall set forth the interest accrued on Advances under the Servicing Facility for such month; provided that any failure or delay in delivering such interest billing statement or any inaccuracy therein shall not affect the Obligations.

(e)     Notwithstanding anything in this Agreement or in any of the other Loan Documents to the contrary, the sum of all interest and all other amounts deemed interest under applicable law that may be collected by Lenders under this Agreement or the Notes shall not exceed the Maximum Rate. Lenders and Borrower intend and agree that under no circumstances shall Borrower be required to pay interest on Advances or any other Obligations at a rate in excess of the Maximum Rate, and in the event any such interest is received or charged by a Lender in excess of the Maximum Rate, Borrower shall be entitled to an immediate refund of any such excess interest by a credit to and payment toward the unpaid balance of the Obligations owed to such Lender (such credit to be considered to have been made at the time of the payment of the excess interest) with any excess interest not so credited to be immediately repaid to Borrower by such Lender.

Section 2.6     Acknowledgement of Termination of Commitments.

(a)     Borrower acknowledges, confirms and agrees that all PITI Advance Commitments (as defined in the Existing Agreement) have been terminated as of the Second Amendment Effective Date.

(b)     Borrower acknowledges, confirms and agrees that all Servicing Rights Commitments (as defined in the Existing Agreement) have been terminated as of October 31, 2008.

Section 2.7     Mandatory Repayments.

(a)     Borrower shall repay all outstanding Advances on the earliest to occur of: (i) the Maturity Date and (ii) a Change of Control.

(b)     [Intentionally left blank].

(c)     If at any time (including without limitation, after the Advance Period) the outstanding principal amount of PITI Advances shall exceed the then applicable PITI Borrowing Base, Borrower shall repay such PITI Advances by an amount equal to such excess within two (2) Banking Days following notice thereof given by Agent to Borrower. If at any time (including without limitation, after the Advance Period) the outstanding principal amount of Servicing Rights Advances shall exceed the then applicable Servicing Rights Borrowing Base, Borrower shall repay such Servicing Rights Advances by an amount equal to such excess within two (2) Banking Days following notice thereof given by Agent to Borrower.

(d)     By no later than May 29, 2009, Borrower shall have repaid in full not less than all the outstanding principal amount of the PITI Advances, together with any and all accrued interest thereon.

B # 935671 v.9

(e)     Within two (2) days after receipt by Borrower of any capital infusion, Borrower shall repay the outstanding principal amount of the Servicing Rights Advances in an amount equal to not less than seventy five percent (75%) of the amount of such additional capital infusion.

(f)     (i)     On the date of receipt of payment in respect of any Servicing Sale Receivables, Borrower shall repay the outstanding principal amount of the Servicing Sale Advance by an amount equal to the amount of such payment. Such amount shall be paid directly to Agent (and Borrower shall so notify each Approved Purchaser of this requirement) by wire transfer to the Collateral Payment Account (or as otherwise directed by Agent in writing), pursuant to the wire transfer instructions set forth on Exhibit B, accompanied by a copy of the applicable Approved Purchaser's written purchase advice. Such wire, among other things, shall specify the applicable Servicing Sale Agreement, the sale date and the amount of the purchase price paid by the applicable Approved Purchaser for the Servicing Rights included in such sale; provided, however, Agent may change the wire transfer instructions from time to time. Unless such wire is received by Agent on or prior to 1:00 p.m. (Orlando time) on such date of receipt of Servicing Sale Receivables, the funds shall be deemed to have been received by Agent on the next succeeding Banking Day as set forth in Section 2.10(a).

(ii)     On the date of receipt of payment in respect of any P&I Receivables, Borrower shall repay the outstanding principal amount of PITI Advances by an amount equal to the amount of such payment by wire transfer to the Collateral Payment Account (or as otherwise directed by Agent in writing), pursuant to the wire transfer instructions set forth on Exhibit B. Such wire, among other things, shall specify the P&I Receivables being paid; provided, however, Agent may change the wire transfer instructions from time to time. Unless such wire is received by Agent on or prior to 1:00 p.m. (Orlando time) on the date of such repayment, the funds shall be deemed to have been received by Agent on the next succeeding Banking Day as set forth in Section 2.10(a).

(iii)     On the date of receipt of payment in respect of any T&I Receivables, Borrower shall repay the outstanding principal amount of PITI Advances by an amount equal to the amount of such payment by wire transfer to the Collateral Payment Account (or as otherwise directed by Agent in writing), pursuant to the wire transfer instructions set forth on Exhibit B. Such wire, among other things, shall specify the T&I Receivables being paid; provided, however, Agent may change the wire transfer instructions from time to time. Unless such wire is received by Agent on or prior to 1:00 p.m. (Orlando time) on the date of such repayment, the funds shall be deemed to have been received by Agent on the next succeeding Banking Day as set forth in Section 2.10(a).

(g)     All repayments of Advances received by Agent pursuant to this Section 2.7 shall be deposited by Agent in the Collateral Payment Account. Agent shall have the sole right of withdrawal with regard to funds from time to time in the Collateral Payment Account.

(h)     Each repayment of Advances under this Section 2.7 shall be allocated among Lenders on a pro rata basis in accordance with the aggregate outstanding principal amounts of their respective applicable Advances. Interest shall be payable in accordance with the provisions of Section 2.5.

(i)     On May 15, 2009, Borrower shall repay $25,000,000.00 of the outstanding principal amount of the Servicing Rights Advances.

(j)     No later than the 15th calendar day of every month (commencing in June 2009), Borrower shall repay not less than $12,000,000.00 (net of repayments made pursuant to the second sentence of Section 2.7(c), but in addition to any other amounts paid or payable under this Agreement) of the outstanding principal amount of the Servicing Rights Advances.

(k)     Borrower shall (i) repay the outstanding principal amount of the Servicing Rights Advances by 100% of the net proceeds received by Borrower from additional funding vehicles engaged for the purpose of retiring the Servicing Facility, and (ii) maintain the required Servicing Rights Collateral Value; provided, however, that nothing in this clause (k) shall be construed as permitting Borrower to obtain such funding vehicles as would be prohibited under this Agreement or otherwise would require the consent of Agent, Lenders or any other Person.

21

(l)     Borrower shall repay the outstanding principal amount of the Servicing Rights Advances by each net increase in cash flow received from the sale of Mortgage Loans on a servicing released basis through Platinum Community Bank.

Section 2.8     <u>Optional Prepayments</u>.

Borrower shall have the right at any time and from time to time to prepay outstanding Advances, without prior notice. The Agent, in its sole discretion, shall direct the application of any such payment to the PITI Advances and/or Servicing Rights Advances in such allocation as it shall determine. Each prepayment of Advances under this Section 2.8 shall be allocated among Lenders on a pro rata basis in accordance with the aggregate outstanding principal amounts of their respective applicable Advances. All prepayments of Advances under this Section 2.8 shall be without premium or penalty. Interest shall be payable in accordance with the provisions of Section 2.5.

Section 2.9     <u>Fees</u>.

(a)     Borrower agrees to pay to Agent, for its own account, an agency fee (the "Agency Fee") in the amount and on the dates separately agreed to by Agent and Borrower.

(b)     [Intentionally left blank].

(c)     Borrower agrees to pay to Agent for the pro-rata account of each Lender (ratably in accordance with such Lender's Commitment Percentage) a facility fee (the "Facility Fee") at a rate per annum equal to 0.50% (50 basis points) on outstanding Advances, payable in advance on a monthly basis on the first Banking Day of each calendar month (and calculated based upon the outstanding Advances as of the last calendar day of the immediately preceding calendar month), commencing on June 1, 2009, and on the first Banking Day of each calendar month thereafter.

(d)     [Intentionally left blank].

(e)     [Intentionally left blank].

(f)     The fees set forth in this Section 2.9, once paid, shall not be refundable under any circumstances.

Section 2.10     <u>Payments, Etc.</u>

(a)     Except as otherwise specifically provided herein, all payments by Borrower under this Agreement shall be made without defense, set-off or counterclaim to Agent not later than 1:00 p.m. (Orlando time) on the date when due, it being expressly agreed and understood that if a payment is received after 1:00 p.m. (Orlando time) by Agent, such payment will be deemed to have been made on the next succeeding Banking Day and interest thereon shall be payable at the then applicable rate during such extension. All payments hereunder shall be made in Dollars in immediately available funds at the Payment Office. Agent will promptly after receipt of each such payment (and in any event by 5:00 p.m., Orlando time, on the Banking Day on which such funds are received or deemed to have been received) distribute funds relating to the payment of (i) principal or interest on any outstanding Advance to Lenders ratably in accordance with the aggregate principal amount of such Advances, (ii) the Facility Fee ratably to Lenders and (iii) any other amount payable to Lenders to such Lenders by wire transfer pursuant to the wire transfer instructions set forth on <u>Exhibit C</u>.

(b)     Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day that is not a Banking Day, the due date thereof shall be extended to the next succeeding Banking Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of interest and Fees shall be made on the basis of a year of three hundred and sixty (360) days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or Fees are payable. Each determination by Agent of an interest rate or Fee hereunder shall be conclusive and binding absent manifest error.

(d)     Prior to the occurrence of an Event of Default and acceleration of all Advances outstanding hereunder, all amounts received on any day by Agent in respect of principal of the Advances shall be applied as follows: first, ratably to Lenders in accordance with the aggregate principal amounts of their respective outstanding Advances, to repay pro-rata the required aggregate principal amount of Advances due and payable on such day pursuant to Section 2.7 based on the amount of Advances outstanding on such day; second, ratably to Lenders in accordance with the aggregate principal amounts of their respective outstanding Advances, to prepay outstanding Advances being prepaid on such day pursuant to Section 2.8; third, ratably to Lenders in accordance with their respective unpaid Obligations, to pay any such unpaid Obligations which are then currently due and payable; and fourth, the balance, if any, shall (provided that no Potential Default or Event of Default has occurred and is continuing) be released by Agent to Borrower by transfer to the Operating Account. If any Potential Default or Event of Default has occurred and is continuing, but the maturity of the Obligations has not yet been accelerated pursuant to Section 7.2, all amounts remaining after making the applications required by clauses first, second and third above shall be applied to the repayment of outstanding Advances and/or other outstanding Obligations, in such order as Lenders may determine.

(e)     Following the occurrence of an Event of Default and acceleration of all Advances outstanding hereunder, all amounts received by Agent hereunder and under the other Loan Documents (except as otherwise required by the Intercreditor Agreement) shall be disbursed by Agent as follows: first, to Agent and, if permitted hereunder, Lenders, to reimburse Agent and Lenders for all fees, costs and expenses set forth in Section 9.4 reasonably incurred by them in connection with an Event of Default or otherwise payable to Agent under the Loan Documents; second, ratably to Lenders in accordance with the amount of accrued and unpaid interest on all Advances and Fees due Lenders; third, ratably to Lenders in accordance with the aggregate principal amounts of their outstanding Advances, to repay all outstanding Advances and any unpaid Obligations referred to in clause (b) of the definition of "Obligations" herein; fourth, to reimburse Agent and Lenders for any remaining outstanding Fees; fifth, ratably to Lenders in accordance with their respective unpaid Obligations, to pay all remaining unpaid Obligations; sixth, so long as Colonial is then a Lender under this Agreement, to Colonial to pay all other debts, liabilities and obligations of Borrower to Colonial (other than any Obligations of Colonial as a "Lender" under the Servicing Facility), including, without limitation, under the Overline Facility, the COLB Facility and any obligations of Borrower to Colonial under any then existing Colonial participation interest in any of Borrower's Mortgage Loans; and seventh, to Borrower by transfer to the Operating Account, or to such other account as Borrower may direct in writing for such purpose; provided, however, that upon request of Agent, Colonial shall promptly provide to Agent a written certification specifying any and all amounts Colonial is entitled to receive pursuant to clause "sixth" above, and Agent shall be entitled to conclusively rely upon any such written certification from Colonial without any independent investigation thereof; provided, further, that Agent may refrain from making any further distributions under clauses "sixth" or "seventh" above until such time as Agent shall have received from Colonial such written certification and has had a commercially reasonable period of time to act thereon.

Section 2.11     Indemnity.

Borrower shall indemnify each Lender against any loss or expense that such Lender actually sustains or incurs as a consequence of (a) any failure by Borrower to fulfill on the Effective Date or otherwise any applicable conditions set forth in this Agreement, including, without limitation, under Section 9.10 or (b) the occurrence of any Event of Default. A certificate of such Lender setting forth in reasonable detail any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.11 shall be delivered to Borrower and shall be conclusive and binding absent manifest error.

Section 2.12     Inability to Determine Interest Rate.

If at any time during the term of the Facilities,

(a)     Agent shall have determined (which determination shall be conclusive and binding upon Borrower) that, by reason of circumstances affecting the relevant interbank market, adequate means do not exist for ascertaining the LIBOR Rate, or

(b)    Agent shall have received notice from Required Lenders that the LIBOR Rate does not adequately and fairly reflect the cost to such Lenders of maintaining or otherwise continuing their Advances,

Agent shall give written notice (or telephonic notice, promptly confirmed in writing) to Borrower and to Lenders as soon as practicable thereafter. Until Agent shall notify Borrower and Lenders that the circumstances giving rise to such notice no longer exist, (i) the obligations of Lenders to continue Advances bearing interest at the LIBOR Rate *plus* the Applicable Margin shall be suspended and (ii) all such affected Advances shall be bear interest at the Prime Rate *plus* the Applicable Margin unless Borrower prepays such Advances in accordance with this Agreement.

Section 2.13     Illegality.

If any Change in Law shall make in unlawful or impossible for any Lender to maintain or otherwise continue any Advance bearing interest at the LIBOR Rate *plus* the Applicable Margin, and such Lender shall so notify Agent, Agent shall promptly give notice thereof to Borrower and the other Lenders, whereupon until such Lender notifies Agent and Borrower that the circumstances giving rise to such suspension no longer exist, (i) the obligation of such Lender to continue Advances bearing interest at the LIBOR Rate *plus* the Applicable Margin shall be suspended and (ii) all such affected Advances shall be bear interest at the Prime Rate *plus* the Applicable Margin unless Borrower prepays such Advances in accordance with this Agreement.

Section 2.14     Increased Costs.

(a)     If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement that is not otherwise included in the determination of the LIBOR Rate hereunder against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the LIBOR Rate); or

(ii)    impose on any Lender or the eurodollar interbank market any other condition affecting this Agreement or any Advances made by such Lender bearing interest at the LIBOR Rate *plus* the Applicable Margin or any participation therein;

and the result of the foregoing is to increase the cost to such Lender of continuing or maintaining any Advance bearing interest at the LIBOR Rate *plus* the Applicable Margin or to reduce the amount received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then Borrower shall promptly pay, upon written notice from and demand by such Lender on Borrower (with a copy of such notice and demand to Agent), to Agent for the account of such Lender, within five (5) Banking Days after the date of such notice and demand, such additional amount or amounts as shall be sufficient to compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender shall have determined that on or after the date of this Agreement any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital (or on the capital of such Lender's parent corporation) as a consequence of its obligations hereunder to a level below that which such Lender or such Lender's parent corporation could have achieved but for such Change in Law (taking into consideration such Lender's policies or the policies of such Lender's parent corporation with respect to capital adequacy) then, from time to time, within five (5) Banking Days after receipt by Borrower of written demand by such Lender (with a copy thereof to Agent), Borrower shall pay to such Lender such additional amounts as will compensate such Lender or such Lender's parent corporation for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or such Lender's parent corporation, as the case may be, specified in paragraph (a) or (b) of this Section 2.14 shall be delivered to Borrower (with a copy to Agent) and shall be conclusive, absent manifest error. Borrower shall pay any such Lender such amount or amounts within five (5) Banking Days after receipt thereof.

B # 935671 v.9

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.14 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that Borrower shall not be required to compensate a Lender under this Section for any increased costs or reductions incurred more than six (6) months prior to the date that such Lender notifies Borrower of such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then such six-month period shall be extended to include the period of such retroactive effect.

Section 2.15     Taxes.

(a)     All payments made by Borrower under this Agreement and the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding, in the case of Agent and each Lender, net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Agent or such Lender as a result of a present or former connection between the jurisdiction of the government or taxing authority imposing such tax and Agent or such Lender (excluding a connection arising solely from Agent or such Lender having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or the other Loan Documents) or any political subdivision or taxing authority thereof or therein (all such non-excluded taxes, levies, imposts, duties, charges, fees, deductions and withholdings being hereinafter called "*Taxes*"). If any Taxes are required to be withheld from any amounts payable to Agent or any Lender hereunder or under the other Loan Documents, the amounts so payable to Agent or such Lender shall be increased to the extent necessary to yield to Agent or such Lender (after payment of all Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement and the other Loan Documents. Whenever any Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to Agent a certified copy of an original official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Agent the required receipts or other required documentary evidence, Borrower shall indemnify Agent and Lenders for any incremental taxes, interest or penalties that may become payable by Agent or any Lender as a result of any such failure. The agreements in this subsection shall survive the termination of this Agreement and the payment of the Notes and all other amounts payable under the Loan Documents.

(b)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to Borrower (with a copy to Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate. Without limiting the generality of the foregoing, each Foreign Lender agrees that it will deliver to Agent and Borrower (or in the case of a Participant, to the Lender from which the related participation shall have been purchased) (i) two (2) duly completed copies of Internal Revenue Service Form W8-BEN or W8-ECI, or any successor form thereto, as the case may be, certifying in each case that such Foreign Lender is entitled to receive payments made by Borrower hereunder and under the Note payable to it, without deduction or withholding of any United States federal income taxes and (ii) a duly completed Internal Revenue Service Form W-8 or W-9, or any successor form thereto, as the case may be, to establish an exemption from United States backup withholding tax. Each such Foreign Lender shall deliver to Borrower and Agent such forms on or before the date that it becomes a party to this Agreement (or in the case of a Participant, on or before the date such Participant purchases the related participation). In addition, each such Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Lender. Each such Lender shall promptly notify Borrower and Agent at any time that it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(c)     Borrower shall not be required to pay any increased amount on account of Taxes pursuant to this Section 2.15 to any Lender to the extent such Taxes would not have been payable if such Lender had furnished a statement or form (properly and accurately completed in all material respects) which it was required to furnish in accordance with subsection (b) of this Section 2.15, and such Taxes shall be borne solely by such Lender.

B # 93567: v.9

Section 2.16    Sharing of Setoffs.

Except as otherwise provided in this Agreement, each Lender agrees that if, through the exercise of a right of banker's lien, setoff or counterclaim against Borrower, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means (other than pursuant to Sections 2.13, 2.17 or 9.6), such Lender shall obtain payment (voluntary or involuntary) in respect of any Obligation as a result of which the unpaid portion of its Obligations shall be proportionately less than the unpaid portion of the Obligations of any other Lender, it shall simultaneously purchase from such other Lender at face value a participation in the Obligations of such other Lender, so that the aggregate unpaid amount of the Obligations and such participations in Obligations held by each Lender shall be in the same proportion to the aggregate unpaid amount of all Obligations then outstanding as the amount of its Obligations prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Obligations outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided that, if any such purchase or purchases or adjustments are made pursuant to this Section 2.16 and the payment giving rise thereto is thereafter recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustments restored without interest. Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in an Obligation which has been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by Borrower to such Lender by reason thereof as fully as if such Lender had made a loan directly to Borrower in the amount of such participation. To the extent that any application of proceeds of Collateral may be deemed to constitute a setoff or "other means" of obtaining payment under this provision, this provision shall not affect or impair the right of any Lender to receive and retain payments in accordance with Sections 2.7 and 2.10. If any Lender shall obtain payment (voluntary or involuntary) on account of any Obligation that exceeds the amount to which it is entitled as specified in Section 2.7 or 2.10, as applicable, such Lender shall purchase a participation in the Obligations of any Lender that should have received such payment in the amount thereof.

Section 2.17    Mitigation of Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.14, or if Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable under Section 2.14 or Section 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with such designation or assignment.

(b)    If (i) any Lender requests compensation under Section 2.14, (ii) Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender does not consent to a modification or waiver of the terms of this Agreement or the other Loan Documents requested by Agent, or otherwise fails to give its consent to an action requested by Borrower hereunder and, in each case, the Required Lenders have given their consent then, provided no Potential Default or Event of Default has occurred and is continuing, Borrower may, at its sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions set forth in Section 9.6(b)) all its interests, rights and obligations under this Agreement to an assignee (which assignee may be another Lender) that shall assume such obligations; provided, that (x) Borrower shall have received the prior written consent of Agent, which consent shall not be unreasonably withheld, (y) such Lender shall have received payment of an amount equal to the outstanding principal amount of all Advances owed to it, accrued interest thereon, accrued Fees and all other amounts payable to it hereunder, from the assignee (in the case of such outstanding principal and accrued interest) and from Borrower (in the case of all other amounts) and (z) in the case of a claim for compensation under Section 2.14 or payments required to be made pursuant to Section 2.15, such assignment will not result in a reduction in such compensation or payments to such Lender from Borrower. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

26

(c)     The replacement Lender shall not be a bank or other financial institution that has made a claim for compensation under Section 2.14 or payments required to be made pursuant to Section 2.15 that may have given rise to Borrower's election to replace any Lender hereunder, and each such replacement Lender shall execute and deliver to Agent such documentation satisfactory to Agent pursuant to which such replacement Lender is to become a party hereto with a Commitment Percentage equal to that of the Lender being replaced.

(d)     Agent shall reasonably cooperate in effectuating the replacement of any Lender under this Section 2.17, but at no time shall Agent be obligated to initiate any such replacement.

(e)     After any assignment pursuant to this Section 2.17, the replaced Lender shall retain the benefit of Sections 2.14, 2.15 and 9.4 in respect of the period prior to the effective date of such assignment.

## ARTICLE III
## CONDITIONS

Section 3.1     [Intentionally left blank].

Section 3.2     General.

Each condition in this Agreement including, without limitation, those set forth in Section 9.10, is material to the transactions contemplated by this Agreement, and time is of the essence with respect to each such condition.

## ARTICLE IV
## SECURITY

Section 4.1     Grant of Security Interest.

Borrower hereby assigns, pledges and transfers to Agent, in its capacity as agent on behalf of and for the benefit of Lenders, and grants to Agent, in its capacity as agent on behalf of and for the benefit of Lenders, a security interest in, all of Borrower's right, title and interest in, under and to the property described in Section 4.2(a), subject to no other Liens except for Permitted Liens (provided, that such Permitted Liens are expressly junior and subordinate to the Lien of this Agreement) (for purposes of this Article IV, collectively and severally, the "Collateral"), to secure payment and performance of the Obligations.

Furthermore, Borrower confirms and reaffirms all prior pledges and transfers of, and grants of security interest in and to, the Collateral in favor of the Predecessor Agent, and acknowledges, confirms, and agrees that Agent (as successor to the Predecessor Agent) is, and shall be, entitled to any and all rights and benefits of such pledges, transfers and grants of security interest, as if made directly to Agent.

Section 4.2     Collateral.

(a)     The Collateral shall consist of all right, title and interest of Borrower in, under and to each of the following, wherever located, whether now existing or hereafter arising, and whether now or hereafter owned or acquired by, or accruing or owing to, Borrower:

(i)     All Servicing Contracts, all Servicing Rights, all other contracts, and all guaranties, instruments, documentation and chattel paper relating to or arising from such Servicing Rights and Servicing Contracts, and any other right, title and interest of Borrower in, to and under the Mortgage Notes, Mortgages and other security documents evidencing and securing the Mortgage Loans that are the subject of the Servicing Rights;

(ii)    All Servicing Receivables and each of the following rights and interests, to the extent same relate to rights to payment under, or claims for monies payable or to become payable under, the Servicing Contracts: all contract rights, accounts, general intangibles, and other rights to payment and claims for monies payable or to become payable under the Servicing Contracts;

27

(iii)     All other rights and remedies under the Servicing Contracts;

(iv)     All rights of Borrower to sell or assign its interest therein and all amounts payable to the Borrower thereunder arising out of any termination thereof, and all files, surveys, certificates, correspondence, appraisals, computer programs, tapes, disks, cards, accounting records and other records and data of Borrower related to the Mortgage Loans covered by the Servicing Rights;

(v)     All Servicing Sale Agreements, all other contracts, and all guaranties, instruments, documentation and chattel paper, relating to or arising from such Servicing Sale Agreements;

(vi)     All Servicing Sale Receivables and each of the following rights and interests, to the extent same relate to rights to payment under, or claims for monies payable or to become payable under, the Servicing Sale Agreements: all contract rights, accounts, general intangibles, and other rights to payment and claims for monies payable or to become payable under the Servicing Contracts;

(vii)     All other rights and remedies under the Servicing Sale Agreements;

(viii)     The Collateral Payment Account, the Operating Account and all other accounts at any time maintained by Borrower and/or Agent in connection with the Servicing Facility and any and all money, cash, deposits and investments at any time held in such accounts, and any and all rights of Borrower to insurance payments made in respect of such accounts;

(ix)     All rights of Borrower in, to and under any Hedging Arrangements entered into to protect Borrower against changes in the value of any of the Servicing Collateral, including without limitation, all rights to payment arising under such Hedging Arrangements;

(x)     All P&I Receivables and each of the following rights and interests, to the extent same relate to rights to payment under, or claims for monies payable or to become payable under, the Mortgage Loans relating to such P&I Receivables: all contract rights, accounts, general intangibles, and other rights to payment and claims for monies payable or to become payable under such Mortgage Loans;

(xi)     All T&I Receivables and each of the following rights and interests, to the extent same relate to rights to payment under, or claims for monies payable or to become payable under, the Mortgage Loans relating to such T&I Receivables: all contract rights, accounts, general intangibles, and other rights to payment and claims for monies payable or to become payable under such Mortgage Loans;

(xii)     All now existing or hereafter arising accounts, chattel paper, general intangibles (including payment intangibles), instruments and software (as each such term is defined in Article 9) constituting or relating to any of the foregoing Servicing Collateral;

(xiii)     All claims and causes of actions in which Borrower has or may have against any Person, including but not limited to, tort claims and commercial tort claims, arising out of or relating to any of the foregoing, and the products and proceeds thereof; and

(xiv)     All Products and Proceeds of the foregoing Servicing Collateral.

(b)     BORROWER HEREBY AUTHORIZES AGENT TO FILE A UCC-1 FINANCING STATEMENT AND/OR A UCC-3 AMENDMENT IN THE STATE OF FLORIDA OR IN ANY OTHER APPLICABLE JURISDICTION FROM TIME TO TIME TO INCORPORATE OR OTHERWISE SET FORTH THE DESCRIPTION OF THE COLLATERAL SET FORTH IN THIS SECTION 4.2. FURTHER, BORROWER, BY EXECUTION HEREOF, IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE UNDER THE UNIFORM COMMERCIAL CODE OR OTHERWISE TO FILE ANY CORRECTION STATEMENT, AMENDMENT OR TERMINATION FINANCING STATEMENT WITH ANY JURISDICTION RELATING TO THE COLLATERAL WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT.

(c)     This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Notes and all other Obligations.

B # 935671 v.9

Section 4.3       Standard of Care of Agent; Indemnification.

Notwithstanding anything to the contrary contained herein:

(a)       The provisions of this Agreement and the Exhibits and Schedules attached hereto set forth the exclusive duties of Agent, and no implied duties or obligations shall be read into this Agreement against Agent. Agent shall not be bound in any way by any agreement or contract other than this Agreement and the Exhibits and Schedules attached hereto and any other agreement to which it is a party. Agent shall not be required to ascertain or inquire as to the performance or observance of any of the conditions or agreements to be performed or observed by any other party, except as specifically provided in this Agreement and the Exhibits and Schedules attached hereto. Agent disclaims any responsibility for the validity or accuracy of the recitals to this Agreement and any representations and warranties contained herein, unless specifically identified as recitals, representations or warranties of Agent.

(b)       It is expressly agreed, anything herein contained to the contrary notwithstanding, that Borrower shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and Agent and Lenders shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of Borrower's assignment of the Collateral as security for the Obligations, nor shall Agent or any Lender be required or obligated in any manner to perform or fulfill any of the obligations of Borrower under or with respect to any Collateral solely by reason of such assignment.

(c)       Throughout the term of this Agreement, Agent shall have no responsibility for ascertaining the value, collectability, insurability, enforceability, effectiveness or suitability of any of the Collateral, the title of any party therein, the validity or adequacy of the security afforded thereby, or the validity of this Agreement (except as to Agent's authority to enter into this Agreement and to perform its obligations hereunder).

(d)       Agent shall not be under any duty to examine or pass upon the genuineness, validity or legal sufficiency of any of the Collateral. Agent may rely upon and shall be protected in acting in good faith upon any notice, resolution, request, consent, order, certificate, report, statement or other paper or document appearing on its face to be genuine and to have been signed or presented by the proper party or parties or by a person or persons authorized to act on behalf of the proper party or parties, including without limitation, any Borrowing Base Certificate. Agent shall not be liable for any action or omission except for its own gross negligence or willful misconduct.

(e)       No provision of this Agreement shall require Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if, in its judgment, it shall believe that repayment of such funds or adequate indemnity against such risk or liability is not assured to it.

(f)       Agent is not responsible for preparing or filing any reports or returns relating to federal, state or local income taxes with respect to this Agreement, other than for Agent's compensation or for reimbursement of expenses.

(g)       Borrower agrees to reimburse and hold harmless Agent, its directors, officers, employees and agents from and against any and all liability, loss and expense, including reasonable counsel fees, arising from or connected with Agent's execution and performance of this Agreement including, but not limited to, the claims of any third parties, including any assignee, except in the case of loss, liability or expense resulting from gross negligence or willful misconduct on the part of Agent. Notwithstanding anything to the contrary contained herein, this provision shall survive the termination of this Agreement.

29

B # 935671 v.9

(h)     Agent shall have the power to employ such agents as it may deem necessary or appropriate in the performance of its duties and the exercise of its powers under this Agreement.

(i)     Anything in this Agreement to the contrary notwithstanding, in no event shall Agent be liable hereunder to Borrower, Lenders or any other Person for consequential loss or consequential damage of any kind whatsoever (including but not limited to loss of profits), even if Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 4.4     Fees and Expenses of Agent.

Agent shall notify Borrower of all fees, expenses and charges of Agent arising out of Agent's entering into this Agreement and performing its duties and obligations as Agent under this Agreement, and such fees, expenses and charges shall be paid promptly by Borrower or, if already paid by Agent, Borrower promptly shall reimburse Agent therefor. Agent may employ, at Borrower's expense, such legal counsel and other experts as it reasonably deems necessary in connection with entering into this Agreement and performing its duties and obligations under this Agreement.

Section 4.5     Availability of Documents.

Each Lender and its agents, accountants, attorneys and auditors will be permitted during normal business hours at any time and from time to time upon reasonable notice to Agent to examine (to the extent permitted by applicable law) the files, documents, records and other papers in the possession or under the control of Agent relating to any or all of the Collateral and to make copies thereof. As long as no Event of Default has occurred and is continuing, any such activity will be at no cost or expense to Borrower; if an Event of Default has occurred and is continuing, all costs and expenses associated with the exercise by any Lender of its rights under this Section 4.5 shall be paid by Borrower within fifteen (15) days of receipt by Borrower from such Lender of a statement setting forth in reasonable detail the amount thereof.

Section 4.6     Representations and Warranties of Borrower With Regard to the Servicing Collateral.

(a)     Special Representations and Warranties as to Servicing Contracts. By granting a security interest in the Servicing Collateral to Agent, for the benefit of Lenders, Borrower shall be deemed to have represented and warranted with respect to each Servicing Contract now or hereafter included in the Servicing Collateral, that:

(i)     Borrower is the legal and equitable owner and holder of each Servicing Contract listed on Schedule 6, any other Servicing Contracts currently in effect and the Servicing Rights appurtenant thereto and has full power and authority to grant a security interest in such Servicing Collateral. Each such Servicing Contract has been duly and validly made subject to the Lien of this Agreement and is subject to no Liens other than the Lien created pursuant to this Agreement and, to the extent applicable, Permitted Liens.

(ii)     Each Servicing Contract has been duly executed and delivered by Borrower, and assuming the due execution and delivery by the other parties thereto, is valid and enforceable in accordance with its terms, provided that (A) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally and (B) rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability.

(iii)     To Borrower's knowledge, no default, nor any event which with notice or lapse of time or both would become a default, has occurred and is continuing under each Servicing Contract and no action has been taken to terminate any Servicing Contract.

(iv)     Borrower has complied, and will continue to comply, with all laws, rules and regulations including, but not limited to, all applicable FHLMC, GNMA and other Approved Investor requirements, in respect of each Servicing Contract.

30

(v)     The Servicing Rights and all Servicing Receivables are subject to no Liens other than the Liens created pursuant to this Agreement and Permitted Liens.

(vi)    The Mortgage Loan servicing rights which are included in the computation of the Servicing Rights Borrowing Base in each Borrowing Base Certificate delivered to Agent are owned by Borrower pursuant to valid and binding Servicing Contracts. Borrower is in compliance with all terms of such Servicing Contracts and all requirements of FHLMC, GNMA and other applicable Approved Investors under each such Servicing Contract.

(vii)   The Mortgage Loans subject to such Servicing Contract are owned by an Approved Investor, and are not subject to any repurchase, purchase option or similar agreement, other than (subject to the rights of Agent and Lenders hereunder) with another Approved Investor.

(b)     <u>Special Representations and Warranties as to Servicing Sale Agreements</u>. By granting a security interest in the Servicing Collateral to Agent, for the benefit of Lenders, Borrower shall be deemed to have represented and warranted with respect to each Servicing Sale Agreement included in the Servicing Collateral, that:

(i)     Borrower is the legal and equitable owner and holder of each Servicing Sale Agreement listed on <u>Schedule 7</u>, any other Servicing Sale Agreement currently in effect and the Servicing Rights appurtenant thereto and has full power and authority to grant a security interest in such Servicing Collateral. Each such Servicing Sale Agreement has been duly and validly made subject to the Lien of this Agreement and is subject to no Liens other than the Lien created pursuant to this Agreement and Permitted Liens.

(ii)    Each Servicing Sale Agreement has been duly executed and delivered by Borrower, and assuming the due execution and delivery by the other parties thereto, is valid and enforceable in accordance with its terms, provided that (A) the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally and (B) rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability.

(iii)   To Borrower's knowledge, no default, nor any event which with notice or lapse of time or both would become a default, has occurred and is continuing under any Servicing Sale Agreement and no action has been taken to terminate each Servicing Sale Agreement.

(iv)    Borrower has complied, and will continue to comply, with all laws, rules and regulations including, but not limited to, all applicable Approved Purchaser requirements, in respect of each Servicing Sale Agreement.

(v)     All Servicing Sale Receivables are subject to no Liens other than the Lien created pursuant to this Agreement and Permitted Liens.

(vi)    Borrower is in compliance with all terms of such Servicing Sale Agreements and all requirements of the applicable Approved Purchaser under such Servicing Sale Agreement.

(c)     <u>General Representations and Warranties as to the Servicing Collateral</u>. Borrower hereby represents and warrants with respect to the Collateral that:

(i)     Borrower has good title to and is the sole owner of the Servicing Collateral pledged by it hereunder (or, in the case of after-acquired Collateral, at the time Borrower acquires rights in the Servicing Collateral, will be the sole owner thereof).

(ii)    Except for Permitted Liens held by any Person, no Person has (or, in the case of after-acquired Servicing Collateral, at the time Borrower acquires rights therein, will have) any right, title, claim or interest (by way of security interest or other lien or charge or otherwise) in, against or to the Servicing Collateral pledged by it hereunder.

(iii)   All information heretofore, herein or hereafter supplied to Agent or Lenders by or on behalf of Borrower with respect to the Servicing Collateral is or will be accurate and complete in all material respects.

31

(iv)    No consent of any other Person is required for the grant of the security interest provided herein by Borrower in any of the Servicing Collateral including, without limitation, any computer software being utilized by Borrower pursuant to license, lease or otherwise, other than consents which have been obtained, nor will any consent need to be obtained upon the occurrence of an Event of Default for Agent and Lenders to exercise their rights with respect to any of the Servicing Collateral.

Section 4.7    <u>Covenants of Borrower With Regard to the Servicing Collateral.</u>

(a)    Borrower warrants and will defend the right, title and interest of Agent, for the benefit of Lenders, in and to all of the Eligible Servicing Rights and all other items of Servicing Collateral against the claims and demands of all other Persons.

(b)    As requested by Agent and not less often than quarterly if any changes have occurred in the Eligible Servicing Rights, Borrower shall execute and deliver to FHLMC, GNMA and such other Approved Investors as have entered into Acknowledgment Agreements from time to time, updated Schedules to the Acknowledgment Agreements with such Approved Investors reflecting any Servicing Contracts with such Approved Investors which have become Servicing Rights since the initial Acknowledgment Agreement (or most recent update thereto) with such Approved Investor.

(c)    Borrower shall not, without the prior written consent of Agent or Required Lenders, amend or modify, or waive any of the terms and conditions of, or settle or compromise any claim in respect of, any Servicing Collateral or any rights related to any of the foregoing, except in the ordinary course of the Borrower's business and provided that (i) no Potential Default or Event of Default has occurred and is continuing and (ii) any such amendment, modification, waiver, settlement or compromise will not (A) result in any mandatory repayment to be payable in accordance with Section 2.7, (B) cause a Potential Default or Event of Default or (C) otherwise adversely affect the interest of Lenders in the Servicing Collateral.

(d)    Except as otherwise expressly provided herein, Borrower shall not sell, assign, transfer or otherwise dispose of, or grant any option with respect to, or pledge or otherwise encumber or create or permit to exist any Lien on, any of the Servicing Collateral or any interest therein.

(e)    Borrower shall service all Mortgage Loans that are the subject of any Servicing Contracts in accordance with the standard requirements of the other parties to such Servicing Contracts and all applicable Agency and other applicable Approved Investor requirements.

(f)    Borrower shall promptly notify Agent of any default of which it has knowledge under any Servicing Contract or any Servicing Sale Agreement.

(g)    Borrower shall execute and deliver such further instruments and shall do and perform all things necessary or expedient to be done or observed for the purpose of effectively creating, maintaining and preserving the security and benefits intended to be afforded by this Agreement and shall promptly notify Agent, after Borrower becomes aware of the same, of any Change in Law which may affect Agent's ability, for the benefit of Lenders, to effectively create, maintain and preserve the security and benefits intended to be afforded by this Agreement.

(h)    Borrower shall hold all escrow funds collected in respect of Mortgage Loans that are the subject of Servicing Contracts in trust, without commingling the same with any other funds, and apply the same for the purposes for which such funds were collected, except to the extent that the Borrower has previously paid the disbursement for which the collection was received and is obligated to pay the amount collected to the Lenders.

(i)    Borrower shall cooperate with Agent and Lenders, and any of their respective representatives in any review or inspection of the Servicing Rights or the Mortgage Loans subject to any Servicing Rights, and, upon reasonable notice, make available to such Person any books and records relating to such Servicing Rights as well as the appropriate employees of Borrower for the purpose of discussing the same, all at such time during business hours as may be reasonably requested by Agent.

B # 935671 v.9

(j)     Borrower authorizes Agent, upon reasonable notice to Borrower, for reasonable purposes and on any reasonable basis, to confer directly with Approved Investors under Servicing Contracts regarding the status of such Servicing Contracts, Borrower's relationship with such Approved Investors, and any other matters reasonably requested by Agent, an officer or representative of Borrower to participate in such conferences if Borrower so desires.

(k)     Borrower shall maintain all of the approvals of any Agency or any private mortgage insurer which it has on the date hereof and shall not become ineligible as a Mortgage Loan servicer under the applicable FHLMC and GNMA guidelines.

(l)     Borrower shall do, execute, acknowledge and deliver, or cause be done, executed, acknowledged and delivered, all such other acts, instruments and transfers as Agent or Required Lenders may reasonably request from time to time in order to create and maintain a perfected first priority security interest in the Servicing Collateral in favor of Agent for the benefit of Lenders, and to create, maintain and preserve the security and benefits intended to be afforded by this Agreement, subject to no prior or equal security interest, lien, charge or encumbrance, or agreement purporting to grant to any Person a security interest in the Servicing Collateral.

(m)     Borrower will, within ten (10) days after a request from Agent, deliver to Agent copies of the Servicing Contracts and Servicing Sale Agreements in effect at the time of said request, and all amendments thereto.

(n)     Borrower shall notify Agent of any change in Borrower's name, identity or structure through merger, consolidation or otherwise before any such change shall occur.

Section 4.8     Collection of Collateral Payments.

(a)     Borrower shall, at its sole cost and expense, use its best efforts to obtain payment, when due and payable, of all Collateral Payments, including without limitation, the taking of such action with respect thereto as Agent may reasonably request, or, in the absence of such request, as Borrower may reasonably deem advisable; provided that Borrower shall not, without the prior written consent of Agent, grant or agree to any rebate, refund, compromise or extension with respect to any Collateral Payment. Upon the request of Agent following the occurrence of an Event of Default, Borrower shall notify and direct any party who is or might become obligated to make any Collateral Payment with respect to the Servicing Collateral, to make payment thereof to Agent (or to Borrower in care of Agent) at such address as Agent may designate. Borrower shall reimburse Agent promptly upon demand for all out-of-pocket costs and expenses, including reasonable attorneys' fees and litigation expenses, actually incurred by Agent in seeking to collect any Collateral Payment.

(b)     If an Event of Default has occurred and is continuing, upon the request of Agent, Borrower shall, immediately upon receipt, transmit and deliver to Agent, in the form received, all cash, checks, drafts and other instruments for the payment of money (properly endorsed so that such items may be collected by Agent) that may be received by Borrower at any time as payment on account of any Collateral Payment with respect to the Collateral and if such request is made, until delivery to Agent, such items shall be held in trust for Agent on behalf of Lenders and shall not be commingled by Borrower with any of its other funds or property. Agent is hereby authorized and empowered to endorse the name of Borrower on any check, draft or other instrument for the payment of money received by Agent on account of any Collateral Payment if Agent believes such endorsement is necessary or desirable for purposes of collection.

(c)     Borrower shall indemnify and save harmless Agent and Lenders from and against all reasonable liabilities and expenses on account of any adverse claim asserted against Agent or any Lender relating to any moneys received by Agent on account of any Collateral Payment, and such obligation of Borrower shall continue in effect after and notwithstanding the discharge of the Obligations and the release of the security interest granted in Section 4.1.

Section 4.9     Authorized Action by Agent.

Borrower hereby irrevocably appoints Agent as its attorney-in-fact, coupled with an interest, (a) at any time while an Event of Default has occurred and is continuing, to do (but Agent shall not be obligated to and

33

B # 935671 v.9

shall incur no liability to Borrower, Lenders or any third party for failure so to do) any act that Borrower is obligated by this Agreement to do, and to exercise such rights and powers as Borrower might exercise with respect to the Collateral, including, without limitation, the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt for all interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral; (ii) enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for, the Collateral; (iii) insure, process and preserve the Collateral; (iv) transfer the Collateral to Agent's own name or its nominee's name; (v) sell or otherwise dispose of the Collateral as provided in Section 7.2, and (vi) make any compromise or settlement, and take any other action it deems advisable with respect to the Collateral, and (b) at any time, whether or not an Event of Default has occurred or is continuing, (i) to execute any and all documents which Borrower is required to execute under this Agreement and (ii) to file any appropriate UCC-1 financing statements, UCC-3 amendments and/or amendments or continuations thereof in any jurisdiction which Agent deems necessary or advisable in order to perfect the security interest granted hereunder (but Agent shall be obligated to and shall incur no liability to Borrower or any third party for failure so to do), all without the signature of Borrower. Notwithstanding anything contained herein, in no event shall Agent be required to make any presentment, demand or protest, or give any notice, and Agent need not take any action to preserve any rights against any prior party or any other Person in connection with the Obligations or with respect to the Collateral.

Section 4.10   Release of Collateral.

Upon the written request of Borrower delivered to Agent from time to time, Agent shall authorize the sale of any Servicing Rights and the corresponding release of the Servicing Rights specified in such request from the lien of this Agreement if, and only if, (i) at the time of such release no Potential Default or Event of Default shall have occurred and then be continuing, (ii) after giving effect to such release the sum of (x) the Servicing Rights Borrowing Base *plus* (y) the PITI Borrowing Base shall exceed the outstanding Obligations, (iii) after giving effect to the planned disposition by the Borrower of such Servicing Rights concurrently with or after its release, no Potential Default or Event of Default shall occur, and (iv) the proceeds of such sale shall be deposited into the Collateral Payment Account for application against the outstanding Servicing Rights Advance and/or PITI Advances, as determined by Agent in its sole discretion.

Section 4.11   FHLMC/GNMA Agency Guide Required Language.

Lenders and Borrower acknowledge that the FHLMC Guide and the GNMA Guide require that this Agreement reflect that: (a) Borrower is entitled to servicing income with respect to its FHLMC Servicing Rights and its GNMA Servicing Rights, as applicable, only so long as Borrower is a FHLMC – Approved Servicer or a GNMA – Approved Servicer, as the case may be, in good standing; (b) upon Borrower's loss of FHLMC – Approved Servicer or GNMA – Approved Servicer, as applicable, status, Agent's rights as a secured party to any servicing income related to FHLMC Servicing Rights or GNMA Servicing Rights, as the case may be, also terminates; and (c) the pledge of rights to servicing income conveys no rights (such as a right to become a substitute servicer or issuer) that are not otherwise specifically provided for in the FHLMC Guide or the GNMA Guide, as applicable. Borrower expressly understands and agrees that the foregoing sentence of this Section 4.11 is required to be included in this Agreement by the FHLMC Guide or the GNMA Guide, as applicable, and is not intended to modify, amend or lessen the effect of any Loan Document or Borrower's obligations thereunder.

Section 4.12   Negative Pledge.

Except as set forth in the Pledge Agreement and/or Intercreditor Agreement, as long as any Obligations remain unpaid, none of Borrower's shareholders shall pledge, assign, transfer or encumber any Capital Stock such shareholder holds of Borrower to any third party, other than to Agent and/or Lenders.

Section 4.13   Banker's Lien.

Borrower hereby grants to Lenders and their respective Affiliates a lien on, and a security interest in, the deposit balances, accounts, items, certificates of deposit and monies of Borrower in possession of or on deposit with Agent or any of its Affiliates, to secure and as collateral for the payment of the Notes and all other Obligations and the performance of all obligations of Borrower under the Loan Documents. Borrower specifically

B # 935671 v.9

agrees that any such Affiliate of Agent shall be deemed to be the duly designated agent of Agent for purposes of holding possession of any such deposits and monies.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

As an inducement to Agent and each Lender to enter into this Agreement, Borrower represents and warrants to Agent and each Lender that:

Section 5.1    Corporate Existence; Compliance with Law and Contractual Obligations.

Borrower (a) is duly organized, validly existing and in good standing as a corporation under the laws of the State of Florida and in each jurisdiction where its ownership of property or conduct of business requires such qualification, except where the failure to be so qualified would not have a Material Adverse Effect; (b) has the corporate power and authority and the legal right to own and operate its property and to conduct business in the manner in which it does and proposes so to do; and (c) is not in violation of any Requirement of Law or any Contractual Obligation if such violation could have a Material Adverse Effect.

Section 5.2    Corporate Power; Authorization; Enforceable Obligations.

Borrower has the corporate power and authority to execute, deliver and perform the Loan Documents to which it is a party and to repay Advances hereunder and use the proceeds of such Advances and has taken all necessary corporate action to authorize the execution, delivery and performance of the Loan Documents, the repayment of Advances and the use of the proceeds of such Advances. The Loan Documents have been duly executed and delivered on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against it in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and by general principles of equity.

Section 5.3    No Legal or Contractual Bar.

The execution, delivery and performance of the Loan Documents, and the Advances previously made hereunder, do not and will not (a) violate any Requirement of Law or any Contractual Obligation of Borrower, (b) except as contemplated by this Agreement, require any license, consent, authorization, approval or any other action by, or any notice to or filing or registration with, any Governmental Authority or any other Person or (c) result in the creation or imposition of any Lien on any asset of Borrower except as contemplated by the Loan Documents.

Section 5.4    Financial Information.

(a)    The consolidated balance sheet of Borrower as at April 30, 2008 and the related consolidated statements of income, retained earnings and cash flows for the fiscal year then ended, including in each case the related schedules and notes, reported on by Deloitte & Touche LLP, true copies of which have been previously delivered to Agent and Lenders, are complete and correct and fairly present the financial condition of Borrower as at the date thereof and the results of operations and cash flows for such period, in accordance with GAAP applied on a consistent basis.

(b)    Borrower has no material liability of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, and no condition, situation or set of circumstances exists that could be reasonably expected to result in such a liability, in each case that is not reflected in the balance sheet referred to in Section 5.4(a) or will not be reflected in the most recent balance sheet delivered to Agent and Lenders pursuant to Section 6.1(a)(i) or, if applicable, Section 6.1(a)(ii).

B # 935671 v.9

(c)     Since the date of the financial statements referred to in subsection (a) above, no material adverse change has occurred in the business, financial condition or results of operations of Borrower.

Section 5.5     No Material Litigation.

There is no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of Borrower, threatened by or against Borrower, or against any of Borrower's properties or revenues that, individually or in the aggregate, if adversely determined, could have a Material Adverse Effect.

Section 5.6     Taxes.

Borrower has filed or caused to be filed all tax returns that are required to be filed and has paid all taxes shown to be due and payable on such returns or on any assessments made against it or any of its property other than taxes and assessments that are being contested in good faith by appropriate proceedings and as to which Borrower has established adequate reserves in conformance with GAAP.

Section 5.7     Investment Company Act.

Borrower is not, and is not controlled by, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.8     Subsidiaries; Capitalization.

Except as set forth in Schedule 5, Borrower has no Subsidiaries. The issued and outstanding capital stock of Borrower and its Subsidiaries is owned, beneficially and of record, by the Persons listed in Schedule 8 in the amounts and percentage interests set forth opposite such Persons' names.

Section 5.9     Use of Proceeds.

The proceeds of all Advances have been used by Borrower solely for the purpose of working capital. No part of the proceeds of any Advance have been used by Borrower to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. The use of such proceeds did not violate and was not inconsistent with the provisions of Regulation T, U or X of the Board.

Section 5.10     ERISA.

(a) No Prohibited Transactions, Accumulated Funding Deficiencies, withdrawals from Multiemployer Plans or Reportable Events have occurred with respect to any Plans or Multiemployer Plans that, in the aggregate, could subject Borrower to any material tax, penalty or other liability where such tax, penalty or liability is not covered in full, for the benefit of Borrower, by insurance; (b) no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated under Section 4041 of ERISA, nor has the PBGC instituted proceedings to terminate, or appoint a trustee to administer, a Plan and no event has occurred or condition exists that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (c) the present value of all benefits liabilities (as defined in Section 4001(a)(16) of ERISA) under all Plans (based on the actuarial assumptions used to fund the Plans) does not exceed the assets of the Plans; and (d) the execution, delivery and performance by Borrower of the Loan Documents and the Advances hereunder and the use of the proceeds thereof will not, and did not, involve any Prohibited Transaction.

Section 5.11     Security Interests.

The security interests created in favor of Agent, in its capacity as agent on behalf of and for the benefit of Lenders under this Agreement, and to Lenders and their respective Affiliates, constitutes and will constitute a perfected security interests in the Collateral, and such Collateral is not and will not be subject to any other Liens, except for Permitted Liens.

B # 935671 v.9

Section 5.12    Agency Approvals.

Borrower is (a) a FHLMC - Approved Servicer, (b) a HUD direct endorsement lender, (c) a VA approved lender, and (d) a GNMA - Approved Servicer in each case, in good standing. Borrower currently is not an FNMA – Approved Servicer.

Section 5.13    Principal Place of Business and Chief Executive Office; Location of Records.

Borrower's principal place of business and chief executive office and the place where its records concerning the Collateral are kept and Borrower's organizational number are set forth on Exhibit D hereto.

Section 5.14    Name; Trade Name.

Borrower has not used or transacted business under any other corporate or trade name in the five-year period preceding the Effective Date.

Section 5.15    Anti-Terrorism Laws.

(a)     General. Neither Borrower nor any Affiliate of Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)     Executive Order No. 13224. Neither Borrower nor any Affiliate of Borrower, nor any of their respective agents acting or benefiting in any capacity in connection with the Servicing Facility or other transactions hereunder, is any of the following (each a "Blocked Person"):

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)   a Person or entity with which any bank or other financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)     a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

(vi)    a Person or entity who is affiliated with a Person or entity listed above.

Neither Borrower nor, to the knowledge of Borrower, any of its agents acting in any capacity in connection with the Facilities or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

(c)     Notice to Borrower. Agent for itself and for each of the Lenders hereby notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Lenders are required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow them to identify Borrower in accordance with the USA Patriot Act. Borrower agrees to provide to each Lender, promptly after any request by such Lender, such information as such Lender shall require for purposes of complying with the requirements of the USA Patriot Act, the federal regulations issued

B # 935671 v.9

pursuant to the USA Patriot Act and any customer identification program established by such Lender pursuant to the USA Patriot Act.

Section 5.16    Subservicers.

        No Person currently acts as a subservicer on the Servicing Portfolio.

Section 5.17    Ocala Funding.

        Borrower will not be obligated to pay market value losses on sales to third parties of mortgage loans held by Ocala Funding in excess of a ten percent (10%) recourse cap.

ARTICLE VI

COVENANTS

Section 6.1    Affirmative Covenants.

        Borrower hereby covenants and agrees that, as long as any Obligations remain unpaid, Borrower shall:

        (a)    Reports to Agent and Lenders.    Furnish or cause to be furnished to Agent and each Lender directly:

        (i)    Annual Financial Statement.    As soon as available and in any event within ninety (90) days after the end of each fiscal year of Borrower, a consolidated and consolidating balance sheet of Borrower as at the end of such year and the related consolidated and consolidating statement of income, and consolidated statements of retained earnings and cash flows of Borrower for such fiscal year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year, all in reasonable detail and accompanied by a report thereon of Deloitte & Touche LLP, or other independent public accountants of recognized national standing acceptable to Agent, which report shall be unqualified as to scope of audit and shall not be qualified as to going concern, and shall state that such financial statements present fairly the financial condition as at the end of such fiscal year, and the results of operations and cash flows for such fiscal year, of Borrower in accordance with GAAP consistently applied.    Such financial statements shall be accompanied by a certificate of such accountants attesting to whether Borrower is in compliance with the financial covenants applicable to Borrower as set forth in Section 6.3;

        (ii)    Monthly Financial Statements.    As soon as available and in any event within (x) forty (40) days after the end of each (i) calendar month (except March and April month end statements shall be due on or before July 15 of the applicable fiscal year and May month end statements shall be due on or before July 31 of the applicable fiscal year), a consolidated balance sheet of Borrower as at the end of such calendar month and the related consolidated statement of income of Borrower for such calendar month and the portion of the fiscal year ended at the end of such calendar month, and (ii) fiscal quarter (except for the fiscal quarter ending March 31), (A) consolidated statements of retained earnings and cash flow of Borrower for such fiscal quarter, (B) a consolidated and consolidating statement of income of Borrower for such fiscal quarter, and (C) a consolidated and consolidating balance sheet of Borrower as at the end of such fiscal quarter, all in reasonable detail and certified by the chief financial officer of Borrower that they are complete and correct and that they present fairly the financial condition as at the end of such calendar month or such fiscal quarter, and the results of operations and cash flows for such calendar month or such fiscal quarter and such portion of the fiscal year, of Borrower in accordance with GAAP consistently applied (subject to normal year-end adjustments), and (y) ten (10) days after the end of each month, information on monthly production volume in dollars and units, with month-to-date and year-to-date totals, and retained servicing information, including weighted average coupon, unpaid principal balance and delinquency rate information.    The monthly financial statements shall be accompanied by a certificate of the chief financial officer of Borrower attesting to whether Borrower is in compliance with the financial covenants applicable to Borrower as set forth in Section 6.3 of this Agreement;

        (iii)    Financial Statements of Personal Guarantor.    As soon as available and in any event within thirty (30) days of the annual anniversary date of the last such financial statement, a personal financial

38

B # 935671 v.9

statement of Personal Guarantor. Said financial statement must be on Agent-approved financial statement form for individuals with spouse joinder or waiver, where applicable;

(iv) <u>Personal Guarantor Tax Returns</u>. As soon as available and in any event within ten (10) days after the date of filing, copies of the completed Federal income tax returns of Personal Guarantor;

(v) <u>No Default/Compliance Certificate</u>. Together with the financial statements required pursuant to subsections (i) and (ii) above, a certificate of the chief financial officer of Borrower (A) to the effect that, based upon a review of the activities of Borrower and such financial statements during the period covered thereby, no Event of Default or Potential Default exists, or if an Event of Default or a Potential Default exists, specifying the nature thereof and Borrower's proposed response thereto, and (B) demonstrating in reasonable detail whether there has been compliance as at the end of such fiscal year, such fiscal quarter or such month with the applicable financial covenants set forth in Section 6.3;

(vi) <u>Appraisals; Borrowing Base Certificates</u>. As soon as available and in any event within (x) fifteen (15) days following the end of each month, an Appraisal, and (y) ten (10) days following the end of each month, a current Borrowing Base Certificate. Each Appraisal and the method of computing the Servicing Rights Collateral Value for the Eligible Servicing Rights included in the Servicing Rights Borrowing Base (including the discount rate applied by the Approved Appraiser) must be satisfactory to Agent. Borrower, at its discretion, may deliver each Appraisal and Borrowing Base Certificate to Agent and Lenders more frequently than the dates set forth above, but shall, in any event, deliver an Appraisal and a Borrowing Base Certificate on the dates for delivering such Appraisal and Borrowing Base Certificate set forth above. Agent or Required Lenders may require at any time upon (x) fifteen (15) days' prior notice that Borrower obtain and deliver a current Appraisal, and (y) ten (10) days' prior notice that Borrower obtain and deliver a current Borrowing Base Certificate;

(vii) <u>Monthly Servicing Reports</u>. Within forty (40) days after the end of each calendar month, a reconciliation of the Pledged Servicing Portfolio as of the end of said calendar month setting forth (A) as to all Mortgage Loans the servicing rights to which are the subject of any Servicing Contract (specified by investor type, recourse and nonrecourse), (1) the total number of Mortgage Loans, and the aggregate percentage thereof, which (a) are current and in good standing, (b) are more than 30, 60 or 90 days past due, respectively, (c) are the subject of pending bankruptcy or foreclosure proceedings, or (d) have been converted (through foreclosure or other proceedings in lieu thereof) by Borrower into real estate owned by Borrower, and (2) reserves established by Borrower for losses in respect of delinquent Mortgage Loans or real estate owned by Borrower, (B) a servicing trial balance including weighted average coupon, unpaid principal balance and delinquency rate information, and (C) a list of all of the Servicing Contracts between Borrower and any Approved Investor as of such date;

(viii) <u>Servicing Transactions</u>. No later than ten (10) days prior to the closing date thereof, written notice of any purchase or sale of Servicing Rights or any other transaction which would result in greater than a ten percent (10%) increase or decrease in the aggregate unpaid principal balance of all Mortgage Loans included in the Pledged Servicing Portfolio;

(ix) <u>Audit Reports</u>. Promptly after receipt thereof by Borrower, copies of the "on-site review reports", "limited review reports", and/or "audit reports", as the case may be, prepared by HUD or any Agency in respect of Borrower and its operations;

(x) <u>Notice of Default</u>. Promptly after the occurrence of an Event of Default or a Potential Default, a certificate of the chief financial officer of Borrower specifying the nature thereof and Borrower's proposed response thereto;

(xi) <u>Litigation</u>. Promptly after the occurrence thereof and in any event within five (5) days after Borrower knows or has reason to know of the occurrence thereof, notice of the institution of or any material adverse development in any action, suit or proceeding or any governmental investigation or any arbitration, before any court or arbitrator or any governmental or administrative body, agency or official, against Borrower or any material property of Borrower, in each case if such action, suit, proceeding, investigation or arbitration, individually or together with one or more other actions, suits, proceedings, investigations or arbitrations, could result in liabilities to Borrower in excess of the Material Amount;

B # 935671 v.9

(xii)  ERISA. In connection with ERISA:

(A)  Promptly and in any event within ten (10) days after Borrower knows or has reason to know of the occurrence of a Reportable Event with respect to a Plan with regard to which notice must be provided to the PBGC, a copy of such materials required to be filed with the PBGC with respect to such Reportable Event and in each such case a statement of the chief financial officer of Borrower setting forth details as to such Reportable Event and the action that Borrower proposes to take with respect thereto;

(B)  Promptly and in any event within ten (10) days after Borrower knows or has reason to know of any condition existing with respect to a Plan that presents a material risk of termination of such Plan, imposition of an excise tax, requirement to provide security to such Plan or incurrence of other liability by Borrower or any ERISA Affiliate, a statement of the chief financial officer of Borrower describing such condition;

(C)  At least ten (10) days prior to the filing by any plan administrator of a Plan of a notice of intent to terminate such Plan, a copy of such notice;

(D)  Promptly and in no event more than ten (10) days after the filing thereof with the Secretary of the Treasury, a copy of any application by Borrower or an ERISA Affiliate for a waiver of the minimum funding standard under section 412 of the Code;

(E)  Promptly and in no event more than ten (10) days after the filing thereof with the Internal Revenue Service, copies of each annual report that is filed on Form 5500, together with certified financial statements for any Plan (if any) as of the end of such year and actuarial statements on Schedule B to such Form 5500;

(F)  Promptly and in any event within ten (10) days after it knows or has reason to know of any event or condition that might constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, a statement of the chief financial officer of Borrower describing such event or condition;

(G)  Promptly and in no event more than 10 days after receipt thereof by Borrower or any ERISA Affiliate, a copy of each notice received by Borrower or an ERISA Affiliate concerning the imposition of any withdrawal liability under section 4202 of ERISA; and

(H)  Promptly after receipt thereof a copy of any notice Borrower or any ERISA Affiliate may receive from the PBGC or the Internal Revenue Service with respect to any Plan or Multiemployer Plan; provided that this subparagraph (H) shall not apply to notices of general application promulgated by the PBGC or the Internal Revenue Service;

(xiii)  Change of Control.  Promptly after obtaining knowledge of any actual or proposed Change of Control, notice thereof, together with a description of the nature and the date or proposed date thereof;

(xiv)  Mergers and Acquisitions.  Promptly, upon entering into any agreement to purchase or acquire, or permitting any of its Subsidiaries to enter into any agreement to purchase or acquire, any or all of the assets or business of any Person (whether such purchase or acquisition shall be by means of merger, stock purchase, asset purchase or otherwise), notice thereof, together with a copy of the agreement;

(xv)  Monthly P&I Receivables and T&I Receivables Reports.  Within thirty (30) days after the end of each calendar month, a report of all advances by Borrower generating P&I Receivables and T&I Receivables, as applicable, as of the end of said calendar month, in each case on an individual Mortgage Loan basis;

(xvi)  Other Liabilities.  Promptly, upon creating, incurring, assuming, suffering to exist or otherwise becoming liable in respect of, or permitting any of its Subsidiaries to create, incur, assume, suffer

40

to exist or otherwise become liable in respect of, any Funded Liabilities in an aggregate principal amount exceeding $500,000.00, notice thereof, together with copies of the evidence of such indebtedness and related documents; and

        (xvii)   <u>Other Information</u>. Promptly, such additional financial and other information, including financial statements of Borrower or any Approved Investor (other than an Agency), and such information regarding the Collateral as any Lender, through Agent, may from time to time reasonably request, including such information as is necessary for such Lender to grant participations of its interests in Advances hereunder.

        (b)   <u>Maintenance of Existence and Properties; Compliance with Laws; Maintenance of Agency Status</u>. Preserve and maintain, and cause each of its Subsidiaries to preserve and maintain, its corporate existence and all rights, privileges, licenses, approvals, franchises, properties and assets material to the normal conduct of its business; comply, and cause each of its Subsidiaries to comply, in all material respects with all Contractual Obligations and Requirements of Law, except when the failure to so comply would not have a Material Adverse Effect; and maintain at all times its status as a FHLMC approved seller/servicer, a GNMA approved issuer/servicer, a HUD direct endorsement lender and a VA approved lender in good standing.

        (c)   <u>Inspection of Property; Books and Records; Discussion</u>. Keep, and cause each of its Subsidiaries to keep, proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities, and permit representatives of Agent and Lenders (at no cost to Borrower unless an Event of Default has occurred and is continuing) to visit and inspect any of its properties and examine and make abstracts from any of its books and records during normal business hours, upon reasonable advance notice and as often as may reasonably be desired by Agent or such Lender, and to discuss the business, operations, properties and financial and other condition of Borrower and its Subsidiaries with officers and employees of such parties, and with their independent certified public accountants. Agent or any Lender will be allowed to conduct, from time to time at Borrower's expense, financial and operational audits at Borrower's office during normal business hours, including Agent's periodic audit of Borrower's operations and the Collateral and shall pay the reasonable fees and costs associated with such audits.

        (d)   <u>Insurance</u>. Maintain or cause to be maintained with financially sound and reputable insurers, insurance with respect to its properties and business, and the properties and business of its Subsidiaries, against loss or damage of the kinds customarily insured against by reputable companies in the same or similar businesses, such insurance to be of such types and in such amounts (with such deductible amounts) as is customary for such companies under similar circumstances, including errors and omissions coverage and fidelity coverage in form and substance acceptable under Agency guidelines, and furnish Agent on request (i) copies of all policies (each of which shall be issued by a company reasonably acceptable to Agent, name Agent as an additional insured/loss payee and contain a provision for thirty (30) days prior written notice to Agent of any cancellation, non-renewal or modification thereof) at the following address:

        Sovereign Bank, as Agent
        75 State Street
        Boston, MA 02109
        Attn.:   Stephen E. Burse
               Mail Code: MA1-SST-0413

        together with proof of payment of the applicable premiums and (ii) full information as to all such insurance. Borrower shall at all times maintain a fidelity bond covering all employees who handle money or documents in an amount and issued by a company acceptable to Agent, naming Agent and Lenders as "loss payees" and protecting Agent and Lenders against loss due to double pledging or other fraud involving the Collateral.

        (e)   <u>Payment of Taxes and Claims, Etc</u>. Pay, and cause each of its Subsidiaries to pay, (i) all taxes, assessments and governmental charges imposed upon it or upon its property, and (ii) all genuine claims (including claims for labor, materials, supplies or services) that might, if unpaid, become a Lien upon its property, unless, in each case, the validity or amount thereof is being contested in good faith by appropriate proceedings and Borrower or such Subsidiary has maintained adequate reserves in accordance with GAAP with respect thereto or has posted a bond in respect thereof satisfactory to Agent.

(f)    <u>Other Accounts</u>.  Maintain the Collateral Payment Account and the Operating Account with Agent, which accounts shall be maintained in a manner acceptable to the Agent.

(g)    <u>Further Documents</u>.  Execute and deliver or to cause to be executed and delivered to Agent from time to time such confirmatory or supplementary security agreements, financing statements, reaffirmations and consents and such other documents, instruments or agreements as Agent may reasonably request, that are in Agent's reasonable judgment necessary or desirable to obtain for Agent and Lenders the benefit of the Loan Documents and the Collateral.

(h)    <u>Operational Procedures</u>.  Follow and abide by any operational procedures of Agent that may be instituted from time to time.

(i)    [Intentionally left blank.]

(j)    <u>Post Closing</u>.  Deliver to the Agent, (i) by no later than June 15, 2009, evidence (in form and substance acceptable to Agent) that Agent has been named as an additional insured/loss payee under such insurance policies as are required under Section 6.1(d), which evidence shall also provide that Agent shall receive 30-day prior written notice of any cancellation, non-renewal or modification of such insurance policies, (ii) by no later than June 15, 2009, such good standing certificates as required pursuant to Section 9.10(a)(xii) and which have not been provided to Agent on or before the Effective Date and (iii) by no later than May 29, 2009, an amendment or letter agreement to the applicable Acknowledgment Agreement with GNMA (in form and substance acceptable to Agent), evidencing the assignment of such Acknowledgment Agreement from the Predecessor Agent to the Agent.

(k)    <u>List of Hedging Arrangements</u>.  On the 15th calendar day of every month and the last calendar day of every month, Borrower shall provide to the Agent and the Lenders a listing of all of its Hedging Arrangements and mark-to-market values of the Eligible Servicing Rights as to which Servicing Rights Advances have been made and remain outstanding.

(l)    <u>Adequate Hedging Position</u>.  At all times during the term of the Servicing Facility, Borrower shall maintain an adequate hedging position on the Eligible Servicing Rights as to which Servicing Rights Advances have been made and remain outstanding.

Section 6.2    <u>Negative Covenants</u>.

Borrower hereby covenants and agrees that, as long as any Obligations remain unpaid, Borrower shall not, directly or indirectly:

(a)    <u>Liens</u>.  Create, incur, assume or suffer to exist, or permit any Subsidiary to create, incur, assume or suffer to exist, any Lien upon its properties, assets or revenues now owned or hereafter acquired, except:

(i)    Liens created or permitted by this Agreement or any of the other Loan Documents, including without limitation, Permitted Liens;

(ii)    Liens created or permitted under any of the Other Approved Facilities; <u>provided</u>, that notwithstanding anything to the contrary contained herein, such Liens (other than Liens created under the Restated Repurchase Agreement and subject to the Intercreditor Agreement) shall not encumber at any time any properties, assets or revenues of Borrower which are Collateral under this Agreement;

(iii)    Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; <u>provided</u> that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP;

(iv)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, lessors', landlords' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings; or

B # 935671 v.9

(v)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements not to exceed $100,000.00 in the aggregate, provided that, in the event Borrower makes any such pledge or deposit, Borrower shall deliver to the Agent a detailed schedule regarding such pledge or deposit, including, but not limited to, the amount, the date made, any expiration or termination dates and such other information as the Agent reasonably may request.

(b)     Other Secured Financing.  Create, incur, assume, suffer to exist, or otherwise become or be liable in respect of, or permit any of its Subsidiaries to create, incur, assume, suffer to exist, or otherwise become liable in respect of, any other financing that is secured by the Servicing Collateral without prior written consent of Agent and Required Lenders.

(c)     Other Indebtedness.  Create, incur, assume or suffer to exist, or otherwise become liable in respect of any bank debt or term debt (including any Subordinated Debt) that is included on Borrower's consolidated balance sheet in excess of $1,000,000.00 at any one time outstanding or that is an off-balance sheet financing and not included on Borrower's consolidated balance sheet (other than (i) the Obligations, (ii) Colonial's off-balance sheet "COLB Facility" in favor of Borrower, as modified, increased or renewed from time to time, (iii) the Repurchase Facility Obligations, (iv) the other Other Approved Facilities and (v) the Plainfield Indebtedness but only for so long as Plainfield is a party to the Intercreditor Agreement), without the prior written consent of Agent and Required Lenders.

(d)     Change of Business.  Engage in any type of business that is unrelated to the mortgage banking and lending business and the servicing of Mortgage Loans.

(e)     Change of Control.  Suffer or permit any Change of Control.

(f)     Fundamental Changes.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or liquidate or dissolve; provided, that if at the time thereof and immediately after giving effect thereto, no Potential Default or Event of Default shall have occurred and be continuing Borrower may merge with a Person if Borrower is the surviving Person.

(g)     Investments.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in, any Person (collectively, "Investments"), except:

(i)     extensions of trade credit and accounts receivable generated in the ordinary course of business;

(ii)     Investments as reflected in the financial statement referenced in Section 5.4(a);

(iii)     Investments in cash or cash equivalents;

(iv)     Hedging Arrangements entered into by Borrower to protect Borrower against changes in the value of any of the Collateral or any of its other assets;

(v)     Investments in equity or debt securities which are listed on a national securities exchange or freely traded in the over-the-counter market; provided, that (i) the aggregate costs incurred in making such Investments shall not exceed $100,000.00 at any time and (ii) prior to and immediately after giving effect to such Investment, no Potential Default or Event of Default shall have occurred and be continuing;

(vi)     if permitted by Section 6.2(n), formation of new Subsidiaries; provided, such Subsidiaries execute a Guarantee guaranteeing the Obligations hereunder in form and substance satisfactory to Agent, except that Subsidiaries that are special purpose funding vehicles formed in connection with securitizations of Borrower's assets or other off-balance sheet transactions and

43

B # 935671 v.9

Subsidiaries that are shown on Schedule 5 as being exempt from such guarantee obligation shall not be required to execute such Guarantee;

(vii)     loans or advances to employees, officers or directors of Borrower in the ordinary course of business for travel, relocation and related expenses; and

(viii)     an equity Investment in Colonial in an amount not to exceed $150,000,000, so long as, and to the extent that, (A) such investment is consummated by Borrower: (i) on or before July 31, 2009, and (ii) with monies, property or assets that do not constitute Collateral or Proceeds thereof (other than Proceeds of Hedging Arrangements terminated in the ordinary course of Borrower's business) and (B) Agent shall have received evidence satisfactory to it (in its sole discretion) that Colonial has received, or will receive on or before Borrower's investment in Colonial contemplated by this clause (viii), TARP funding from the United States Treasury in an amount not less than three percent (3%) of the risk-weighted assets of Colonial (measured as of the date of such investment by Borrower) as determined by the United States Treasury's normal calculations.

(h)     Guarantees.  Except in connection with the Plainfield Indebtedness and the FHLB Indebtedness, Guarantee, endorse or otherwise become secondarily liable for or upon the obligations of any other Person, except by endorsement for deposit in the ordinary course of business.

(i)     Restrictive Agreements.  Enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon the ability of Borrower to create, incur or permit any Lien upon any of its assets or properties, whether now owned or hereafter acquired or of any Subsidiary to declare or pay dividends or to make loans or other advances to Borrower, directly or indirectly.

(j)     Payment of Dividends and Other Payments.  (i) Declare or pay any dividend on its capital stock now or hereafter outstanding (except dividends payable solely in shares of the capital stock of Borrower), or make any other distribution to its respective stockholders, whether in cash, property or securities or (ii) make any payment on its Subordinated Debt without, in each instance, the prior written consent of Agent and the Required Lenders; provided, however, so long as Borrower is in compliance with the financial covenants contained in Section 6.3 and all other covenants contained herein, both before and after giving effect thereto, and no Event of Default or Potential Default has occurred and is continuing, or would result after giving effect thereto, Borrower may declare and pay dividends on its capital stock and make payments on its Subordinated Debt from time to time.

(k)     Transactions with Affiliates.  Enter into, or permit any of its Subsidiaries directly or indirectly to enter into, any transaction (including the purchase, sale, lease or exchange of any property, the making or borrowing of any loan or the rendering of any service) with any Affiliate on terms, in each instance, that are less favorable to Borrower or such Subsidiary than those that might be obtained at the time from Persons which are not Affiliates.

(l)     ERISA.  Take, or permit any of its Subsidiaries to take, any of the following actions:

(i)     Terminate or withdraw from any Plan so as to result in any material liability to the PBGC;

(ii)     Engage in or permit any Person to engage in any Prohibited Transaction involving any Plan that would subject Borrower or any of its Subsidiaries to any material tax, penalty or other liability;

(iii)     Incur or suffer to exist any material Accumulated Funding Deficiency, whether or not waived, involving any Plan;

(iv)     Allow or suffer to exist any event or condition that presents a risk of incurring a material liability to the PBGC;

44

(v)     Amend any Plan so as to require the posting of security under section 401(a)(29) of the Code; or

(vi)    Fail to make payments required under section 412(m) of the Code and section 302(e) of ERISA that would subject Borrower or any of its Subsidiaries to any material tax, penalty or other liability.

(m)     <u>Transfer to Affiliates</u>.  Sell, assign or otherwise transfer any of its assets, or permit any of its Subsidiaries to sell, assign or otherwise transfer any of their respective assets, to any Affiliate of Borrower without the prior written consent of Agent and the Required Lenders.

(n)     <u>Subsidiaries</u>.  Form or cause to be formed after the date hereof any Subsidiaries (other than special purpose funding vehicles in connection with securitizations of Borrower's assets or other off-balance sheet transactions) without the prior written consent of Agent and the Required Lenders.

(o)     <u>Margin Regulations</u>.  Use any or all of the proceeds of any Loan (i) to purchase or carry Margin Stock or extend credit to others for the purpose of purchasing or carrying Margin Stock or (ii) in any manner that will violate or be inconsistent with the provisions of Regulation T, U or X of the Board.

(p)     <u>Change of Jurisdiction of Incorporation; Principal Place of Business and Chief Executive Office; Location of Records</u>.  Change its jurisdiction of incorporation from the State of Florida or its principal place of business and chief executive office and the place where its records concerning the Collateral are kept as set forth on <u>Exhibit D</u> unless it has given Agent at least thirty (30) days' prior written notice thereof.

(q)     <u>Amendments to Material Documents</u>.  Amend, modify or waive any of its rights in a manner materially adverse to Agent or Lenders under (a) its certificate of incorporation, bylaws or other organizational documents or (b) any material contract if, in either case, any such amendment, modification or waiver, would cause a change in the financial condition of Borrower or any of its Subsidiaries in a Material Amount.

(r)     <u>Change in Accounting; Fiscal Year</u>.  Make any significant change in accounting treatment or reporting practices, except as required or, with the approval of Required Lenders, as permitted, by GAAP or FAS 133, or permit its fiscal year to end on a day other than March 31.

(s)     <u>Subordinated Debt</u>.  Make any payment to a Subordinated Creditor on any Subordinated Debt which would cause a violation of any of the financial covenants contained in Section 6.3 or which otherwise would be in violation of the Subordination Agreement applicable thereto and, prior to making any such payment, without first providing Agent with a certificate of Borrower's chief financial officer attesting, to the satisfaction of Agent, that Borrower, following the making of such payment, will be in compliance with each of the foregoing financial covenants.

(t)     <u>Reserved</u>.

(u)     <u>Anti-Terrorism Laws</u>.  Take, or permit any Affiliate to take, any of the following actions:

(i)     conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person;

(ii)    deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or

(iii)   engage in on conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act.

Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender, in its sole discretion, confirming Borrower's compliance with this Section 6.2(u).

B # 935671 v.9

Section 6.3     Special Financial Covenants.

Borrower hereby covenants and agrees that, as long as any Obligations remain unpaid the following special financial covenants shall be applicable to Borrower and tested monthly at the end of each calendar month as set forth below:

(a)     Tangible Net Worth.     Tangible Net Worth shall not be less than $142,000,000.00 on a consolidated basis.

(b)     Adjusted Tangible Net Worth.  Adjusted Tangible Net Worth shall not be less than $130,000,000.00 on a consolidated basis.

(c)     Leverage Ratio.  The Leverage Ratio shall not be greater than 15.0:1.0.

(d)     Current Ratio.  The Current Ratio shall not be less than 1.0:1.0.

(e)     Interest Coverage Ratio.  The Interest Coverage Ratio shall not be less than 1.2:1.0, calculated on a rolling 12-month basis.

(f)     Minimum Corporate Cash.     Borrower's (specifically excluding Subsidiaries of Borrower) cash or Cash Equivalents on hand shall not be less than $6,000,000.00.

ARTICLE VII
EVENTS OF DEFAULT: REMEDIES

Section 7.1     Events of Default.

If one or more of the following events (each an "*Event of Default*") shall have occurred and be continuing, each shall be and constitute an "*Event of Default*" hereunder:

(a)     Payments.  Borrower shall fail to pay when due (whether at scheduled maturity, upon mandatory repayment or otherwise) any principal of any Note, or Borrower shall fail to pay within five (5) Banking Days after the due date thereof any interest on any Note, any Fees or any other Obligation;

(b)     Covenants Without Notice.  Borrower shall fail to observe or perform any covenant or agreement contained in Section 4.12, 6.1(a)(x), 6.1(a)(xiii), 6.1 (b), 6.1(f), 6.1(h), 6.2 (other than Section 6.2(e)), or 6.3; provided that any violation of Section 6.2(a) that is attributable to the existence of an involuntary Lien on the Collateral shall not constitute an Event of Default until thirty (30) days after the imposition thereof if at all times during such thirty (30) day period (i) Borrower is making a diligent effort by appropriate means to remove such Lien and (ii) such Lien does not have a Material Adverse Effect;

(c)     Covenants With Five Day Grace Period.  Borrower shall fail to observe or perform any covenant or agreement contained in Section 6.1(a) (other than those referred to in Section 7.1(b)) or 6.1(c), and such failure shall remain unremedied for five (5) Banking Days after oral notice thereof to an Authorized Officer (which shall be confirmed in writing before the end of such five (5) Banking Day period);

(d)     Covenants With Thirty Day Grace Period.  Borrower shall fail to observe or perform any covenant or agreement contained in any Loan Document, other than those referred to in Section 7.1(a), 7.1(b), 7.1(c) or 7.1(m), and, if capable of being remedied, such failure shall remain unremedied for thirty (30) days after the earlier of (i) Borrower's obtaining knowledge thereof or (ii) written notice thereof shall have been given to Borrower by Agent or any Lender; provided that (x) if such failure is capable of being remedied but only in a period of more than thirty (30) days, then such failure shall not constitute an Event of Default until ninety (90) days after the earlier of the above dates if Borrower is making a diligent effort

46

by appropriate means to observe or perform such covenant and (y) failure to observe or perform such covenant does not have a Material Adverse Effect;

(e) Representations. Any representation, warranty or statement made or deemed to be made by Borrower or any of its officers or Authorized Representatives under or in connection with any Loan Document shall have been inaccurate, incomplete or incorrect in any respect when made or deemed to be made;

(f) Non-Payment of Other Liabilities. Borrower shall fail to make any payment of principal or interest on any of its Liabilities (other than the Obligations) including, but not limited to, the Overline Facility Obligations, the Repurchase Facility Obligations and any of its Liabilities under the Other Approved Facilities, when due (whether at stated maturity, by acceleration, on demand or otherwise) after giving effect to any applicable grace period;

(g) Defaults Under Other Agreements. Borrower shall fail to observe or perform any covenant or agreement contained in any agreement or instrument relating to any of its Liabilities (other than the Obligations) including, but not limited to, any of the Other Approved Facilities, within any applicable grace period, or any other event shall occur if the effect of such failure or other event is to accelerate, or to permit the holder of such Liabilities or any other Person to accelerate, the maturity of such Liabilities; or any such Liabilities shall be required to be prepaid (other than by a regularly scheduled required prepayment) in whole or in part prior to their stated maturity;

(h) Bankruptcy. Borrower or any Guarantor shall commence a voluntary case under Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or any involuntary case is commenced against Borrower or any Guarantor and the petition is not dismissed within sixty (60) days after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or any substantial part of the property of Borrower or any Guarantor; or Borrower or any Guarantor commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law or there is commenced against Borrower or any Guarantor any such proceeding that remains undismissed for a period of sixty (60) days; or Borrower or any Guarantor is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Borrower or any Guarantor shall fail to pay, or shall state that it or he is unable to pay, or shall be unable to pay, its or his debts generally as they become due; or Borrower or any Guarantor shall call a meeting of its or his creditors with a view to arranging a composition or adjustment of its or his debts; or Borrower or any Guarantor shall by any act or failure to act indicate its or his consent to, approval of or acquiescence in any of the foregoing; or any corporate action is taken by Borrower or any Guarantor for the purpose of effecting any of the foregoing;

(i) Money Judgment. One or more judgments or orders for the payment of money shall be rendered against Borrower or any Guarantor and such judgment or order shall continue unsatisfied (in the case of a money judgment) and in effect for a period of thirty (30) days during which execution shall not be effectively stayed or deferred (whether by action of a court, by agreement or otherwise);

(j) ERISA. (i) Any Reportable Event or a Prohibited Transaction shall occur with respect to any Plan; (ii) a notice of intent to terminate a Plan under section 4041 of ERISA shall be filed; (iii) a notice shall be received by the plan administrator of a Plan that the PBGC has instituted proceedings to terminate a Plan or appoint a trustee to administer a Plan; (iv) any other event or condition shall exist that might, in the opinion of Agent or the Required Lenders, constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (v) Borrower or any ERISA Affiliate shall withdraw from a Multiemployer Plan under circumstances that Agent or the Required Lenders determine could have a Material Adverse Effect; and in case of the occurrence of any event or

47

condition described in clauses (i) through (v) above, such event or condition together with all other such events or conditions, if any, could subject Borrower to any tax, penalty or other liabilities in the aggregate material in relation to the business, operations, property or financial or other condition of Borrower;

(k)     Dissolution, etc.  Borrower shall commence dissolution proceedings or otherwise shall cease its mortgage banking and lending business;

(l)     Death; Incapacity.  Personal Guarantor shall die or shall become incapacitated in any material respect;

(m)     Change of Control.  Any Change of Control shall occur;

(n)     Adverse Changes.  Any change in the financial condition of Borrower of any of its Subsidiaries shall occur which is in a Material Amount;

(o)     Agency Approvals.  Any Agency Approvals shall be cancelled, terminated, suspended or withdrawn, or any servicing contract with any Agency shall be cancelled for cause or breach of any servicing obligation or other cause or, in the reasonable determination of Required Lenders, any operating restrictions, suspensions or other limitations (including a moratorium on commitment authority with any Agency resulting from the failure of Borrower to satisfy or comply with any applicable Agency's standards, rules, regulations or guidelines) shall be imposed upon Borrower by any Agency, which  has a Material Adverse Effect, or an Agency has given notice to Borrower of material servicing deficiencies requiring correction within a time specified, which (i) if not corrected, could result in the termination of Borrower's servicing contracts with such Agency and (ii) which are not corrected within the time period specified by such Agency or if no such time period is specified, within such reasonable time period established by Required Lenders and, in either case, Required Lenders  determine that such deficiencies are material, or an Agency shall impose supervisory controls upon Borrower or a moratorium on transfers of additional servicing contracts to Borrower;

(p)     Insecurity.  Agent or the Required Lenders, in the exercise of good faith, shall deem itself or themselves to be insecure with respect to Borrower's ability to repay the Obligations as and when due or to comply with and perform any of the covenants, agreements, or obligations of Borrower hereunder;

(q)     Security Interests.  Agent and/or Lenders, as applicable, shall cease for any reason (other than pursuant to the terms of this Agreement) to have valid and perfected first priority security interests in the Collateral, or any Person shall take any action to discontinue or to assert the invalidity or unenforceability of such security interests;

(r)     Termination or Cancellation of Servicing Contract or Servicing Sale Agreement.  Any Servicing Contract or Servicing Sale Agreement is terminated or cancelled without the prior written consent of Agent and Required Lenders and such termination, in the opinion of Agent and Required Lenders, has a Material Adverse Effect;

(s)     Default Under Guaranty.  Any Guarantor shall fail to meet or comply with any term or condition of its or his respective Guaranty or shall seek to cancel its or his respective Guaranty for any reason whatsoever or shall default in the payment or performance of any obligations or indebtedness thereunder to Agent and Lenders;

(t)     Default Under Other Loan Documents.  Any default or event of default shall occur under any of the other Loan Documents, subject to any applicable notice requirements and the expiration of any applicable grace periods provided therein;

(u)     Default Under Other Approved Facilities.  Any default or event of default shall occur under any of the Other Approved Facilities or the documents and instruments

48

governing, evidencing, securing, guaranteeing or otherwise relating to such Other Approved Facilities, subject to any applicable notice requirements and the expiration of any applicable grace periods provided therein; or

(v)      <u>Default Under Plainfield Indebtedness</u>. LBF Holdings or Borrower shall fail to observe or perform any covenant or agreement contained in any agreement or instrument relating to the Plainfield Indebtedness, within any applicable grace period, or any other event shall occur if the effect of such failure or other event is to accelerate, or to permit the holder of such indebtedness or any other Person to accelerate, the maturity of such indebtedness; or any such indebtedness shall be required to be prepaid (other than by a regularly scheduled required prepayment) in whole or in part prior to its stated maturity.

Section 7.2      <u>Remedies</u>.

Upon the occurrence of any Event of Default which remains uncured after any applicable grace or curative period provided herein, Agent may, and upon the written request of the Required Lenders, shall, take any or all of the following actions:

(a)      [Intentionally left blank];

(b)      declare the principal of and any accrued interest on all Advances, and all other Obligations, to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower; <u>provided</u> that, if an Event of Default specified in Section 7.1(h), 7.1(k), 7.1(l) or 7.1(m) shall occur, all Obligations shall become immediately due and payable automatically without the giving of any such notice and without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower and, upon any such acceleration, the unpaid principal of and any accrued interest on all Advances, and all other Obligations, shall from and after the date of occurrence of such Event of Default bear interest at the Default Rate;

(c)      collect the Collateral with or without taking possession of any of the Collateral subject, however, to the Intercreditor Agreement;

(d)      take possession of all or any portion of the Collateral subject, however, to the Intercreditor Agreement;

(e)      foreclose or otherwise enforce Agent's and/or Lenders' security interests in the Collateral in any manner permitted by law or provided for hereunder subject, however, to the Intercreditor Agreement;

(f)      exercise any and all of Borrower's rights and remedies under any Servicing Contract or Servicing Sale Agreement including, but not limited to, (i) notify (or request Borrower to notify) all obligors in respect of the Collateral (which, for purposes hereof, shall include without limitation, any obligors under the Mortgage Loans being serviced by Borrower under the Servicing Contracts) that the Collateral has been assigned to Agent and/or Lenders, and that all payments thereon are to be made directly to Agent or such other party as may be designated by Agent; (ii) settle, compromise or release, in whole or in part, any amounts owing on the Collateral, on terms acceptable to Agent; and (iii) enforce payment and prosecute any action or proceeding with respect to any and all of the Collateral, and where any such Collateral is in default, foreclose on and enforce security interests in such Collateral by any available judicial procedure or without judicial process and sell property acquired as a result of any such foreclosure subject, however, to the Intercreditor Agreement;

(g)      notify each Approved Investor and/or, if applicable, Approved Purchaser, of such Event of Default and take any action deemed appropriate by Agent to transfer the Servicing Rights and the Servicing Contracts and/or, if applicable, the Servicing Sale

49

Agreements, to Agent or its nominee (and Borrower shall fully cooperate in the transfer of such Collateral to Agent or its nominee);

(h)     exercise all rights and remedies of Borrower provided in the Acknowledgment Agreements, the Servicing Contracts and/or the Servicing Sale Agreements;

(i)     act, or contract with a third party to act, as servicer or subservicer of each item of the Collateral requiring servicing (any third parties' fees to be paid by Borrower) and perform all obligations required in connection with the Servicing Contracts and/or the Servicing Sale Agreements;

(j)     sell or otherwise dispose of the Collateral or any part thereof at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery (without the assumption of any credit risk), on such terms and in such manner as Agent may determine (taking into account the circumstances under which the Collateral is being sold);

(k)     require Borrower to assemble the Collateral and/or books and records relating thereto and make such available to Agent at a place to be designated by Agent subject, however, to the Intercreditor Agreement;

(l)     enter onto property where any Collateral or books and records relating thereto are located and take possession thereof with or without judicial process;

(m)     prior to the disposition of the Collateral, prepare it for disposition in any manner and to the extent Agent deems appropriate; and

(n)     exercise from time to time any and all other remedies available under applicable law including, but not limited to, those of a secured party under the Florida Uniform Commercial Code.

Notwithstanding the foregoing, in the event that Borrower comes into possession of any Proceeds, Borrower shall deliver or cause to be delivered all such Proceeds to Agent, or to any Person designated by Agent, in the exact form received, together with any necessary endorsements, unless Agent has instructed Borrower otherwise in writing. Until so delivered, Borrower shall hold all such Proceeds it receives in trust for Agent (for the benefit of Lenders) without commingling the same with any other funds or property of Borrower or any other Person.

Borrower acknowledges that the Collateral is collateral of a type that is customarily sold on a recognized market. Borrower waives any right it may have to prior notice of the sale of any such Collateral, and agrees that Agent or any Lender may purchase any such Collateral at a private sale of such Collateral. Upon any sale or other disposition pursuant to this Agreement, Agent shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral or portion thereof so sold or disposed of and all Proceeds thereof shall be promptly transmitted to Agent. Each purchaser at any such sale or other disposition shall hold the Collateral free from any claim or right of whatever kind, including any equity or right of redemption of Borrower, and Borrower specifically waives (to the extent permitted by law) all rights of redemption, stay or appraisal that it has or may have under any rule of law or statute now existing or hereafter adopted. Agent is hereby granted a license or other right to use, without charge, Borrower's computer programs, other programs, labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and Borrower's rights under all licenses and all other agreements related to the foregoing shall inure to Agent's benefit until the Obligations are paid in full. Nothing herein contained shall be construed as an assumption by Agent or its appointee of any liability of Borrower with respect to any of the Collateral, and Borrower shall be and remain responsible for all such liabilities.

Any notice pursuant to any Requirements of Law of any sale, public or private, of all or any part of the Collateral shall be deemed in all circumstances to have been given in a commercially reasonable manner if sent at least five (5) Banking Days prior to such sale by mail to Borrower at its address last known to Agent. Agent

50

shall not be obligated to make any sale pursuant to any such notice. At any such sale the Collateral may be sold in one lot as an entirety or in separate lots or parcels. In the case of any sale of all or any part of the Collateral for credit or for future delivery, the Collateral so sold may be retained by Agent until the selling price is paid by the purchaser thereof, but Agent and Lenders shall not incur any liability in case of the failure of such purchaser to take up and pay for the Collateral so sold, and in case of any such failure, such Collateral may again be sold under and pursuant to the provisions hereof. Borrower hereby appoints Agent or the Agent's agent or designee as Borrower's attorney-in-fact with power to execute all conveyances, assignments and transfers of the Collateral sold pursuant hereto in the name and stead of Borrower. Borrower shall, if so requested by Agent, ratify and confirm any sale or sales by executing and delivering to Agent, or to such purchaser or purchasers, all such documents as may, in the judgment of Agent, be advisable for such purpose. All acts of such attorney or designee are hereby ratified and approved by Borrower, and such attorney or designee shall not be liable for any acts of omission or commission, nor for any error of judgment or mistake of fact or law in accordance with this Agreement. The power of attorney hereby granted is irrevocable and coupled with an interest while any of the Obligations remain unsatisfied.

Borrower acknowledges that Borrower and Agent have entered into, or may from time to time hereafter enter into, the Acknowledgment Agreements with FHLMC, GNMA or any other Approved Investor in order to obtain the consent of FHLMC, GNMA or any other Approved Investor to the assignment of and security interest granted in the related Servicing Contracts pursuant to Section 4.2, as the same may be amended from time to time. Borrower further acknowledges that the Acknowledgment Agreements may contain certain provisions concerning the enforcement by Agent of the security interest of Agent on behalf of Lenders in the Servicing Contracts subject thereto. Borrower agrees that the disposition of its rights in any Servicing Contract pursuant to the terms of the applicable Acknowledgment Agreement shall be deemed commercially reasonable within the meaning of the Florida Uniform Commercial Code or other applicable law. Borrower hereby waives any claims it might otherwise have against Agent and Lenders as a result of the Agent's compliance with the terms of any Acknowledgment Agreement.

Section 7.3    Setoff.

Agent and Lenders may set off against the unpaid balance of the Obligations any funds or debts owing to Borrower by Agent or any Lender including, but not limited to, any funds in any deposit account, savings certificate or other instrument now or hereafter maintained by Borrower with Agent or such Lender or any of its Affiliates. Borrower hereby confirms Agent's and such Lender's right of lien and setoff and nothing in this Agreement shall be deemed to constitute any waiver or prohibition thereof.

Section 7.4    Cumulative Rights.

The rights, powers and remedies of Agent and/or Lenders under this Agreement shall be in addition to all rights, powers and remedies given to Agent and/or Lenders by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing Agent's and/or Lenders' security interest in the Collateral.

Section 7.5    Waiver.

Any waiver, forbearance, failure or delay by Agent or Lenders in exercising, or the exercise or beginning of exercise by Agent or Lenders of, any right, power or remedy, simultaneous or later, shall not preclude the further, simultaneous or later exercise thereof, and every right, power or remedy of Agent or Lenders shall continue in full force and effect.

Section 7.6    Collections and Costs.

Borrower agrees to pay and be liable for any and all necessary expenses, including reasonable attorneys' fees and paralegals' fees and court costs, incurred by Agent and Lenders in collecting or enforcing their rights in the Collateral, together with interest thereon at the Default Rate, whether or not suit is brought and whether incurred with trial, rehearing, retrial, appeal or bankruptcy.

B # 935671 v.9

Section 7.7     Agent Appointed Attorney-in-Fact.

Agent is hereby appointed the attorney-in-fact of Borrower, with full power of substitution, for the purpose of carrying out the provisions hereof and taking any action and executing any instruments which Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, Agent shall have the right and power to give notices of its security interest in the Collateral to any Person and, either in the name of Borrower or in its own name, to receive, endorse and collect all checks made payable to the order of Borrower representing any payment on account of the principal of or interest on, or the proceeds of sale of, any of the Collateral and to give full discharge for the same.

Section 7.8     Rights of Individual Lenders.

No Lender shall have any right by virtue, or by availing itself, of any provision of this Agreement to institute any action or proceedings at law or in equity or otherwise (excluding any actions in bankruptcy), upon or under or with respect to this Agreement, or for the appointment of a receiver, or for any other remedy under this Agreement (other than the right of setoff in accordance with Section 9.5), unless the Required Lenders previously shall have given to Agent written notice of an Event of Default and of the continuance thereof and made written request upon Agent to institute such action or proceedings in its own name as Agent and shall have offered to Agent reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and Agent, for ten (10) Banking Days after its receipt of such notice, request and offer of indemnity, shall have failed to institute any such action or proceeding and no direction inconsistent with such written request shall have been given to Agent by the Required Lenders; it being understood and intended, and being expressly covenanted by each Lender with each other Lender and Agent, that no one or more Lenders shall have any right in any manner whatever by virtue, or by availing itself, of any provision of this Agreement to affect, disturb or prejudice the rights of any other Lender, or to obtain or seek to obtain priority over or preference to any other such Lender, or to enforce any right under this Agreement except in the manner herein provided and for the equal, ratable and common benefit of each of the Lenders.

Section 7.9     Limitation on Liability of Agent and Lenders.

It is expressly agreed by Borrower that, anything herein to the contrary notwithstanding, Borrower shall remain liable to observe and perform all the conditions, duties and obligations to be observed and performed by it relating to the Collateral, and Borrower shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions relating thereto. Neither Agent nor any Lender shall have any obligation or liability under any instrument, agreement, contract or other document by reason of or arising out of this Agreement or the granting of a security interest in any instrument, agreement, contract or other document to Agent or behalf of and for the benefit of Lenders or the receipt by Agent or any Lender of any payment relating to any of the foregoing pursuant hereto, nor shall Agent or any Lender be required or obligated in any manner to perform or fulfill any of the obligations of Borrower thereunder, or to make any payment, or to make any inquiry as to the nature of the sufficiency of any payment received by it or the sufficiency or any performance by any party thereunder, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

Section 7.10     Notice of Default.

Should any Potential Default or Event of Default occur and be continuing, any Lender (including Agent) having actual knowledge thereof shall promptly notify, (i) in the case of a Lender (other than Agent), Agent, or (ii) in the case of Agent, the other Lenders, of the existence thereof; provided, that the failure of any Lender to provide any such notice shall not result in any liability to such Lender.

B # 935671 v.9

# ARTICLE VIII
## AGENT

Section 8.1    Appointment of Agent.

Each Lender hereby designates the Agent to act as herein specified. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of a Note shall be deemed irrevocably to authorize, Agent to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder or thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Agent may perform any of its duties hereunder or thereunder by or through its agents or employees.

Section 8.2    Nature of Duties of Agent.

Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the other Loan Documents. Neither Agent nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted hereunder or thereunder or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct. The duties of Agent shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender; and nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.

Section 8.3    Lack of Reliance on Agent.

(a)    Independently and without reliance upon Agent, each Lender, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Borrower and its Affiliates in connection with the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Borrower and its Affiliates, and, except as expressly provided in this Agreement, Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of Advances or at any time or times thereafter.

(b)    Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection with this Agreement or any other Loan Document or for the execution, effectiveness, genuineness, validity, enforceability, collectability, priority or sufficiency of this Agreement or any other Loan Document or for the sufficiency of the Collateral or the validity, perfection or priority of any security interest in the Collateral or the financial condition of Borrower or its Affiliates or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Loan Document, or the financial condition of Borrower or its Affiliates, or the existence or possible existence of any Potential Default or Event of Default.

Section 8.4    Certain Rights of Agent.

If Agent shall request instructions from the Required Lenders (or, if this Agreement requires consent of all Lenders, from all Lenders) with respect to any act or action (including the failure to act) in connection with this Agreement or any other Loan Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders (or, if this Agreement requires consent of all Lenders, from all Lenders), and Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or, if this Agreement requires consent of all Lenders, of all Lenders).

B # 935671 v.9

Section 8.5     Reliance by Agent.

       Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other documentary or teletransmission message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person. Agent may consult with legal counsel (including counsel for Borrower), independent public accountants (including those retained by Borrower) and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 8.6      Indemnification of Agent.

       To the extent Agent is not reimbursed and indemnified by Borrower, each Lender will reimburse and indemnify Agent, in proportion to its respective Commitment Percentage from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable attorneys' fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder and under the other Loan Documents, in any way relating to or arising out of this Agreement or the other Loan Documents; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence or willful misconduct.

Section 8.7      Agent in its Individual Capacity.

       With respect to the Advances made by it and the Note(s) issued to it, the Person serving as Agent shall have the same rights and powers hereunder as any other Lender or holder of a Note and may exercise the same as though it were not performing the duties specified herein, and the terms "Lenders," "Required Lenders," "holders of Notes" or any similar terms shall, unless the context clearly otherwise indicates, include the Person serving as Agent in its individual capacity. The Person serving as Agent may accept deposits from, lend money to, and generally engage in any kind of banking, trust, financial advisory or other business with Borrower or any Affiliate of Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower and any Affiliates of Borrower for services in connection with this Agreement and the other Loan Documents and otherwise without having to account for the same to Lenders.

Section 8.8      Holders of Notes.

       Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof shall have been filed with Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note or notes issued in exchange therefor.

Section 8.9      Successor Agent.

       (a)      Agent may resign as Agent hereunder at any time by giving written notice thereof to Lenders and Borrower if (i) it believes that its duties hereunder present an actual or potential conflict of interest with any other business of Agent, (ii) it determines at any time that the introduction of, or any change in, any applicable law, rule, regulation, order or decree or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by Agent with any request or directive (whether or not having the force of law) of any such Authority, shall make it unlawful or improper for Agent to continue as Agent hereunder, (iii) it ceases to be a Lender hereunder because it does not agree to an extension of the Maturity Date, or (iv) for any other reason whatsoever, provided that Agent gives to Lenders and Borrower at least fifteen (15) days' prior written notice of such resignation. In addition, Agent may be removed at any time with cause by the Required Lenders (which cause may include, without limitation, Agent's gross negligence or willful misconduct in the performance of its duties under this Agreement). Upon any such resignation or removal, the Required Lenders shall have the right, upon five (5) Banking Days' notice to Borrower, to appoint a successor Agent which shall be a Lender; provided, that such successor Agent, if no Event of Default then exists, shall be reasonably acceptable to Borrower, and if any Event of Default then exists, shall not require Borrower's

consent or approval. If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then, upon five (5) Banking Days' notice to Borrower, the retiring Agent may, on behalf of Lenders, appoint a successor Agent, which shall be a bank which maintains an office in the United States, or a commercial bank organized under the laws of the United States of America or of any State thereof, or any Affiliate of such bank, having a combined capital and surplus of at least $250,000,000.00.

(b) Any resignation or removal of Agent hereunder shall be effective only upon the acceptance of any appointment as Agent hereunder by a successor Agent. Upon such acceptance, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. After any retiring Agent's resignation or removal hereunder as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

Section 8.10    Right of Inspection.

Agent shall permit any officer, employee or agent of any Lender, upon written request by such party to the Agent, to visit and inspect the premises on which the custodial duties of Agent hereunder are performed at a time which is reasonably satisfactory to Agent and such requesting party, and allow such requesting party to examine the books and records of Agent which pertain to such custodial duties, take copies and extracts therefrom, and discuss the performance of such custodial duties with the officers, accountants and auditors of Agent that are responsible therefor, all at such reasonable times and as often as any Lender may desire.

ARTICLE IX
MISCELLANEOUS PROVISIONS

Section 9.1    Notices.

Except as otherwise expressly set forth herein, all notices, requests and other communications to any party hereunder shall be in writing (including telecopy or similar teletransmission or writing) and shall be given to such party at its address or telecopy number set forth on Schedule 2 hereto or such other address or telecopy number as such party may hereafter specify by notice to each other party. Each such notice, request or other communication shall be effective (a) if given by telecopy, when such telecopy is transmitted to the telecopy number specified herein and the receipt thereof is confirmed by the recipient, (b) if given by mail, seventy-two (72) hours after such communication is deposited in the U.S. mails with first class postage prepaid, addressed as aforesaid or (c) if given by any other means (including by air courier), when delivered at the address specified pursuant to this Section; provided, that notices to Agent pursuant to Article II shall not be effective until received.

Section 9.2    Amendments, Etc.

No amendment or waiver of any provision of any Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower and the Required Lenders, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that notwithstanding anything else contained herein, (a) no amendment, waiver or consent shall, unless in writing and signed by all the Lenders, do any of the following: (i) subject the Lenders to any additional obligations, (ii) reduce the principal of, or the amount or rate of interest on, the Notes or the payment of any Fees hereunder, (iii) postpone any date fixed for any payment in respect of principal of, or interest on, the Notes or the payment of any Fees hereunder or waive any Event of Default under Section 7.1(a), (iv) change Section 2.10(d) or (e) or any other provision providing for the pro rata nature of payments to Lenders in a manner that would alter the pro rata sharing of such payments required thereby, (v) change the Maturity Date, the definitions of "PITI Borrowing Base", "Servicing Rights Borrowing Base", "PITI Collateral Value", "Servicing Rights Collateral Value", "Eligible P&I Receivables", "Eligible Servicing Rights" or "Eligible T&I Receivables" (or any component definitions of the preceding seven terms) or "Required Lenders" or the number or identity of Lenders that is required for any or all of the Lenders to take any action hereunder, (vi) release the Lien of Agent and/or Lenders on any of the Collateral, except as otherwise permitted herein, (vii) release any Guarantor from its or his obligations under its or his respective Guaranty, or (viii) amend this Section 9.2 or Section 9.6, and

55

(b) no amendment, waiver or consent shall, unless in writing and signed by Agent affect the rights or duties of Agent under this Agreement or any of the other Loan Documents. Borrower agrees to pay to each Lender an administration fee equal to $15,000.00 payable on the Effective Date and for each amendment, restatement, supplement or other modification of, or waiver in respect of, any Loan Document such fee shall be payable as of the effective date of such amendment, restatement, supplement, modification or waiver (and Agent is authorized by Borrower to debit amounts on deposit in the Operating Account or any of Borrower's other accounts maintained with Agent for such payment). In addition, if Borrower (a) as at the end of any calendar month is not in compliance with any of the financial covenants set forth in Section 6.3 or (b) at any time is not in compliance with any other covenants set forth herein and, in either case, Required Lenders agree, in writing, to forbear enforcement of such covenant violation(s) (it being understood and agreed that Lenders have no obligation to agree to forbear at all, or to extend the term of any forbearance to which Required Lenders, from time to time, may agree, but may agree or not agree to forbear, or to extend any forbearance agreed to, in the sole and absolute discretion of Required Lenders), Borrower shall pay each Lender a forbearance fee equal to $15,000.00 for each month that such covenant violation(s) and forbearance continues, which fee shall be payable within five (5) Banking Days following each calendar month end (and Agent is authorized by Borrower to debit amounts on deposit in the Operating Account or any of Borrower's other accounts maintained with Agent for such payment). Notwithstanding anything in this Agreement to the contrary, Agent shall not be required to obtain the consent, written agreement or other authorization of any Lender in connection with any Fees payable only to Agent, including, without limitation, the postponement, deferral, waiver or modification thereof.

Section 9.3    No Waiver; Remedies Cumulative.

No failure or delay on the part of Agent and/or any Lender, as applicable, in exercising any right or remedy hereunder or under another Loan Document and no course of dealing with Borrower, on the one hand, and Agent and/or any Lender, as applicable, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right or remedy hereunder or thereunder. The rights and remedies expressly provided herein and in the other Loan Documents are cumulative and not exclusive of any rights or remedies that Agent and/or any Lender, as applicable, would otherwise have. No notice to or demand on Borrower not required hereunder or under the other Loan Documents in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Agent and/or any Lender, as applicable, to any other or further action in any circumstances without notice or demand. For purposes of this Agreement and the other Loan Documents, any Potential Default, Event of Default or other default hereunder or thereunder, as applicable, shall be deemed to be continuing unless expressly waived by the Agent (acting with the requisite consent of the Lenders as and to the extent required herein) in writing.

Section 9.4    Payment of Expenses, Indemnification, Etc.

(a)    Borrower shall:

(i)    (A) pay all reasonable out-of-pocket costs and expenses of Agent in the administration (both before and after the execution hereof and including advice of counsel as to the rights and duties of Agent and Lenders with respect thereto) of, and in connection with the preparation, execution and delivery of, this Agreement and the other Loan Documents, and (B) pay all reasonable out-of-pocket costs and expenses of Agent and each Lender in the preservation of rights under, enforcement of, and, after the occurrence of a Potential Default or an Event of Default, the refinancing, the renegotiating or the restructuring of, this Agreement and the other Loan Documents and the documents and instruments referred to herein and therein including in connection with any bankruptcy, insolvency, liquidation, reorganization or similar proceeding and any amendment, waiver or consent relating hereto and thereto (including the reasonable fees and disbursements of counsel (including allocated costs of internal counsel) for Agent and, in the case of enforcement, for each of the Lenders (and Agent is authorized by Borrower to debit amounts on deposit in the Operating Account or any of Borrower's other accounts maintained with Agent for payment of all such costs and expenses, including the reasonable fees and disbursements of counsel);

(ii)    pay and hold Agent and each Lender harmless from and against any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement, the Notes and any other Loan Documents, any collateral described therein, or any payments due thereunder, and save Agent and each

56

Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes; and

(iii)     indemnify Agent and each Lender, and their respective officers, directors, employees, representatives and agents from, and hold each of them harmless against, any and all out-of-pocket costs, losses, liabilities, claims, damages or expenses actually incurred by any of them (whether or not any of them is designated a party thereto) arising out of or by reason of any investigation, litigation or other proceeding related to any actual or proposed use by Borrower of the proceeds or any of the Advances or Borrower's entering into and performing of the Loan Documents, including the reasonable fees and disbursements of counsel (including allocated costs of internal counsel) incurred in connection with any such investigation, litigation or other proceeding; provided that neither Agent nor any Lender shall have the right to be indemnified hereunder for its own gross negligence or willful misconduct.

(b)     To the extent that Borrower fails to pay any amount required to be paid to Agent under subsection (a) above, each Lender severally agrees to pay to Agent such Lender's Commitment Percentage (determined as of the time that the unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that the unreimbursed expense or indemnified payment, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against Agent in its capacity as such.

(c)     All amounts due under this Section 9.4 shall be payable promptly after written demand therefor. If and to the extent that the obligations of Borrower under this Section 9.4 are unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations that is permissible under applicable law.

Section 9.5     Right Of Setoff.

In addition to and not in limitation of all rights of offset that Agent and each Lender may have under applicable law, for so long as any Event of Default has occurred and is continuing and whether or not Agent and such Lender has made any demand or the Obligations have matured, Agent and such Lender shall have the right to appropriate and apply to the payment of the Obligations all deposits (general or special, time or demand, provisional or final) then or thereafter held by, and other indebtedness or property then or thereafter owing to Borrower by, Agent and such Lender, whether or not related to any Loan Document or any transaction hereunder.

Section 9.6     Benefit of Agreement.

(a)     This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties hereto; provided, that Borrower may not assign or transfer any of its interest or delegate any of its obligations under the Loan Documents without the prior written consent of Lenders and any such assignment or transfer without the prior written consent of Lenders shall be null and void.

(b)     Any Lender may at any time and from time to time sell, assign, transfer, pledge or convey all or any portion of its rights and/or delegate all or any portion of its obligations under this Agreement and the other Loan Documents (including, without limitation, Advances made by such Lender to Borrower or any other interest of such Lender in the Loan Documents) to any Person, including, without limitation, Affiliates of such Lender (each, an "Assignee"), without notice to or consent by Agent, Borrower or any other Person. Agent and Borrower hereby agree that upon any such sale, assignment, transfer, pledge, conveyance or delegation by a Lender, Assignee shall have, to the extent of such sale, assignment, transfer, pledge or conveyance, the same rights and benefits as it would have if it were a Lender under the Loan Documents and the holder of such Lender's Note, except as otherwise provided therein; provided, that neither Agent nor Borrower shall have any duty to recognize the Assignee absent receipt by it of notice of such sale, assignment, transfer, pledge, conveyance or delegation; and provided, further, that no such sale, assignment, transfer, pledge, conveyance or delegation shall relieve such Lender of any of its obligations as a Lender under this Agreement or any of the other Loan Documents unless and until the written consent of Agent and, if no Event of Default has occurred and is continuing, of Borrower (which consent of Borrower, if applicable, will not be unreasonably withheld) is obtained. In any case of any assignment where such consent has been obtained, (i) the assigning Lender shall provide a copy of such assignment to Agent and Agent shall record the name of the Assignee in its records as the holder of Advances equal to the principal amount of

B # 935671 v.9

Advances assigned to Assignee, and Agent shall adjust in its records the assigning Lender's and the Assignee's Commitment Percentage, as appropriate, (ii) Borrower shall execute and deliver to the Assignee a new Note in the amount of the Assignee's Commitment and, if applicable, a renewal Note in the amount of such assigning Lender's retained Commitment, and (iii) Agent shall deliver to Borrower and each Lender a revised Schedule 1, Schedule 2 and Exhibit C for the purpose of adding the Assignee as a "Lender" under this Agreement.

(c) Any Lender may, without notice to or consent by Agent, Borrower or any other Person, sell participations in all or any part of any Advance or Advances made by such Lender to Borrower (including, without limitation, Advances made by such Lender to Borrower under the Servicing Facility) or any other interest of such Lender in the Loan Documents to any Person (each, a "*Participant*"), in which event the Participant shall not have any direct rights against Borrower or the Collateral under the Loan Documents or any other document delivered in connection herewith (Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of Participant relating thereto).

(d) Any Lender may at any time pledge all or any portion of its rights under the Loan Documents to a Federal Reserve Bank. No such pledge shall release the transferor Lender from its obligations hereunder.

(e) In connection with any such sale, assignment, transfer, pledge or conveyance permitted under subsections (b), (c) and (d) above, Borrower authorizes Agent and each Lender to disclose to any Assignee or Participant and to any prospective Assignee or Participant, any and all information in Agent's or such Lender's possession concerning Borrower or such Advances.

Section 9.7    Governing Law; Submission to Jurisdiction.

(a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND UNDER THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF FLORIDA.

(b) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS TO WHICH BORROWER IS A PARTY MAY BE BROUGHT IN (A) THE COURTS OF THE STATE OF FLORIDA LOCATED IN ORANGE COUNTY OR OF THE UNITED STATES OF AMERICA FOR THE MIDDLE DISTRICT OF FLORIDA, (B) THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA OR THE UNITED STATES OF AMERICA FOR THE EASTERN DISTRICT OF PENNSYLVANIA, (C) ANY STATE OR FEDERAL COURT LOCATED IN THE COMMONWEALTH OF MASSACHUSETTS OR (D) ANY APPELLATE COURT FROM ANY THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, BORROWER HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OR MAINTAINING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c) BORROWER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO BORROWER AT ITS SAID ADDRESS, SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.

(d) NOTHING HEREIN SHALL AFFECT THE RIGHT OF AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.

B # 935671 v.9

Section 9.8    Confidentiality . Each of Agent and each Lender agrees to take normal and reasonable precautions to maintain the confidentiality of any information designated in writing as non-public and confidential that is provided to it by Borrower or any Guarantor, except that, subject to taking such normal and reasonable precautions to maintain the confidentiality thereof, such information may be disclosed by Agent and any Lender (a) pursuant to a subpoena or order of any court or administrative agency or in any pending legal or administrative proceeding, or as otherwise required by law, (b) upon the request or demand of any regulatory authority having jurisdiction over Agent or such Lender, or any of their respective Affiliates, (c) to the extent that such information becomes publicly available other than by reason of the breach of this Agreement or any other agreement with Borrower or becomes available to Agent, any Lender, any of their respective Affiliates or any of their or such Affiliate's respective directors, officers, employees, agents .and advisors (each, a "*Related Party*") on a non-confidential basis from a source other than Borrower or any Guarantor, (d) to any Related Party of Agent or such Lender, including without limitation, directors, employees, legal counsel, independent auditors and other experts or agents who need to know such information and are informed of the confidential nature of such information and are directed to maintain the confidentiality of such information, (e) to any of its Affiliates and Subsidiaries which are informed of the confidential nature of such information and agree to the duty of confidentiality as provided herein, (f) to any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to Borrower, any Subsidiaries or the Obligations which are informed of the confidential nature of such information and agree to the duty of confidentiality as provided herein, (g) as disclosed in court for purposes of establishing a "due diligence" defense, (h) in defending itself against any action brought by or on behalf of Borrower, (i) in connection with the exercise of any  remedy hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (j) subject to provisions substantially similar to this Section 9.8, to any actual or prospective Assignee or Participant, or (k) with the consent of Borrower. Any Person required to maintain the confidentiality of any information as provided for in this Section 9.8 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information.    Notwithstanding the foregoing provisions, in the event that Agent, any Lender or any Related Party, as applicable, under this Section 9.8 becomes legally compelled (whether by court or regulatory order or otherwise, except pursuant to clause (b) above) to disclose any of the confidential information received from Borrower, it will provide Borrower with prompt notice (unless otherwise prohibited to do so) so that Borrower may seek a protective order or other appropriate remedy. In the event that such a protective order or other appropriate remedy is not obtained, Agent, such Lender or such Related Party, as applicable, compelled to furnish such confidential information, will furnish only that portion of the confidential information which is legally required and will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded such information.

Section 9.9        Counterparts.

        This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Section 9.10        Effectiveness.

        As of the date hereof (the "*Effective Date*"), this Agreement shall become effective provided that each of the following conditions has been satisfied (it being understood that the right to assert that any such condition has not been satisfied is vested exclusively with the Agent and no other Person, and absent such an assertion in writing by the Agent specifically stating its intent to deem this Agreement not effective, subject to clause (e) below, this Agreement will be presumed effective on the Effective Date):

        (a)        Borrower shall have delivered or shall have had delivered to Agent, in form and substance and in quantities reasonably satisfactory to Agent and its counsel, each of the following:

                (i)        this Agreement, duly executed by the parties hereto and thereto;

                (ii)        unless previously provided in connection with the Existing Agreement and not required by Agent to be modified, amended, restated or replaced, such UCC financing statements and other documents, instruments and agreements, properly executed (where required), deemed necessary or appropriate by

59

Agent, in its reasonable discretion, to create in favor of Agent and/or Lenders a valid and perfected, first priority security interest in and lien upon the Collateral;

(iii) the Subsidiary Guaranty and the Personal Guaranty, each duly executed by the parties thereto;

(iv) [Intentionally left blank]

(v) unless previously provided in connection with the Existing Agreement and not required by Agent to be modified, amended, restated or replaced, the duly executed Acknowledgment Agreements and, if required by Agent, a Power of Attorney in connection with each such Acknowledgment Agreement;

(vi) [Intentionally left blank];

(vii) an opinion of outside legal counsel to Borrower and Guarantor covering such matters as Agent may require or request, but in any event in similar scope and coverage to such legal opinions previously delivered in connection with the Prior Amended and Restated Agreement and the First Amendment;

(viii) a certified copy of resolutions of the Board of Directors of Borrower and Guarantors (other than the Personal Guarantor) approving the execution, delivery and performance of all Loan Documents required to be delivered by such parties hereunder and the transactions contemplated therein;

(ix) a certificate of the Secretary or an Assistant Secretary of Borrower and Guarantors (other than the Personal Guarantor) certifying the names and true signatures of the officers of such parties authorized to sign the Loan Documents required to be executed and delivered by such parties hereunder, in each case dated the Effective Date;

(x) unless previously provided in connection with the Existing Agreement and not subsequently modified, amended, restated or replaced, a copy of the Certificate of Incorporation of Borrower, certified by the Secretary of State of the jurisdiction of Borrower's incorporation as of a recent date;

(xi) unless previously provided in connection with the Existing Agreement and not subsequently modified, amended, restated or replaced, a copy of the Bylaws of Borrower, certified by the Secretary or an Assistant Secretary of Borrower on the Effective Date as being accurate and complete;

(xii) a certificate of the Secretary of State of the jurisdiction of incorporation of Borrower and each Guarantor (other than the Personal Guarantor) certifying such party is in good standing as of a recent date (within 30 days of the Effective Date);

(xiii) a certificate of an executive officer of Borrower in form acceptable to Agent dated the Effective Date, which shall include a certification from Borrower as to the identity of any counterparty to a Hedging Arrangement that meets the conditions specified in clause (b) of the definition of "Obligations," or if there are, or were, no such counterparties a statement to that effect; and

(xiv) such other opinions, documents, certificates or agreements as Agent may reasonably request, in form and substance satisfactory to Agent.

(b) evidence satisfactory to Agent that all reasonable fees, costs and expenses of its counsel relating to the preparation, negotiation and closing of the transaction contemplated hereby through the Effective Date will be paid in full on such date.

(c) The following statements shall be true and correct on the Effective Date:

(i) the representations and warranties in each Loan Document (after giving effect to this Agreement) are correct and accurate on and as of the Effective Date, as though made on and as of the Effective Date; and

B # 935671 v.9

(ii)     after giving effect to this Agreement, no Event of Default or Potential Default has occurred and is continuing.

(d)     Borrower shall have paid to Agent, for its own account and/or for the pro-rata account of each Lender, as applicable, all Fees required under Section 2.9 and any other fees required by this Agreement and the other Loan Documents unless, Agent and/or Lenders, as applicable, have deferred or postponed payment of such Fees.

(e)     Notwithstanding execution of this Agreement by Borrower and each Lender party hereto and satisfaction (or waiver by Agent (acting with the requisite consent of the Lenders as and to the extent required herein)) of each of the conditions set forth in subsections (a) through (e) above of this Section 9.10, this Agreement shall not, in any event, be or become effective and binding upon the parties until executed and accepted by Agent in its capacity as such on behalf of Lenders.

Section 9.11     Headings Descriptive.

The headings of the several sections and subsections of this Agreement, and the Table of Contents, are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 9.12     Survival of Representations and Indemnities.

All covenants, agreements, representations and warranties made herein and in any certificate delivered pursuant hereto shall survive the repayment of any Advances, or portion thereof, and the reaffirmation of Borrower of the Notes and other Loan Documents regardless of any investigation made by Agent or any Lender and of Agent's and each Lender's access to any information and shall continue in full force and effect so long as any Obligation is outstanding and unpaid. Borrower's obligations under Sections 2.11, 2.14 and 9.4 (and any other indemnification obligations of Borrower or other obligations that so provide) shall survive the termination or expiration of this Agreement for any reason whatsoever and payment of the Notes.

Section 9.13     Severability.

In case any one or more of the provisions contained in this Agreement or any of the Notes should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein and therein in any way be affected or impaired thereby.

Section 9.14     Release of Claims.

In consideration of the matters set forth in this Agreement, Borrower, on behalf of itself and its successors and assigns, hereby fully, finally and irrevocably releases Agent and each Lender, and their respective officers, representatives, agents, attorneys, employees, predecessors, successors and assigns (collectively, the "*Released Parties*") from any and all defenses, affirmative defenses, claims' counterclaims, offsets, cross-claims, damages, demands, actions and causes of action of any kind or nature existing as of the date of this Agreement or based on facts or circumstances arising at anytime up through and including the date of this Agreement, whether known or unknown and whenever and howsoever arising, relating to the Existing Agreement, the Existing Servicing Facility, the Servicing Facility, the liabilities and obligations of Borrower under the Existing Servicing Facility or the Servicing Facility, the other Obligations, the Notes or the other Loan Documents, or any of them, or any past relationship with the Agent, the Predecessor Agent and/or any Lender. In addition, Borrower hereby agrees not to commence, join in, prosecute, or participate in any suit or other proceeding in a position adverse to that of any of the Released Parties arising directly or indirectly from any of the foregoing matters.

Section 9.15     WAIVER OF TRIAL BY JURY.

**TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, COUNTERCLAIM OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF**

B # 935671 v.9

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THIS WAIVER APPLIES TO ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS AND PROCEEDINGS, INCLUDING PERSONS WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE PARTIES HERETO AND EACH PARTY FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. EACH PARTY FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS SECTION.

Section 9.16    Amendment and Restatement of Existing Agreement.

At such time as this Agreement becomes effective as set forth in Section 9.10, this Agreement shall completely amend, restate and supersede the Existing Agreement and, from and after the Effective Date, shall govern the relationship of the parties with regard to the Servicing Facility and the other matters set forth herein.

Section 9.17    NO CONSEQUENTIAL DAMAGES.

WITH REGARD TO ANY ACTION, COUNTERCLAIM OR PROCEEDING UNDER THIS AGREEMENT, UNDER NO CIRCUMSTANCES WILL AGENT OR ANY LENDER BE LIABLE TO BORROWER FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT SUCH DAMAGES ARE CAUSED BY THE FAULT OR NEGLIGENCE OF AGENT OR SUCH LENDER AND WHETHER OR NOT AGENT OR SUCH LENDER IS NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

B # 935671 v.9

IN WITNESS WHEREOF, the parties hereto have caused this Sixth Amended and Restated Servicing Facility Loan and Security Agreement to be executed as of the day and year first above written.

BORROWER:

TAYLOR, BEAN & WHITAKER MORTGAGE CORP.

By: _Sherry Dickinson_

Name:   Sherry D. Dickinson
Title:   Vice Chairman

**STATE OF GEORGIA**

**COUNTY OF COBB**

On this 15th day of May, 2009, personally appeared Sherry D. Dickinson, as Vice Chairman of TAYLOR, BEAN & WHITAKER MORTGAGE CORP., a Florida corporation (the "*Corporation*"), and before me executed the attached Sixth Amended and Restated Servicing Facility Loan and Security Agreement, dated as of May 15, 2009, by and among the Lenders party thereto, Sovereign Bank, as Agent and Lender, and the Corporation as Borrower, on behalf of the Corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the State and County last aforesaid.

_Christin M Fishback_

Signature of Notary Public-State of Georgia

_Christin M Fishback_

Print Name: Notary Public, State of Georgia
Personally Known_____
Produced Identification_____
Type of Identification_____

(NOTARIAL SEAL)

Notary Public, Gwinnett County, Georgia
My Commission Expires July 22, 2011

SOVEREIGN BANK
as Agent

By: _____
Name: Stephen E. Burse
Title:   Senior Vice President

**SOVEREIGN BANK,**
as a Lender

By:_____
Name:  Stephen E. Burse
Title:   Senior Vice President

THE FARMERS BANK,
as a Lender

By: _____
Name: A. Sidney Lane
Title:    President

THE BANK OF NEW YORK MELLON,
as a Lender

By: _____

Name: Gregory Muller

Title: Vice President

COLONIAL BANK,
as a Lender

By: _____

Name: Amy J. Nunneley

Title: Senior Vice President

**GUARANTY BANK,**
as Lender

By: _____

Name:  Mark Short
Title:   Vice President

**U.S. BANK NATIONAL ASSOCIATION,**
as a Lender

By: _____

Name:  Saqib Khawaja

Title:    Vice President

**FEDERAL DEPOSIT INSURANCE CORPORATION**, as
receiver for FRANKLIN BANK, SSB, as a Lender

By: _____

Name:  BILL PEEBLES

Title:  ATTORNEY-IN-FACT

Sixth Amended and Restated Servicing
   Facility Loan and Security Agreement
Signature Page S-10

**HARRIS N.A.,**
as a Lender

By: _____

Name: Robert Bomben
Title: Director

KBC BANK NV,
as a Lender

By: _____

Name: Lawrence Manochio
Title:   Vice President

By: _____

Name:
Title:
Sandra T. Johnson
Managing Director

SEASIDE NATIONAL BANK & TRUST,
as a Lender

By: _____

Name:  Thomas N. Grant
Title:    Senior Vice President