UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:                                          CHAPTER 11

TAYLOR, BEAN & WHITAKER                         CASE NO. 3:09-bk-07047-JAF
MORTGAGE CORP.,

    Debtor
_____/

# BANK OF AMERICA'S OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 363, 541 AND 552 AND BANKRUPTCY RULE 4001

Bank of America, National Association ("Bank of America"), as successor in interest through merger to LaSalle Bank, National Association and LaSalle Global Trust Services, and in its capacity as Collateral Agent, Indenture Trustee, and Custodian with respect to Ocala Funding LLC ("Ocala"), objects to the Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to 11 U.S.C. §§ 105(a), 361, 363, 541 and 552 and Bankruptcy Rule 4001 (the "Cash Collateral Motion") filed by Taylor, Bean & Whitaker Mortgage Corp. (the "Debtor") [C.P. #5] on August 24, 2009. In support of its Objection, Bank of America states as follows:

## I. INTRODUCTION

The Court should deny the Cash Collateral Motion for the following reasons: (i) the Debtor does not identify whose cash collateral it seeks to use or the source of the alleged cash collateral, and therefore, the Debtor cannot establish that it has sufficient interest in the cash it proposes to use; (ii) the Debtor does not provide adequate protection to the parties whose cash collateral it seeks to use; and (iii) even if approval of cash collateral use is at all appropriate, the

Debtor should not be allowed to use cash to pay for certain of the line items on the Budget attached to the Cash Collateral Motion.

## II. BACKGROUND

*A. The Ocala Loans and the Role of Bank of America*

1. On June 30, 2008, Ocala, a special-purpose commercial paper and financing conduit, agreed to purchase certain mortgage loans and related loan documents (collectively, the "Ocala Loans") from the Debtor pursuant to a Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement (the "MLPSA"). A copy of the MLPSA is attached hereto as **Exhibit A** and is incorporated herein by reference.

2. Under the terms of the MLPSA, Ocala permitted the Debtor to service the Ocala Loans for a fee.

3. Ocala funded its purchase of the Ocala Loans under the MLPSA by issuing subordinated notes and commercial paper, for which Bank of America served as Indenture Trustee, Collateral Agent, and Custodian. Among other things, on June 30, 2008, Ocala issued notes pursuant to a Second Base Indenture between Ocala, as issuer, and Bank of America, as Indenture Trustee (as amended and supplemented, the "Second Base Indenture"). Copies of the Second Base Indenture and two supplements thereto are attached hereto as composite **Exhibit B** and are incorporated herein by reference.

4. On June 30, 2008, Ocala also entered into an Indenture Agreement and Restated Security Agreement with Bank of America (the "Security Agreement") whereby Ocala, to secure its obligations under the Second Base Indenture, pledged to Bank of America, as Collateral Agent, among other things: (a) the Ocala Loans; (b) the principal and interest paid under the Ocala Loans; (c) any proceeds from the sale of the Ocala Loans to investors (the "Ocala Loan

HUNTON & WILLIAMS

Proceeds"); and (d) the servicing rights relating to the Ocala Loans (collectively, the "Ocala Assets"). A copy of the Security Agreement is attached hereto as **Exhibit C** and is incorporated herein by reference.

5.  Bank of America, as Collateral Agent for the Ocala Secured Parties, perfected its first priority security interest in the Ocala Assets pursuant to the terms of a Second Amended and Restated Custodial Agreement, dated as of June 30, 2008, among Ocala as issuer, the Debtor, as seller and servicer, and Bank of America, as Custodian and Collateral Agent (the "Custodial Agreement"). A copy of the Custodial Agreement is attached hereto as **Exhibit D** and is incorporated herein by reference.

6.  Ocala subsequently resold certain of the Ocala Loans to third parties, including the Federal Home Loan Mortgage Corporation ("Freddie Mac"), in exchange for cash payments.

7.  As of the date hereof, the outstanding balance of commercial paper and subordinated notes issued by Ocala, and for which Bank of America serves as indenture trustee, is approximately $1.765 billion.

*B. The Colonial Bank Injunction and the Debtor's Relationship with Colonial Bank*

8.  Under a series of bailee letters (collectively, the "Bailee Letters"), also referred to as "Transmittal Letters," Colonial Bank, N.A. ("Colonial Bank") agreed to hold the Ocala Loans and the Ocala Loan Proceeds in trust and as custodian, agent, and bailee for and on behalf of the Ocala Secured Parties. A copy of a form Bailee Letter is attached hereto as **Exhibit E** and is incorporated herein by reference.

9.  Under the Bailee Letters, within fifteen days of its receipt of an Ocala Loan, Colonial Bank was obligated to either: (a) remit to Bank of America, as Collateral Agent, the Ocala Loan Proceeds for all Ocala Loans purchased by Freddie Mac, or (b) return to Bank of

America any Ocala Loans that Freddie Mac declined or refused to purchase.

10. Upon information and belief, during the period from June 11, 2009 through and including August 4, 2009, Freddie Mac delivered to Colonial Bank, for payment to Bank of America, as Collateral Agent, an amount in excess of $1 billion in Ocala Loan Proceeds resulting from Freddie Mac's purchase of Ocala Loans.

11. Bank of America fulfilled all of its obligations under the Bailee Letters. Colonial Bank nevertheless refused to deliver to Bank of America, as Collateral Agent, all or substantially all of the Ocala Loans and the Ocala Loan Proceeds.

12. On August 11, 2009, Bank of America sent Colonial Bank a demand for documents and proceeds (the "August 11 Demand"), whereby Bank of America effectively revoked the Bailee Letters, to the extent not already revoked or expired, and terminated all of Colonial Bank's rights to hold possession of the Ocala Loans and Ocala Loan Proceeds in trust and as custodian, agent, and bailee on behalf of the Ocala Secured Parties. A copy of the August 11 Demand is attached hereto as **Exhibit F** and is incorporated herein by reference.

13. On August 12, 2009, Bank of America filed a Complaint in the United States District Court for the Southern District of Florida (the "District Court") against Colonial Bank asserting various legal and equitable claims, thus initiating the case styled *Bank of America, National Association v. Colonial Bank, et. al.*, Case No. 09-22384-Civ-Jordan/McAlliey (the "Colonial Bank Action"). Bank of America also sought emergency injunctive relief in the Colonial Bank Action to prevent Colonial Bank from dissipating, transferring or commingling the Ocala Loans and the Ocala Loan Proceeds.

14. On August 13, 2009, the District Court entered an Order Granting Bank of America's Motion for Temporary Restraining Order (the "Temporary Restraining Order")

granting Bank of America's request for emergency injunctive relief. A copy of the Temporary Restraining Order is attached hereto as **Exhibit G** and is incorporated herein by reference.

15. By the Temporary Restraining Order, the District Court enjoined Colonial Bank "and all persons acting under direction or control, or in concert with" Colonial Bank, from:

> [S]elling, pledging, assigning, liquidating, encumbering, transferring, or otherwise disposing of all or any portion of (a) the proceeds paid by Freddie Mac to Colonial Bank, as trustee, custodian, bailee, and agent, for certain mortgage loans and corresponding loan documents owned by Ocala Funding, LLC ("Ocala"), and (b) certain mortgage loans and corresponding loan documents delivered to Colonial Bank, as trustee, custodian, bailee, and agent, which were not purchased by Freddie Mac as set forth on the schedule annexed hereto as Schedule A to the complaint of this action.

16. According to the Cash Collateral Motion, the Debtor maintained over 100 bank accounts at Colonial Bank.

17. Upon information and belief, among these accounts was an account or accounts in the name of the Debtor at Colonial Bank through which the Debtor held and/or controlled some or all of the Ocala Assets.

18. In addition, the Debtor, as servicer of the Ocala Loans, is believed to be in possession of principal and interest payments made on the Ocala Loans, as well as certain tax and insurance escrow payments, which may be held in accounts at Colonial Bank.

19. On August 14, 2009, Bank of America, through counsel, provided the Debtor with actual notice of the Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65(d)(2) (the "TRO Notice"). In the TRO Notice, Bank of America requested that the Debtor take all necessary steps to preserve documents related to the Colonial Bank Action. A copy of the TRO Notice is attached hereto as **Exhibit H** and is incorporated herein by reference.

20. On August 14, 2009, the Alabama State Banking Department appointed the Federal Deposit Insurance Corporation as receiver for Colonial Bank, pursuant to 12 U.S.C. § 1821(c) et seq.

21. On August 26, 2009, Colonial Bank's parent entity, Colonial BancGroup, Inc., filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States District Court for the Middle District of Alabama.

*C. Events Leading to the Debtor's Bankruptcy Filing*

22. Pursuant to certain regulations of the United States Department of Housing and Urban Development ("HUD"), as well as agreements with the Government National Mortgage Association ("Ginnie Mae"), Freddie Mac and various lenders, the Debtor was required to deliver year-end audited financial statements to these agencies and lenders.[1]

23. Deloitte LLP ("Deloitte") served as the Debtor's auditor.

24. On June 16, 2009, members of Deloitte's team expressed concerns that they were encountering delays in obtaining information and documentation from the Debtor regarding certain assets on the Debtor's balance sheet.

25. On August 3, 2009, federal investigators, including agents of the United States Federal Bureau of Investigation, raided the Debtor's headquarters in Ocala, Florida.

26. On August 4, 2009, HUD suspended the Debtor's HUD/FHA origination and underwriting approval. In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that the Debtor's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of

---

[1] The Debtor's fiscal year ended March 31, 2009.

6

HUNTON & WILLIAMS

fraud, and that the Debtor failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

27. In addition, on or about August 4, 2009, Ginnie Mae terminated the Debtor's authority to act as a Ginnie Mae issuer and to service its $26 billion mortgage portfolio, and Freddie Mac terminated the Debtor's eligibility to sell loans and service its $51.2 billion portfolio.

28. On August 5, 2009, the Debtor laid off approximately 2,000 employees and significantly reduced its business operations.

29. Also on August 5, 2009, Colonial Bank froze all of the Debtor's accounts and refused to accept deposits, honor checks, receive wire transfers, or permit disbursements.

30. During this time period, at least 14 states, including New Jersey, North Carolina, Connecticut, Massachusetts, and Florida, issued cease and desist orders regarding the Debtor's mortgage lending operations due to, among other things, the Debtor's failure to fund mortgage loans.

31. On August 14, 2009, Bank of America sent the Debtor a letter declaring an event of default under the MLPSA and informing the Debtor that its rights to service the Ocala Loans were terminated (the "Debtor Default Letter"). By the Debtor Default Letter, Bank of America also requested that the Debtor assist with the transfer of the Ocala Loans to a new servicer. A copy of the Debtor Default Letter is attached hereto as **Exhibit I** and is incorporated herein by reference.

32. On August 20, 2009, representatives of Bank of America traveled to the Debtor's corporate headquarters in Ocala, Florida in an effort to facilitate the transfer of servicing rights

HUNTON & WILLIAMS

related to the Ocala Loans to a new servicer and to arrange for the transfer of any other Ocala Assets in the possession, custody or control of the Debtor.

33. While at the Debtor's offices, representatives of Bank of America were informed by the Debtor's staff that documents evidencing certain Ocala Loans were in the possession of the Debtor, but that those documents were scheduled to be shipped away from the Debtor's offices.

34. In addition, as noted above, the Debtor may be in possession, custody or control of some or all of the Ocala Assets.

35. Notwithstanding repeated requests, the Debtor has not provided Bank of America with an accounting setting forth, among other things, the amount of Ocala Loans sold to third parties or the location of the Ocala Assets.

*D. The Bankruptcy Filing and the Cash Collateral Motion*

36. On August 24, 2009 (the "Petition Date"), the Debtor filed in this Court a voluntary petition under Chapter 11 of the Bankruptcy Code.

37. On August 24, 2009, the Debtor also filed the Cash Collateral Motion. By the Cash Collateral Motion, the Debtor seeks authority to use "cash collateral" for a five week period pursuant to the Budget attached as Exhibit A to the Cash Collateral Motion.

38. According to the Budget, the Debtor proposes to use cash that, "per management," does not include any amounts associated with borrower payments received and funded into the Debtor's accounts since the freezing of the Debtor's accounts at Colonial Bank.

39. The Debtor does not otherwise clarify the source of the cash that it intends to use.

40. For the reasons set forth below, the Court should deny the Cash Collateral Motion.

### III. **OBJECTION**

Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest, and includes the proceeds, products, offspring, rents, or profits of property … subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." *See* 11 U.S.C. § 363(a). The Debtor may not use cash collateral unless each entity that has an interest in such cash collateral consents or the Court, after notice and a hearing, authorizes such use in accordance with the provisions of this section. *See* 11 U.S.C. § 363(c)(2). If the Debtor uses cash collateral of a third party, it must provide that party with adequate protection. *See* 11 U.S.C. § 363(e). Furthermore, the Debtor is required to segregate and account for any cash collateral in its possession, custody or control. *See* 11 U.S.C. § 363(c)(4).

The Court should deny the Cash Collateral Motion for three reasons.

First, it is not clear from the Cash Collateral Motion whether the cash the Debtor seeks to use is in fact "cash collateral" as defined by 11 U.S.C. § 363(a). In the Cash Collateral Motion, the Debtor states that it has "funds on deposit in various bank accounts as well as various accounts/notes receivable which may constitute cash collateral as defined by section 363(a) of the Bankruptcy Code." Cash Collateral Motion, ¶ 31. The Debtor does not, however, identify at what institutions the various bank accounts containing the alleged cash collateral are located[2]; nor does it identify the source of the cash in those accounts. In the Budget attached as Exhibit A to the Cash Collateral Motion, the Debtor provides that its "Beginning Cash Balance," in an

---

[2] In the Cash Collateral Motion, the Debtor states that its principal banking relationship was with Colonial Bank, but notes that it had "numerous other accounts" at "other banks". Cash Collateral Motion, ¶¶ 9, 11.

unidentified account, is $4,243,000. In footnote 3 to the Budget, the Debtor states that the $4,243,000 represents "identifiable operating cash 'per management.'" Yet, as set forth in the Cash Collateral Motion, one of the reasons for the Debtor's bankruptcy filing is that the Debtor's auditors expressed concerns about delays it encountered in obtaining information and documentation for the Debtor regarding the treatment and presentation of certain assets on its balance sheet. Cash Collateral Motion, ¶ 21. Additionally, the Cash Collateral Motion states that, following the "precipitous events of early August, the members of the [Debtor's] board of directors and the company's corporate officers resigned, and new management was not put into place until August 20, 2009." Cash Collateral Motion, ¶ 15. If "management," as referred to in footnote 3, describes "old management" which resigned and whose financial statements did not receive a clean audit, it is not clear that the presentation of such cash as "identifiable operating cash" is trustworthy. If "management," as referred to in footnote 3, describes "new management" appointed less than a week ago, it is not clear how new management can vouch at this point for the descriptions given by old management, or whether they have had sufficient time to make their own determination. As a result of this uncertainty, Bank of America cannot determine if any of the cash that the Debtor seeks to use is cash that belongs to Ocala, as opposed to cash that belongs to the Debtor. To the extent that the cash belongs to Ocala, it does not belong to the Debtor, and does not constitute "cash collateral" subject to use by the Debtor under 11 U.S.C. § 363(a).

Second, even assuming the cash sought to be used by the Debtor qualifies as "cash collateral" under § 363(a), the Debtor does not provide sufficient adequate protection to protect the interests of the parties whose cash collateral it intends to use. According to the Cash Collateral Motion, the Debtor intends to provide adequate protection to "Secured Parties" by

granting "replacement liens" to the Secured Parties.[3] Cash Collateral Motion, ¶ 34. The Debtor describes these replacement liens as "floating" liens on "such collateral … to the same extent, validity, and priority as existed prior to the Petition Date." *Id.* Upon information and belief, however, the collateral on which the Debtor seeks to impose "replacement liens" is already subject to prepetition liens that are protected by § 552(b) of the Bankruptcy Code. *Id.* As such, the replacement liens the Debtor proposes to grant do not constitute adequate protection to the parties whose cash collateral the Debtor intends to use.

Third, even if the cash sought to be used by the Debtor qualifies as "cash collateral", and even if the Court determines that the hollow "replacement liens" offered by the Debtor constitute sufficient adequate protection for the use of such cash collateral, certain of the line items for which the Debtor seeks to use cash are not appropriate uses of emergency cash collateral. In the Cash Collateral Motion, the Debtor states that it proposes to use "cash collateral" to pay, among other things, expenses associated with loans it is servicing under servicing agreements that "have not been properly terminated or transferred". Cash Collateral Motion, ¶'s 31 and 32. The Debtor, however, does not identify which servicing agreements purportedly have not been properly terminated. Bank of America believes that it properly terminated the Debtor's rights to service the Ocala Loans prepetition. Thus, to the extent the Debtor seeks to use cash to pay for expenses relating to the servicing of the Ocala Loans, the Court should deny the Debtor's proposed use of cash collateral. In addition, in the budget attached as Exhibit "A" to the Cash Collateral Motion, the Debtor indicates that it intends to use $1,365,000 of "cash collateral" to

---

[3] In the Motion, the Debtor defines "Secured Parties" to include Colonial Bank, Henley Holdings, LLC, Natixis Real Estate, Plainfield Specialty Holdings, RBC a/k/a Florida Choice Bank and Sovereign Bank. Cash Collateral Motion, ¶ 29. Based on this definition of "Secured Parties", it appears that the Debtor does not intent to use the cash that is owned by Ocala. Nevertheless, because the Debtor does not identify whose cash it intends to use, nor the source of the cash, Bank of America is compelled to file this objection.

pay professionals retained in the case during the first five weeks of the bankruptcy case. The Debtor should not be authorized to pay any professional fees and costs from any cash, whether it is encumbered or not, absent the filing of fee applications and approval of such applications by the Court. Furthermore, to the extent it seeks to use cash collateral to pay professional fees and costs, the Debtor should be required to file and prevail on a surcharge motion under § 506(c) of the Bankruptcy Code and meet the necessary standards of proof under that provision.

## IV. <u>CONCLUSION</u>

Bank of America is primarily concerned that the Debtor identify and preserve the Ocala Assets that might be in the Debtor's possession, custody or control. The Cash Collateral Motion does little to assuage Bank of America's concerns in that it does not identify the accounts from which the Debtor proposes to use cash or identify the sources of this cash. Before the Court allows the Debtor to use any "cash collateral," it should compel the Debtor to disclose the accounts from which the cash will be spent and, more importantly, the sources of such cash. To the extent that any of the cash is part of the Ocala Assets, it belongs to Ocala, and it does not constitute cash collateral that the Debtor can use. Furthermore, to the extent the Debtor would treat Bank of America as a secured party, the adequate protection it proposes to provide is inadequate. Finally, the Cash Collateral Motion proposes the use of cash collateral to pay for inappropriate expenses, such as payment of professional fees and expenses, and potentially to pay the expenses associated with servicing the Ocala Loans since Bank of America believes it properly terminated the Debtor's right to service these loans prepetition.

**WHEREFORE**, Bank of America respectfully requests the entry of an order denying the Cash Collateral Motion and granting such other and further relief as the Court deems just and proper.

**Dated: August 26, 2009**
    **Miami, Florida**

Respectfully Submitted,

**HUNTON & WILLIAMS, LLP**
*Counsel for Bank of America National Association, as Collateral Agent, Indenture Trustee, and Custodian*
1111 Brickell Avenue - Suite 2500
Miami, FL 33131
Tel: (305) 810-2500
Fax: (305) 810-2460

   /s/ Andrew Zaron
Andrew Zaron (FBN 965790)
Kevin Eckhardt (FBN 412902)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 26, 2009, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Andrew Zaron
Andrew Zaron

# TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
# CASE NO. 09-07047-JAF

## SERVICE LIST

Russell M. Blain/Amy Denton Harris/
Edward J. Peterson, III
Stichter, Riedel, Blain, Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, FL 33602
*Counsel for Taylor, Bean Whitaker Mortgage*

Jason Ward Johnson
Lowndes, Drosdick, Doster, Kantor & Reed
Post Office Box 2809
Orlando, FL 32802
*Counsel for Federal Home Loan Mortgage Corporation*

United States Trustee - JAX
135 W. Central Blvd., Suite 620
Orlando, FL 32801

Frank F. McGinn
Barlett Hackett Feinberg PC
155 Federal Street, 9th Floor
Boston, MA 02110
*Counsel for Iron Mountain Information Management, Inc.*

Philip V. Martino
DLA Piper US LLP
100 North Tampa Street, Suite 2200
Tampa, FL 33602
*Counsel for FDIC, as Receiver for Colonial Bank*

Robert A. Soriano
Greenberg, Traurig,, P.A.
625 East Twiggs Street, Suite 100
Tampa, FL 33602
*Counsel for Sovereign Bank*