UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TAYLOR, BEAN & WHITAKER MORTGAGE CORP., | CASE NO. 3:09-bk-07047-JAF |
| Debtor _____/ | |

### BANK OF AMERICA'S EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY RELATING TO SERVICING OF OCALA LOANS

Bank of America, National Association ("Bank of America"), as successor in interest through merger to LaSalle Bank, National Association and LaSalle Global Trust Services, and in its capacity as Collateral Agent, Indenture Trustee, and Custodian with respect to Ocala Funding, LLC ("Ocala"), pursuant to 11 U.S.C. §§ 105(a) and 362(d) and Federal Rule of Bankruptcy Procedure 4001, files this Emergency Motion for Relief from the Automatic Stay Relating to Servicing of the Ocala Loans, and in support thereof states as follows:

### I.    BACKGROUND

*A. The MLPSA and the Designated Rights*

1.      On June 30, 2008, Ocala, a special-purpose commercial paper and financing conduit, entered into a Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement (the "MLPSA") with Taylor, Bean and Whitaker Mortgage Corp. (the "Debtor") whereby Ocala agreed to purchase certain mortgage loans and related loan documents (collectively, the "Ocala Loans") from the Debtor, as well as the servicing rights associated with the Ocala Loans ("Servicing Rights"). Bank of America is a third party beneficiary to the

MLPSA. A copy of the MLPSA is attached hereto as **Exhibit A** and is incorporated herein by reference.

2. Under the terms of the MLPSA, the Debtor was designated with the right to service the Ocala Loans (the "Designated Rights"). Exh. A at 32, 52. Specifically, section 4.1 of the MLPSA provides that Ocala "hereby appoints, authorizes and empowers [the Debtor] to perform all of the duties and responsibilities of the Servicer under this Purchase Agreement. [The Debtor], as an independent contract servicer, shall service and administer the Mortgage Loans." Exh. A at 32.

3. Article X of the MLPSA provides for certain "Servicer Events of Default" with respect to the Designated Rights. Exh. A at 55-56. Specifically, section 10.1(g) of the MLPSA provides that it is a Servicer event of default if the Debtor fails to be an approved Servicer with the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Exh. A at 56. Further, section 10.1(i) of the MLPSA provides that it is a Servicer event of default if the Debtor fails "to make any payment or deposit required under this Purchase Agreement on or before two (2) days after the date such payment or deposit is required to be made." Id.

4. Section 10.1 of the MLPSA provides that "[a]t any time during the continuance of an event of default … [Ocala] may … terminate all of the rights and obligations of [the Debtor] under this Purchase Agreement and in and to the Mortgage Loans and the proceeds thereof." Exh. A at 56. Further, section 10.1 provides that, upon receipt by the Debtor of written notice of termination, "all authority and power of [the Debtor] under this Purchase Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed" pursuant to the MLPSA. Id.

5. Section 10.1 of the MLPSA additionally provides that, upon written request from Ocala, the Debtor "shall prepare, execute and deliver to the successor entity designated by [Ocala] any and all documents and other instruments, place in such successor's possession all Mortgage Loan Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination … at [the Debtor's] sole expense". Exh. A at 56.

6. Section 10.1 of the MLPSA finally provides that the Debtor "shall cooperate with such successor in effecting the termination of [the Debtor's] responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all amounts which shall at the time be credited by [the Debtor] to any Collection Account or Escrow Account or thereafter received with respect to the Mortgage Loans." Exh. A at 56.

7. Section 14.1 of the MLPSA provides that Ocala "hereby assigns, conveys, transfers, delivers and sets over unto [Bank of America, as Collateral Agent] for the benefit of the Secured Parties, all of its right, title and interest in, to and under, whether now owned or existing, or hereafter acquired, this Purchase Agreement". Exh. A at 65. Section 14.1 additionally provides that Ocala and the Debtor each "consent to such assignment and acknowledge that [Bank of America, as Collateral Agent] shall enjoy [Ocala's] rights under this Purchase Agreement … [Bank of America, as Collateral Agent] shall have all rights of [Ocala] to enforce the covenants and conditions set forth in this Purchase Agreement with respect to the Mortgage Loans". Id. at 65-66.

8. Ocala funded its purchase of the Ocala Loans under the MLPSA by issuing subordinated notes and commercial paper, for which Bank of America served as Indenture Trustee, Collateral Agent, and Custodian. Among other things, on June 30, 2008, Ocala issued

notes pursuant to a Second Amended and Restated Base Indenture between Ocala, as issuer, and Bank of America, as Indenture Trustee (as amended and supplemented, the "Second Base Indenture"). Copies of the Second Base Indenture and supplements thereto are attached hereto as composite **Exhibit B** and are incorporated herein by reference.

9. On June 30, 2008, Ocala also entered into an Indenture Agreement and Second Amended and Restated Security Agreement with Bank of America (the "Security Agreement") whereby Ocala, to secure its obligations under the Second Base Indenture, pledged to Bank of America, as Collateral Agent, among other things: (a) the Ocala Loans; (b) the principal and interest paid under the Ocala Loans; (c) any proceeds from the sale of the Ocala Loans to investors (the "Ocala Loan Proceeds"); and (d) the servicing rights relating to the Ocala Loans (collectively, the "Ocala Assets"). A copy of the Security Agreement is attached hereto as **Exhibit C** and is incorporated herein by reference.

10. Bank of America, as Collateral Agent for the holders of commercial paper and subordinated notes, perfected its first priority security interest in the Ocala Assets pursuant to the terms of a Second Amended and Restated Custodial Agreement, dated as of June 30, 2008, among Ocala as issuer, the Debtor, as seller and servicer, and Bank of America, as Custodian and Collateral Agent (the "Custodial Agreement"). Specifically, Bank of America filed a UCC-1 financing statement with respect to the Ocala Assets. A copy of the Custodial Agreement is attached hereto as **Exhibit D** and is incorporated herein by reference.

11. The Debtor subsequently undertook the servicing of the Ocala Loans in accordance with the Designated Rights provided for in the MLPSA. Specifically, the Debtor accepted payments of principal and interest from borrowers under the Ocala Loans, handled escrow funds and the release thereof, dealt with loan forbearance and modification requests,

evaluated and facilitated refinancing and sale transactions. Upon information and belief, the Debtor is currently in possession of principal, interest, tax and insurance payments, and other funds, relating to the servicing of the Ocala Loans. For purposes of this Motion, Bank of America will refer to all documents and records of any kind relating to the Ocala Loans as the "Ocala Loan Files," and to all funds collected relating to the Ocala Loans as the "Collected Funds."

*B. Events Leading to the Debtor's Bankruptcy Filing and Termination of the Designated Rights*

12. Pursuant to certain regulations of the United States Department of Housing and Urban Development ("HUD"), as well as agreements with the Government National Mortgage Association ("Ginnie Mae"), Freddie Mac and various lenders, the Debtor was required to deliver year-end audited financial statements to these agencies and lenders.[1] Deloitte LLP ("Deloitte") served as the Debtor's auditor. On June 16, 2009, members of Deloitte's team expressed concerns that they were encountering delays in obtaining information and documentation from the Debtor regarding certain assets on the Debtor's balance sheet. Deloitte refused to issue a clean audit of the Debtor's financial statements.

13. On August 3, 2009, federal investigators, including agents of the United States Federal Bureau of Investigation, raided the Debtor's headquarters in Ocala, Florida.

14. On August 4, 2009, HUD suspended the Debtor's HUD/FHA origination and underwriting approval. In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that the Debtor's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of

---

[1] The Debtor's fiscal year ended March 31, 2009.

fraud, and that the Debtor failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

15. In addition, on or about August 4, 2009, Ginnie Mae terminated the Debtor's authority to act as a Ginnie Mae issuer and to service its $26 billion mortgage portfolio, and Freddie Mac terminated the Debtor's eligibility to sell loans and service its $51.2 billion portfolio.

16. On August 5, 2009, the Debtor laid off approximately 2,000 employees, or approximately 80% of its workforce, and significantly reduced its business operations.

17. The Debtor's primary banking relationship was with Colonial Bank. Upon information and belief, through August 5, 2009, the Debtor deposited the Collected Funds at Colonial Bank.

18. On August 5, 2009, Colonial Bank, N.A. froze all of the Debtor's accounts and refused to accept deposits, honor checks, receive wire transfers, or permit disbursements. On August 14, 2009, the State of Alabama Department of Banking Regulation appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver of Colonial Bank.

19. On August 14, 2009, Bank of America, as assignee of the rights of Ocala pursuant to section 14.1 of the MLPSA, sent the Debtor a letter declaring events of default under sections 10.1(g) and 10.1(i) of the MLPSA and informing the Debtor that the Designated Rights were terminated (the "Termination Letter"). By the Termination Letter, Bank of America also requested that the Debtor assist with the transfer of the Ocala Loans to a new servicer. A copy of the Termination Letter is attached hereto as **Exhibit E** and is incorporated herein by reference.

20. On August 20, 2009, representatives of Bank of America traveled to the Debtor's corporate headquarters in Ocala, Florida in an effort to facilitate the transfer of the Designated

Rights to a new servicer. While at the Debtor's offices, representatives of Bank of America were informed by the Debtor's staff that Ocala Loan Files were in the possession of the Debtor, but were scheduled to be shipped away from the Debtor's offices.

21. During this time period, at least 14 states, including New Jersey, North Carolina, Connecticut, Massachusetts, and Florida, issued cease and desist orders regarding the Debtor's mortgage lending operations due to, among other things, the Debtor's failure to fund mortgage loans.

22. On August 21, 2009, the State of Florida Office of Financial Regulation ("OFR") issued its Second Emergency Order to Cease and Desist against the Debtor (the "Cease and Desist Order"). A copy of the Cease and Desist Order is attached as **Exhibit F** hereto. The Cease and Desist Order reflects that: (a) the Debtor was using a "single bank account" to deposit operating funds and custodial funds, which "intermingling of funds poses a serious risk to Florida consumers" (Ex. F at ¶¶ 10 - 12); (b) the Debtor is "not capable of performing … servicing functions" (Ex. F at ¶ 16); (c) the Debtor agreed it would transfer all of its servicing rights to other companies (Ex. F at ¶¶ 13 - 14); (d) during the month of August, the OFR received 25 written complaints from borrowers, including complaints about "servicing problems" (Ex. F at ¶ 16); and (e) between August 14 and August 18, the OFR received 116 phone calls about problems with the Debtor's servicing of loans (Id.).

23. In addition, "following the precipitous events of early August, the members of the [Debtor's] board of directors and the company's corporate officers, including the Chairman, Vice Chairman, Chief Executive Officer, and Chief Financial Officer, resigned…On or about August 20, 2009, the [Office of Thrift Supervision] approved Mr. Luria [of Navigant Consulting] to

serve as [Chief Restructuring Officer] ... of the Debtor." *See* Case Management Summary filed by the Debtor (C.P. # 4).

24.  On August 24, 2009 (the "Petition Date"), the Debtor filed in this Court a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

25.  Since the Petition Date, Freddie Mac and the FDIC have filed motions alleging that the Debtor continues to encounter problems servicing loans.  Among other things, they allege that the Debtor has failed to pay real estate taxes and insurance premiums from payments made by homeowners; failed to deposit payments made by homeowners by check; failed to effect automated payments by internet or phone; and failed to initiate ACH drafts for mortgage payments due in August.

26.  As of the date of this Motion, Bank of America is unable to complete a transition of the servicing rights for the Ocala Loans to a successor servicer because the Debtor has either been unwilling to cooperate with a transfer of the rights or is unable to do so because of its limited staff.

## II.  RELIEF REQUESTED

By this Motion, Bank of America requests that the Court grant it relief from stay to pursue all of its rights and remedies relating to the Debtor's servicing of the Ocala Loans, and to compel the Debtor to: (A) transfer the Designated Rights, Ocala Loan Files and Collected Funds to a successor servicer; (B) cooperate with Bank of America and the successor servicer with the transfer of the Designated Rights, Ocala Loan Files and the Collected Funds; and (C) provide Bank of America with an accounting.

### III.   ANALYSIS

Pursuant to 11 U.S.C. § 362(d), a court shall grant a party in interest relief from the automatic stay:

(1)   for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]

(2)   with respect to a stay of an act against property under subsection (a) of this section, if --

(A)   the Debtor does not have an equity in such property; and

(B)   such property is not necessary to an effective reorganization.

*A.   Cause to Lift the Automatic Stay*

"Cause" under 11 U.S.C. § 362(d)(1) has no clear definition under the Bankruptcy Code *See, e.g., In re Tucson Estates, Inc.*, 912 F. 2d 1162 (9th Cir. 1990). Therefore, courts must determine if "cause" exists on a case by case basis, based on the totality of the circumstances. *Id.*; *In re George*, 315 B.R. 624 (Bankr. S.D. Ga. 2004). The party seeking relief from the automatic stay has the burden of making a prima facie case for showing cause exists, and, if such prima facie case is shown, the Debtor has the burden of proving by a preponderance of the evidence that cause does not exist. *See* 11 U.S.C. § 362(g) (providing that the movant bears the burden of proof with respect to the issue of the debtor's equity in property, and the debtor bears the burden of proof on all remaining issues); *see also In re Allstar Buildings, Inc.*, 834 F. 2d 898 (11th Cir. 1987); *In re Brown*, 290 B.R. 415, (Bankr. M.D. Fla. 2003); *In re Paxson Elec. Co.*, 242 B.R. 67 (Bankr. M.D. Fla. 1999).

Cause exists to lift the automatic stay as requested here for several reasons. First, the Debtor never owned the Ocala Loans, the Servicing Rights, the Ocala Loan Files or the

Collected Funds. It was merely granted the Designated Rights so it could service the Ocala Loans. Because of the Debtor's various defaults under the MLPSA, Bank of America terminated the Designated Rights prior to the Petition Date by sending the Debtor the Termination Letter. Under the MLPSA, upon receipt of the Termination Letter by the Debtor, the Debtor's interest in the Designated Rights was effectively terminated. Exh. A at 56.

It is axiomatic that a bankruptcy estate acquires no greater ownership rights over property that the Debtor had prior to the bankruptcy filing. *See* 11 U.S.C. § 541; *In re Britton*, 288 B.R. 170 (Bankr. N.D.N.Y. 2002). Therefore, a contract that is terminated pursuant to state law prior to the filing of a bankruptcy petition cannot be resurrected by the filing of such a petition. *See Mortgage Network Corp. v. Federal Home Loan Mortgage Corp.,* 1996 WL 64984 (9th Cir. Feb. 1996) (finding that a servicer whose rights were terminated pre-petition has no remaining possessory interest in the servicing rights post- petition); *Am. Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F. 3d 1401 (9th Cir. 1995) (same), *cert. denied*, 519 U.S. 812 (1996); *In re Atkins*, 237 B.R. 816 (Bankr. M.D. Fla. 1999).

Here, in light of the termination of the Designated Rights by Bank of America prior to the Petition Date, the only remaining right of the Debtor with respect to the Ocala Loans as of the Petition Date, and the only right that could therefore pass to the bankruptcy estate, is the right to continue servicing the Ocala Loans until the transfer of the Designated Rights to a successor servicer is complete. While it is true that the Debtor has possession of the Ocala Loan Files and Collected Funds, a possessory interest in property does not equate to an ownership interest. *See In re Steele*, 297 B. R. 589 (Bankr. E.D. Mo. 1989). Furthermore, relief from stay should be granted to compel a debtor to transfer mortgage documents in their possession once the debtor's servicing rights have been terminated. *See In re Malmart Mortgage Co.*, 1988 WL 1004731 at

HUNTON & WILLIAMS

*3 (Bankr. D. Mass. Jan. 25, 1988). In other words, as it relates to the servicing of the Ocala Loans, the Debtor has no meaningful right in property to be protected, and cause therefore exists to lift the automatic stay.

Cause also exists to grant Bank of America relief from the automatic stay because the Debtor cannot provide Bank of America with adequate protection of its interest in the Ocala Loans, the Ocala Loan Files, the Collected Funds and the Servicing Rights. Similar to the term "cause," the term "adequate protection" is not defined by the Bankruptcy Code. *See, e.g., In re Carson*, 34 B.R. 502 (D. Kans. 1983). As explained in *In re Alyucan Interstate Corp.*, 12 B.R. 803, 805 (Bankr. Utah 1981), "[t]he omission was probably deliberate…Not only is the concept [of adequate protection] kaleidoscopic, but also the circumstances to which it applies will change from creditor to creditor, and from hearing to hearing, or even as to the same creditor in different hearings…".

Under the circumstances here, the Debtor cannot provide Bank of America with adequate protection. As noted, within the last two months: (A) the Debtor's auditor, Deloitte, accused the Debtor of financial irregularities and refused to issue the Debtor a clean audit; (B) the FBI raided the Debtor's headquarters; (C) HUD suspended the Debtor's HUD/FHA origination and underwriting approval; (D) Ginnie Mae terminated the Debtor's authority to act as a Ginnie Mae issuer and servicer; (E) Freddie Mac terminated the Debtor's authority to act as a Freddie Mac issuer and servicer; (F) the Debtor laid off approximately 2,000 employees, the bulk of its staff; (G) the Debtor is in default under the terms of the MLPSA, and is incapable of curing the default because, among other things, Freddie Mac has terminated its rights to act as an issuer or servicer; (H) at least 14 states, including New Jersey, North Carolina, Connecticut, Massachusetts, and Florida, issued cease and desist orders regarding the Debtor's mortgage lending operations, and

it is therefore questionable whether the Debtor is even properly licensed to service the Ocala Loans; (I) the OFR issued its Cease and Desist Order, determining that: (1) the Debtor was using a "single bank account" to deposit operating funds and custodial funds, which "intermingling of funds poses a serious risk to Florida consumers"; (2) the Debtor is "not capable of performing … servicing functions"; (3) the Debtor agreed it would transfer all of its servicing rights to other companies; (4) during the month of August, the OFR received 25 written complaints from borrowers, including complaints about "servicing problems"; (5) between August 14 and August 18, the OFR received 116 phone calls about problems with the Debtor's servicing of loans; and (J) the Debtor's officer and directors resigned.  In addition, since the Petition Date, according to the FDIC and Freddie Mac, the Debtor is failing to perform basic servicing functions, including failing to deposit checks from homeowners into segregated accounts (or any accounts, for that matter); failing to effect automated payments by internet or phone; and failing to initiate ACH drafts for mortgage payments.  Under these circumstances, Bank of America's interest in the Ocala Loans, Servicing Rights, Ocala Loan Files and Collected Funds are being severely compromised with every day that passes.[2]

Putting aside the harm caused to Bank of America, homeowners stand to suffer immensely if the Designated Rights are not promptly transferred so that the Ocala Loans can be properly serviced.  If their principal and interest payments are not properly credited to their loans, or if their taxes are not paid, they could suffer penalties and possibly have to deal with foreclosure.  If their insurance premiums are not paid, and their homes suffer a casualty, they may be left without a place to live or means to rebuild.  Under these circumstances, too, the

---

[2] It is also worth noting that the examples of adequate protection set forth in 11 U.S.C. § 361 -- periodic cash payments, replacement liens ad other relief that would provide the indubitable equivalent of Bank of America's interests -- do not apply or could not be accomplished here.

HUNTON & WILLIAMS

Court should grant relief from the automatic stay to allow Bank of America to get the Ocala Loans out of the hands of the Debtor and place them on higher, safer ground to avoid them from being swept up in the Debtor's disastrous collapse.

B.   *The Debtor Does Not Have any Equity in the Designated Rights, and the Designated Rights Are Not Necessary to an Effective Reorganization*

In addition to granting relief from the automatic stay for cause, the Court should grant Bank of America relief from the automatic stay because: (i) the Debtor does not have any equity interest in the Designated Rights, Ocala Loan Files or the Collected Funds, and (ii) the property is not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2). For property to be "necessary to an effective reorganization, within the meaning of the Bankruptcy Code provision governing relief from the automatic stay, it must be demonstrated that reorganization is realistically possible". *See In re Albany Partners, Ltd.*, 749 F. 2d 670 (11th Cir. 1984). In addition, the reorganization must take place within a reasonable time. *See In re Abdulla*, 2009 WL 348465 (Bankr. D. Mass. 2009); *In re Boca Development Associates*, 21 B.R. 624, 630 (Bankr.S.D.N.Y.1982) (modifying stay to allow mortgagee to proceed with foreclosure action where, among other things, debtor failed to establish that an "effective" reorganization was likely within the near future).

As noted above, the Debtor has never owned the Ocala Loans or the Servicing Rights. The only interest the Debtor had was in the Designated Rights, which Bank of America terminated prior to the Petition Date. Furthermore, as also noted above, while the Debtor has a possessory interest in the Ocala Loan Files and the Collected Funds, it does not have an ownership interest in them. Accordingly, the Debtor does not have equity in the Designated Rights, Ocala Loan Files or Collected Funds. Given all of the problems facing the Debtor, including the allegations of financial irregularities, its lack of staff, and its licensing issues, the

Debtor cannot prove that a reorganization is at all possible, let alone likely within a reasonable time.

### III. CONCLUSION

The Court should grant Bank of America relief from the automatic stay to pursue all of its rights and remedies relating to the servicing of the Ocala Loans and compel the Debtor to (A) transfer the Designated Rights, Ocala Loan Files and Collected Funds to a successor servicer, (B) take all other actions necessary to effect the purposes of the prepetition termination of the Designated Rights, and (C) provide Bank of America with an accounting. Cause exists to grant Bank of America relief from the automatic stay because: (i) Bank of America terminated the Designated Rights prior to the Petition Date, and the Debtor no longer has any cognizable interest in the Designated Rights; (ii) the Debtor cannot provide Bank of America with adequate protection of its interest in the Ocala Loans, Servicing Rights, Ocala Loan Files and Collected Funds since, among other things, the Debtor is unreliable, short-staffed and may not even be licensed to service loans; and (iii) homeowners may suffer greatly if stay relief is not granted immediately. Alternatively, the Court should grant Bank of America relief from the automatic stay because the Debtor does not have an equity in the Ocala Loans, Designated Rights, Ocala Loan Files or Collected Funds, and such property is not necessary to an effective reorganization.

**WHEREFORE**, Bank of America respectfully requests the entry of an order granting Bank of America relief from stay to pursue all of its rights and remedies relating to the Debtor's servicing of the Ocala Loan; compelling the Debtor to (A) transfer the Designated Rights, Ocala Loan Files and Collected funds to a successor servicer, (B) take all other actions necessary to effect the purposes of the prepetition termination of the Designated Rights, and (C) provide Bank of America with an accounting; and granting such other and further relief as the Court deems just and proper.

**Dated: September 1, 2009**
        **Miami, Florida**

                                        Respectfully Submitted,

                                        **HUNTON & WILLIAMS, LLP**
*Counsel for Bank of America National Association, as Collateral Agent, Indenture Trustee, and Custodian*
1111 Brickell Avenue - Suite 2500
Miami, FL 33131
Tel: (305) 810-2500
Fax: (305) 810-2460

                                        ____/s/ Andrew Zaron_____
Andrew Zaron (FBN 965790)
Kevin Eckhardt (FBN 412902)

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on September 1, 2009, I electronically filed the foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                /s/ Andrew Zaron
                Andrew Zaron