# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:                                      Chapter 11

**TAYLOR, BEAN & WHITAKER**                 Case No. 3:09-BK-07047-JAF
**MORTGAGE CORP.,**

      **Debtor.**

---

**MOTION OF THE DEBTOR SEEKING ORDER: (A) AUTHORIZING THE
DEBTOR TO OBTAIN POSTPETITION FINANCING FROM THE DIP LENDER
ON A FINAL BASIS PURSUANT TO SECTIONS 105 AND 364 OF THE
BANKRUPTCY CODE; (B) PROVIDING LIENS, SECURITY INTERESTS AND
SUPERPRIORITY CLAIMS TO THE DIP LENDER; AND (C) APPROVING
THE FORM AND METHOD OF NOTICE THEREOF**

---

> **A final hearing to consider and act upon this motion pursuant to Fed. F. Bankr. P.
> 4001(c)(2) will be held in Courtroom 4D, Bryan Simpson United States Courthouse, 300
> North Hogan Street, Jacksonville, Florida, on Thursday, November 5, 2009, at 9:30 a.m.
> before The Honorable Jerry A. Fund, United States Bankruptcy Judge.**

---

Taylor, Bean & Whitaker Mortgage Corp., debtor and debtor-in-possession herein (the

"Debtor"), hereby files this motion (the "Motion") pursuant to sections 105 and 364 of the U.S.

Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), for entry of an

Order approving postpetition financing pursuant to a senior, secured, priming credit facility (the

"DIP Facility").

    (A)    The Motion seeks authorization and approval of the DIP Facility, on the

terms consistent with those set forth in the Debtor-In-Possession Loan Agreement (the

"DIP Loan Agreement"), a copy of which is attached hereto as Exhibit "A" and the other

"DIP Loan Documents" as defined in the DIP Loan Agreement, as they may be modified

from time to time.[1] The DIP Lender shall be Selene Residential Mortgage Opportunity Fund, L.P. ("Selene"). The Advances made under the DIP Loan Agreement (the "DIP Loans") shall be available, among other things, to pay (a) Debtor's ordinary course ongoing operating expenses, and (b) certain administrative fees and expenses approved by the Court. Among other conditions precedent to the DIP Facility is that the Court shall have entered an order in form and content reasonably satisfactory to the DIP Lender, pursuant to the Bid Procedures Motion filed concurrently by the Debtor, providing that Selene RMOF REO Acquisition II LLC ("Acquisition"), which is an affiliate of the DIP Lender, shall have been named the stalking horse bidder for the purchase of the Real Estate Assets identified for sale in the Bid Procedures Motion on terms and conditions that are reasonably acceptable to Acquisition.

(B)    The Motion seeks an order:[2]

a.    That the allowed claims (the DIP Superpriority Claim") of the DIP Lender under the DIP Loan Documents shall have priority, as provided for in Section 364(c) of the Bankruptcy Code over any and all other administrative expenses, except for the payment of up to $2.5 million comprising the Carve-out described below, which includes fees and expense reimbursement due to professionals of the Debtor and of the Committee of Unsecured Creditors (the "Creditors' Committee", and fees of the U.S. Trustee and any chapter 7 trustee appointed for the Debtor;

---

[1]    Defined terms used in this Motion and not defined herein shall have the meaning given to such terms in the DIP Loan Agreement.

[2]    This Motion contains a summary of the salient terms of the DIP Loan Agreement and is qualified in its entirety by reference to the provisions of the DIP Loan Agreement and the proposed Order annexed hereto.

2112624v4

b.    That the liens of the DIP Lender shall be, and be deemed immediately secured by, first-priority liens (the "DIP Liens"), as provided for in Sections 364 (c) and (d) of the Bankruptcy Code, upon a discrete portfolio of REO residential properties identified on Exhibit "B" hereto (the "DIP Lien REO Properties"), the proceeds thereof being collectively referred to as the "Collateral";

c.    If necessary, that adequate protection, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, shall be granted to those entities, if any, holding existing liens or claims upon the DIP Lien REO Properties, which liens and claims are to be junior to liens to be granted to the DIP Lender pursuant and subject to the terms of the Order; and

d.    That a hearing (the "Hearing"), pursuant to Bankruptcy Rule 4001 shall be held on the Motion for this Court to consider entry of an order (the "Order")[3] approving the DIP Facility, on a permanent basis, as set forth herein and in the DIP Loan Agreement.

In support of its Motion, the Debtor respectfully represents as follows:

## BANKRUPTCY RULE 4001 SUMMARY OF RELIEF REQUESTED

Pursuant to Bankruptcy Rule 4001(c)(1)(B), a concise statement of material provisions of the proposed DIP Loan Agreement and form of Order is as follows:

---

[3]    A copy of the proposed Order is annexed hereto as Exhibit "C" hereof.

2112624v4

A.   Interest Rate:  The LIBOR Rate plus 8.00%.  The default interest rate is the LIBOR Rate plus 13%.  (*See* DIP Loan Agreement § 2.3(a)).

B.   Maturity:  The earliest to occur of (1) the effective date of a plan of reorganization for the Debtor approved by the Bankruptcy Court, (2) the sale of all or substantially all of Debtor's Real Estate Assets under Section 363 of the Bankruptcy Code, or (3) the date that is 180 days after entry of the Order.  (*See id.*, § 2.4(b)(i)).

C.   Events of Default:  Failure to make a payment when due; breach of any representation, warranty, or covenant after applicable grace or cure periods have expired; material adverse changes; injunction against the Debtor; failure of this Court to enter an order approving the 363 Sale within 150 days after the date of the DIP Loan Agreement; failure to close the 363 Sale within 180 days after the DIP Loan Agreement; default by the Debtor under the Order; payment by the Debtor of an unauthorized payment; or invalidity of the DIP Loan Documents; or creation of liens or allowance of claims in parity with or superior to the Superpriority Claims of the DIP Lender.  (*See id.* Article 8).

D.   Liens:  The DIP Lender shall have first priority liens under Sections 364 (c) and (d) on a portfolio of residential properties identified on Schedules 4.1(a), (b) and (c) to the DIP Loan Agreement, comprising the DIP Lien REO Properties and related assets, which had been, prior to Debtor taking title pursuant to foreclosure sales, the subject of mortgages securing mortgage loans.  (*See id.* § 4.1).

E.   Borrowing Limits:  Up to principal amount of $25 million and potentially another $175,000.  (*See id.* § 2.1(a) and §13.7).

- 4 -

F.  <u>Borrowing Conditions</u>:  Delivery of DIP Loan Documents, corporate resolutions, entry of the Order and the Bid Procedures Order, naming Acquisition as the stalking horse bidder for Debtor's Real Estate Assets, which shall not be subject to an appeal or stay, no Default or Event of Default existing, evidence that insurance required by the DIP Loan Documents is in force, delivery of legal opinions, acknowledgments by non-SPE subsidiaries consenting to the DIP financing; the DIP Lender's satisfaction with its due diligence investigation of the Collateral; Debtor's certification of notice of this Motion and relief sought in the Order has been provided to the Subsidiaries, SecurityOne Valuation Services, LLC and the Debtor's pre-petition warehouse lenders and delivery by the Debtor of a Borrowing Base Certificate.  (*See id.* Article 3).

G.  <u>Priming Lien Under Section 364(d)</u>:  Debtor believes that there are no valid consensual liens or mortgages on the DIP Lien REO Properties.  The Motion does not seek to prime any known non-consensual liens for taxes or otherwise.  Nevertheless, out of an abundance of caution, the Debtor will seek a priming lien as to any entity that is able to establish at the Hearing that it possesses a valid lien on the DIP Lien REO Properties that are not exempted from the DIP Liens under the Credit Agreement.

H.  <u>Adequate Protection</u>:  Debtor does not believe that it will be necessary to provide adequate protection to any entity in exchange for the DIP Liens.  However, if ordered by this Court, the DIP Loan Agreement allows the Debtor to make such payments.  (*See id.* § 4.3(d)).

I.    <u>Waiver of Automatic Stay</u>:  The Order will provide that the automatic stay terminates five (5) business days after notice is given of the occurrence of an event default unless the Court holds that no event of default occurred.

J.    <u>Section 506(c) Limitation</u>:  Claims under 506(c) are deemed waived.  (*See id.* § 8.12).

K.    <u>Indemnity Provisions</u>:  The DIP Lender is entitled to be indemnified and held harmless for certain liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of the DIP Loan Documents, and to other indemnification provisions as more particularly described in the DIP Loan Agreement. (*See id.* § 10.01).

## JURISDICTION

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014.

## BACKGROUND

2.    On August 24, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Clerk of this Court.

2112624v4

3. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to §§ 1107 and 1108.

4. Until very recently, the Debtor was the largest independent (i.e. non-depository owned) mortgage lender in the United States. Headquartered in Ocala, Florida, the Debtor employed approximately 2,400 people across the country. The largest offices were in Ocala, Florida; Atlanta, Georgia; and Tampa, Florida. The Debtor's principal business was comprised of:

- Origination, underwriting, processing and funding of conforming conventional and government-insured residential mortgage loans;

- Sale of mortgage loans into the "secondary market" to government-sponsored enterprises such as the Federal Loan Mortgage Corporation ("**Freddie Mac**") or the Government National Mortgage Association ("**Ginnie Mae**"); and

- Mortgage payment processing and loan servicing.

5. For a detailed description of the Debtor's business operations and the reasons for the filing of this Case, please see the description contained in the Debtor's Case Management Summary [Docket No. 4].

6. In the course of its normal operations, Debtor has acquired title through foreclosure sales conducted under the direction of Debtor to approximately 2000 residential properties located throughout the United States, which properties had been subject to mortgages securing mortgage loans. These residential properties, which include without limitation the DIP Lien REO Properties, are referred to in this Motion as the "REO Properties." Debtor holds fee simple title to the DIP Lien REO Properties free and clear of any valid liens, claims or encumbrances, other than possible encumbrances in the nature of tax liens and easements or

- 7 -

other Permitted Liens described in the DIP Loan Agreement. (The Debtor does not concede that its title to the remainder of the REO Properties is subject to such liens, claims or encumbrances).

7.     The Debtor is in need of additional financing to, among other things, (a) permit the orderly liquidation of its business, including without limitation the "Servicing Reconciliation" which is the subject of the Stipulation and Agreed Order Between Taylor, Bean & Whitaker Mortgage Corp. and Federal Deposit Insurance Corporation, as Receiver for Colonial Bank dated September 11, 2009 [Docket No. 222] and (b) pay the costs of administration of its estate. Absent an infusion of liquidity, the Debtor is likely to experience significant disruptions in its ability to liquidate its operations on an orderly basis, which ultimately would have a disastrous effect on the value of the Debtor's estate.

8.     As part of the Debtor's recent financial analysis and projections, the Debtor has developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. A copy of the forecast is attached hereto as Exhibit "D." This forecast considers a number of factors, including, among others, the impact of a bankruptcy filing, material cash disbursements and required payments.

9.     Absent approval of the DIP Facility, the Debtor's financial analysis and projections make clear that the Debtor's current cash on hand and cash generated from liquidations will be insufficient to, among other things, complete the Servicing Reconciliation and continue the orderly wind-down of its business and satisfy other working capital and administrative expense needs during the pendency of this Chapter 11 case, all of which are necessary to preserve the value of the estate.

2112624v4

## RELIEF REQUESTED

**A.    Detailed Summary of DIP Facility.**

10.    By this Motion, the Debtor seeks the issuance and entry of an Order of this Court granting the Debtor the authority to obtain debtor-in-possession financing under the terms and provisions of the DIP Loan Agreement and the DIP Loan Documents.  The salient provisions of the DIP Loan Agreement are as follows:

   a.    <u>Borrower</u>.  Taylor Bean & Whitaker Mortgage Corp.

   b.    <u>DIP Lender</u>.  Selene and/or other financial institutions selected by Selene.

   c.    <u>DIP Facility</u>.  A first priority secured credit facility to be provided to the Borrower with a maximum credit amount of $25,000,000.

   d.    <u>Maturity of the DIP Facility</u>.  The earliest to occur of (1) the effective date of a Chapter 11 plan for the Debtor, (2) the sale of substantially all of Debtor's Real Estate Assets under Section 363, or (3) the date that is 180 days after entry of the Order. (*See id.*, § 2.4(b)(i)).

   e.    <u>Use of Proceeds</u>.  The DIP Facilities shall be used, among other things, to pay (a) Debtor's ordinary course ongoing operating expenses, and (b) certain administrative fees and expenses approved by the Court.

   f.    <u>Security</u>.  Except for the Carve-out, the DIP Facility shall be secured in accordance with sections 364(d) of the Bankruptcy Code by valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in, and liens upon the Collateral.

g. <u>Carve-out</u>. As discussed in more detail below, the DIP Lender's liens will be subject to a Carve-out for certain professional fees, administrative expenses, U.S. Trustees' fees and any Chapter 7 trustee's fees in an aggregate amount up to $2,500,000.

h. <u>Interest</u>. Advances outstanding under the Revolver would bear interest at the LIBOR Rate plus 8.00%. The default rate of interest is the LIBOR Rate plus 13.00%.

i. <u>Mandatory Repayments</u>:

(i) <u>Termination Date</u>: The Obligations are due and payable on the Termination Date.

(ii) <u>Asset Sales</u>: Repayments in the amount of all of the Net Cash Proceeds of the sale or other disposition of any of the DIP Lien REO Properties.

(iii) <u>Extraordinary Receipts</u>: Proceeds from any insurance tax or condemnation claims or awards.

j. <u>Conditions to Closing and Funding</u>. Other conditions appropriate in the judgment of DIP Lender and customary for financings of this type, including, without limitation, the following: Delivery of DIP Loan Documents, corporate resolutions, entry of the Order and the Bid Procedures Order, naming Acquisition as the stalking horse bidder for Debtor's Real Estate Assets, which shall not be subject to an appeal or stay, no Default or Event of Default existing, evidence that insurance required by the DIP Loan Documents is in force, delivery of legal opinions, acknowledgments by non-SPE subsidiaries consenting to the DIP financing, the DIP Lender's satisfaction with its due diligence investigation of the Collateral, Debtor's certification of notice of this Motion and relief sought in the Order has been provided to the Subsidiaries, SecurityOne Valuation Services, LLC and the Debtor's pre-petition warehouse lenders and delivery by the Debtor of a Borrowing Base Certificate.

2112624v4

k.    <u>Events of Default</u>. As set forth in the DIP Loan Agreement, the following is a brief summary of the "Events of Default" as defined therein: failure to make a payment when due; breach of any representation, warranty, or covenant after applicable grace or cure periods have expired; material adverse changes; injunction against the Debtor; failure of Debtor to obtain from this Court an order approving the 363 Sale within 150 days after the date of the DIP Loan Agreement; failure to close the 363 Sale within 180 days after the DIP Loan Agreement; default by the Debtor under the Order; payment by the Debtor of an unauthorized payment; invalidity of the DIP Loan Documents; or creation of liens or allowance of claims in parity with or superior to the Superpriority Claims of the DIP Lender.

## B.    The Critical Need for the DIP Facility.

11.    The DIP Facility is the only financing available to the Debtor at this time. The Debtor has been unable to procure sufficient financing (a) in the form of unsecured credit allowable under Section 364(a) or (b) of the Bankruptcy Code or (b) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. Thus, based on the foregoing and for the reasons set forth below, the Debtor submits that it has satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to Sections 364 (c) and (d) of the Bankruptcy Code.

12.    Entry into the DIP Facility and securing financing thereunder is absolutely necessary to the preservation of the value of the estate's assets and is in the best interest of the Debtor's creditors and all parties in interest; therefore, entry into the DIP Facility is an exercise of the Debtor's sound business judgment. Given the Debtor's constrained liquidity, the DIP Facility is of critical importance to operating the Debtor's business and preserving value.

Preservation of the value of its assets are preserved, thereby providing a greater recovery to the Debtor's creditors than would be realized if the Debtor was forced to convert to Chapter 7. Accordingly, the Debtor submits that the availability of credit under the DIP Facility is necessary to preserve and enhance the value of its estate for the benefit of all stakeholders in this Chapter 11 case.

**C.      Approval Under Sections 364 (c)(2) and (d) of the Bankruptcy Code.**

13.      Section 364 of the Bankruptcy Code allows a debtor to: (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security. If a debtor-in-possession cannot obtain postpetition credit on an unsecured basis, a bankruptcy court may authorize the obtaining of credit or the incurring of debt, the repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, or combination of the foregoing.

14.      Section 364(c)(2) authorizes the obtaining of credit secured by a lien on property of the estate that is not otherwise subject to a lien. As set forth above, Debtor does not believe that the DIP Lien REO Properties are subject to any valid consensual liens.

15.      Additionally, Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

16.     As noted above, the need for the Debtor to obtain financing is critical. Further, the evidence at the Hearing will show that a working capital facility of the type needed in this chapter 11 case could not have been obtained on any other basis.

17.     The Debtor proposes to obtain financing under the DIP Facility, the DIP Loan Documents and the Order by seeking, pursuant to section 364(c)(2) of the Bankruptcy Code, to provide for senior security interests in, and liens upon, the Collateral.

18.     In addition, the Debtor is seeking authority, pursuant to section 364(d) of the Bankruptcy Code, to prime and any valid liens which may exist on the Collateral (as defined in the DIP Loan Agreement). Accordingly, Debtor seeks authority to grant adequate protection to any entity whose liens or claims are being primed by the DIP Facility (the Debtor does not concede that any entity is entitled to adequate protection).

19.     Absent the consent of the secured party to be primed or subordinated, the Bankruptcy Code generally requires a debtor to demonstrate that alternative sources of credit are not available under the other provisions of section 364 of the Bankruptcy Code, prior to allowing a debtor to grant a priming lien on encumbered property. *See RTC v. Swedeland Development Group Inc. (In re Swedeland Development Group, Inc).* 16 F.34 552, 563 (3d Cir. 1995); *In re Snowshoe*, 789 P.24 at 1087. Moreover, courts will accord a great deal of weight to a Debtor's need for financing in order to continue to operate when coupled with the Debtor's inability to obtain alternative financing without granting priming liens. *See, e.g., In re Snowshoe*, 789 F.2d at 1088 (lack of alternative financing and need to obtain cash infusion to preserve value); *Ames* 115 B.R. at 40.

2112624v4

**D.    The Debtor's Lack of Alternative Financing.**

20.    It is well recognized that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions.  *See, e.g., Transcript of Record at 734-35:24-1, In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); *In re Snowshoe Co. Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable).  Indeed, courts often recognize that where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).  Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Section 364(a) and (b).  *See Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

21.    No party in interest can credibly deny that the current market for financing is exceedingly strained as the global economy continues to deal with the current credit crisis. Simply put, because of current economic conditions, there is no ready market for any financing, including debtor-in-possession financing or otherwise and provisions once considered "extraordinary" in debtor-in-possession financing arrangements have, for the time being, become standard.  *See, e.g., Lyondell*, Tr. At 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now."); Transcript of Record 123:17-25, 123:1, *Chemtura*, (S.D.N.Y. Mar. 20, 2009) (J. Gonzalez noting

- 14 -

support for finding that DIP with roll-up provision was the only funding available to meet the Debtor's needs at that time).

22.     The only significant source of liquidity required by the Debtor that is available at this time is that afforded by the DIP Facility. Accordingly, the Debtor submits that terms of the DIP Loan Agreement are the only terms available to the Debtor.

23.     The evidence at the Hearing will show that a working capital facility of the type needed by the Debtor could not have been obtained on any other basis. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at1087.

24.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364. *See In re Snowshoe Co.*, 789 F.2d at 1087; *In re Plabell*, 137 B.R. at 900. Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley. Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Say. Bank FSB v. Sky Valley*, 99 B.R. 1997, 120 n.4 (M.D. Ga. 1989).

25.     The Debtor has engaged in discussions and negotiations with various parties in an effort to obtain additional liquidity and financing. In addition to debtor-in-possession financing, the Debtor also discussed and contemplated the use of cash collateral, without any additional financing, to fund operations during the Chapter 11 case. However, available and projected cash collateral will not be sufficient to meet the Debtor's projected liquidity needs. Thus, to provide

the Debtor with appropriate and necessary financing, the negotiation of adequate liquidity in the form of debtor-in-possession financing is critical.

26. During the negotiations, the Debtor went to great lengths to achieve the best deal possible for its constituents. The DIP Lender made several key concessions, including, among others, that the DIP Lender agreed to a more limited number of deliverables required by the Debtor as a condition to closing the DIP Facility, and agreed to accept more narrow representations, warranties and covenants than it originally proposed. The DIP Loan Agreement grants the Debtor considerable flexibility in the use of loan proceeds and does not impose onerous reporting requirements on the Debtor.

27. In this extremely challenging credit market, the Debtor has been unable to find alternative or better financing on the terms and of the type and magnitude required in this Chapter 11 case on an unsecured basis, or without offering terms substantially similar to those of the DIP Facility. Based on this, as well as the foregoing factors and in light of the fair and thorough negotiation process, this DIP Facility is the only feasible financing option for the Debtor and is in the best interests of the Debtor's estate.

## E. Use of DIP Facility Proceeds

28. The proposed Order provides that, upon finalizing and executing the DIP Loan Documents, the Debtor will immediately be authorized to borrow the amount of available borrowings under the DIP Loan Agreement.

29. Attached hereto as Exhibit "D" is an operating budget (the "Budget") for the period of October 9, 2009 to January 1, 2010 (the "Budget Period"). The Budget has been prepared by the Debtor and represents the Debtor's projection of those costs which are

- 16 -

reasonable and necessary for the Debtor's continued operations during the Budget Period. The DIP Facility will be used to provide the liquidity necessary to fund the amounts set forth in the Budget.

30.     The Budget has been reviewed and approved by the DIP Lender.

**F.      The Carve-out.**

31.     In order to ensure payment of legal fees and expenses to the professionals retained by the Debtor and the Creditors' Committee, the Order provides for a carve-out from the DIP Superpriority Claim and the DIP Liens. The DIP Superpriority Claim and the DIP Liens shall be subject to payment of the following in an amount not to exceed $2,500,000 in the aggregate (collectively, the "Carve-out"): (i) (a) the unpaid fees of the clerk of this Court, (b) the unpaid fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717, and (c) up to $50,000 for unpaid fees and disbursements, including reasonable attorneys' fees of a chapter 7 trustee appointed in this Case pursuant to section 726 of the Bankruptcy Code, and (ii) up to $2,400,000 for the payment of the aggregate allowed unpaid fees and expenses during this Case arising after the occurrence of an Event of Default and the acceleration of the Obligations pursuant to Section 9.1 of the DIP Loan Agreement payable under Sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtor and the Creditors' Committee; provided, however, that no proceeds of the Collateral and no amounts received pursuant to the professional carve-out shall be used to in any manner that constitutes an Adverse Bankruptcy Action as described in the DIP Loan Agreement, including, without limitation, (A) seeking to challenge the validity, amount, priority, perfection or enforceability of the Obligations and the DIP Liens; (B) seeking to invalidate, set aside, avoid or subordinate any part of the Obligations or the DIP Liens or to hinder or delay the DIP Lender in

any material respect in enforcing the Obligations and the DIP Liens; (C) seeking to assert any claims or defenses against the DIP Lender or its affiliates; (D) seeking to authorize the Debtor to obtain post-petition credit other than from the DIP Lender without the DIP Lender's consent; or (E) that hinders or delays the DIP Lender's realization on any of the Collateral or the enforcement of rights or remedies under the DIP Loan Documents or this Order, except to challenge whether an Event of Default has occurred.

## G.    Application of the Business Judgment Standard

32.    As described above, the Debtor's present management has concluded that the DIP Facility, as proposed, is the best alternative available under the circumstances. Bankruptcy courts routinely defer to a Debtor's business judgment on most business decisions, including the decision to borrow money. *Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *Ames*, 115 B.R. at 38 (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus Inc.*, 37 B.R. 3, 42 (Bankr, S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.    In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions

- 18 -

involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

34.     The Debtor has exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Agreement. The terms of the DIP Agreement are fair and reasonable, are the result of extensive arms-length negotiations, and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to borrow funds from the DIP Lender on the secured, administrative superpriority basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, and take the other actions requested herein.

35.     The Debtor believes that it could not obtain financing from any other lender on terms more favorable than the DIP Loan Agreement offered by the DIP Lender. The Debtor's management exercised its best business judgment in negotiating the DIP Lender that is presently before the Court.

## H.     Good Faith.

36.     Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."). *See also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr.

Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

37.    The DIP Loan Agreement was the result of good faith and arm's-length negotiations, with all parties represented by counsel. The Debtor believes that the terms of the DIP Loan Agreement are fair and reasonable under the circumstances, and that the DIP Lender is entitled to the benefits of section 364(e) of the Bankruptcy Code.

**I.    Request for Modification of Automatic Stay.**

38.    As set forth more fully in the proposed Order, the proposed DIP Facility contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the DIP Lender to take certain actions required or permitted by the Order. More specifically, the Order provides the DIP Lender with relief from the automatic stay upon the occurrence of specified events of default and the Debtor's failure to cure or contest same successfully to allow the DIP Lender, *inter alia*, to enforce certain remedies against the Collateral, without having to obtain any further order of this Court. The Order further provides that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Lender shall be required to give five (5) business days' written notice to each of counsel for the Debtor and counsel for the Creditors' Committee and the U.S. Trustee, as provided for in the DIP Loan Documents.

39.    The Debtor submits that stay modification provisions of this sort are ordinary and usual features of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Order.

2112624v4

**J.    Request for Hearing.**

40.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests that the Court set a hearing date that is no earlier than 15 days from the filing of this Motion for consideration of entry of the Order.

**K.    Request for Waiver of Stay.**

41.    The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Facility is essential to prevent considerable damage to the Debtor's operations, value and ability to reorganize.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the ten (10) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

42.    Pursuant to sections 102(1), 363(c) and 364 of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c), notice of this Motion and the proposed Order has been provided via facsimile, overnight delivery service, electronic transmission or same-day messenger service to: (i) counsel for the Creditors' Committee, (ii) the Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee"), (iii) all other parties requesting notice in this case; and (iv) all other parties indicated on the Certificate of Service to be filed with respect to this Motion.  The Debtor respectfully submits that no other or further notice should be required.

2112624v4

## CONCLUSION

**WHEREFORE** the Debtor respectfully requests entry of an Order granting the relief requested herein, and granting the Debtor such other and further relief as may be just.

This 21st day of October 2009.

/s/ Jeffrey W. Kelley
Ezra H. Cohen (GA Bar No. 173800)
Jeffrey W. Kelley (GA Bar No. 412296)
Hazen H. Dempster (Ga Bar No. 217592)
Jeffrey.kelley@troutmansanders.com
**TROUTMAN SANDERS LLP**
Bank of America Plaza
600 Peachtree Street, N.E. - Suite 5200
Atlanta, Georgia 30308-2216
Telephone No.: (404) 885-3000
Facsimile No.: (404) 885-3900
**SPECIAL COUNSEL FOR THE DEBTOR**

/s/ Russell M. Blain
Russell M. Blain (FBN 0236314)
rblain@srbp.com
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone No.: (813) 229-0144
Facsimile No.: (813) 229-1811
**ATTORNEYS FOR DEBTOR**

2112624v4