# EXHIBIT "A"
# DIP Loan Agreement

# DEBTOR-IN-POSSESSION LOAN AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "Agreement") is entered into as of October 21, 2009 between Taylor, Bean & Whitaker Mortgage Corp., a Florida corporation and a debtor and a debtor-in-possession ("Borrower"), and Selene Residential Mortgage Opportunity Fund L.P., a Delaware limited partnership (together with any other party joined hereto or participating as a lender from time to time pursuant to Section 13.1, "Lender"). Capitalized terms utilized herein shall have the meanings ascribed to such terms in Section 1.1 of this Agreement.

## RECITALS

WHEREAS, on August 24, 2009 ("Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and has retained possession of its assets and is authorized under Bankruptcy Code Sections 1107 and 1108 to continue the management and operation of its business as a debtor-in-possession;

WHEREAS, by order of the Bankruptcy Court dated September 3, 2009, Neil F. Luria of Navigant Capital Advisors LLC ("Navigant") was appointed to serve as Chief Restructuring Officer of Borrower (the "Chief Restructuring Officer");

WHEREAS, as of the Petition Date, Borrower was a national wholesale mortgage lender;

WHEREAS, Borrower has requested that Lender provide a debtor-in-possession financing facility to Borrower that will provide a certain amount of funds that Borrower requires to supplement any available cash revenues, principally to (i) pay Borrower's ongoing and budgeted operating expenses, and (ii) pay certain allowed Administrative Fees and Expenses;

WHEREAS, Lender has indicated its willingness to agree to extend that financing to Borrower upon the terms and conditions set forth in this Agreement and upon the entry of a Financing Order acceptable to Lender;

WHEREAS, Borrower has agreed to use its best efforts to provide Lender with protection, as described in this Agreement and the Financing Order(s), subject to the approval of the Bankruptcy Court; and

WHEREAS, Borrower shall use its best efforts to have the Bankruptcy Court enter the Financing Order pursuant to which Lender shall make post-petition loans, advances and other financial accommodations to Borrower, subject to any limitations as set forth in the Financing Order and/or this Agreement.

NOW, THEREFORE, in consideration of these premises and of the mutual undertakings set forth herein, the parties hereto agree to as follows:

# ARTICLE 1

# DEFINITIONS AND CONSTRUCTION

**1.1. Terms.** As used in this Agreement, the following terms shall have the following meanings:

"*363 Sale*" shall have the meaning ascribed to such term in Section 6.7. "*Acquisition*" shall have the meaning ascribed to such term in Section 3.1(a)(iii).

"*Acknowledging Subsidiary*" means any wholly-owned Subsidiary of Borrower (other than any of the Special Purpose Subsidiaries) and any Subsidiary of Borrower for whom the Chief Restructuring Officer has the power to act on behalf of such Subsidiary.

"*Adjustments*" means, as of the date of determination, an amount equal to the sum of:

(a) any and all unpaid property taxes due and owing (whether or not contested) with respect to the Eligible Real Estate Assets set forth in a Current Broker Price Opinion;

(b) any and all unpaid mechanics liens due and owing (whether or not contested) with respect to the Eligible Real Estate Assets set forth in a Current Broker Price Opinion;

(c) in the case of any Eligible Real Estate Assets that has been the subject of a condemnation, fire, flood or other type of casualty event or has otherwise been destroyed, an amount as reasonably determined by Lender, equal to diminution in Value resulting from such condemnation, fire, flood or other type of casualty event or destruction that has either occurred after the date of a Current Broker Price Opinion with respect to such Eligible Real Estate Assets or has not been adequately provided for in the determination of the Quick Sale Value set forth in the Current Broker Price Opinion;

(d) The diminution in Value of any Eligible Real Estate Assets from the Reconciled Value of such Eligible Real Estate Asset, as reasonably determined by Lender in its good faith based on material information not considered in the Current Broker Price Opinion or which is materially different than the information considered in the Current Broker Price Opinion; and

(e) the Value of any Eligible Real Estate Assets that has been sold or otherwise disposed of by Borrower and is set forth in a Current Broker Price Opinion.

"*Administrative Expense*" means a claim against Borrower and/or its estate in the Case that is an administrative expense claim having priority over unsecured claims pursuant to Section 503(b) of the Bankruptcy Code.

"*Administrative Fees and Expenses*" means any claim, as allowed by the Bankruptcy Court, against Borrower for fees and/or expenses pursuant to Bankruptcy Code Sections 327, 328 and/or 330.

"*Advance Commitment*" means with respect to Lender, the aggregate commitment of Lender to make Advances from and after the entry of the Financing Order, in an aggregate amount not to exceed $25,000,000, subject to the conditions set forth in Sections 2.1, 3.1 and 3.2.

"*Advances*" means all loans, advances and other financial accommodations by Lender to or on account of Borrower under Section 2.1.

"*Agreement*" means this Debtor-in-Possession Loan Agreement, as amended, modified, revised or restated from time to time.

"*Authorized Officer*" means any officer or other representative of Borrower authorized to transact business with Lender.

"*Availability*" means, at any time, an amount equal to (a) $25,000,000, minus (b) the aggregate amount of Advances made by Lender under this Agreement.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. Sections 101 et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Middle District of Florida or such other court having jurisdiction over the Case.

"*Bid Procedures Motion*" means the motion filed by Borrower seeking approval of bidding procedures for, and the sale of, the Real Estate Assets.

"*Bid Procedures Order*" shall have the meaning ascribed thereto in Section 3.1(a)(iii).

"*Borrower's Books*" means all of Borrower's books and records including all of the following: ledgers; records indicating, summarizing, or evidencing Borrower's assets or liabilities; all information relating to Borrower's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information, and the facilities containing such information, but specifically excluding Borrower's corporate minute books, stock ledgers and the like.

"*Borrower's Request*" means a request by Borrower for an Advance hereunder in the form of Exhibit A.

"*Borrowing Base*" means, at any time, an amount equal to (a) thirty five percent (35%) of the Value of the Eligible Real Estate Assets minus (b) the Adjustments and minus (c) $2,500,000.

"*Borrowing Base Certificate*" means a certificate signed and certified as accurate and complete by the Chief Restructuring Officer of Borrower in substantially the form of Exhibit B or another form which is acceptable to Lender.

"*Broker Price Opinion*" means a determination of the Quick Sale Value of the Real Estate Assets described therein made by one or more unaffiliated vendors mutually approved in writing by Lender and Borrower.

"*Business Day*" means any day which is not a Saturday, Sunday, or other day on which banks in the State of New York are authorized or required to close.

"*Carve-out*" means an amount not to exceed $2,500,000, equal to the sum of (i) (a) the unpaid fees of the clerk of the Bankruptcy Court, (b) the unpaid fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717, and (c) up to $50,000 for unpaid fees and disbursements, including reasonable attorneys' fees of a chapter 7 trustee appointed in this Case pursuant to Bankruptcy Code Section 726, and (ii) up to $2,400,000 for the payment of the aggregate allowed unpaid fees and expenses during the Case arising after the occurrence of an Event of Default and the acceleration of the Obligations pursuant to Section 9.1 hereof (the "Professional Carve-out") payable under Sections 330 and 331 of the Bankruptcy Code to professionals ("Professional Persons") retained pursuant to an order of the Court by Borrower and any official creditors committee that may be appointed. The Carve-out shall be funded as set forth in Section 4.4. "*Case*" means the reorganization case of Borrower under Chapter 11 of the Bankruptcy Code, pending in the Bankruptcy Court as Case No. 09-07047.

"*Chief Restructuring Officer*" shall have the meaning ascribed to such term in the above Recitals.

"*Collateral*" means those certain assets of the Borrower securing the Obligations of Borrower hereunder as more particularly described in Section 4.1.

"*Current Broker Price Opinion*" means a Broker Price Opinion that is dated not more than one hundred twenty (120) days prior to the date of determination of the Borrowing Base.

"*Daily Balance*" means the amount of the Obligations owed at the end of a given day.

"*Default*" means any event or occurrence or set of facts which could constitute an Event of Default with the passage of time or the giving of notice.

"*DIP Loan Documents*" means, collectively, this Agreement, the Note, any Financing Order, each Borrower's Request, or other agreements, instruments, amendments, or documents, if any, which create, evidence, create a security interest in or secure the Note, and any other agreement, instrument, amendment, or document entered into between Borrower and Lender or in favor of Lender relating to or in connection with this Agreement or the Obligations; provided, that the Asset Purchase Agreement executed and delivered in connection with the 363 Sale shall not be deemed to be a DIP Loan Document.

"*Effective Date*" means the date on which all of the conditions set forth in Section 3.1 have been satisfied or waived in writing by Lender in Lender's sole discretion.

"*Eligible Real Estate Assets*" means the Real Estate Assets owned by Borrower and held for resale by Borrower, provided that, such Real Estate Assets are: (i) subject to the first priority, valid and perfected security interest of Lender and are not subject to any other Liens except Permitted Liens; (ii) set forth in a Broker Price Opinion delivered to Lender, (iii) described in a title report that contains no exception to clean title other than Permitted Liens; (iv) located in the United States; (v) approved by Lender after completion of any due diligence investigation of

such Real Estate Asset and Lender's first priority, valid and perfected security interest therein as determined by Lender; and (vi) in compliance with the representations and warranties set forth in Section 5.12(b). In the event that a Real Estate Asset, which was previously an Eligible Real Estate Asset, ceases to be an Eligible Real Estate Asset hereunder, Borrower shall notify Lender on and at the time of submission of the next Borrowing Base Certificate.

"*Equipment*" shall have the meaning ascribed to such term in Section 4.1(g).

"*Event of Default*" means any event specified in Article 8.

"*Extraordinary Receipts*" shall have the meaning ascribed to such term in Section 2.4(b)(iii).

"*Financing Order(s)*" means the order, in the form attached hereto as Exhibit C or as otherwise approved by Lender, authorizing, inter alia, the granting of credit by Lender to Borrower pursuant to Section 364 of the Bankruptcy Code, entered by the Bankruptcy Court in the Case, and any subsequent order pursuant to Section 364 of the Bankruptcy Code, in each case, that is satisfactory in form and content to and consented to by Lender.

"*Fixtures*" shall have the meaning ascribed to such term in Section 4.1(h).

"*GAAP*" means generally accepted accounting principles consistently applied.

"*Improvements*" shall have the meaning ascribed to such term in Section 4.1(e).

"*Indemnified Liabilities*" shall have the meaning ascribed to such term in Section 10.1.

"*IRC*" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"*Land*" shall have the meaning ascribed to such term in Section 4.1(a).

"*Leases*" shall have the meaning ascribed to such term in Section 4.1(j).

"*Lender*" means Lender named in the caption of this Agreement.

"*LIBOR Rate*" means the daily thirty (30)-day London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) that appears on Bloomberg as of approximately 11:00 a.m. (New York time) on such date of determination; provided, that if such index ceases to exist or is no longer published or announced, then the term "LIBOR Rate" means the thirty (30)-day London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) as published in The Wall Street Journal on such date of determination, provided however that in no event shall the LIBOR Rate be less than one percent (1.00%) per annum. The LIBOR Rate is subject to change on a daily basis.

"*Liens*" means with respect to any property of any Person, any mortgage, lien, deed of trust, hypothecation, fiduciary transfer of title, assignment by way of security, pledge, charge, lease, sale and lease-back arrangement, easement, servitude, trust arrangement, or security

interest, encumbrance or claim (including, but not limited to, any "claim" as defined in Section 101(5) or "lien" as defined in Section 101(37) of the Bankruptcy Code) of any kind in respect of such property, or any preferential arrangement having the practical effect of constituting a security interest with respect to the payment of any obligation with, or from the proceeds of, any property of any kind (and a Person shall be deemed to own subject to a Lien any property that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property), whether arising prior to, on, or subsequent to the commencement of the Case, whether imposed by agreement, understanding, law, equity or otherwise.

"*Material Adverse Change*" means a material adverse change in (a) the Collateral taken as a whole or (b) the validity or enforceability of the Financing Order(s) or any of the DIP Loan Documents, or (c) the rights and remedies of Lender under the Financing Order(s) and any of the DIP Loan Documents.

"*Navigant*" shall have the meaning ascribed to such term in the above Recitals.

"*Net Cash Proceeds*" means, with respect to any disposition or sale of the Collateral, the aggregate gross cash proceeds payable to, or for the benefit of Borrower from such disposition or sale (including, without limitation, cash received by way of deferred payment pursuant to a note receivable, conversion of non-cash consideration, cash payments in respect of purchase price adjustments or otherwise, but only as and when such cash is received) minus: (i) the direct, actual and customary third-party costs and expenses incurred in connection therewith to unaffiliated third parties (including in the case of any such disposition or sale, brokerage fees and reasonable attorney's fees and expenses and reimbursement of costs and expenses incurred by Navigant in connection with such disposition or sale); minus (ii) the fee payable to Navigant in connection with such sale in an amount not to exceed 25 basis points of such sale price; and minus (iii) any provision for the actual amount of real estate taxes payable by Borrower to the extent paid, offset from the gross cash proceeds or escrowed by a title agent or title insurance for such payment. For purposes of the definition of "Net Cash Proceeds," Navigant shall be deemed to be an unaffiliated third party of Borrower.

"*Note*" means the promissory note, substantially in the form of Exhibit D hereto, made by Borrower to the order of Lender concurrently herewith or at any time hereafter.

"*Notice Expenses*" shall have the meaning ascribed to such term in Section 13.6(b).

"*Obligations*" means all loans, advances, including but not limited to Advances, and any overadvances, debts, liabilities, obligations, covenants, duties, and the obligation to pay or reimburse Lender for fees and expenses, owing by Borrower to Lender of any kind and description in connection with any of the DIP Loan Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Borrower to others which Lender may obtain by assignment or otherwise, and all interest thereon.

"*Operating Report*" means any operating report to be supplied by Borrower pursuant to Section 6.1(b).

*"Overadvanced Amount"* shall have the meaning ascribed to such term in Section 2.1(b).

*"Permitted Liens"* shall have the meaning ascribed to such term in Section 4.3(a).

*"Person"* means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof) and shall include such Person's successors and assigns.

*"Petition Date"* shall have the meaning ascribed to such term in the above Recitals.

*"Professional Persons"* shall have the meaning ascribed to such term in the definition of "Carve-out."

*"Professional Carve-out"* shall have the meaning ascribed to such term in the definition of "Carve-out."

*"Quick Sale Value"* means the anticipated sales price for any Real Estate Asset in an as-is condition with the intention to sell such Real Estate Asset within thirty (30) days from such date of determination.

*"Real Estate Assets"* means all of the Land and the Improvements thereon identified for sale and described in the Bid Procedures Motion.

*"Reconciled Value"* with respect to any Eligible Real Estate Asset, means the lower of the Quick Sale Values reported in at least two Current Broker Price Opinions. In the event that there are not at least two Current Broker Price Opinions, the Reconciled Value shall equal the lowest Quick Sale Value set forth in a Broker Price Opinion, less 20% of such Quick Sale Value for each 30-day period after the date that is 120 days after the date of the applicable Broker Price Opinion.

*"Rents"* shall have the meaning ascribed to such term in Section 4.1(j).

*"Special Purpose Subsidiaries"* shall mean the following: Ocala Funding, LLC; TBALT Corp.; TBW Funding Company LLC; TBW Funding Company II LLC; TBW Funding Company III LLC; Magnolia Street Funding, Inc.; Magnolia Street Funding II, Inc.; Magnolia Street Funding III, Inc.; Platinum Bancshares, Inc.; Platinum Community Bank, and Ocala Servicing LLC, each a Delaware entity and a subsidiary of the Borrower.

*"Subsidiaries"* means, with respect to Borrower, at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of Borrower in Borrower's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general

partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by Borrower or one or more subsidiaries of Borrower.

"*Term*" means the period from the date of the execution and delivery by Lender of this Agreement through and including the earlier of (a) the Termination Date and (b) the indefeasible payment and performance in full of the Obligations.

"*Termination Date*" means (a) the earliest of (i) the effective date of a plan of reorganization for Borrower which has been approved by the Bankruptcy Court, (ii) the closing date of a sale, transfer or other conveyance of all or substantially all of the Real Estate Assets pursuant to Section 363 of the Bankruptcy Code, or (iii) the date that is 180 days after entry of the Financing Order, or (b) if earlier terminated or accelerated by Lender pursuant to Section 9.1, the date of such termination or acceleration.

"*UCC*" means New York's codification of the Uniform Commercial Code.

"*Value*" means the Reconciled Value of the Eligible Real Estate Assets set forth in any Broker Price Opinion.

**1.2. Interpretation.**

a. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

b. Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

c. A reference to any party to this Agreement or any other agreement or document shall include such party's duly authorized representatives, successors and permitted assigns.

d. A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

e. All references to "$" and dollars shall be deemed to refer to United States currency.

f. All references to any financial or accounting terms shall be defined in accordance with GAAP as applicable in the United States and consistently applied by Borrower.

g. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Recitals, Schedule and Exhibit references are to this Agreement unless otherwise specified.

    h.  The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

    i.  Borrower and Lender each hereby acknowledge that (i) Borrower and Lender jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Borrower and Lender have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

    j.  The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

    k.  References to any document, instrument, mortgage or agreement of any kind shall refer to any permitted amendments, restatements or other modifications thereof.

  **1.3.** **Exhibits.** All of the exhibits, addenda or riders attached to this Agreement shall be deemed incorporated herein by reference.

  **1.4.** **UCC.** Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC, unless otherwise defined herein.

ARTICLE 2

<u>ADVANCES AND TERMS OF PAYMENT</u>

  **2.1.** **Advance Commitment; Advances; Advance Limit; Use of Proceeds.**

    a.  **Advance Commitment.** Subject to the terms and conditions set forth herein, Lender agrees to make Advances to Borrower from time to time during the Term in an aggregate principal amount that will not result in Lender making aggregate Advances that exceed the lower of: (i) the Advance Commitment or (ii) the Borrowing Base. Once repaid, Advances may not be re-borrowed.

    b.  **Advances and Advance Limit.** Lender shall not make any Advances to Borrower unless Lender shall have received a written request of Borrower in the form of a Borrower's Request, no later than 12:00 noon, prevailing Eastern Time, ten (10) days prior to the day such Advance is requested to be made. Lender shall not be required to make any Advance: (a) in an amount less than $100,000 or more than $5,000,000; (b) more than once per week; (c) if such Advance would result in Lender making aggregate Advances that exceed the lesser of the Advance Commitment or the Borrowing Base, as determined on the date of such Advance; (d) except as provided in <u>Section 4.4</u>, with respect to the Carve-Out after the Termination Date; or (e) if a Default or an Event of Default has occurred and is continuing. The aggregate amount of the Advances outstanding at any time shall not exceed amounts available pursuant to the Borrowing Base. In the event that the outstanding amount of the Advances exceed the amounts

available pursuant to the Borrowing Base, or the Advance Commitment, such event shall not limit, waive or otherwise affect any rights of Lender in that circumstance or on any future occasions and Borrower shall, upon demand by Lender, which may be made at any time or from time to time, immediately repay to Lender the entire amount or the portion thereof (the "Overadvanced Amount") of any such excess(es) for which payment is demanded.

   c. **Use of Proceeds.** Borrower is authorized to use said Advances to (i) pay Borrower's ordinary course ongoing operating expenses, and (ii) pay certain Administrative Fees and Expenses approved by the Bankruptcy Court.

   **2.2.** **Authorization to Make Advances.** Lender is hereby authorized to make Advances based upon a written Borrower's Request substantially in the form attached hereto as <u>Exhibit A</u> received from anyone purporting to be an Authorized Officer. All requests for Advances shall be made pursuant to a Borrower's Request specifying the date on which such Advance is to be made (which day shall be a Business Day at least ten (10) days after delivery of the request of such Advance) and the amount of such Advance. All Advances made under this Agreement shall be conclusively presumed to have been made to, at the request of, and for the benefit of Borrower when deposited to the credit of Borrower or otherwise disbursed in accordance with the instructions of Borrower or in accordance with the terms and conditions of this Agreement. Unless otherwise requested by Borrower, all Advances shall be made by a wire transfer to the deposit account of Borrower set forth on <u>Schedule 2.2</u> or otherwise designated by Borrower from time to time to Lender in a written notice delivered pursuant to <u>Article 12</u>.

   **2.3.** **Interest.**

   a. The aggregate outstanding balances of the Obligations shall bear interest at the per annum rate equal to the LIBOR Rate plus eight percent (8%). The Obligations shall bear interest from and after the occurrence of a Default or an Event of Default, and without constituting a waiver of any such Default or Event of Default, at the per annum rate equal to the LIBOR Rate plus thirteen percent (13%). All interest payable under the DIP Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed on the Daily Balance. Interest as provided for herein shall accrue, and absent the occurrence of a Default or an Event of Default, shall be payable on the first Business Day of each month during the Term.

   b. In no event shall interest on the Obligations exceed the highest lawful rate in effect from time to time. It is not the intention of the parties hereto to make an agreement that violates any applicable state or federal usury laws. In no event shall Borrower pay or Lender accept or charge any interest which, together with any other charges upon the principal or any portion thereof, exceeds the maximum lawful rate of interest allowable under any applicable state or federal usury laws. Should any provision of this Agreement or any existing or future Notes or DIP Loan Documents between the parties be construed to require the payment of interest or any other fees or charges which could be construed as interest which, together with any other charges upon the principal or any portion thereof and any other fees or charges which could be construed as interest, exceeds the maximum lawful rate of interest, then any such excess shall be applied to the remaining principal balance of the Obligations, if any, and the remainder refunded to Borrower.

**2.4. Principal Repayment.** Any prepayment in whole or in part shall include accrued interest and all other sums then due hereunder. No partial prepayment shall affect the obligation of Borrower to make any payment of principal or interest hereunder on the due dates specified.

    a. **Voluntary Payment.** Borrower shall have the right to prepay all or any part of the outstanding principal balance without premium; provided, that the minimum voluntary repayment shall be in an amount equal to at least $100,000.

    b. **Mandatory Re-payment.**

        (i) **Termination Date or Acceleration.** The entire principal sum of the Obligations, if not sooner paid, shall become and be absolutely due and payable by Borrower to Lender upon the Termination Date or acceleration pursuant to Article 9 of this Agreement.

        (ii) **Collateral Sales.** If there are any Net Cash Proceeds arising from a disposition or sale of any of the Collateral at a time when any Obligations are outstanding, Borrower shall immediately turn over to Lender such Net Cash Proceeds.

        (iii) **Extraordinary Receipts.** If there are any proceeds (net of any direct costs and expenses incurred in the collection thereof) received from the payment of insurance losses or claims, tax refunds, condemnation awards, indemnification payments or any other source in connection with the Collateral ("Extraordinary Receipts") at a time when any Obligations are outstanding, Borrower shall immediately pay and turn over such Extraordinary Receipts to Lender.

    c. **Application of Payments, Extraordinary Receipts and Net Cash Proceeds.**

        (i) All payments or proceeds voluntarily paid to Lender pursuant to Section 2.4(a) or required to be paid to Lender pursuant to Section 2.4(b) shall be applied by Lender first to the fees and expenses of Lender, if any, second to the payment of accrued but unpaid interest and third to reduce the principal of the Advances then outstanding.

        (ii) After all Advances have been repaid in full, Lender shall release any excess amounts held pursuant to Section 2.4(c)(i) to Borrower.

**2.5. Closing Fee.** On or prior to the Effective Date, Borrower shall pay to Lender a closing fee equal to three percent (3%) of the total Advance Commitment.

**2.6. Effectiveness.** Subject to Section 3.1 below, this Agreement shall be binding and deemed effective upon (i) execution by Lender and Borrower, (ii) approval by the Bankruptcy Court, (iii) entry of the Financing Order, and (iv) satisfaction of the condition set forth in Section 3.1(a)(iii) below, and thereafter shall continue in full force through the Term. No termination of this Agreement shall relieve or discharge Borrower of its duties, Obligations and covenants hereunder until all Obligations have been indefeasibly paid and performed in full. On the

Termination Date of this Agreement, the Obligations shall be immediately due and payable in full.

## ARTICLE 3

## Conditions to Advances

**3.1. Conditions Precedent to Effective Date.** The Effective Date of this Agreement and the obligations of Lender hereunder are subject to the satisfaction in Lender's sole discretion of each of the following conditions precedent:

    a. **Delivery of Certain Documents.** Lender shall have received on or prior to the Effective Date each of the following, each dated the Effective Date unless otherwise indicated or agreed to by Lender, in form and substance reasonably satisfactory to Lender:

        (i) this Agreement (including all Schedules hereto), the Note substantially in the form set forth as Exhibit D hereto, in each case, duly executed and delivered by Borrower;

        (ii) the Bankruptcy Court shall have entered the Financing Order on or before 5:00 p.m. prevailing Eastern Time on December 31, 2009 and Borrower shall have delivered to Lender a copy of such order. The Financing Order shall not be subject to any stay of its effectiveness, shall not have been amended, modified or vacated, and shall contain a finding that the debt incurred and Liens granted pursuant to this Agreement and the other DIP Loan Documents were made in good faith pursuant to Section 364(e) of the Bankruptcy Code;

        (iii) the Bankruptcy Court shall have entered an order (the "Bid Procedures Order"), in form and content reasonably satisfactory to Lender, pursuant to the Bid Procedures Motion, providing that Selene RMOF REO Acquisition II LLC, an affiliate of Lender ("Acquisition"), shall have been named the stalking horse bidder for the purchase of the Real Estate Assets on terms and conditions that are reasonably acceptable to Acquisition. Borrower shall have delivered to Lender a copy of such order. Such order shall not be subject to appeal or any stay of its effectiveness, and shall not have been amended, modified or vacated;

        (iv) a certificate of the Chief Restructuring Officer, Secretary or an Assistant Secretary of Borrower certifying (A) the names and true signatures of each officer of Borrower that has been authorized to execute and deliver any DIP Loan Document or other document required hereunder to be executed and delivered by or on behalf of Borrower, (B) Borrower's by-laws as in effect on the date of such certification, (C) the resolutions of Borrower's Board of Directors approving and authorizing the execution, delivery and performance of this Agreement (and any amendments hereto), the other DIP Loan Documents to which it is a party and each Advance to be made hereunder and (D) that there have been no changes in the certificate of incorporation, by-laws or resolutions of Borrower from the applicable documents delivered pursuant to such certificate;

(v) a certificate of the Chief Restructuring Officer or President of Borrower stating that no Default or Event of Default will exist on the Effective Date;

(vi) evidence satisfactory to Lender that the insurance policies required by the DIP Loan Documents are in full force and effect, together with endorsements naming Lender, as an additional insured or loss payee under all insurance policies to be maintained with respect to Borrower;

(vii) such opinion letters of counsel to Borrower with respect to the DIP Loan documents and such other matters as Lender may request;

(viii) an acknowledgement in the form attached hereto as Exhibit E, pursuant to which each Acknowledging Subsidiary of Borrower consents and agrees to the Liens, rights and relief granted to Lender under this Agreement and/or the Financing Order, including the priming of any Lien that such Acknowledging Subsidiary has or may obtain against any of the Collateral;

(ix) a certificate of Borrower certifying that it has provided proper and adequate notice of the motion to the Bankruptcy Court seeking approval of this Agreement and the relief sought in the Financing Order to all of its Subsidiaries and SecurityOne Valuation Services, LLC and Borrower's pre-petition warehouse lenders of which Borrower, including its Chief Restructuring Officer, has knowledge; and

(x) such other certificates, documents, agreements and information respecting Borrower as Lender may reasonably request.

b. **Due Diligence.** Lender, in its sole discretion, shall be satisfied with and shall have completed its due diligence investigation of the Collateral.

**3.2. Conditions Precedent to Each Advance.** The obligation of Lender on any date (including the Effective Date) to make any Advance is subject to the satisfaction of each of the following conditions precedent:

a. **Borrower's Request.** With respect to any Advance, Lender shall have received a duly executed Borrower's Request.

b. **Representations and Warranties; No Defaults.** The following statements shall be true on the date of such Advance, both before and after giving effect thereto and to the application of the proceeds thereof:

(i) the representations and warranties set forth in the DIP Loan Documents shall be true and correct on and as of the Effective Date and shall be true and correct (unless such representation and warranty is already qualified by materiality, then such representation and warranty shall be true and correct in all material respects) on and as of any date after the Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an