earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date; and

(ii) no Default or Event of Default shall have occurred and be continuing.

c. **Delivery of Borrowing Base Certificate.** Lender shall have received a Borrowing Base Certificate dated as of the date of the Borrower's Request

d. **Compliance with Agreement.** Borrower shall be in compliance with all of the terms, provisions, conditions and covenants of this Agreement.

e. **No Legal Impediments**. The making of the Advance on such date does not violate any applicable law, regulation, administrative order, order of any court or other governmental authority on the date of or immediately following such Advance and is not enjoined, temporarily, preliminarily or permanently.

Each submission by Borrower to Lender of a Borrower's Request and the acceptance by Borrower of the proceeds of each Advance requested therein shall be deemed to constitute a representation and warranty by Borrower as to the matters specified in this Section 3.2 on the date of the submission of the Borrower's Request and the making by Lender of such Advance.

## ARTICLE 4

## SUPERPRIORITY NATURE OF OBLIGATIONS, GRANT OF SECURITY INTEREST AND PRIORITY OF LIENS

**4.1. Grant of Security Interest.** Borrower hereby mortgages, grants, pledges and assigns to Lender for its benefit a perfected mortgage, pledge and security interest in all of Borrower's right, title and interest in and to each of the items of collateral set forth below, now existing or hereafter acquired, which mortgages, pledges and security interests shall be subject to the priorities set forth in Section 4.3 of this Agreement and the Financing Order. The mortgages, pledges and security interests granted hereunder shall be deemed valid, perfected, senior, enforceable and unavoidable without the necessity of filing or recording any financing statements, deeds of trust, mortgages, or other instruments or documents which may otherwise be required under the law of any jurisdiction or the taking of any other action otherwise necessary to validate or perfect such mortgages, pledges and security interests:

a. Land. The real property described in Schedule 4.1(a) attached hereto and made a part hereof (the "Land");

b. Ground Leases. All of the leasehold estates and all of Borrower's right, title, interest, privileges and options created by those certain leases described in Schedule 4.1(b) attached hereto;

c. <u>Condominiums</u>. All right, title and interest of Borrower, including rights as the "Sponsor", in, to and under those certain Declaration of Condominiums, and all other documents relating to the condominiums, and all right, title and interest of Borrower in and to all condominium apartments or units in such condominiums, set forth in <u>Schedule 4.1(c)</u> together with the appurtenant easements, limited common elements and undivided percentage interests in the common elements of the units set forth in <u>Schedule 4.1(c)</u>, which common elements include the Land or portions thereof;

d. <u>Additional Land</u>. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land;

e. <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land, including, without limitation, any mobile homes situated on the Land (collectively, the "<u>Improvements</u>");

f. <u>Easements</u>. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtsey and rights of curtsey, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

g. <u>Equipment</u>. All "equipment," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, which is primarily used in connection with the Improvements or the Land and is located thereon or therein together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "<u>Equipment</u>");

h. <u>Fixtures</u>. All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation thereon, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals,

dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "Fixtures");

    i.  Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the UCC, whether tangible or intangible (other than Fixtures), including, without limitation, "Inventories of Merchandise" and "Inventories of Supplies" as defined in the UCC, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof;

    j.  Leases and Rents. All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "Leases"), whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses), all revenues and credit card receipts collected from the rental thereof, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, or other space, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, wholesale and retail sales, service charges, telephone service and proceeds, if any, from business interruption or other loss of income insurance from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Obligations;

k. **Condemnation Awards**. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to any of the Collateral, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Collateral;

l. **Insurance Proceeds**. All proceeds in respect of any of the Collateral under any insurance policies covering the Collateral in whole or in part, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Collateral;

m. **Tax Certiorari**. All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against any of the Collateral as a result of tax certiorari or any applications or proceedings for reduction;

n. **Rights**. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to any of the Collateral and to commence any action or proceeding to protect the interest of Lender in any of the Collateral;

o. **Agreements**. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

p. **Accounts**. All reserves, escrows and deposit accounts maintained by Borrower with respect to the Collateral (excluding any such reserve, escrow or deposit received in connection with any bid received in connection with the 363 Sale), together with all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

q. **Books and Records**. All books, records, ledger cards and other property at any time evidencing or relating to the Collateral;

r. **Proceeds**. All proceeds and products of any of the foregoing, in any form, including, without limitation, any claims against third parties for loss or damage to or destruction of any or all of the foregoing and to the extent not otherwise included, all payments under insurance (whether or not Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral; and

s. **Other Rights**. All other rights and interests granted to Lender under the Financing Order.

t. <u>Carve-Out</u>. Notwithstanding the foregoing, the Collateral shall not include (i) the funds from the disbursement of the Advance made in accordance with Section 4.4 for the Carve-Out or (ii) the deposit account in which such funds are held; <u>provided</u>, that such deposit account is a segregated account and no other funds have been commingled therewith.

**4.2. Security for Obligations.** This Agreement and the Collateral secure the payment of the Obligations.

**4.3. Superpriority Nature of Obligations.**

a. The Obligations shall be secured by first priority Liens in the Collateral under Sections 364(c)(2) and 364(d) of the Bankruptcy Code. No other Liens may encumber the Eligible Real Estate Assets included in the Collateral, other than (i) Liens in favor of Lender; (ii) Liens for taxes, assessments and other governmental charges or levies; (iii) the claims of materialmen, mechanics or repairmen for labor, materials, supplies, rentals or other similar Liens properly perfected before the Petition Date; (iv) Liens granted prior to the Petition Date but not perfected prior to the Petition Date; (v) Liens constituting (A) encumbrances in the nature of zoning restrictions, easements (including reciprocal easement agreements), rights-of-way, municipal building and zoning ordinances and similar charges, utility agreements, covenants, reservations, restrictions, encroachments, charges, encumbrances, or other similar restrictions, title defects or (B) other irregularities which are reflected on a title report, if any; in each case under clause (A) or (B), that were not incurred in connection with and do not secure debt and do not impair (x) the use thereof for their intended purposes or (y) the marketability or value of such property; and (vi) and the Liens set forth on Schedule 4.3(a) (collectively, "Permitted Liens").

b. The Obligations shall have the status in the Case of superpriority administrative expenses under Section 364(c)(1) of the Bankruptcy Code. Subject to the Carve-out and the Professional Carve-out, such administrative claim shall have priority over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in this Case or any subsequent proceeding or case under the Bankruptcy Code in which Borrower is a debtor.

c. Lender's Liens on the Collateral under Sections 364(c)(2) and 364(d) of the Bankruptcy Code, for the benefit of Lender, and the superpriority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject only to the Carve-out; <u>provided</u>, that in no event shall any of the Carve-out include any fees or expenses arising after the conversion of this Case to a case under Chapter 7 of the Bankruptcy Code in an amount exceeding $50,000.

d. Subject to the provisions of the Financing Order and this <u>Section 4.3</u>, Borrower shall be permitted to pay as the same may become due and payable (i) administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of its business, (ii) provided that no Event of Default has occurred and is continuing, compensation and reimbursement of expenses to professionals allowed by order of the Bankruptcy Court and payable under Sections 330 and 331 of the Bankruptcy Code, but only to

the extent funds are available in the Professional Carve-out account established under Section 4.4, and (iii) any other pre-petition or post-petition expenses of Borrower, including adequate protection payments, to the extent approved by the Bankruptcy Court and not otherwise prohibited by the terms of this Agreement or the other DIP Loan Documents. Except for the Professional Carve-out and payments under 28 U.S.C. § 1930(a)(6), no costs or expenses of administration shall be imposed against Lender or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and Borrower hereby waives, for itself and on behalf of its estate in bankruptcy, any and all rights under Sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender.

**4.4. Funding of the Carve Out.** So long as no Default or Event of Default shall have occurred and be continuing, Borrower shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable. No proceeds of the Collateral and no amounts received pursuant to the Professional Carve-out shall be used to pay compensation or expense reimbursement of any Professional Person or creditors' committee or any other costs incurred, directly or indirectly, in respect of, arising from or relating to, the commencement of, prosecution by, or joinder by any creditors' committee or any Person of any claims, objections, causes of action, contested matters, adversary proceedings, or other proceedings (including the preparation of any pleadings in respect thereof, but not including any investigation) (a) seeking to challenge the validity, amount, priority, perfection or enforceability of the Obligations and the Liens granted in connection with the DIP Loan Documents; (b) seeking to invalidate, set aside, avoid or subordinate in whole or in part any of the Obligations or the Liens held by Lender or to hinder or delay Lender in any material respect in asserting or enforcing the Obligations and the Liens; (c) seeking to assert any claims, cause of action or defenses against Lender or its officers, directors, employees, agents, attorneys, affiliates, assigns or successors, including, without limitation, any attempt to recover on an action taken by or on behalf of Borrower, its bankruptcy estate, a bankruptcy trustee or a statutory committee under Chapter 5 or Section 724(a) of the Bankruptcy Code and proceeds thereof; (d) seeking to authorize Borrower to obtain post-petition credit or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than from Lender without Lender's consent; or (e) that has or could have the effect of hindering or delaying Lender's assertion, enforcement or realization on any of the Collateral or the enforcement of any of Lender's rights or remedies under any of the DIP Loan Documents or the Financing Order except as otherwise permitted in the Financing Order to challenge whether an Event of Default has occurred (each matter described in clauses (a) through (e) above, an "Adverse Bankruptcy Action"). Immediately upon the termination of this Agreement pursuant to Section 9.1 hereof, Lender shall immediately fund the amount of the Carve-Out in an amount not to exceed the lower of (i) Availability or (ii) the Borrowing Base to be determined at such time (but without any deduction from the Borrowing Base for the amount set forth in clause (c) of the definition of Borrowing Base ($2,500,000).

**4.5. Financing Statements.** Borrower hereby authorizes Lender to file one or more initial financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Borrower.

4.6. **Lender Appointed Attorney-in-Fact.** Borrower hereby irrevocably appoints Lender such Borrower's attorney-in-fact (which appointment shall be irrevocable and deemed coupled with an interest), with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in Lender's discretion, upon and during the occurrence and continuation of an Event of Default in accordance with Article 9 of this Agreement and the Financing Order, to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

    a. to obtain and adjust insurance required to be paid to Lender;

    b. to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

    c. to receive, endorse, and collect any drafts or other instruments and documents in connection with Sections 4.6(a) or 4.6(b) above, and

    d. to file any claims or take any action or institute any proceedings which Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender on the date hereof, the Effective Date, and on the date of each Borrower's Request and Advance made pursuant to Section 2.1, the following:

5.1. **Due Incorporation and Qualification.** Borrower is and shall at all times hereafter be a corporation duly organized and validly existing under the laws of the state of Florida and is qualified and licensed to do business in any state in which the conduct of its business or its ownership of assets requires that it be so qualified and where the failure to be qualified would reasonably be expected to have a material adverse effect to Borrower. Set forth on Schedule 5.1 is a true and correct list of all Subsidiaries of Borrower. Each Special Purpose Subsidiary has no Liens on, or title in, any of the Collateral. On the Effective Date, no Special Purpose Subsidiary shall have any right, title or interest in or to any of the Collateral that is senior to, or pari passu with, the Liens of Lender.

5.2. **Due Authorization.** Borrower has the right and power and is duly authorized by all appropriate corporate or other required action to enter into each of the DIP Loan Documents to which it is a party, subject only to the Bankruptcy Court's entry of the Financing Order. Except for the Financing Order, no authorizations of, or registrations or filing with, any governmental authority, or any applicable securities exchange, or other third party are necessary for the execution, delivery or performance by Borrower of the DIP Loan Documents to which it

is a party, or for the legality, validity or enforceability hereof or thereof. Borrower is a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

**5.3. Due Execution; Binding Obligation.** Upon entry by the Bankruptcy Court of the Financing Order, the execution, delivery and performance by Borrower of each of the DIP Loan Documents to which it is a party, have been duly executed and delivered by Borrower. This Agreement is, and each of the other DIP Loan Documents to which Borrower is or will be a party, when delivered hereunder or thereunder, and upon entry and subject to the terms of the Financing Order, will be, a legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and the Financing Order.

**5.4. The Financing Order.** As of the date of the making of any Borrower's Request or Advance hereunder, the Financing Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except in accordance with the terms hereof).

**5.5. Compliance with Articles; Bylaws.** The execution by Borrower of the DIP Loan Documents to which it is a party does not constitute a breach of any provision contained in Borrower's articles of incorporation or its bylaws, nor does it constitute a Default or an Event of Default under any post-petition material agreement to which Borrower is now or may hereafter become a party.

**5.6. Accuracy of Information and No Material Adverse Change in Financial Statements.**

a. To Borrower's knowledge, any written statements with respect to the Collateral which have been made by Borrower to Lender or to the Bankruptcy Court in connection with any DIP Loan Document and any other document delivered pursuant hereto or thereto, including any of the Collateral, taken as a whole and in light of the circumstances in which made, contain no untrue statement of a material fact and do not omit to state a material fact necessary to make such statements not misleading in any case, which have not been, prior to the date hereof, corrected, supplemented, or remedied by subsequent documents furnished or statements made orally or in writing to Lender or the Bankruptcy Court (as appropriate); and, to the extent that any such written statements constitute projections or other forward-looking statements, such projections or other forward-looking statements were prepared in good faith on the basis of assumptions, methods, data, tests and information reasonably believed by Borrower to be valid and accurate in all material respects at the time such projections were furnished to Lender or the Bankruptcy Court.

b. Except as disclosed on Schedule 5.6, to Borrower's knowledge after reasonable inquiry and diligence, as of the Effective Date there are no unstayed legal or arbitral proceedings, or any other proceedings or investigation by or before any governmental, judicial or regulatory authority or agency, pending or threatened in writing to Borrower, or threatened against Borrower either (i) which is reasonably likely to be determined adversely and if so determined would have a Material Adverse Change or that seek to enjoin or delay any of the transactions contemplated hereby or (ii) relates to any of the Real Estate Assets.

**5.7. Use of Proceeds.** All proceeds provided by Lender to Borrower pursuant to any Financing Order, this Agreement or otherwise, have been and shall be used by Borrower solely for those purposes set forth in Section 2.1(c) of this Agreement.

**5.8. Defaults and Events of Default.** No Default or Event of Default has occurred or is existing under any of the DIP Loan Documents.

**5.9. Administrative Expenses and Lien.** Upon the entry of the Financing Order and continuing thereafter, the Obligations shall at all times constitute an Administrative Expense for which Lender shall at all times maintain and have a superpriority claim pursuant to Section 364(c) of the Bankruptcy Code and shall maintain and have a lien on the Collateral pursuant to the priority provisions of Section 4.3 of this Agreement and no other party has or shall have a lien or claim that is pari passu or superior to the claim of Lender, except as otherwise described in Section 4.3(a) above.

**5.10. Reliance by Lender; Cumulative.** Each warranty, representation and agreement contained in this Agreement shall automatically be deemed repeated and made by Borrower on the date of each request for an Advance by Borrower and on each date on which Lender makes such Advance is delivered and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements which Borrower shall now or hereafter give, or cause to be given, to Lender.

**5.11. Right To Inspect.** Lender shall have the right, as reasonable, upon reasonable notice at any time or times hereafter during Borrower's usual business hours (or at any time after the occurrence and during the continuation of a Default), to inspect any of the Collateral or, as applicable, during the usual business hours of any third party having control over Borrower's Books to inspect Borrower's Books, facilities and operations in order to verify the amount or condition of, or any other matter relating to, the DIP Loan Documents, Obligations or Borrower's financial condition.

**5.12. Title to Collateral; Liens.**

a. As of the Effective Date, subject to Section 5.12(b), to the knowledge of Borrower, Borrower has good and marketable title (subject only to Permitted Liens) to all of the Collateral.

b. As to each Eligible Real Estate Asset, the Borrower owns and has good and marketable title or subsisting leasehold interests subject only to Permitted Liens to, and enjoys on the date hereof and on the date of each Advance, peaceful and undisturbed possession of such Eligible Real Estate Asset.

c. Borrower is not and will not be party to any contract, agreement, lease or instrument entered into on or after the Petition Date, the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a Lien on any of the Collateral in violation of this Agreement.

# ARTICLE 6

## AFFIRMATIVE COVENANTS

Borrower covenants and acknowledges that as long as any portion of the Obligations remain outstanding, Borrower shall comply with all of the following:

**6.1. Notices and Other Reports.** Borrower shall provide to Lender the following:

a. written notice of the occurrence of any Default or Event of Default pursuant to any DIP Loan Document;

b. as soon as available and in any event no later than 30 days after the end of each month (or such later period permitted by the Bankruptcy Court or the US Trustee's office), copies of monthly Operating Report prepared by management and submitted to the Bankruptcy Court and/or the U.S. Trustee;

c. as soon as available and in any event no later than three (3) Business Days after each weekly period, a report accompanied by a certificate of the Chief Restructuring Officer, in form and substance satisfactory to Lender, as of the last day of the preceding weekly period, setting forth the following information for Borrower for the preceding weekly period on both a weekly and cumulative basis from the date of this Agreement to such date, on a cash basis: (i) total disbursements, and (ii) total cash receipts;

d. prompt written notice to Lender in the event that the Chief Restructuring Officer has actual knowledge that:

(i) any of the Eligible Real Estate Assets are not, to Borrower's knowledge, free and clear of any Liens other than Permitted Liens;

(ii) Borrower has become administratively insolvent;

(iii) Borrower is not in compliance with any applicable law, regulation or court order the failure of which to comply would reasonably be expected to result in a Material Adverse Change;

e. as soon as available, but in any event within fifteen (15) days of each calendar month and at such other times as may be necessary to re-determine Availability of Advances hereunder or as may be requested by Lender, as of the period then ended, a Borrowing Base Certificate which calculates Borrower's Borrowing Base, accompanied by supporting data upon Lender's request;

f. as soon as available, but in any event within fifteen (15) days of each calendar month, a report prepared by Borrower setting forth (i) any legal or arbitral proceeding, or any other proceeding by or before any governmental, judicial or regulatory authority or agency, the effect of which could reasonably be expected to result in an Adjustment to the Borrowing Base with respect to any Eligible Real Estate Asset equal to or greater than 15% of

the Value of such Eligible Real Estate Asset, and of which Borrower has not previously informed Lender, (ii) any default by Borrower in the performance of any post-petition obligation to which it is bound (other than the Obligations, which is the subject of Section 6.1(a) above) that has or could have a material adverse effect on any of the Collateral and (iii) any failure by Borrower to pay any real estate tax or any related charge when due that could result in a Lien on any Eligible Real Estate Asset which either (x) is equal to or greater than 15% of the Value of such Eligible Real Estate Asset or (y) is otherwise known to the Chief Restructuring Officer; and

    g.  any other information or documents reasonably requested by Lender.

  **6.2. Taxes.** All post-petition Federal, state and local assessments and taxes payable with respect to the Collateral, whether real, personal or otherwise, due or payable by, or imposed, levied or assessed against Borrower shall hereafter be paid before they become delinquent or before the expiration of any extension period except for those taxes, assessments and the like being contested by Borrower in good faith and by appropriate proceedings and as to which Borrower has established appropriate reserves in accordance with GAAP, provided, that no Lien is placed on any of the Collateral during any such contest as a consequence of the failure to pay such tax, assessment or the like. Borrower shall make due and timely payment or deposit of all federal, state and local taxes, assessments or contributions required of it by law.

  **6.3. Insurance.** Borrower shall keep and maintain the Collateral insured against all risk of loss or damage from fire, theft, vandalism, and all other hazards and risks of physical damage included within the meaning of the term "extended coverage" in such amounts as are ordinarily insured against by similar businesses or owners outside of bankruptcy and, in each case, in such amounts and scope of coverage on substantially similar terms and conditions as in force as of the date of this Agreement and as is otherwise reasonably satisfactory to Lender. Borrower shall also keep and maintain general liability insurance and property damage insurance, and insurance against loss from business interruption, insuring against all risks relating to or arising from Borrower's ownership and use of the Collateral and the operation of its business. Borrower shall deliver to Lender prior to the date of the first Advance a standard ACCORD Evidence of Insurance Certificate evidencing insurance policies maintained by Borrower and naming Lender as additional insured for all liability policies and as loss payee for all property damage and business interruption insurance.

  **6.4. Compliance With Law.** Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of governmental authorities relating to Borrower and the conduct of its business except where the failure to so comply would not reasonably be expected to result in a Material Adverse Change.

  **6.5. Compliance with Bankruptcy Court.** Borrower shall comply with the notice and other requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and all other applicable rules in a manner reasonably acceptable to Lender and its counsel except where the failure to so comply would not reasonably be expected to result in a Material Adverse Change.

  **6.6. Compliance with DIP Loan.** Borrower shall make all payments under this Agreement and any of the other DIP Loan Documents when due.

6.7. **363 Sale.** Following the filing of the Bid Procedures Motion, Borrower will use its best efforts to obtain Bankruptcy Court approval of the Bid Procedures Order for the sale of the Real Estate Assets to Acquisition (the "363 Sale"). Lender (or its designee or assignee) shall be permitted to credit bid the amount outstanding under this Agreement and apply such outstanding amount, plus all accrued interest thereon, as a credit against the purchase price to be paid for the Real Estate Assets in the 363 Sale or any other sale of the Collateral. Borrower shall, in good faith, use its commercially reasonable efforts and take all actions and do all other things necessary, proper or advisable, in order to consummate and make effective the transactions contemplated by the 363 Sale. Borrower will promptly inform Lender and Acquisition of, and provide Lender and Acquisition with, any information regarding any written offers or written expressions of interest involving Borrower or the Collateral.

## ARTICLE 7

## NEGATIVE COVENANTS

Borrower covenants and acknowledges that as long as any portion of the Obligations remain outstanding that it shall not undertake any of the following without the prior written consent of Lender:

7.1. **Extraordinary Transactions and Disposal of Assets.** (i) Enter into any acquisition, merger, consolidation or amalgamation, except where Borrower is the surviving corporation, or (ii) dissolve itself (or suffer any dissolution), or (iii) convey, sell, lease, assign, transfer or otherwise dispose of any Eligible Real Estate Asset for a purchase price equal to less than 45% of the Value of such Real Estate Asset and other than for cash consideration, or (iv) grant any Lien on, any of the Collateral, or (v) incur any indebtedness for borrowed money or any other indebtedness (other than trade payables in the ordinary course of business and indebtedness existing on the date hereof and set forth on Schedule 7.1) except as expressly approved by the Bankruptcy Court; or (vi) sell or transfer any Collateral other than for cash consideration, directly or indirectly, with, any of its present or former executives or direct or indirect owner of 5% or more of its equity or direct or indirect owner of 5% of its secured or unsecured claims, other than on commercially reasonable, arms-length terms, except as expressly approved by the Bankruptcy Court.

7.2. **Guaranty.** Guaranty or otherwise become in any way liable with respect to the obligations of any third party, except by endorsement of instruments or items of payment for deposit to the accounts of Borrower for negotiation and delivery to Lender.

7.3. **Restructure.** Make any material change in its financial structure or business operations that adversely effects the Collateral, except the 363 Sale or as otherwise authorized or approved by the Bankruptcy Court.

7.4. **Prepayments.** Pay or accelerate the payment of any existing or other indebtedness for borrowed money owing to any third party with respect to the Collateral that are due no later than 15 days thereafter.

7.5. **Investments, Loans and Advances.** Make any loans, advances or extensions of credit; or make any capital contribution or other investment other than in the ordinary course of business.

7.6. **Accounting Methods.** Modify or change its methods of accounting other than as required or permitted by GAAP or enter into, modify or terminate or allow to exist any agreement presently existing or at any time hereafter entered into with any third party for the preparation or storage of Borrower's records of accounts and financial condition without said parties agreeing to provide Lender with information regarding the Collateral and/or Borrower's financial condition.

7.7. **Bankruptcy Case.** Seek, consent or suffer to exist: (a) any modification, stay, vacation or amendment to the Financing Order, unless Lender has consented to such modification, stay, vacation or amendment in writing, (b) a priority claim for any administrative expense or unsecured claim against Borrower, (now existing or hereafter arising of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code) in parity with or superior to the superpriority claim of Lender in respect of the Obligations, other than any allowed claim for Administrative Fees and Expenses, or (c) any pleading, motion, application or other paper seeking: (i) to dismiss the Case; (ii) to convert the Case to a case under Chapter 7 of the Bankruptcy Code; (iii) the appointment of a trustee or an examiner with enlarged powers to operate Borrower's business; or (iv) relief from the automatic stay or any other injunction with similar effect to allow a third party to proceed against any of the Collateral. In addition to the foregoing, Borrower shall not take, or suffer to remain uncontested any Adverse Bankruptcy Action.

7.8. **No Change in Management.** Terminate or otherwise change the employment of Borrower's Chief Restructuring Officer.

7.9. **Restrictions Regarding Subsidiaries.** (i) Use any cash, including, without limitation, any Net Cash Proceeds, of Borrower to fund or make payments to any Subsidiary, (ii) make any investments in any Subsidiary, (ii) guaranty or otherwise become in any way liable with respect to the obligations of any Subsidiary, (iv) grant any Lien on, or sell or dispose of any Eligible Real Estate Asset to, any Subsidiary, or (v) enter into any contracts, agreements, documents or instruments, or incur any other obligations after the Petition Date, with any Subsidiary, which has or is reasonably likely to have a material adverse effect on any of the Collateral.

## ARTICLE 8

## EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an Event of Default by Borrower hereunder:

8.1. **Failure to Pay.** Borrower's failure to pay when due and payable, or when declared due and payable, any portion of the Obligations (whether principal, interest, taxes, or otherwise).

**8.2. Failure to Perform.** The failure of Borrower to perform, keep or observe any term, provision, condition, representation, warranty, covenant or agreement contained in Article 6 (except as otherwise provided in Section 8.3) or Article 7 of this Agreement.

**8.3. Other Covenants.** The failure of Borrower to comply with the provisions of Sections 6.1(b), (c), (e) or (f) hereof and such failure continues for three (3) Business Days after notice thereof from the Lender.

**8.4. Misrepresentation.** Any material misstatement or material misrepresentation (except if such statement or representation is already qualified by materiality or a Material Adverse Change, then, in each case, such misstatement or misrepresentation) now or hereafter exists in any warranty, representation, statement, aging or report made to Lender by Borrower or any officer, employee, or agent of Borrower, or if any such warranty, representation, statement, aging or report is withdrawn by any such Person; provided that there shall be no Event of Default for a misrepresentation of Sections 5.12(a) or (b) if (i) after giving effect to any Adjustment to the Borrowing Base to account for such misrepresentation, no Overadvanced Amount exists or (ii) within five (5) business days after the discovery of such misrepresentation, Borrower eliminates the Overadvanced Amount by adding additional Eligible Real Estate Assets to the Borrowing Base or (iii) within five (5) business days after the discovery by Borrower of such misrepresentation, Borrower has paid the Overadvanced Amount, if any, arising as a result of such misrepresentation, pursuant to Section 2.1(b).

**8.5. Material Adverse Change.** A Material Adverse Change shall exist.

**8.6. Injunction Against Borrower.** Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business.

**8.7. Bankruptcy Court.** The Bankruptcy Court enters any order that has not been consented to by Lender: (a) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying any Financing Order or any other order with respect to any of the Case affecting in any material respect this Agreement, (b) appointing a Chapter 11 trustee or appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (c) dismissing the Case or converting the Case to a Chapter 7 case, (d) permitting a sale of all or substantially all of Borrowers' assets to any Person other than Lender, Acquisition or any other affiliate of Lender, (e) confirming a plan of reorganization that has not been approved or consented to by Lender, (f) granting relief from the automatic stay without the affirmative consent of Lender so as to allow a third party to proceed against any assets or property of Borrower, or (g) granting an Adverse Bankruptcy Action.

**8.8. Sale Order.** If the Bankruptcy Court fails to enter an order to approve the 363 Sale within 150 days after the date of this Agreement.

**8.9. 363 Sale.** If Borrower fails to close the 363 Sale within 180 days after the date of this Agreement.