# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:

**TAYLOR, BEAN & WHITAKER**
**MORTGAGE CORP.,**

   **Debtor.**

_____/

**Case No.: 3:09-bk-07047-JAF**

**Chapter 11**

**OBJECTION OF FREDDIE MAC TO BANK OF AMERICA'S MOTION FOR
AN ORDER AUTHORIZING AND DIRECTING EXAMINATION OF FEDERAL
HOME LOAN MORTGAGE CORPORATION PURSUANT TO RULE 2004 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND TO JOINDER
BY BNP PARIBAS IN BANK OF AMERICA'S MOTION FOR ORDER
AUTHORIZING 2004 EXAMINATION OF FEDERAL HOME LOAN
CORPORATION AND JOINDER BY DEUTSCHE BANK AG IN BANK OF
AMERICA'S MOTION, AND TO BANK OF AMERICA'S MOTION TO JOIN
MOTION OF CREDITORS COMMITTEE FOR CLARIFICATION OF ORDER
AUTHORIZING RULE 2004 EXAMINATION OF FEDERAL HOME LOAN
MORTGAGE CORPORATION**

Federal Home Loan Mortgage Corporation ("Freddie Mac"), presently under

conservatorship of the Federal Housing Finance Agency ("FHFA" or "Conservator"),[1] by

and through its undersigned counsel, files this Objection ("Objection") to Bank of

America's ("BoA") Motion for an Order Authorizing and Directing Examination of the

Federal Home Loan Mortgage Corporation Pursuant to Rule 2004 of the Federal Rules of

Bankruptcy Procedure 2004 (Doc. No.: 1317) ("BoA 2004 Motion"), and to the Joinder

by BNP Paribas ("BNPP") in Bank of America's Motion for Order Authorizing 2004

---

[1] On September 6, 2008, FHFA's Director placed Freddie Mac into
conservatorship pursuant to express authority granted to him in the Housing and
Economic Recovery Act of 2008, Pub. L. 110-289, 122 Stat. 2654 (codified at 12 U.S.C.
§ 4617) ("HERA"), to preserve and conserve Freddie Mac's assets and property. As
Conservator, FHFA has specific and particular power over assets held by Freddie Mac, as
discussed *infra* beginning at page 21.

Examination of Federal Home Loan Corporation (Doc. No.: 1362) and the Joinder by Deutsche Bank AG ("DB", and together with BNPP, the "BoA Exam Joinder Parties") in Bank of America's Motion for Order Authorizing 2004 Examination of Federal Home Loan Mortgage Corporation (Doc. No.: 1368) (together called "BoA Exam Joinder Motions") and to Bank of America's Motion to Join Motion of Creditors Committee for Clarification of Order Authorizing Rule 2004 Examination of Federal Home Loan Mortgage Corporation ("Clarification Joinder Motion"). Freddie Mac respectfully requests that the Court deny with prejudice the BoA 2004 Motion and related BoA Exam Joinder Motions and the Clarification Joinder Motion because (1) there is no reason to revisit this Court's prior order and disrupt the court-ordered discovery and production that is currently underway between Taylor, Bean & Whitaker Mortgage Corp. ("TBW" or "Debtor") and Freddie Mac and (2) the BoA 2004 Motion constitutes an unduly burdensome attempt to examine a non-debtor party for an improper purpose and ulterior motive related to Bank of America's third party litigation with BNPP and DB, which is currently pending in the District Court for the Southern District of New York (the "New York Litigation"). In furtherance thereof, Freddie Mac states as follows:

## BACKGROUND

1.      On or about September 11, 2009, TBW and the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank (the "FDIC"), entered into a Stipulation (Doc. No.: 222) (the "FDIC Stipulation") that sought to provide a reconciliation of the Debtor's pre-petition residential mortgage servicing activities (the "Servicing Reconciliation") and a reconciliation of the Debtor's ownership of mortgage assets (the "Asset Reconciliation," and together with the Servicing Reconciliation, the

"Reconciliation Process"). The Court entered an order approving the FDIC Stipulation on September 29, 2009 (Doc. No.: 348).

2.      On February 18, 2010, TBW filed a Motion (the "Debtor's 2004 Motion") for an Order Authorizing and Directing Examination of the Federal Home Loan Mortgage Corporation Pursuant to Federal Rule of Bankruptcy Procedure 2004 (Doc. No.: 1046), seeking an extensive production of documents and witnesses by Freddie Mac. The stated purpose of the requested Debtor's 2004 Motion was to enable TBW to complete the Reconciliation Process as provided in the FDIC Stipulation, and to assist the Debtor in propounding a liquidating plan of reorganization in this Chapter 11 bankruptcy case. Thereafter, joinder motions were filed by the Official Committee of Unsecured Creditors (the "Committee"), BoA, BNPP, DB and other parties (collectively hereinafter, the "Debtor Exam Joinder Motions").[2]

3.      On March 17, 2010, the Court held a hearing on the Debtor's 2004 Motion, the Debtor Exam Joinder Motions, and the Objection of Freddie Mac to Taylor, Bean & Whitaker Mortgage Corporation's Motion for an Order Authorizing and Directing Examination of the Federal Home Loan Mortgage Corporation Pursuant to Federal Bankruptcy Rules of Procedure 2004 and Objection to BNPP's, FDIC Receiver's

---

[2]See Motion to Join Debtor's Motion for an Order Authorizing and Directing Examination of the Federal Home Loan Mortgage Corporation Pursuant to Federal Bankruptcy Rules of Procedure 2004 and Request for Copies of Documents Produced filed by the Official Unsecured Creditors' Committee (Doc. No.: 1163) (the "Committee Joinder Motion"), Bank of America's Joinder to Debtor's Motion for Order Authorizing 2004 Examination of Federal Home Loan Mortgage Corporation (Doc. No.: 1177) (the "BoA Joinder Motion"), FDIC-Receiver's Limited Motion to Join Debtor's Motion for an Order Authorizing and Directing Examination of the Federal Home Loan Mortgage Corporation Pursuant to Federal Rules of Bankruptcy Practice 2004 (Doc. No.: 1129), as well as related joinders by other parties (collectively, including the Committee, BoA and FDIC, the "Debtor Exam Joinder Parties").

and the Official Committee of Unsecured Creditors' Motions to Join (Doc. No.: 1178) (the "<u>Freddie Mac Objection</u>").[3]  After extensive argument, and based in part upon a stipulated resolution of the Debtor's 2004 Motion by TBW and Freddie Mac (the "<u>TBW Discovery Stipulation</u>") announced orally to the Court, the Court on March 26, 2010, entered its Order on Taylor, Bean & Whitaker Mortgage Corp.'s Motion Authorizing and Directing Examination of Federal Home Loan Mortgage Corporation and Related Joinders Thereto (Doc. No.: 1247) (the "<u>Debtor Exam Order</u>").

4.  The Debtor Exam Stipulation was intended to resolve the issues before the Court and was based in part upon an agreement by TBW and Freddie Mac to narrow the scope and reasonably schedule the production of necessary documents.  Freddie Mac understood at the time that it entered into the TBW Discovery Stipulation that the resolution of the issues as agreed upon by TBW and Freddie Mac would facilitate any legitimate need that the estate had to conduct an oral examination of Freddie Mac witnesses, and would permit the examination of documents in the possession of Freddie Mac for the twin purposes of TBW's compliance with the FDIC Stipulation and the development of a proposed liquidating plan of reorganization.

5.  Pursuant to the express terms of the Debtor Exam Order, the Court authorized TBW to conduct a Rule 2004 examination of Freddie Mac, including the taking of depositions of witnesses associated with Freddie Mac, and to issue subpoenas for documents in Freddie Mac's possession.  The Court, however, expressly stated that Freddie Mac reserved its right to raise any and all objections to such requests by TBW.

---

[3]Freddie Mac did not have notice of the BoA Joinder Motion at the time it filed the Freddie Mac Objection, but the Freddie Mac Objection objected generally to

6.      At the March 17, 2010 hearing, Freddie Mac also objected to the Debtor Exam Joinder Motions, and continues to do so.  In response, BoA and BNPP represented to the Court that they would <u>not</u> seek to initiate their own discovery of Freddie Mac and rather would "ride the coattails" of the Debtor in discovery.[4]  For example, in a colloquy with the Court, BNPP represented as follows:

> Mr. Weiss:      . . . We are riding their coattails.  We will not seek any discovery beyond what's set forth in the debtor's motion.
>
> The Court:      Or what they later agree to.
>
> Mr. Weiss:      Correct.

March 17, 2010 Hearing Tr. at 16.

7.      BoA's counsel then told the Court that he agreed with BNPP's counsel's comments.  Specifically, BoA's counsel stated: "I will gladly say that I agree with Mr. Weiss because his comments were virtually identical to the ones that I was going to make in terms of both the scope of the relief that we request and the reasons why we think the relief is appropriate."  March 17, 2010 Hearing Tr. at 21.

8.      At the conclusion of the hearing, the Court specifically directed that the Debtor Exam Joinder Parties, including BoA, DB, and BNPP, were prohibited from expanding the scope of the Debtor Exam Order to seek their own discovery from Freddie Mac.  As the Court stated at the hearing: "[The Debtor Exam Joinder Parties] are prohibited from filing or seeking independent discovery.  They have to just go on the debtor's discovery."  March 17, 2010 Hearing Tr. at 32.

---

participation by all Debtor Exam Joinder Parties, and such objection was also asserted orally at the hearing.

[4] DB was not represented at the hearing.  (March 17, 2010 Hearing Tr. at 6.)

9.     This prohibition was further memorialized in the Debtor Exam Order: "[T]he Joinder Parties are prohibited from issuing subpoenas, propounding document requests, or otherwise filing or seeking their own discovery from Freddie Mac . . ." Debtor Exam Order at p. 3.

10.     The Court then reiterated the terms of its Order at the May 7, 2010 hearing: "I granted the debtor's motion and I said the other parties can sit there, they can't participate . . . to allow the debtor to move on through and get this reconciliation done . . . I think that's what everybody agreed on." May 7, 2010 Hearing Tr. at 31-32.

11.     Over the continuing objection of Freddie Mac (which Freddie Mac hereby re-asserts), the Court ordered that such Debtor Exam Joinder Parties would be permitted to make inquiry of any Freddie Mac witness at the conclusion of TBW's inquiry of such witness, subject to Freddie Mac's right to object. The Court also ordered that Freddie Mac would be required to produce documents only to TBW. Again over the continuing objection of Freddie Mac, the Court ordered that TBW would be required to produce any documents not designated as "Confidential Documents" to the Debtor Exam Joinder Parties. The Court further ordered that TBW may not disclose documents that are designated as "Confidential Documents" to any of the Debtor Exam Joinder Parties, except the Committee on an "attorneys' eyes only" basis. The Court provided a mechanism, however, for the Debtor Exam Joinder Parties — including BoA, DB, and BNPP — to challenge the designation by Freddie Mac of documents as "Confidential Documents." In short, the Court provided procedures for the Debtor Exam Joinder Parties to obtain necessary discovery without, in its view, unduly burdening Freddie Mac.

12. Consistent with the Court's Order, Freddie Mac has been working closely with the Debtor to provide the Debtor with the information that the Debtor believes is necessary for its Reconciliation Process. To date, Freddie Mac has made four (4) separate productions of documents to the Debtor, including all of the information that the Debtor has requested for purposes of the Reconciliation Process. A production log describing Freddie Mac's production to the Debtor has been provided to the Debtor Exam Joinder Parties, including BoA, BNPP and DB. At no point has BoA, BNPP or DB approached Freddie Mac to discuss the production or the specific documents that Freddie Mac has produced to the Debtor.

13. Instead, on April 21, 2010, BoA filed the BoA 2004 Motion, seeking to conduct its own Rule 2004 examination of Freddie Mac. The BoA Exam Joinder Parties filed the BoA Exam Joinder Motions.

14. In support of the BoA 2004 Motion, BoA alleges the following:

a) Freddie Mac purchased mortgages directly from TBW, as well as from Ocala Funding, LLC ("Ocala"), a subsidiary of TBW. BoA 2004 Motion, ¶4.

b) BoA entered into a Second Amended and Restated Loan Purchase and Servicing Agreement dated June 30, 2008 ("MLPSA") with Ocala, as purchaser, and TBW, as seller and servicer. BoA 2004 Motion, ¶7.

c) Pursuant to the terms of the MLPSA, Ocala purchased mortgage loans ("Ocala Loans") from TBW that it financed with BoA funds, and Ocala issued subordinated notes ("Notes") pursuant to a Second Base Indenture. BoA 2004 Motion, ¶8.

  d)  Ocala pledged to BoA, as Collateral Agent, the Ocala Loans, the principal and interest under such Ocala Loans, any proceeds arising from the sale of the Ocala Loans to investors, and the servicing rights relating to the Ocala Loans.  BoA 2004 Motion, ¶9.

  e)  The outstanding balance of the subordinated Notes totals approximately $1.75 billion.  BoA 2004 Motion, ¶10.

  f)  BoA "believes that a portion of the loans currently held by Freddie Mac may include Ocala Loans that were pledged to Bank of America under the Security Agreement and that Ocala assets may have been diverted to Freddie Mac to cover TBW servicing advance obligations."  BoA 2004 Motion, ¶11.

15.  BoA requests that the Court order a Rule 2004 examination of Freddie Mac, its employees, former employees, and documents, stating that "Bank of America will investigate, among other things, issues related to the following:  (a) the purchase and sale of mortgage assets; (b) investor remittances; (c) bank reconciliations; (d) the repurchase-request process; (e) transfers of money from TBW to Freddie Mac; and (f) Freddie Mac's claim of ownership of certain mortgage assets and its custodial arrangements with Colonial for those assets.  Tellingly, "*Bank of America believes that information gathered in these areas will play a critical role in determining the rights of various creditors and other parties-in-interest with respect to the mortgage assets held by Freddie Mac.*"  BoA 2004 Motion, ¶22 (emphasis added).

16.  In addition, on April 12, 2010, the Committee filed its Motion of the Official Committee of Unsecured Creditors for Clarification of the Court's Ruling on Taylor, Bean & Whitaker Mortgage Corp.'s Motion Authorizing and Directing

Examination of the Federal Home Loan Mortgage Corporation and Related Joinders Thereto (the "Clarification Motion").  Pursuant to the Clarification Motion, the Committee requested that the Court require TBW to produce to the Committee's counsel copies of all documents produced by Freddie Mac to TBW, including those that are designated as Confidential Documents and contain privileged, competitive or proprietary information.

17.     On April 21, 2010, twelve (12) days after the time for rehearing had expired on the Debtor Exam Order pursuant to Rule 9023, BoA filed its Clarification Joinder Motion.

## DISCUSSION

### THE REQUESTED DISCOVERY INTERFERES WITH THE COURT'S PRIOR ORDER AND IS UNDULY BURDENSOME AND IS BEING SOUGHT FOR PURPOSES UNRELATED TO THIS CASE.

**I.      There is No Reason to Interfere with the Court-Ordered Discovery and Production Process that is Underway Between Freddie Mac and the Debtor.**

18.     The BoA 2004 Motion seeks to disrupt the orderly process put in place by this Court for the Debtor's 2004 discovery of Freddie Mac.  Consistent with the Court's Order, Freddie Mac has been cooperating with the Debtor and providing the Debtor with the documents that the Debtor believes are necessary to complete the Reconciliation Process.  In fact, Freddie Mac already has produced to the Debtor all of the documents that the Debtor has requested in connection with the Reconciliation Process. Notwithstanding the Court's Order, their prior representations to the Court and this orderly production of documents, BoA, BNPP and DB seek to interfere with the 2004 discovery process and entangle the Court in discovery relating to a massive third party

dispute that is pending between them in the District Court for the Southern District of New York.

19.     As set forth above, the Court granted the Debtor's request to conduct 2004 discovery of Freddie Mac at the March 17, 2010 hearing.   At that hearing, BoA and BNPP represented to the Court that they would follow the lead of the Debtor and would not interfere with the process by initiating their own discovery of Freddie Mac.   More importantly, the Court specifically prohibited BoA, BNPP, DB and other third parties from pursuing their own discovery from Freddie Mac.   The Court has stated these terms of its Order no less than *three* times.   *See, e.g.*, May 7, 2010 Hearing Tr. at 31-32 ("I granted the debtor's motion and I said the other parties can sit there, they can't participate . . . to allow the debtor to move on through and get this reconciliation done . . . I think that's what everybody agreed on.").

20.     Consistent with the Court's Order, Freddie Mac has been cooperating with the Debtor to provide the Debtor with the documents that the Debtor believes it needs to complete its Reconciliation Process.   In that regard, the Debtor and Freddie Mac agreed on specific documents that Freddie Mac would produce in connection with the Reconciliation Process.   Freddie Mac has now produced those documents to the Debtor in a series of four (4) separate productions.   These documents include, among other things, the Master Agreements and Master Commitments between Freddie Mac and TBW regarding the terms of purchase and sale of loans; transmittal letters regarding the Master Agreements and Master Commitments; the Acknowledgement Agreements between Freddie Mac, TBW and Colonial Bank, N.A. and Freddie Mac, TBW and Ixis Real Estate

Capital, Inc., respectively; and documents relating to a population of 7,883 loans about which the Debtor requested information.

21.     In light of this Court's Order and the cooperation between the Debtor and Freddie Mac, there is no basis for the BoA 2004 Motion.  In fact, at this point in time, all documents that the Debtor has told Freddie Mac that it needs in order to complete the Reconciliation Process have been produced by Freddie Mac.  The Debtor and Freddie Mac continue to cooperate with regard to other categories of documents that the Debtor has requested.  Accordingly, there is no need for this Court to revisit or amend the Court's clearly stated prior ruling.  The Court should deny the BoA 2004 Motion.

**II.     The BoA 2004 Motion and the BoA Exam Joinder Motions Are Unduly Burdensome and Have Been Made for the Improper Purpose of Obtaining Discovery for Use in Other Lawsuits.**

22.     BoA, as well as DB and BNPP, are aware of the productions that have been made by Freddie Mac because a production log identifying the produced documents has been provided to them.  At no point has BoA, BNPP or DB contacted Freddie Mac to discuss the production or the specific documents that Freddie Mac has produced.  Instead, they have chosen to file a motion to take their own discovery of Freddie Mac.  Under the guise of seeking information relevant to the Reconciliation Process, BoA, BNPP and DB are attempting to use this forum to obtain discovery from Freddie Mac for use in the New York Litigation.  BoA, DB and BNPP conveniently fail to mention the existence of this litigation in their respective motion and joinders for 2004 discovery.  Rather, BoA has admitted its real goal – to seek determination of its and others' alleged rights in Freddie Mac's assets.  See ¶15 at p.8, above.

23.     The BoA 2004 Motion seeks virtually every communication and document relating in any way to TBW's business relationship with Freddie Mac.  Given that the relationship involved the servicing of $50 billion in Freddie Mac loans, the volume of such documents and communications is enormous.  Indeed, the information requested by BoA includes at least twelve (12) witnesses associated with Freddie Mac, as well as eight (8) years' worth of documents relating (according to the Debtor) to over 295,000 mortgages.  The sheer volume of information that Freddie Mac will be required to examine for confidentiality or privilege, catalogue, copy, and produce to a nondebtor is extraordinary and unduly burdensome.  *In re Hammond*, 140 B.R. 197, 201 (Bankr. S.D. Ohio 1992) ("even if the discovery is within the bounds of Rule 2004, discovery is not permitted where the cost and burden of disclosure outweigh the interest of the party requesting such discovery," quoting *In re Drexel Burnham Lambert, Inc*., 123 B.R. 702, 712 (Bankr. S.D. N.Y. 1991)); s*ee also In re Texaco, Inc*., 79 B.R. 551, 553 (Bankr. S.D. N.Y. 1987).

24.     In fact, Freddie Mac estimates that at least thirty-two (32) terabytes of electronic information would need to be searched, and the results reviewed, in order to respond to BoA's document requests.  This is a staggering amount of information with equally staggering costs attached to the searching and reviewing of it.  A terabyte can hold 34 million pages of documents.  Thirty-two (32) terabytes is over *1 billion pages* of documents, which is *three times* the size of the printed collection of the Library of Congress.

25.     BoA effectively acknowledges the extreme breadth of its requests by its heavy reliance upon cases that purport to authorize broad "fishing expedition" style Rule

2004 examinations.[5]  Those cases, however, deal with instances where the debtor is taking 2004 discovery or is being subjected to it —not creditors taking 2004 discovery of other creditors.  *See e.g., In re Wilcher, supra* ("The proper mode of discovery which ordinarily must be utilized against a third party … is contained in the Federal Rules of Civil Procedure, which provide numerous procedural safeguards against unfairness to the party…  By contrast, the procedural safeguards provided by Bankruptcy Rule 2004 are minimal."); *In re Hopewell International Ins., Ltd.*, 258 B.R. 580, 586 (Bankr. S.D. N.Y. 2001) (Denying Rule 2004 examination of non-debtor and stating, "Discovery under Rule 2004 is broad, and it encompasses matters relating to the administration of the debtor's estate.  But it is generally used for examination of the debtor regarding the debtor's assets and liabilities, not creditors.").

26.    The breadth of the discovery sought by BoA is so vast that Freddie Mac estimates that it will cost at a minimum $10,000,000 to provide the discovery sought.  Moreover, the information requested by BoA, to the extent that it is actually relevant to BoA's rights and obligations, is information that BoA should have in its own possession.  Now, BoA seeks to unfairly shift the cost of compiling and providing such records to Freddie Mac by means of a broad "fishing expedition" style Rule 2004 examination.[6]

---

[5]See the cases cited by BoA at BoA 2004 Motion, ¶21, emphasizing the breadth of a Rule 2004 examination of the debtor, including *In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702 (Bankr. S.D. N.Y. 1991), and claiming that a Rule 2004 examination "can be legitimately compared to a fishing expedition."

[6] In connection with being placed into conservatorship by FHFA, Freddie Mac entered into certain agreements with the U.S. Treasury pursuant to which the Treasury made commitments to provide up to $200 Billion in funding to Freddie Mac under certain conditions.  To date, the Treasury has provided approximately $61.3 Billion in funding to Freddie Mac.  Similarly, BoA has recently received billions of dollars of aid from the U.S. Government and ultimately the U.S. taxpayers.  Any funds expended by Freddie

27.    BoA claims in the BoA 2004 Motion that this extraordinary procedure of a broad "fishing expedition" style Rule 2004 examination of a non-debtor, Freddie Mac, is merited because of BoA's allegations that Freddie Mac may have acquired mortgages in which BoA held a security interest.  The actual facts of this case (including those which BoA omitted in its pleadings) demonstrate only that BoA and the Joinder Parties are trying to use an abusive Rule 2004 examination of Freddie Mac for the purpose of shifting a loss that should rightfully be born by BoA or its note holders.

28.    BoA omits numerous material facts from the BoA 2004 Motion:

(a)    BoA has been sued in the Southern District of New York by the holders of the Notes under which BoA acts as Collateral Agent.  DB, the holder of a Note in the approximate amount of $1.2 billion, sued BoA (the "<u>DB Complaint</u>," a copy of which is attached hereto as Exhibit "A") alleging among other things that BoA failed to perfect the security interest in the Ocala Loans pledged as collateral for the Notes.  Specifically, DB alleges:

> "In August 2009, following the bankruptcy of TBW, it was revealed that with respect to the great majority of those mortgages, BoA either never had control of them in the first place or already had sold them to Freddie Mac."

See ¶15 of DB Complaint.

(b)    DB further alleges:

> "For example, the August 12, 2009 BOA Loan Report showed that there was approximately $1,160,530,265 in mortgages securing DB's investment.  BOA's own internal information, however, shows that at least $470 million of these mortgages already had been delivered and sold to Freddie Mac at least two weeks prior to the date of the BOA Loan Report and so could not have constituted

Mac in responding to BoA's discovery request would effectively require an additional expenditure of taxpayer funds.

collateral securing DB's investment. Further, on information and belief, as of August 12, 2009, there were virtually no mortgages held by BOA to secure DB's investment."

See ¶83 of DB Complaint.

(c) Another Noteholder, BNPP, the holder of a Note in the amount of $480.7 million, makes similar allegations in its complaint against BoA (the "BNPP Complaint," a copy of which is attached as Exhibit "B," was also filed in the Southern District of New York:

"Many of the Shipped Reports that Bank of America sent to BNPP misrepresented the collateral securing the BNPP's Secured Notes by including mortgage loans that were no longer owned by Ocala. For example, the August 4, 2009 Shipped Report provided by Bank of America to BNPP listed 2,043 loans with a face amount of $417.7 million that Bank of America purportedly owned. However Bank of America's internal documents (executed by Matthew Smith) established that 90% of those loans (1,837 mortgages with a face amount of $374.9 million) were previously purchased by Freddie Mac and were no longer owned by Bank of America."

See ¶103 of BNPP Complaint, emphasis added.

(d) In response to the New York Litigation, BoA filed a Memorandum of Law in Support of its Motion to Dismiss (the "BoA Dismissal Memorandum," see Exhibit "C," attached hereto). In the BoA Dismissal Memorandum, BoA does not contest that the alleged security interest in the Ocala Loans was unperfected against the rights of Freddie Mac, but asserts as its primary argument that perfecting the security interest in the Ocala Loans was not its responsibility. Rather, according to BoA, that responsibility fell upon Ocala Funding, LLC, and the Debtor itself. BoA states:

"Under the Purchase Agreement, and also at TBW's direction, Ocala controlled the removal of the mortgage loans from the facility's accounts at BoA for sale to third parties, mostly Freddie

Mac, as well as the transfer of the resulting proceeds back to the relevant accounts or sub-accounts to fund additional mortgage purchases."

See the BoA Dismissal Memorandum, p. 8 (bottom) to p. 9 (top). BoA further states:

"As with the Security Agreement, Ocala had the right to remove mortgage files from the Custodial Account in order to facilitate their sale to third parties such as Freddie Mac."

See BoA Dismissal Memorandum, p. 14 (bottom). BoA further explains:

"[T]here certainly are transactions where the parties insist on an escrow or "lockbox" arrangement to protect against malfeasance by one or more of the principals by preventing them from controlling the program's assets. Ocala was not such a program. On the contrary, TBW controlled the assets every step of their way through the program:

- TBW decided which mortgage loans to place in the program;

- TBW serviced the loans held by the program;

- TBW decided when to sell the loans out of the program;

- TBW decided to whom to sell the loans; and

- TBW decided at what price to sell the loans."

See BoA Dismissal Memorandum, p. 15. BoA further explains:

"TBW wanted to control every aspect of its program, and Plaintiffs [DB and BNPP] contractually agreed—and received massive fees in their many capacities for this concession—to allow it to do so."

See BoA Dismissal Memorandum, p. 16, (top). BoA again states:

"The Security Agreement—like the other Facility Documents— makes crystal clear that only TBW and Ocala are responsible for perfecting the security interests in loans assigned to the facility."

BoA Dismissal Memorandum, p. 35. To further emphasize, BoA repeats:

"[U]nder the Agreement, TBW had the right to remove mortgage files from the Custodial Account in order to facilitate their sale to third parties such as Freddie Mac."

See BoA Dismissal Memorandum, p. 46.[7]

29.     The information provided in the New York Litigation appears to establish that TBW *did* sell mortgage loans to Freddie Mac.  BoA makes clear that it was *intended* and *agreed* by the parties that the Debtor would be able to sell mortgage loans to Freddie Mac free of BoA's security interest, with the security interest attaching to the proceeds. See the BoA 2004 Motion, ¶9, stating that the Security Agreement pledged "any proceeds from the sale of the Ocala Loans to investors."

30.     There is no allegation that Freddie Mac acted improperly in its purchases of these mortgage loans.  If anything, Freddie Mac, as a purchaser for value and in good faith, may retain these assets, even if BoA is correct in its allegations against TBW and Ocala.  *See* 11 U.S.C. 548(c).  Thus, the rationale by BoA to "determin[e] the rights of various creditors and other parties-in-interest with respect to the mortgage assets held by Freddie Mac" lacks credibility as there has been no allegation of wrongdoing on the part of Freddie Mac, and does not justify the "fishing expeditions" sought by BoA.

31.     The transaction to which BoA was a party is what is known as a "mortgage warehouse facility."[8]  Such a facility is akin to a floating inventory lien in that

---

[7] The actions of BoA, DB and BNPP regarding Freddie Mac in this matter must be scrutinized in connection with their representations in the NY Litigation - that Ocala and TBW were authorized to sell mortgage loans to Freddie Mac and that these three (3) entities had no security interest in the mortgage loans now part of Freddie Mac's assets.

[8] See ¶2 of the BNPP Complaint, stating:  "Ocala is a mortgage warehousing facility created to provide short-term liquidity funding to Taylor, Bean & Whitaker Mortgage Corp. ("TBW") pending the sale of mortgages originated by TBW to the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others."

the owner of the collateral is able to sell the collateral free of the lien, with the security interest attaching to the proceeds. Once the mortgages were sold, they belonged to Freddie Mac, free of BoA's security interest.

32.     As BoA explains at length in its own BoA Dismissal Memorandum filed in the New York Litigation, the secured party's protection in this case from fraud by the seller lies in its continual monitoring of the facility and the collateral, and its immediate intervention if the seller acts improperly. The dispute in the New York Litigation appears to hinge upon which of the parties to the facility (of which Freddie Mac is not a party) had the responsibility to monitor and compel compliance. None of the parties in the New York Litigation make any claim that they are the true owner of the mortgage loans now owned by Freddie Mac. Rather, the actions appear to relate to their liabilities *vis-à-vis* each other arising out of the sale of the loans to Freddie Mac in good faith and for full value.

33.     Whatever the merits of the respective positions of BoA, DB and BNPP, however, the facts remain that (i) no discovery has yet taken place in the New York Litigation, (ii) Freddie Mac is not a party to those cases, and (iii) to Freddie Mac's knowledge, neither the Debtor nor any other party has chosen to raise the question of whether the automatic stay precludes those cases from going forward. Thus, those cases are proceeding apace. Notwithstanding the foregoing (and perhaps because of it), BoA, as well as DB and BNPP, have chosen to use this forum to obtain discovery from Freddie Mac that they cannot obtain in those cases in their present posture. It is improper for BoA and the Joinder Parties to use this Court to seek an order against Freddie Mac, an innocent non-debtor third party to submit itself, its employees, its former employees, and

its business records to a far-reaching, overbroad, "fishing expedition" style Rule 2004 examination, primarily, if not exclusively, related to the unwarranted but patently transparent effort of BoA and the Joinder Parties to shift their losses to Freddie Mac, and ultimately to the U.S. taxpayer.

34.    BoA states that it believes some of the mortgages held by Freddie Mac may include Ocala Loans in which it allegedly held a security interest.  BoA's insistence that it may have an interest in those mortgages is belied by the fact that BoA is apparently unable even to identify the mortgages in question without having Freddie Mac first provide the information to BoA by means of a Rule 2004 examination.  Even more importantly, BoA admits in its Dismissal Memorandum that Ocala and TBW had BoA's contractual approval to sell the mortgage loans at issue to Freddie Mac.  BoA Dismissal Memorandum, p. 8-9.  The Court should not countenance the use of a Rule 2004 examination to circumvent the normal rules of discovery, or to unfairly assist BoA and the Joinder Parties to conduct a fishing expedition of matters and issues which have not been properly pled, and with respect to which Freddie Mac and the Conservator have not been given fair notice.

35.    Finally, BoA states in the BoA 2004 Motion that because the list of documents and witnesses requested by BoA is identical to the list of documents and witnesses requested by the Debtor, BoA's requests would not "increase or alter the burden on Freddie Mac."  BoA 2004 Motion, p. 10.  BoA relies heavily on this point, calling it "important."  BoA 2004 Motion, p. 8.[9]  BoA completely ignores the fact that the

---

[9]Yet curiously, BoA then goes on to list a number of other matters that are not within the scope contemplated by the Debtor as additional areas of its inquiry.  See BoA 2004 Motion, ¶22.

Debtor and Freddie Mac have agreed to an orderly production of documents necessary to assist the Debtor with the Reconciliation Process. Testimonial discovery has been deferred for the present. But while even the Debtor has agreed to narrow its inquiry, BoA continues to insist upon a far-reaching fishing expedition style Rule 2004 examination, and insists that depositions proceed immediately. Further, BoA announced (even in advance of any production) that it "has serious concerns that the forthcoming Asset Reconciliation report will not contain complete and accurate information." BoA 2004 Motion, p. 9. This advance prediction purports to provide a basis for BoA to leapfrog the Debtor's Reconciliation Process and proceed with its own agenda, seeking information before the Debtor is able to obtain it, or even needs it. This is a misuse of the Rule 2004 process.

36. Moreover, the relief sought by BoA and the Joinder Parties could significantly disrupt and delay this bankruptcy proceeding, as the court and the affected parties would be forced to devote a considerable amount of time to administering the discovery process.

37. The Court should therefore exercise its discretion to maintain the orderly and efficient progress of this proceeding by denying the BoA 2004 Motion.

### III. The Court Should Not Revisit Its Order and Allow BoA to Review Freddie Mac's Confidential, Proprietary Information.

38. While BoA styles its Clarification Joinder Motion as a motion for clarification, the Debtor Exam Order was unambiguous, and did not require clarification. The Debtor Exam Order expressly stated that "Freddie Mac may identify such documents due to privilege, proprietary information or other reasons … not to be shared, produced, copied, or transmitted or otherwise disclosed to any of the Joinder Parties, <u>or their</u>

respective counsel…" Debtor Exam Order, pp. 3-4 (emphasis added). In addition, as the Committee admits in its Clarification Motion to which BoA seeks to join, the issue of whether the Joinder Parties' counsel should be permitted to review Confidential Documents was extensively argued at the hearing. BoA's Clarification Joinder Motion is really an untimely motion for reconsideration. If BoA wished for the proposed "attorneys' eyes only" provision to be included in the Court's Debtor Exam Order, it should have either filed a timely motion for reconsideration of the Order or submitted to the Court an alternative form of proposed order containing such a provision. It did neither.

39.     BoA is well aware that it lost on the issue that was argued extensively before the Court, but now seeks another bite at the apple, while complaining at the same time that the discovery has been delayed. As discussed above, BoA is incorrect in this basic factual allegation because there has been no delay. TBW and Freddie Mac have had ongoing, substantive discussions regarding the scope and timing of Freddie Mac's production of documents. Those discussions, which began upon the filing of the Debtor's 2004 Motion, have continued through the present time, and have been productive, with the parties having agreed upon the scope of the production related to the Reconciliation Process, as discussed above. As with the BoA 2004 Motion, there is no need for the Court to revisit its prior Order and the Court should deny the Clarification Joinder Motion.

### THE CONSERVATOR'S DUTY TO CONSERVE AND PROTECT FREDDIE MAC'S ASSETS PROVIDES FURTHER SUPPORT TO DENY THE BURDENSOME AND ABUSIVE DISCOVERY SOUGHT BY BoA.

40.     On July 30, 2008, Congress passed, and the President subsequently signed HERA into law, which formed FHFA. See 12 U.S.C. §4617. FHFA replaced the Office

of Federal Housing Enterprise Oversight as the regulator with jurisdiction over Freddie Mac and is vested with the authority of supervising and regulating Freddie Mac.

41. Among its "principal duties," FHFA is charged with examining the financial safety and soundness and overall risk management practices of Freddie Mac. 12 U.S.C. §4513(a)(1)(B)(i). In addition, HERA granted the Director of FHFA the authority to place Freddie Mac into conservatorship or receivership "for the purpose of reorganizing, rehabilitating, or winding up the affairs of [Freddie Mac]." 12 U.S.C. §4617(a)(2).

42. FHFA, as Conservator, has succeeded to "all rights, titles, powers, and privileges" of Freddie Mac and its stockholders. See 12 U.S.C. §4617(b)(2)(A)(i). In its capacity as Conservator, FHFA is vested with broad statutory powers to act on behalf of and through Freddie Mac.

43. Pursuant to 12 U.S.C. § 4617(b)(2)(B)(i), FHFA is empowered as Conservator to "take over the assets of and operate [Freddie Mac] with all the powers of the shareholders, the directors, and the officers of [Freddie Mac] and conduct all business of [Freddie Mac]." FHFA is entitled to exercise these powers to "preserve and conserve the assets and property of [Freddie Mac]," *id.* §4617(b)(2)(B)(iv).

44. Furthermore, FHFA, as Conservator of Freddie Mac, is statutorily empowered to:

- "collect all obligations and money due [Freddie Mac]," *id.* §4617(b)(2)(B)(ii);

- "perform all functions of [Freddie Mac] in the name of [Freddie Mac] which are consistent with the appointment as conservator," *id.* §4617(b)(2)(B)(iii);

- "take any such action as may be (i) necessary to put [Freddie Mac] in a sound and solvent condition; and (ii) appropriate to carry on the business of [Freddie Mac] and preserve and conserve the assets and property of [Freddie Mac]," *id.* §4617(b)(2)(D)(i)-(ii);

- "exercise all powers and authorities specifically granted to conservators... and such incidental powers as shall be necessary to carry out such powers," *id.* §4617(b)(2)(J)(i); and

- "take any action authorized by this section, which the Agency determines is in the best interests of [Freddie Mac] or the Agency," *id.* §4617(b)(2)(J)(ii).[10]

---

[10]In order to provide the Conservator with the broadest possible latitude to operate Freddie Mac and preserve and conserve its assets without interference, Congress expressly precluded judicial review of or interference with the Conservator's statutorily authorized activities: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." *Id.* §4617(f). The Eleventh Circuit has recently held—in a case involving some of the funds at issue in this bankruptcy case— that, based on a similar statute providing the same sort of protection for the FDIC as provided for to the Conservator under Title 12, a District Court lacked jurisdiction to enjoin the FDIC. *See Bank of America National Association v. Colonial Bank*, ___ F.3d ___, 2010 WL 1644886, No. 09-22384 CV-AJ (11th Cir. Apr. 26, 2010). Indeed, several courts have interpreted 12 U.S.C. § 4617(j) by referencing cases decided under the FDIC's comparable FIRREA provisions. *See Kuriakose v. Fed. Home Loan Mortgage Corp.*, No. 1:08-cv-07281, 2009 WL 4609591, at *9 (S.D.N.Y. Dec. 7, 2009) ("In analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent relating to the nearly identical anti-injunction statute under [FIRREA]."; *Esther Sadowsky Testamentary Trust*, 639 F. Supp. 2d 347, 350-51 (S.D.N.Y. 2009) (holding that §4617(f) bars the plaintiff's actions and observing that "[a] similar anti-injunction clause in the FIRREA, 12 U.S.C. § 1821(j), has been found by several courts to constitute

45. Courts are called upon every day to balance the legitimate needs of litigants against the potential of overly burdensome and abusive discovery. Here, the prospect of forcing the Freddie Mac conservatorship estate, and ultimately the American taxpayer, to incur $10,000,000 or more in expenses to provide overly burdensome discovery designed to meet the needs of litigants in connection with the New York Litigation, which is wholly separate from this bankruptcy, should strongly tip the balance in favor of a denial of the BoA 2004 Motion.[11] Moreover, that balancing should take into account that the overly burdensome, highly expensive discovery that BoA seeks is contrary to the Conservator's mandate to conserve and protect the assets of Freddie Mac, here amounting to a waste of $10,000,000 or more in taxpayer funds.

46. If the Court decides to grant the BoA 2004 Motion, notwithstanding these strong arguments to the contrary, then BoA should be required to bear the costs of Freddie Mac's production. As stated, the amount of information that needs to be searched and reviewed to respond to BoA's requests is staggering, as are the associated costs, a minimum of $10,000,000. Accordingly, if this Court grants the BoA 2004 Motion, the Court should order BoA to cover all costs associated with Freddie Mac's

---

a sweeping ouster of courts' power to grant equitable remedies." (internal quotation marks and citations omitted)); *In re Fed. Nat'l Mortgage Ass'n Secs., Derivative, and "ERISA" Litig.*, 629 F. Supp. 2d 1, 4 n.4 (D.D.C. 2009) ("HERA explicitly prohibits" courts from "tak[ing] action that would 'restrain or affect' FHFA's discretion.").

[11] Freddie Mac continues to operate under a conservatorship established in 2008, with financial support from the U.S. Treasury Department through the Senior Preferred Stock Purchase Agreements established at the same time. Any funds expended by Freddie Mac in responding to BoA's discovery request would further deplete the financial resources of Freddie Mac, and those resources would have be replenished by additional financial draws upon the U.S. Treasury. BoA seeks to have U.S. taxpayers fund its "fishing expedition" into Freddie Mac's records through its Rule 2004 Motion.

response to its discovery requests. *See, e.g., Eley v. Hayes*, 2007 U.S. Dist. LEXIS 63012, 2007 WL 2462638 (S.D. Ga. 2007) ("Normally, an F.R.Civ.P. 45 requester is obligated to pay all subpoenaed document-production costs: Rule 45's mandatory cost-shifting provisions promote the most efficient use of resources in the discovery process.") (internal citation and quotation omitted).

## CONCLUSION

The requested Rule 2004 examination of Freddie Mac by BoA, DB and BNPP and the Clarification Joinder Motion are simply not appropriate, carries with them the grave potential for abuse, and contravenes Freddie Mac's Conservator's congressionally mandated duties. Accordingly, the BoA 2004 Motion, the BoA Exam Joinder Motions and the Clarification Joinder Motion should be denied in their entirety, with prejudice.

Respectfully submitted,

/s/ David E. Peterson
Gary R. Soles
Florida Bar No.: 0616149
Jason Ward Johnson
Florida Bar No.: 0186538
David E. Peterson
Florida Bar No. 0373230
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
450 South Orange Avenue, Suite 800
Orlando, Florida 32803
Telephone: (407) 843-4600
Facsimile: (407) 843-4444
e-mail: jason.johnson@lowndes-law.com

and

/s/ Hugh Ray
Hugh Ray
Texas Bar No: 16611000
Paul Moak
Texas Bar No: 00794316

McKool Smith, P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344
e-mail: pmoak@mckoolsmith.com


/s/ George Kielman
George Kielman,
Managing Associate General Counsel
Kenton W. Hambrick,
Associate General Counsel
Soha Mody, Associate General Counsel
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive - MS 202
McLean, Virginia 22102
Telephone: (703) 903-2640
Facsimile: (703) 903-3691
Attorneys for Federal Home Loan Mortgage
Corporation


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 10th day of June, 2010, I electronically filed the foregoing *Objection of Freddie Mac To Bank of America's Motion for an Order Authorizing and Directing Examination of Federal Home Loan Mortgage Corporation Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and to Joinder by BNP Paribas in Bank of America's Motion for Order Authorizing 2004 Examination of Federal Home Loan Corporation and Joinder by Deutsche Bank AG in Bank of America's Motion and to Bank of America's Motion to Join Motion of Creditors Committee for Clarification of Order Authorizing Rule 2004 Examination Of Federal Home Loan Mortgage Corporation* with the Clerk of Court by using the Case Management/Electronic Case Filing ("CM/ECF") system which will send a notice of electronic filing, and I will complete service of the foregoing as required by Rule 5, Federal Rules of Civil Procedure, made applicable by Rule 7005, Federal Rules of Bankruptcy Procedure, to all parties indicated on the electronic filing receipt.


/s/ David E. Peterson
David E. Peterson