IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| TAYLOR, BEAN & WHITAKER MORTGAGE CORP., REO SPECIALISTS, LLC, and HOME AMERICA MORTGAGE, INC., | Case No. 3:09-bk-07047-JAF<br>Case No. 3:09-bk-10022-JAF<br>Case No. 3:09-bk-10023-JAF |
| Debtors. | |
| TAYLOR, BEAN & WHITAKER MORTGAGE CORP., | Case No. 3:09-bk-07047-JAF |
| Applicable Debtor. | |

**FINAL RECONCILIATION REPORT OF**
**DEBTOR TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**

Jeffrey W. Kelley (Ga. Bar No. 412296)
jeffrey.kelley@troutmansanders.com
Ezra H. Cohen (Ga. Bar No. 173800)
ezra.cohen@troutmansanders.com
J. David Dantzler, Jr. (Ga. Bar No. 205125)
david.dantzler@troutmansanders.com
**TROUTMAN SANDERS LLP**
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

**SPECIAL COUNSEL TO DEBTOR TAYLOR,
BEAN & WHITAKER MORTGAGE CORP.**

Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
Amy Denton Harris (FBN 0634506)
aharris@srbp.com
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811

**ATTORNEYS FOR DEBTOR TAYLOR, BEAN &
WHITAKER MORTGAGE CORP.**

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ...........................................................................................................ii

NOTICE AND DISCLAIMER ..............................................................................................1

SUMMARY OF FINDINGS..................................................................................................2

I.       BACKGROUND .....................................................................................................9

II.      TBW'S BUSINESS OPERATIONS .....................................................................13

         A.       Origination, Underwriting and Funding ....................................................13

         B.       Mortgage Loan Funding Process................................................................17

         C.       Sales of Mortgages to Investors ................................................................19

         D.       TBW's Mortgage Servicing Operations ....................................................22

         E.       Real Estate Owned ("REO") ......................................................................26

III.     SUPPORTING DATA AND DATABASE............................................................28

IV.      SERVICING RECONCILIATION .......................................................................30

         A.       Affected Funds Reconciliation ..................................................................30

         B.       Book-to-Bank Reconciliations ...................................................................37

         C.       Servicing Advances Reconciliation ...........................................................41

         D.       Borrower Protocol Update .........................................................................43

V.       ASSET RECONCILIATION.................................................................................51

         A.       Ocala Funding ............................................................................................53

         B.       Colonial COLB...........................................................................................68

         C.       Colonial AOT Facilities and BoA EPF......................................................71

         D.       Uses of Cash and Funding Sources ............................................................77

         E.       REO .............................................................................................................83

VI.      NEXT STEPS........................................................................................................84

**TABLE OF EXHIBITS**

Exhibit A    Overview of Servicing Reconciliation Procedures

Exhibit B    Overview of Asset Reconciliation Procedures

Exhibit C    "Gross" Affected Funds as of April 30, 2010

Exhibit D    Reductions to the "Gross" Affected Funds as of April 30, 2010

Exhibit E    "Net" Affected Funds as of April 30, 2010

Exhibit F    Summary of Funds Identified in the Colonial Bank Custodial Funds Clearing Account ("CFCA")

Exhibit G    Custodial Funds Clearing Account as of April 30, 2010

Exhibit H    Colonial Bank Custodial Funds Clearing Account Roll Forward from August 1, 2009 through April 30, 2010

Exhibit I    Summary of Funds "Still Under Review" and Proposed Final Steps

Exhibit J    Colonial Bank Account Balances

Exhibit K    Regions Account Balances

Exhibit L    Summary of the Regions Refunds Account Allocation as of April 30, 2010

Exhibit M    P&I Book-to-Bank Reconciliation by Investor

Exhibit N    P&I Book-to-Bank Reconciliation – Other P&I Items

Exhibit O    Escrow Fund Book-to-Bank Reconciliation by Investor

Exhibit P    EDCA Reconciliation by Investor as of April 30, 2010

Exhibit Q    Other Unreimbursed Items

Exhibit R    Advance Reimbursement as of April 30, 2010

Exhibit S    Databases Created for the Asset Reconciliation

Exhibit T    Discrepancies Between Data Sources that Identify Freddie Mac as the Investor for Ocala Funding Loans

Exhibit U    Discrepancies Between Data Sources that Identify Freddie Mac as the Investor for COLB Loans

Exhibit V    Example of bailee letter for shipment of loans from Colonial to LGTS

Exhibit W    Example of bailee letter for shipment of loans from LGTS

Exhibit X    Form 996

## NOTICE AND DISCLAIMER

This Final Reconciliation Report (the "**Report**") is intended to provide the Court, mortgage investors, creditors, and other stakeholders with the final results of the Servicing Reconciliation and the Asset Reconciliation performed by Taylor, Bean & Whitaker Mortgage Corp., as the Debtor and the Debtor in Possession in this Chapter 11 case ("**TBW**" or the "**Debtor**").  The information set forth herein is the result of work performed by the Debtor, its Chief Restructuring Officer and associated support staff and legal counsel.  The findings set forth in this Report (including the tables and exhibits) are the result of reconciliation activities conducted in accordance with processes designed by the Debtor and are not intended to be in conformance with Generally Accepted Accounting Principles, Generally Accepted Auditing Standards, or Attest Engagement Standards as defined by the American Institute of Certified Public Accountants.

While this Report is intended to be final, it is important to emphasize that because of the circumstances of this case, it is conceivable that specific findings could change as additional facts are discovered.  The findings set forth below are intended to be factual and are not intended to be and should not be construed as an opinion or assurance of any lawyer, accountant, or other professional involved in the reconciliation process.

Due to the time and expense required, the Debtor has not undertaken a comprehensive analysis of all receipts and disbursements of money by TBW in the course of its business operation.  It may be necessary and appropriate to perform such an analysis, at least for specific time periods, at some future stage of this case.

## SUMMARY OF FINDINGS

By July 2009, TBW had grown into one of the largest mortgage lenders in the United States.  At that time, TBW was originating approximately 14,500 mortgage loans per month through a nationwide network of mortgage brokers and community banks.  TBW then sold those loans to the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") and other mortgage investors, who used these assets to support the issuance of mortgage-backed securities or held them as investments.  In general, TBW retained the right to service the mortgage loans – *i.e.*, collect monthly mortgage payments from borrowers, pay principal and interest to the mortgage investors, manage tax and insurance "escrows," and perform other related activities.  By July 2009, TBW was servicing more than 512,000 mortgages having an unpaid principal balance in excess of $80 billion.

On Monday, August 3, 2009, federal law enforcement agents simultaneously executed search warrants at TBW's Ocala headquarters and at the Orlando offices of Colonial Bank ("**Colonial**"), TBW's primary bank.  The following day:

- The United States Department of Housing and Urban Development ("**HUD**") delivered written notice suspending TBW's HUD/FHA origination and underwriting approval;

- The Government National Mortgage Association ("**Ginnie Mae**") delivered written notice of termination of TBW as a Ginnie Mae issuer and servicer of its $26 billion mortgage portfolio; and,

- Freddie Mac delivered written notice of the termination of TBW's eligibility to sell loans to Freddie Mac and to service its $51.2 billion portfolio.

In combination, these terminations and suspensions rendered TBW unable to conduct its business.

After TBW's emergency request for reconsideration of HUD's termination was denied on Wednesday, August 5, 2009, TBW immediately laid off the vast majority of its approximately 2,500 employees.  On that same day, Colonial placed an administrative hold on all of TBW's accounts, making it impossible for TBW to access more than 100 bank accounts.  By Friday, August 7, 2009, TBW was effectively out of business.

In the midst of the company's collapse, mortgage investors demanded that TBW transfer servicing responsibility for their respective loan portfolios to other servicers.  At the same time, more than 40 state regulatory agencies commenced emergency enforcement proceedings against TBW, further constraining its ability to conduct any business activity.

On August 14, 2009, Colonial was closed by the Alabama State Banking Department, and the Federal Deposit Insurance Corp. was appointed as receiver in accordance with the statutory receivership process provided for in 12 U.S.C. §1821, *et seq.* ("**FDIC-Receiver**").  The monies on deposit at Colonial, including the servicing-related accounts, remained subject to the administrative hold.  All the while, borrowers continued to send mortgage payments to TBW (including payments sent to a lockbox maintained at Colonial), and checks written by TBW on Colonial accounts were not honored.

On August 24, 2009, TBW filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code (the "**Petition**").  Prior to the Chapter 11 filing, TBW's directors and officers resigned; two new, independent restructuring professionals were appointed to comprise TBW's board of directors; and, Neil Luria of Navigant Capital Advisors, LLC was appointed by the new board as Chief Restructuring Officer.  In addition, new bank accounts were

established at Regions Bank ("**Regions**") to be used by the Debtor in the administration of the bankruptcy estate.

In the earliest stages of this bankruptcy case, issues emerged regarding the ownership of mortgages that were claimed to be collateral securing payment of promissory notes issued by TBW's subsidiary, Ocala Funding, LLC ("**Ocala Funding**"), pursuant to the terms of a commercial paper facility. In sum, when TBW collapsed, Ocala Funding did not have possession and control of mortgages that, when coupled with available cash collateral, were sufficient to satisfy the amounts owed under the facility. Bank of America, as indenture trustee of the facility, contended that Colonial was in possession of mortgages (or related sales proceeds) that were collateral for the facility. Because Ocala Funding and the commercial paper facility were managed by TBW, these issues are relevant to the administration and ultimate resolution of this bankruptcy estate.

Given the nature of the relationship between TBW and Colonial, it was important to establish an interface between the discrete insolvency proceedings of the two institutions. As the result of extensive negotiations that began prior to the filing of the Petition, the FDIC-Receiver and the Debtor entered into a Stipulation dated September 10, 2009 [Docket Nos. 202 and 222] (the "**Stipulation**"). In relevant part, the Stipulation required the Debtor to perform a reconciliation of the borrower funds and other servicing-related monies that had been affected by the sudden collapse of TBW and the failure of Colonial (the "**Servicing Reconciliation**"), as well as an analysis of the mortgage loans that were the subject of competing claims of ownership (the "**Asset Reconciliation**" and together with the Servicing Reconciliation, the "**Reconciliations**"). The Stipulation was approved by this Court in orders entered on September 29, 2009 and October 16, 2009 [Docket Nos. 348 and 468].

From the outset, it was evident that the reconciliation processes would be complicated and that the scope of work would likely evolve as facts and circumstances were developed. In accordance with the Stipulation, the Debtor filed two interim reports regarding the status of its work. In the course of the Servicing Reconciliation, the Debtor, in collaboration with the FDIC-Receiver, developed a "protocol" to address myriad problems experienced by borrowers resulting from TBW's collapse. In an order entered on February 24, 2010, this Court approved the Debtor's recommended "Borrower Protocol."

The balances reported in the Servicing Reconciliation are "as of" April 30, 2010, which are updated from the balances reported in the Debtor's interim reports.[1] While the precise cash amounts will continue to change due to bank activity after April 30, 2010, the reconciliation processes are concluded. Throughout, the Debtor has worked collaboratively with the FDIC-Receiver and has endeavored to provide informal updates to the other parties most affected by the results. Enormous amounts of data have been reviewed and compiled. Electronic databases have been and/or will be made available to interested parties pursuant to appropriate confidentiality agreements.

While the Debtor's analysis is set forth in detail in this Report, the fundamental findings can be summarized as follows:

### *Servicing Reconciliation*

1.      The cumulative amount of servicing-related funds affected by the above-described events is $860,642,822 (the "**Gross Affected Funds**"). These Gross Affected Funds include: (a) deposits in servicing-related accounts at Colonial, Regions, Seaside Bank ("**Seaside**"), and Platinum Community Bank; (b) certain money that the Debtor and the FDIC-

---

[1]      This Report also includes categories and allocations of funds that were not included in the interim reports.

Receiver have turned over to mortgage investors since August 5, 2009, including checks in the lockbox at Colonial; and, (c) electronic payments that were in process, but not completed, as of August 5, 2009. The Gross Affected Funds do not include additional borrower payments received by the Debtor and forwarded to new servicers after servicing transfers were accomplished.

2.      As of April 30, 2010, a total of $396,014,173 in servicing-related monies are on deposit at the following banks:

| | |
|---|---|
| Colonial | $242,304,743 |
| Regions | $148,709,430 |
| Seaside | $5,000,000 |

3.      As of August 4, 2009 (the day before the administrative hold), there was $25,145,274 less cash on deposit in the Colonial servicing-related accounts than TBW's books indicated should have been in place, indicating a cash shortfall in the servicing accounts in this amount. Approximately $19 million of this shortfall is in tax and insurance "escrow" accounts that had not been funded as of that date due to TBW's business custom and practice regarding the funding of these accounts.

4.      As of the filing of this Report, the cumulative balance of the Debtor's unreimbursed servicing advances and unpaid servicing fees is $263,993,800.

### *Asset Reconciliation*

1.      As of August 24, 2009, Ocala Funding owed approximately $1.68 billion to Deutsche Bank and BNP Paribas pursuant to promissory notes issued as part of its commercial paper facility. As of that date, the value of the collateral in the possession of Bank of America, as collateral agent for the Ocala Funding commercial paper facility, comprised of cash and 693 loans, was less than $165 million. Eighty-six (86) of these loans are assigned the Ocala Funding

investor code in the TBW servicing system, but 25 of these are loans that never closed or were paid off.

2.      According to Bank of America's records, there were 9,111 mortgage loans that were collateral securing the amounts owed on the Ocala Funding commercial paper facility as of August 24, 2009.  However, it is now evident that Ocala Funding or TBW had previously sold and been paid for more than 8,600 of these loans, with 7,192 having been sold to Freddie Mac.  Another 301 of the loans that were purportedly collateral for the facility, were either very old, had never closed, had been paid off, or were sold prior to 2007.  Only 183 loans (including the 86 described in Paragraph 1, above) are assigned the Ocala Funding investor code in the TBW servicing system, and 23 of these loans were apparently sold to and paid for by Freddie Mac.

3.      In the months preceding TBW's collapse, the exclusive source for funding individual loan closings was the Colonial COLB facility.  As loans were funded, they were assigned to that facility and then sold.  As of August 24, 2009, Colonial's records indicate that there were 8,714 loans assigned to the COLB facility, with an associated advance balance in excess of $1.7 billion.  Of this total, there were 4,928 loans, with a cumulative advance balance of $909.6 million, that had been "sold" to Ocala Funding and delivered to LGTS, its collateral agent, for which Colonial had not been paid.  In addition, Ocala Funding or TBW had previously sold 4,856 of the 8,714 loans to third-party mortgage investors such as Freddie Mac, which included 4,254 of the loans that had been sold to Ocala Funding (for which Colonial had not been paid).  The result is that the respective records of Colonial, Ocala Funding, and Freddie Mac (and other investors) each indicate that they are the "owner" of the same 4,254 mortgages.[2]

---

[2]      Throughout this Report, certain statements are made regarding "loans" and the movement of "loans" by and among parties.  In this context, "loan" actually refers to original loan documents such as the promissory note and other original documents evidencing the loan and mortgage interest.

4.      As of August 24, 2009, there were 124 pools of loans assigned to the Colonial

AOT facilities with a purported cumulative balance of $1,473,868,368.  None of these "trades"

was an actual, pending transaction, and 112 were "duplicative" of actual trades assigned to

another Bank of America financing facility (wholly unrelated to Ocala Funding).  Hence, there is

no value in the 124 trades assigned to the AOT facilities.

5.      In addition to the 124 worthless "trades," there were 9,304 individual loans

assigned to the AOT facilities.  As of August 24, 2009, a significant portion of these loans had

been sold to other mortgage investors, had been paid off or otherwise had been charged off.  Of

the remainder, 1,837 had been foreclosed, with 1,197 of the underlying properties on hand when

the Petition was filed.  The net result is that there are 3,278 loans, having a cumulative unpaid

principal balance of $488.5 million, assigned to the AOT that had not been sold and/or

foreclosed as of August 24, 2009.  The actual value of these loans is substantially less than the

unpaid principal balance, which means that the AOT facilities are likely under-collateralized by

more than $1 billion.

6.      While the amounts have not been quantified precisely, it is evident that since June

30, 2008, hundreds of millions of dollars in proceeds from the Colonial AOT facilities and

proceeds of loan sales by Ocala Funding and TBW were used to pay servicing advances and loan

repurchases, pay off worthless trades assigned to the AOT facilities, and fund other aspects of

TBW's business operations.  These uses were inconsistent with the controlling agreements

governing the facilities.

The Debtor will provide the Court and interested stakeholders with an overview of this

Report during the status conference to be held on July 7, 2010.  The Debtor will continue to work

with the FDIC-Receiver and other affected stakeholders to identify, clarify, and, to the extent

possible, resolve key issues regarding claims and recoveries. With the completion of this Report, the Debtor, in conjunction with the Committee as a co-proponent, expects to be able to file a proposed plan of liquidation and disclosure statement by September 21, 2010, if not earlier, which is consistent with the pending Motion for Second Extension of Exclusivity Periods [Docket No. 1573] filed by TBW and the other Debtors in these consolidated Chapter 11 cases.

# I.    BACKGROUND

1.      Prior to the commencement of this case, TBW was the largest independent (*i.e.*, non-depository owned) mortgage lender in the United States. Headquartered in Ocala, Florida, TBW employed approximately 2,500 people across the country. The largest offices were in Ocala, Florida; Atlanta, Georgia; Cincinnati, Ohio; and Tampa, Florida.

2.      TBW's principal banking relationship was with Colonial where it maintained more than 116 bank accounts, 110 of which were used in TBW's mortgage servicing operations.

3.      On August 3, 2009, federal law enforcement agencies executed search warrants simultaneously at TBW's headquarters in Ocala and at Colonial's mortgage warehouse lending offices in Orlando.

4.      On or about August 5, 2009, a hold was placed on all of TBW's accounts at Colonial, which made it impossible for TBW to access funds on deposit at Colonial and/or obtain information via the Colonial website regarding current balances and other bank account activity. On the same day, TBW received notices of termination and/or suspension from HUD, Ginnie Mae, and Freddie Mac.

5.      Pursuant to an order of the Alabama State Banking Department dated August 14, 2009, Colonial Bank was closed and the Federal Deposit Insurance Corporation was appointed as receiver (the "**FDIC-Receiver**"). As a result, the FDIC-Receiver succeeded to all rights, title, powers and privileges of Colonial and of any stockholder, member, accountholder, depositor,

officer, or director of Colonial with respect to the institution and the assets of the institution pursuant to 12 U.S.C. § 1821(d)(2)(A)(i).

6.      Despite the account hold, TBW continued to receive checks directly from borrowers.  Concerned that they might become "stale," TBW's prior management made the decision to deposit these checks into an operating account maintained at Wachovia Bank ("**Wachovia**").

7.      On August 24, 2009 (the "**Petition Date**"), TBW filed a voluntary petition for relief (the "**Petition**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

8.      Just prior to the filing of the Petition, TBW's board of directors resigned and a new board, comprised of two experienced restructuring professionals, was put in place.

9.      Neil Luria of Navigant Capital Advisors, LLC ("**Navigant**") was appointed as Chief Restructuring Officer (the "**CRO**"), and Navigant was employed pursuant to Section 363 of the Bankruptcy Code to provide additional support staff.  The final order approving the employment of the CRO and Navigant was entered by the Bankruptcy Court on November 12, 2009 [Docket No. 635].

10.     After the commencement of this bankruptcy case, TBW's new management established bank accounts at Regions, which on a much simplified basis mirrors TBW's account structure at Colonial.  The borrower payments deposited into the Wachovia account were transferred to the Regions accounts.

11.     Before and after the filing of the Petition, TBW and the FDIC-Receiver engaged in extensive negotiations in an effort to address jurisdictional and other issues arising from the

separate insolvency proceedings of TBW and Colonial, which are governed by different statutory schemes.

12.      On September 10, 2009, TBW, as Debtor, and the FDIC-Receiver entered into the Stipulation, which:  (a) provided a framework for the interface between the TBW bankruptcy estate and the Colonial receivership; and, (b) defined a reconciliation process designed to identify and address issues regarding the appropriate allocation, receipt and disbursement of borrower funds and other cash (*i.e.,* the Servicing Reconciliation), as well as questions regarding the nature and ownership of the mortgages and other related assets under TBW's management and control as of early August 2009 (*i.e.,* the Asset Reconciliation).

13.      The Stipulation was presented at a hearing and initially approved in an order of this Court dated September 29, 2009, but objections were filed and a further hearing was conducted.  In accordance with consensual modifications intended to address the fundamental points raised by the objections, the Stipulation was approved in an order entered on October 16, 2009.[3]

14.      As the Debtor gained a better understanding of the facts and circumstances related to TBW's business operation and continued to work with the FDIC-Receiver in the Reconciliations, it became apparent that both the Servicing Reconciliation and the Asset Reconciliation were more complicated than had first appeared in September 2009.[4]  Moreover, it has become abundantly clear that additional work not specifically addressed by the Stipulation was necessary.  Exhibit A to this Report generally describes the activities undertaken in the

---

[3]      Bank of America filed a notice of appeal from this order, but that appeal has not further delayed implementation of the provisions of the Stipulation.

[4]      The combination of the sudden collapse of TBW and the existence of parallel criminal proceedings has resulted in the unavailability of nearly all previous key employees to assist in the reconciliation processes.

performance of the Servicing Reconciliation, and Exhibit B generally describes the activities

undertaken in the performance of the Asset Reconciliation.

15.    The Stipulation established a target of October 30, 2009 for the completion of the

Servicing Reconciliation but provided for the possibility of a longer process, which longer

process has proven necessary.  The Debtor's First Interim Reconciliation Report [Docket No.

555] (the "**First Report**") provided general background information regarding TBW's business

operation and the events surrounding the filing of the Petition on August 24, 2009.  The Debtor's

Second Interim Reconciliation Report, filed on December 15, 2009 (the "**Second Report**")

[Docket No. 776], provided a reconciliation and allocation of $811,748,402 in servicing-related

funds that were affected by the Colonial bank account hold beginning on August 5, 2009, by

Colonial's subsequent failure and by TBW's Chapter 11 case.  Regarding the Servicing

Reconciliation, this Report includes updates to the Second Report to take into bank activity

through April 30, 2010, the resolution of certain reconciling items, and current status of the

resolution of outstanding borrower issues.  In addition, this Report provides the Debtor's analysis

of advances made by TBW on behalf of investors and the custodial bank account balances as of

August 4, 2009, which provides the basis for its determination of the aggregate unreimbursed

advances, unpaid fees and shortfalls in certain custodial accounts.

16.    In accordance with the terms of the Stipulation, the Debtor has worked closely

with the FDIC-Receiver in performing the Servicing Reconciliation and the Asset

Reconciliation.  Throughout the process, the FDIC-Receiver has reviewed the Debtor's

procedures and the results of the reconciliation efforts.  With respect to the Servicing

Reconciliation, the FDIC-Receiver has devoted substantial time and resources to reviewing the

Debtor's work product and supporting data.  The FDIC-Receiver has reviewed the results of the

Asset Reconciliation, but has not engaged in a similar in-depth review of the supporting data. The FDIC-Receiver has not identified any material errors or omissions in the Servicing Reconciliation or the Asset Reconciliation in the course of these reviews. Despite this collaboration, it is important to emphasize that the previously filed interim reports, as well as this Report, have been filed by the Debtor, not the FDIC-Receiver or any other party.

## II.      TBW'S BUSINESS OPERATIONS

17.     TBW's business was complex and complicated. In general, its principal operations included:

- Origination, underwriting, processing and funding of conforming and non-conforming [5] conventional and government-insured residential mortgage loans;

- Sale of mortgage loans and securities into the "secondary market," principally to government-sponsored enterprises such as Freddie Mac and to investors in Ginnie Mae insured securities and financial institutions; and

- Mortgage payment processing and loan servicing.

## A.      Origination, Underwriting and Funding

18.     Through a large network of independent mortgage brokers and community banks, TBW provided mortgage financing to individual borrowers throughout the United States. TBW's ultimate objective was to sell these mortgages to "**investors**," including government-sponsored enterprises (*e.g.,* Freddie Mac) and financial institutions (*e.g.,* Wells Fargo), and retain the right to service the mortgages for the purchasing investor.

---

[5]      Conforming loans are loans that meet the normal Freddie Mac or Ginnie Mae guidelines. Non-conforming loans are all other loans, which include Alt-A loans, jumbo loans, second-lien mortgage loans and subprime loans.

19.    Because TBW intended to sell the mortgage loans that it originated, its underwriting guidelines conformed with guidelines established by the investors.  In effect, the investors' guidelines became the underwriting guidelines used by TBW.

20.    In the five years prior to the commencement of this bankruptcy case, TBW experienced tremendous growth in the number of loans it originated.  For calendar year 2004, TBW closed or purchased a total of 59,129 loans representing a dollar value in excess of $9.5 billion.  By calendar year 2008, that annual production volume had increased to 184,227 loans with a dollar value in excess of $32.3 billion.  The annual growth in TBW's production from 2004 through 2008 can be summarized as follows:

| Year | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Loan Count | 59,129 | 93,375 | 139,148 | 195,226 | 184,227 |
| Dollars | $9,516,878,000 | $17,358,993,000 | $23,501,086,000 | $33,727,081,000 | $32,332,121,000 |

By early 2009, TBW was originating approximately 14,500 new loans every month, representing in excess of $2.7 billion in monthly production.

21.    TBW's mortgage servicing operation experienced similar growth.  In December 2004, TBW was servicing 73,345 loans with an unpaid principal balance ("**UPB**") in excess of $10.5 billion.  By August of 2009, TBW's servicing portfolio had grown to more than 512,000 loans with a UPB in excess of $80 billion.

22.    In order to fund the individual mortgage loans at closing and then hold them until they could be sold, TBW required significant financing.  At the same time, TBW's servicing operations required substantial working capital in order to fund the necessary servicing advances required under its various servicing agreements.  Therefore, TBW financed its loan originations, mortgage sales, and servicing operations using a variety of funding sources.

23.     A key component of TBW's financing was its long-standing relationship with Colonial. Dating back to 1999, Colonial served as one of TBW's primary sources for loan funding through a number of different facilities. Beginning in September of 1999, Colonial provided TBW with a traditional mortgage warehouse lending facility (the "**Colonial Mortgage Warehouse Facility**"), which continued in various forms until the hold was placed on all of TBW's accounts in August 2009. Included in the Colonial Mortgage Warehouse Facility was an overline facility (the "**Colonial Overline Facility**" or the "**Overline**"), which provided certain additional funding capacity for TBW.

24.     Starting in 2002, Colonial began providing TBW with additional funding options through various participation facilities. Under the terms of these facilities, which in recent years were referred to as the COLB facilities (the "**COLB**"), TBW sold to Colonial a participation interest (usually 99%) in mortgage loans, which were then sold to a mortgage investor or allocated to a particular mortgage security for which other financing was available.

25.     TBW and Colonial also entered into additional assignment of trade participation facilities commonly referred to as the AOT facilities (the "**AOT**")[6] under which Colonial would purchase participation interests in trades held by TBW with respect to agency securities (both Freddie Mac and Ginnie Mae) and securities issued by private label issuers. Once TBW allocated a loan to an agency or private label securitization, a loan that was previously funded on the COLB (or other facilities) could be moved to the AOT until the ultimate settlement of the underlying trades.

26.     Collectively, the COLB and AOT facilities provided TBW with funding capacity through Colonial in excess of $3 billion for the origination, purchase, and ultimate sale of loans.

---

[6]     In the months leading up to TBW's collapse, TBW entered into similar AOT facilities with Cole Taylor Bank and USAmeribank.

27.    In addition to the Colonial facilities, TBW had a number of other funding sources for the origination and sale of mortgage loans, most of which were terminated prior to or at the beginning of 2009:

a.    From 2002 until January of 2009, TBW was a party to a purchase facility with Credit Suisse First Boston Mortgage Capital, LLC ("**CSFB**").  The CSFB facility began as a $125 million facility, ultimately increased to a $700 million facility, and was thereafter paid in full and terminated in January of 2009.

b.    From 2003 until 2007, TBW and Washington Mutual Bank, FA were parties to an early purchase facility which initially provided funding of $300 million, ultimately expanded to provide funding of up to $700 million, and was paid in full by TBW in July 2007.

c.    TBW entered into a purchase facility with Dresdner Bank AG in May of 2007 which provided an additional $300 million in funding.  The Dresdner facility was paid in full and terminated in December of 2008.

d.    TBW entered into an early purchase facility with Bank of America in March of 2009 (the "**BoA EPF**").  The BoA EPF initially provided funding for up to $500 million and was expanded in May of 2009 to provide for funding of up to $1 billion.  This facility was in effect when TBW ceased operations in August 2009.

e.    As more fully described below, TBW's subsidiary Ocala Funding LLC and related commercial paper facility (the "**OFCP**") was created in 2005, ultimately expanded to a $4 billion facility, and was restructured in June

of 2008 and reduced to a $1.75 billion facility.  This facility was in effect in August 2009.

28.    In addition to funding sources used for its loan origination and sale activities, TBW also had two working capital facilities to fund the company's servicing operations:

a.    From 2001 until May of 2009, Colonial served as the lead in a syndicate of banks which provided TBW with a working capital facility collateralized by a security interest in certain of TBW's mortgage servicing rights.  In May of 2009, Sovereign Bank replaced Colonial as the lead bank in the syndicate (the "**Colonial/Sovereign MSR Facility**"). The Colonial/Sovereign MSR Facility at one time provided working capital funding of up to $311.5 million, but by August of 2009 had been reduced to approximately $168.2 million.

b.    Natixis Real Estate Capital Inc. provided TBW with another working capital facility secured by certain other mortgage servicing rights of TBW (the "**Natixis Facility**").  The Natixis Facility originally provided up to $133 million in working capital, was later amended to provide for up to $200 million, but by August of 2009 had been reduced to approximately $46.4 million outstanding on the facility.

## B.    <u>Mortgage Loan Funding Process</u>

29.    In general, "wet funding" is the provision of money to an individual borrower at the time of the closing of the mortgage loan before the delivery of original loan documents to the lender.  Accordingly, because of the risk that there could be some issue with respect to the perfection of a security interest after funds have been provided, there have historically been fewer sources of "wet funding" than there are for other types of financing.

30.     Historically, TBW had several sources of available "wet funding," but over time, many of those sources diminished or disappeared completely.  At the time of the filing of the Petition, TBW's sole source of wet funding was the COLB at Colonial.

31.     When a mortgage loan "dried" – *i.e.*, the original loan documents were delivered to TBW – it was eligible for sale to an investor.  Most loans were sold to investors in "pools." As pools of dry loans were assembled, they were typically moved from a facility that provided "wet funding" to a facility that provided for "dry funding."  If operating as designed, the net effect of the transfer of a loan from a wet funding source to a dry funding source would be that monies were advanced to TBW from the "dry funding" source to be used to reduce the outstanding balance on the "wet funding" source, so that the "wet funding" source would continue to be available to originate new loans.

32.     As structured, TBW's dry funding sources provided interim financing and were available to "warehouse" mortgage loans between the time that they dried and the time that they were sold to investors (sometimes referred to as "take-out purchasers").

33.     TBW also used available "dry funding" to purchase loans originated and closed by other mortgage lenders, which could be included in pools sold to investors.  Historically, the volume of purchased dry loans from other originators was much smaller than the volume of TBW-originated loans financed by its wet funding sources.

34.     Depending on the structure of the sale of a pool to an investor, several weeks could pass between the time that TBW entered into a contract to sell a pool of mortgages and the date that it received payment for that sale.  In general, when sales proceeds were received, they were or should have been used to pay the associated wet or dry funding balances.

35.     As a result of the processes described above, there was constant movement of loans among various sources of funding between the time of origination and the ultimate sale to a take-out purchaser (*i.e.,* investor).

36.     TBW's secondary marketing group was principally responsible for the sale of loans to investors, and TBW's treasury group, in conjunction with members of senior management, was responsible for administering the various funding sources.

**C.     Sales of Mortgages to Investors**

37.     In sum, the mortgage loan sale process worked as follows:

      a.     TBW assimilated pools of loans for sale to investors, which were, most often, to be used to support mortgage-backed securities.

      b.     As a part of the sales process, the loan pools were assigned to specific "trades" at the time that the sales contract was entered into – *i.e.,* the loans were allocated to a specific issue of mortgage-backed securities.

      c.     Purchase proceeds were not paid to TBW until the trade to which the pools were assigned "settled" – i.e., the securities were issued and sold.

38.     In general, TBW sold all agency-eligible mortgage loans whether originated by TBW or purchased from another originator, by one of the following methods:

      a.     Conforming loans eligible for sale to Freddie Mac were either:

            i.     aggregated into pools that were exchanged for mortgage-backed securities; or

            ii.     individual loans were sold to Freddie Mac for cash through the Freddie Mac "cash window."

      b.     FHA mortgage loans and VA mortgage loans originated by TBW were generally pooled and sold either in the form of Ginnie Mae mortgage-

backed securities issued by TBW or on an assignment-of-trade basis to other approved Ginnie Mae sellers.

c.      Freddie Mac and Ginnie Mae securities collateralized by eligible loans were then sold to approved broker-dealers.  TBW paid certain fees to Freddie Mac and Ginnie Mae in connection with these programs. Historically, a majority of TBW's mortgage loans qualified under the various Freddie Mac and Ginnie Mae program guidelines, which include specific property and credit standards, including a loan size limit.

TBW generally sold conforming loans within 30 to 90 days of closing.[7]

39.      Loans not eligible to serve as collateral for Freddie Mac or Ginnie Mae securities – e.g., jumbo loans, certain types of reduced documentation (or Alt-A loans), certain types of second-lien loans, and subprime loans – were sold through a variety of channels.  Starting in 2006, TBW's primary mode of selling non-eligible Alt-A collateral and certain jumbo loans was through private-label securitizations.  For other types of non-eligible collateral, TBW sold the loans on a whole loan basis (either individually or in bulk).  Buyers of non-Freddie Mac and non-Ginnie Mae eligible loans and securities included large depository financial institutions, large mortgage banks, securities dealers, real estate investment trusts, hedge funds and other institutional loan buyers.  These types of loan sales generally were consummated within 60 to 90 days of loan origination.  TBW typically retained the servicing rights relating to loans that it originated, but on occasion TBW sold loans along with their servicing rights, and on occasion sold servicing rights in bulk.

---

[7]      TBW entered into sales contracts with Freddie Mac and Ginnie Mae using their automated selling systems.

40.    TBW's loan sales were governed by agreements with the mortgage investors. These agreements established an ongoing program under which investors purchased or securitized certain loans, as long as the loans offered for sale met agreed-upon underwriting standards.  In the case of conventional loans (*i.e.,* a mortgage loan that is not guaranteed or insured by the federal government), TBW was generally at risk for any mortgage loan default until the loan was sold, subject to the obligations of any primary mortgage insurer.  Once the loan was sold, the risk of loss from default and foreclosure generally passed to the purchaser or insurer of the loan.

41.    In the case of FHA and VA loans, TBW generally was required to request insurance or a guarantee certificate within 60 days of loan closing, and the loan had to be current at the time of the request.  Once the insurance or the guarantee certificate was issued, the insurance or guarantee generally was available for claims against foreclosure and related losses as a result of a borrower default.  Certain losses related to foreclosures and similar procedures in connection with FHA mortgage loans were not covered by FHA insurance, nor were losses that exceeded the VA's guarantee limitations.  Additionally, FHA could request indemnification from TBW for its failure to comply with applicable guidelines in the origination or servicing of loans and could curtail insurance claim payments based on failures to comply with FHA's claims guidelines.  Likewise, the VA could reduce guarantee payments based on failures to comply with VA requirements, and in certain cases the VA would deny any liability under a guaranty.

42.    In connection with its loan sales to investors, TBW made representations and warranties customary in the industry relating to, among other things, compliance with laws, regulations, certain program standards and the accuracy of information contained in the loan file. In the event of a breach of these representations and warranties, TBW could become liable to the

-21-

purchasing investor for certain damages and losses or could be obligated to repurchase the subject loans and bear any potential related loss on the disposition of those loans.

D.    **TBW's Mortgage Servicing Operations**

43.    In general, mortgage servicing involves the administration of individual mortgages on behalf of investors, including:  the collection of monthly mortgage payments (including loan payoffs) from individual borrowers; the disbursement of principal and interest payments to investors; payment of real estate taxes and insurance on behalf of borrowers; and, the administration of loan defaults and foreclosures.

44.    Prior to the events that resulted in the filing of the Petition, TBW's mortgage servicing operations were substantial.  As of August 3, 2009, TBW serviced approximately 512,000 different mortgage loans (primarily first-lien, fixed-rate mortgages), having a combined UPB in excess of $80 billion.  These mortgages ultimately were securitized through government-sponsored enterprises, including Freddie Mac and Ginnie Mae (which, collectively, accounted for approximately 95% of the total UPB), or sold and securitized in "private label" securitizations and held in trusts for which Wells Fargo and Bayview served as master servicers (which accounted for roughly 5% of the total UPB).  Finally, TBW serviced mortgages for its own portfolio and those of related entities, such as Platinum Community Bank ("**Platinum**"), and serviced mortgages that were outstanding on various warehouse lines.

45.    The key tool in TBW's servicing operation was an automated servicing system ("**Servicing System**"), the fundamental component of which is a computer software product provided by Financial Industry Computer Systems ("**FICS**").  FICS is used by numerous mortgage servicers in the United States.  Borrower issues and transactions (*e.g.,* mortgage payments, defaults, payment of taxes and insurance), as well as investor issues and transactions

(*e.g.*, record of the owner of each mortgage and the allocation and transmittal of borrowers' payments to the appropriate investor), were administered using the Servicing System.

46.     Individual borrowers made mortgage payments to TBW in a variety of ways, including:  (a) by check made payable to TBW and mailed either to a lockbox maintained by Colonial or directly to TBW; or, (b) by various electronic payment methods.  These borrower payments were initially deposited into a single TBW bank account maintained at Colonial commonly referred to as the "**Custodial Funds Clearing Account**" or "**CFCA**".

47.     As payments were received and deposited into the CFCA, they were recorded in TBW's Servicing System.  Each day, the prior day's deposits, if recorded in the Servicing System, were "pushed down" (*i.e.*, transferred) from the CFCA to various custodial accounts commonly referred to as "**P&I**" (Principal and Interest) and "**T&I**" (Taxes and Insurance) accounts maintained on behalf of the various investors.  Borrower payments were allocated among the investor P&I and T&I accounts using information maintained and administered in the Servicing System.  TBW's compensation, in the form of servicing fees, was also paid from the CFCA account.

48.     P&I payments were disbursed to investors each month.  With the exception of Freddie Mac, investors received P&I payments mid-month (usually on or about the 18th) for monthly mortgage payments and unscheduled payments (*e.g.,* loan pay offs) received in the prior month.  Freddie Mac, TBW's largest investor, had two programs known as ARC and Gold.  For the ARC program, P&I payments were transmitted to Freddie Mac in the early part of the month (usually the 6th).  For the Gold program, P&I payments were transmitted mid-month (usually the 18th).  Other unscheduled payments were transmitted to Freddie Mac on a daily basis.

49.    As borrowers' tax and insurance premium payments came due, monies were transferred from the appropriate T&I accounts to Escrow Disbursement Clearing Accounts ("**EDCA**").

50.    The following diagram provides a simplified description of the flow of funds received from borrowers by TBW:



Note: This schematic is intended to provide an overview of the complex banking system in place between TBW and Colonial Bank as of August 4, 2009.  For purposes of presentation, this schematic is highly simplified--the actual banking system was comprised of approximately 100 separate bank accounts.

51.    As indicated in the diagram above, the actual payments of real estate taxes and insurance premiums (as well as other "escrow" related payments) were made from an EDCA account maintained at Platinum.  In sum, funds were transferred from the investor T&I accounts into an EDCA account at Colonial.  The collected funds were then transferred to the Platinum EDCA account.  As a general rule, checks were written on this account on a daily basis.  In addition, refunds of excess T&I monies were paid to borrowers from the Platinum EDCA account.

52.     Virtually all of TBW's servicing arrangements required that "scheduled/scheduled" payments be made to investors.[8]  In other words, TBW, as servicer, was required to make P&I payments to investors in an amount equal to the amount that should have been received from all borrowers as if they had made payment on a timely basis.  The result was that TBW was required to fund (*i.e.*, "advance") the payment of principal and interest due on mortgages for which borrowers failed to make timely payment.

53.     Similarly, TBW made tax and insurance advances for mortgages for which insufficient "escrow" balances were on hand at the time that tax and insurance premium payments were due.

54.     In general, for mortgage loans that were in default, TBW made "**Servicing Advances**" (*i.e.*, P&I advances and T&I advances) until the time that a foreclosure was completed, which in many states was a number of months after the first missed payment by the borrower.

55.     As servicer, TBW also managed the foreclosure process and incurred foreclosure-related expenses.  These expenses are referred to as "**Corporate Advances**."

56.     Ultimately, the Servicing Advances and the Corporate Advances were recovered or should have been recovered by TBW from the following:  (i) payments received from borrowers (for which advances were made); (ii) the proceeds of the sale of foreclosed houses or the proceeds from short sales; or (iii) claim reimbursements from the investors or HUD for insured loans.

---

[8]     The Freddie Mac ARC program required "scheduled/scheduled" payments.  The Gold program was a "scheduled/actual" program, which required TBW to advance scheduled interest amounts, but not principal.

E.    **Real Estate Owned ("REO")**

57.    Following foreclosure, TBW typically administered the underlying real estate in one of the following ways:

a.    For loans sold or securitized through Freddie Mac, once the foreclosure was completed the property was transferred to Freddie Mac in the ordinary course of business, and TBW would then file a claim for Servicing Advances and Corporate Advances made with respect to that property.

b.    For loans securitized through Ginnie Mae, once the property was foreclosed, TBW transferred title to the property to HUD provided that the property was in "conveyance condition."  If an inspection of the property revealed that the property did not meet HUD's requirements for "conveyance condition," a property preservation company was retained to bring the property in compliance prior to conveyance to HUD.  TBW filed claims with HUD for recovery of any available government guaranty of the principal balance of the loan and Servicing Advances and Corporate Advances made as the servicer.

c.    For other loans held by TBW directly or financed on one of the Colonial facilities or for loans securitized in "private label" securitizations, TBW continued to maintain and manage the properties and market them until their ultimate disposition through TBW's REO Department (the "**REO Department**").  Employees in the REO Department would coordinate the initial cleanup of the property, arrange for any necessary repairs and maintenance, schedule periodic visits to the property, and coordinate all sales activities with respect to the property until it was sold.  Rather than

using a traditional nationwide network of real estate brokers and agents,

TBW's REO Department relied primarily on a methodology which

employed the placement of signs at each REO property site displaying 1-

800 numbers, which directed prospective buyers to TBW's REO

Department using certain call-capture technologies.  At the time of

commencement of TBW's Chapter 11 case, TBW had more than 4,400

properties under management in its REO Department.

58.     Historically, TBW accounted for REO properties as an on-balance-sheet asset on

its financial statements regardless of whether the property was financed using an

"on-balance-sheet" facility or an "off-balance-sheet" facility.  Certain of the facilities used by

TBW, like the COLB and AOT facilities, were accounted for as off-balance-sheet because the

underlying funding transaction was treated as a "true sale" of a participation interest to Colonial.

59.     In connection with the release of TBW's January 2009 interim financial

statements, TBW concluded that REO properties financed on the AOT facilities should be taken

off of the company's balance sheet, leaving on the balance sheet only the REO assets financed

through an on-balance-sheet facility or that were owned by TBW free and clear of liens.  During

the course of TBW's year-end audit conducted by Deloitte LLP ("**Deloitte**"), the auditors raised

questions regarding the change in treatment of REO on TBW's balance sheet.  Ultimately,

Deloitte stopped working on the audit and withdrew from the field in June 2009 pending the

outcome of an internal investigation of this and other accounting issues to be conducted by

independent outside counsel.  TBW hired the law firm of Troutman Sanders LLP ("**Troutman**")

to conduct the investigation, and Troutman was in the process of conducting that investigation

when TBW collapsed in early August 2009.

### III.    SUPPORTING DATA AND DATABASE

60.    In performing the Reconciliations and related analysis and investigation, the Debtor determined that it was reasonable and appropriate to rely upon the information in TBW's Servicing System.  As with any large servicing operation, the Debtor found errors and a very limited number of transactions that had not been recorded timely in the Servicing System as of TBW's cessation of business operations (*e.g.,* borrower escrow balances from origination and upfront mortgage insurance payments).  However, these limited occurrences did not have a material impact on the overall quality of the information or the results of the Reconciliations.

61.    TBW's Servicing System uses a series of investor codes (the "**Investor Codes**") to track ownership of loans.  From the time of origination (or acquisition) by TBW, loans initially were coded to Investor Code 001 regardless of the financing facility to which the loan was assigned.[9]  When the loans were sold to an investor, the designation in the Servicing System was changed to the purchasing investor's Investor Code.  Therefore, the assigned Investor Code in the TBW Servicing System was fundamental to making payments to investors and in the compilation of servicing-related reports.

62.    In and around late July and early August, TBW continued to sell loans to investors.  However, as the company suddenly collapsed and ceased business operations, the change from 001 to the Investor Code of the purchasing investor was not made for certain loan sales made during that time period. As servicing was transferred to subsequent servicers in accordance with each investor's instructions after August 4, 2009, the change from 001 to the Investor Code for the purchasing investor was made by the Debtor.  However, rather than

---

[9]    Historically, a similar practice was used for loans originated or acquired using the OFCP, and the related Investor Code was 002.  However, the use of the 002 Investor Code declined after June 30, 2008 and, ultimately, was not used by TBW.  As more fully explained elsewhere in this Report, there are only 183 loans with the 002 Investor Code.

making these adjustments in TBW's Servicing System, the changes in Investor Code were made in the "**Lookup Database,**" which is a database compiled by the Debtor for use in the Reconciliations.  In short, the Lookup Database included the information for all loans in TBW's Servicing System,[10] which was then adjusted to reflect the identity of the purchasing investor.  Accordingly, it is the identity of the investor as reflected in the Lookup Database that has been used for the Reconciliations.

63.     In addition to the Lookup Database, the Debtor developed a number of other databases based on information extracted from TBW's Servicing System and records from TBW's accounting, treasury, cashiering, investor reporting, and secondary marketing departments.  These databases, which are identified in more detail in Exhibits A, B, and S to the Report, were also used by the Debtor to perform the Reconciliations and related research and analysis.

64.     The investor allocations made in the Servicing Reconciliation have been made in the same way that TBW would have made them in the ordinary course of its business operation absent the Colonial account hold and the Chapter 11 filing.  Except as described in Paragraph 62, above, the Debtor has not made any adjustments regarding the ownership of the underlying mortgage assets or the corresponding monies based upon the results of the Asset Reconciliation.

65.     The Debtor believes that the findings set forth below, based upon the data in TBW's Servicing System and the Debtor's various databases created in connection with the Reconciliations, are fair and accurate.

---

[10]     TBW maintained an archival database for loans liquidated prior to January 1, 2007.  Loan data with respect to such loans is not included in TBW's active Servicing System and is not included in the Access Database.

IV.    **SERVICING RECONCILIATION**

66.    As a result of TBW's sudden collapse and the failure of Colonial, $860,642,822 in affected funds (the "**Gross Affected Funds**") were trapped in the Debtor's servicing complex and the Company's servicing-related accounts.  The reconciliation of those funds, which involved approximately 400,000 transactions and more than 512,000 loans, was complicated and time-intensive.

67.    As it evolved, the Servicing Reconciliation included three distinct components:

a.    The "**Affected Funds Reconciliation**," under which the Debtor performed a reconciliation and allocation of all monies that were affected by the Colonial bank account hold beginning on August 5, 2009, Colonial's subsequent failure and TBW's bankruptcy;

b.    The "**Book-to-Bank Reconciliations**," pursuant to which the Debtor determined the amount of any shortfalls in investors' custodial accounts; and

c.    The "**Servicing Advances Reconciliation**," pursuant to which the Debtor reconciled and accounted for unreimbursed advances (including Servicing Advances and Corporate Advances) and servicing fees not paid to the Debtor.

A.    **Affected Funds Reconciliation**

68.    The Affected Funds Reconciliation involved the allocation to investors of the $860,642,822 in "**Gross Affected Funds**" (see Table 1, Line 43 and Exhibit C) that were trapped on and after August 5, 2009 as a result of the administrative hold at Colonial and TBW's subsequent bankruptcy filing.  Such funds, as described in more detail below, include amounts currently or previously at Colonial, Regions, Seaside, and Platinum, as well as certain amounts trapped either in lockboxes or electronic suspense.

69.     As part of the Affected Funds Reconciliation, the Debtor deducted from the Gross Affected Funds: (i) any Gross Affected Funds that have been turned over to investors by the Debtor or the FDIC-Receiver since August 5, 2009; and, (ii) the Gross Affected Funds that were never monetized (*i.e.*, electronic payments trapped in suspense).  After subtracting these amounts from the Gross Affected Funds, the remaining total "**Net Affected Funds on Deposit**" as of April 30, 2010 is $396,014,173 (Table 1, Line 43), which represents the amount of Gross Affected Funds currently on deposit at Colonial ($242,304,744), Regions ($148,709,430), and Seaside ($5,000,000).

70.     In its Second Report, the Debtor provided its allocation of "Gross" and "Net" Affected Funds, as of November 30, 2009. (See, Second Report, Tables 1 and 3, p. 5 and p. 11, respectively.)  These included:

- Deposits in clearing accounts and custodial accounts at Colonial;

- Deposits in accounts at Regions (including transfers from the Wachovia account);

- Un-deposited checks maintained in the Colonial lockbox;

- Initiated, but not completed, ACH transfers;

- Deposits in a Freddie Mac-related custodial account at Platinum; and

- Checks written on the Platinum EDCA (but not funded).

For this Report, the allocation of affected funds has been updated to reflect the Net Affected Funds on Deposit as of April 30, 2010 and includes the following additions and revisions from the Second Report:

- Allocations based upon bank activity after November 30, 2009, the cut-off date for the Second Report;

- Inclusion of additional categories of affected funds that were not reflected in the

Second Report;

- Allocation of monies, deposits, wire transfers and REO proceeds not identified or allocated as of the filing of the Second Report (see, Second Report, Table 2, p. 9); and,

- Changes in the allocation of certain mortgages to specific investors, primarily based upon warehouse lender information and feedback received from subsequent servicers after servicing portfolios were transferred.

71.    A high-level review of the results of the Affected Funds Reconciliation and the investor level allocation of Gross Affected Funds and Net Affected Funds on Deposit is set forth in greater detail in Table 1 below and in Exhibits C through E to this Report.

**TABLE 1**

Calculation of Net Affected Funds on Deposit as of April 30, 2010

| Line | Investor | Gross Affected Funds | Less: Funds Transferred to Investors and Other Parties | Less: FDIC Lockbox Not Distributed | Less: Posted, Not Monetized | Net Affected Funds on Deposit |
|---|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] | [E] |
| 1 | Freddie Mac [F] | $ 562,056,053 | $ (311,215,060) | $ (154,838) | $ (47,387,043) | $ 203,299,113 |
| 2 | Ginnie Mae | 120,761,519 | (59,340,492) | (4,558) | (13,307,411) | 48,109,057 |
| 3 | Wells Fargo | 117,282,764 | (13,749,525) | (145,354) | (1,777,984) | 101,609,902 |
| 4 | TBW - Not Service Released | 11,624,837 | (776,187) | (5,392) | (14,139) | 10,829,119 |
| 5 | TBW - Net Funded / FHLMC | 4,161,355 | (93,162) | (92,601) | (2,390) | 3,973,201 |
| 6 | TBW - Net Funded / GNMA | 2,407,588 | (40,679) | (69,501) | (3,017) | 2,294,392 |
| 7 | TBW - Net Funded / Wells Fargo | 11,381 | (535) | - | - | 10,846 |
| 8 | Colonial-FDIC | 7,260,737 | (2,582,550) | (4,227) | (284,091) | 4,389,868 |
| 9 | BB&T | 3,914,393 | (90,234) | (53,718) | (7,061) | 3,763,380 |
| 10 | Bayview Loan Servicing LLC | 2,646,568 | (733,389) | (17,665) | (84,853) | 1,810,662 |
| 11 | Bank of America | 1,578,206 | (619,783) | (4,134) | (100,963) | 853,325 |
| 12 | UMS - Hudson City | 1,469,380 | (8,258) | (11,739) | (9,894) | 1,439,489 |
| 13 | TBW - Selene Interim Serviced | 1,545,733 | (1,119,473) | (8,765) | (31,822) | 385,674 |
| 14 | Urban Trust Bank | 1,036,752 | (51,134) | - | (12,329) | 973,289 |
| 15 | Bank of Internet | 971,126 | (34,194) | (3,028) | (3,254) | 930,650 |
| 16 | Platinum Community Bank-FDIC | 1,226,431 | (451,448) | (3,185) | (60,738) | 711,060 |
| 17 | Henley Holdings | 826,270 | (383,215) | (4,505) | (109,661) | 328,889 |
| 18 | Seaside | 546,663 | (196,210) | - | (7,146) | 343,307 |
| 19 | Mercantile Bank | 680,544 | (8,168) | - | - | 672,376 |
| 20 | Ocala Funding - RoundPoint Interim Serviced | 475,406 | (131,149) | (1,450) | (19,610) | 323,197 |
| 21 | Cole Taylor | 511,022 | (175,532) | (6,721) | (19,851) | 308,919 |
| 22 | IndyMac | 175 | - | (175) | - | - |
| 23 | Five Mile Capital | 1,458 | - | - | - | 1,458 |
| 24 | US AmeriBank | 113,675 | (55,629) | (1,788) | (14,673) | 41,586 |
| 25 | MGC Mortgage | 89,293 | (10,230) | (13,209) | (14,934) | 50,920 |
| 26 | Century National Bank | 44,672 | - | (2,563) | (837) | 41,271 |
| 27 | Hyde Park Savings Bank | 49,075 | (1,787) | (1,468) | - | 45,819 |
| 28 | CitiMortgage Inc | 42,700 | - | (1,350) | (1,982) | 39,368 |
| 29 | First American Bank & Trust | 19,728 | - | - | - | 19,728 |
| 30 | MountainView | 78,644 | (2,889) | (1,122) | - | 74,633 |
| 31 | Citi Home Equity | 3,141 | - | (3,141) | - | - |
| 32 | RBC Bank | 3,537 | - | - | - | 3,537 |
| 33 | Selene | 3,091 | (3,091) | - | - | - |
| 34 | Bayrock Mortgage | 21,505 | (1,469) | - | - | 20,036 |
| 35 | Central Mortgage (CMC) | 1,342 | - | - | - | 1,342 |
| 36 | Marix Servicing | 41,206 | - | (2,470) | - | 38,736 |
| 37 | First Alternative Mortgage Corp | 142,410 | - | - | - | 142,410 |
| 38 | Borrower | 360,533 | - | (1,000) | - | 359,533 |
| 39 | Returned to Western Union | 2,983,562 | (2,982,677) | - | - | 885 |
| 40 | EDCA | 8,414,181 | (5,473,290) | - | - | 2,940,892 |
| 41 | Seaside | 5,000,000 | - | - | - | 5,000,000 |
| 42 | Still Under Review | 234,167 | - | (401,861) | - | (167,694) |
| 43 | **Total** | $ 860,642,822 | $ (400,331,437) | $ (1,021,529) | $ (63,275,683) | $ 396,014,173 |

[A] Investor and borrower funds that were trapped in TBW's servicing account complex on and after August 5, 2009. See Exhibit C for additional information. Certain Gross Affected Funds amounts reflect the full borrower payment which includes unpaid service fees to TBW. In addition, for a small population of loans, the Gross Affected Funds will include insurance premium payments made by borrowers for non-mortgage related insurance policies. Historically, TBW transferred these insurance premium payments to the insurance carriers. The Debtor will consider adjusting the Gross Affected Funds amounts for both the service fee and the insurance premium amounts, as appropriate, subsequent to the issuance of the Report.

[B] Represents Gross Affected Funds that were transferred to other parties through April 30, 2010. See Exhibit D for additional information.

[C] As indicated in the Debtor's prior interim reports, the FDIC-Receiver collected, maintained, and forwarded borrower payments received in the Colonial lockbox after August 12, 2009. These lockbox checks were not monetized/not deposited in TBW bank accounts and not posted in the Servicing System. The FDIC-Receiver distributed a majority of the $94.7 million of lockbox checks to investors or their subsequent servicers based on information provided by the Debtor. This amount represents the balance of lockbox checks that had not been distributed as of April 30, 2010. See Exhibit D for additional information.

[D] Amounts represent funds that were not monetized/not deposited in TBW bank accounts, but were posted to the TBW Servicing System. The effect is that while the servicing records indicate that a payment was made, no cash was actually received from the borrower in connection with these payments. See Exhibits C, D, and E for additional information.

[E] Net Affected Funds on Deposit at Colonial, Regions, and Seaside as of April 30, 2010 totals $396,014,173. See Exhibit E for additional information.

[F] The Freddie Mac Gross Affected Funds amount includes $210 million of T&I escrow funds that were on deposit in a custodial account at Platinum. Based on discussions with the FDIC, it is the Debtor's understanding that the FDIC distributed such amount to Freddie Mac in August or September of 2009. See Exhibit C.

72.     Exhibits C through L to this Report provide more detailed information regarding the Affected Funds Reconciliation than the summary information provided herein.  The balances in a few accounts will continue to change as a result of transactions after April 30, 2010, but it is not anticipated that any subsequent changes will have a material effect on the Servicing Reconciliation set forth herein.

73.     With the exception of $234,167 (Table 1, Column A, Line 42), all of the Gross Affected Funds have been allocated to investors.  The unallocated amounts consist of various deposits at Colonial and Regions, certain custodial P&I and T&I balances, and lockbox checks maintained by the FDIC-Receiver.  A schedule of these "Still Under Review" amounts by category, and the proposed next steps, if any, to reconcile and resolve the items is set forth in Exhibit I.

74.     Importantly, not all affected funds have actually been "monetized" or deposited into bank accounts under the control of the Debtor or the FDIC-Receiver.  Examples of such non-monetized items include electronic payments caught in suspense by the Colonial administrative hold and lockbox checks distributed by the FDIC.  Moreover, during the course of this case, certain funds have been transferred to investors and/or their subsequent servicers – e.g., lockbox checks and monies used to fund the Borrower Protocol payments.  Such amounts as well have been deducted from the Gross Affected Funds in the analysis.

75.     The affected funds do not include amounts on deposit in TBW's operating accounts at Colonial, Platinum, Regions, and various other institutions or more than $200 million in borrower check payments received by the Debtor and forwarded to investors and/or their subsequent servicers without being posted in the Debtor's Servicing System.  The Debtor's

monthly operating reports provide additional information regarding the Debtor's operating

accounts and the funds not included in this Report.

### *Summary of Colonial Bank Funds on Deposit*

76.     The affected funds at Colonial were limited to seven categories of accounts.

These account categories and associated balances as of April 30, 2010 are summarized in Table 2

below.  Additionally, Exhibit J provides a detailed schedule of all Colonial accounts – servicing

and non-servicing related – indicating the account balances as of the identified dates.

## TABLE 2

Summary of Colonial Bank Funds on Deposit at April 30, 2010

| | Bank | Account Name | 4/30/10 Bank Balance | Description |
|---|---|---|---|---|
| 1 | Colonial | Custodial Funds Clearing Account ("**CFCA**") | $ 213,619,182 | Account in which borrower funds were initially deposited.  See Exhibits E through I for additional information.  A portion of these funds represent unpaid servicing fees to TBW. |
| 2 | Colonial | Investor P&I (45) | 3,268,562 | Investor Principal & Interest accounts.  See Exhibit J for additional information. |
| 3 | Colonial | Investor T&I (45) | 18,649,234 | Investor Tax & Insurance accounts.  See Exhibit J for additional information. |
| 4 | Colonial | Western Union Clearing Account | 885 | See Exhibit E, Line 39 for additional information. |
| 5 | Colonial | REO Proceeds Clearing Account | 3,151,176 | This account includes proceeds from REO sales that would have been transferred to the CFCA in the ordinary course of business had the Colonial account hold not occurred in August 2009. |
| 6 | Colonial | Escrow Disbursement Clearing Account ("**EDCA**") | 2,940,892 | As more fully described in the Borrower Protocol, $8,414,181 was on deposit in this account as of August 5, 2009.  From this balance, $5,473,290 was transferred to investors in accordance with the Borrower Protocol.  The balance – $2,940,892 as of April 30, 2010 – remains on deposit in this account.  (See Exhibit J, p. 3 and Exhibit E) |
| 7 | Colonial | Other Servicing Accounts (16) | 674,814 | As indicated in Exhibit C and Exhibit J, there are a number of "other" Colonial accounts related to the servicing function. |
| 8 | **Total** | | **$242,304,744** | |

77.     Importantly, neither the calculation of Gross Affected Funds and Net Affected

Funds set forth in Table 1 above nor the balances in Table 2 reflect funds that were transferred

out of certain investor P&I and T&I accounts between August 6, 2009 and August 25, 2009.

During that period, Colonial and/or the FDIC-Receiver released $673,429,353 to Ginnie Mae,

$180,189,139 to Freddie Mac, and $4,367,581 to Henley Holdings from their respective P&I and T&I accounts.  (See, Exhibits D and J.)

### *Summary of Regions Bank Funds on Deposit*

78.    In addition to the Debtor's operating accounts, there are 32 Regions accounts that have been used to wind-down TBW's servicing operation and to allocate monies among investors (though none of the Regions accounts are custodial accounts).  As of April 30, 2010, there was $228,529,585 on deposit in these 32 accounts.

79.    Table 3 below is a summary of the balances in these Regions accounts as of April 30, 2010.

## TABLE 3

Summary of Regions Bank Funds on Deposit at April 30, 2010 (Non-Operating Accounts)

| | Bank | Account Name | 4/30/10 Bank Balance | 4/30/10 Affected Funds Total | Description |
|---|---|---|---|---|---|
| 1 | Regions | Deposit and Clearing Accounts (3) | $13,031,760 | $13,031,760 | Accounts into which a majority of borrower payments were received by TBW after August 4, 2009 (and not otherwise transmitted to subsequent servicers) have been deposited. (See, Exhibit E.) |
| 2 | Regions | P&I and T&I Accounts (25) | 120,385,354 | 120,385,354 | T&I and P&I accounts established to mirror Colonial account structure on simplified basis.  These accounts receive a "push down" of T&I and P&I funds from amounts deposited into the Deposit and Clearing Accounts.  As indicated in Table 1 and Exhibit E, all of these monies have been allocated. |
| 3 | Regions | Service Fee Account | 1,337,847 | 1,337,847 | Deposits into these accounts represent the various fees transferred from the Regions Clearing account as part of the "push down" of borrower funds on deposit in Regions Deposit and Clearing accounts, including service fees, late returned check fees, etc. (See, Exhibit E.) |
| 4 | Regions | REO Proceeds Account | 90,434,696 | 10,619,784 [A] | Account holding proceeds from REO sales in the ordinary course of business and pursuant to § 363 of the Bankruptcy Code.  The balance in the Regions REO Proceeds account has been allocated among affected investors.  (See, Exhibit E.)  Table 11 provides a summary of deposits into and disbursements from these REO proceeds accounts. |
| 5 | Regions | REO Specialists (formerly RBC) | 566,457 | 561,213 | Similar to the REO Proceeds Account amount above except these proceeds were originally deposited in an RBC account and subsequently transferred to a Regions account.  (See, Exhibit E and Table 11.) |

## TABLE 3

Summary of Regions Bank Funds on Deposit at April 30, 2010 (Non-Operating Accounts)

| | Bank | Account Name | 4/30/10 Bank Balance | 4/30/10 Affected Funds Total | Description |
|---|---|---|---|---|---|
| 6 | Regions | Refunds Account | 2,773,472 | 2,773,472 | Account into which refunds totaling $11,291,175 from force placed insurance claims, tax refunds and private mortgage insurance premium refunds have been deposited.  As these refunds have been allocated, $8,517,703 in T&I and/or corporate advances made by TBW have been reimbursed.  (See, Exhibit R).  These deposits have not been posted to the borrower's record in TBW's Servicing System.  TBW will provide the information to each investor so that necessary adjustments can be made to each affected borrower's escrow account.  Exhibit L provides a summary of deposits and disbursements from the Refund Account, which includes repayment of advances repaid to TBW. |
| 7 | **Total** | | **$228,529,585** | **$148,709,430** | |

[A] The REO proceeds amount in the Affected Funds column only includes proceeds associated with investor owned REO properties.  See Table 11 for additional information.

80.     In sum, the Debtor has reviewed and analyzed $860,642,822 in Gross Affected Funds trapped in the Debtor's servicing complex and has reconciled and allocated all but $234,167 to the appropriate investor.  Attached as Exhibit K is a detailed schedule of all Regions accounts used in the Affected Funds Reconciliation, indicating the account balances as of April 30, 2010.

**B.    Book-to-Bank Reconciliations**

81.     In order to determine whether any shortfalls existed in the various accounts maintained by TBW for the benefit of investors, the Debtor undertook Book-to-Bank Reconciliations which compared investors' balances in TBW's Servicing System with amounts actually on deposit in the corresponding investor bank accounts maintained by TBW.

   a.     With respect to P&I accounts, the reconciliations included a comparison of the Servicing System borrower payments, cumulative P&I advances made by TBW, and other expense items pursuant to the servicing contracts to related bank balances;

      b.       With respect to T&I accounts, the reconciliations included a comparison of the Servicing System borrower escrow balances to the related bank balances; and

      c.       With respect to EDCA accounts, the reconciliations included a comparison of outstanding EDCA checks to the related bank balances.

82.     Because the administrative hold was placed on TBW's Colonial accounts on August 5, 2009, the last day that banking transactions were conducted in the ordinary course of TBW's business was August 4, 2009.  Accordingly, the Book-to-Bank Reconciliations were undertaken as of August 4, 2009.  The EDCA Book-to-Bank Reconciliations were prepared through April 30, 2010 to reflect disbursements made pursuant to the Borrower Protocol.

83.     The Book-to-Bank Reconciliations identified total shortfalls for investor P&I, T&I "escrow," and EDCA bank accounts in the aggregate amount of $25,145,274.  In effect, this represents money collected by TBW that was not turned over to investors.  The results of the Book-to-Bank Reconciliations are summarized as follows:

- $5,626,200 shortfall in the P&I accounts of Freddie Mac, Ginnie Mae, and a number of other investors.  The P&I shortfall includes expense items owing to Freddie Mac and Ginnie Mae pursuant to the terms of their respective servicing agreements.

- $19,056,184 shortfall in investor T&I escrow accounts.  Historically, escrow amounts collected from borrowers at loan closings were used by TBW to reduce the amount of funds TBW transferred to the title company closing the loan, and TBW did not deposit the borrower's escrow amounts into a segregated custodial bank account.  Typically, when loans were sold to an investor, the necessary

amounts were then transferred to investors' custodial accounts. Of the $19,056,184 shortfall in escrow accounts, $18,681,936 is the amount that had not been funded as of August 4, 2009 in accordance with this business practice.

- $462,890 shortfall in EDCA accounts. The shortfall represents the difference between the balances in TBW's EDCA accounts (including an account at Seaside)[11] and the total adjusted checks written on the Platinum EDCA account that were not and will not be honored. Adjustments were made to account for the following: outstanding checks that were funded as a result of the approval of the Borrower Protocol and checks written by TBW on or after August 4, 2009 that were not funded from investors' T&I custodial accounts due to the administrative hold. As a result, money associated with these checks is included in the balances of the investors' custodial accounts.

As indicated in the following Table, the Debtor has allocated these shortfalls among investors:

---

[11]    This amount assumes full recovery of $5 million on deposit in a custodial account at Seaside Bank, for which a turnover demand has been made. In the event that less than $5 million is recovered from Seaside, the amount of the EDCA shortfall will increase accordingly.

## TABLE 4

Servicing Shortfalls

| Line | Investor | P&I Shortfalls | Escrow Shortfalls | EDCA Shortfalls | Net Shortfalls by Investor |
|---|---|---|---|---|---|
| | | [A] | [B] | [C] | |
| 1 | American Servicing | $ - | $ 420 | $ - | $ 420 |
| 2 | Bank of America | - | 3,959,749 | (891) | 3,958,858 |
| 3 | Bank of Internet | - | - | - | - |
| 4 | Bayrock Mortgage | - | - | - | - |
| 5 | Bayview Loan Servicing LLC | - | 14,896 | 1,299 | 16,195 |
| 6 | BB&T | - | 292 | (28) | 264 |
| 7 | Central Mortgage (CMC) | - | - | 355 | 355 |
| 8 | Century National Bank | - | - | - | - |
| 9 | CitiMortgage Inc | - | 61,315 | 127 | 61,442 |
| 10 | Cole Taylor | - | 516,869 | (978) | 515,891 |
| 11 | Colonial - FDIC | - | 5,751,541 | 2,721 | 5,754,262 |
| 12 | Freddie Mac | 2,954,582 | 1,825,585 | 257,919 | 5,038,086 |
| 13 | First American Bank & Trust | - | - | - | - |
| 14 | First Charter | - | 1,638 | - | 1,638 |
| 15 | First Western Bank | - | 457 | - | 457 |
| 16 | GMAC | - | - | - | - |
| 17 | Ginnie Mae | 2,515,497 | 2,940,097 | 178,515 | 5,634,109 |
| 18 | Henley Holdings | - | - | - | - |
| 19 | Hyde Park Savings Bank | - | - | - | - |
| 20 | IndyMac | - | 116 | - | 116 |
| 21 | Mercantile Bank | - | 1,018 | - | 1,018 |
| 22 | MGC Mortgage | - | 115,700 | 287 | 115,987 |
| 23 | MountainView | 113,684 | 21,581 | - | 135,266 |
| 24 | Ocala Funding - RoundPoint Interim Serviced | - | 204,714 | 274 | 204,988 |
| 25 | Ocwen | - | - | 189 | 189 |
| 26 | Platinum Community Bank - FDIC | - | 1,683,228 | 20 | 1,683,248 |
| 27 | RBC Bank | - | - | - | - |
| 28 | Seaside | - | 796,713 | (49) | 796,664 |
| 29 | Selene | 42,436 | 30,307 | 61 | 72,804 |
| 30 | TBW - Not Service Released | - | 186,835 | 6,675 | 193,509 |
| 31 | TBW - Net Funded / FHLMC | - | 137,673 | - | 137,673 |
| 32 | TBW - Net Funded / GNMA | - | 188,756 | - | 188,756 |
| 33 | TBW - Net Funded / Wells Fargo | - | 685 | (17) | 668 |
| 34 | TBW - Selene Interim Serviced | - | 511,927 | 835 | 512,762 |
| 35 | UMS - Hudson City | - | - | 138 | 138 |
| 36 | Urban Trust Bank | - | 15,992 | 56 | 16,048 |
| 37 | US AmeriBank | - | 105,731 | (166) | 105,565 |
| 38 | US Bank | - | - | 64 | 64 |
| 39 | Wachovia | - | 639 | - | 639 |
| 40 | Wells Fargo | - | 10,119 | 15,483 | 25,602 |
| 41 | Unallocated | - | (28,409) | - | (28,409) |
| 42 | **Total** | $ 5,626,200 | $ 19,056,184 | $ 462,890 | $ 25,145,274 |

[A] P&I Book-to-Bank Reconciliations as of August 4, 2009 reflecting net shortfalls by investor. For additional information, see positive investor balances in Column H of Exhibit M.

[B] Escrow Book-to-Bank Reconciliations reflecting escrow shortfalls by Investor. See Exhibit O for additional information.

[C] EDCA Book-to-Bank Reconciliations reflecting EDCA shortfalls by Investor. See Exhibit P for additional information. This shortfall reflects $5 million at Seaside which is included in the bank balance. The EDCA shortfall has been allocated to investors on a pro rata basis based upon each investor's adjusted book balance over the total adjusted book balance.

C.    **Servicing Advances Reconciliation**

84.    In connection with performing the Book-to-Bank Reconciliations, the Debtor also analyzed and reconciled, pursuant to the Servicing Advances Reconciliation, Servicing Advances and Corporate Advances made by TBW on behalf of investors for which it had not received reimbursement and servicing fees for which TBW had not received payment.  Unreimbursed Servicing Advances and Corporate Advances total $237,988,341, and unpaid servicing fees total $39,511,966.  After accounting for advance reimbursements received by TBW of $13,506,507, the total remaining unreimbursed and unpaid amount is $263,993,800, the components of which are:

- $71,376,950 in **Net P&I Advances** representing principal and interest payments advanced by TBW on behalf of investors.

- $116,479,538 in **T&I Advances** representing amounts disbursed by TBW for payment of taxes and insurance premiums.  TBW has made an adjustment to those amounts for outstanding checks issued that did not clear the bank and were not funded.

- $38,850,744 in **Corporate Advances** representing amounts paid by TBW related to the foreclosure of defaulted loans (*e.g.*, attorneys' fees and expenses).  TBW has made an adjustment to those amounts for outstanding checks issued that did not clear the bank and were not funded.

- $11,281,109 in **Other Unreimbursed Items** representing outstanding unreimbursed amounts for Servicing Advances and Corporate Advances not captured in other categories (including amounts outstanding related to loans that were liquidated and/or modified).

- $39,511,966 in **Unpaid Servicing Fees** representing fees earned on current and delinquent loans up to the date such loan was released to a subsequent servicer.

- $13,506,507 in **Advance Reimbursements** representing reimbursements of advances the Debtor has received during the pendency of this case.  These are reimbursements received by TBW which include reimbursement of $8,517,703 from the Regions Refund Account; $2,688,804 from the Regions REO Proceeds Account; and $2,300,000 received from Wells Fargo and Bayview in accordance with stipulations entered in connection with the Chapter 11 case.

  § Table 5 below provides the Debtor's reconciliation and calculation of results by investor of total unreimbursed advances and unpaid service fees and the reimbursements of those amounts, if any, since August 4, 2009.

**TABLE 5**
Unreimbursed Advances and Unpaid Service Fees

| Line | Investor | Net P&I Advances [A] | T&I Advances [B] | Corporate Advances [C] | Other Unreimbursed Items [D] | Total Unreimbursed Advances [A]+[B]+[C]+[D] [E] | Unpaid Service Fees [F] | Advance Reimbursement as of April 30 2010 [G] | Net Unreimbursed Advances and Unpaid Service Fees |
|---|---|---|---|---|---|---|---|---|---|
| 1 | American Servicing | $ - | $ - | $ 107 | $ - | $ 107 | $ - | $ - | $ 107 |
| 2 | Bank of America | - | 13,374 | 2,328 | - | 15,702 | - | (2,332) | 13,370 |
| 3 | Bank of Internet | - | 6,224 | - | - | 6,224 | 1,606 | - | 7,830 |
| 4 | Bayrock Mortgage | - | - | - | - | - | - | - | - |
| 5 | Bayview Loan Servicing LLC | 10,920,636 | 2,602,346 | 1,423,877 | - | 14,946,859 | 873,154 | (1,176,149) | 14,643,864 |
| 6 | BB&T | 0 | 79,413 | 26,901 | - | 106,315 | 58,747 | - | 165,062 |
| 7 | Central Mortgage (CMC) | - | 14,291 | 1,243 | - | 15,534 | - | - | 15,534 |
| 8 | Century National Bank | 945 | 3,325 | 1,090 | - | 5,360 | 2,275 | - | 7,635 |
| 9 | CitiMortgage Inc | - | 12,023 | 840 | - | 12,863 | - | - | 12,863 |
| 10 | Cole Taylor | - | 524 | - | - | 524 | - | - | 524 |
| 11 | Colonial - FDIC | - | 6,020,206 | 1,433,845 | - | 7,454,051 | - | (459,015) | 6,995,036 |
| 12 | Freddie Mac | - | 50,264,497 | 7,863,122 | 2,929,932 | 61,057,551 | 15,620,927 | (5,064,749) | 71,613,729 |
| 13 | First American Bank & Trust | - | - | - | - | - | 24 | - | 24 |
| 14 | First Charter | - | - | - | - | - | - | - | - |
| 15 | First Western Bank | - | - | - | - | - | - | - | - |
| 16 | GMAC | - | - | 10 | - | 10 | - | - | 10 |
| 17 | Ginnie Mae | - | 30,732,276 | 13,443,982 | 7,957,927 | 52,134,184 | 17,495,659 | (741,821) | 68,888,021 |
| 18 | Henley Holdings [H] | - | 3,231 | 7,220 | - | 10,450 | 13,329 | - | 23,780 |
| 19 | Hyde Park Savings Bank | 18,460 | 5,445 | 1,111 | - | 25,015 | 2,620 | (1,787) | 25,849 |
| 20 | IndyMac | - | - | 2,052 | - | 2,052 | - | - | 2,052 |
| 21 | Mercantile Bank | - | 4,983 | 530 | - | 5,513 | - | (2,655) | 2,858 |
| 22 | MGC Mortgage | - | - | - | - | - | - | (2,608) | (2,608) |
| 23 | MountainView | - | - | - | - | - | - | (103) | (103) |
| 24 | Ocala Funding - RoundPoint Interim Serviced | - | 4,914 | 1,705 | - | 6,618 | - | - | 6,618 |
| 25 | Ocwen | - | - | - | - | - | - | - | - |
| 26 | Platinum Community Bank - FDIC | 69,738 | 54,368 | 645 | - | 124,751 | 2,556 | - | 127,307 |
| 27 | RBC Bank | - | 2,692 | - | - | 2,692 | 29 | - | 2,720 |
| 28 | Seaside | - | 66 | - | - | 66 | - | - | 66 |
| 29 | Selene | - | - | - | - | - | - | - | - |
| 30 | TBW - Not Service Released | - | - | - | 393,249 | 393,249 | - | (393,249) | - |
| 31 | TBW - Net Funded / FHLMC | - | - | - | - | - | - | - | - |
| 32 | TBW - Net Funded / GNMA | - | - | - | - | - | - | - | - |
| 33 | TBW - Net Funded / Wells Fargo | - | - | - | - | - | - | - | - |
| 34 | TBW - Selene Interim Serviced | - | - | - | - | - | - | - | - |
| 35 | UMS - Hudson City | - | - | 539 | - | 539 | 7,191 | - | 7,730 |
| 36 | Urban Trust Bank | - | 9,038 | 937 | - | 9,975 | 191 | - | 10,165 |
| 37 | US AmeriBank | - | 793 | - | - | 793 | - | - | 793 |
| 38 | US Bank | - | - | - | - | - | - | - | - |
| 39 | Wachovia | - | - | 14 | - | 14 | - | - | 14 |
| 40 | Wells Fargo | 60,367,171 | 26,645,512 | 14,638,648 | - | 101,651,332 | 5,433,659 | (5,662,039) | 101,422,951 |
| 41 | Total | $ 71,376,950 | $ 116,479,538 | $ 38,850,744 | $ 11,281,109 | $ 237,988,341 | $ 39,511,966 | $ (13,506,507) | $ 263,993,800 |

[A]   P&I Book-to-Bank Reconciliation as of August 4, 2009 reflecting net advances made by TBW. For additional information, see negative investor balances in Column H of Exhibit M.
[B]   T&I advances on loans and REOs after adjustment for Platinum EDCA bounced checks.
[C]   Corporate Advances on loans and REOs after adjustment for Platinum EDCA bounced checks.
[D]   Other unreimbursed amounts to TBW. See Exhibit Q for additional information.
[E]   Total unreimbursed Advances which is the sum of [A]+[B]+[C]+[D].
[F]   Unpaid service fees for loans and REOs calculated up to service release date for each investor.
[G]   Represents funds transferred from the Regions Refund Account, funds transferred from Regions REO Proceeds Account, and $1,300,000 and $1,000,000 advances received from Wells Fargo and Bayview, respectively, to facilitate servicing transfer of their loans in 2009. See Exhibit R for more details.
[H]   TBW serviced released approximately $125 million of loans to Henley Holdings. Pursuant to the terms of a mortgage loan purchase agreement entered into in 2007, TBW, through its wholly-owned subsidiary TBW Funding III LLC, has a residual interest in the loans after satisfaction of amounts owing to Henley Holdings. TBW has requested certain information from Henley Holdings with respect to that residual interest.

## D.   **Borrower Protocol Update**

85.   Beginning on August 4, 2009 and continuing thereafter, all investors demanded that the servicing of their respective mortgage assets be transferred to a different service

provider.  As summarized in the following schedule, the servicing of all mortgage assets was transferred to subsequent servicers except for 751 Net Funded Loans described briefly below.

**TABLE 6**
TBW Loan Service Release Schedule by Investor

| Investor | Servicer | Dates | # of Loans |
|---|---|---|---|
| Bank of America | Bank of America | 8/10/09 - 8/18/09 | 2,920 |
| Bayview Loan Servicing LLC | Bayview Loan Servicing LLC | 9/1/09 | 2,021 |
| Colonial-FDIC | RoundPoint | 9/4/09 - 12/14/09 | 7,709 |
| Freddie Mac | Cenlar | 8/12/09 | 266,183 |
| Freddie Mac | Ocwen | 8/12/09 | 24,305 |
| Freddie Mac | Saxon | 8/12/09 | 4,991 |
| Ginnie Mae | Bank of America | 8/10/09 - 8/21/09 | 180,205 |
| Henley Holdings | 21st Mortgage Corp | 8/18/09 | 2,946 |
| Ocala Funding – RoundPoint Interim Serviced | RoundPoint | 9/18/09 | 183 |
| Platinum Community Bank-FDIC | Dovenmuehle / RoundPoint | 8/27/09 | 1,518 |
| Seaside | RoundPoint | 9/4/09 | 538 |
| TBW – Selene Interim Serviced | Selene | 11/6/09 - 5/12/10 | 1,060 |
| Wells Fargo | American Home Mortgage | 10/19/09 | 15,996 |
| Various | Various | Aug - Dec 09 | 711 |
| **Total** | | | **511,286** |

86.     The abrupt nature of TBW's collapse, coupled with the administrative hold placed on the Colonial bank accounts, created numerous problems for borrowers and resulted in the filing of numerous state regulatory actions.  However, the combination of the Colonial receivership and the transfer of servicing to new servicers prevented the Debtor from remedying the borrower problems unilaterally.

87.     As a result of the collaborative efforts of the Debtor and the FDIC-Receiver, on January 21, 2010, the Debtor filed a Motion for Approval of Protocol to Resolve Borrower Issues [Doc. No. 927] ("**Borrower Protocol**").  In sum, there were more than 16,000 borrowers affected by one of the following issues:

a.     *Issue 1:  Insurance Proceeds* – monies received by TBW from property insurance companies based on payment of individual borrower claims for loss or damage to property, but not paid to the borrower as of the date of the administrative hold.

      b.    *Issue 2: Tax and Insurance Escrow Proceeds* – T&I monies owed, but not paid, to borrowers who had paid off their mortgages as of the date of the administrative hold.

      c.    *Issue 3: Bounced Checks Written on Platinum EDCA* – checks written by TBW to borrowers that were not honored.

The total amount of cash required to resolve these three issues was $25,636,418 (*i.e.,* the cumulative amount owed to borrowers).

      88.    In addition, in the Borrower Protocol the Debtor identified a fourth issue regarding 788 (751 serviced at TBW and 37 service-released) "Net Funded Loans" (*Issue 4: Net Funded Loans*).  As more fully described in the Borrower Protocol, TBW had implemented a practice of refinancing certain mortgages but waiting until the new loan was sold before paying off the old mortgage (rather than paying the old mortgage off at closing).  As a result of the events in August 2009, certain borrowers have two mortgages outstanding because the old loan was not paid off.  The Borrower Protocol proposed a resolution to this issue whereby the appropriate investor will evaluate the old and the new loan and resolve the matter with each borrower so that only one loan remains outstanding.

      89.    After a hearing on the Borrower Protocol held on February 19, 2010, the Bankruptcy Court granted the motion and approved the recommended Borrower Protocol by an Order entered on February 24, 2010 [Doc. No. 1079].

      90.    In accordance with the approved Borrower Protocol, most affected investors opted to participate in the resolution of Issues 1, 2 and 3.  As of the filing of this Report, the FDIC-Receiver has transferred $7,861,287 and the Debtor has transferred $781,367 to various investors to be used in the resolution of those issues.  Four (4) investors (Wachovia, Central

Mortgage, Five Mile Capital and Mercantile Bank) did not opt in to the Borrower Protocol.  The Debtor believes, but has not confirmed, that each investor that opted in has issued checks to their affected borrowers.

91.     As of the filing of this Report, all affected investors have opted to participate in the resolution of Issue 4 regarding Net Funded Loans.  However, in each instance TBW continues to service the new loan and believes the loans need to be service-released to the investors to properly resolve the issue.

92.     In addition to the issues addressed in the Borrower Protocol, a number of other borrower issues have been identified as a result of the Servicing Reconciliation.  These are issues that should be addressed by the subsequent servicers and, in certain circumstances, adjustments to individual borrowers' servicing records may be necessary.

93.     These additional borrower issues can be summarized as follows:

a.     *Borrower Payments "Posted, Not Monetized"* – As indicated above and detailed in Exhibit C, $63,208,545 in ACH borrower payments and $67,137 in Western Union borrower payments were posted in TBW's Servicing System as received, but no cash was actually received by TBW due to the imposition of the administrative hold on the Colonial bank accounts.  As a result, the servicing records that were provided to subsequent servicers by TBW indicate that a payment was made by the borrower, however, no corresponding funds are on deposit at Colonial or Regions.  These "payments" are allocated among investors in Table 1, as well as at Exhibit C.  The Debtor will work with the subsequent servicers to properly update borrower records to address this issue.

-46-

b.      *Western Union Clearing Account Funds* – As described in Exhibit C,

$17,294,686 in partial borrower payments were on deposit in the Western

Union Clearing Account at Colonial when the administrative account hold

was implemented.  While these amounts are accounted for as Gross

Affected Funds in the Servicing Reconciliation, the FDIC-Receiver turned

these funds over to Western Union on November 20, 2009.  (See, Exhibit

D.)  Based on discussions with Western Union, the Debtor understands

that Western Union either:  (i) sent the borrowers' payments to the

subsequent servicer if there were enough funds for a full payment, or, (ii)

sent the borrower a check if the funds were not enough for a full mortgage

payment.  If the affected borrowers have received their portion of these

funds from Western Union, then no action is required.  However, to the

extent that any of these funds remain at Western Union, the investors for

the affected borrowers should work with Western Union to determine

whether the funds should be released to the borrower or paid to the

subsequent servicer with appropriate adjustments made in any affected

borrower's servicing records.

c.      *Borrower Payments Posted, Then Forwarded* – In the course of

transferring loans to subsequent servicers, there were instances of TBW

receiving borrower checks, posting them in the Servicing System, and then

forwarding the checks to the appropriate subsequent servicer (rather than

depositing the checks).  These payments, totaling $7,946,899, are

identified in Exhibit C.  Investors and their subsequent servicers should

confirm that these checks are properly recorded in their servicing records (*i.e.,* confirm that the check was not entered as another payment by the subsequent servicer upon receipt).

d.    *Payments on Deposit, But Not Posted* – There is approximately $136 million in borrower-related payments deposited into the clearing accounts at Colonial or Wachovia (and subsequently Regions), but the payments were not recorded in TBW's Servicing System for one of the following reasons:  (i) the requisite information was not sent to TBW by Colonial (e.g., lockbox checks deposited on August 10, 2009); or, (ii) the underlying loan had already been released to a subsequent servicer, but the borrower payments were deposited into Colonial and Wachovia accounts. Hence, the borrower made the payment and the payment was received, and yet the payment was not recorded as received.  The information necessary to resolve this issue has been available to the applicable investors since January 2010.  While some investors and their subsequent servicers resolved this issue promptly, others have not done so and have actually reported the affected borrowers to credit reporting agencies as being delinquent.  This is an important issue that requires immediate attention by the applicable investors and subsequent servicers.

e.    *Escrow Refunds* – As indicated above and in Exhibit L, the Debtor has received $11,291,175 in refunds associated with "escrows" such as force placed insurance, mortgage insurance, and overpayment of taxes.  Because these refunds were received after servicing was released, they have not

been recorded in the Servicing System.  Subsequent servicers need to update these borrowers' servicing records to reflect these refunds.

f.    *Bounced EDCA Checks* – As more fully described in the Borrower Protocol, the cumulative amount of checks written on the Platinum EDCA account that were not and will not be honored is $31,284,686.  The checks written to borrowers (totaling $9,866,332) were addressed in the Borrower Protocol; however, the balance of the checks, which included payments of taxes and insurance premiums, was not addressed.  As explained above, there are monies on deposit at Colonial and Seaside that are related to these payments though there is a cumulative shortfall in the EDCA accounts.  (See, Exhibit P.)  To the extent not already done, subsequent servicers should make certain that the payments related to any remaining bounced EDCA checks have been made.  The affected borrowers' servicing records should be adjusted accordingly.

g.    *Escrow Accounts* – As with any large servicing enterprise, the Debtor has, since the release of servicing, discovered errors in the recorded borrower escrow balances of a limited number of borrowers.  The Debtor has provided and will continue to provide information regarding these errors to the appropriate investors so that adjustments can be made in their servicing records.

h.    *Erroneous Credit Reporting* – As a result of some of these and, possibly, other issues, some subsequent servicers have reported borrowers to credit reporting agencies as delinquent, even though all mortgage payments have

been timely made.  To the extent not already done, investors and their subsequent servicers should correct these reports.

i.      *Satisfaction of Paid-Off Mortgages* – There are mortgages that were paid in full, but as to which the appropriate recordings were not made at the time of TBW's collapse.  The recording process is ongoing.  The Debtor, in addition to some investors, are working with Nationwide Title Clearing Inc. ("**NTC**") to make the appropriate filings.  TBW and NTC will work with each investor to resolve any open satisfaction requests from borrowers.

94.     Some of these issues have already been resolved by some of the investors and their subsequent servicers.  The Debtor, however, continues to receive communications from borrowers indicating that further efforts will be required to achieve complete resolution.  The Debtor has previously provided certain investors with information required to address some of these issues after the filing of the Second Report.  The Debtor will make additional information available and will work with investors and their subsequent servicers in a continuing effort to resolve these issues properly.

95.     Subsequent to the filing of this Report, the Debtor expects to make data available to the FDIC-Receiver and investors that may have an interest in the Gross and Net Affected Funds and expects to provide information with respect to each investor's applicable loan servicing and reconciliation records (subject to the execution of a confidentiality agreement acceptable to the FDIC-Receiver and the Debtor).  The detailed information supporting the Debtor's Servicing Reconciliation will be available on an investor-by-investor basis for review via encrypted databases and spreadsheets.

## V.    <u>ASSET RECONCILIATION</u>

96.    From the earliest days of this case, there have been questions about the nature, location and ownership of certain mortgage assets originated, sold and/or serviced by TBW.  In an effort to clarify these issues, the Asset Reconciliation began shortly after the Stipulation was approved.  Early on, it was clear that the parameters of the Asset Reconciliation would continue to evolve as facts were developed.

97.    As indicated in the First Report, the initial focus of the Asset Reconciliation was 7,883 specific loans that were the subject of litigation between Bank of America (as indenture trustee for the OFCP) and Colonial.  However, as the investigation and analysis of these assets progressed, it became apparent that there were significant issues regarding other mortgage assets that are relevant to this case.  In addition, issues emerged regarding TBW's use of certain funding sources.

98.    Ultimately, the Asset Reconciliation has included the investigation and analysis of the following interrelated components:

        a.    The status, as of the filing of the Petition, of mortgage assets related to the Ocala Funding commercial paper facility;

        b.    The status, as of the filing of the Petition, of mortgage assets related to the Colonial COLB;

        c.    The status, as of the filing of the Petition, of mortgage assets related to the Colonial AOT; and,

        d.    TBW's use of cash related to the OFCP and AOT.

99.    Due to the additional time and expense that would be involved, the Debtor has not performed an extensive tracing of TBW's receipt and disbursement of funds during the course of its business operation.  However, as facts continue to emerge, the Debtor, in consultation with

significant stakeholders, may determine that it is necessary and appropriate to perform such an analysis.

100.    As indicated below, the time period most relevant to the Asset Reconciliation is June 30, 2008 (*i.e.*, the date of the restructuring of the OFCP) through August 24, 2009 (*i.e.*, the Petition Date).  However, during the course of the Debtor's investigation and reconciliation, certain facts and circumstances were discovered regarding transactions and conduct prior to June 30, 2008.  While this earlier conduct may be relevant to the resolution of specific issues, the Debtor does not believe that these earlier transactions and conduct are central to the issues that are the subject of the Asset Reconciliation.[12]

101.    The results of the Asset Reconciliation are summarized below.  However, it is important to emphasize that this Report is not intended to provide a comprehensive recitation of all facts that were developed during the course of the Debtor's investigation into these issues.  Moreover, this Report is not intended to be a determination or adjudication of the legal issues associated with these facts.  Rather, the Asset Reconciliation has been developed in the hope and expectation that the relevant factual record will be available to the Court and interested parties to facilitate prompt resolution of various legal issues related to TBW's Chapter 11 case.

102.    As the Asset Reconciliation has progressed, the Debtor has been in communication with interested parties regarding this process and its preliminary findings.  Records and information, including extensive mortgage and financial databases and the electronic evidence database compiled during the course of the reconciliation process, have been made available, as appropriate.  This information will continue to be available to investors,

---

[12]    On June 16, 2010, an indictment filed against Lee Farkas, TBW's former Chairman and principal shareholder, was unsealed in the Eastern District of Virginia.  In sum, Mr. Farkas has been charged with bank fraud, wire fraud and securities fraud.  It is apparent that some, but not all, of these charges arise from facts and circumstances that are the subject of the Asset Reconciliation.  However, a number of the charges relate to earlier conduct.  The Debtor is informed and believes that the criminal investigation is ongoing.

creditors and other interested parties, subject to appropriate agreements regarding maintenance and use of confidential information.

**A.    Ocala Funding**

103.    Ocala Funding is a limited liability company formed by TBW in 2005 as a "bankruptcy remote" subsidiary.  TBW was the managing member of Ocala Funding and, as a practical matter, was fully responsible for all of its business activities.

104.    In or about April 2005, Ocala Funding established a commercial paper facility – *i.e.*, the OFCP.  The controlling documents are voluminous and complicated.  In sum, the OFCP was structured as follows:

    a.    Ocala Funding issued short-term promissory notes ("**Secured Loan Notes**") to participants in the OFCP, most, if not all, of which were large financial institutions.

    b.    The proceeds of the note sales were used to fund mortgages originated by TBW (*i.e.*, wet funding) and to purchase mortgages from other lenders.

    c.    Even though Ocala Funding provided the funding, most, if not all, mortgage loans were made (or acquired) in the name of TBW.

    d.    TBW sold the mortgages financed by Ocala Funding to "take-out purchasers" such as Freddie Mac and large financial institutions engaged in the issuance of mortgage-backed securities.

    e.    Ocala Funding's principal bank was LaSalle Bank in Chicago (which subsequently was acquired by Bank of America).  As a result, disbursements to fund mortgage loans and loan purchases, along with the proceeds from the sale of Secured Loan Notes and mortgages, were maintained in and administered through accounts at LaSalle Bank.  While

there were various accounts over time, the one that is most relevant to the Asset Reconciliation is the "**Ocala Funding Collateral Account**," which was used throughout the life of the OFCP.

    f.    Under the terms of the controlling documents, the amounts owed by Ocala Funding pursuant to the issued and outstanding Secured Loan Notes were to be secured by collateral consisting of mortgages and cash owned by Ocala Funding.

    g.    As Secured Loan Notes matured, they were either: (a) paid in full; or, (b) "rolled," with accrued interest paid on the maturity date and new notes issued to the same investors.

105.    LaSalle Global Trust Services ("**LGTS**"), an operating unit of LaSalle Bank, was the trustee under the controlling indenture for the OFCP. In that capacity, it acted on behalf of the purchasers of the Secured Loan Notes in dealing with Ocala Funding (and TBW). LGTS also served as custodian and collateral agent for the facility. In those capacities, LGTS acted as the custodian of mortgages for Ocala Funding and as the party who dealt with Ocala Funding regarding the status of the collateral for the Secured Loan Notes – *i.e.*, mortgages and cash.

106.    Typically, Secured Loan Notes were issued as business activities dictated, and they typically matured between one and thirty days after issuance. As a result, there were multiple issuances of Secured Loan Notes each month. Every time new notes were issued, including when maturing notes were "rolled" as described above, the underlying collateral was reviewed by Ocala Funding and LGTS to determine whether there was sufficient collateral available to support the new issue. This "collateral check" was to be performed in accordance with the controlling agreements.

107.    From its inception, the OFCP was an important funding source for TBW, and the amount of issued and outstanding notes increased as TBW's business grew.  In May 2005, there was a total of $325 million in issued and outstanding Secured Loan Notes.  By June 2007, the outstanding balance of issued Secured Loan Notes had grown to more than $4.4 billion.  In addition, Ocala Funding owed $67.5 million in subordinated debt.

108.    In August 2007, the asset-backed commercial paper market crashed.  As a result, Ocala Funding was unable to continue issuing new Secured Loan Notes as it had done in the past, and many of the participants in the OFCP stopped purchasing Secured Loan Notes.  As a result, between August 2007 and October 2007, Ocala Funding redeemed almost $2.8 billion in Secured Loan Notes.

109.    The OFCP was restructured as of June 30, 2008.  By this time, the amount of issued and outstanding Secured Loan Notes had been reduced to $895 million, which meant that the total indebtedness under the facility, including the subordinated debt amount, was $962.5 million.  However, it now appears that the value of the underlying collateral – *i.e.*, the value of the mortgages plus the "eligible" cash – totaled only $250.4 million.  Hence, there was a collateral shortfall of more than $712 million at the time of the restructuring.[13]

110.    The changes to the OFCP resulting from the restructuring included:

      a.    The maximum amount of Secured Loan Notes that could be issued and outstanding was reduced to $1.75 billion.

---

[13]    Obviously, this shortfall is substantial and inconsistent with the terms of the controlling agreements.  As of the filing of this Report, the Debtor has not identified transactions prior to August 2008 in which cash in Ocala Funding accounts was used to fund other aspects of TBW's business or that otherwise was transferred to third-parties.  Conversely, the Debtor has identified significant cash transactions on and after August 18 or 20, 2008 that are inconsistent with the controlling documents.

b.      The two remaining participants in the OFCP – Deutsche Bank ("**DBK**")
and BNP Paribas ("**BNP**") – were the only purchasers of Secured Loan
Notes.

c.      Mortgages assigned as collateral for the OFCP were specifically allocated
among the two participants.

d.      Wet funding was no longer permitted – *i.e.*, cash proceeds could not be
used to fund mortgage originations.  Cash could only be used to purchase
mortgages that had "dried."

e.      Ginnie Mae approved mortgages were not eligible collateral for the
facility.

f.      Mortgages were eligible collateral for the facility for no more than 60 days
after purchase by Ocala Funding.

111.    The net effect of the changes to the OFCP was that after June 2008, the primary
business activity of Ocala Funding was intended to be the purchase of mortgages from Colonial
and other lenders.

112.    With the restructuring of the OFCP in June 2008, TBW's principal source for wet
funding became the COLB at Colonial.  At all relevant times, money paid to Colonial for the
purchase of mortgages funded on the COLB (or assigned to the AOT) was deposited into the
TBW (or Seaside) Investor Funding Accounts at Colonial.  While these accounts were
maintained in TBW's name, TBW did not have signature authority over them.  Rather, it appears
that TBW provided Colonial with information, which, in effect, was direction to Colonial about
how deposits should be applied by Colonial with respect to mortgage purchases.

113.    Contemporaneously with the restructuring of the OFCP on June 30, 2008, new Secured Loan Notes were issued, so that the cumulative amount of issued and outstanding Secured Loan Notes was increased from $895 million to $1,682,485,000, with approximately $1.2 billion of the notes owned by Deutsche Bank and the balance owned by BNP.  From then until the Petition Date, the amount issued and outstanding on the OFCP remained unchanged. Hence, in the ensuing fourteen months, the Secured Loan Notes issued to DBK and BNP were "rolled" each month.

114.    As a result of the issuance of the new Secured Loan Notes at the time of the restructuring, $783 million in purchase proceeds (from DBK and BNP) was deposited into Ocala Funding accounts at Bank of America (formerly LaSalle) on June 30, 2008.  On the same day, more than $237 million was transferred from those accounts to the Investor Funding Account at Colonial to purchase mortgages "off of the COLB".

115.    In the weeks following the restructuring, Ocala Funding continued to use the remaining cash proceeds to purchase mortgages off of the COLB and, to a much lesser extent, from others.  By August 20, 2008, Ocala Funding had used virtually all of the new cash to acquire mortgages, which increased the apparent value of its mortgage collateral by almost $735 million.  However, during this same period of time, the disparity between the value of the collateral and the amounts owed under the OFCP continued to increase.  It now appears that on August 20, 2008 the value of the collateral was $723 million *less than* the cumulative amount Ocala Funding owed to DBK and BNP, which was an $11 million increase in the shortfall since the restructuring on the OFCP in June 2008.

116.    While there were changes to the OFCP as a result of the restructuring, many practical aspects of the relationship between TBW, Ocala Funding, Colonial, and LGTS (and

Bank of America) remained the same.  The logistics regarding purchases "off of the COLB" generally worked as follows immediately following the restructuring:

a.  TBW originated and initially funded individual mortgage loans on the "wet" sublimit of COLB.

b.  The mortgage loan documents were shipped from the closing agent/attorney's office to TBW's Central Document Facility in Ocala. The documents were inspected by TBW and the loan information was loaded into TBW's Servicing System.

c.  The mortgage loan documents were then sent to the Warehouse Lending Group at Colonial, where they were also inspected.  After Colonial confirmed the mortgage was dry, it was reassigned to the "dry" sublimit of COLB, thus freeing up funding space on the "wet" sublimit.

d.  TBW arranged for mortgages to be sold off of the COLB to Ocala Funding and shipped to LGTS.  Simultaneously, TBW also arranged for the ultimate sale of the mortgages from Ocala Funding to take-out purchasers, primarily Freddie Mac.

e.  Prior to June 30, 2008, TBW sent LGTS a "Gatekeeper" report – typically each day – which identified all mortgages that had been funded using the OFCP and that were being shipped to LGTS.  After the restructuring, TBW continued to use the Gatekeeper report to identify for LGTS the mortgages that were being submitted for purchase by Ocala Funding that had been previously shipped to LGTS.  At the same time, TBW provided wire-transfer instructions for the payment to purchase the mortgages.

f.    Upon LGTS's approval of the Gatekeeper report, LGTS wired funds as instructed.  For mortgages being purchased off of the COLB, the purchase money was wired to the TBW Investor Funding account at Colonial.

g.    As mortgages were sold to Ocala Funding, the original loan documents were shipped from Colonial to LGTS, as custodian for Ocala Funding. These documents were transferred to LGTS subject to the terms of a general bailee letter.[14]  An example of one of these letters is attached as Exhibit V.

h.    When loan documents were received by LGTS, they were reviewed and, after being confirmed as suitable collateral for the OFCP, were entered into LGTS's collateral management system as being "on hand."  The effect of this designation was that LGTS was in possession of loan documents for a mortgage that qualified and was treated as collateral for the OFCP.

i.    As mortgages were sold from Ocala Funding to the ultimate take-out purchasers, LGTS shipped the subject loan documents to the custodian for the purchaser, subject to the terms of a bailee letter.[15]  An example of one of these letters is attached as Exhibit W.

j.    Because TBW typically arranged for sales to take-out purchasers simultaneously with selling loans to Ocala Funding, LGTS typically did not retain possession of saleable loan collateral for more than a few days.

---

[14]    The Debtor has not confirmed the existence of a bailee letter for every shipment of loans from Colonial to LGTS.

[15]    The Debtor has not confirmed the existence of a bailee letter for every loan shipment by LGTS.

When loan documents were shipped by LGTS subject to a bailee letter, their status in the LGTS collateral management system was changed to "active release."  The effect of this designation was that LGTS did not have physical possession of loan documents for the subject mortgage, even though it continued to be counted as collateral for the OFCP.

k.    As the custodians for take-out buyers received, reviewed and approved the loans shipped by LGTS, the purchase proceeds paid to Ocala Funding should have been wired by the take-out buyer to the "Ocala Funding Collateral Account" at Bank of America.

l.    Each morning, TBW received an automated report from LGTS identifying all "on-hand" and "active release" loans – *i.e.*, a complete listing of all mortgages that LGTS counted as collateral for the OFCP.

m.    Every day TBW prepared an internal Ocala Funding Pipeline report.  In general, this report tracked TBW's accounting for the mortgages that were collateral for the facility, as well as the loans purportedly purchased by take-out purchasers that day.

n.    Beginning in July 2008, TBW sent separate daily pipeline reports to DBK and BNP identifying the mortgages assigned as collateral to each OFCP investor.  Beginning in the fall of 2008, LGTS sent separate daily collateral reports to DBK and BNP.

o.    The vast majority of mortgages shipped to LGTS were ultimately sold to Freddie Mac with TBW retaining the servicing rights.  For these loans sold to Freddie Mac, Colonial served as the document custodian (through

its Corporate Trust group), which meant that these loan documents were shipped back from LGTS to Colonial.

p.   As a part of the Freddie Mac purchase process, lien holders are required to execute a Form 996. It appears that TBW prepared these forms and submitted them to LGTS for execution. An example of one of these forms is attached as Exhibit X.

q.   When LGTS removed loans from the Ocala Funding collateral listing, the status in the collateral management system was changed to "inactive."

The purchase and sale process described above was directed by TBW. Moreover, TBW also directed the disbursement of monies from the Ocala Funding Collateral Account.

117.   Within months of the restructuring of the OFCP, the process described in the preceding paragraph changed. By December 2008:

a.   TBW continued to send Gatekeeper reports to LGTS identifying mortgages that were "purchased" off of the COLB, however, in many instances, there was no corresponding request to transfer funds to the TBW Investor Funding Account at Colonial. In other words, mortgages were being shipped to LGTS and/or "purchased" by Ocala Funding, but the purchase payment was not being made to Colonial.

b.   Consistent with past practices, upon receipt and review of the loan documents, LGTS entered mortgages into its collateral management system as being "on hand" and, then, when shipped out as being on "active release" in accordance with its historical practice.

    c.        As loans were shipped from LGTS in connection with sales to take-out purchasers, the sales proceeds were paid to Ocala Funding (into the Ocala Funding Collateral Account), however, the sales proceeds were not used to pay Colonial for the loans being sold.  Instead, it now appears TBW directed Bank of America to wire money to Colonial from the Ocala Funding Collateral Account to pay for mortgages that had been shipped to LGTS earlier (an average of 25 days) and which had already been sold and paid for in the intervening time.  As a result, numerous mortgages remained in "active release" status in the LGTS collateral system after they were sold to take-out purchasers.

    d.        Because payment to Colonial was not being made in a manner that actually corresponded to purchase and sale activity by Ocala Funding, mortgages remained on the COLB (*i.e.*, collateral/assets supporting the total amount advanced on the COLB) and were simultaneously listed as collateral for the OFCP.

The net effect of this course of conduct is that thousands of loans were sold to take out purchasers but continued to be listed as collateral for the OFCP in the LGTS collateral management system after the sale.  Moreover, a substantial number of these loans also remained "on the COLB" because Colonial was not paid at the time of "purchase" by Ocala Funding or at the time of sale of the mortgages to take-out purchasers.[16]

---

[16]      Moreover, the available evidence indicates that 2,979 mortgages that appear to have been "sold" to Ocala Funding were actually paid for using proceeds from the BoA EPF described in Section V.C., below.  Apparently, mortgages were shipped to LGTS, listed as collateral for the OFCP, then shipped back to Colonial as described above with no payment from Ocala Funding to Colonial.  All of these mortgages were then sold by TBW to Freddie Mac in connection with the issuance of mortgage-backed securities, and were assigned to the BoA EPF pending settlement of the trade.  Proceeds from that facility were then used to pay Colonial for the subject mortgages.

118.    During 2009, the balance owed for the loans shipped to Ocala Funding "off of COLB," but for which Colonial was not paid at the time of sale, steadily increased.  According to Colonial's records, at the end of May 2009, the amount owed to Colonial for loans shipped to LGTS, but not paid for, totaled nearly $600 million.  By August 5, 2009, that amount had increased to over $900 million.

119.    When TBW collapsed in early August 2009, the process described above came to an abrupt halt.  At that time, the outstanding balance owed by Ocala Funding on the Secured Loan Notes continued to be approximately $1.68 billion (approximately $1.2 billion being owed to DBK and approximately $481 million being owed to BNP).  However, the value of the mortgages physically located at LGTS (693 mortgages with a UPB of $89.1 million), coupled with the cash on deposit in the Ocala Funding bank accounts (approximately $75 million) was far less than the amount owed.[17]

120.    On or about August 12, 2009, Bank of America, in its capacity as indenture trustee and collateral agent for the OFCP, filed suit seeking emergency injunctive relief against Colonial alleging that Colonial was in possession of 7,883 loans or the proceeds of the sale of those loans ("**TRO Loans**") that constituted collateral for the OFCP.  Hence, Bank of America asserted that Colonial should return or pay for these loans.  The FDIC was appointed receiver for Colonial shortly thereafter.  Bank of America made similar assertions regarding these loans early in this case, which prompted this Asset Reconciliation.

121.    As more fully explained below, it now appears that, as a result of the processes described above, these TRO Loans were listed as OFCP collateral in "active release" status in the LGTS collateral management system despite the fact that they had actually been sold by Ocala

---

[17]    Some of the 693 loans are old.  The Debtor has been able to confirm that Ocala Funding purchased 290 of these loans, but the identity of the seller has not been ascertained in all instances.

Funding (and/or TBW) and paid for by a take-out purchaser.  Moreover, more than half of these loans remained on the COLB because Colonial had not been paid for them.

122.    The Debtor, with assistance from Bank of America, identified a total of 9,111 mortgage loans (which includes all of the TRO Loans) that, according to the LGTS collateral management system, are collateral for the OFCP – *i.e.*, either "on hand" or on "active release" as of August 2009 – and available to secure repayment of the issued and outstanding Secured Loan Notes.  This list of loans was compiled from four different sources:  (a) the August 5, 2009 LGTS collateral report; (b) the August 13, 2009 LGTS collateral report; (c) the list of TRO Loans attached to Bank of America's complaint filed against Colonial; and, (d) a physical count conducted by LGTS after August 2009 of the mortgage loans "on-hand" – *i.e.*, in the physical possession of LGTS.  These 9,111 mortgage loans are recorded in the LGTS collateral management system as follows:

### TABLE 7

| OFCP Investor Per LGTS | Total Loans Assigned to Investor Per LGTS | Total Loans With "On-Hand" Status Per LGTS | Total Loans With "Active Release" Status Per LGTS |
|---|---|---|---|
| BNP | 2,214 | 182 | 2,032 |
| DBK | 6,121 | 302 | 5,819 |
| Ocala Funding (Unassigned) | 776 | 344 | 432 |
| **Total** | **9,111** | **828** | **8,283** |

Of these 9,111 loans, 8,256 were first included as collateral for the OFCP on or after April 9, 2009.

123.    In stark contrast to the LGTS records, other investors are identified as the owners of all but 183 of these 9,111 mortgage loans in TBW's Servicing System.[18]  This disparity was a focal point of the Debtor's Asset Reconciliation and related investigation.

124.    The Debtor located 9,084 of the subject 9,111 mortgage loans in TBW's Servicing System (*i.e.*, there is no record for 27 of the mortgages).  Of the 9,084 loans for which there are records, 110 had been paid off by the borrower; 49 had never been funded; 9 were listed as real property owned by TBW; 60 were Net Funded Loans (as described in Section IV.D., above); and 46 had been disposed of prior to 2007.

125.    Accordingly, of the 9,111 mortgage loans on the LGTS collateral list for the OFCP, there are 8,810 mortgage loans that were actually reviewed as part of the Asset Reconciliation.  Because all but 183 of these loans were assigned to other investors in TBW's Servicing System, the Debtor endeavored to determine whether the indicated investor paid for its assigned mortgages.  As more fully described in Exhibit B to this Report, multiple sources of information were used to perform this analysis.  Where necessary and appropriate, the Debtor validated loan level data by reconciling it to actual cash deposits.  In addition, pursuant to its ongoing discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure, the Debtor has recently obtained from Freddie Mac copies of Freddie Mac purchase advices and Form 996's, which have been tested but not yet thoroughly analyzed.  The testing done to date indicates that these records are consistent with the Debtor's findings regarding the subject loans.

126.    In general, the Debtor verified that the investor indicated in the Lookup Database did make payment to Ocala Funding or to TBW for the assigned loans in connection with a purchase transaction.  However, as a result of this analysis, the Debtor discovered a few

---

[18]    The servicing of these 183 loans was transferred to RoundPoint in September 2009.  At that time, the UPB of these loans totaled $37.3 million.

erroneous assignments of loans to investors in the Servicing System based on the purchase and

cash transactions.  (See, "Comments" in Table 8, below.)

127.    The following Table summarizes the Debtor's analysis of the 8,810 loans:

**TABLE 8**

| Line | Investor | Total Loans | Comments |
|------|----------|-------------|----------|
| 1 | American Portfolio | 1 | |
| 2 | Bank of America | 297 | All of these mortgages were assigned to the BoA EPF. |
| 3 | Bank of Camden | 15 | |
| 4 | Bayview | 5 | |
| 5 | Beal Bank | 1 | |
| 6 | CitiMortgage | 138 | |
| 7 | Colonial | 742 | Includes **33** mortgages that were paid for by Ocala Funding but are on the Overline with a $0 balance.  Also includes **4** mortgages that appear to have been purchased by Freddie Mac. |
| 8 | Freddie Mac | 7,165 | Does <u>not</u> include **4** mortgages assigned to Colonial and **23** mortgages assigned to Ocala Funding that appear to have been purchased by Freddie Mac. |
| 9 | GNMA | 3 | |
| 10 | Marix Servicing | 12 | |
| 11 | MGC Mortgage | 2 | |
| 12 | MountainView | 16 | |
| 13 | Ocala Funding | 183 | Does <u>not</u> include **33** and **6** mortgages assigned to Colonial and TBW/Selene, respectively, that were purchased by Ocala Funding. Includes **23** mortgages that appear to have been purchased by Freddie Mac. |
| 14 | Ocwen | 1 | |
| 15 | Omni American | 1 | |
| 16 | Platinum Community Bank | 85 | |
| 17 | Seaside | 10 | |
| 18 | Selene | 8 | |
| 19 | TBW/Selene | 6 | All **6** of these mortgages were paid for by Ocala Funding.  These mortgages do not appear to have been sold to another investor. |
| 20 | Urban Trust Bank | 46 | |
| 21 | Wells Fargo | 73 | |
| 22 | **TOTALS** | **8,810** | |

128.    The 7,883 TRO Loans are included in the analysis summarized above.  The

available information indicates that either Ocala Funding or TBW was paid by investors for the

vast majority of the TRO Loans.

129.    In addition to the foregoing, the Debtor endeavored to ascertain how many of the

subject 8,810 loans had actually been paid for in connection with Ocala Funding's apparent

purchases from Colonial or other lenders.  All cash disbursements from the Ocala Funding bank

accounts at Bank of America from June 30, 2008 through August 4, 2009 have been thoroughly

analyzed.  As part of this analysis, the Debtor has identified the disbursements that were used to

purchase loans on behalf of Ocala Funding during this period, as well as the loans related to each

such disbursement.  In sum, of the 8,810 loans, it appears that:

      a.     Ocala Funding actually paid for 691.

      b.     Colonial was not paid for 4,928, which remained "on the COLB" as of

            August 2009.

      c.     The remaining 3,191 were not paid for by Ocala Funding, but were paid

            for using other funding sources unrelated to Ocala Funding or the OFCP.[19]

130.    In sum, as of August 2009, Ocala Funding owed approximately $1.68 billion to

DBK and BNP pursuant to the terms of issued and outstanding Secured Loan Notes.  Of the

9,111 loans listed as collateral to secure the repayment of those notes, Ocala Funding actually

purchased and paid for 691.  The vast majority of these loans were sold to Freddie Mac and other

take-out purchasers, who made payment to Ocala Funding or to TBW for those purchases.  The

servicing for most, if not all, of these loans was transferred to the subsequent servicers for the

take-out purchasers in accordance with TBW's servicing records.  Moreover, Colonial was not

---

[19]    It appears that the 2,979 of these loans were purchased off of COLB using the BoA EPF described below
and were assigned as collateral for that facility.

paid for 4,928 of these loans even though they were originally funded using the COLB and shipped to LGTS as custodian and collateral agent for Ocala Funding.

**B.**    **Colonial COLB**

131.    As indicated above, the COLB was an important funding source for TBW.  In general, the COLB facility operated as follows:

a.    Advances from the COLB were made to TBW on a daily basis and were used to fund loan closings and, to a lesser extent, to purchase dry loans from other lenders.  The money advanced to TBW was deposited into the Colonial Master Advance account.

b.    Typically, Colonial created a participation certificate for the prior day's advance on the COLB.  The certificate was provided to TBW, signed and then returned to Colonial.  Colonial executed the certificate after receiving the executed version from TBW.  This exchange was typically accomplished electronically, using e-mail.  Colonial retained a hard copy of the participation certificate.  The specific loan listings associated with each day's advance were not attached to the participation certificate but were maintained in electronic form by Colonial.

c.    TBW sent "funding tapes" to Colonial multiple times each day.  The funding tapes provided Colonial with directions regarding wiring funds from the Master Advance Account to fund individual loan closings and loan purchases.

d.    Loans funded at closing using advances from the COLB were initially assigned to the "wet" sublimit of COLB.

-68-

e.    After the closing and related activities were completed, loan documents were shipped by the closing agent to TBW's Central Document Facility in Ocala.  TBW inspected the documents, entered the loan into the Servicing System, and then shipped them to Colonial's Warehouse Lending Group in Orlando, Florida.

f.    When Colonial confirmed that the loan was "dry," the loan was reassigned to the "dry" sublimit of COLB.

g.    TBW directed and managed the sale of the COLB loans to investors.  When loans assigned to the COLB were sold, Colonial shipped the loans to the purchasing investor's custodian for inspection.  In the case of loans sold to Freddie Mac, Colonial simply transferred the loan documents from its Warehouse Lending Group to its Corporate Trust Department, which served as custodian for Freddie Mac.

h.    Every day, Colonial prepared a "pipeline" report, which identified, among other things, the loans assigned to the COLB, including the mortgages funded with advances and those that had been shipped to investors but not yet paid for.  In addition, the pipeline report identified loans paid down (*i.e.*, paid for) that day, which would be removed from the next day's pipeline report.

i.    At the end of each day, Colonial created a "pay down" file, which identified the specific deposits into the Investor Funding Account that were being used to pay down the COLB, as well as the AOT and other TBW warehouse lines.  It appears that this report was used by TBW and

Colonial to make decisions regarding the use of monies deposited into the

Investor Funding Account, including payments applied to the various

Colonial financing facilities and transfers to other TBW accounts at

Colonial.

132.    TBW was the servicer of the mortgages on the COLB.  Payments received from

borrowers on these mortgages were deposited into the CFCA and, from there, into TBW's

operating account as they were received.  Each month, TBW made interest payments to Colonial

based on the outstanding balance of the COLB.

133.    As of the appointment of the FDIC-Receiver on August 14, 2009, Colonial's

records indicated that there were 8,714 loans assigned to the COLB, with an associated advance

amount in excess of $1.7 billion for these loans.  Comparing this listing to TBW's Servicing

System, it appears that 29 of these loans were either paid off by the borrower or not maintained

in TBW's Servicing System.  As described in Exhibit B, the Debtor has analyzed the 8,685

COLB loans for which there are TBW servicing records.

134.    Of the 8,685 COLB loans that were reviewed, the Debtor determined that 3,829

loans, with a UPB of approximately $825.9 million, had not been sold by Colonial.[20]  The other

4,856 were ultimately sold to and paid for by the following investors:  Freddie Mac (4,802);

Wells Fargo (30); and, CitiMortgage (24).  The Debtor has been able to trace cash payments

from Freddie Mac, Wells Fargo, and CitiMortgage for these loans.

135.    As indicated in the Ocala Funding section, above, there are 4,928 loans assigned

to the COLB that are also on the LGTS collateral list for the OFCP that were not paid for by

Ocala Funding.  The cumulative COLB balance associated with these 4,928 loans is $909.6

---

[20]    The servicing for the vast majority of these loans was released to RoundPoint Mortgage Company
("**RoundPoint**"), the subsequent servicer for the FDIC-Receiver.

million.  Of the 4,856 COLB loans sold to Freddie Mac, CitiMortgage, and Wells Fargo described in the preceding paragraph, 4,252 of these loans (with an associated balance on the COLB of $779.9 million) are also among the 4,928 loans on the LGTS collateral list.

136.    In sum, of the 8,714 loans assigned to the COLB as of August 14, 2009, 29 were not located.  Colonial was in possession of and had not sold 3,829.  The other 4,856 had been sold by TBW or Ocala Funding and paid for by other investors, but Colonial had not been paid.  Of these loans sold to other investors, 4,252 had initially been "sold" to Ocala Funding and shipped to LGTS before being shipped to the purchasing investor (or its custodian).

C.    **Colonial AOT Facilities and BoA EPF**

137.    In addition to the COLB facility, TBW had access to funding through the AOT facilities.  Like the COLB, the AOT was designed as a participation facility – *i.e.*, Colonial was granted a "participation" (*i.e.*, ownership) interest in the mortgage pools assigned to the facility.  Unlike the COLB, wet funding was not available under the AOT.  Rather, it was designed as an interim funding source used to "warehouse" dried mortgage loans as pools were being finalized for sale to investors who were issuers of mortgage-backed securities.

138.    In general, the AOT (like other assignment of trade facilities) was designed to operate as follows:

        a.    TBW entered into a "trade" with an issuer of mortgage-backed securities, which means that the issuer agreed to purchase pools of mortgages that would support the issuance of the securities.

        b.    Under the terms of the contract with the purchaser/issuer, TBW was not paid until the "trade settled" – *i.e.*, the securities were sold and the proceeds received by the issuer.

c.      Between the contract date and the settlement date, the mortgage pools were assigned to the AOT.  At the time of the assignment of a pool to the AOT, Colonial acquired a 99% interest in the mortgage pool and paid corresponding cash to TBW.

d.      TBW used the proceeds from the AOT to pay down the warehouse lines that had been used initially to finance the loans in the pool.

e.      When the trade settled, the purchase proceeds were to be wired to the Investor Funding Account at Colonial and should have been used to pay down the AOT.

139.    Trades involving both agency approved securities (*e.g.,* Freddie Mac) and private label securities were allowed on the AOT.

140.    TBW was the servicer of the mortgages in the pools assigned to the AOT.  Each month, TBW made an interest payment to Colonial based on the outstanding balance of the AOT, and TBW retained monthly interest from borrowers.

141.    From 2005 to 2008, the balance on the AOT increased from approximately $500 million to almost $2 billion.  By early August 2009, the balance had decreased to just under $1.5 billion.

142.    On March 31, 2009, TBW entered into a new financing arrangement that was similar in structure to the AOT but allowed for only agency-approved securities.  This new interim funding source was the BoA EPF facility (wholly unrelated to Ocala Funding and OFCP).  Initially, the size of the BoA EPF was $500 million but it eventually grew to $1 billion.  In sum, the BoA EPF worked as follows:

a.  TBW aggregated mortgage loans into mortgage pools and submitted the pools to Freddie Mac and Ginnie Mae for approval as eligible collateral for mortgage-backed securities.

b.  Once approved, these pools were sold into "trades" – *i.e.*, securities issued by Freddie Mac or securities insured by Ginnie Mae.  The vast majority of the trades, which were identified in the underlying document by the trade number and pool numbers, were assigned to the BoA EPF.

c.  At the time of the assignment to the BoA EPF, Bank of America transferred 95% of the purchase proceeds to TBW's Investor Funding Account at Colonial.  With very limited exceptions, these funds were then used to pay down the COLB.

d.  However, unlike the AOT, Bank of America (rather than TBW) received and controlled the purchase proceeds when the trade settled.

e.  Upon receipt of the settlement proceeds, Bank of America transferred the remaining 5% of the purchase price to the Investor Funding Account at Colonial.

143.    In general, it appears that the BoA EPF operated as designed, although the Committee of Unsecured Creditors filed an adversary proceeding against Bank of America seeking to recover amounts owed to TBW under the terms of the BoA EPF.

144.    During the course of its investigation and analysis of Ocala Funding, the Debtor determined that there were substantial deposits into the Ocala Funding Collateral Account that originated as draws by TBW on the AOT, but which seemed wholly inconsistent both with the

purpose of Ocala Funding and the design of the AOT.[21]  Similarly, the Debtor also determined that there were substantial disbursements from the Ocala Funding Collateral Account that were used to pay down the balance owed on the AOT.  These disbursements typically occurred on the same day and in amounts similar to an advance from the AOT that was deposited with Ocala Funding.  Again, these disbursements were inconsistent with the structures of Ocala Funding and the AOT.  (See, Section D, below.)

145.  In the course of investigating the AOT-related deposits into and disbursements from the Ocala Funding Collateral Account, the Debtor determined that there was a correlation between the trades assigned to the BoA EPF and the trades assigned to the AOT, which can be summarized as follows:

a.  Each trade TBW entered into was assigned a unique internally generated ticket number.  In addition, each mortgage-backed pool that was created by TBW and approved by Freddie Mac or Ginnie Mae was assigned a unique pool number.

b.  When a trade was assigned to the BoA EPF, the pool number and the ticket number were each included in the documents supporting the trade assignment.

c.  Within days of assigning a trade to the BoA EPF, TBW assigned to the AOT the same ticket number and pool number that had been used for the BoA EPF trade.  The characteristics (*e.g.,* the amount and settlement date) of the pools assigned to the AOT were similar – but not identical – to those of the pools previously assigned to the BoA EPF.

---

[21]  The only instances in which advances on the AOT might have been paid to Ocala Funding would have been for loans owned by Ocala Funding that were included in the trades assigned to the AOT.

      d.     In addition, the actual mortgages purportedly included in the pool assigned to the AOT were completely different from the corresponding mortgages included in the pool assigned to the BoA EPF.  While the loans in the pools assigned to the BoA EPF were the actual loans approved by Freddie Mac or Ginnie Mae, the loans included in the corresponding pools assigned to the AOT were, in general, a collection of old loans, loans that had been paid off or sold and that now appear to be fictitious – *i.e.*, non-existent – loans.  Hence, the loans actually included in the pools assigned to the AOT were of questionable value and validity.

      e.     Upon assignment of one of these pools to the AOT, monies were advanced by Colonial and deposited into the Ocala Funding Collateral Account.  At the time of many of these advances, a disbursement was made from the Ocala Funding Collateral Account and deposited into the Investor Funding Account at Colonial and used to pay down the AOT, thereby removing a prior trade from the collateral listing and replacing it with the new trade.  As more fully described in Section C, below, some of the deposits from the AOT into the Ocala Funding Collateral Account were used for various other purposes.

146.    As of August 5, 2009, there were 124 trades assigned to the AOT.  The cumulative purchase price (*i.e.*, outstanding balance) of these trades was $1,473,868,368.  The Debtor has determined that 112 of these trades correspond to actual trades that had been assigned to the BoA EPF *prior to being assigned to the AOT*.[22]  Five of the assigned trades cannot be

---

[22]      Bank of America advanced funds to TBW for all 112 of these trades prior the advance being made on the AOT.  The BoA EPF proceeds were used by TBW to pay down loans on COLB, Platinum and the Overline.

found in TBW's secondary trading system, and seven are primarily comprised of loans having little value, if any at all.  In other words, none of the 124 mortgage pools assigned to the AOT was actually associated with a real, pending trade.  Hence, the collateral value of these "trades" is zero.

147.    In addition to analyzing the 124 trades assigned to the AOT as of early August 2009, the Debtor has also analyzed the individual loans that were assigned to the AOT.  The last pipeline report in which Colonial provided TBW with a list of loans assigned to the AOT was dated July 24, 2009.  This listing included 7,867 loans.  However, by the time of the FDIC's appointment as receiver, the list included 9,304 loans shown as having been assigned to the AOT with an assigned "purchase price" totaling $1.26 billion.  Given that the balance of the AOT as of August 5, 2009 was approximately $1.47 billion, there is a shortfall of $211 million even if all of the loans exist, are performing, and are owned by Colonial.

148.    When the loans are actually analyzed, it is evident that the value of the loans that might actually be collateral for the AOT is well below the $1.47 billion balance.  Using TBW's servicing records and other available information, the Debtor has analyzed the 9,304 loans purportedly assigned to the AOT as of early August 2009 and has determined that:

     a.    231 loans either had never been serviced by TBW or had not been serviced since 2006.  The cumulative purchase price of these loans according to the AOT loan listing exceeds $31 million.

     b.    2,752 loans, with assigned purchase prices totaling $323,846,996, had been previously sold to other investors, but had not been removed from the AOT loan listing.

    c.        1,206 loans with assigned purchase prices totaling $136,028,808 had been "charged off" or paid off by the borrower, but had remained on the AOT loan listing.

    d.        1,837 loans had been foreclosed, meaning that the underlying collateral is actually REO (which is not permitted collateral under the terms of the AOT).[23] This includes some second liens (*e.g.,* home equity lines of credit) and properties that had been conveyed to HUD and the VA prior to August 2009.  The aggregate purchase prices assigned to this group of loans total $295,831,301.

    e.        3,278 loans were coded "001" in TBW's Servicing System, which was the code used for loans owned by TBW and/or assigned to one of the Colonial facilities.[24]  The purchase prices for this group of loans according to the AOT loan listing total $474,881,623.

The loan documents for much of the REO and many of the "001" loans were in the possession of the Warehouse Lending Group at Colonial as of the appointment of the FDIC-Receiver.

**D.**    <u>**Uses of Cash and Funding Sources**</u>

    149.    In light of the circumstances surrounding Ocala Funding and the AOT, the Debtor analyzed the funding sources in place at the time that the Petition was filed – *i.e.*, the COLB, AOT, OFCP and BoA EPF – and how monies advanced on each were used by TBW.

    150.    Given the length of time that the COLB, AOT, and OFCP were in place, the Debtor did not endeavor to review thoroughly every transaction on each of these facilities.

---

[23]    1,197 of these REO properties were part of the Section 363 bulk sale approved by the Bankruptcy Court and closed in December 2009.

[24]    Servicing of these loans was transferred to RoundPoint, as servicer for the FDIC-Receiver.

Rather, overall activity on each funding source was analyzed in reverse chronological order. As a result of this high level review (and in the context of other facts developed during the course of the Debtor's investigation), the Debtor ascertained the following:

a.    The transactions associated with the BoA EPF appear to be consistent with its purpose and structure.

b.    The wet funding of loan originations and related transactions associated with the COLB appear to be consistent with its purpose and structure. However, as explained above, payments to Colonial for loans sold "off of the COLB" were not made in accordance with the terms of the controlling agreements.[25]

c.    The Debtor has conducted a general review of cash activity in the Ocala Funding Collateral account for the year 2007 and a detailed review of the activity in that account for 2008 and 2009. Based upon this review, the Debtor has not identified any activity in the Ocala Funding Collateral Account prior to June 30, 2008 that is clearly inconsistent with the purpose and structure of the OFCP. Conversely, the Debtor has identified numerous deposits into and disbursements from that account since June 30, 2008 that appear to be inconsistent with the purpose and structure of the OFCP.

d.    The Debtor has identified numerous transactions related to the AOT going back to 2004 that appear to be inconsistent with the purpose and structure of the AOT. While the Debtor will continue to review and analyze a

---

[25]    In the recently filed indictment of Lee Farkas, the government contends that the COLB was misused prior to 2008. The Debtor's investigation of the COLB has not included that period of time. As of the filing of this Report, the Debtor can neither confirm nor dispute these contentions.

number of these transactions, it appears that the transactions that most

affect this Asset Reconciliation occurred after June 30, 2008 and involved

deposits into and disbursements from the Ocala Funding Collateral

Account.

Hence, the Debtor's analysis of the uses of cash has centered on transactions involving the Ocala

Funding Collateral Account since June 30, 2008.

### *Deposits into the Ocala Funding Collateral Account*

151.    Between June 30, 2008 and August 4, 2009, more than $19.9 billion was

deposited into the Ocala Funding Collateral Account.  Deposits from financial institutions that

purchased loans (e.g., Freddie Mac, Citibank, CSFB, and Wells Fargo) appear to have been

consistent with the purpose and structure of Ocala Funding and the OFCP.  However, other

deposits into the Ocala Funding Collateral Account are not consistent with the design of Ocala

Funding and the OFCP.

152.    In sum, it appears that more than $8 billion deposited into the Ocala Funding

Collateral Account between June 30, 2008 and August 4, 2009 was not related to the operation of

Ocala Funding or the OFCP.  Among other things, these deposits appear to be:

- ·   Advances on the AOT used to pay off worthless trades previously assigned to
      the AOT (see, Section B, above);

- ·   Advances on the AOT used to fund payments to mortgage investors or other
      aspects of TBW's operations; and,

- ·   Short term transfers that correspond to collateral confirmations performed in
      connection with the operation of the OFCP.

153.    The following table summarizes the deposits into the Ocala Funding Collateral

Account at Bank of America from June 30, 2008 through August 4, 2009:

**TABLE 9**

Deposits Into The Ocala Funding Collateral Account For the Period June 30, 2008 Through August 4, 2009

| Line | Source of Deposit | Total Deposits / (Transactions) | Comments |
|---|---|---|---|
| 1 | Freddie Mac | $ 9,892,876,473 / (423) | Consistent with structure and purpose of Ocala Funding. |
| 2 | Colonial AOT | 6,986,392,581 / (83) | Inconsistent with the structure and purpose of Ocala Funding and the AOT. |
| 3 | TBW Investor Funding Account (Colonial) | 751,205,386 / (133) | Approximately $450 to $500 million in deposits appear to be proceeds of sales of Ocala Funding loans initially deposited into the Investor Funding Account and then transferred to the Ocala Funding Collateral Account.  These transactions appear to be consistent with the purpose and structure of Ocala Funding.  However, more than $250 million in deposits from the Investor Funding Account were not consistent with the structure of the OFCP. |
| 4 | Citibank | 625,808,957 / (314) | Consistent with structure and purpose of Ocala Funding. |
| 5 | CSFB AOT | 550,953,658 / (21) | Consistent with structure and purpose of Ocala Funding. |
| 6 | Master Advance Account  (Colonial) | 450,100,000 / (25) | Inconsistent with the structure and purpose of Ocala Funding, though some of these deposits appear to have been applied to pay down loans on the Ocala Funding collateral list that had already been sold to Investors.  The Master Advance Account was used in connection with funding loan closings with individual borrowers and other purposes such as loan repurchases from Investors.  Deposits in excess of $265 million correspond to a single "collateral check" done pursuant to the OFCP, which were returned to Colonial the next day, via a $265 million wire into the Investor Funding Account. |
| 7 | Wells Fargo | 269,585,700 / (236) | Consistent with structure and purpose of Ocala Funding. |
| 8 | RBC Operating | 94,993,785 / (13) | Inconsistent with the structure and purpose of Ocala Funding. TBW maintained an operating account that was used to fund TBW's payroll and other aspects of TBW's operations.  It is possible that some of these deposits were in payment of interest and fees associated with the OFCP or in "repayment" of servicing advances that were funded from the Ocala Funding Collateral account.  However, three of these transfers - totaling $29 million - correspond to "collateral checks" done pursuant to the OFCP. |
| 9 | TBW P&I Custodial Others (Colonial) | 84,000,000 / (2) | Inconsistent with the structure and purpose of Ocala Funding.  This deposit corresponds with a single "collateral check" pursuant to the OFCP.  The day after receiving the $84 million, the funds were returned to the custodial accounts at Colonial from which the deposits originated. |
| 10 | Franklin American | 75,687,302 / (29) | Consistent with structure and purpose of Ocala Funding. |
| 11 | Fees | 53,741,334 / (49) | Under the terms of the OFCP agreements, fees were paid by TBW/Ocala Funding to DBK/BNP.  It appears that some or all of these fees were then "returned" to TBW/Ocala Funding by DBK/BNP.  The Debtor has lumped all of these types of transactions under the category of "Fees."  The Debtor has not determined whether these transactions are consistent with the terms of the controlling agreements. |
| 12 | Custodial Funds Clearing Account (Colonial) | 41,500,000 / (5) | Inconsistent with the structure and purpose of Ocala Funding. |
| 13 | DBK Collateral (BOA) | 26,334,461 / (11) | Consistent with structure and purpose of Ocala Funding. |
| 14 | Return Wire | 8,758,059 / (36) | Inconsistent with the structure and purpose of Ocala Funding. |
| 15 | Urban Trust Bank | 8,305,209 / (11) | Consistent with structure and purpose of Ocala Funding. |
| 16 | BNP Collateral (BOA) | 2,962,895 / (11) | Inconsistent with the structure and purpose of Ocala Funding. |
| 17 | MCM Management | 2,944,844 / (5) | Consistent with structure and purpose of Ocala Funding. |
| 18 | Dresdner Bank | 2,283,919 / (2) | Consistent with structure and purpose of Ocala Funding. |
| 19 | Other Sources | 5,074,006 / (28) | |
| 20 | **TOTAL DEPOSITS** | [A] $ 19,933,508,568 / (1,437) | |

[A] Excludes a deposit from a Freddie Mac P&I account on 12/05/08 that was a reversal of a previous transfer to the same P&I account.

### *Disbursements from the Ocala Funding Collateral Account*

154.    Between June 30, 2008 and August 4, 2009, more than $19.9 billion was disbursed from the Ocala Funding Collateral Account.  Certain disbursements are consistent with the purpose and structure of Ocala Funding and the OFCP; however, others are not.  In general, it appears that these "inconsistent" disbursements were used to:

- Pay down expiring "trades" assigned to the AOT (see, Section B, above);

- Fund P&I servicing advances to investors;

- Finance TBW's operations; and,

- Repay very short-term deposits – *i.e.*, one or two days – into the Ocala Funding Collateral Account (apparently in conjunction with collateral confirmations performed in connection with the operation of the OFCP.

155.    The following table summarizes the disbursements from the Ocala Funding Collateral Account at Bank of America from June 30, 2008 through August 4, 2009:

**TABLE 10**

Disbursements From The Ocala Funding Collateral Account For The Period June 30, 2008 Through August 4, 2009

| Line | Recipient of Disbursement | Total Disbursements / (Transactions) | Comments |
|---|---|---|---|
| 1 | TBW Investor Funding Account (Colonial) | $ 10,177,897,949 / (290) | A significant portion of these disbursements were payment for loans purchased "off of the COLB" by Ocala Funding and, therefore, are consistent with the structure and purpose of Ocala Funding. However, approximately $5 billion of this amount was used to pay off expiring "trades" on the AOT as described in Section C, above, which would have been funded by deposits from the AOT.  As indicated in the prior table, $265 million appears to be the return of money that transferred from the Colonial Master Advance Account that corresponds to a collateral check. |
| 2 | DBK Collateral (BOA) | 4,981,106,143 / (406) | Consistent with the structure and purpose of Ocala Funding. |
| 3 | BNP Collateral (BOA) | 2,052,994,482 / (369) | Consistent with the structure and purpose of Ocala Funding. |
| 4 | FHLMC P&I Acct. No. ******1506 (Colonial) | 706,830,816 / (23) | Inconsistent with the structure and purpose of Ocala Funding. With the exception of $34.2 million, these disbursements were used to fund P&I Servicing Advances paid to Freddie Mac.  It appears that TBW was "repaid" these advances, but the "repayments" were not made to Ocala Funding.  Prior to mid-December 2008, "repayments" were made to the Colonial Master Advance Account and, thereafter, to the RBC Operating Account. |
| 5 | Custodial Funds Clearing Account (Colonial) | 674,349,711 / (20) | Inconsistent with the structure and purpose of Ocala Funding.  Approximately $330 million of these disbursements were used to fund Servicing Advances to Investors.  The advances to Freddie Mac and Ginnie Mae were "repaid," though not to Ocala Funding.  However, only a portion of the Servicing Advances to the private Investors were "repaid" to TBW.  The remaining disbursements were used for a variety of purposes unrelated to the operation of Ocala Funding. |
| 6 | CSFB | 570,150,835 / (10) | Consistent with the structure and purpose of Ocala Funding. |
| 7 | Master Advance Account (Colonial) | 451,087,135 / (51) | Inconsistent with the structure and purpose of Ocala Funding.  In general, these disbursements correspond to payments made by TBW in connection with fees, margin calls and payments on working capital lines, as well as when transfers to the TBW Operating account occurred. |
| 8 | FHLMC P&I Acct. No. ******5410 (Colonial) | 129,728,959 / (12) | Inconsistent with the structure and purpose of Ocala Funding.  These disbursements were used to fund P&I Servicing Advances paid to Freddie Mac.  It appears that TBW was "repaid" these advances, but the "repayments" were not made to Ocala Funding.  Prior to mid-December 2008, "repayments" were made to the Colonial Master Advance Account and, thereafter, to the RBC Operating Account. |
| 9 | TBW Operating Account (Colonial) | 58,500,000 / (9) | Inconsistent with the structure and purpose of Ocala Funding. It appears that these disbursements to TBW's Operating Account were used primarily to fund borrower tax and insurance "escrows" as loans were sold to Investors.  While TBW received "escrows" from borrowers at closing, the T&I accounts were not funded until the loan was actually sold. |
| 10 | GNMA P&I Acct. No. ******5287 (Colonial) | 57,832,567 / (2) | Inconsistent with the structure and purpose of Ocala Funding.  It appears that these disbursements were used to fund Servicing Advances paid in connection with the August and November 2008 scheduled P&I payments to investors in securities guaranteed by Ginnie Mae.  As with the Freddie Mac advances, it appears that these were repaid, but the repayments were made to the Colonial Master Advance Account, not to Ocala Funding. |
| 11 | Platinum Bank | 62,239,697 / (3) | Inconsistent with the structure and purpose of Ocala Funding.  $50,000,000 was used to fund the purchase money escrow account at Platinum established in connection with TBW's (and others') potential $300 million investment in Colonial, which was not consummated.  The remaining $12.2 million was used to purchase loans from Platinum that were not used as collateral for the OFCP. |
| 12 | Sovereign Bank | 22,461,005 / (1) | Inconsistent with the structure and purpose of Ocala Funding.  It appears that this disbursement was a payment on TBW's working capital line with Sovereign. |
| 13 | Fees | 7,913,976 / (93) | Consistent with the structure and purpose of Ocala Funding. |
| 14 | US Ameribank | 5,000,000 / (1) | Consistent with the structure and purpose of Ocala Funding. |
| 15 | Loan Purchase | 3,669,649 / (10) | Consistent with the structure and purpose of Ocala Funding. |
| 16 | Henley Holdings P&I Acct. No. ******4822 (Colonial) | 2,500,000 / (1) | Inconsistent with the structure and purpose of Ocala Funding. |
| 17 | RBC Operating | 350,000 / (1) | |
| 18 | Return Wire | 499,272 / (2) | |
| 19 | Citibank | 134,830 / (1) | |
| 20 | Seaside | 69,235 / (1) | |
| 21 | **TOTAL DISBURSEMENTS** [A] | **$ 19,965,316,261 / (1,307)** | |

[A] Excludes a transfer from a Freddie Mac P&I account on 12/05/08 that was returned to the Ocala Funding Collateral account on the same day.

156.    In sum, it appears that more than $2 billion in funds disbursed from the Ocala

Funding Collateral Account between June 30, 2008 and August 4, 2009 was not related to the

operation of Ocala Funding or the OFCP.  Despite the extensive commingling of funds in the Ocala Funding Collateral Account, it is apparent that TBW used monies obtained from Colonial (principally from the AOT) and from Ocala Funding to fund these Inconsistent Disbursements.

**E.      REO**

157.    As previously discussed, TBW's REO portfolio included properties that were owned outright by TBW and properties that had been financed as loans on one of the Colonial facilities or securitized in a private label securitization.  As of August 4, 2009, there were a total of 4,481 REO properties being managed by TBW.  By April 30, 2010, only 499 of these properties remained.

158.    The following table summarizes activity related to the REO properties since August 4, 2009:

**TABLE 11**

Summary of REO Transactions - August 2009 through April 2010

| | | | | | Sale Results | | | |
|---|---|---|---|---|---|---|---|---|
| Line | Investor | Beg. Inventory REO Properties as of 8/4/09 | Post-Petition Service Released REO | REO Sales | Proceeds Received | Transferred to TBW Operating Account | Remaining Proceeds Received as of 4/30/10 | End Inventory REO Properties as of 4/30/10 |
| | **REO Sales Proceeds** [A] | | | | | | [E] | |
| 1 | TBW Owned | 772 | - | (597) | $40,570,371 | ($40,283,236) | $287,135 | 175 |
| 2 | Colonial | 1 | - | (1) | 83,030 | (2,453) | 80,577 | - |
| 3 | Mercantile | 1 | - | (1) | 300,117 | (5,513) | 294,604 | - |
| 4 | Wells Fargo | 2,038 | (1,971) | (67) | 12,900,576 | (2,688,804) | 10,211,772 | - |
| 5 | Bayview | 176 | (176) | - | - | - | - | - |
| 6 | BB&T | 5 | (5) | - | - | - | - | - |
| 7 | "On AOT/Overline" [B] | 1,488 | - | (1,164) | 102,347,501 | (25,142,430) | 77,205,070 | 324 |
| 8 | **Subtotal** | **4,481** | **(2,152)** | **(1,830)** | **$156,201,594** | **($68,122,436)** | **$88,079,159** | **499** |
| | **Property Preservation and T&I Refunds** [C] | | | | | | | |
| 9 | REO Related Refunds | | | | 2,375,371 | (1,292,614) | 1,082,758 | |
| | **MI Claims** [D] | | | | | | | |
| 10 | TBW MI Claims on REO | | | | 2,080,397 | - | 2,080,397 | |
| 11 | **Total** | **4,481** | **(2,152)** | **(1,830)** | **$160,657,363** | **($69,415,049)** | **$91,242,314** | **499** |

[A]    Proceeds from REO sales in the ordinary course and the § 363 sale.

[B]    Advances associated with these properties are reimbursed to the Debtor, with the net sale proceeds maintained in the Regions REO Proceeds account.

[C]    Refunds sent back to the Debtor for property taxes, insurance and property presenation advances on REO homes that had been sold prior to the necessary required service release.

[D]    Receipt of mortgage insurance claims for TBW Owned REO.

[E]    Includes deposits in the Regions REO Proceeds account and the Regions REO Specialists account (which are REO sales proceeds originally deposited in Wachovia and RBC prior to TBW's bankruptcy).

159.    The reduction in REO properties since August 4, 2009 is due to two factors:  (a) the turnover of 2,152 properties to Wells Fargo, Bayview and BB&T in connection with servicing transfers; and, (b) the sale of 1,830 properties, a majority of which were either owned by TBW (594 properties) or assigned to the AOT (947 properties).[26]  The remaining 499 properties are divided between TBW-owned properties (175 properties) and properties assigned to the AOT (250 properties) and the Overline (74 properties).

160.    As indicated in Table 11, above, the Debtor has realized proceeds totaling $156.2 million from the sale of REO properties.  The Debtor has also recovered $4.5 million in funds related to the management of the REO.[27]  The $160.7 million in REO-related funds was deposited into the Wachovia operating account (subsequently transferred to the Regions REO Proceeds account), the RBC REO Specialists bank account (subsequently transferred to the Regions REO Specialists account) and directly into the Regions REO Proceeds account.  The Debtor has transferred $69.4 million from the sale of REO owned by the Debtor from the REO Proceeds account to the Debtor's operating account, which is also at Regions.  After this transfer, the remaining REO related proceeds totaled $91.2 million as of April 30, 2010.[28]

## VI.    NEXT STEPS

161.    The Debtor will provide an overview of this Report for the Court and stakeholders during the status conference to be held on July 7, 2010.  In all likelihood, mortgage investors and

---

[26]    These REO properties were sold either in the ordinary course or in the bulk sale via the Court-approved Section 363 auction process.

[27]    The $4.5 million includes the collection of mortgage insurance refunds and the recovery of advances made by the Debtor to preserve the value of the REO.  These advances were made to cover property taxes, insurance premiums and maintenance costs.

[28]    The $91,242,314 consists of the remaining REO related proceeds, however, the combination of the Regions REO Proceeds account and the Regions REO Specialists account total $91,001,153, which is $241,161 less than the remaining REO related proceeds as a result of REO preservation costs paid out of the RBC REO Specialists account prior to the establishment of the Regions account structure.

other affected creditors will require additional time to review and analyze the allocations and other findings set forth herein.

162.     Data supporting both the Servicing Reconciliation and the Asset Reconciliation have been and will continue to be made available to applicable investors subject to execution of appropriate agreements regarding maintenance and use of confidential information.

163.     The Debtor will continue to work with the FDIC-Receiver to:  (a) ascertain how and when distributions should be made from the servicing-related accounts at Colonial and Regions; (b) define and resolve issues related to and arising from the relationship between TBW and Colonial; and (c) develop appropriate methods of assuring investors' implementation of the Borrower Protocol, including the additional issues identified in this Report.

164.     The completion of the Servicing Reconciliation and the Asset Reconciliation is fundamental to the formulation and proposal of a plan of liquidation for the Debtors (the "**Plan**"), the preparation of an accompanying disclosure statement that meets the requirements of Section 1125 of the Bankruptcy Code (the "**Disclosure Statement**"), and the confirmation of the Plan under Section 1129 in this case.  In conjunction with the completion of this Report, the Debtor, in collaboration with the Committee, has been working to formulate the Plan and to compile information for the Disclosure Statement.  The Debtor has invited the Committee to join the Debtor as a co-proponent of the Plan, and the Committee has indicated that it will join the Debtor in formulating and proposing the Plan. The Debtor and the Committee expect to be able to file the Plan and Disclosure Statement by September 21, 2010, or earlier.

165.     The Debtor and the Committee have begun discussions with several stakeholders in an effort to define key issues and, to the extent possible, resolve differences regarding claims and recoveries.  The completion of the reconciliation processes and the filing of this Report

should facilitate those discussions.  The Debtor expects to engage all significant stakeholders in similar discussions as this case moves forward.  To the extent that resolution cannot be achieved by agreement, then the process should aid in narrowing and clarifying disputes and quantifying claims and recoveries.

166.    As indicated above, it may be necessary and appropriate at some point in the future for the Debtor to analyze TBW's sources and uses of funds for certain periods of time.

167.    The Debtor anticipates that it will continue to receive and respond to formal discovery and informal information requests regarding the findings set forth herein, as well as the underlying analysis and investigation.

DATED this 1st day of July, 2010.

                                 Respectfully submitted,


                                 */s/ J. David Dantzler, Jr.*

Jeffrey W. Kelley (Ga. Bar No. 412296)
jeffrey.kelley@troutmansanders.com
Ezra H. Cohen (Ga. Bar No. 173800)
ezra.cohen@troutmansanders.com
J. David Dantzler, Jr. (Ga. Bar No. 205125)
david.dantzler@troutmansanders.com
**TROUTMAN SANDERS LLP**
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

**SPECIAL COUNSEL TO DEBTOR TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**


Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
Amy Denton Harris (FBN 0634506)
aharris@srbp.com
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**

110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811

**ATTORNEYS FOR DEBTOR TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp.,** together will all exhibits thereto, has been furnished by electronic mail and/or by the Court's CM/ECF system on this 1st day of July, 2010 to the parties listed on the Service List attached hereto.


*/s/ Russell M. Blain*
RUSSELL M. BLAIN

-88-

## SERVICE LIST

| |
|---|
| Kenneth C. Meeker, Esquire, Assistant United States Trustee, and Elena L. Escamilla, Esquire, Office of the United States Trustee, 135 West Central Boulevard, Suite 620, Orlando, Florida 32801-2476 |
| Paul Steven Singerman, Esquire, and James D. Gassenheimer, Esquire, Berger Singerman, P.A., 1000 Wachovia Center, 200 South Biscayne Boulevard, Miami, Florida 33131 |
| James Berger, Esquire, Esquire, Berger Singerman, P.A., 350 East Las Olas Boulevard, 10th Floor, Fort Lauderdale, Florida 33301 |
| Arthur Spector, Esquire, Berger Singerman, P.A., 2650 North Military Trail, Suite 240, Boca Raton, Florida 33431-7391 |
| Donald A. Workman, Esquire, Baker Hostetler, 1100 Washington Square, 1050 Connecticut Avenue Northwest, Washington, D.C. 20036-5304 |
| Thomas R. Califano, Esquire, Richard F. Hans, Esquire, and Christopher R. Thomson, Esquire, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020-1104 |
| Jeffrey E. Schmitt, Esquire, Legal Division, Federal Deposit Insurance Corporation, 3501 Fairfax Drive, Arlington, Virginia 22226 |
| Roy S. Kobert, Esquire, and Nicolette Vilmos, Esquire Broad and Cassel, 390 North Orange Avenue, 14th Floor, Orlando, Florida 32801 |
| Robert A. Soriano, Esquire, Greenberg Traurig, LLP, 625 East Twiggs Street, Suite 100, Tampa, Florida 33602-3925 |
| Jason W. Johnson, Esquire, and David E. Peterson, Esquire, Lowndes, Drosdick, Doster, Kantor & Reed, 215 North Eola Drive, Orlando, Florida 32801 |
| George A. Kielman, Esquire, Kenton W. Hambrick, Esquire, and Soha Mody, Esquire, Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive – MS 202, McLean, Virginia 22102 |
| Hugh Ray, Esquire, McKool Smith P.C., 600 Travis Street, Suite 7000, Houston, Texas 77002 |
| Lisa Gonsior Laukitis, Esquire, Jones Day, 222 East 41st Street, New York, New York 10017-6702 |
| Betsy C. Cox, Esquire, Rogers Towers, P.A., 1301 Riverplace Boulevard, Suite 1500, Jacksonville, Florida 32207 |
| Thomas E Lauria, Esquire, and Matthew C. Brown, Esquire, White & Case LLP, 4900 Wachovia Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131-2352 |
| Frank E. Emory, Jr., Esquire, and Joseph B. Buonanno, Esquire, Hunton & Williams LLP, 3500 Bank of America Plaza, 101 South Tryon Street, Charlotte, North Carolina 28280 |
| Andrew D. Zaron, Esquire, Hunton & Williams, LLP, 1111 Brickell Avenue, Suite 2500, Miami, Florida 33131-3126 |
| Michael A. Tessitore, Esquire, The Tessitore Law Firm, P.A., 612 East Colonial Drive, Suite 150, Orlando, Florida 32803 |

| |
|---|
| Robert M. Dombroff, Esquire, Todd B. Marcus, Esquire, and Erin Kate Mautner, Esquire, Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022 |
| Alan D. Weiss, Esquire, Holland & Knight LLP, 3900 Bank of America Building, 50 North Laura Street, Jacksonville, Florida 32202-3622 |
| Stephen P. Sorensen, Esquire, Williams & Connolly LLP, 725 Twelfth Street, Northwest, Washington, D.C. 20005 |
| Nina M. LaFleur, Esquire, Post Office Box 861128, St. Augustine, Florida 32086-1128 |
| John C. Weitnauer, Esquire, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424 |
| James H. Post, Esquire, Smith Hulsey & Busey, 1800 Wachovia Center, 225 Water Street, Jacksonville, Florida 32202 |
| James W. Carpenter, Esquire, Angelo & Banta, P.A., 515 East Las Olas Boulevard, Suite 850, Fort Lauderdale, Florida 33301 |
| Jeffrey N. Rich, Esquire, K&L Gates, 599 Lexington Avenue, New York, New York 10022-6030 |
| Jason B. Burnett, Esquire, and Kenneth B. Jacobs, Esquire, Gray Robinson, P.A. 1100 Bank of America Building, 50 North Laura Street, Jacksonville, Florida 32202 |
| Glenn Gillett, Esquire, United States Department of Justice, Civil Division, Post Office Box 875, Ben Franklin Station, Washington, D.C. 20044 |
| Jack A. Raisner, and René S. Roupinian, Esquire, Outten & Golden LLP, 3 Park Avenue, 29th Floor, New York, New York 10016 |
| Scott K. Rutsky, Esquire, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036-8299 |
| Scott Tavolieri, Esquire, State of Florida Office of Financial Regulation, 921 North Davis Street, Building B, Suite 225, Jacksonville, Florida 32209 |