# Exhibit A

# Overview of Servicing Reconciliation Procedures

## EXHIBIT A

### OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

Following are general summary discussions of the procedures performed in the Servicing Reconciliation. Such procedures are included for each of the following three components of the Servicing Reconciliation:[1]

1.      The *Affected Funds Reconciliation* under which the Debtor performed a reconciliation and allocation of all monies that were affected by the Colonial Bank account hold beginning on August 5, 2009, Colonial's subsequent failure and TBW's bankruptcy.

2.      The *Book-to-Bank Reconciliations* pursuant to which the Debtor determined the amount of any shortfalls in investor's custodial accounts.

3.      The *Servicing Advances Reconciliation* pursuant to which the Debtor reconciled and accounted for unreimbursed advances (including P&I, T&I, and Corporate Advances) and service fees not paid to the Debtor.

## I.      Affected Funds Reconciliation

### A.      Understanding of TBW Cash Accounts

In order to develop Table 1 of the Report and the related exhibits, the Debtor first gained an understanding of cash accounts, balances, the sources of funds deposited in TBW's bank accounts, and the purpose of each bank account. This understanding was obtained through (1) numerous discussions with TBW personnel in the Accounting, Investor Services, and Cashiering departments, among others, (2) discussions with FDIC-Receiver personnel, and (3) a review of thousands of contemporaneous TBW documents including, but not limited to, bank statements, TBW trial balances, bank reconciliations, accounting documentation, cashiering documentation, and correspondence with the FDIC-Receiver, as well as large volumes of electronic data. The following sections set forth a high level summary of the procedures performed in order to compile the data used to develop the Affected Funds Reconciliation:

1.      The Debtor obtained Colonial, Wachovia, Regions, RBC Bank, Platinum bank account statements and other account information for over 100 accounts on a monthly basis from July 2009 through April 2010.

2.      The Debtor identified the cash balances for the accounts used in the servicing operation as of the following dates: July 31, 2009; August 4, 2009 (i.e., the balance prior to the bank account hold[2]); August 24, 2009 (the Petition Date); September 30, 2009, October 31, 2009, November 30, 2009, and April 30, 2010. See Exhibits J and K for a detailed summary of these accounts.

---

[1]      All Capitalized terms not otherwise defined herein shall have the meaning set forth in the Final Reconciliation Report.

[2]      Colonial placed an administrative hold on TBW's accounts at Colonial beginning on August 5, 2009, making it impossible for TBW to access funds from more than 100 bank accounts or use those accounts in the operation of its business.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

3.       The Debtor identified the following servicing related accounts at Colonial:

    a.       Custodial Funds Clearing Account ("CFCA")

    b.       Investor specific Principal & Interest accounts (45 accounts)

    c.       Investor specific Tax & Insurance accounts (45 accounts)

    d.       CA and IL Impound Escrow accounts (2 accounts)

    e.       REO Proceeds Clearing

    f.       Escrow Distribution Clearing Account

    g.       Western Union Clearing Account

    h.       Other Accounts

        i.       EDCA - CS

        ii.       CS Deposits Clearing Account

        iii.       Investors Clearing Account

        iv.       GPS Custodial Clearing

        v.       TBW Escrow Servicing Account

4.       The Debtor established numerous accounts at Regions, which on a much simplified basis mirrors the account structure at Colonial.  These accounts include servicing related, REO proceeds and escrow refund accounts, as follows:

    a.       Deposit (2 accounts)

    b.       Clearing [3]

    c.       P&I and T&I (25 accounts)

    d.       Service Fee

    e.       REO Proceeds

    f.       Refunds

---

[3]     As described in the Report, funds that were initially deposited in Wachovia were subsequently transferred to various Regions accounts, primarily the Clearing account.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

5.    TBW maintained an account with RBC Bank which was referred to as the REO Specialists, LLC account and generally served as an operating account for REO preservation activities.  Certain REO proceeds were deposited in this account after the administrative hold.

6.    The Debtor identified and analyzed the following two accounts at Platinum:

a.    TBW maintained $210 million at Platinum, which consisted of T&I escrow funds on deposit in a series of custodial accounts.  The Debtor did not assess the loan level detail for these Platinum accounts.  However, the Debtor performed a detailed analysis to identify the sources of the $210 million and the accounts where there funds were deposited.

b.    TBW maintained an Escrow Distribution Clearing Account ("EDCA") which was used to distribute payments of real estate taxes and insurance premiums (as well as other "escrow" related payments).  TBW typically distributed thousands of checks monthly from this account.

**B.    Identifying the Loan Level Detail Associated with Gross Affected Funds**

The Debtor next gained an understanding of the relationship between cash activity and the TBW servicing system, as well as how TBW processed borrower payments, executed transfers to investor accounts, and processed returns (e.g., NSF, ACH returns, etc.).  This understanding assisted with the extensive process of identifying the loan level detail associated with Gross Affected Funds (See Exhibit C for a detailed allocation).

1.    Based on discussions with TBW personnel and review of the TBW's electronic records, the Debtor determined that the loan level detail associated with borrower payments on deposit could not be extracted from the Servicing System, as the Servicing System did not contain the necessary fields of data to reconcile to the daily deposits.  In addition, TBW did not maintain the data in a usable, electronic format on a daily basis.  Therefore, the Debtor undertook an extensive process to identify the loan level data.  The following sections set forth a summary of this process.

2.    The Debtor determined that the TBW Cashiering Department ("Cashiering") was primarily responsible for identifying, processing (updating the Servicing System records), and depositing borrower funds.  Therefore, the Debtor conducted extensive interviews, reviewed thousands of Cashiering work papers, and reviewed large volumes of electronic data in order to identify the necessary documentation to perform the Affected Funds Reconciliation.  The Debtor identified the following roles of Cashiering:

a.    Cashiering processed thousands of borrower payments on a daily basis, which came in the following forms:

i.    Physical checks received at TBW (generally numbered in the thousands per day);

## EXHIBIT A

### OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

        ii.       Direct deposit information received from Colonial bank in the form of wire transfers or lockbox checks; and

        iii.     Direct deposit information received from third parties that transferred funds to TBW accounts.

b.     Cashiering personnel identified the data received and reconciled the information to bank transactions.  Next, Cashiering personnel applied the borrower payments to the corresponding loans by manually entering or downloading the information into the TBW Servicing System.  TBW Cashiering generally processed payments and/or payment data the same day that it was received.  In certain instances, TBW Cashiering did not identify the nature of certain deposits immediately or did not receive the relevant data and would have to delay the posting process in the Servicing System.

c.     TBW Cashiering prepared a "**Daily Log**" report, which summarized each day's posting of borrower payments on TBW's Servicing System.  The activity was segregated into various categories, including cash receipts by cash source (e.g., lockbox checks, wire transfers, Western Union, etc.; see Exhibit F), returns, and non-cash entries.  The Daily Log was an integral part of the cash reconciliation process as it provided a means of reconciling the cash activity in the various bank accounts to the payments posted on the TBW Servicing System.  The Daily Log support packages generally included the following:

        i.       Summary schedule of Servicing System postings and bank deposits.

        ii.       Loan level detail schedules - each support package contained large volumes of data detailing TBW Servicing System postings.  In certain instances, the package included data associated with borrower payments that were not posted to the TBW Servicing System because the loan was previously service released.

        iii.     Notes and correspondence supporting TBW Cashiering research on borrower payments.

3.     After identifying the requisite data, the Debtor's next step was to collect the necessary data in order to identify and relate the loan level detail to the bank activity and funds on deposit.  This identification process included weeks of interviews/inquiries of TBW personnel, an extensive review/analysis of Cashiering documentation and electronic data, subsequent research, and finally, the reconciliation of loan level data to cash on deposit.  These processes were different for each bank account and are described in greater detail below.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

a.      The Colonial Bank CFCA - This process of identifying the cash and the associated loan level detail for this account was complex as this account is where borrower funds are initially deposited and typically included thousands of transactions per month.  The Debtor's procedures for identifying the loan level detail varied depending on the time period.  The following sections describe the procedures for identifying loan level detail for two distinct periods, activity through August 4, 2009, and activity from August 5, 2009 going forward.

   i.      *Activity up through August 4, 2009* - the ending CFCA balance on August 4, 2009 consisted primarily of funds that had been deposited prior to August 4, 2009, but had not been transferred to investor specific custodial P&I and T&I accounts.  Generally, funds remain in the CFCA for two reasons:  (a) the item has not been posted to the TBW Servicing System and allocated to an investor, or (b) the item has been posted to the Servicing System but could not be transferred due to the Colonial administrative hold.  In this case, deposits that were posted on or prior to August 3, 2009 were transferred to the custodial investor P&I and T&I accounts.  If a deposit was posted on or after August 4, 2009, the funds were trapped in the CFCA due to the administrative hold.  The Debtor performed a series of extensive analyses to identify the loan level detail associated with the August 5, 2009 opening balance.  This process included the following:

   (a)      Reconciliation of the CFCA account at July 31, 2009 on a detailed transaction and loan level basis; this process included "un-batching" hundreds of bulk/bundled deposit and return items, which entailed significant research involving numerous Debtor personnel working with several banks, TBW personnel, FDIC-Receiver personnel , and third parties that sourced the funds.  As indicated previously, there were typically thousands of transactions per month in the CFCA, with certain transactions containing thousands of borrower payments.  For example, the July 2009 CFCA included over $2 billion in credits, $2 billion in debits, and approximately 5,500 transactions.

   (b)      Identification of the TBW Servicing System postings after August 3, 2009 with deposit dates of August 3, 2009 or prior.  For example, the Debtor reviewed the Cashiering Daily Logs and determined that over $5 million of July 2009 REO related deposits were not posted to the TBW Servicing System until after the Petition Date.  Although

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

the REO deposits were posted in October, the amounts could not be transferred from the CFCA to the appropriate custodial investor account because of the administrative hold. Therefore, these deposits were part of the opening CFCA balance on August 5, 2009 and have remained in the account since being deposited in July 2009.

(c) Identification of items that were deposited prior to August 4, 2009 but never posted to the TBW Servicing System. This process entailed comparing the deposit loan level detail to TBW's Servicing System postings. The Debtor, with the assistance of TBW personnel, queried the loan level detail associated with the thousands of July 2009 transactions against the Servicing System and identified deposits that were not posted to the Servicing System prior to August 4, 2009. Certain transactions in the CFCA balance were not posted to the TBW Servicing System because they were either previously service released or were never identified by TBW.

ii. *Activity from August 5, 2009 forward* – all borrower deposits in the CFCA from August 5, 2009 forward were trapped in the CFCA due to the administrative hold. Therefore, the process of identifying the deposits from August 5, 2009 was more straightforward than the opening balance above. However, the process of identifying the loan level detail was as complex due to the higher volume of activity. The Debtor performed the following procedures in order to identify the loan level detail associated with cash deposits and withdrawals from 8/5/09 forward:

(a) The Debtor analyzed TBW bank statements and classified the thousands of deposits and withdrawals into unique categories. Most of the bank activity was distinct and could be categorized readily. However, the Debtor faced a substantial challenge in performing the classification of CFCA activity as the bank data was in PDF format that could not be utilized in spreadsheets or databases. Therefore, the Debtor digitized, or converted hundreds of pages of bank activity from a PDF format into a format that could be imported and manipulated in a database. This process was extensive and was utilized throughout the procedures described in this exhibit.

## EXHIBIT A

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

(b)     In order to identify the loan level detail associated with each category of cash, the Debtor utilized the Daily Logs. Although the Daily Logs contained the necessary summary level detail, the supporting data was fragmented and required a significant degree of review and reconciling in order to get an accurate understanding of the daily postings to the TBW Servicing System and the underlying loan level detail. The Debtor utilized appropriate TBW Cashiering personnel, PDF files and native files (e.g., Microsoft Excel) as part of this process which took numerous Debtor personnel weeks to complete due to significant volume of activity. The Cashiering daily log support packages consisted of hundreds of pages in most instances. One example of the complexity of this process is the reconciliation of the August 5, 2009 "Phone Check/TMP/eStatements" postings, which represented incoming borrower payments via ACH transactions totaling $3.28 million. The documentation supporting the August 5, 2009 posting of these payments consisted of 13 different reports containing hundreds of line items each, which had to be identified and reconciled to the summary page. Once the amounts were reconciled to the summary page, the Debtor had to locate and obtain the full detail for each of the 13 reports. The hundreds of pages of detail were in PDF format and had to be digitized, as described previously. This process was repeated for each category of cash for each day that was analyzed, which amounted to thousands of pages of loan level data. For additional information and summaries of these categories of cash in the CFCA, refer to Exhibits F and G to the Report. In addition, the Debtor worked with cashiering to identify loan level detail associated with transactions totaling over $63 million that were posted to the Servicing System but were not monetized.

(c)     Once the Debtor reconciled the Daily Log's summary data to the supporting data for each business day from July 30, 2009 forward, the Debtor was able to begin the process of identifying the loan level detail associated with the bank activity. This process was done by reconciling the bank activity to the Daily Log summary page. For example, the August 5, 2009 Daily Log indicated that TBW processed $4,879,373.40 in borrower payments that were deposited at the Colonial Lockbox. The Debtor reconciled this deposit

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

amount to the corresponding amount on the August 2009 CFCA bank statement. This step was performed for each day from July 30, 2009 for each category in order to gain a thorough understanding of the funds in the CFCA.

(d)     The Debtor's next step in determining the loan level detail associated with the bank activity was to digitize or convert the data containing the large volumes of loan level detail from PDF format to a database friendly format. This process involved thousands of PDF pages that had to be carefully converted page by page. The converted data was loaded into the master database and reconciled to the bank activity and Daily Logs again in order to ensure completeness. This process involved over 300,000 individual loan records and millions of data points that were collected in the Debtor's master database.

(e)     The above process did not capture all of the bank activity. A significant number of transactions required research because TBW had not previously processed certain payments and withdrawals. Each of these items was unique and required a high level of research/investigation since each item was at the individual transaction level. On many occasions, the research required correspondence, telephone calls or other follow up activities with third parties to assist with the research process.

iii.     In most instances, cash collections were posted to the TBW Servicing System after the funds were received, and after TBW personnel identified the loan level detail. However, there are certain types of transactions where a payment was posted to a borrower's account prior to cash receipt. An example of these types of transactions are TBW payment center ACH's, where TBW posts a payment to the TBW Servicing System, initiates an ACH draw from the borrower's bank account, and collects the cash three business days later.

b.     Colonial investor P&I and T&I – the Debtor identified numerous Colonial custodial investor P&I and T&I accounts. In general, these accounts were investor specific and the Debtor simply allocated the entire balance to the corresponding investor. Certain accounts were not investor specific and required additional research. The Debtor conducted numerous interviews to gain an understanding of the nature of these non-investor specific accounts. In most instances, TBW personnel provided the loan level detail

## EXHIBIT A

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

supporting the bank balances, which was based on ordinary course bank reconciliations. However, certain instances required additional research involving third parties that originally sourced the funds.

c.     Colonial Western Union Clearing - Western Union administers a program pursuant to which bi-weekly payments are collected from borrowers which are maintained in a Colonial account referred to as the "Western Union Clearing Account". Western Union determined when the payments would be transferred to TBW's CFCA, at which time the borrower payment would be reflected in the TBW Servicing System. The Debtor contacted Western Union personnel to obtain the loan level detail associated with this account, processed the information, and allocated the funds by investor as reflected in Exhibit C to the Report. Exhibit D reflected the FDIC-Receiver's return of all amounts in the Western Union Clearing Account to Western Union on November 20, 2009, with the exception of $885 remaining in the account at April 30, 2010. Western Union subsequently informed the Debtor that Western Union (1) sent the borrowers' payments to the subsequent servicer if there were enough funds for a full payment, or (2) sent the borrower a check if the funds were not enough for a full mortgage payment.

d.     Colonial REO Proceeds Clearing Account and Other Accounts – the Debtor identified the loan level detail associated with the $3.15 million in the REO Proceeds Clearing Account and certain other accounts with the assistance of TBW personnel and the information explicitly presented on the bank statements (i.e., loan numbers and borrower names).

e.     Colonial Escrow Distribution Clearing Account ("EDCA") - the Colonial EDCA account contains borrower funds transferred from custodial T&I accounts at Colonial to fund borrower tax and insurance disbursements, as well as other escrow disbursements. Initially, TBW made the disbursements directly from this account. However, in early 2009, TBW began to transfer these funds to TBW's Platinum EDCA account where the disbursements were ultimately made. The Debtor worked directly with TBW personnel to identify the loan level detail associated with activity in this account from August 2009 forward and to develop the list of outstanding EDCA checks in the Colonial account.

f.     Wachovia – subsequent to the administrative hold and prior to the Petition Date, TBW's prior management made the decision to deposit approximately 4,000 borrower payment checks into an operating account maintained at Wachovia, totaling over $53 million. These deposits were made prior to the Petition Date of August 24, 2009. The Debtor worked directly with TBW personnel to obtain the loan level detail associated with

# EXHIBIT A

## OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

these deposits.  The Debtor analyzed the detail that TBW provided and identified several hundred deposits without a corresponding loan number.  Therefore, the Debtor performed extensive analysis to identify the corresponding borrower and loan number for these items, by directing/supervising numerous TBW personnel to find and analyze the supporting documentation, which entailed a review of the images for the 4,000 checks.  This process was not completed for several weeks.  The funds in the Wachovia account were subsequently transferred to the Regions Clearing Account, which is described in greater detail below.

g.    Regions Accounts – as indicated earlier in this exhibit, the Debtor established a series of bank accounts at Regions in September 2009, which on a much simplified basis mirrors the account structure at Colonial.  The accounts are described in greater detail below along with the procedures the Debtor performed to identify the associated loan level detail.

i.    Deposit and Clearing Accounts – these accounts are the equivalent of the Colonial Bank CFCA, whereby a majority of borrower payments received by TBW since August 4, 2009 were deposited.  Generally, the borrower payments were deposited into the two Deposit accounts (one for checks and the other for ACH transactions), and subsequently transferred to the Clearing Account.  The Debtor was responsible for the Regions deposits, the first of which occurred on September 16, 2009.  Therefore, the Debtor maintained the loan level detail associated with the deposits into Regions accounts.  See Table 3 of the Report and Exhibits C through E for additional information.

ii.    Refunds Account - account into which refunds totaling $11,291,175 from force placed insurance claims, tax refunds and private mortgage insurance premium refunds were deposited.  Similar to the Deposit and Clearing Accounts above, the Debtor was responsible for establishing this account and maintained the loan level detail associated with the deposits.  See Table 3 of the Report and Exhibit L for additional information.

iii.    REO Account - account holding proceeds from REO sales in the ordinary course of business and pursuant to § 363 of the Bankruptcy Code totaling over $160 million.  Similar to the Deposit and Clearing Accounts above, the Debtor was responsible for establishing this account and maintained the loan level detail associated with the deposits.  Table 11 provides a summary of deposits into and disbursements from this REO Account.

## EXHIBIT A

### OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

      iv.     Investor P&I and T&I Accounts - T&I and P&I accounts were established to mirror Colonial account structure on simplified basis. These accounts receive a push down of T&I and P&I funds from amounts deposited into the Deposit and Clearing Accounts. Similar to the Deposit and Clearing Accounts above, the Debtor was responsible for establishing these accounts and maintained the loan level detail associated with the deposits.

      v.     Service Fee Account - deposits into this account represent the various fees transferred from the Regions Clearing account as part of the "push down" (i.e., allocation) of borrower funds on deposit in Regions Deposit and Clearing accounts, including service fees, late returned check fees, etc. Similar to the Deposit and Clearing Accounts above, the Debtor was responsible for establishing this account and maintained the loan level detail associated with the deposits.

h.     Posted, Not Monetized – The Debtor also identified borrower payments that were posted in TBW's Servicing System, but no cash was actually received by TBW due to the imposition of the administrative hold on the Colonial bank accounts. The following is a description of these items and the procedures performed to identify the associated loan level detail.

      i.     TBW ACH - amounts represent TBW initiated ACH payments held in suspense and never drawn from borrowers accounts and therefore not monetized. However, TBW posted the payments in the Servicing System. As a result, the servicing records that TBW provided to subsequent servicers indicate that a payment was made by the borrower, however, no corresponding funds are on deposit at Colonial or Regions. Similar to the CFCA procedures described above, the Debtor worked directly with TBW personnel to reconcile these amounts to the Daily Logs, identified the relevant documents containing the loan level detail, and then digitized the data into a usable format.

      ii.     Checks forwarded - amounts represent certain borrower payments that were (1) collected after the implementation of the Colonial account hold, and (2) were processed and recorded in the Servicing System. The borrower checks were not deposited into TBW accounts and were forwarded to investors and their subsequent servicers in September 2009. The Debtor was responsible for documenting these checks and maintained the loan level detail associated with the deposits.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

  iii. Western Union - amounts represent Western Union related postings to the Servicing System that were not supported by cash deposits. Based on the Debtor's research, TBW appeared to have posted these items erroneously as they are duplicative of postings made one or two business days prior. The Debtor discovered these items during the process of reconciling the TBW postings to the bank deposit data.

i. FDIC-Lockbox – the FDIC-Receiver collected, maintained, and forwarded over 75,000 borrower payments received in the Colonial lockbox after August 12, 2009. These lockbox checks were not monetized/not deposited in TBW bank accounts and not posted in the Servicing System. The FDIC-Receiver and the Debtor worked jointly to identify the loan numbers for each check in order to forward the checks to the appropriate investor and their related subsequent servicer. The FDIC-Receiver distributed all but $1 million of the $94.7 million of lockbox checks to investors or their subsequent servicers. The Debtor has already documented the procedures for this process in great detail in the First Report's Servicing Reconciliation Methodology as detailed below:

  i. The FDIC collected and arranged the lockbox checks into over 60 boxes which generally consisted of approximately nine (9) batches/box and approximately 200 checks/batch. The FDIC-Receiver created control sheets for each and every batch, detailing the contents of the batch.

  ii. The FDIC-Receiver retained custody of the checks at TBW and provided them to the TBW Cashiering personnel to be processed.

  iii. The Debtor maintained a schedule to log assignment of boxes.

  iv. The TBW Cashiering personnel created new summary spreadsheets for each tray and batch by entering check amount, check number and loan number. Upon completion of each tray, TBW Cashiering personnel provided the electronic data to the Debtor and the FDIC-Receiver. TBW Cashiering personnel concurrently reviewed the batched FDIC-Receiver control sheets by box to identify any blank or unpopulated data (i.e., loan account numbers). The information was researched and populated, with the corrected data written on the FDIC-Receiver control sheet and in an exception column on the appropriate row in the electronic spreadsheet.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

v.      The Debtor independently verified the accuracy of the Cashiering schedule against the original control schedule and the check. The Debtor forwarded the analyses to FDIC-Receiver personnel.

vi.     The Debtor investigated all changes and exceptions and forwarded the results to the FDIC-Receiver before the box could be finalized and prepared for sorting.

vii.    The Debtor prepared revised control sheets for each batch and box. The data was sorted by investor and their successor servicer while maintaining the original FDIC-Receiver order within each successor servicer batch.

viii.   The FDIC-Receiver reconciled the updated control totals to the original FDIC-Receiver box totals.

ix.     The Debtor, the FDIC-Receiver and TBW Cashiering personnel jointly sorted checks by successor servicer on a box by box level. The sorting was based on the revised batch control sheets supplied by the Debtor.

x.      The FDIC-Receiver has released approximately $93.7 million of lockbox checks to investors and their successor servicers.

4.      The Debtor performed analyses to determine the posting status for all funds identified on a loan level basis, which amounted to over 400,000 transactions. These analyses consisted of comparing the population of cash activity identified in the Affected Funds Reconciliation to the TBW Servicing System. These analyses were performed on a loan level basis in order to achieve a high level of granularity. The process entailed a significant level of research/investigation due to variances between the amounts collected and actual TBW Servicing System postings. For example, a borrower remitted a payment for $500, of which $490 was the scheduled payment amount and the remaining $10 was a curtailment (additional principal payment). The TBW Servicing System split the payment into two separate line items while the loan level detail shows only the $500 payment. Therefore, the Debtor performed an analysis to reconcile this payment to the TBW Servicing System in order to assign the posting status. The results of the posting status analysis are reflected in the Access Database containing unique, identifying information for each transaction ("Affected Funds Database"). The Affected Funds Database contained loan level detail for each transaction, the specifics of the transactions (e.g., date, amount, bank, etc.), and other related information collected by the Debtor.

**C.      Identifying the Loan Level Detail Associated with Distributions of Gross Affected Funds**

1.      As detailed in Exhibit D to the Report, the Debtor collected data associated with Gross Affected Funds that were distributed to various parties. As indicated in the Report, these

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

amounts included (i) any Gross Affected Funds that have been distributed by the FDIC-Receiver since August 5, 2009, (ii) any Gross Affected Funds that have been distributed by the Debtor since August 5, 2009, and (iii) any Gross Affected Funds that were never monetized (i.e., electronic payments trapped in suspense, checks forwarded, etc.).  The procedures performed varied by distribution type.  The following sections provide greater detail of the procedures that the Debtor performed in identifying the loan level detail of the distributions.

    a.    FDIC-Receiver CFCA Third Party ACH distributions – the FDIC-Receiver transferred approximately $34.5 million in funds to investors and their subsequent servicers.  The Debtor worked directly with the FDIC-Receiver to identify the loan level data and the investors associated with the amounts transferred.  This data was captured in a Final Allocation Database (the "Final Allocation Database"), with the allocation reflected in Exhibit D.  Both the Debtor and FDIC-Receiver understand that a small portion of the initial allocation and subsequent distributions may have been made to incorrect parties.  The Debtor and FDIC-Receiver will work jointly to reconcile the differences and work with investors to re-allocate the funds, as needed.

    b.    Colonial Western Union Clearing Account - the FDIC-Receiver returned all amounts in the Western Union Clearing Account to Western Union on November 20, 2009, with the exception of $885 remaining in the account at April 30, 2010.  Therefore, the Debtor performed limited procedures relating to this distribution as virtually all the funds were returned.  The Debtor engaged Western Union in discussions to determine how the funds were handled after they were returned by the FDIC-Receiver.  Western Union informed the Debtor that Western Union either (1) sent the borrowers' payments to the subsequent servicer if there were enough funds for a full payment, or (2) sent the borrower a check if the funds were not enough for a full mortgage payment.

    c.    FDIC-Receiver Lockbox check distributions – the FDIC-Receiver forwarded approximately $93.7 million in checks to investors and their subsequent servicers.  The Debtor worked directly with the FDIC-Receiver to identify the loan level data and investors associated with the forwarded checks.  This data was captured in the Final Allocation Database, with the allocation reflected in Exhibit D to the Report.  Both the Debtor and FDIC-Receiver understand that a small number of checks may have been initially allocated and distributed to incorrect parties.  The Debtor and FDIC-Receiver will work jointly to reconcile the differences and work with investors to re-allocate the funds, as needed.

    d.    Borrower Protocol - the Bankruptcy Court approved the Motion for Approval of Protocol to Resolve Borrower Issues by an Order entered on

## EXHIBIT A

### OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

February 24, 2010 [Doc. No. 1079] ("Borrower Protocol").  Accordingly, the FDIC-Receiver transferred $7,861,287 from various Colonial Bank accounts and the Debtor transferred $781,367 from the Regions Clearing Account to various investors to be used in the resolution of borrower issues.  The Debtor was instrumental in identifying the loan level detail and funds to be distributed in satisfaction of the Borrower Protocol.  The Debtor incorporated this information into the Final Allocation Database with the allocation reflected in Exhibit D to the Report.

e.  Transfers to Ginnie Mae - on August 7, 2009, Colonial Bank transferred funds from the CFCA to the Colonial custodial Ginnie Mae P&I and T&I accounts.  These transfers were associated with various 8/3 and 8/4 borrower payments TBW received that would have been transferred to the Ginnie Mae P&I and T&I accounts the following business day but-for the Colonial account hold.  This transfer represents the actual "push down" of funds from the Custodial Funds Clearing Account.  The Debtor performed limited procedures associated with this transfer, as the entire balance related to one investor and two bank transactions.  The Debtor reconciled the amounts to the CFCA bank statement, obtained the loan level from TBW personnel, and confirmed that the associated loans were related to Ginnie Mae.

f.  Platinum - the FDIC distributed $210 million to Freddie Mac in the August or September of 2009.  The Debtor performed limited procedures relating to this distribution as all of the funds were returned to Freddie Mac.  The Debtor received verbal confirmation from FDIC-Receiver representatives that all of the funds were transferred to Freddie Mac.

g.  Posted Checks Forwarded – amount represents certain borrower payments that were (1) collected after the implementation of the Colonial account hold, (2) processed and posted to the Servicing System, and (3) forwarded to investors and their subsequent servicers in September 2009 rather than being deposited into the Regions accounts.  As indicated above, all of the checks included in the Check Forwarded population were under the control of the Debtor in the September 2009 timeframe and were forwarded to investors and their subsequent servicers.  Therefore, the Debtor's procedures were limited to identifying the loan level detail of checks and allocating the amounts by investor, as reflected in Exhibit D.

h.  Regions - the Debtor directed a series of transfers from various Regions accounts.  The following sections set for the nature of the transfers and the procedures performed to identify the associated loan level detail.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

    i.      Borrower Protocol Transfers – the purpose of these transfers and the Debtor's procedures are consistent with the Borrower Protocol description above, with the funds being distributed from the Regions Clearing Account rather than the Colonial accounts.

    ii.     Transfers to Selene – amount represents transfers of funds from the Regions Clearing Account to Selene as interim servicer for TBW's service-released loans.  Since the Debtor maintained control of these funds, limited procedures were performed, which included confirming that the amounts transferred were allocated to TBW/Selene.

    iii.    Transfers to Operating – amounts relate to transfers to the Regions Operating Account from the Regions REO Proceeds, Regions Refunds, Regions Clearing, and RBC accounts for reimbursement of force placed insurance, T&I advances, and REO proceeds deposits, among others.  The Debtor identified the relevant funds, performed the calculations (if necessary), and maintained/managed the transfers of funds.  Therefore the Debtor's procedures were limited to identifying the loan level detail associated with the transfers.  The transfers to Regions Operating are reflected in Exhibit D.

**D.**      **Reconciliation of Cash Amounts to Bank Statements**

    1.     The Debtor reconciled the Gross Affected Funds to bank statements on two different levels, which are described below.

    a.     Inherent in the CFCA loan level identification process was a reconciliation of the cash, by category, to the CFCA bank statements.  The Debtor compared the summary cash data from the Daily Logs to the bank statements to confirm the accuracy of the loan level detail.

    b.     The Debtor obtained the cash balances that are reflected in the Exhibits to this Report from the Colonial statements for certain accounts, including custodial investor P&I and T&I accounts, REO Proceeds Clearing Account, EDCA, and the "Other Accounts" reflected in Exhibit E to the Report.

    c.     Finally, the Debtor reconciled all of the balances reflected in Exhibit E of the Report to the corresponding April 30, 2010 bank balances, without exception.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

2.      In summary, the above reconciliation procedures indicates that the relevant Gross Affected Funds cash has been identified and reconciled to corresponding bank statements as of April 30, 2010.

**E.      Investor Allocation Process**

1.      Once the Debtor identified the loan level detail in the Affected Funds Database, the next step was to identify the corresponding investor and subsequent servicer, if any.  The process of identifying the investor and subsequent servicer involved utilizing the TBW Servicing System, specifically Access database which included all the loans in the TBW Servicing System by Investor Code ("the Lookup Database"; (see Section [III] of the Report).  The Debtor compared the Lookup Database to the Affected Funds Database, which produced the Final Allocation Database.  The Final Allocation Database combined the investor and subsequent servicer information with each cash transaction identified.

2.      The Debtor utilized formulas in the process of applying the Lookup Database to the Affected Funds Database.  The formulas were applied to data in order to identify loans in which (i) the payment did not relate to a typical monthly borrower payment, and (ii) payments were received after a paid in full ("PIF"), short sale, charge off, or service release date.  The results of the formula were captured in the "Final Investor" field of the Final Allocation Database, and were as follows:

a.      The appropriate investor;

b.      Blank or "Still Under Review" – this population was followed-up by a manual review process to assess ownership of the funds.  In general, blank items relate to transactions in which the loan number does not have a match on the Lookup Database.  The "Still Under Review" classification at this stage of the analysis was preliminary.  The procedures described below detail how the final "Still Under Review" population was finalized as reflected in Table 1 of the Report and Exhibits C through E and I.

3.      The manual review process was necessary for over 1,000 deposited items where the ownership of the funds was not clear.  The items are flagged in the Debtor's database as "Still Under Review" or blank.  The Debtor performed the following in connection with the manual review:

a.      The Debtor developed a database that documented a majority of the allocations of ownership completed during the extensive manual review process (the "Manual Review Database").  The data from the Manual Review Database was added to the results of the overall analysis to reflect the appropriate investor allocation.

b.      The Debtor added the final ownership field in the Final Allocation Database to reflect the appropriate investor allocation.  If the final

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

allocation was not consistent with the investor from the "Lookup Database", the Debtor documented the manual allocation with a flag in a field entitled "manual adjustment."

II.    **Book-to-Bank Reconciliations and Servicing Advances Reconciliation**

A.    **Overview**

1.    A significant effort was necessary to prepare the Book-to-Bank Reconciliations and the Servicing Advances Reconciliation.  This was due to a number of factors, including, among others:

a.    Former TBW senior managers were not available.

b.    TBW's Servicing System did not have systematic reconciliation reports.

c.    It was necessary to develop/populate multiple Access databases due to the volume of loans (over 512,000) and transactions (millions) involved in the reconciliations.

d.    Separate manual calculations of losses incurred on short sales for each loan by investor were necessary to calculate unreimbursed advances and proceeds due to the investor.

e.    Certain data from the Servicing System was not in usable format requiring manual efforts to combine loan data in Excel spreadsheets and Access databases.

f.    Thousands of individual PDF reports from the Servicing System were utilized and/or included in the Excel spreadsheets and Access databases.

g.    All borrower payments from July 1 to August 3, 2009 (July 16 to August 3, 2009 for Freddie Mac) in the Servicing System were reconciled to respective investor custodial P&I bank accounts which included hundreds of thousands of transactions.

h.    All information reported to Freddie Mac (on Freddie Mac's MIDANET reporting application) by TBW from June 15 to August 4, 2009 was imported to an Access database.

i.    The Debtor had to determine how remittance programs historically operated for each individual investor at TBW.  This was necessary in order to prepare reconciliations for each investor.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

       j.       Freddie Mac expense items included in the P&I book-to-bank reconciliation that were historically provided to TBW had to be independently calculated.

**B.**     **Servicing Shortfalls (Table 4 and related Exhibits)**

     1.     P&I Shortfalls - See Section C.1. below for Net P&I Advances which resulted in a P&I Shortfall.

     2.     Escrow Shortfalls - Escrow Shortfalls were calculated per the Escrow Book-to-Bank Reconciliation included in Exhibit O.  The steps in this reconciliation were as follows:

       a.       August 3, 2009 Book Balance - Obtained loan level Escrow balances (including borrower T&I, loss drafts and unapplied balances) for each loan from the Servicing System.  The Debtor designed and developed an Access database to store the Escrow balances.  The Debtor developed queries to extract the loan level data from the servicing system, organized the data, reconciled the data for completeness and loaded the data into the Debtor's Access database.

       b.       August 4, 2009 Escrow Funds - Obtained investor custodial T&I bank statements to validate the August 4, 2009 balances.  The Debtor obtained loan detail for the bank balances of the California and Illinois Impound Accounts and allocated to investors accordingly.  These bank balances were used to compare to the August 3, 2009 book balance.

     3.     EDCA Shortfalls - EDCA Shortfalls were calculated per the EDCA Book-to-Bank Reconciliation detailed in Exhibit P.  The steps in this reconciliation were as follows:

       a.       Created a list of checks issued and still outstanding for the Platinum bank account.

       b.       Researched Platinum information provided to the Debtor to adjust the outstanding check list for checks that cleared in bulk bank transactions.

       c.       Adjusted the outstanding check list for checks issued pursuant to the Borrower Protocol and for checks issued on and subsequent to August 4, 2009.

       d.       The Debtor compared the remaining outstanding checks to related Colonial, Platinum and Seaside balances to determine the EDCA shortfall.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

**C.     Unreimbursed Advances and Unpaid Service Fees (Table 5 and related Exhibits)**

1.     The P&I Book-to-Bank Reconciliation detailed in Exhibit M shows net P&I Advances for which TBW was not reimbursed.  Such advances include each of the following items along with the steps described below for how each item was determined:

a.     P&I Advances - Obtained loan level reports from the Servicing System that provided the total P&I advances on each loan.  The Debtor developed queries to extract the loan level data from the Servicing System, organized the data, reconciled the data for completeness and loaded the data into the Debtor's spreadsheets and Access databases.  The debtor validated the results from the Servicing System by recalculating for each loan an expected P&I advance amount based on delinquency status of each loan.

b.     July Scheduled Remittances - Obtained the wire remittance amounts between July 1, 2009 and August 3, 2009 for each Investor and the related supporting remittance reports.  The form of the data required the Debtor to manually extract and reconcile the loan level data to be used in the Debtor's spreadsheets and Access databases.

c.     Borrower Collections - Obtained borrower payments received by TBW and posted in the Servicing System between July 1, 2009 and August 3, 2009.  The debtor validated and reconciled the daily borrower payments received to the investor custodial P&I accounts.

d.     Prepaid Borrower Payments - Obtained loan level reports from the Servicing System that provided the prepaid borrower payments on each loan.  The form of the data required the Debtor to manually extract and reconcile the loan level data to be used in the Debtor's spreadsheets and Access databases.

e.     Other P&I Items Detailed in Exhibit N

i.     Unapplied balances - Obtained the unapplied balances for each affected Ginnie Mae loan from the Servicing System.

ii.     Seller Servicer Remittance Analysis Balance - Obtained the Freddie Mac issued Seller/Servicer Remittance Analysis report as of August 4, 2009 which provides this balance.  The Debtor reviewed/analyzed historical remittance activity between TBW and Freddie Mac from May 2008 through August 4, 2009 to confirm the business activity and support the balance.

iii.     Private Investor Funds - Obtained reports and historical remittance amounts on the related MBS to calculate the amount.

**EXHIBIT A**

**OVERVIEW OF SERVICING RECONCILIATION PROCEDURES**

       iv.     July ARC Curtailments - Obtained loan level reports from the Servicing System that provided the July ARC Curtailments on each loan. The form of the data required the Debtor to manually extract and reconcile the loan level data to be used in the Debtor's spreadsheets and Access databases.

       v.     Guaranty Fee - Obtained Ginnie Mae pool level information from the Servicing System that provided the guaranty fee. The Debtor confirmed that the July guaranty fee was not paid by August 4, 2009.

       vi.     Foreclosure claims - The Debtor identified the foreclosed loan population from the Servicing System and spreadsheets historically maintained by TBW. The Debtor calculated incremental claim amounts over and above claims previously filed with and paid by Freddie Mac, and claim amounts where claims were either filed or not yet filed with Freddie Mac which remain unpaid.

       vii.     Repurchases - The Debtor identified a number of repurchased loans where the amount for the repurchases remains unpaid. This is included as an amount owing to Freddie Mac.

       viii.     Compensating Interest - The Debtor identified the affected loans paid in full and independently calculated the interest amount under the terms of the compensating interest criteria of the Freddie Mac Seller/Servicer Guide.

       ix.     Same Month Pooling - The Debtor identified the affected loans and independently calculated the interest amount under the terms of the Same Month Pooling criteria of the Freddie Mac Seller/Servicer Guide.

       x.     Reserve Holdback - Obtained the amount included in the custodial P&I account relating to the Reserve Holdback provisions of the securitization contract.

    2.     T&I Advances- In order to calculate these amounts, the Debtor started by obtaining loan level T&I balances for each loan service released to each investor. The Debtor designed and developed an Access database to store the T&I balances. The Debtor developed queries to extract the loan level data from the Servicing System, organized the data, reconciled the data for completeness, and loaded the data into the Debtor's Access database. The Debtor reconciled the loan population and loan balances to each trial balance provided to each investor's successive servicer(s).

## EXHIBIT A

### OVERVIEW OF SERVICING RECONCILIATION PROCEDURES

3.      Corporate Advances – In order to calculate these amounts the Debtor started by obtaining loan level Corporate Advance balances for each loan service released to each investor. The Debtor designed and developed an Access database to store the Corporate Advance balances.  The Debtor developed queries to extract the loan level data from the Servicing System, organized the data, reconciled the data for completeness, and loaded the data into the Debtor's Access database.  The Debtor reconciled the loan population and loan balances to each trial balance provided to each investor's successive servicer(s).

4.      Other Unreimbursed Items detailed in Exhibit Q were calculated as follows:

    a.      HUD Claims - The Debtor identified short sales and foreclosed loan population based on the Servicing System and spreadsheets historically maintained by TBW.  The Debtor calculated the claim (for both filed and unfiled claims as of August 4, 2009) amounts which remain unpaid.

    b.      Modifications - The Debtor identified loan modifications based on the Servicing System and spreadsheets historically maintained by TBW.  The Debtor calculated the claim (for both filed and unfiled claims as of August 4, 2009) amounts which remain unpaid.  The claim amount also includes incentive fees which remain unpaid.

    c.      Excess UPB - The Debtor identified loans with principal balance differences.  The Debtor calculated the differences to identify the amounts which remain unpaid.

    d.      Short Sale Claims - The Debtor identified short sales based on the Servicing System and spreadsheets historically maintained by TBW.  The Debtor calculated the incentive claim amounts which remain unpaid.

5.      Unpaid Service Fees - The Debtor developed queries to extract the loan level data from the Servicing System, organized the data, reconciled the data for completeness and loaded the data into the Debtor's spreadsheets and Access databases.  The Debtor calculated the service fee due on each loan up through each loan's service release date.