# Exhibit B

# Overview of Asset Reconciliation Procedures

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

As more fully described in the Debtor's Final Reconciliation Report, the Asset Reconciliation has included the investigation and analysis of certain mortgage assets and funding sources relevant to issues in this bankruptcy case.[1]  In connection with this process, the Debtor has:

a.  interviewed and met with numerous TBW personnel;

b.  reviewed certain electronic data stored on TBW's servers for key operational areas;

c.  built numerous databases that include loan level and cash activity details;

d.  identified loans sold to investors and traced cash payments from investors to loans; and

e.  traced cash disbursements from Ocala Funding to specific loans purchased by Ocala Funding.

Each of these tasks is discussed in more detail below.

## I.    Interviews of TBW Personnel

In connection with the Asset Reconciliation, the Debtor, through Navigant support staff and attorneys at Troutman Sanders, has conducted multiple interviews and meetings with TBW personnel in an attempt to understand how TBW operated and the types of information generated and relied upon in its day-to-day operations.  The functional area and the title of individuals the Debtor met with are identified below:

| FUNCTIONAL AREA | TITLE |
| --- | --- |
| Accounting | Controller |
| Accounting | Director, Financial Planning |
| Accounting | Director, Accounting Operations |
| Accounting | Senior Financial Analyst |
| Accounting | Cash Department |
| Treasury | VP, Asset Acquisition |
| MBS Delivery | Specialist |
| Investor Services | Director, Reporting & Operations Analysis |
| Investor Services | Director, Investor Services |

---

[1]  All Capitalized terms not otherwise defined herein shall have the meaning set forth in the Final Reconciliation Report.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

| FUNCTIONAL AREA | TITLE |
|---|---|
| Loan Administration | Executive Director |

By the time the Asset Reconciliation began in early October 2009, no one from the Capital Markets group remained with the Debtor.[2]  In addition, only one member of the Treasury group still remained with the Debtor.  This individual, however, left the Debtor shortly after the Asset Reconciliation started. The Debtor has also not interviewed anyone from Colonial who was involved with TBW or from LaSalle or its successor Bank of America in connection with its involvement with Ocala Funding.

**II.        Analysis of the Debtor Network Drives, Shared Folders and Email**

In conjunction with interviewing the available Debtor personnel, the Debtor, through Navigant support staff and attorneys at Troutman Sanders, also conducted an in-depth forensic analysis of the following Debtor network drives and shared folders:

- Accounting
- Secondary
- Treasury
- Investor Services

1.        These network drives and shared folders contained hundreds of gigabytes of data and tens of thousands of individual files.  The purpose of the Debtor's analysis was to determine what types of information were stored electronically and to identify the information that could be potentially relevant to the Asset Reconciliation.  The following is a general overview of the types of information that the Debtor believes is relevant to the Asset Reconciliation:

| DOCUMENT TYPE | SUMMARY OF DOCUMENT TYPE |
|---|---|
| Bank of America Early Purchase Facility "Advance Tape" | These reports contain the loan level detail underlying the agency pool that was advanced on the BoA EPF. |
| Bank of America Early Purchase Facility "Funding Worksheets" | These reports identify the pools that were advanced on the BoA EPF.  These reports also contain information regarding the purchase price, the initial payment and the holdback payment for pools assigned to the BoA EPF. |

---

[2]        This group was also commonly referred to as Secondary Markets.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

| DOCUMENT TYPE | SUMMARY OF DOCUMENT TYPE |
|---|---|
| Bank of America/LaSalle Daily Ocala Funding bank statements | TBW downloaded bank statements every day from LaSalle. These bank statements showed all activity within the account that day. TBW personnel would mark up the daily bank statements in an effort to identify the source of deposits and the purpose for the disbursements. |
| COLB Paydown Reports | This is a report prepared daily by Colonial. This report tracks all investor deposits into the Investor Funding account and shows how these deposits were used. In general, the deposits in this account were applied to pay down TBW's warehouse lines including COLB and the AOT. |
| Colonial Advances Report | This is a schedule included in the daily COLB, Seaside and Platinum Pipeline reports. The schedule included in the report identifies the pools advanced on the AOT and the Overline on that day and the advance amount. |
| Colonial Bank Statements | TBW had over one hundred different bank accounts with Colonial. The key Colonial operating accounts with respect to the Asset Reconciliation are the Investor Funding and Colonial Master Advance accounts. The Investor Funding accounts were the accounts where proceeds from loan sales were deposited. The Master Advance account is the account where loans on COLB were funded, certain loans were repurchased and other Colonial related fees and expenses were paid. The key Colonial custodial accounts include the CFCA and the Freddie Mac and Ginnie Mae P&I accounts. |
| Colonial Payment Reports | This is a schedule included in the daily Colonial Pipeline reports for COLB, Seaside, Platinum and the Overline. These schedules identify the loans that were paid-off the facility that day. |

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

| DOCUMENT TYPE | SUMMARY OF DOCUMENT TYPE |
|---|---|
| Colonial Pipeline Reports | Report prepared daily by Colonial. These reports included several different schedules including a "pipeline" report showing all loans outstanding on (1) COLB, (2) Overline, (3) Seaside and (4) Platinum. The COLB pipeline reports go back to well before 2007. The Seaside pipeline reports start in December 2008, while the Platinum reports begin in June 2009. The Overline pipeline report is included with the COLB pipeline report. |
| Colonial Purchase Reports | This is a schedule included in the daily Colonial Pipeline reports for COLB. This schedule shows the loans that were purchased by COLB that day. |
| Daily Cash Proofs | These reports were prepared everyday by Investor Services. These reports identified where money in the CFCA account was transferred. |
| DBK and BNP Pipelines | These were daily reports prepared by TBW that identified the Ocala Funding loans that were assigned to DBK and BNP. These reports were sent to BNP and DBK directly by TBW starting in July 2008. |
| Freddie Mac Form 996E | This is a Freddie Mac form titled "Warehouse Lender Release of Security Interest." It was prepared by TBW and sent to LGTS or Colonial for execution. Once the form was signed by LGTS or Colonial, TBW would forward it to Freddie Mac. It is the Debtor's understanding that Freddie Mac would not release funds without an approved 996E. |
| Freddie Mac Funding Detail Reports | These reports were downloaded directly from Freddie Mac on a daily basis by Investor Services. These reports identified the loans that were purchased that day by Freddie Mac. Investor Services used these reports to change a loan's Investor Code in the Servicing System to Freddie Mac's code. |
| Funding Management System | This is the system used by TBW to manage the funding of loans. This system identifies, among other things, the warehouse line used to fund the loan, the date the loan was funded and the account where the wire was sent to. |

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

| DOCUMENT TYPE | SUMMARY OF DOCUMENT TYPE |
|---|---|
| Ginnie Mae Form 11705 and 11706 | Form 11705 contains pool level data while Form 11706 identifies the specific loans included in the Ginnie Mae pool. |
| Ginnie Mae Text Files | These are files that were downloaded directly from Ginnie Mae by Investor Services.  These files identified which loans were assigned to which Ginnie Mae pool and when it was assigned.  Investor Services used these files to make sure that the investor loan number for all Ginnie Mae loans was correctly identified in the Servicing System. |
| LGTS Daily Collateral Reports | LGTS would send TBW collateral lists each morning identifying all "on-hand" and "active release" Ocala Funding loans.  Beginning in the fall of 2008, LGTS would also send a separate collateral list to BNP and DBK that identified the loans assigned to each investor. |
| Ocala Funding Collateral Account Monthly Schedules | These are Excel files maintained by TBW.  These files summarize all of the daily cash activity for, among others, the Ocala Funding, DBK and BNP collateral accounts.  This file also includes a summary description of what the transaction related to.  In general, this description was similar to the handwritten notes included on the daily Ocala Funding bank statements. |
| Ocala Funding Gatekeeper Reports | These reports were prepared by TBW's Capital Markets (a/k/a Secondary) group and then forwarded to Treasury before being sent on to LaSalle.  These reports identified the loans that were being submitted for approval (by LGTS) for purchase that day. |
| Ocala Funding Pipeline Reports | Report prepared daily by TBW.  It does not appear this was distributed externally on a regular basis.  This report includes a pipeline report that identified the loans allegedly outstanding at Ocala Funding.  This report also identified the loans advanced and paid down each day.  The Ocala Funding Pipeline Reports appear to have begun in July 2005. |
| Purchase Advices | In general, TBW retained PDF versions of third party (e.g., Freddie Mac, Wells Fargo) purchase advices.  The purchase advices are one source that can be used to trace sale proceeds to specific loans. |

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

| DOCUMENT TYPE | SUMMARY OF DOCUMENT TYPE |
|---|---|
| QRM | QRM was TBW's secondary markets trading system. |
| Rules System | This system provides historical loan level information. This dataset identifies, among other things, the loan type, last warehouse bank, broker, underwriter, MERS, sold date and investor. |
| TBW Master Pipeline Report | Report prepared each day by TBW. This spreadsheet aggregates all of the loans outstanding on TBW's various funding sources each day. These reports start in August 2007. The name of this report was changed to the Funding Report in July 2009. |
| Wire Breakdowns | TBW prepared daily wire breakdowns by investor to track loan sale proceeds deposited into, among others, the Investor Funding and the Ocala Funding Collateral accounts. These wire breakdown reports allowed TBW to trace specific deposits to specific loans. |

2.      In addition to the data contained on the Debtor's servers, the Debtor created a database containing over 2 million email records and attachments for key TBW custodians. This discovery database includes records dating back to as early as 2002. The email discovery database was used extensively by the Debtor to research specific loans and cash movements as well as to respond to specific requests from outside parties.

### III.    Databases Created by the Debtor

Based upon the Debtor's review of TBW's records, it became apparent that TBW did not have a centralized system that allowed a user to trace the history of a loan from origination all the way through to purchase by an investor. In fact, it appears TBW relied upon Excel spreadsheets to manage its day-to-day operations and track the movement and sale of loans. In order to perform the Asset Reconciliation, the Debtor concluded that it would be necessary to create numerous databases that would allow it to track loans from their inception through sale. A list of the databases created, the source files used to create them, the time period covered and the number of records in each one is contained in Exhibit S.

### IV.    Identification of Loans to Analyze for the Asset Reconciliation

The Debtor has worked with the FDIC and Bank of America to identify the mortgage loans that are the subject of the Asset Reconciliation. The sources relied upon for the OFCP, COLB and AOT mortgage loans that were analyzed by the Debtor are discussed below.

3.      *Ocala Funding Mortgage Loans* - The Debtor, with assistance from Bank of America, identified a total of 9,111 (which includes all of the TRO Loans) mortgage loans that, according to the LGTS collateral management system, are collateral for the OFCP – i.e., either

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

"on hand" or on "active release" as of August 2009.  This list of loans was compiled from four different sources: (1) the August 5, 2009 LGTS collateral report; (2) the August 13, 2009 LGTS collateral report; (3) the list of TRO Loans attached to Bank of America's complaint filed against Colonial; and, (4) a physical count conducted by LGTS after August 2009 of the mortgage loans "on-hand" – i.e., in the physical possession of LGTS.

4.    *COLB Mortgage Loans* – The FDIC provided the Debtor with a list of 8,714 COLB mortgages that were still outstanding when Colonial was seized on August 14, 2009.  It is the Debtor's understanding that this list was generated from Colonial's internal mortgage loan accounting system.  The Debtor reconciled this list to the August 5, 2009 Colonial Pipeline report, which was the last one TBW received from Colonial.  There are 142 mortgages on the August 5, 2009 pipeline report that are not on the collateral list provided by the FDIC.  The Debtor has been able to account for all 142 mortgage loans and has identified the reason why they are not on the FDIC list.

5.    *AOT Mortgage Loans* – Colonial typically emailed to TBW on a daily basis two spreadsheets related to the AOT.  One of the spreadsheets identified the *trades* that were outstanding on the AOT.  The second spreadsheet identified the *mortgage loans* "on the AOT" and the trades the loans were assigned to.  The last date these two spreadsheets were provided to TBW by Colonial was July 24, 2009.  According to the loan level spreadsheet, there were 7,867 loans assigned to the AOT as of this date.

6.    The FDIC provided the Debtor with a list of loans "on the AOT" from a source that had been brought to the FDIC's attention.[3]  This list, however, included 9,304 loans that were supposedly "on the AOT."  While all 7,867 loans on the July 24, 2009 list are included in the 9,304, there are 1,437 that are not.  Based on TBW's Master Pipeline reports, nearly all of the 1,437 additional AOT loans were on the AOT at different points in time prior to August 5, 2009.[4]  Nonetheless, for purposes of the Asset Reconciliation, the Debtor has relied upon the list of 9,304 AOT mortgage loans.

7.    The Debtor also prepared an aging analysis of the Ocala Funding and COLB mortgages.  The purpose of this analysis was to identify a reasonable date range that could be used to determine how far back in time the information captured in the databases built by the Debtor should go in order to reasonably account for activity involving the subject loans.  The following table summarizes the aging analysis for the Ocala Funding mortgages.

---

[3]    This list has not been validated by the FDIC.

[4]    As of the August 5, 2009 Master Pipeline Report, which was the last one prepared by TBW, 64 of the 1,437 were listed as being "on the AOT" and 4 were on the Overline.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**TABLE 1**

Aging Analysis of Ocala Funding Loans

| Loan Status Per LGTS | | Prior to 2008 | 2008 | January 1, 2009 March 31, 2009 | April 1, 2009 - June 30, 2009 | July 1, 2009 - August 14, 2009 | Not Found in Reports | Total |
|---|---|---|---|---|---|---|---|---|
| "Active Release" | [A] | 0 | 1 | 195 | 4,222 | 3,853 | 12 | 8,283 |
| "On-Hand" | [B] | 201 | 40 | 0 | 46 | 437 | 104 | 828 |
| | | | | | | | | 9,111 |

[A] Based on the date the loan was shipped by LGTS to an Investor. There are 12 loans listed as Active Release that have no
    Release Date. These loans were identified by BoA through its physical inventory count.
[B] Based on the Advance Date of the loan per the daily TBW Ocala Funding Pipeline Reports.

8.      Over 96% or 8,753 of the Ocala Funding mortgages were either shipped by LGTS to investors or added as collateral to the OFCP in 2009.  The next table summarizes the aging analysis for the COLB mortgages.

**TABLE 2**

Aging Analysis of Loans Outstanding on COLB Based on the "Inception Date"

| Loans on Construction Sublimit | Prior to 2009 | | January 1, 2009 March 31, 2009 | April 1, 2009 - June 30, 2009 | July 1, 2009 - August 14, 2009 | No Inception Date | | Total Loans |
|---|---|---|---|---|---|---|---|---|
| 16 | 6 | [A] | 18 | 3,678 | 4,991 | 5 | [B] | 8,714 |

[A] The earliest Colonial Pipeline Report we have loaded into a database is 09/02/08.
[B] These loans were on COLB on the Wet Sublimit as of 08/06/09.

9.      Over 99% or 8,687 of the COLB mortgages were assigned to the COLB in 2009.

10.      Based upon the above aging analysis, the Debtor believes its databases should at least capture data for the period January 2009 through August 5, 2009.  However, in order to account for as many of the subject loans as possible, the Debtor has also captured data for periods prior to 2009.  The exact periods covered by each database are identified in Exhibit S to the Report.

## V.      Tracing Mortgage Loans to Specific Investors

The next step in the Asset Reconciliation was to determine whether there was any indication that the subject loans were purchased by third party investors, such as Freddie Mac or Wells Fargo.  This step involved:  (1) identifying the investor that the subject loans are currently assigned to, and (2) tracing cash payments from investors to the subject mortgage loans.  The Debtor relied upon the following data sources in connection with this analysis:

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

- QRM
- Lookup Database
- Freddie Mac Funding Detail Reports
- TBW Prepared Investor Wire Breakdowns and Investor Purchase Advices
- Ginnie Mae Text Files
- BoA EPF

11.     *QRM* was TBW's secondary marketing trading system.  TBW used QRM to manage its hedging activities and loan sales to third party mortgage investors.  As such, QRM is essentially the starting point for understanding why a loan is assigned to a specific investor.  For example, if Wells Fargo is identified in QRM as the investor for a loan, one would expect the loan to be:

      a.      coded to Wells Fargo in the Servicing System;

      b.      in a TBW prepared wire breakdown for Wells Fargo that ties to a deposit from Wells Fargo;

      c.      and in a purchase advice from Wells Fargo.

12.     As discussed in more detail in the Report, the *Lookup Database* is based upon the Servicing System.  Each loan in the Servicing System was coded to a specific investor.  When loans were initially funded or purchased by TBW, they would be assigned to the Investor Code for the warehouse lender that provided the funds.  Once a loan was sold, the Investor Code would be changed in the Servicing System to the purchaser's Investor Code.  This change was made by Investor Services, not TBW's Treasury or Secondary Markets groups.  The Investor Code assigned to a loan would determine which investor P&I and escrow account the borrower payments would be transferred to.  As such, loans needed to be properly coded to investors in order for TBW's servicing operations to function reliably.

13.     While QRM and the Lookup Database are reliable indicators of who the investor is for each loan, they do not contain information that allows one to tie a cash payment from the investor directly to the loan.

14.     In contrast, the Freddie Mac Funding Detail Reports, the TBW Investor Wire Breakdowns, the Investor Purchase Advices, the Ginnie Mae Text Files and the BoA EPF all can be used to trace cash payments to specific loans.  Each one of these sources is discussed in more detail below.

A.     **Freddie Mac Funding Detail Reports**

15.     As previously mentioned, on a daily basis TBW's Investor Services group would download the Funding Detail Reports from Freddie Mac.  These reports include information regarding the date a loan was purchased and the amount of principal purchased.  These reports, however, do *not* tie exactly to the cash payment made by Freddie Mac for the loan because,

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

among other things, they do not identify the premium or discount paid for the loan.[5]
Nonetheless, the principal purchased should be reasonably close to the total cash paid for the
loan.  For purposes of the Asset Reconciliation, the Debtor has loaded into a database all of the
daily Freddie Mac Funding Detail Reports stored on the Investor Services network drive for the
period November 3, 2008 through August 4, 2009.

16.     The Debtor endeavored to validate the database and its source information by
comparing TBW's and Ocala Funding's daily Freddie Mac related *cash receipts*[6] to the total
daily loan *principal purchased* per the Funding Detail Reports.  In other words, the Debtor
attempted to reconcile actual cash receipts from Freddie Mac to the principal balance of the loans
purchased by Freddie Mac.

17.     Freddie Mac deposits into the following bank accounts were captured in this
analysis: (1) TBW Investor Funding, (2) Seaside Investor Funding and (3) Ocala Funding
Collateral.  The Debtor's analysis covered Freddie Mac cash receipts and principal purchased
during the period December 1, 2008 through August 4, 2009.  The results of this reconciliation
are summarized below:

**TABLE 3**

Total Freddie Mac Related Deposits into the TBW and Seaside Investor Funding and Ocala Funding
Collateral Accounts Compared to the Total Principal Purchased per the Funding Detail Reports for the
Period December 1, 2008 Through August 4, 2009

| Freddie Mac Cash Window Deposits | Freddie Mac MBS Settlement Proceeds | Total Freddie Mac Related Deposits | Principal Purchased Per Funding Detail Reports | Difference |
|---|---|---|---|---|
| $   8,380,335,177 | $   685,497,692 | $   9,065,832,869 | $   8,977,184,129 [A] | $   88,648,739 |

[A] This number is calculated by taking the total principal purchased from the Funding Detail Reports
    excluding the principal purchased for pools assigned to the EPF.

18.     As the above table highlights, between December 1, 2008 and August 4, 2009,
total Freddie Mac related cash receipts exceeded the total principal purchased by Freddie Mac by

---

[5]     The Freddie Mac "Loan Purchase Statement" (a/k/a purchase advice) is a Freddie Mac document that
identifies the exact amount of cash paid by Freddie Mac for each loan.  It was TBW's practice to retain
PDF copies of all Freddie Mac purchase advices for each Freddie Mac cash window related deposit.  While
TBW continued this practice for deposits into the Investor Funding accounts, beginning in or about January
2009, TBW stopped retaining copies of Freddie Mac purchase advices for Freddie Mac deposits into the
Ocala Funding Collateral account.

[6]     There are two forms of Freddie Mac related cash receipts: (1) deposits directly from Freddie Mac for cash
window loan sales and (2) deposits from Bank of New York covering proceeds from the settlement of
Freddie Mac securities.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

$88.6 million or approximately *1 percent*. This difference is consistent with the fact that Freddie Mac's *actual* cash payment included accrued interest and premiums or discounts and, as such, would necessarily vary from the principal purchased. With respect to the period December 1, 2008 through August 3, 2009, it is the Debtor's view that the Funding Detail Reports in the Debtor's possession are complete and can be relied upon to trace cash receipts from Freddie Mac to specific loans.[7]

19.     On August 4, 2009, the receipts from Freddie Mac exceeded the principal purchased per the available Funding Detail Reports by $7.7 million or by over 32 percent. As such, the Funding Detail Reports for August 4, 2009 are not complete. The Debtor, however, has located four TBW wire breakdowns dated August 4, 2009 that identify the source as Freddie Mac. These wire breakdowns tie exactly to the individual deposits from Freddie Mac on August 4, 2009. In addition, there are Freddie Mac purchase advices that agree to the information in the TBW prepared wire breakdown.

20.     In conclusion, the Debtor believes that between the Funding Detail Reports and the August 4, 2009 Freddie Mac wire breakdowns, it has the necessary data to trace cash payments from Freddie Mac to specific loans for the period December 1, 2008 through August 4, 2009.

**B.     TBW Prepared Wire Breakdown and Investor Purchase Advices**

21.     It was TBW's practice to prepare what it referred to as a *wire breakdown* for each deposit from an investor. The wire breakdown identified the date of the wire, the amount of the wire, the source of the wire (e.g., Wells Fargo), the individual loans purchased and the cash payment for each loan that made up the total deposit. There were separate wire breakdowns prepared for Ocala Funding and the TBW and Seaside Investor Funding accounts.[8] It appears that at least the Investor Funding wire breakdowns were shared with Colonial.

22.     These wire breakdowns were retained in the Secondary Markets shared folder and organized by year and month. TBW has copies of wire breakdowns going back to well before 2007. The purchase advices were also retained in the Secondary Markets shared folder. They are organized by year, month and investor.

23.     Based on internal TBW procedure memorandums, it appears that for major investors, such as CitiMortgage, Wells Fargo and Freddie Mac, TBW would create the wire breakdown by downloading or copying the loan purchase details directly from the investor's website. In addition to downloading the loan details, TBW would also download a copy of the actual purchase advice from these investors.

---

[7]     While there are minor differences between QRM and the Freddie Mac Funding Detail Reports, there are 49,429 loans in 2,607 pools where *both* the pool number and the loan number match *exactly* between the two data sources.

[8]     Wire breakdowns related to the TBW Investor Funding account would include the phrase "C-Wire" in the file name, while Ocala Funding related wire breakdowns would include the phrase "Ocala Funding."

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

24.     While TBW also prepared wire breakdowns for smaller investors, the process used to create them is not clear.  TBW did, however, retain copies of the loan level purchase advices for sales to smaller investors.  The Debtor has not attempted to reconcile all of the wire breakdowns for the smaller investors to purchase advices.  The limited number of purchase advices the Debtor has reviewed, however, have been consistent with the wire breakdown and other information.

25.     The purchase advices for the *settlement of securities* were sent to TBW by Bank of New York via email.  Unlike the other investor purchase advices, the purchase advices from Bank of New York did not include loan level detail.  More specifically, they only identified the *pools* (e.g., Freddie Mac, Ginnie Mae) that settled that day.

26.     In general, the Bank of New York *wire breakdowns* prepared by TBW were loan level specific.  There were, however, some wire breakdowns that only identified the pool or were a combination of loan level and pool level detail.  While the Debtor has not compared all of the Bank of New York wire breakdowns to the purchase advices, the Debtor is aware of instances where the pools identified in the *wire breakdown* are <u>not</u> the same as the pools identified in the Bank of New York *purchase advice* for the same day.  In fact, according to QRM the pools identified in the wire breakdowns had settlement dates prior to the date of the wire breakdown.[9]

27.     There are also numerous instances where a so-called "funding adjustment" was made to the Bank of New York settlement proceeds deposited into the TBW Investor Funding account.  The effect of this adjustment was that it reduced the amount available to pay down the appropriate warehouse lines.[10]  While the Debtor has not analyzed each "funding adjustment," it appears that the "funding adjustment" would at least initially be transferred to other TBW accounts.

**C.     Wire Breakdown Database and Reconciliation to Investor Deposits**

28.     The Debtor has loaded into a database all of the TBW prepared wire breakdowns for the period June 1, 2008 through August 5, 2009.  In order to test the completeness of the wire breakdowns, the Debtor has tied deposits from certain investors to the wire breakdown attributed by TBW to that deposit and that investor.

29.     In terms of Ocala Funding, the Debtor divided Ocala Funding Collateral account investor deposits between non-Freddie Mac and Freddie Mac investors.  The following table summarizes the results of the Debtor's reconciliation of *non-Freddie Mac* deposits to "matching" wire breakdowns for the period June 1, 2008 through August 4, 2009.[11]

---

[9]     In general, the pools in the Bank of New York wire breakdowns can be found in Bank of New York purchase advice corresponding to the settlement date indicated in QRM.

[10]    Some of these funding adjustments were in the tens of millions of dollars.

[11]    For purposes of this analysis, in order for a wire breakdown to be considered "matching," both the amount and the source of the wire breakdown must correspond to the source of deposits.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**TABLE 4**

Total Non-Freddie Mac Investor Deposits into the Ocala Funding Collateral Account and Total
Matching TBW Wire Breakdowns for the Period June 1, 2008 to August 4, 2009

| Line | Source of Funds Per TBW | Total Deposits | Total Matching Wire Breakdowns | Difference | |
|------|-------------------------|----------------|--------------------------------|------------|---|
| 1 | Bank of America (BoA) | $ 46,025,987 | $ 14,764,260 | $ 31,261,727 | [A] |
| 2 | Bank of New York (BONY) | 269,476,622 | 207,614,937 | 61,861,686 | [A] |
| 3 | CitMortgage | 630,009,777 | 625,862,143 | 4,147,634 | [B] |
| 4 | CSFB AOT | 715,422,323 | 704,582,902 | 10,839,421 | [C] |
| 5 | Franklin American | 75,747,302 | 75,687,302 | 60,000 | |
| 6 | Wells Fargo | 270,158,420 | 267,880,873 | 2,277,547 | [D] |
| 7 | Others | 68,591,493 | 68,388,034 | 203,458 | |
| 8 | **Total** | **$ 2,075,431,924** | **$ 1,964,780,451** | **$ 110,651,473** | |
| 9 | **Total Exlcuding BoA and BONY** | **$ 1,759,929,315** | **$ 1,742,401,254** | **$ 17,528,061** | |

[A] The missing wire breakdowns all include transfers from the Investor Funding account.
[B] We have not been able to locate a wire breakdown for deposits on 12/30/08 and 12/31/08.
[C] We have not been able to locate a wire breakdown for one deposit on 12/30/08.
[D] We have not been able to locate wire breakdowns for deposits that were made between 12/26/08
     and 12/31/08.

30.     Excluding Bank of America and Bank of New York, the Debtor was able to match wire breakdowns to all but $17.5 million of deposits from non-Freddie Mac sources (See Table 4, Line 9). In order to further test the reliability of the Ocala Funding related wire breakdowns, the Debtor compared a small sample of CitiMortgage and Wells Fargo purchase advices to the corresponding wire breakdown (See Table 4, Lines 3 and 6).

31.     None of the deposits in the above table attributed by TBW to Bank of America or Bank of New York actually involved transfers from those two entities (See Table 4, Lines 1 and 2). All of the Bank of America and the vast majority of the Bank of New York transfers came directly from the Investor Funding account. The Bank of America difference is due to a missing wire breakdown for a transfer on May 12, 2009 to Ocala Funding. The Bank of New York difference can be traced almost entirely to two missing wire breakdowns on April 20th and April 21, 2009.

32.     With respect to *Freddie Mac*, the Debtor was able to tie the vast majority of deposits from Freddie Mac between June 1, 2008 and December 31, 2008 to Freddie Mac related wire breakdowns that had been saved in the Secondary Markets shared folder. In 2009, however, TBW's Secondary Markets shared folder contained almost no Ocala Funding wire breakdowns or purchase advices for Freddie Mac deposits. This is despite the fact Freddie Mac deposited over $5.6 billion into the Ocala Funding Collateral account in 2009.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

33.    The Debtor undertook an extensive review of TBW's internal communications in an effort to track down the missing wire breakdowns and purchase advices.  Based upon this review, the Debtor was able to locate copies of Ocala Funding Freddie Mac wire breakdowns that tied to $1.43 billion of the $1.45 billion in proceeds received from Freddie Mac during the period May 15, 2009 through August 4, 2009.[12]

34.    The Debtor, however, was only able to locate wire breakdowns corresponding to $488.8 million of the nearly $4.2 billion deposited in the Ocala Funding Collateral account by Freddie Mac during the period January 1, 2009 through May 14, 2009.  As such, the primary source available to identify Ocala Funding mortgages sold to Freddie Mac during this period is the Freddie Mac Funding Detail Reports.

35.    The Debtor tested the reliability of the wire breakdowns it was able to locate by comparing the wire breakdown details to the Freddie Mac Funding Detail Reports.  The Debtor did not identify any material issues that would indicate the wire breakdowns were not reliable.  Based upon this additional testing, the Debtor believes that the Freddie Mac wire breakdowns that were located can be relied upon to trace sales proceeds from Freddie Mac to specific loans.

36.    Given the problems with the Bank of New York wire breakdowns discussed in paragraphs 26 and 27, the Debtor has elected to place little, if any, reliance upon them as a source for the Asset Reconciliation.  The Debtor does, however, believe that wire breakdowns for the other Non-Freddie Mac Investors identified in Table 4 can be relied upon to trace sales proceeds deposited into the Ocala Funding Collateral account to specific loans purchased by those Investors.

37.    In addition to analyzing the Ocala Funding Collateral account investor deposits, the Debtor performed the same analysis regarding proceeds from key third party investors that were deposited into the TBW and Seaside *Investor Funding* accounts.  This analysis covered sales proceeds deposited during the period January 1, 2009 through August 5, 2009 and by the following investors: (1) CitiMortgage, (2) Wells Fargo and (3) Freddie Mac (cash window sales).

38.    The Debtor focused the reconciliation of deposits to wire breakdowns on these three investors because they are the *only* third party investors identified as potential third party investors in the 8,714 COLB loans.  (See Section VIII below)  The results of the Debtor's analysis with respect to these three investors are summarized below:

---

[12]    The Debtor was not able to locate corresponding purchase advices for all of these wire breakdowns.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**TABLE 5**

Deposits From Key Investors Into the TBW and Seaside Investor Funding Accounts and
Total Matching TBW Wire Breakdowns for the Period January 1, 2009 to August 5, 2009

| Investor | Total Deposits | Total Matching Wire Breakdowns | Difference | |
|---|---|---|---|---|
| CitiMortgage | $        38,418,092 | $        38,373,759 | $          44,333 | [A] |
| Freddie Mac (Cash Window) | 2,171,681,811 | 2,171,681,811 | - | |
| Wells Fargo | 100,957,418 | 100,406,182 | 551,237 | [B] |
| **Total** | **$   2,311,057,322** | **$   2,310,461,752** | **$        595,569** | |

[A] The difference is due to a 05/20/09 transfer from Ocala Funding to Investor Funding.
On the same day of the transfer there was a deposit from CitiMortgage into the Ocala
Funding Collateral account. The loan associated with the transfer to Investor Funding
is in the 05/20/09 Ocala Funding CitiMortgage wire breakdown.
[B] There was a deposit on 08/05/09 from Wells Fargo without a wire breakdown. We have
located purchase advices from Wells Fargo supporting this deposit.

39.    The loan associated with the one missing deposit attributed to CitiMortgage can be found in an Ocala Funding wire breakdown. In addition, the loans purchased by Wells Fargo for which there is no wire breakdown are identified in a Wells Fargo purchase advice. The Debtor also compared a small sample of CitiMortgage and Wells Fargo wire breakdowns to their corresponding purchase advices and noted no issues.

40.    The Debtor also tested the reliability of the Freddie Mac wire breakdowns by comparing them to the Freddie Mac Funding Detail Reports. There were no issues identified that would call into question the reliability of the TBW prepared Freddie Mac related wire breakdowns. As such, the Debtor believes the CitiMortgage, Wells Fargo and Freddie Mac Investor Funding related wire breakdowns can be relied upon to trace sales proceeds from these investors to specific loans sold by Ocala Funding and TBW for at least the period January 1, 2009 through August 5, 2009.

**D.    Ginnie Mae Text Files**

41.    As previously mentioned, the Ginnie Mae Text Files were downloaded by the Investor Services group.[13] These files identified the issuer id, issuer's loan number (i.e., TBW), the pool number, the Ginnie Mae loan number, the original principal balance and the "Record Date," which is equivalent to the month the pool was created.

42.    The Debtor has loaded the available Ginnie Mae Text Files into a database for the period December 2008 through August 2009. The Debtor has attempted to verify the reliability of the Ginnie Mae database and, thus, the underlying source documents by performing the following steps:

---

[13]    Investor Services downloaded monthly and pool specific files from Ginnie Mae.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

a.      Confirm the Ginnie Mae pools that settled;

b.      Reconcile settlement proceeds received from Bank of New York for Ginnie Mae securities to the original principal balance of the pools in the Ginnie Mae database that settled that day;[14]

c.      Reconcile the QRM trading data to the Ginnie Mae database.

43.     There were 64 pools included in the Ginnie Mae Text Files that were created prior to August 5, 2009 that were scheduled to settle after August 5, 2009.  None of these pools settled with TBW.[15]  The Debtor has carved out these 64 "busted" pools and the loans associated with them into a separate Ginnie Mae database.[16]  Furthermore, the Debtor only considered loans assigned to settled Ginnie Mae pools in the Asset Reconciliation Analysis.

44.     Similar to the Freddie Mac Funding Detail Reports, the Ginnie Mae Text Files do not identify the actual cash paid for each loan or for the entire pool.  However, similar to the Freddie Mac Funding Detail Reports, the actual cash settlement proceeds should be reasonably close to the original principal balance of the pool.  The following table compares the total settlement proceeds received by TBW for Ginnie Mae related securities for the period December 1, 2008 through August 5, 2009, to the total original principal balance of the Ginnie Mae pools - per the Ginnie Mae Text Files - that *settled* during that same time frame.



**TABLE 6**

Total Settlement Proceeds Received by TBW on Ginnie Mae Related Securities Compared to the Original Principal Balance of the Pools

| Settlement Proceeds Ginnie Mae MBS | Original Principal Balance Per Ginnie Mae Text Files | | Difference |
|---|---|---|---|
| $     6,100,734,594 | $     5,941,831,906 | [A] | $     158,902,688 |

[A] This number is calculated by taking the original principal balance from the Ginnie Mae Text Files excluding the pools assigned to the EPF.

---

[14]     QRM is the source for the actual settlement date for the pools in the Ginnie Mae database.

[15]     The BoA EPF was assigned 42 of the 64 pools.  The loans assigned to these 42 pools that did not settle were service released to Bank of America.

[16]     None of the loans assigned to these 64 pools were service released to Ginnie Mae's subsequent servicer.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

45.　　As the above table illustrates, the Ginnie Mae related settlement proceeds exceeded the original principal balance of the loans assigned to the pools by approximately $158.9 million or by 2.7 percent.  While this variance is greater than the one observed with respect to the Freddie Mac Funding Detail Reports, in the Debtor's view it does not rise to a level that would suggest the Ginnie Mae Text Files are materially incomplete or unreliable.

46.　　Since QRM was used to manage all of TBW's trading activity, the pools in the Ginnie Mae database should also be in QRM.  In addition, the loans assigned to the pools in the Ginnie Mae database should be very similar to the loans assigned to the pools in QRM.  The Debtor identified all Ginnie Mae pools in QRM that had a settlement date between December 1, 2008 and August 5, 2009 and compared the details of the QRM pools to the details contained in the Ginnie Mae database.  The results of this analysis are summarized in the table below

**TABLE 7**

Comparison of Ginnie Mae Pools and Loans in QRM to the Ginne Mae Text Files

| Line | Source | Total Ginnie Mae Pools | Total Ginnie Mae Loans in Pools | Total Ginnie Mae Original Principal Balance |
|------|--------|------------------------|----------------------------------|---------------------------------------------|
| 1 | QRM | 1,219 | 65,482 | $  11,022,722,949 |
| 2 | Ginnie Mae Text Files | 1,219 | 65,485 | 11,024,454,505 |

47.　　There were a total of 1,219 Ginnie Mae pools in QRM and the Ginnie Mae Text Files that settled between December 2008 and August 5, 2009.  The pool numbers are exactly the same in both data sources.  Furthermore, the total loans in the 1,219 pools and the aggregate principal balance of the loans in those pools are almost identical between the two sources.

**E.　　BoA EPF**

48.　　The BoA EPF was entered into on March 31, 2009.  The BoA EPF allowed TBW to receive upfront cash for agency eligible mortgage pools that had not yet settled with the take-out purchaser.  The Debtor has created a database that includes all of the *pools* and the *loans* assigned by TBW to the BoA EPF since its inception.

49.　　The *pool* information was created from the so-called "funding worksheets" prepared by TBW.  These schedules identified, among other things, the pools assigned to the

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

BoA EPF that day, the total purchase price, the *95% initial payment* and the *5% holdback payment*.[17]

50.     The *loan level* detail captured in the database was developed from the "advance tapes" that were prepared by TBW for the pools assigned to the BoA EPF.  These "advance tapes" identified, among other things, all the loans included in the pool and borrower specific information.

51.     In an effort to validate the information loaded into the database and, thus, the underlying source data, the Debtor performed the following tasks:

      a.     Traced the 95% initial payment and the 5% holdback payment per the "funding worksheets" to actual cash receipts from Bank of America;

      b.     Determined whether the loans assigned to pools in the BoA EPF are in the same pools in the Funding Detail Reports and the Ginnie Mae Text Files.

52.     The following table summarizes the results of the Debtor's cash tracing:

**TABLE 8**

Total Initial Payment and Holdback Payment Due to TBW Per the EPF Database

Compared to Actual Cash Receipts from Bank of America

| Line | Payment Type | BoA EPF | Cash Receipts from Bank of America | Difference |
|------|--------------|---------|------------------------------------|------------|
| 1 | 95% Initial Payment | $ 6,318,224,106 | $ 6,319,914,945 | $ (1,690,839) |
| 2 | 5% Holdback Payment | 332,757,523 | 293,783,732 | 38,973,791 |

53.     As the above table highlights, except for minor differences, TBW received the initial payment from Bank of America for all the pools assigned to the BoA EPF (See Table 8, Line 1).  Therefore, the cash receipts from Bank of America are consistent with the "funding worksheets" and, thus, the pool level details included in the BoA EPF database constructed by the Debtor.

54.     The nearly $39 million difference between the 5% holdback due TBW and the cash received from Bank of America for the holdback (See Table 8, Line 2) is because TBW was not paid the holdback on pools assigned to the BoA EPF that were scheduled to settle on or after

---

[17]     Bank of America paid TBW 95% of the purchase price (i.e., the initial payment) when the pool was initially assigned to the BoA EPF.  The 5% holdback was paid by Bank of America when the pool settled and Bank of America received the proceeds from Bank of New York.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

August 4, 2009.  Bank of America did, however, pay TBW the holdback for all pools that settled prior to August 4, 2009.

55.    In order to verify that the loans identified in the TBW "advance tapes" were the actual loans assigned to the Freddie Mac and Ginnie Mae pools advanced on the BoA EPF, the Debtor compared the loan level BoA EPF data to the Freddie Mac Funding Detail Reports and the Ginnie Mae Text Files previously discussed.  The following table summarizes the results of that comparison.

**TABLE 9**

Comparison of Pools and Loans Assigned to the EPF to the Freddie Mac Funding Detail Reports and the Ginnie Mae Text Files

| Source | Freddie Mac | | Ginnie Mae | |
|---|---|---|---|---|
| | EPF Pools | EPF Loans | EPF Pools | EPF Loans |
| Total - Settled | 44 | 4,094 | 316 | 27,650 |
| Match with Agency Databases | 43 [A] | 4,062 | 316 | 27,609 |

[A] The one pool missing from the Freddie Mac Funding Detail Reports Database is Pool 70873013. It settled on August 4, 2009. We have not been able to locate all of the Funding Detail Reports for this date. It was included in the recent documents received from Freddie Mac.

56.    The pools and the loans assigned to the pools included in the Debtor's BoA EPF database are consistent with the pool and loan level data downloaded by TBW from Freddie Mac and Ginnie Mae.  In other words, the BoA EPF database and, thus, the underlying documents supporting it are complete and reliable.

**F.    Conclusion**

57.    The Debtor believes that through a combination of (1) the Funding Detail Reports, (2) the Wire Breakdowns, (3) the Ginnie Mae Text Files, (4) the BoA EPF database, (5) the purchase advices, (6) the Lookup Database, and (7) QRM, it has a comprehensive and reliable data set that can be used to identify loans that have been sold to and paid for by investors for at least the period December 2008 through August 2009.

**VI.    Ocala Funding Mortgage Loan Purchases**

58.    In addition to verifying that the investor actually paid TBW or Ocala Funding for a mortgage, the Debtor also endeavored to trace cash disbursements from Ocala Funding to purchase mortgages.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

59.    In general, the recordkeeping process related to the loans "purchased" by Ocala Funding worked as follows:

      a.      On a daily basis TBW would send a *Gatekeeper* report to LGTS that identified the loans to be "purchased" by Ocala Funding.[18]

      b.      After LGTS reviewed the Gatekeeper report and approved it, LGTS would wire the funds to the accounts that TBW identified.

      c.      TBW would create an "*Advance*" report that was included in the daily Ocala Funding Pipeline report.  The "Advance" report was created from the Gatekeeper report and identified all loans Ocala Funding "purchased" that day.

      d.      The "Advance" report also identified the line (i.e., BNP or DBK) the mortgage loans were assigned to, the advance amount and the funded amount.

            i.      The *advance amount* represented the "original purchase price" of the mortgage loan and essentially reflected the loan's market value.

            ii.      The *funded amount* represented the <u>cash</u> that was disbursed by Ocala Funding to purchase the mortgage loan.

60.    The following is a summary of how the *cash moved*, after June 30, 2008, from Ocala Funding to purchase mortgage loans identified in the Gatekeeper reports.

      a.      Transfer of funds from the *Ocala Funding, BNP* or *DBK Collateral* accounts to the Ocala Funding *Disbursement* account.  The funds would then be wired by LGTS from the Disbursement account to the institution selling the dry loan.

            i.      The loans purchased through these types of transfers would also appear in that day's Gatekeeper report.

            ii.      Loans purchased by Ocala Funding through the Disbursement account appeared on the "**Advance**" report on the same day as the transfer from the Disbursement account and with a *funded amount* equal to the actual wire sent out of the account.

            iii.      TBW would <u>not</u> prepare a wire breakdown for these types of loan purchases.

---

[18]    There were separate Gatekeeper reports for BNP and DBK.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

    iv.    Funds disbursed in this manner did not involve loan purchases from COLB.

b.    Transfer of funds from the *BNP* or *DBK Collateral* accounts to the *Investor Funding* account.

    i.    TBW typically prepared **wire breakdowns** for these types of transfers. These wire breakdowns contained the phrases "C-Wire" and "Ocala Funding" in the file name.

    ii.    In general, the loans identified in the wire breakdown would also appear in that day's Gatekeeper report with corresponding instructions provided by TBW to wire funds to the Investor Funding account.

    iii.    Loans purchased by Ocala Funding through these types of transfers appeared on the "**Advance**" report the same day as the wire transfer and with a *funded amount* equal to the actual wire amount in the wire breakdown.

    iv.    These transfers involved purchases by Ocala Funding loans "off of COLB."

c.    Transfer of funds from the *Ocala Funding Collateral* account to the *Investor Funding* account.

    i.    TBW typically prepared **wire breakdowns** for these types of transfers. These wire breakdowns, however, contained the phrases "C-Wire" and "Paydown" in the file name, <u>not</u> "Ocala Funding."

    ii.    The loans identified in the wire breakdown also would <u>not</u> appear in that day's Gatekeeper report. Instead, these loans would have been included in *earlier* Gatekeeper reports.

    iii.    Loans purchased by Ocala Funding through these types of transfers did <u>not</u> appear on the "Advance" report on the <u>same day</u> as the wire transfer. Instead, these loans appeared in earlier "Advance" reports but with a *funded amount* equal to $0.

    iv.    In general, these transfers involved a payment to COLB for loans that had been shipped to Ocala Funding (typically weeks earlier), but not yet paid for.

    v.    This process appears to have started in December 2008.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

61.    The following table summarizes the amount of money transferred through each one of the above processes between June 30, 2008 and August 4, 2009.

**TABLE 10**

Transfers From the Ocala Funding, DBK and BNP Collateral Accounts to the Ocala Funding Disbursement
or the TBW Investor Funding Accounts For the Period June 30, 2008 to August 4, 2009

| Line | Funds Transferred From | Funds Transferred To | June 30, 2008 - December 31, 2008 | January 1, 2009 - August 4, 2009 | Total |
|------|------------------------|----------------------|-----------------------------------|----------------------------------|-------|
| 1 | OF/DBK/BNP Collateral | Disbursement | $ 1,624,186,684 | $ 135,859,715 | $ 1,760,046,399 |
| 2 | DBK/BNP Collateral | Investor Funding | 5,226,679,185 | 775,772,665 | 6,002,451,850 |
| 3 | OF Collateral | Investor Funding | 638,128,797 | 9,528,485,334 | 10,166,614,131 |
| 4 | Total | | $ 7,488,994,665 | $ 10,440,117,714 | $ 17,929,112,379 |

62.    During the last six months of 2008, the vast majority of the loan purchases were funded by transfers to either the Disbursement account (See Table 10, Line 1) or by transfers from the DBK/BNP Collateral accounts to the Investor Funding account (See Table 10, Line 2). As a result, loan purchases by Ocala Funding occurred the same day the loans were on both the Gatekeeper report and the "Advance" report and also had a *funded amount* greater than $0 (i.e., cash was disbursed).

63.    In 2009, the process for funding loan purchases changed dramatically.  More specifically, the vast majority of loan purchases in 2009 were paid for by a transfer from the Ocala Funding Collateral account to the Investor Funding account (See Table 10, Line 3).  As a result, the vast majority of loans purchased by Ocala Funding were being shipped to Ocala Funding, included in a Gatekeeper report, and counted as collateral for the OFCP prior to Ocala Funding ever paying COLB for the loans.

64.    In addition, of the $9.5 billion in transfers to the Investor Funding account from the Ocala Funding Collateral account in 2009, $5 billion had nothing to do with loan purchases. Instead, the $5 billion was part of a "round-trip" movement of money that involved an advance on the AOT to Ocala Funding that was returned the same day to Colonial and used to pay down expiring (or expired) AOT trades.

65.    Based on the process employed by TBW to track the Ocala Funding loan purchases discussed above, the Debtor has identified the following data sources that can be used to trace cash payments from Ocala Funding to specific loans:

      a.     Loans that are on the "**Advance**" report with a *funded amount* greater than $0 can be used to identify loan purchases for:

           i.     transfers to the Disbursement Account (See Table 10, Line 1)and

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

ii.    transfers from the BNP and DBK Collateral accounts to the Investor Funding account (See Table 10, Line 2).

(a)    In addition, wire breakdowns that include the references "C-Wire" and "Ocala Funding" can also be used to account for transfers from the BNP/DBK Collateral accounts to the Investor Funding account.

b.    **Wire breakdowns** that contain the references "C-Wire" and "Paydown" can be used to identify loan purchases for:

i.    transfers from the Ocala Funding Collateral account to the Investor Funding account (See Table 10, Line 3).

66.    After identifying the data sources available to trace loan purchases to cash disbursements, the Debtor prepared the following analyses to test the completeness of the source data.

a.    Reconciled daily transfers to the *Disbursements* accounts and from the *DBK/BNP Collateral* accounts to the Investor Funding account to the daily funded amount per the "Advance" report (See Table 10, Lines 1 and 2).

b.    Reconciled the daily transfers from the *Ocala Funding Collateral* account to the Investor Funding account to matching wire breakdowns (See Table 10, Line 3).

67.    The following table summarizes the results of the first test.



**TABLE 11**

Transfers to the Ocala Funding Disbursement Account and from the DBK/BNP Collateral Accounts to the TBW Investor Funding Account Compared to the "Funded Amount" from the Ocala Funding Pipeline "Advance" Report for the Period June 30, 2008 to August 4, 2009

| Transfers from OF/DBK/BNP to Disbursement Account | Transfers from DBK/BNP to Investor Funding | Total | OF Pipeline Advance Report "Funded Amount" | Difference |
|---|---|---|---|---|
| $ 1,760,046,399 | $ 6,002,451,850 | $ 7,762,498,248 | $ 7,729,351,718 | $ 33,146,530 |

68.    According to the above table, $7.73 billion in loan purchases can be traced to loans that have a *funded amount* greater than $0 in the "Advance" report.[19]  As such, the

---

[19]    The totals for the first three columns in Table 11 are the same in Lines 1 and 2 from Table 10.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

"Advance" report accounts for all but $33.1 million, or less than 0.5 percent, of the $7.77 billion in funds transferred to the Disbursement account or transferred from the DBK or BNP Collateral accounts to Investor Funding.  Furthermore, the loans that make up the $33.1 million difference can be accounted for in wire breakdowns with the references "C-Wire" and "Ocala Funding."  In other words, the Debtor will be able to trace nearly all of these types of cash disbursements to specific loan purchases for the period June 30, 2008 through August 4, 2009.

69.    The following table summarizes the Debtor's tracing of transfers from the *Ocala Funding Collateral* Account to the TBW Investor Funding Account to matching wire breakdowns.

---

**TABLE 12**

Transfers from the Ocala Funding Collateral Account to the TBW Investor Funding Account and

Total Matching Wire Breakdowns for the Period June 30, 2008 to August 4, 2009

| Line | Description | Amount |
|------|-------------|--------|
| 1 | Transfers from Ocala Funding Collateral to Investor Funding (See Table 10, Line 3) | $  10,166,614,131 |
| 2 | Matching Wire Breakdowns with "C-Wire" and "Paydown" Reference | 9,930,668,940 |
| 3 | Matching Wire Breakdowns without "C-Wire" and "Paydown" Reference | 75,897,924 |
| 4 | **Difference** | $      160,047,266 [A] |

[A] A $90 million transfer on September 30, 2008 and a $62.5 million transfer on December 31, 2008 account for nearly all of the missing wire breakdowns.  Both of these transfers were used to pay down the AOT.

---

70.    Nearly 98% of the above cash transfers to the Investor Funding account can be tied to matching wire breakdowns that contain a "C-Wire" and "Paydown" reference (See Table 12, Line 2 Compared to Line 1).  There are an additional nearly $76 million in wire breakdowns that have the *same date* and *amount* as the wire transfer from Ocala Funding (See Table 12, Line 3).  These wire breakdowns, however, reference other investors and do not include both the "C-Wire" and "Paydown" references.  Finally, nearly all of the missing wire breakdowns involved cash transfers that were not used to purchase loans, but instead went to pay down pools on the AOT (See Table 12, Line 4 and Note A).  As such, the Debtor will be able to trace nearly all of these types of cash disbursements to specific loan purchases for the period June 30, 2008 through August 4, 2009.

**A.    Conclusion**

71.    The Debtor believes that through a combination of the "Advance" report, and the wire breakdowns with references to "C-Wire" and "Paydown" or "Ocala Funding," it has a comprehensive and reliable data set that can be used to trace cash disbursements from Ocala

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

Funding to fund the purchase of specific loans for at least the period June 30, 2008 through August 4, 2009.[20]

## VII.    Ocala Funding Analysis

72.    As previously mentioned, the Debtor, with assistance from Bank of America, identified a total of 9,111 (which includes all of the TRO Loans) mortgage loans that, according to the LGTS collateral management system, are collateral for the OFCP – i.e., either "on hand" or on "active release" as of August 2009 – and available to secure repayment of the issued and outstanding Secured Loan Notes.

73.    When TBW and Colonial collapsed in August 2009, thousands of the subject Ocala Funding loans were listed as collateral securing other TBW related warehouse lines such as COLB and the AOT.  In other words, these Ocala Funding loans were assigned as collateral to multiple TBW lines.  The following table summarizes how many of the 9,111 Ocala Funding mortgages were assigned to other TBW lines.

**TABLE 13**

Ocala Funding Loans That Are Also Identified as Collateral on other TBW and Colonial Lines





| Ocala Funding Loans | COLB | | AOT | | Overline | | Seaside | | Platinum | | BOA EPF | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9,111 | 4,928 | [A] | 93 | [A] | 112 | [A] | 10 | [B] | 85 | [B] | 2,979 | [C] | 8,207 |

[A] Based on August 14, 2009 loan lists provided by the FDIC for each facility.
[B] Based on the August 5, 2009 pipeline reports for Seaside and Platinum.
[C] Based on the BoA EPF database created by the Debtor, which includes all loans assigned to the BoA EPF.

74.    Hence, of the 9,111 Ocala Funding mortgages supposedly securing the repayment of the Secured Loan Notes held by Deutsche Bank and BNP, 8,207 of them were are also assigned as collateral for other facilities.  Furthermore, as discussed in more detail below, Ocala Funding or TBW was paid by third party investors, such as Freddie Mac, for the vast majority of these mortgages.  Thus, there are a substantial number of Ocala Funding loans that are claimed by three different owners.

75.    The Debtor located 9,084 of the subject 9,111 mortgage loans in the Lookup Database (i.e., there is no record for 27 of the mortgages).  The 27 mortgages not in the Lookup Database were all included in the "Ocala" pool in the LGTS collateral management system.[21]

---

[20]    In addition, the Debtor has loaded into a database all of the available "Advance" reports dating back to July 2005.  The Debtor has relied upon this database to identify loans purchased by Ocala Funding prior to June 2008.

[21]    In other words, none of the 27 loans were specifically assigned as collateral to the BNP or DBK lines.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

These loans were shipped to LGTS in October 2008 and December 2008.  According to the LGTS collateral management system, six of these loans are coded as "on-hand" and 21 are coded as "active release" with release dates between February 2009 and May 2009.  The Debtor was not able to confirm that Ocala Funding paid for these 27 loans.  In addition, it does not appear that these mortgages ever closed.

76.    With respect to the 9,084 mortgage loans that are in the Lookup Database, 274 can be grouped as follows:

**TABLE 14**

274 Ocala Funding Loans by Status Group

| Status Group | [A] | Total Loans |
|---|---|---|
| Paid In Full | [B] | 110 |
| Net Funded | [C] | 60 |
| Loan Deletes | | 49 |
| TBW REO Sold | [D] | 8 |
| TBW Active REO | [E] | 1 |
| Disposed of Prior to 2007 | | 46 |
| **TOTAL** | | **274** |

[A] Based on the Status Detail code in the Lookup Database.
[B] Excludes one loan that was Net Funded.
[C] Includes one loan that was Paid In Full.
[D] Includes 1 REO asset that is also "on the AOT."
[E] This REO property is also "on the AOT."

a.    *Paid In Full* – These are loans that have been paid off by the borrower. The Debtor has been able confirm that funds were, in fact, received for at least 106 of these 110 loans.  In addition, the Servicing System records indicate that 82 of these loans were paid off prior to 2009.

b.    *REO* – There are 9 mortgage loans on the Ocala Funding loan list that are actually REO.  Eight of those assets were sold by the Debtor between December 2009 and February 2010.  The remaining REO asset is under contract but the closing has been held up due to issues with the deed.

c.    *Net Funded* – As more fully described in the Borrower Protocol motion, TBW implemented a practice of refinancing certain mortgages but waiting until the new loan was sold before paying off the old mortgage (rather than paying the old mortgage off at closing).  As a result of the events in August 2009, certain borrowers have two mortgages outstanding as the old loan was not paid off.  The Borrower Protocol proposed a resolution to this issue whereby the impacted investor would evaluate the old and the

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

new loan with the intent to resolve the matter with each borrower such that only one loan remains outstanding.

d.    *Loan Deletes* – This "Status Detail" typically indicates that while information regarding these 49 loans was loaded into the Servicing System, the loans did not close.  Most of these loans were funded initially on Ocala Funding.  The Debtor has been able to verify that funds initially sent for 47 of the loans were returned to either Ocala Funding or the original sender.[22]

e.    *Disposed of Prior to 2007* – These loans were not in the Lookup Database, but were in TBW's Servicing System.  As such, these mortgages were either paid off or sold or became inactive prior to 2007.  Nonetheless, they continued to remain listed as collateral for the OFCP.

77.    Accordingly, of the 9,111 on the LGTS collateral list for the OFCP, 8,810 (9,084 – 274) mortgage loans were reviewed to determine whether: (1) Ocala Funding purchased the mortgage and (2) the investor indicated in the Lookup Database purchased and paid for its assigned mortgages.  The sources of information discussed in Section V above were used to perform both of these analyses.

78.    In order to verify whether Ocala Funding paid for these 8,810 mortgages, the Debtor compared all of these mortgages to all of the available "Advance" reports and to wire breakdowns that contained the references "C-Wire" and "Paydown" or "Ocala Funding."[23]  The results of this analysis are summarized below.

**TABLE 15**
Summary of Analysis of Whether Ocala Funding Purchased Loans

| Total Loans | Loans not on OF Advance Report | Loans on OF Advance Report with $0 "Fund" Amount | Loans on OF Advance Report with "Fund" Amount Greater than Zero | Loans in OF Related Wire Breakdown | Distinct Loans Paid for by OF | Cannot Confirm Payment |
|---|---|---|---|---|---|---|
| 8,810 | 242 | 8,024 | 544 | 540 | 691 | 8,119 |

79.    As indicated in the second to last column of the above table, the Debtor was only able to confirm that Ocala Funding paid for 691 of the 8,810 mortgages.

---

[22]    The Debtor has confirmed that the Alabama Housing Finance Authority paid TBW for one of these two loans in February 2008 and that TBW transferred the funds for this loan to Ocala Funding within a couple of days of receipt.

[23]    Every available Advances report going back to July 2005 was loaded into a database by the Debtor.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

80.    In order to verify whether the currently indicated investor paid for the mortgage, the Debtor divided the 8,810 mortgages into the following investor groups: (1) Freddie Mac, (2) Other Third Party Investors, (3) TBW Related Parties and (4) Ocala Funding.[24]  The number of mortgages included in each investor group is summarized in the table below.

**TABLE 16**

Remaining 8,810 Ocala Funding Loans

| Investor Group | Total Loans |
|---|---|
| Freddie Mac | 7,165 |
| Other Third Party Investors | 619 |
| TBW Related Parties | 843 |
| Ocala Funding | 183 |
| TOTALS | 8,810 |

81.    The specific analysis done by the Debtor with respect to each one of these groups is discussed in more detail below.[25]

**A.    Freddie Mac**

82.    The Debtor compared all 8,810 mortgages to the following data sources to determine if any of these sources identified Freddie Mac as the investor: (1) Lookup Database, (2) Freddie Mac Funding Detail Reports and (3) QRM.  The following table summarizes the results of this analysis.

**TABLE 17**

Ocala Funding Loans that Have Freddie Mac

Identified As the Investor In the Following Sources

| Lookup Database | Funding Detail Reports | QRM |
|---|---|---|
| 7,165 | 7,122 | 7,082 |

---

[24]    These groupings are based upon the investor the mortgage is currently assigned to in the Lookup Database.

[25]    None of the 9,111 Ocala Funding loans were included in the Ginnie Mae Text Files database.  This is consistent with the notion that Ginnie Mae loans were not eligible collateral for the OFCP after June 2008.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

83.    When you combine the individual loan numbers from the three different data sources into one master list, there are a total of 7,196 unique loan numbers, of which 7,031 appear in *all three* sources.  In other words, there are 165 (7,196 – 7,031) unique loan numbers where Freddie Mac is identified as the investor in only one or two sources, but not all three.

84.    The Debtor reviewed each one of these 165 mortgages in more detail to determine whether there is evidence indicating Freddie Mac purchased any of these 165 mortgages and whether the investor is correctly assigned in the Lookup Database.  A summary of that analysis is contained in Exhibit T to the Report.  Based upon this additional review, the Debtor did discover 27 mortgages where it appears Freddie Mac paid cash for the mortgage, but the mortgages are currently assigned in the Lookup Database to either Ocala Funding or Colonial.  These instances are discussed in more detail below.

a.    There are 23 mortgages currently assigned to Ocala Funding that were in Freddie Mac pool "30873013."  This pool was advanced on the BoA EPF on July 23, 2009.  All of these mortgages are in a wire breakdown that ties to a deposit from Bank of America into the Investor Funding account on July 23, 2009.  This pool settled on August 4, 2009.  The Debtor does not have the Funding Detail Reports for this pool.  However, the settlement details and the Form 996 for this pool were recently produced by Freddie Mac.  All 23 of these loans are included in these documents.

b.    There is one mortgage currently assigned to Colonial that was in Freddie Mac pool "30862471."  This loan was in the Freddie Mac Funding Detail Report for this pool and it is in the Form 996 for this pool that the Debtor recently received from Freddie Mac.  This loan is also included in a Freddie Mac TBW wire breakdown that can be tied to a deposit into the Investor Funding account on July 13, 2009.  Freddie Mac is also identified as the investor in QRM for this loan.  The Debtor was not able to find any information in the email discovery database indicating that TBW repurchased the mortgage after it was sold to Freddie Mac.

c.    There are three additional loans that are currently assigned to Colonial that were included in Freddie Mac pools that settled on August 4, 2009.  The Debtor does not have all of the Freddie Mac Funding Detail Reports for this day.  However, all three of these loans can be found in a TBW prepared wire breakdown that ties to a Freddie Mac deposit on August 4, 2009.  In addition, all three of these loans are included in purchase advices for these pools that were recently produced by Freddie Mac.

85.    In summary, the Debtor has verified that Freddie Mac made payment to Ocala Funding or TBW for 7,192 of the 8,810 Ocala Funding mortgages.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**B.    Other Third Party Investors**

86.    The Debtor compared the 619 mortgages currently assigned to the "Other Third Party Investors" group to the following data sources to determine if these sources identified the same investor for the mortgage as the Lookup Database: (1) QRM, (2) Wire Breakdowns and (3) Purchase Advices.

**TABLE 18**

Ocala Funding Loans that Are Assigned to "Other Third Party Investors"

| Investor | Lookup Database | In QRM | In Wire Breakdowns | Purchase Advice | |
|---|---|---|---|---|---|
| American Portfolio | 1 | 1 | 1 | 1 | |
| Bank of America | 297 | 0 | 297 | 0 | [A] |
| Bank of Camden | 15 | 15 | 15 | 15 | |
| Bayview | 5 | 5 | 5 | 5 | |
| Beal Bank | 1 | 1 | 1 | 1 | |
| CitiMortgage | 138 | 138 | 138 | 137 | |
| GNMA | 3 | 2 | 3 | 3 | |
| Marix Servicing | 12 | 12 | 12 | 12 | |
| MGC Mortgage | 2 | 2 | 2 | 2 | [B] |
| MountainView | 16 | 16 | 16 | 16 | |
| Ocwen | 1 | 1 | 1 | 1 | [C] |
| Omni American | 1 | 1 | 1 | 1 | |
| Selene | 8 | 8 | 8 | 8 | |
| Urban Trust Bank | 46 | 41 | 46 | 37 | |
| Wells Fargo | 73 | 69 | 72 | 72 | [D] |
| **Total** | **619** | **312** | **618** | **311** | |

[A] These loans were in pools advanced on the EPF between July 24 and July 30. All pools were scheduled to settle on or after August 5, 2009. They are not in QRM because the pools were unwound in QRM. There is no Purchase Advice from BONY because the pool did not settle.
[B] The Investor for these loans per QRM is Beal Bank. The Wire Breakdowns and Purchase Advices are also for Beal Bank.
[C] The Investor for this loan per QRM is MCM Mortgage. The Wire Breakdown and Purchase Advice are also for MCM Mortgage.
[D] Includes three loans that were in private label securitizations in either June 2006 or May 2007 where Wells Fargo is the Master Servicer.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

87.     With the exception of one mortgage currently assigned to Wells Fargo, the Debtor has verified that either Ocala Funding or TBW was paid for at least 618 of the mortgages assigned to the investors identified in the above table.

88.     The one Wells Fargo loan at issue was service released to Wells Fargo's subsequent servicer in October 2009. This loan was purchased by Ocala Funding in May 2007. According to internal TBW communications, this loan was scheduled to be included in a TBW private label security that was issued in May 2007. This loan was included in the purchase advice issued with the security and the purchase price for this loan was included in the total proceeds received by TBW when the security was issued. This loan, however, was not included in the wire breakdown prepared by TBW related to this security.[26]  In August 2007, a transfer was made from the Ocala Funding Collection account to the Ocala Funding Collateral account to pay down the loan on Ocala Funding. Nonetheless, it appears that the investor in the security paid TBW for this loan.

C.     **TBW Related Parties**

89.     The Debtor has defined the TBW Related Parties to include: (1) Colonial, (2) Platinum, (3) Seaside and (4) TBW. There are 843 Ocala Funding related mortgages currently assigned to these four investors. The Debtor has endeavored to determine whether Ocala Funding paid for any of these mortgages. The results of this analysis are summarized below.

**TABLE 19**

Summary of Analysis of Whether Ocala Funding Paid for Loans Currently Assigned to TBW Related Parties

| Line | Investor | Total Loans | Loans not on OF Advance Report | Loans on OF Advance Report with $0 "Fund" Amount | Loans on OF Advance Report with "Fund" Amount Greater than Zero | Loans in OF Related Wire Breakdown | Distinct Loans Paid for by OF | Cannot Confirm Payment |
|---|---|---|---|---|---|---|---|---|
| 1 | Colonial | 742 | 67 | 639 | 36 | 18 | 40 | 702 |
| 2 | Platinum Community Bank | 85 | 0 | 85 | 0 | 0 | 0 | 85 |
| 3 | Seaside | 10 | 0 | 10 | 0 | 0 | 0 | 10 |
| 4 | TBW/Selene | 6 | 0 | 0 | 6 | 6 | 6 | 0 |
| 5 | **Total** | **843** | **67** | **734** | **42** | **24** | **46** | **797** |

90.     The Debtor has been able to verify that Ocala Funding paid for 46 of the 843 mortgages assigned to the investors in this group (See Table 19, Line 5). Furthermore, there is

---

[26]     It appears that the loan was excluded from the wire breakdown because it was inadvertently coded as paid in full.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

no indication that these 46 loans were ever sold to outside investors.[27]  These 46 mortgages are discussed in more detail below.

>  a.  Of the 40 Colonial mortgages that Ocala Funding paid for, 36 are assigned to the Overline and 4 to the AOT (See Table 19, Line 1).  While Colonial made advances on all 4 of the mortgages assigned to the AOT, no advances were made on 33 of the 36 mortgages assigned to the Overline.
>
>  b.  The 6 TBW mortgages were purchased by Ocala Funding between May 18, 2009 and June 2, 2009 (See Table 19, Line 4).  Correspondingly, all 6 of these loans were paid down on COLB during the same period.  All 6 of these mortgages have a status of "active release" according to LGTS's collateral management system.  However, they were all included in the collateral list prepared by LGTS that was based upon the physical inventory count it undertook after August 2009.  As such, the mortgage documents for this loan appear to be on-hand at LGTS.

## D.    Ocala Funding

91.    There are only 183 mortgages currently assigned to Ocala Funding in the Lookup Database that were released to a subsequent servicer.  As discussed earlier, it appears that 23 of these mortgages were sold to the BoA EPF on July 23, 2009 and then purchased by Freddie Mac on August 4, 2009.  Similar to the analysis the Debtor undertook with respect to the mortgages assigned to the TBW Related Parties, the Debtor has endeavored to determine how many of the 183 mortgages assigned to Ocala Funding were paid for by Ocala Funding.  The results of that analysis are summarized below.

**TABLE 20**

Summary of Analysis of Whether Ocala Funding Paid for the 183 Loans Currently Assigned to It

| Total Loans | Loans not on OF Advance Report | Loans on OF Advance Report with $0 "Fund" Amount | Loans on OF Advance Report with "Fund" Amount Greater than Zero | Loans in OF Related Wire Breakdown | Distinct Loans Paid for by OF | Cannot Confirm Payment |
|---|---|---|---|---|---|---|
| 183 | 10 | 37 | 136 | 144 | 153 | 30 |

92.    As indicated in the second to last column of the above table, the Debtor was able to verify that Ocala Funding paid for 153 of the 183 mortgages.  The 30 mortgages the Debtor

---

[27]    In fact, these loans are all identified as "Do Not Sell" loans in TBW's Rules system.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

was not able to confirm Ocala Funding paid for include the 23 mortgages that Freddie Mac paid for but are currently assigned to Ocala Funding.

## VIII.   COLB Loan Analysis

93.     As discussed in Section IV, when Colonial was seized on August 14, 2009 there were 8,714 loans listed as still outstanding on the COLB.  Of this total, 29 can be grouped as follows:

**TABLE 21**

COLB Loans by Status Group or COLB Sublimit

| Status Group or COLB Sublimit | | Total Loans |
|---|---|---|
| Loan Deletes | [A] | 3 |
| Paid in Full | [B] | 3 |
| Old Virginia & United Funding Management | [C] | 23 |
| **TOTAL** | | **29** |

[A] Based on the Status Detail code in the Lookup Database.
[B] Based on the Status Detail code in the Lookup Database
     and includes 2 loans that were sold to Freddie Mac
[C] These loans are not in the Lookup Database.  Old Virginia and
     United Funding are "sublimits" of COLB.  Old Virginia and United
     Funding apparently used these sublimits to fund their own loans.

94.     *Loan Deletes* – As previously mentioned, loans with a "Status Detail" of Loan Delete in the Servicing System indicate that while the loan was initially loaded into the Servicing System it ultimately did not close.  If a wire was sent to close the loan and the loan is coded as Loan Delete, then there should be a wire returning the funds.  The Debtor has not been able to locate a return wire or returned funds for any of these loans.  In addition, these three loans were shipped to three different investors in June and July 2009.  The Debtor has located purchase advices from investors for two of the loans and confirmed that the sales proceeds were received by either TBW or Ocala Funding.

95.     *Paid In Full* - The Debtor has also confirmed that payoffs were received in August 2009 for all three COLB loans coded as Paid In Full.  Furthermore, Freddie Mac was

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

identified as the investor for two of the three loans.[28]  The Debtor has confirmed that Freddie Mac paid Ocala Funding in June 2009 for both of these loans.

96.      *Old Virginia and United Funding Mortgage* – None of these loans are in the Lookup Database.  There is, however, an Old Virginia and a United Funding Mortgage sublimit on COLB.  The Debtor understands that these two entities were "warehouse customers" of TBW who used COLB to fund the origination of their own loans, not TBW loans.  The advances on COLB for these two sublimits did not go through TBW's Master Advance account.  In addition, sales proceeds for loans assigned to these sublimits were not deposited into TBW's Investor Funding account.

97.      Accordingly, of the 8,714 mortgages on the COLB collateral list, 8,685 (8,714 – 29) were reviewed to determine whether the investor indicated in the Lookup Database purchased and paid for its assigned mortgages.  The sources of information discussed in Section V above were used to perform this analysis.  The allocation of the 8,685 COLB mortgages by investor is summarized below.

**TABLE 22**

Remaining 8,865 COLB Loans by Investor

| Investor | Total Loans |
|---|---|
| Freddie Mac | 4,798 |
| CitiMortgage | 24 |
| Wells Fargo | 30 |
| Colonial | 3,831 |
| Platinum Community Bank | 1 |
| TBW/Selene | 1 |
| **TOTALS** | **8,685** |

98.      The specific analysis done by the Debtor with respect to each one of these investors is discussed in more detail below.[29]

---

[28]      The other loan was a construction loan.

[29]      There was one COLB loan that appeared in the Ginnie Mae database.  The wire to close the loan was returned subsequent to the loan being assigned to the Ginnie Mae pool.  As a result, TBW had to repurchase the loan out of the pool once it settled.  TBW eventually resubmitted the loan for funding on COLB and the loan closed on the second attempt.  This loan is currently assigned to Colonial in the Lookup Database.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

A.     **Freddie Mac**

99.     The Debtor compared all 8,685 COLB mortgages to the following data sources to determine if any of them identified Freddie Mac as the investor: (1) Lookup Database, (2) Freddie Mac Funding Detail Reports, (3) QRM and (4) Freddie Mac Related Wire Breakdowns. The following table summarizes the results of this analysis.

**TABLE 23**

Remaining 8,685 COLB Loans that Have Freddie Mac

Identified As the Investor In the Following Sources

| Lookup Database | Funding Detail Reports | QRM | Freddie Mac Related Wire Breakdowns |
|---|---|---|---|
| 4,798 | 4,800 | 4,804 | 4,700 |

100.     When you combine the loan numbers from the four different data sources into one file, there are a total of 4,806 distinct loan numbers, of which 4,693 appear in all three sources. In other words, there are 113 (4,806 – 4,693) distinct loan numbers where Freddie Mac is identified as the investor in one or more of the sources, but not all four.

101.     The Debtor reviewed each one of these 113 mortgages in more detail to determine whether there is evidence indicating Freddie Mac purchased any of these 113 mortgages and whether the investor has been correctly assigned.  A summary of that analysis is contained in Exhibit U of the Report.  Based upon this additional review, the Debtor did discover 4 mortgages where it appears Freddie Mac paid for the mortgage, but the mortgages are currently assigned to *Colonial*.

102.     These same four loans are included in the 8,810 Ocala Funding mortgages and were previously discussed in paragraph 84(b) and 84(c).

103.     In summary, the Debtor has verified that Freddie Mac made payment to Ocala Funding or TBW for 4,802 of the 8,865 COLB mortgages.[30]

---

[30]     This total does not include the two mortgages that Freddie Mac purchased that were paid in full in early August 2009.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**B.    CitiMortgage and Wells Fargo**

104.    The Debtor compared the 54 mortgages currently assigned to CitiMortgage and Wells Fargo to the following data sources to determine if these sources identified the same investor for the mortgage as the Lookup Database: (1) QRM, (2) Wire Breakdowns and (3) Purchase Advices.

**TABLE 24**

Remaining 8,685 COLB Loans that Are Assigned to CitiMortgage and Wells Fargo

| Investor | Lookup Database | In QRM | In Wire Breakdowns | Purchase Advice |
|---|---|---|---|---|
| CitiMortgage | 24 | 24 | 24 | 24 |
| Wells Fargo | 30 | 30 | 30 | 30 |
| **Total** | **54** | **54** | **54** | **54** |

105.    Hence, the Debtor has verified that TBW or Ocala Funding was paid for all 54 of these mortgages.

**C.    Colonial**

106.    Of the 3,831 mortgages assigned to Colonial, 3,826 appear on a "COLB Purchase" report.[31]  While the Debtor has not verified every transaction, when a loan appears in the COLB Purchase report, a corresponding wire out of the Colonial Master Advance account can be found.  The 5 mortgages that are not in a purchase report all have an advance balance of $0 per the COLB loan list provided by the FDIC.  According to TBW's Funding Management System, all 5 of these wires were "processed" in early August 2009.  Furthermore, these 5 loans are not included on the Ocala Funding loan list.

107.    The FDIC also provided the Debtor with access to the participation certificates related to these mortgages.  The Debtor reviewed all the certificates and was able to reconcile the total purchase amount identified in the certificate to the loan level detail for the loans purchased by Colonial that day.  In summary, with the exception of a few loans the Debtor has been able to verify that Colonial purchased the mortgages assigned to it.

**D.    Platinum and TBW**

108.    The one *Platinum* loan appears on a July 29, 2009 "COLB Purchase" report.  The Debtor reviewed the Colonial Master Advance account bank statement and confirmed that a wire in the exact amount indicated in the "COLB Purchase" report for this loan was sent out on July

---

[31]    These reports are part of daily Colonial Pipeline reports sent by Colonial to TBW.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

29, 2009.[32]  Furthermore, according to TBW's Funding Management System the wire for this loan was scheduled to be sent by Colonial from the Master Advance account, not from Platinum's account.  It appears that this loan is currently not assigned to the correct investor.

109.    According to TBW's Funding Management System, the one TBW loan was scheduled to be funded on COLB on May 26, 2009.  This loan appears in the May 26, 2009 "COLB Purchase" report.  The loan was paid off COLB on June 1, 2009 because the wire was returned to Colonial.  This loan was subsequently resubmitted for funding and was funded on COLB on July 6, 2009.  The Debtor has verified that a wire transfer was sent from the Colonial Master Advance account on the same day for the loan.  In addition, the loan also appears on the July 6, 2009 "COLB Purchase" report.  The Debtor has not found any evidence indicating that this loan was sold to an investor after July 6, 2009.  It appears that this loan is also currently assigned to the wrong investor.

**E.      COLB Compared to Ocala Funding**

110.    As previously mentioned, when TBW collapsed in early August 2009, there were thousands of the same loans that were listed as collateral for both Ocala Funding and COLB.  In addition to the double assigning of loans between Ocala Funding and COLB, thousands of those same loans had already been sold to and paid for by investors.  The following table summarizes by investor the number of COLB loans that are duplicated on the 9,111 Ocala Funding collateral list.

---

[32]      The wire description contained on the bank statement referenced Platinum Community Bank.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**TABLE 25**

COLB Loans That Are Also on the List of 9,111 Ocala Funding Loans

| Line | COLB Loan Grouping | Total Loans on COLB | Total COLB Loans Also on Ocala Funding Loan List | | Outstanding COLB Balance on Loans Also on Ocala Funding Loan List |
|---|---|---|---|---|---|
| 1 | Freddie Mac | 4,798 | 4,200 | | $ 770,621,265 |
| 2 | CitiMortgage | 24 | 22 | | 4,313,124 |
| 3 | Wells Fargo | 30 | 30 | | 4,976,887 |
| 4 | Colonial | 3,831 | 674 | | 129,342,527 |
| 5 | Platinum Community Bank | 1 | | | |
| 6 | TBW/Selene | 1 | | | |
| 7 | Loan Deletes | 3 | | | |
| 8 | Paid in Full | 3 | 2 | [A] | 343,800 |
| 9 | Old Virginia & United Funding Management | 23 | | | |
| 10 | TOTALS | 8,714 | 4,928 | | $ 909,597,603 |

[A] Prior to being paid off, these two loans had been sold to Freddie Mac.

111.    Hence, there are 4,252 (4,928 – 674 -2) mortgages that have an outstanding balance on the COLB totaling nearly $780 million that are pledged as collateral to COLB, Ocala Funding and a third party mortgage investor (See Table 25, Line 4 and Line 10).[33]

112.    The Debtor further analyzed these 4,928 mortgages to determine if Ocala Funding had paid for them.  The results of that analysis are summarized below.

---

[33]    The 4,252 does not take into account the four loans, discussed in paragraphs 101 and 102, currently assigned to Colonial that appear to have been purchased by Freddie Mac.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

**TABLE 26**

Ocala Funding Loans That Are Also on COLB and Whether Ocala Funding Paid for the Loans

| Total Loans | Loans not on OF Advance Report | Loans on OF Advance Report with $0 "Fund" Amount | Loans on OF Advance Report with "Fund" Amount Greater than Zero | Loans in OF Related Wire Breakdown | Distinct Loans Paid for by OF | Cannot Confirm Payment |
|---|---|---|---|---|---|---|
| 4,928 | 65 | 4,863 | 0 | 0 | 0 | 4,928 |

113.    As reflected in the second to last column in Table 26, the Debtor was not able to confirm that Ocala Funding paid for any of these mortgages.

## IX.    AOT Trades and Loan Analysis

114.    As of August 5, 2009, there were 124 trades assigned to the AOT.  The cumulative purchase price (i.e., outstanding balance) of these trades was $1.5 billion.  The following table breaks down the 124 trades between settled and "busted" agency (i.e., Freddie Mac and Ginnie Mae) trades and non-agency (i.e., Private Label) trades.

**TABLE 27**

Summary of Trades Outstanding on the AOT As of August 5, 2009

| Line | Trade Type | Total Trades | Purchase Price |
|---|---|---|---|
| 1 | *"Settled"* Agency Pools/Trades Outstanding on AOT | 102 | $    1,146,800,877 |
| 2 | *"Busted"* Agency Pools/Trades Outstanding on AOT | 10 | 95,341,976 |
| 3 | Non-Agency Trades Outstanding on AOT | 12 | 231,725,514 |
| 4 | **TOTAL** | **124** | $    1,473,868,368 |

115.    There were a total of 112 agency related pools listed as outstanding on the AOT as of August 5, 2009 (See Table 27, Lines 1 and 2).  All 112 of these pools were assigned to the BoA EPF prior to being advanced on the AOT.  As of August 5, 2009, 102 of the 112 agency-related pools had settled and Bank of America, since they were all assigned to the BoA EPF, had received the settlement proceeds from Bank of New York (See Table 27, Line 1).

116.    The 10 "busted" agency pools all had scheduled settlement dates after August 5, 2009 (See Table 27, Line 2).  Again, all of these pools were assigned to the BoA EPF prior to being advanced on the AOT.  In addition, none of the underlying AOT loans assigned to the 10 AOT pools were the same loans assigned to the 10 BoA EPF pools.  Finally, all of the loans assigned to the 10 "busted" BoA EPF pools were service released to Bank of America.

EXHIBIT B

OVERVIEW OF ASSET RECONCILIATION PROCEDURES

117.    In terms of the 12 non-agency trades on the AOT (See Table 27, Line 3), there is no record for five of them in QRM, TBW's secondary markets trading system.  The remaining seven private label trades had settlement dates ranging from June 2, 2009 to July 2, 2009.  In other words, all seven of these trades had expired as of August 5, 2009.

118.    In addition to analyzing the trades outstanding on the AOT, the Debtor has also analyzed the loans that were assigned to the AOT.  As discussed in Section IV, per information provided by the FDIC there were a total of 9,304 loans identified as being "on the AOT" when TBW collapsed in August 2009.  The following table groups the 9,304 AOT loans into different high level categories based upon the "Status Detail" of the loans in the Lookup Database.

**TABLE 28**

Summary of Loans "on the AOT" by Status Group

| Line | Status Group | Total Loans | | Total Purchase Price Per AOT Loan Level Detail |
|:---:|---|:---:|:---:|---:|
| 1 | Transferred to RoundPoint for Servicing | 3,278 | $ | 474,881,623 |
| 2 | Transferred to Other Investors | 2,752 | | 323,846,996 |
| 3 | REO | 1,837 | [A] | 268,823,349 |
| 4 | Non-Service Released | 1,206 | | 136,028,808 |
| 5 | Not in Lookup Database | 137 | | 15,788,736 |
| 6 | Not in Servicing System | 94 | | 15,532,968 |
| 7 | **TOTAL LOANS** | **9,304** | $ | **1,234,902,481** |

[A] This total includes not only the 1,197 REO properties that were part of the §363 REO sale
     approved by the Bankruptcy count, but also second liens and REO that was conveyed
     to HUD or the VA prior to August 2009.  These assets were not included in the 363 sale.

119.    *Line 1:* The largest category of AOT loans are the 3,278 that have been service released to RoundPoint.  This group includes loans that had an Investor Code of 001 in the Servicing System.  This was the code used for loans owned by TBW and/or assigned to one of the Colonial facilities.  Colonial is identified as the investor for all 3,278 loans.  The purchase price of this group of loans, according to the AOT loan listing, is $474,881,623.

120.    *Line 2:* The second largest category of AOT loans are those that have been service released to investors other than Colonial.  This includes loans that were service released prior to and after August 5, 2009.  The Debtor has been able to trace the vast majority of these loans to wire breakdowns or other data sources that support the allocation of the loans to the investors.

EXHIBIT B
OVERVIEW OF ASSET RECONCILIATION PROCEDURES

121.    *Line 3:* There are 1,837 loans "on the AOT" that have a status detail that indicates the underlying collateral is actually REO.  This total includes the 1,197 REO properties that were part of the §363 sale approved by the Bankruptcy Court.  The 1,837, however, also includes second liens (e.g., home equity lines) and properties that were conveyed to HUD and the VA prior to August 2009.  None of these types of properties were included in the §363 sale.

122.    *Line 4:* In addition to the AOT loans that have been service released, there are 1,206 loans that fall into what the Debtor has defined as the "Non-Service Released" category. For purposes of the Debtors analysis, this group includes loans with a "Status Detail" that indicates the loan is no longer active (e.g., "Paid In Full").  Loans with a "Status Detail" of either "Paid In Full" or "Charge Off" account for 1,162 of the loans and $129 million of the purchase price of the loans in this group.[34]

123.    There are 137 AOT loans *not* in the Lookup Database, which means these loans were paid-off, sold or were otherwise disposed of prior to 2007 (See Table 28, Line 5). Furthermore, there are another 94 loans that have never been loaded into TBW's Servicing System and, therefore, have never been serviced by TBW (See Table 28, Line 6).

## X.    Ocala Funding Cash Activity Analysis

124.    TBW downloaded Ocala Funding bank statements on a daily basis from LGTS. Copies of the daily statements were retained by TBW on the Accounting network shared drive. The daily statements also contain hand written notes from TBW employees.  In general, these notes described the source and use of funds.

125.    TBW also used Excel spreadsheets to track the daily cash activity for all the Ocala Funding accounts.  These spreadsheets included the comments that were written on the daily bank statements.  The Debtor has created a database from these daily spreadsheets for the following accounts and for the following periods:

      a.      Ocala Funding Collateral Account – January 1, 2007 through August 4, 2009

      b.      DBK Collateral Account – June 30, 2008 through August 4, 2009

      c.      BNP Collateral Account - June 30, 2008 through August 4, 2009

126.    While the database includes all of TBW's original comments, the Debtor needed to standardize them in order to analyze the Ocala Funding cash activity.  For transactions after 2007, the Debtor also validated each entry in the database by comparing the data fields to the daily bank statements.

---

[34]    The Debtor has not endeavored to validate the accuracy of the Status Detail with respect to the AOT loans included in this category.  In addition, loans with a Status Detail of "Charge off" could include REO that was sold with the loan balance charged off after the sale.  However, the loan was coded in the Servicing System as a "Charge off" instead of REO.

## EXHIBIT B
## OVERVIEW OF ASSET RECONCILIATION PROCEDURES

127.    The Debtor also tested the database to ensure that all cash activity for these accounts from 2007 forward was captured.  More specifically, the Debtor used the daily deposits and disbursements to calculate a daily beginning and ending balance for each account.  The July 31, 2009 ending balance, based on this daily calculation, ties to the month end balance report downloaded by TBW from LGTS.