THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| In re:<br><br>**TAYLOR, BEAN & WHITAKER MORTGAGE CORP.,<br>REO SPECIALISTS, LLC, and<br>HOME AMERICA MORTGAGE, INC.,**<br><br>    **Debtors and Debtors in Possession.** | **Chapter 11**<br><br>**Case No. 3:09-bk-07047-JAF<br>Case No. 3:09-bk-10022-JAF<br>Case No. 3:09-bk-10023-JAF**<br><br>**Jointly Administered Under<br>Case No. 3:09-bk-07047-JAF** |

**DISCLOSURE STATEMENT OF THE DEBTORS, PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE, WITH RESPECT TO JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**TROUTMAN SANDERS LLP**
Jeffrey W. Kelley (GA Bar No. 412296)
jeff.kelley@troutmansanders.com
J. David Dantzler, Jr. (GA Bar No. 205125)
david.dantzler@troutmansanders.com
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
Telephone No: 404-885-3358
Facsimile No.: 404-885-3995
**SPECIAL COUNSEL FOR THE DEBTOR AND DEBTOR IN POSSESSION TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**

**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone No.: 813-229-0144
Facsimile No.: 813-229-1811
**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

2155255v12

Please note that this Disclosure Statement has not yet been approved by the United States Bankruptcy Court for the Middle District of Florida under § 1125 of the Bankruptcy Code for use in the solicitation of acceptances of the Chapter 11 Plan described herein. Accordingly, the filing and distribution of this Disclosure Statement is not intended, and should not be construed, as a solicitation of acceptances of such Plan. The information contained herein should not be relied upon for any purpose before a determination by the Bankruptcy Court that this Disclosure Statement contains "adequate information" within the meaning of § 1125 of the Bankruptcy Code.

# TABLE OF CONTENTS

I.     DEFINITIONS ........................................................................................... 1

II.    INTRODUCTION ..................................................................................... 1

     A.     Disclosure Statement Enclosures ................................................ 3

     B.     Overview of the Plan ................................................................... 3

     C.     Recommendation ........................................................................ 12

III.   ELIGIBILITY TO VOTE........................................................................ 12

     A.     Holders Entitled to Vote ............................................................ 12

IV.   BACKGROUND OF THE DEBTORS AND THESE CHAPTER 11 CASES ............. 15

     A.     Debtors' Corporate Structure...................................................... 15

         1.      TBW ............................................................................ 15

         2.      TBW's Subsidiaries .................................................... 15

     B.     Overview of the Debtors' Businesses ......................................... 15

         1.      TBW ............................................................................ 15

         2.      Home America Mortgage ............................................ 16

         3.      REO Specialists .......................................................... 17

     C.     TBW's Primary Business Segments ........................................... 17

         1.      Loan Origination......................................................... 17

         2.      Loan Sales ................................................................... 18

         3.      Loan Servicing............................................................ 22

         4.      Hedging Activities ...................................................... 24

         5.      Ancillary Business Loans ........................................... 24

         6.      Platinum Bank ............................................................ 25

     D.     Principal Financing Transactions and Indebtedness.................... 26

         1.      Loan Participation Facilities ....................................... 26

         2.      Ocala Funding Facility ............................................... 30

         3.      Credit Facilities .......................................................... 33

         4.      Loan Servicing Facilities ............................................ 34

         5.      Guaranty of Plainfield Loan to TBW Affiliate........................ 35

         6.      Henley Holdings Facility ............................................ 36

     E.     Properties ................................................................................... 36

F.   Events Leading to the Debtors' Chapter 11 Filings.............................................. 37

G.   Impact of Pre-Filing Events Upon TBW's Assets and Liabilities ....................... 40

H.   These Chapter 11 Cases....................................................................................... 40

　　1.   Debtor in Possession Status....................................................................... 41

　　2.   Entry of TBW's First Day Orders and Other Administrative Orders...... 41

　　3.   Retention of Professionals ......................................................................... 42

　　4.   Appointment of Official Committee of Unsecured Creditors ................. 42

　　5.   Debtor in Possession Financing and Use of Cash Collateral................... 43

　　6.   Termination of TBW as Servicer and Transfer of Servicing to
　　　　Other Entities ........................................................................................... 44

　　7.   The Servicing Reconciliation and the Asset Reconciliation.................... 45

　　8.   Borrower Protocol Issues............................................................................ 48

　　9.   Claims, Demands Made or Litigation Commenced by TBW, or on
　　　　behalf of TBW, Seeking to Recover Property of the Estate .................... 49

　　10.  Litigation against TBW .............................................................................. 50

　　11.  Asset Sales ................................................................................................... 54

　　12.  Schedules and Statements of Financial Affairs; Claims Bar Dates
　　　　and Aggregate Claims Asserted................................................................. 55

　　13.  Abandonment of Certain Non-Essential Records and Property .............. 57

　　14.  Rejection of Leases and Executory Contracts ........................................... 57

　　15.  Extension of Exclusivity............................................................................. 58

　　16.  Cash Position .............................................................................................. 58

　　17.  Insurance Assets ......................................................................................... 58

　　18.  Payments to Creditors Within 90 Days of Petition Date ......................... 59

　　19.  EPD Claims and Breach of Warranty Claims........................................... 60

V.   GLOBAL SETTLEMENT WITH THE FDIC ................................................................. 60

A.   Summary of FDIC Settlement Agreement .......................................................... 61

　　1.   TBW Whole Loans ...................................................................................... 62

　　2.   AOT Facility................................................................................................ 62

　　3.   Overline Facility ......................................................................................... 63

　　4.   Ocala Funding Loans .................................................................................. 64

|   |   |   |   |   |
|---|---|---|---|---|
|   |   | 5. | COLB Facility | 64 |
|   |   | 6. | REO | 65 |
|   |   | 7. | TBW Funding Company II LLC Account | 65 |
|   |   | 8. | BB&T Funds | 65 |
|   |   | 9. | Payments from Certain TBW Accounts at Colonial | 66 |
|   |   | 10. | FDIC Substantial Contribution Claim | 66 |
|   |   | 11. | FDIC GUC Claim | 66 |
|   |   | 12. | FDIC Payment to Trade Creditors | 66 |
|   |   | 13. | Colonial Receivership | 66 |
|   |   | 14. | General Release by FDIC | 66 |
|   |   | 15. | General Release by TBW | 67 |
| VI. | THE PLAN | | | 67 |
|   | A. | Classification of Claims and Interests | | 67 |
|   | B. | Treatment of Claims and Interests | | 69 |
|   |   | 1. | Administrative Expense Claims | 70 |
|   |   | 2. | DIP Facility Claims | 71 |
|   |   | 3. | Statutory Fees | 71 |
|   |   | 4. | Priority Tax Claims | 72 |
|   |   | 5. | Other Priority Claims | 72 |
|   |   | 6. | FDIC Secured Claims | 72 |
|   |   | 7. | Sovereign Secured Claim | 73 |
|   |   | 8. | Natixis Secured Claim | 73 |
|   |   | 9. | Plainfield Secured Claim | 73 |
|   |   | 10. | Other Secured Claims | 74 |
|   |   | 11. | General Unsecured Claims Against all Debtors, Other than Trade Claims and Subordinated Claims | 75 |
|   |   | 12. | General Unsecured Claims (Trade Creditors) Against TBW (TBW Class 9) | 75 |
|   |   | 13. | Subordinated Claims | 76 |
|   |   | 14. | Interests | 76 |
|   | C. | Acceptance or Rejection of the Plan; Nonconsensual Confirmation | | 77 |

| | | | |
|---|---|---|---|
| | 1. | Ability to Vote on the Plan | 77 |
| | 2. | Non-Consensual Confirmation | 77 |
| D. | | Means of Implementing the Plan | 77 |
| | 1. | Corporate Action; Dissolution of Debtors | 77 |
| | 2. | Dissolution of Creditors' Committee | 78 |
| | 3. | Consummation of FDIC Settlement Agreement | 78 |
| | 4. | The Plan Trust; Assumption of Plan Obligations | 79 |
| | 5. | Vesting of Assets | 84 |
| | 6. | Plan Advisory Committee | 84 |
| | 7. | No Liability of Plan Trustee or Plan Advisory Committee and Related Parties; Indemnification | 87 |
| | 8. | Plan Trustee as Successor to the Debtors | 88 |
| | 9. | Preservation of Causes of Action | 88 |
| E. | | Distributions under the Plan | 88 |
| | 1. | Timing of Distributions | 88 |
| | 2. | Reserves | 89 |
| | 3. | Distribution Calculation | 91 |
| | 4. | Priorities | 91 |
| | 5. | Calculation of Unsecured Claims | 92 |
| | 6. | Payment in Full of Allowed Unsecured Claims for Which More Than One Debtor is Liable | 92 |
| | 7. | Manner of Distribution | 93 |
| | 8. | De Minimis Distributions | 93 |
| | 9. | Delivery of Distributions | 93 |
| | 10. | Undeliverable Distributions | 93 |
| | 11. | Setoffs and Recoupments | 94 |
| | 12. | Distributions in Satisfaction; Allocation | 94 |
| | 13. | Cancellation of Notes, Agreements and Interests | 94 |
| | 14. | No Interest on Claims | 95 |
| | 15. | Withholding Taxes | 95 |
| | 16. | Reports | 95 |

F.    Claims Administration; Disputed Claims ................................................. 95

     1.    Reservation of Rights to Object to Claims and Interests ......................... 95

     2.    Objections to Claims and Interests ....................................................... 96

     3.    Service of Objections ............................................................................. 96

     4.    Determination of Claims ........................................................................ 96

     5.    No Distributions on Disputed Claims Pending Allowance ..................... 97

     6.    Claim Estimation for Disputed Claims ................................................... 97

G.    Executory Contracts and Unexpired Leases; Employee Benefit Plans ............... 97

     1.    Rejection of Unassumed Executory Contracts and Unexpired
         Leases ................................................................................................. 97

     2.    Employee Benefit Plans ......................................................................... 98

     3.    Rejection Damages Bar Date ................................................................. 98

     4.    Insurance Policies ................................................................................. 98

H.    Exculpations and Releases ............................................................................. 99

     1.    Debtor's Exculpation and Release of Chapter 11 Protected Parties ........ 99

     2.    Further Exculpation and Release of Chapter 11 Protected Parties ........ 100

     3.    Release of the Federal Deposit Insurance Corporation ......................... 100

     4.    Release by the Federal Deposit Insurance Corporation ......................... 101

     5.    Limitation on Release .......................................................................... 102

I.    Effect of Confirmation and Injunction ........................................................ 102

     1.    Plan Injunction ................................................................................... 102

     2.    Continuation of Existing Injunctions and Stays .................................... 103

     3.    Binding Effect of Plan ......................................................................... 103

     4.    No Effect on Objections to Fee Applications ........................................ 104

J.    Conditions Precedent to Effective Date; Revocation, Withdrawal, or Non-
     Consummation of the Plan ........................................................................... 104

K.    Miscellaneous Provisions ............................................................................ 105

     1.    Retention of Jurisdiction ...................................................................... 105

     2.    Final Order ......................................................................................... 108

     3.    Amendments and Modifications ........................................................... 108

     4.    Tax Exemption .................................................................................... 109

# TABLE OF CONTENTS
(continued)

|   |   | 5. | Non-Severability | 109 |
|   |   | 6. | Revocation | 109 |
|   |   | 7. | Controlling Documents | 109 |
|   |   | 8. | Governing Law | 110 |
|   |   | 9. | Filing of Additional Documents | 110 |
|   | L. |   | Cramdown and Bankruptcy Rule 9019 Requests | 110 |
| VII. |   |   | CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN | 110 |
|   | A. |   | Risk Factors Regarding Bankruptcy Cases | 111 |
|   |   | 1. | Allowance of Claims | 111 |
|   |   | 2. | Objections to Classification of Claims Pursuant to § 1122 of the Bankruptcy Code | 111 |
|   |   | 3. | Valuation Risk | 111 |
|   |   | 4. | Risk of Non-Confirmation of the Plan | 112 |
|   |   | 5. | Nonconsensual Confirmation | 112 |
|   |   | 6. | Delays of Confirmation and/or Effective Date | 112 |
|   |   | 7. | Plan Trust Operations | 112 |
|   |   | 8. | Causes of Action | 113 |
|   | B. |   | Risk Factors Relating to Securities Laws | 113 |
|   |   | 1. | Non-Transferability | 113 |
|   |   | 2. | Uncertainty of Value | 114 |
| VIII. |   |   | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 114 |
|   | A. |   | General | 114 |
|   | B. |   | Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally | 115 |
|   |   | 1. | Recognition of Gain or Loss | 115 |
|   | C. |   | Treatment of the Plan Trust and its Beneficial Owners | 116 |
|   |   | 1. | Plan Trust | 116 |
|   |   | 2. | Disputed Claims and Other Reserves | 118 |
|   | D. |   | Information Reporting and Withholding | 118 |
|   | E. |   | Importance of Obtaining Professional Tax Assistance | 118 |
| IX. |   |   | ALTERNATIVES TO CONFIRMATION OF THE PLAN | 118 |

X.   ACCEPTANCE AND CONFIRMATION OF THE PLAN; VOTING
     REQUIREMENTS ................................................................................ 119

     A.   Best Interests Test ..................................................................... 119

     B.   Financial Feasibility Test ........................................................... 120

     C.   Acceptance by Impaired Classes ................................................ 121

     D.   Voting Procedures ..................................................................... 122

          1.   Ballots ............................................................................ 122

          2.   Deadline for Voting ....................................................... 123

          3.   Importance of Your Vote ............................................... 123

XI.  RECOMMENDATION AND CONCLUSION ........................................ 123

<u>EXHIBITS</u>:

Exhibit A – The Plan, together with the Definitions Annex attached thereto
Exhibit B – Disclosure Statement Order
Exhibit C – Liquidation Analysis
Exhibit D – Plan Support Agreement

# I.    DEFINITIONS

Capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meaning given to such terms in the Definitions Annex attached to the Plan.

# II.    INTRODUCTION

TBW filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 24, 2009, and its wholly-owned subsidiaries, Home America Mortgage and REO Specialists, filed on November 25, 2009, thereby commencing these Chapter 11 Cases pending before the Bankruptcy Court. TBW, Home America Mortgage and REO Specialists are individually, a "Debtor,"[1] and collectively, the "Debtors."

Since filing for bankruptcy protection, TBW has continued to operate its business and manage its affairs as a debtor-in-possession pursuant to § 1107 and § 1108 of the Bankruptcy Code. TBW ceased originating mortgage loans just prior to the Petition Date, and its post-petition business has consisted principally of loan servicing, the liquidation of its loan portfolios and REO, the analysis, prosecution, defense and settlement of Claims, the wind-down of its business, and the orchestration of a consensual plan of liquidation. HAM, which pre-petition was in the business of originating mortgage loans that it assigned to TBW, is a debtor-in-possession but has not operated as a business since the Petition Date. REO Specialists' only asset as of the Petition Date was the ownership of a deposit account.

The Debtors and the Creditors' Committee (referred to collectively as the Plan Proponents) filed their Plan on September 21, 2010. A copy of the Plan is attached hereto as Exhibit A. THE PLAN IS THE PRODUCT OF CLOSE COLLABORATION BETWEEN THE DEBTORS AND THE CREDITORS' COMMITTEE, AND THEIR RESPECTIVE PROFESSIONALS. THE DEBTORS AND THE CREDITORS' COMMITTEE SUPPORT THE PLAN AND URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN.

**Approval of this Disclosure Statement by the Bankruptcy Court does not mean that the Bankruptcy Court recommends acceptance or rejection of the Plan.**

This Disclosure Statement was prepared by the Debtors' professionals in conjunction with, and based on information provided by, the Debtors' employees throughout these Chapter 11 Cases. The Debtors are solely responsible for the information contained in this Disclosure Statement. This Disclosure Statement does not constitute financial or legal advice. Creditors and Interest Holders of the Debtors should consult their own advisors if they have questions about the Plan or this Disclosure Statement.

**While this Disclosure Statement describes certain background matters and the material terms of the Plan, it is intended as a summary document only and is qualified in its entirety by reference to the Plan. Furthermore, descriptions in this Disclosure**

---

[1]    Pursuant to the Definitions Annex, when not otherwise indicated, Debtor shall mean TBW.

Statement of pleadings, orders, and proceedings in these Chapter 11 Cases are qualified in their entirety by reference to such pleadings, orders and proceedings, including the relevant docket items noted herein. You should read the Plan, such pleadings or orders, and the transcripts of the proceedings in these Chapter 11 Cases to obtain a full understanding of their provisions. Additional copies of this Disclosure Statement and the Exhibits attached to this Disclosure Statement, as well as any docket items from these Chapter 11 Cases, are available for inspection during regular business hours at the office of the clerk of the Bankruptcy Court, United States Bankruptcy Court for the Middle District of Florida, Bryan Simpson United States Courthouse, 300 North Hogan Street, Jacksonville, Florida 32202. In addition, copies may be viewed on the Internet at the Bankruptcy Court's website (http://www.flmb.uscourts.gov/) by following the directions for accessing the ECF system on such website. Copies are also available free of charge from the Claims Administrator by writing to TBW Ballot Processing, c/o BMC Group, Inc., 18750 Lake Drive East, Chanhassen, MN 55317, or by telephone at (888) 909-0100 or via email at info@bmcgroup.com. Copies of the Plan and Disclosure Statement can also be viewed online, free of charge, at www.bmcgroup.com/tbwmortgage. The list of General Unsecured Claims included in TBW Class 9 (titled General Unsecured Claims (Trade Creditors) Against TBW) can also be viewed online, free of charge, by accessing www.bmcgroup.com/tbwmortgage and following the links to information regarding TBW Class 9.

The statements and information concerning the Debtors and the Plan set forth in this Disclosure Statement constitute the only statements or information concerning such matters that have been approved by the Bankruptcy Court for the purpose of soliciting acceptances or rejections of the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein. Neither delivery of this Disclosure Statement nor any exchange of rights made in connection with the Plan will under any circumstances create an implication that there has been no change in the information set forth herein since the date that this Disclosure Statement and the materials relied upon in preparation of this Disclosure Statement were compiled. The Debtors assume no duty to update or supplement the disclosures contained herein and do not intend to update or supplement the disclosures, except to the extent, if any, necessary at the hearing on confirmation of the Plan.

This Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote in favor of or against the Plan. Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions, and projections that may be materially different from actual future results, including any estimates of the Cash that will be available for Distribution to the Holders of Claims, estimates of the percentage recovery of the various types of Claims, estimates of the aggregate final allowed amounts of the various types of Claims, estimates of the proceeds from the sale, liquidation, or other disposition of the Debtors' remaining Assets, estimates of the value of the Plan Trust Assets, and estimates of the expenses that will be incurred by the Plan Trust. There can be no assurance that any forecasted or

2

**projected results contained herein will be realized, and actual results may vary from those shown herein, possibly by material amounts.**

A.   **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

- A copy of the Plan, together with the Definitions Annex attached thereto (Exhibit A)

- A copy of the Order approving the Disclosure Statement entered [_____], 2010 (Exhibit B);

- An analysis of a hypothetical liquidation of the Debtors under Chapter 7 of the Bankruptcy Code (Exhibit C);

- The Plan Support Agreement substantially in the form of Exhibit D to the FDIC Settlement Agreement pursuant to which the FDIC has agreed to vote for and support the Plan (Exhibit D);

- A Ballot for Holders of Impaired Claims to vote to accept or reject the Plan; and

- The Plan Notice, setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing.

B.   **Overview of the Plan**

The following is a brief overview of the Plan, which is qualified in its entirety by reference to the Plan. The Plan is attached as Exhibit A to this Disclosure Statement.

Under the Plan, a single liquidating trust will be established for the benefit of Creditors of the Debtors, which Plan Trust will succeed to all Assets of the Debtors (including, but not limited to, all Causes of Action). The Plan Trustee will, among other things, liquidate the non-Cash Assets transferred to the Plan Trust (including the prosecution of Causes of Action), reconcile all Claims against the Debtors, make Distributions to Holders of Allowed Claims against the Debtors as provided in the Plan, and otherwise wind down these Chapter 11 Cases and the Debtors' respective Estates.

The Plan designates a series of Classes of Claims and Interests for each Debtor. These Classes take into account the differing nature of the various Claims and Interests, as well as their relative priority under the Bankruptcy Code.

The following Plan Summary Table summarizes the classification and treatment of Claims and Interests under the Plan (including certain unclassified Claims), **THE PLAN**

3

**SUMMARY TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT ADDRESS ALL ISSUES REGARDING CLASSIFICATION, TREATMENT, AND ULTIMATE RECOVERIES. THE PLAN SUMMARY TABLE IS <u>NOT</u> A SUBSTITUTE FOR A FULL REVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.**

The percentage recovery for each Class set forth in the Plan Summary Table is based on the Debtors' good-faith estimate, based on all information currently known, of (i) the amount of Claims against each Debtor that will ultimately be Allowed[2] and (ii) the amount of Cash that will be available in such Debtor's Estate for Distribution to Holders of Allowed Claims after liquidation of all Plan Trust Assets by the Plan Trustee.[3] The actual amounts of Allowed Claims against each Debtor and Cash available for Distribution to Creditors of the Estates could vary materially from the Debtors' estimates, and the actual percentage recoveries for Creditors will necessarily depend upon the actual amounts of Allowed Claims, Cash realized from the liquidation of non-litigation Assets, Cash realized from prosecuting Causes of Action, and expenses of the Plan Trust.

For the foregoing reasons, no representation can be, or is being, made with respect to whether the percentage recoveries set forth in the Plan Summary Table will be realized by the Holders of Allowed Claims against the Debtor. **THERE IS NO GUARANTEED RECOVERY AND THERE ARE NO GUARANTEED AMOUNTS OF RECOVERY FOR ANY HOLDER OF A CLAIM. THERE WILL BE NO RECOVERY FOR ANY HOLDER OF AN INTEREST.**

In addition, the Plan provides for the establishment of a Cash reserve for Disputed Claims within any particular Class. Interim Distributions of Cash on Allowed Claims of a given Class may be made from time to time, so long as sufficient Cash held in reserve to cover the Disputed Claims of such Class pending allowance or disallowance of such Disputed Claims. As a result, the process of distributing all Cash to be distributed to Holders of Allowed Claims under the Plan will be completed over time.

---

[2]  Estimated amounts of Allowed Claims do not constitute an admission by the Debtors or any other party as to the validity or amount of any particular Claim. The Debtors, on behalf of themselves, the Plan Trustee, and the Plan Advisory Committee, reserve the right to dispute the validity or amount of any Claim that has not already been Allowed by Order of the Bankruptcy Court or by agreement of the parties.

[3]  For purposes of the Plan Summary Table, estimated Cash excludes any recoveries that may be realized by the Plan Trustee from prosecuting Causes of Action.

4

**Plan Classification – TBW Estate:**

| | Summary of Classification and Treatment of Claims and Interests - TBW | | |
|---|---|---|---|
| **CLASS** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| n/a | Administrative Expense Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium | 100% |
| n/a | Priority Tax Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | 100% |
| 1 | Priority Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | 100% |
| 2 | FDIC Secured Claim (AOT Facility) | Treated in accordance with the FDIC Settlement Agreement | Not Yet Determined |

---

[4]    The treatment of any Allowed Claim within a Class is subject to any agreement between the Holder of such Allowed Claim and the Debtors (if before the Effective Date) or the Plan Trustee (if after the Effective Date) which provides treatment of such Allowed Claim on terms no less favorable to the Debtors than the treatment provided in the Plan.

5

| Summary of Classification and Treatment of Claims and Interests - TBW | | | |
|---|---|---|---|
| **CLASS** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| 3 | FDIC Secured Claim (Overline Facility) | Treated in accordance with the FDIC Settlement Agreement | Not Yet Determined |
| 4 | Sovereign Secured Claim (Sovereign Facility) | At the option of the Plan Trustee: (a) payment in Cash up to the Allowed amount of the Sovereign Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) return of all or any portion of the Assets securing the Allowed Sovereign Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Sovereign Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | Not Yet Determined |
| 5 | Natixis Secured Claim (Natixis Facility) | At the option of the Plan Trustee: (a) payment in Cash up to the Allowed amount of the Natixis Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) return of all or any portion of the Assets securing the Allowed Natixis Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Natixis Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | Not Yet Determined |
| 6 | Plainfield Secured Claim (Plainfield Term Loan) | At the option of the Plan Trustee: (a) payment in Cash up to the Allowed amount of the Plainfield Secured Claim, after the Assets securing such Claim have | Not Yet Determined |

| CLASS | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4] | ESTIMATED % RECOVERY |
|---|---|---|---|
| | | been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) return of all or any portion of the Assets securing the Allowed Plainfield Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Plainfield Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | |
| 7 | Other Secured Claims against TBW | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Allowed Other Secured Claim's legal, equitable, and/or contractual rights; (b) payment in Cash up to the amount of such Allowed Other Secured Claim after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all its Liquidation Expenses and paid the Sharing Percentage; (c) return of all or any portion of the Assets securing such Allowed Other Secured Claim; (d) deferred Cash payments having a present value on the Effective Date equal to the amount of such Allowed Other Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim; (e) such other treatment as would provide such Holder the indubitable equivalent of its Allowed Other Secured Claim; or (f) such other treatment as may be agreed by such Holder and TBW (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | Not Yet Determined |
| 8 | Unsecured Claims | Paid a *pro rata* share of the Net Distributable Assets | Not Yet Determined |

| Summary of Classification and Treatment of Claims and Interests - TBW | | | |
|---|---|---|---|
| **CLASS** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS[4]** | **ESTIMATED % RECOVERY** |
| 9 | Trade Claims | Paid a *pro rata* share of the Net Distributable Assets *plus* the Trade Creditor Recovery | Not Yet Determined |
| 10 | Subordinated Claims | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 11 | Interests in TBW | Holders of such Interests will neither retain nor receive any property on account of such Interests | 0% |

## Plan Classification – HAM Estate:

| Summary of Classification and Treatment of Claims and Interests - HAM | | | |
|---|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS** | **ESTIMATED % RECOVERY** |
| n/a | Administrative Expense Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium | 100% |
| n/a | Priority Tax Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | 100% |
| 1 | Priority Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of | 100% |

8

| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS | ESTIMATED % RECOVERY |
|---|---|---|---|
| | | every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | |
| 2 | Other Secured Claims against HAM | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Allowed Other Secured Claim's legal, equitable, and/or contractual rights; (b) payment in Cash up to the amount of such Allowed Other Secured Claim after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all its Liquidation Expenses and paid the Sharing Percentage; (c) return of all or any portion of the Assets securing such Allowed Other Secured Claim; (d) deferred Cash payments having a present value on the Effective Date equal to the amount of such Allowed Other Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim; (e) such other treatment as would provide such Holder the indubitable equivalent of its Allowed Other Secured Claim; or (f) such other treatment as may be agreed by such Holder and HAM (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | Not Yet Determined |
| 3 | Unsecured Claims | Paid a *pro rata* share of the Net Distributable Assets | Not Yet Determined |
| 4 | Subordinated Claims | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 5 | Interests in HAM | Holders of such Interests will neither retain | 0% |

9

| Summary of Classification and Treatment of Claims and Interests - HAM | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS | ESTIMATED % RECOVERY |
| | | nor receive any property on account of such Interests | |

**Plan Classification – REO Specialists Estate:**

| Summary of Classification and Treatment of Claims and Interests – REO Specialists | | | |
|---|---|---|---|
| CLASS(ES) | DESCRIPTION | TREATMENT OF ALLOWED CLAIMS WITHIN CLASS | ESTIMATED % RECOVERY |
| n/a | Administrative Expense Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any interest, penalty, or premium | 100% |
| n/a | Priority Tax Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | 100% |
| 1 | Priority Claims | Paid in Cash equal to the Allowed amount of such Claim, which shall not include any penalty or premium, (a) in full on the Effective Date, or (b) in equal payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code | 100% |

2155255v12

| Summary of Classification and Treatment of Claims and Interests – REO Specialists | | | |
|---|---|---|---|
| **CLASS(ES)** | **DESCRIPTION** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS** | **ESTIMATED % RECOVERY** |
| 2 | Other Secured Claims against REO Specialists | At the option of the Plan Trustee: (a) reinstated in full, leaving unaffected the Holder of such Allowed Other Secured Claim's legal, equitable, and/or contractual rights; (b) payment in Cash up to the amount of such Allowed Other Secured Claim after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all its Liquidation Expenses and paid the Sharing Percentage; (c) return of all or any portion of the Assets securing such Allowed Other Secured Claim; (d) deferred Cash payments having a present value on the Effective Date equal to the amount of such Allowed Other Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim; (e) such other treatment as would provide such Holder the indubitable equivalent of its Allowed Other Secured Claim; or (f) such other treatment as may be agreed by such Holder and REO Specialists (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date) | Not Yet Determined |
| 3 | Unsecured Claims | Paid a *pro rata* share of the Net Distributable Assets | Not Yet Determined |
| 4 | Subordinated Claims | Holders of such Claims will neither retain nor receive any property on account of such Claims | 0% |
| 5 | Interests in REO Specialists | Holders of such Interests will neither retain nor receive any property on account of such Interests | 0% |

**The treatment and Distributions, if any, provided to holders of Allowed Claims and Interests pursuant to the Plan will be in full and complete satisfaction of all legal, equitable, or contractual rights represented by such Allowed Claims and Interests.**

2155255v12

C.   **Recommendation**

**The Debtors and the Creditors' Committee recommend that all Creditors entitled to vote on the Plan cast their Ballots to accept the Plan. The Debtors believe that Confirmation of the Plan will provide the greatest and earliest possible recoveries to Creditors.**

## III.   ELIGIBILITY TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are Impaired under the Plan may vote to accept or reject the Plan. Generally, a Claim or Interest is Impaired under the Plan if the Holder's legal, equitable or contractual rights are changed under the Plan. In addition, if the Holders of Claims or Interests in an Impaired Class do not receive or retain any property under the Plan on account of such Claims or Interests, such Impaired Class is deemed to have rejected the Plan under § 1126(g) of the Bankruptcy Code, and, therefore, such Holders do not need to vote on the Plan.

A.   **Holders Entitled to Vote**

Below is a chart for each Debtor that identifies which Classes of Claims and Interests are Impaired or Unimpaired. If and to the extent that any Class identified as Unimpaired is determined to be Impaired, such Class will be entitled to vote to accept or reject the Plan.

Classes that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Holders of Claims in Classes that are Impaired are entitled to vote to accept or reject the Plan.

Holders of Claims and Interests in the Classes that will receive no Distribution or retain no property under the Plan are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

| CLASS | DESCRIPTION | STATUS |
|-------|-------------|--------|
| **Unclassified Claims Against All Debtors** | | |
| n/a | Administrative Expense Claims and Priority Tax Claims (§ (507(a)(8)) against all Debtors | Unimpaired - not entitled to vote |

| Claims Against TBW | | |
|---|---|---|
| TBW Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| TBW Class 2 | FDIC Secured Claim (AOT Facility) | Impaired - entitled to vote |
| TBW Class 3 | FDIC Secured Claim (Overline Facility) | Impaired - entitled to vote |
| TBW Class 4 | Sovereign Secured Claim (Sovereign Facility) | Impaired - entitled to vote |
| TBW Class 5 | Natixis Secured Claim (Natixis Facility) | Impaired - entitled to vote |
| TBW Class 6 | Plainfield Secured Claim (Plainfield Term Loan) | Impaired - entitled to vote |
| TBW Class 7 | Other Secured Claims | Impaired – entitled to vote |
| TBW Class 8 | General Unsecured Claims | Impaired - entitled to vote |
| TBW Class 9 | General Unsecured Claims (Trade Creditors) | Impaired - entitled to vote |
| TBW Class 10 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) | Impaired- not entitled to vote |
| TBW Class 11 | Interests | Impaired - not entitled to vote |

| Claims Against HAM | | |
|---|---|---|
| HAM Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired – not entitled to vote |

| HAM Class 2 | Other Secured Claims | Impaired – entitled to vote |
|---|---|---|
| HAM Class 3 | General Unsecured Claims | Impaired – entitled to vote |
| HAM Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) | Impaired –not entitled to vote |
| HAM Class 5 | Interests | Impaired – not entitled to vote |

| Claims Against REO Specialists | | |
|---|---|---|
| REO Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| REO Class 2 | Other Secured Claims | Impaired - entitled to vote |
| REO Class 3 | General Unsecured Claims | Impaired - entitled to vote |
| REO Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) | Impaired – not entitled to vote |
| REO Class 5 | Interests | Impaired – not entitled to vote |

The record date for determining any Creditor's eligibility to vote on the Plan is [_____], 2010. Only those Creditors entitled to vote on the Plan will receive a Ballot with this Disclosure Statement. The decision to subordinate a claim may be made by the Plan Proponents prior to the time Ballots are distributed, or by the Plan Trustee anytime after the Effective Date.

**Creditors whose Claims are subject to a pending objection are not eligible to vote unless such objections are resolved in their favor or, after notice and a hearing pursuant to**

Bankruptcy Rule 3018(a), the Bankruptcy Court allows the Claim temporarily or estimates the amount of the Claim for the purpose of voting to accept or reject the Plan. Any Creditor that wants its Claim to be Allowed temporarily or estimated for the purpose of voting must take the steps necessary to arrange an appropriate hearing with the Bankruptcy Court under Bankruptcy Rule 3018(a).

## IV.    BACKGROUND OF THE DEBTORS AND THESE CHAPTER 11 CASES

### A.    Debtors' Corporate Structure

#### 1.    TBW

The principal Debtor, TBW, is a Florida corporation that was incorporated on May 23, 1991. It is a privately held company, and its major shareholders and their approximate percentage ownership interests are: Lee B. Farkas (79.2%), ESOP (6.1%), and LBF Holdings LLC (14.7%).

#### 2.    TBW's Subsidiaries

TBW has twelve (12) direct or indirect subsidiaries. Of those twelve subsidiaries, only Home America Mortgage and REO Specialists are Debtors.

One of TBW's subsidiaries is a bank holding company, Platinum Bancshares. Platinum Bancshares is the sole owner of Platinum Bank, a federally-chartered thrift located in Rolling Meadows, Illinois. Platinum Bank held mortgages, consumer loans, securities, and cash as its primary assets. On September 4, 2009, the FDIC was appointed the receiver of Platinum Bank by order of the Office of Thrift Supervision.

### B.    Overview of the Debtors' Businesses

#### 1.    TBW

Prior to the Petition Date, TBW was the largest independent (*i.e.* non-depository owned) mortgage lender in the United States. TBW operated three primary lines of business: a mortgage loan origination business, a mortgage loan sales business, and a mortgage loan servicing business. It also entered into a variety of transactions to obtain financing and/or operating capital. A full picture of TBW's operations requires an understanding of its business lines, how it acquired capital to operate, and how it responded when financing and/or capital became increasingly difficult to obtain as the housing market declined, consumer defaults rose, and the credit markets tightened.

2155255v12

TBW's primary businesses were comprised of the following operations:

- Origination, underwriting, processing, and funding of conforming and non-conforming[5] conventional and government-insured residential mortgage loans;

- Sales of mortgage loans into the "secondary market" (i) to government-sponsored enterprises such as Freddie Mac, (ii) to non-affiliated securitization conduits sponsored by banks, such as Credit Suisse or BNP Paribas, that issued securities, some of which were guaranteed by Ginnie Mae, and (iii) to banks and other third-party investors; and

- Mortgage payment processing and loan servicing;

In addition to its primary business lines, TBW engaged in the following ancillary lines of business:

- Hedging its exposure on the mortgage loans it owned to mitigate interest rate and price volatility risks;

- Ancillary business loans made by TBW described in Section IV.C.5 below[6]; and

- Ownership of a bank holding company, Platinum Bancshares.

### 2. Home America Mortgage

Prior to the date it filed its Chapter 11 Case, Home America Mortgage was in the business of originating mortgage loans, which loans it subsequently assigned to TBW. Home America Mortgage was incorporated in Florida in 2002. Prior to January 1, 2009, J. Gregory Hicks (referred to herein as "Hicks") was its majority shareholder, holding ninety percent (90%) of its outstanding stock, with the remaining ten percent (10%) being held by TBW. Home America Mortgage's corporate headquarters was based in Lawrenceville, Georgia, and it operated retail mortgage origination branch offices throughout the southeastern United States. TBW entered into a stock purchase agreement effective as of January 1, 2009 pursuant to which TBW acquired the outstanding stock in the company held by Hicks. Under the terms of the stock purchase agreement, TBW paid $2,987,000 in Cash, a million of which was held back pending resolution of outstanding tax obligations; $9 million of the purchase price was paid through satisfaction of a $9 million promissory note payable from Hicks to TBW; and $9 million of the purchase price was paid in the form of an unsecured, non-negotiable subordinated promissory

---

[5] Conforming loans are loans that meet the normal Freddie Mac or Ginnie Mae guidelines. Non-conforming loans are all other loans, which include Alt-A loans, jumbo loans, second-lien mortgage loans and subprime loans.

[6] These are the loans to Jumbolair, U.S. Racing, LLC, which owns Ocala Speedway, and over $70 million in loans and advances to various entities owned or controlled by Lee Farkas, former board members of TBW, or their associates. See generally, Section IV.C.5 titled Ancillary Business Loans.

note from TBW to Hicks payable over a seven year period. Hicks received other consideration as part of the transaction, including Home America Mortgage's then unpaid prior year's tax refund, certain notes and accounts receivable for over $3.4 million payable to the company from Hicks and certain of his affiliated companies, and certain furniture and equipment. Also as part of the transaction, TBW paid off the mortgage of approximately $1 million on Home America Mortgage's corporate headquarters, and former shareholders of a predecessor entity to Home America Mortgage, Gary Garrett and Tim Parker, received notes payable by TBW in the total amount of $2,080,000 in exchange for releases by the former shareholders from any and all Claims that the former shareholders had against TBW and Home America Mortgage. Subsequent to the closing, the majority of Home America Mortgage's business operations and employees were transferred to Platinum Bank.

Subsequent to filing its bankruptcy petition, Debtor/HAM rejected its real property leases and equipment leases and has had no meaningful post-petition operations. Debtor/HAM's primary asset is an office building and associated land in Lawrenceville, Georgia, associated with its corporate headquarters, which has an estimated value of $1-2 million.[7] Debtor/HAM had minimal Cash on hand at the Petition Date, and presently has approximately $112,000 Cash on hand.

### 3. REO Specialists

REO Specialists, which operated out of TBW's corporate headquarters, was responsible for the preservation and disposition of the extensive REO portfolio held by TBW for its own account and for the benefit of others. Debtor/REO's primary asset is a deposit account that, as of November 25, 2009 when it filed its bankruptcy petition, had a balance of $566,945.68

### C. TBW's Primary Business Segments

#### 1. Loan Origination

TBW provided mortgage financing to individual borrowers throughout the United States. In doing so, TBW utilized not only its own staff of brokers located in TBW offices nationwide, but also its large network of independent mortgage brokers and community banks. TBW's ultimate objective was to sell these mortgage loans to "investors," including government-sponsored enterprises (e.g., Freddie Mac) and various financial institutions, and retain the right to service the mortgages for the purchasing investor.

TBW made or purchased loans made primarily to borrowers with good credit profiles and also made a limited number of subprime loans. Nearly all of the mortgage loans TBW made or purchased were residential loans secured by one-to-four-family residences. TBW's primary goal in making a decision whether to extend a loan was whether that loan conformed to the expectations and underwriting standards of the secondary mortgage market. Because TBW intended to sell the mortgage loans it originated, its underwriting guidelines generally conformed

---

[7] Under the circumstances, the fair market value of the office building is uncertain.

to the guidelines established by the ultimate investors. In effect, the investors' guidelines became the underwriting guidelines used by TBW. Typically, these standards focused on a potential borrower's credit history (often as summarized by credit scores), income and stability of income, liquid assets and net worth, and the value and the condition of the property securing the loan.

Generally, once a loan was approved, TBW financed the loan it originated or purchased with funds obtained through mortgage warehouse lines, revolving lines of credit, participation facilities and the Ocala Funding Facility. Section IV.D of this Disclosure Statement contains a discussion of these facilities. Loans financed, "sold" or participated under these facilities were then typically sold by TBW within 60 days or less to third-party purchasers. Loans that TBW could not sell, or had to repurchase under these facilities, were held as long-term investments or, if the borrower under the mortgage loan defaulted, were foreclosed and turned into REO. TBW sold REO in the ordinary course of its business.

In the five years prior to the commencement of its bankruptcy case, TBW experienced tremendous growth in the number of loans it originated. For calendar year 2004, TBW originated or purchased a total of 59,129 loans representing a UPB in excess of $9.5 billion. By calendar year 2008 that annual production volume had increased to 184,227 loans with a UPB in excess of $32.3 billion.

The chart below summarizes the growth in TBW's production from 2004 through 2008:

| Year | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|------|
| Loan Count | 59,129 | 93,375 | 139,148 | 195,226 | 184,227 |
| Dollars | $9,516,878,000 | $17,358,993,000 | $23,501,086,000 | $33,727,081,000 | $32,332,121,000 |

As of the beginning of 2009, TBW was originating approximately 14,500 new loans every month (this amount, if annualized, would equal 174,000 new loans), representing in excess of $2.7 billion in monthly production.

## 2. Loan Sales

TBW's business model was based on the premise that the mortgage loans it originated or purchased would be sold within days or weeks of origination. Funding the capital to originate or purchase any loan was, in some instances, tied to TBW having obtained, as of the date of origination or purchase, a commitment from a "take-out investor" to purchase the mortgage loan. In sum, the mortgage loan sale process at TBW generally worked as follows: TBW assimilated pools of loans for sale to investors, which were, most often, to be used to support mortgage-backed securities. As part of the sales process, the loan pools were assigned to specific "trades" at the time that the sales contract was entered into – i.e., the loans were allocated to a specific issue of mortgage-backed securities. Purchase proceeds were not paid to TBW until the trade to which the pools were assigned "settled" – i.e., the securities were issued and sold.

18

In general, TBW sold agency-eligible mortgage loans whether originated by TBW or purchased from another originator, by one of the following methods. Conforming loans eligible for sale to Freddie Mac were either aggregated into pools that were exchanged for mortgage-backed securities, or individual loans were sold to Freddie Mac for cash through the Freddie Mac "cash window." FHA mortgage loans and VA mortgage loans originated by TBW were generally pooled and sold either in the form of Ginnie Mae mortgage-backed securities issued by TBW or on an assignment-of-trade basis to other approved Ginnie Mae sellers. Freddie Mac and Ginnie Mae securities collateralized by eligible loans were then sold to approved broker-dealers. Historically, a majority of TBW's mortgage loans qualified under various Freddie Mac and Ginnie Mae program guidelines, which include specific property and credit standards, including a loan size limit.[8]

Loans not eligible to serve as collateral for Freddie Mac or Ginnie Mae securities – *e.g.*, jumbo loans, certain types of reduced documentation (or Alt-A loans), certain types of second-lien loans, subprime loans and other loans – were sold through a variety of channels. As discussed in more detail below, TBW's primary mode of selling non-conforming loans was through private-label securitizations.[9] For other types of non-eligible collateral, TBW sold the loans on a whole loan basis (either individually or in bulk). Buyers of non-Freddie Mac and non-Ginnie Mae eligible loans and securities included large depository financial institutions, large mortgage banks, securities dealers, real estate investment trusts, hedge funds and other institutional loan buyers. These types of loan sales generally were consummated within 60 to 90 days of loan origination. TBW typically retained the servicing rights relating to loans that it originated, but on occasion TBW sold loans along with their servicing rights, and on occasion sold servicing rights in bulk.

---

[8]     Until April 2002, TBW was an "approved seller" with each of Freddie Mac, Ginnie Mae and Fannie Mae. In April 2002, Fannie Mae terminated the status of TBW as an "approved seller." The termination occurred after Fannie Mae expressed to TBW its concerns regarding its growth rate and operational problems that adversely affected the accuracy of data regarding mortgage loans provided by TBW and the conformity of mortgage loans originated by TBW with Fannie Mae's Guidelines. In connection with the termination of its approved seller status, Fannie Mae also required TBW to sell its portfolio of servicing rights for mortgage loans owned by Fannie Mae.

[9]     In a securitization structure, the mortgage loan is sold by TBW to a special purpose entity, generally wholly-owned by TBW, that is engaged principally in the business of purchasing loans from TBW for that particular sale facility. The special purpose entity obtains the Cash to purchase the mortgage loans from advances made by investors to the special purpose entity. The debt owed to the investors is evidenced either by promissory notes, certificates, or undivided interests in the mortgage notes purchased. The securitization structure is either 1) a one-tier securitization (in which only one special purpose entity is created, and that entity purchases the loans from TBW and issues the debt), or 2) a two-tier securitization (in which a second special purpose entity is created to purchase the mortgage loans from the first special purpose entity, and that second special purpose entity issues the debt). In either a one-tier or two-tier securitization, the mortgage loans are pledged by the special purpose entity that owns and holds title to the loans to the trustee or agent for the investors that hold the debt, to secure the advances made by the investors to the special purpose entity. At the time of each sale of mortgage loans by TBW to a special purpose entity, TBW makes certain representations and warranties regarding the characteristics of the mortgage loans, and the right to enforce those representations and warranties typically are enforced by the trustee or agent for the investors. TBW or its affiliate is also typically engaged to service the mortgage loans for the special purpose entity that owns the loans and issues the debt to the investors.

TBW's loan sales were governed by agreements with the mortgage investors. These agreements established an ongoing program under which investors purchased or securitized certain loans, as long as the loans offered for sale met agreed-upon underwriting standards. In the case of conventional loans (*i.e.,* a mortgage loan that is not guaranteed or insured by the federal government), TBW was generally at risk for any mortgage loan default until the loan was sold, subject to the obligations of any primary mortgage insurer. Once the loan was sold, the risk of loss from default and foreclosure generally passed to the purchaser or insurer of the loan.

In the case of FHA and VA loans, TBW generally was required to request insurance or a guarantee certificate within 60 days of loan closing, and the loan had to be current at the time of the request. Once the insurance or the guarantee certificate was issued, the insurance or guarantee generally was available for claims against foreclosure and related losses as a result of a borrower default. Certain losses related to foreclosures and similar procedures in connection with FHA mortgage loans were not covered by FHA insurance, nor were losses that exceeded the VA's guarantee limitations. Additionally, FHA could request indemnification from TBW for its failure to comply with applicable guidelines in the origination or servicing of loans and could curtail insurance claim payments based on failures to comply with FHA's claims guidelines. Likewise, the VA could reduce guarantee payments based on failures to comply with VA requirements, and in certain cases the VA would deny any liability under a guaranty.

Typically, TBW sold loans on a limited recourse basis in order to reduce exposure to default risk, except that pursuant to the underlying purchase agreements, TBW generally committed to repurchase or substitute a loan if (i) a payment default occurred early in the life of the loan (referred to as an Early Payment Default or EPD), or (ii) TBW breached its representations and warranties regarding the loan. In connection with its loan sales to investors, TBW made representations and warranties customary in the industry relating to, among other things, compliance with laws, regulations, certain program standards and the accuracy of information contained in the loan file. In the event of a breach of these representations and warranties, TBW could become liable to the purchasing investor for certain damages and losses or could be obligated to repurchase the subject loans and bear any potential related loss on the disposition of those loans.

As previously indicated, TBW's primary method of selling non-conforming loans was through private label securitizations. At the Petition Date, the principal private label securitizations were (a) the Bayview/U.S. Bank Securitizations and (b) the securitizations in which various investors purchased loans, and for which Wells Fargo was the master servicer and U.S. Bank the indenture trustee. These facilities are summarized below.

a.    Bayview/U.S. Bank

TBW and Bayview entered into several securitization transactions from 2003 to 2007. TBW sold mortgage loans to a special purpose vehicle, either Magnolia Funding, Magnolia Funding II, or TBW Funding II. That entity then sold the loans to a special purpose trust for which U.S. Bank is the current trustee. The trusts issued Class A Notes, and Class B Certificates or Residual Interest Certificates. Bayview Financial Trading Group, L.P. (referred to as

Bayview in this Disclosure Statement) is the sole holder of the Class A Notes and TBW or its subsidiaries are the holders of the Class B Certificates or Residual Interest Certificates.

b. Various Investors

At the Petition Date, TBW was a party to 12 securitizations for which BNP Paribas, Credit Suisse, Lehman Brothers or UBS or an affiliate were the underwriters. Wells Fargo served as the master servicer and U.S. Bank served as the indenture trustee for each of these securitizations.[10]

These securitization vehicles were designed to qualify as real estate mortgage investment conduits within the meaning of the Internal Revenue Code (referred to as REMICs). The REMICs that qualified as a master REMIC issued certificates reflecting ownership interests in the master REMIC, ranging in type from senior certificates to mezzanine certificates to residual interest certificates. The certificates issued to the investors are pass-through trust certificates. The master REMICs own subsidiary REMICs, which hold as an asset title to the mortgage loans purchased by the depositor from TBW.

These securitizations were generally structured as follows. TBW sold mortgage loans to a special purpose entity that was not owned or controlled by TBW, each of which is called a depositor. The depositor then sold, under a pooling and servicing agreement, to the trustee for the benefit of the certificate holders, pools of mortgage loans. U.S. Bank National Association is the trustee for each of the trusts, and Wells Fargo is the master servicer. TBW was the subservicer, appointed by the master servicer under a separate servicing agreement.

Shortly before the Petition Date, Wells Fargo sent letters alleging that TBW was being terminated as sub-servicer for the trusts. TBW disputed the effectiveness of the attempts to terminate TBW as servicer. On or about October 7, 2009, the Debtor and Wells Fargo (in its capacity as master servicer) filed a stipulation that was approved by the Bankruptcy Court on October 15, 2009, which provided for servicing to be transferred to Wells Fargo or to a sub-servicer of Wells Fargo, in either case as successor servicer, and provided for accelerated

---

[10] Investments in these securitization transactions were evidenced by the following mortgage-backed pass-through trust certificates:

1.  TBW Mortgage Pass-Through Certificates, Series 2006-1;
2.  TBW Mortgage Pass-Through Certificates, Series 2006-2;
3.  TBW Mortgage Pass-Through Certificates, Series 2006-3;
4.  TBW Mortgage Pass-Through Certificates, Series 2006-4;
5.  TBW Mortgage Pass-Through Certificates, Series 2006-5;
6.  TBW Mortgage Pass-Through Certificates, Series 2006-6;
7.  TBW Mortgage Pass-Through Certificates, Series 2007-1;
8.  TBW Mortgage Pass-Through Certificates, Series 2007-2;
9.  CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-1;
10. CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-4;
11. CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-6; and
12. CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-7.

21

reimbursement of Advances to the Debtor in an amount up to $1.3 million, and otherwise maintained the status quo and reserved all rights among the parties [Docket # 456].

In addition, TBW typically held residual interests in certain of these securitizations. To the extent the residual interests had value, they were sold in the MBS Sale held during these Chapter 11 Cases.

### 3. Loan Servicing

TBW's substantial loan servicing operations were conducted from its Central Document Facility in Ocala, Florida and a back-up servicing center in Cincinnati, Ohio. As the volume of TBW's loan production increased, the number of loans TBW was servicing grew as well. At the end of calendar year 2004, TBW was servicing 73,345 loans with an outstanding principal balance in excess of $10.5 billion. By August of 2009, TBW's servicing portfolio had grown to in excess of 512,000 loans (primarily first-lien, fixed-rate mortgages) having an aggregate UPB totaling in excess of $80 billion. These mortgages were for the most part ultimately owned by various investors. The primary investors, constituting in excess of 90% of the total UPB, were Freddie Mac and investors that bought securities that were guaranteed by Ginnie Mae. There were also loans serviced by TBW (roughly 5% of total UPB) that were owned by "private label" securitization trusts for which Wells Fargo and U.S. Bank served as master servicer and trustee respectively. TBW also serviced mortgages for its own portfolio and those of related entities such as Platinum Bank, and serviced mortgage loans that were outstanding on various warehouse lines or participation facilities. By early August of 2009, TBW had over 590 employees in its servicing department.

The terms under which TBW serviced mortgage loans were designed and implemented to monitor and enforce the borrowers' obligations to repay each mortgage loan in accordance with its terms. TBW's servicing business collected mortgage payments, administered tax and insurance escrows, responded to borrower inquiries and enabled TBW to maintain control over the collection and default mitigation processes. The loan servicing business also provided TBW with cash flow, but required a significant amount of operating capital and sometimes involved long time periods of capital outlay. Further, as a result of the economic downturn in the residential marketplace, the servicing component of TBW's business caused TBW to sustain significant losses.

TBW's principal banking relationship was with Colonial Bank (referred to herein as Colonial). In addition to maintaining operating accounts at Colonial, TBW maintained over 100 accounts at Colonial related to its mortgage servicing operations and the disbursement of mortgage payments on behalf of borrowers and investors.

In general, borrowers made mortgage payments to TBW in one of the following ways:

- By check delivered directly to TBW;

- By check delivered to lock boxes maintained by TBW as servicer or by the purchaser of the loan or a participation interest in the loan;

- By ACH transfer (*i.e.*, electronic draft/transfer) from the borrower's bank account into TBW's Custodial Funds Clearing Account located at Colonial;

- By bank-by-phone payment; and

- By Internet banking whereby customers authorize TBW to draft funds from their accounts to the Colonial Bank Clearing Account at Colonial by bank-by-phone payment.

The vast majority of borrower payments were initially deposited into a single Custodial Funds Clearing Account. As payments were received and deposited into the Custodial Funds Clearing Account, they were recorded in TBW's servicing system. Each day, the prior day's deposits, if recorded in the servicing system, were "pushed down" (*i.e.*, transferred) from the Custodial Funds Clearing Account to various custodial accounts commonly referred to as "P&I" (Principal and Interest) and "T&I" (Taxes and Insurance) accounts maintained on behalf of the various investors. Borrower payments were allocated among the investor P&I and T&I accounts using information maintained and administered in TBW's servicing system. TBW's compensation, in the form of servicing fees, was also paid from the Custodial Funds Clearing Account.

P&I payments were disbursed to investors each month, net of any servicing fees earned by TBW. With the exception of Freddie Mac, investors received P&I payments mid-month (usually on or about the 18th) for monthly mortgage payments and unscheduled payments (*e.g.*, loan pay offs) received in the prior month. Freddie Mac, TBW's largest investor, had two programs known as ARC and Gold. For the ARC program, P&I payments were transmitted to Freddie Mac in the early part of the month (usually the 6th). For the Gold program, P&I payments were transmitted mid-month (usually the 18th). Other unscheduled payments were transmitted to Freddie Mac on a daily basis. The insurance and tax portions of mortgage payments were to be paid into an escrow distribution account and paid to the insurers and taxing authorities.

Virtually all of TBW's servicing arrangements required that "scheduled/scheduled" payments be made to investors.[11] In other words, TBW, as servicer, was required to make P&I payments to investors in an amount equal to the amount that should have been received from all borrowers as if they had made payment on a timely basis. The result was that TBW was required to fund (*i.e.*, "advance") the payment of principal and interest due on mortgages for which borrowers failed to make timely payment. Similarly, TBW made tax and insurance advances for mortgages for which insufficient "escrow" balances were on hand at the time that tax and insurance premium payments were due. In general, for mortgage loans that were in default, TBW made these Servicing Advances until the time that a foreclosure was completed, which in many states was a number of months after the first missed payment by the borrower. As servicer, TBW also managed the foreclosure process and incurred Corporate Advances for

---

[11] The Freddie Mac ARC program required "scheduled/scheduled" payments. The Gold program was a "scheduled/actual" program, which required TBW to advance scheduled interest amounts, but not principal.

foreclosure-related expenses and the costs of maintaining and disposing of the property once the foreclosure was completed. Because TBW was obligated to make these Servicing Advances and Corporate Advances, TBW's servicing business required a large amount of cash to fund the servicing operation. Although TBW had rights to recoup those amounts later, when the credit markets declined and defaults spiked, TBW's servicing business became a drag on the company. Ultimately, the Servicing Advances and the Corporate Advances were recovered or should have been recovered by TBW from the following: (i) payments received from borrowers (for which advances were made); (ii) the proceeds of the sale of foreclosed houses or the proceeds from short sales; or (iii) claim reimbursements from the investors or HUD for insured loans. As of the filing of the Reconciliation Report, the cumulative balance of the Debtor's unreimbursed Servicing Advances and unpaid Servicing Fees was $263,993,800. Certain investors have asserted that some or all of these types of Claims are not recoverable in the amounts asserted by the Debtor.

### 4. Hedging Activities

TBW hedged interest rate risk and price volatility on its mortgage loan interest rate lock commitments and mortgage loans during the time it committed to acquire or originate mortgages at a pre-determined rate until the time it sold or securitized mortgages. TBW also hedged interest rate risk associated with funding their portfolio of mortgage loans and mortgage-backed securities. To reduce the sensitivity of earnings to interest rate and market value fluctuations, TBW hedged the risk of changes in the fair value of mortgage servicing rights. Also, to mitigate interest rate and price volatility risks, TBW entered into certain hedging transactions. The nature and quantity of TBW's hedging transactions were determined based on various factors, including market conditions and the expected volume of mortgage acquisitions and originations.

### 5. Ancillary Business Loans

In addition to its traditional residential mortgage lending business, TBW also made loans ancillary to its mortgage operations. For instance, during the course of TBW's history Lee Farkas, the company's majority shareholder and Chairman, took personal loans or withdrew amounts in excess of $50 million from TBW as advances/loans for himself or for companies he owns and controls. Additionally, TBW made commercial loans in and around the Ocala, Florida area to businesses not owned or controlled by Farkas. Included among these loans is a loan made to U.S. Racing, LLC, a company that operates a race track in Ocala. The loan is evidenced by, among other things, that certain Renewal and Consolidation Note dated December 31, 2007 in the total principal sum of $2,026,968.85, a mortgage encumbering the real estate and improvements upon which the track operates, and the personal guaranties from the members of the borrower.

Additionally, TBW loaned $7,360,000 to Jumbolair, Inc., the operator of an airport and luxury fly-in residential community in the Ocala area. The loan to Jumbolair, Inc. is evidenced by, among other documents, that certain Consolidation Line of Credit Note for Business and Commercial Loans dated August 28, 2008 in the face amount of $7,360,000. The loan has matured, and the borrower is in default of its obligations under the note for, among other reasons, its failure to make interest payments since January of 2009. The loan to Jumbolair, Inc. is

24

secured by a mortgage on certain real estate commonly referred to as Jumbolair Estates consisting of undeveloped phases and developed and unsold lots within the subdivision. The mortgage also encumbers the runway/airstrip and certain common areas and facilities within the development. The loan is also secured by personal guaranties from certain shareholders of Jumbolair, Inc.

In June of 2008 TBW also made a loan of $1,650,000 to GF Restaurants of Marion, LLC, a company owned and controlled by Sean Murla and Danny Gaekwad, a former board member of TBW. The loan is currently in default and is secured by an unimproved piece of real property in Ocala, Florida.

The Debtor's books and records also show receivables from a number of subsidiaries or affiliates wholly or partially owned by TBW: $900,509.52 due from wholly-owned subsidiary REO Specialists, LLC; $26,466.51 due from wholly-owned subsidiary Complete Mortgage Solutions LLC; $1,491,525.01 due from wholly-owned subsidiary Maslow Insurance Agency, LLC; $4,284,746.38 due from wholly-owned subsidiary HMC-Home Mortgages Co.; $631,788.66 due from CDF Tax, Flood & Insurance Services, LLC; $841,960.23 due from SecurityOne Valuation Services, LLC of which TBW is a 50% owner; $3,357,278.05 due from 24/7 Call Capture LLC of which TBW is a 20% owner; and $216,770.45 due from HomesFindMe, LLC of which TBW is a 34% owner.

### 6. Platinum Bank

In July of 2008, TBW acquired a controlling interest in Platinum Bancshares, Inc., the holding company of Platinum Community Bank ("Platinum Bank"), a federally-charted thrift based in Rolling Meadows, Illinois. In accordance with the terms of the Common Stock Purchase Agreement by and between Platinum Bancshares, Inc. and TBW dated December 18, 2007, and after approval of the transaction by the Office of Thrift Supervision, TBW initially acquired 4,378,008 shares of common stock of Platinum Bancshares, Inc. (representing 75% of its outstanding stock) for the purchase price of $10 million. From January 31, 2009 to June 30, 2009, TBW contributed an additional $30 million in capital to Platinum Bancshares, increasing its overall ownership percentage to 92.7 %.[12]

After acquiring the Bank, TBW sought to expand the bank as a retail mortgage origination platform. Platinum Bank opened a branch office in the same building as TBW's Ocala corporate headquarters and opened mortgage origination offices in other locations as well. On September 4, 2009, following TBW's shutdown, Platinum Bank was seized by the Office of Thrift Supervision, and the FDIC was appointed as receiver for the bank. In its order appointing the FDIC as receiver, the OTS noted that as of June 30, 2009, Platinum Bank reported approximately $147.96 million in assets and $112.38 million in liabilities. As a contributing cause for the appointment of a receiver, the OTS noted that Platinum Bank obtained $210 million

---

[12]     Additionally, on July 28, 2009, immediately prior to TBW's shutdown, an additional contribution of $3,669,883.65 was transferred to Platinum Bancshares for a capital contribution, but on information and belief, the capital contribution was rejected by Platinum Bank's board of directors. The additional capital contribution has not been returned to TBW.

in escrow deposits from Freddie Mac, which deposits related to TBW's servicing of Freddie Mac loans. With these escrow deposits, according to the OTS order, the bank rapidly doubled its asset size by using most of those escrows for various purposes which are still being explored by the Debtor. On September 1, 2009, according to the OTS order, Freddie Mac demanded repayment of the $210 million by September 8, 2009. Because Platinum Bank did not have sufficient liquidity to repay the escrow deposits as demanded, the OTS concluded that sufficient grounds for the appointment of a receiver existed under applicable law.

D.    **Principal Financing Transactions and Indebtedness**

TBW entered into a myriad of financing transactions to finance its business. At the time TBW filed its Chapter 11 case, the primary means of funding its mortgage origination business included a number of participation facilities, the Ocala Funding Facility, and other traditional warehouse lines of credit. Additionally, TBW funded its servicing operations through working capital lines of credit allegedly secured by TBW's mortgage servicing rights under certain servicing contracts to which TBW is a party. Each of these facilities is discussed below.

1.    **Loan Participation Facilities**

A key component of TBW's financing was its longstanding relationship with Colonial. Dating back to 1999, Colonial served as one of TBW's primary sources for loan funding through a number of different facilities. Starting in 2002, Colonial began providing TBW funding options through various participation facilities, including the COLB Facility and the AOT Facility. Under the terms of these facilities, TBW sold or should have sold to Colonial a participation interest (usually 99%) in mortgage loans until the loans were sold to mortgage investors or allocated to a particular mortgage security for which other financing was available.

a.    COLB

The COLB Facility in which Colonial was the sole participant was the most significant COLB transaction.[13] Under the COLB Facility between TBW and Colonial, TBW sold to Colonial a specified participation interest in mortgage loans. Under the COLB Documents, TBW was obligated to repurchase the participation interests only in quite limited circumstances, principally for breach of a representation or warranty. TBW granted to Colonial a security interest in the mortgage loans and related collateral in the event the transaction was deemed a financing and not a true sale.

In day-to-day operations, the COLB Facility was intended to be a true sale of the participation interests (or a "true participation"), and operated, for the most part, like a true participation. Colonial, as buyer, would purchase a participation interest in the percent specified in the applicable participation certificate of TBW's ownership rights in and to the participated mortgage loans and indebtedness, related loan documents, the end investor commitment, all

---

[13]    TBW was also a party to a smaller COLB participation facility for which Colonial was agent, referred to as the COLB/Seaside Bank Facility.

escrow and reserve accounts and funds held on deposit therein and all other documents and instruments, evidencing, securing or otherwise relating to the participated mortgage loans.

The participation could be bought when the loan was "*wet*" (the original loan documents had not been delivered to the custodian) or "*dry*" (the original loan documents had been delivered to the custodian, except that the original mortgage may not have been returned from the real property recording office). Colonial paid the participation purchase price to the closing agent if the loan was wet. If the loan was dry when Colonial bought its interest, it paid the purchase price to TBW (if TBW originated the loan) or to an applicable warehouse lender (if the loan was originated by a correspondent and bought by TBW). The sale to the take-out investor typically occurred anywhere from 2 days to 4 weeks after purchase of the participation. Importantly, at the time TBW ceased operations, the COLB Facility was TBW's only source of wet funding for its loan origination business.

The preceding description of the COLB Facility summarizes the COLB Documents. There are disputes as to how the COLB Facility actually operated and was managed, but the Debtors have settled those disputes in the FDIC Settlement Agreement. Colonial's perfection in the COLB Loans was also challenged by the Plan Proponents. All perfection issues raised by the Plan Proponents regarding the COLB Facility were also settled in the FDIC Settlement Agreement. See discussion of the FDIC Settlement Agreement in Section V of this Disclosure Statement.

b.     AOT

TBW and Colonial also entered into assignment of trade (commonly referred to as AOT) participation facilities. Under these facilities, Colonial, on its own behalf or as agent for other banks, would purchase participation interests in trades held by TBW with respect to agency securities (both Freddie Mac and Ginnie Mae) and securities issued by private label issuers. In practice, once TBW allocated a loan to an agency or private label securitization, a loan that was previously funded on the COLB Facility (or other facilities) was sometimes moved to the AOT until the ultimate settlement of the underlying trade.

TBW was a party to three different AOT participation facilities. In two of those facilities, the AOT/Cole Taylor Facility and the AOT/USAmeriBank Facility, Colonial purchased participation interests in its capacity as agent for another bank. However, by far the largest AOT participation facility was the facility in which Colonial purchased participations for its own account (referred to herein as the AOT Facility). There was a great deal of discrepancy between the way the AOT Facility was to operate as outlined in the AOT Documents, and the way the AOT Facility in practice operated. There were also disputes regarding the FDIC's perfection in the mortgage loans "assigned to the AOT." The Plan Proponents and the FDIC resolved all disputes regarding the AOT Facility and perfection in the AOT Loans as related collateral in the FDIC Settlement Agreement.

(i)     Structure of facility as set forth in the AOT Documents:

TBW's AOT Facility with Colonial is evidenced by the AOT Documents.  For transactions where the take-out buyers are Freddie Mac or beneficiaries of a Ginnie Mae guaranty, the AOT Documents for agency securities applied.  Where the take-out buyer purchased a pool of mortgage loans or securities issued by a private, non-government-backed issuer, the AOT Documents for whole loan trades and private issuer securities applied.

The AOT Documents provided that Colonial would purchase a 99% participation in a pool of eligible mortgage loans from TBW in a transaction that was intended to be a true sale. The AOT Documents provided that a sale of a participation under the AOT Facility was the sale of an undivided 99% beneficial ownership interest in the note, mortgage, related loan documents and files, and all proceeds thereof. At the time of the sale, TBW also assigned to Colonial all of its rights under a forward trade, which is a commitment from a buyer (a take-out buyer or take-out investor) to purchase the pool of mortgage loans being participated, or securities backed by the pool of mortgage loans being participated, within a specified time period at a specified price, usually within 30 days. Thus, the advance made by Colonial financed TBW's origination of the mortgage loan and provided a type of operating capital for TBW. TBW also earned fee income by servicing the loans during the period from the sale of the participation to the closing of the sale to the take-out buyer.

If the take-out buyer purchased securities backed by the pool of mortgage loans being participated to Colonial, a clearing agent (The Bank of New York Trust Company) acted as the clearing house to close the forward trade.  Under a clearing and custodial agreement, the clearing agent would accept funds from the take-out buyer, accept the securities from the issuer, and accept delivery of the pool of mortgage loans from TBW.  At the closing, TBW received the funds from the take-out buyer, the take-out buyer received the securities, and the issuer of the securities received the loans and loan files. The clearing agent acted as custodian for the various parties for purposes of facilitating the closing.

(ii)     In practice, AOT operated as a financing:

The AOT Facility was structured as a true sale of a participation interest in pools of mortgage loans, although in practice it operated as a financing. TBW obtained advances from Colonial based upon the "assignment" of the AOT Facility mortgage loans owned by TBW to. Contrary to the requirements of the AOT Documents, (a) participation certificates were not issued to evidence the participation interest, (b) TBW paid interest and principal payments to Colonial based upon the amount advanced under the AOT Facility and not based on payments received from borrowers on the mortgages assigned to the AOT, and (c) TBW retained, and did not forward to Colonial, 99% of the principal and interest payments made by borrowers. Thus, in practice, the facility operated not as a sale transaction, but as a loan facility.

As more fully set forth in the Reconciliation Report, the manner by which TBW utilized the AOT Facility led to increasing problems by the Petition Date. For example, among other issues, as of the Petition Date, there were 124 pools of loans assigned to the AOT Facility with a purported cumulative balance of $1,473,868,368. None of these "trades" was an actual, pending

28

transaction, and 112 were "duplicative" of actual trades assigned to another Bank of America financing facility (wholly unrelated to Ocala Funding). Thus, there appears to be no value in the 124 trades assigned to the AOT Facility.

While the amounts have not been quantified precisely, the Reconciliation confirms that since June 30, 2008, hundreds of millions of dollars in proceeds from the AOT Facility (as well as proceeds of loan sales by Ocala Funding) were used to pay Servicing Advances and loan repurchases, pay off worthless trades assigned to the AOT Facility, and fund other aspects of TBW's business operations. These uses were inconsistent with the AOT Documents.

Collectively, the COLB Facility and the AOT Facility provided TBW with funding capacity through Colonial in excess of $3 billion for the origination, purchase and ultimate sale of loans.

c.    Early Purchase Facility

In addition to the Colonial participation facilities, a few months before the Petition Date, Bank of America provided a participation facility to TBW pursuant to a Mortgage Loan Participation Purchase and Sale Agreement dated March 31, 2009 between TBW, as Seller, and Bank of America, as Purchaser, commonly referred to as the "Early Purchase Facility." This facility was another type of participation facility that was established to provide capital for TBW to originate or acquire qualifying mortgage loans, until TBW sold the loans to a Ginnie Mae securitization conduit. The Early Purchase Facility initially provided funding for up to $500 million and was expanded in May of 2009 to provide for funding of up to $1 billion.

The Early Purchase Facility worked as follows. Initially, TBW sold to Bank of America 100% of TBW's beneficial interest in pools of eligible mortgage loans, all related servicing rights, and all rights under a commitment letter issued to TBW from a takeout investor (committing to purchase a Ginnie Mae security backed by the mortgage loan pool on a specified trade date at a specified price.) Each sale was to be evidenced by a participation certificate and was intended to constitute a true sale of a participation interest. TBW sold pools of mortgage loans (that had been participated to Bank of America) to a Ginnie Mae-sponsored special purpose entity in exchange for Ginnie Mae's issuance of the Ginnie Mae mortgaged-backed security to the takeout investor. The purchaser of the Ginnie Mae security (the takeout investor) was Bank of America Securities, which is a registered broker-dealer. On the specified trade date, Bank of America Securities, as takeout investor, paid the purchase price for the Ginnie Mae security to Bank of America, the holder of the 100% participation interest in the mortgage loans, and received the Ginnie Mae security. The issuance of the security caused the defeasance of the participations evidenced by the participation certificate.

Colonial was the custodian for Bank of America, as purchaser, under a custodial agreement also dated March 31, 2009. As custodian, Colonial would (i) take possession of the promissory notes evidencing the participated mortgage loans, (ii) act as authenticating agent for the sale evidenced by the participation certificates and confirm for Bank of America that all mortgage loans described in the participation certificate were in its possession and that all mortgage loan documents had been obtained sufficient for Ginnie Mae to deliver a Ginnie Mae

security, and (iii) deliver to Ginnie Mae a certification sufficient to permit Ginnie Mae to deliver a Ginnie Mae security in respect of the participated mortgage loans.

TBW serviced the mortgage loans from the period from the purchase of the participation certificate by Bank of America to the sale of the mortgage loans and issuance of the Ginnie-Mae security. Bank of America, as purchaser, would engage TBW, as seller, to service the mortgage loans, so long as Bank of America owned the participation certificate. TBW, as seller, retained bare legal title to the mortgage loans to facilitate servicing the loans.

## 2.     Ocala Funding Facility

In addition to the participation facilities, the other major source of funding as of the Petition Date for TBW's loan origination operations was the Ocala Funding Facility, a commercial paper securitization facility. This facility was established in 2005 for the purpose of financing the sale of mortgage loans originated by TBW. Ocala Funding LLC is a limited liability company formed by TBW in 2005 as a "bankruptcy remote" subsidiary, and TBW was its managing member.     Ocala Funding was formed for the sole purpose of (1) purchasing mortgage loans that met certain criteria from TBW and (2) selling and securitizing the mortgage loans to third parties (principally Freddie Mac).

It was expected that Ocala Funding would not hold mortgage loans for more than 60 days.  Ocala Funding obtained funds to purchase mortgage loans from TBW by issuing short-term promissory notes, commonly referred to in the industry as commercial paper notes. Those short term notes were secured by mortgage loans owned by Ocala Funding, and from Cash held in reserve or collateral accounts.  The transaction documents also allowed for the issuance of other types of promissory notes. Since June 30, 2008, the only holders of the senior promissory notes issued by Ocala Funding were BNP Paribas and Deutsche Bank. LaSalle Global Trust, an operating unit of LaSalle Bank (now known as Bank of America and referred to herein as Bank of America) serves as (i) the indenture trustee for the noteholders under the indentures and depositary agreements under which the notes were issued, (ii) as collateral agent for the benefit of the indenture trustee, the depositary, and the noteholders, (iii) as custodian of the original mortgage loans and mortgage loan documents for the benefit of the indenture trustee, the collateral agent and the noteholders, and (iv) as depositary agent.  TBW was the servicer for the facility.

As collateral agent, among other duties, Bank of America was required to maintain (a) a reserve fund that had at all times a minimum amount as stated in the transaction documents and (b) a collateral account into which proceeds from the sale of notes was deposited, from which all maturing notes were to be paid, and from which, if no termination event or amortization event occurred and required reserves were maintained, the issuer (Ocala Funding) could receive a distribution to purchase additional mortgage loans.   Other credit enhancements were also established, including a holdback.  Ocala Funding also issued subordinated notes which are subordinated in right of payment to the notes held by BNP Paribas and Deutsche Bank.

As custodian, among other duties, Bank of America maintained the original mortgage loans that were collateral for the noteholders, and delivered to third party purchasers (principally

Freddie Mac), in escrow, for examination, mortgage loans owned by Ocala Funding and subject to the lien of the collateral agent.

As depositary agent, among other duties, Bank of America acted as depositary for the safekeeping of, and issuing and paying agent for, the notes.

On each date that notes issued by Ocala Funding matured, the noteholders were to be repaid in full the principal and interest owing under those maturing notes, and, on that same day, if certain conditions were met, the investors would purchase a new issuance of Ocala Funding commercial paper. The transaction documents required that the proceeds from each issuance of notes be used to repay notes of the same type maturing on that day, and after paying the maturing notes and paying certain permitted expenses under the transaction documents for the securitization facility, Ocala Funding was allowed to receive the remaining funds to purchase additional mortgage loans from TBW. Cash from the sale of mortgage loans to Freddie Mac was to be remitted to the Ocala Funding collateral account maintained by Bank of America. Thus, Cash collections from the sale of mortgage loans to Freddie Mac and Cash advanced by the noteholders to purchase new notes were to be used to pay the notes that were maturing, to pay certain expenses of the securitization transaction, fund certain reserves and holdbacks, and to purchase new mortgage loans that met Freddie Mac's criteria.

From its inception, the Ocala Funding Facility was an important funding source for TBW, and the amount of issued and outstanding notes increased as TBW's business grew. In May of 2005, there was a total of $325 million in issued and outstanding secured loan notes. By June 2007, the outstanding balance of issued secured loan notes had grown to more than $4.4 billion. In addition, Ocala Funding owed $67.5 million in subordinated debt. In August 2007, the asset-backed commercial paper market crashed. As a result, Ocala Funding was unable to continue issuing new secured loan notes as it had done in the past, and many of the original participants in the facility stopped purchasing secured loan notes. As a result, between August 2007 and October 2007, Ocala Funding redeemed almost $2.8 billion in secured loan notes.

The Ocala Funding Facility was restructured on June 30, 2008, and the maximum amount of the facility was reduced to $1.75 billion. Deutsche Bank and BNP Paribas were the only remaining investors in the facility, and the mortgages assigned as collateral to the facility were specifically allocated among those two participants. Importantly, after the June 2008 restructuring, wet funding was no longer permitted under the facility and the Colonial COLB Facility became TBW's principal source for wet funding.

When TBW received notice from Freddie Mac on August 4, 2009 that it was allegedly terminated as an approved Freddie Mac seller or servicer, TBW was not able to originate new mortgage loans to sell to Ocala Funding. As of that date, the assets owned by Ocala Funding were substantially less than its liabilities.[14]

---

[14]     As discussed more fully in the Reconciliation Report, as of the Petition Date, Ocala Funding owed approximately $1.68 billion to Deutsche Bank and BNP Paribas pursuant to promissory notes issued as part of the

The manner by which TBW utilized Ocala Funding led to increasing problems by the Petition Date. As discussed more fully in the Reconciliation Report, certain loans assigned to the COLB Facility had previously been "sold" to Ocala Funding and delivered to Bank of America, as its collateral agent. Moreover, Ocala Funding or TBW had previously sold certain of these loans to third-party mortgage investors such as Freddie Mac. This practice resulted in the respective records of Colonial, Ocala Funding and Freddie Mac (or other investors) each indicating that they were the "owner" of over 4,000 of the same mortgages.

On November 25, 2009, BNP Paribas and Deutsche Bank sued Bank of America for breach of contract, to enforce their right to indemnification under the transaction documents for the Ocala Funding Facility, and for breach of fiduciary duty. The complaint alleged that the investment made by the investors in Ocala Funding was premised on the understanding that at all times the obligations owing under the commercial paper notes would be fully secured by mortgage loans owned by Ocala Funding and by Cash collected from sales of mortgage loans by Ocala Funding to Freddie Mac. The investors claim they relied on the borrowing base certificate prepared by Ocala Funding before purchasing any new commercial paper from Ocala Funding, and that Bank of America falsely certified that the borrowing base condition was satisfied, and repeatedly did so. They also claimed that Bank of America allowed TBW access to funds in Ocala Funding accounts to make withdrawals that were not permitted by the transaction documents.

Bank of America has filed a motion to dismiss the complaint filed by BNP Paribas and Deutsche Bank. Specifically, Bank of America claims that it had no duty to monitor Ocala Funding's performance under the transaction documents, much less an express duty, and that Bank of America has no duty in the transaction documents to verify Ocala Funding's compliance with the borrowing base. Bank of America claims that it was entitled to rely on certifications provided by Ocala Funding in regard to the matters raised in the complaint. It claims that TBW used its power and authority as servicer to convert funds belonging to Ocala Funding and to direct Bank of America to deliver mortgage loans to enable TBW to convert those mortgage loans for the benefit of TBW or others. Bank of America claims that the transaction documents for the Ocala Funding Facility made it abundantly clear that it was Ocala Funding and TBW, not Bank of America, that was to manage Ocala Funding's assets and direct its daily operations, including the selection and purchase of mortgages and the flow of mortgage proceeds. It further claims that it was TBW, and not Bank of America, that expressly undertook in the transaction documents to perform the oversight functions that the complaint attributes to Bank of America.

Bank of America has filed a proof of claim against TBW in these Chapter 11 Cases in the amount of $1.75 billion, and to the extent treble damages are permitted, $5.25 billion, plus other unliquidated amounts. The proof of claim asserts claims against TBW for fraud, conspiracy, theft, breach of fiduciary duty, breach of contract and other grounds. The holders of the commercial paper notes, Deutsche Bank and BNP Paribas, also filed Claims.

---

Ocala Funding Facility. As of that date, the UPB of the collateral in possession of Bank of America, as collateral agent for the Ocala Funding Facility, comprised of Cash and 693 loans, was less than $165 million.

Ocala Funding is not a debtor in TBW's bankruptcy proceeding. However, transactions between TBW and Ocala Funding and the Ocala Funding Facility were a major focus of the Asset Reconciliation conducted by the Debtor during the pendency of this case. See discussion of the Reconciliation Report *infra* at IV.H.7.

### 3. Credit Facilities

In addition to the various participation facilities and the Ocala Funding Facility, TBW also had a number of smaller traditional credit facilities which it accessed in connection with the origination and sale of mortgage loans. Included among those facilities are the Colonial Overline Facility and the RBC Bank Construction Facility.

#### a. Overline Facility

At the Petition Date, the Colonial Overline Facility was comprised of two sub-facilities that, collectively, provided $19.8 million in funding for TBW:

(1)  a discretionary mortgage loan repurchase facility, evidenced by the Repurchase Agreement under which TBW received 98% of the principal balance of the loan as the purchase price for each conforming loan purchased (the advance rate for a non-conforming loan was 70%), and

(2)  a committed line of credit under which Colonial made advances against 70% of the value of REO owned by TBW as a result of a foreclosure of a mortgage loan that had been the subject of a "sale transaction" (referred to as a "Transaction" under the Repurchase Agreement). This sub-facility is referred to as the REO Line of Credit.

At the Petition Date, the combined commitment under the Overline Facility (for both purchases of loans under the Repurchase Agreement and advances secured by REO under the REO Line of Credit) was $19.8 million.

Previously, TBW also had available to it a committed repurchase facility referred to as the "Repo Line" that allowed TBW to "sell" mortgage loans it originated to the "buyers" (which in fact were lenders) under the Repurchase Agreement. In January 2009, the buyers terminated their commitments to purchase loans under the Repo Line, leaving only the discretionary sub-facility under the Overline Facility in place with Colonial as the sole purchaser of loans. Transactions that were "open" under the Repo Line of the Repurchase Agreement in January 2009 were transferred to the Overline sub-facility. The Repo Line and the discretionary Overline sub-facility were warehouse facilities designed to provide short-term financing pending the sale by TBW of the Purchased Loans to an investor (typically a private investor or a securitization trust). TBW serviced Purchased Loans pending purchase by a take-out investor, which provided TBW with an additional source of fee revenue.

Each mortgage loan assigned under the Overline Facility (or the Repo Line when it was in effect) was termed a "Purchased Loan" and each assignment was referred to as a "Transaction." A Transaction remained an "Open" Transaction until the Purchased Loan was sold to an investor or repurchased by TBW. Concurrent with each transfer of a Purchased Loan

to a buyer, TBW agreed to repurchase the loan in connection with the sale of the loan to an investor or upon the occurrence of certain triggering events. Specifically, TBW was obligated to repurchase Purchased Loans: (i) upon demand, upon the occurrence of any event of default under the Repurchase Agreement; (ii) ten days after notice to TBW of breach of a representation or warranty relating to a Purchased Loan, if such breach remained uncured by TBW; (iii) upon expiration of the commitment of the applicable take-out investor to purchase such Purchased Loan, unless a new investor commitment was provided; and (iv) at the termination of the facilities under the Repurchase Agreement (which had a maturity of 1 year or less). The substantial degree of recourse available against TBW (for events triggered by factors *other than* misrepresentations as to the quality of the loans being sold) rendered these transactions financings rather than true sales.

Colonial claimed to be perfected in the Overline Loans, either by possession or filing. The Plan Proponents challenged Colonial's perfection in the Overline Loans. All perfection issues raised by the Plan Proponents regarding the Overline Loans were also settled in the FDIC Settlement Agreement. See discussion of the FDIC Settlement Agreement in Section V of this Disclosure Statement.

### b. RBC Bank Construction Facility

At the Petition Date, TBW also had a $9 million line of credit for the purpose of funding construction loans to consumers to build single family residences until the loans were converted to permanent mortgage loans. This line of credit was provided by Florida Choice Bank (n/k/a RBC Bank), and is evidenced by a Loan Agreement dated August 31, 2005.

This line of credit was a secured loan, and the collateral was the construction note, the related mortgage, any guaranty, and all other documents relating to the construction loan. RBC Bank filed a UCC-1 financing statement describing this collateral.

RBC Bank obtained stay relief to liquidate its collateral and has an unsecured Deficiency Claim for this facility. Thus, RBC Bank does not hold a Secured Claim against TBW.

### 4. Loan Servicing Facilities

In addition to its loan origination facilities, TBW had two principal loan facilities that provided capital to fund its substantial servicing operations, the Sovereign Facility and the Natixis Facility, which are described below.

### a. Sovereign Facility

Sovereign, as agent for a lender group, provided a revolving credit facility that, as of the Petition Date, was not a fully advanced facility. The Sovereign Facility is evidenced by the Sovereign Loan Agreement. The Sovereign Facility at one time provided working capital funding of up to $311.5 million, but by August of 2009 the amount outstanding on the facility had been reduced to approximately $168.2 million.

The Plan Proponents are currently reviewing the validity, perfection and priority of Sovereign's Liens in the collateral claimed by Sovereign. The Debtor reserves its rights to contest and obtain a judicial determination of the validity and priority of Sovereign's claimed Lien in the collateral for this facility. Further, the Debtor has not determined whether there is any value in the lien claimed by Sovereign.

### b. Natixis Facility

Natixis Real Estate Capital, Inc., f/k/a IXIS Real Estate Capital Inc., extended to TBW a committed line of credit that TBW was to use in accordance with the requirements of Freddie Mac. The Natixis Facility provided up to $133 million in working capital, but by August of 2009 only approximately $46.4 million was outstanding on the facility. The credit facility is evidenced by the Natixis Loan Agreement.

Natixis claims a first-priority perfected security interest in certain rights with regard to mortgage loans covered by or associated with TBW's Freddie Mac Seller Servicer No. 142080. Natixis filed a UCC-1 covering certain collateral.

The Plan Proponents are currently reviewing the validity, perfection and priority of Natixis' Liens in the collateral claimed by Natixis. The Debtor reserves its rights to contest and obtain a judicial determination of the validity and priority of Natixis' claimed Lien in the collateral for this facility. Further, the Debtor has not determined whether there is any value in the lien claimed by Natixis.

## 5. Guaranty of Plainfield Loan to TBW Affiliate

In connection with the formation of TBW's ESOP and TBW's buyout of the equity position that was held by RLI Corp., an Illinois corporation, in TBW, TBW guaranteed a $31 million term loan made by Plainfield to LBF Holdings LLC, a Florida limited liability company that is owned and controlled by Lee Farkas. Lee Farkas is a co-guarantor on the loan. The loan is evidenced by a Term Loan Agreement dated July 31, 2007 between LBF Holdings LLC, as Borrower, and Plainfield, as Lender.

This $31 million term loan was made for the purposes of (i) repaying existing indebtedness owed to Colonial by Lee Farkas under a Term Loan Agreement dated December 29, 2006, (ii) repaying subordinated debt of TBW to RLI Insurance Company, an Illinois corporation, in the amount of $3 million, which had been subordinated to TBW's obligations to Plainfield, and (iii) to finance TBW's general corporate purposes.

The Plan Proponents are currently reviewing the validity, perfection and priority of Plainfield's Liens in the collateral claimed by Plainfield. The Debtor reserves its rights to contest and obtain a judicial determination of the validity and priority of Plainfield's claimed Lien in the collateral for this facility. Further, the Debtor has not determined whether there is any value in the lien claimed by Plainfield.

### 6. Henley Holdings Facility

In October of 2007, TBW entered into a transaction with Henley Holdings LLC pursuant to which TBW transferred second-lien mortgage loans having an approximate UPB of $150 million to Henley Holdings in exchange for $100 million (referred to in this Section IV.D.6 as the "Investment Balance"). The transaction was structured as a sale of the loans from TBW to a wholly-owned special purpose entity, TBW Funding III LLC, with TBW Funding III thereafter selling the loans to Henley Holdings pursuant to the terms of a Mortgage Loan Sales and Servicing Agreement dated October 17, 2007 (together with related transaction documents, referred to as the Henley Holdings Documents). Because TBW Funding and TBW continued to have certain obligations with respect to representations, warranties, and covenants under the transaction documents relative to the loans and the performance of the loans and an obligation to repurchase or substitute loans in the event the loan portfolio failed to meet certain performance criteria, for accounting purposes TBW treated the transaction as a financing on its books and records as opposed to a true sale. Under the terms of the agreement, TBW continued to act as servicer for the loans. Additionally, upon repayment in full of the Investment Balance, the agreement provided that the loans would be assigned and reconveyed by Henley Holdings to TBW Funding III. Immediately prior to the Petition Date, Henley Holdings terminated TBW's right to service the loans and had the servicing of the loans transferred to 21st Century Mortgage Corporation (an affiliate of Henley).

TBW listed Henley Holdings in its Schedules as a secured creditor holding approximately $77.5 million of secured debt payable by TBW. Henley Holdings has filed a proof of claim asserting that it is the legal titled and beneficial owner of the loans. Henley Holdings takes the position that under the terms of the agreements governing the transaction, certain Material Defaults and Trigger Events (as those terms are defined in Henley Holdings Documents) have occurred and neither the Debtor nor TBW Funding III has any interest in the mortgage loans. Further, Henley asserts that if the transaction was characterized as a loan, any such loan would be secured by a first priority perfected security interest in the loans and proceeds thereof. The Debtor has not made a determination on the merits of Henley Holdings' Claim and the perfection status of the collateral underlying its claim and reserves all rights with respect thereto.

### E. Properties

As of the Petition Date, TBW leased real estate premises at over 60 locations across the U.S.. As of the Petition Date, the Debtor's chief executive office was located at 315 N.E. 14th Street, Ocala, Florida 34470. TBW leases its Ocala headquarters. TBW owns REO and certain other real estate in Ocala which it purchased for purposes of additional parking near its corporate headquarters. HAM owns an office building in Lawrenceville, Georgia, which is not encumbered by a mortgage.

By order of the Court dated October 23, 2009, the Debtor rejected approximately 62 non-residential real property leases [Docket # 516]. The Debtor continues to occupy certain locations pursuant to written lease agreements with various landlords, particularly its Ocala headquarters, certain storage facilities, and its Central Document Facility. On May 6, 2010, the Debtor obtained an order to extend the deadline to assume or reject such leases [Docket # 1408]. The

deadline to assume or reject the Ocala headquarters lease is extended until confirmation of the Chapter 11 Plan.

F.    **Events Leading to the Debtors' Chapter 11 Filings**

TBW's fall was sudden and dramatic. On Monday, August 3, 2009, in connection with an ongoing investigation of Colonial, federal agents executed a search warrant at TBW's headquarters in Ocala, Florida. The following day, August 4, 2009, the United States Department of Housing and Urban Development (HUD) suspended TBW's HUD/FHA origination and underwriting approval, Ginnie Mae issued a notice purporting to terminate TBW's authority to act as a Ginnie Mae issuer and to service its $26 billion mortgage portfolio, and Freddie Mac issued a notice purporting to terminate TBW's eligibility to sell loans and to service its $51.2 billion portfolio.

Although TBW had rights of appeal, the suspension and terminations by these agencies dealt a death blow to TBW's business operation. Left with no other choice, in the afternoon of August 5, 2009, TBW laid off approximately 2,000 employees,[15] reduced its business operations to the minimum level believed necessary to preserve the value of its Assets, and began planning for an orderly restructuring or liquidation of the company, resulting in the filing of its Chapter 11 Case.

From TBW's perspective, the August 5, 2009 shutdown of the majority of its business operations was the result of a series of events that had begun on March 31, 2009. On that date, which was also the last day of TBW's 2008-2009 fiscal year, a group of investors led by TBW signed a definitive agreement with Colonial BancGroup, Inc. (referred to as Colonial BancGroup) to participate in a $300 million equity infusion into Colonial BancGroup. Colonial BancGroup is a publicly held bank holding company that is the parent of Colonial. Colonial was struggling, and the $300 million equity investment would make Colonial BancGroup eligible to receive federal Troubled Asset Relief Program (TARP) funds pursuant to an application previously filed by Colonial BancGroup. The closing of the investment by TBW and the other investors was subject to a variety of conditions. The transaction also required the approval of banking regulatory authorities, including the OTS and the Alabama Banking Department, which imposed extensive conditions on the closing of the transaction. The parties to the agreement anticipated that Colonial BancGroup would continue to operate as a publicly traded company with an independent board of directors and management team separate and apart from TBW following the closing of the transaction. Under the terms of the agreement, which were publicly disclosed by Colonial BancGroup on March 31, 2009, the equity investment was to be completed by July 31, 2009.

Historically, TBW and Colonial have had an extensive banking relationship. Colonial maintained virtually all of TBW's bank accounts, including approximately 108 custodial accounts necessary to TBW's servicing business. Significantly, as previously discussed,

---

[15]    It is alleged by these employees that their termination violated the WARN Act, as discussed in Section IV.H.10 below.

Colonial was also party to participation facility agreements with a cumulative purchasing capacity in excess of $3 billion, along with a $19.8 million line of credit, all of which were critical to TBW's business operation.

In connection with the close of TBW's fiscal year on March 31, 2009, Deloitte & Touche LLP (referred to herein as Deloitte), the company's auditor, performed work necessary to the preparation and issuance of TBW's audited financial statements. Pursuant to HUD regulations and TBW's agreements with Ginnie Mae, Freddie Mac, and various lenders, TBW was required to deliver its year-end audited financial statements to the agencies and its lenders within 90 days of its fiscal year-end (*i.e.*, by June 30, 2009). As the audit was underway, banking regulators were reviewing the proposed investment in Colonial by TBW and others in the investor group. Colonial had previously applied for TARP funds in connection with the proposed transaction, and that application was apparently under consideration.

On June 16, 2009, members of Deloitte's audit team met with TBW and expressed concerns that they were encountering delays in obtaining information and documentation from TBW regarding TBW's accounting treatment and presentation of REO on its balance sheet. REO Assets of TBW, for the most part, are properties that were on its balance sheet as a result of foreclosures. An Asset becomes REO when the collateral, residential real estate, securing a defaulted mortgage loan is foreclosed. Specifically, Deloitte was focused on REO Assets that were originally funded using one of Colonial's participation facilities with TBW. Deloitte's concerns derived from its belief that a conversation may have occurred between individuals at TBW and Colonial regarding the accounting treatment for REO on TBW's balance sheet.

Acting on its belief that TBW and Colonial employees had engaged in potentially inappropriate communications regarding TBW's accounting treatment of REO Assets, Deloitte recommended that TBW retain outside counsel, independent from any aspect of TBW's relationship with Colonial and the pending transaction with Colonial, to examine the nature and extent of the perceived communications between TBW and Colonial regarding the REO issue. As a result, TBW retained Troutman Sanders, TBW's special counsel in these Chapter 11 Cases, to look into these issues.

In a letter dated July 2, 2009, Ginnie Mae notified TBW that its failure to submit timely audited financial statements by June 30, 2009, as was required by TBW's Guarantee Agreement as well as the Ginnie Mae Mortgage Backed Securities Guide, constituted an event of default. In its July 2 letter, Ginnie Mae required TBW to provide a written response to Ginnie Mae's July 2 letter that satisfactorily addressed this issue.

Subsequently, in a letter dated July 6, 2009, TBW's Chief Executive Officer, Paul Allen, provided an explanation to Ginnie Mae of the reasons for the delay in delivering audited financials and stated there were no unresolved issues with TBW's auditors. This letter was not reviewed by TBW's counsel, Deloitte, or TBW's Chairman. Two weeks later, when TBW had not delivered audited financial statements, Ginnie Mae requested TBW's permission to speak with Deloitte about the audit. TBW consented, and on or about July 20, 2009, Ginnie Mae spoke with Deloitte. It is now apparent that based on conversations it had with Deloitte, Ginnie Mae drew the conclusion that Mr. Allen's July 6 letter had been misleading. Consequently, on July

22, 2009, Ginnie Mae demanded a prompt explanation, which was provided by a letter from TBW's Chairman dated July 27, 2009. Following TBW's receipt of Ginnie Mae's July 22, 2009 letter, TBW, through Troutman Sanders, was in ongoing communication with Ginnie Mae and HUD's Office of Inspector General.

Apparently, as these events unfolded at TBW, Colonial was communicating with various regulators and federal agencies. Though unknown to TBW at the time, it also appears that Colonial was the subject of civil and criminal investigations by the Department of Justice, as well as other federal agencies.

By a press release issued July 31, 2009, Colonial announced that the $300 million equity investment transaction would not close and that "substantial doubt" existed about its continued viability as a going concern. The following day, Saturday, August 1, 2009, a search warrant was issued for the search of TBW's headquarters in Ocala, Florida. Federal agents executed the search warrant at TBW's headquarters the following Monday, August 3, 2009. On that same day, federal agents executed a search warrant at Colonial's offices in Orlando, Florida.

Though not a cause of TBW's collapse, it should also be noted that on June 22, 2009, TBW entered into a Settlement Agreement and Consent Order with state regulators from 14 states regarding its loan origination and underwriting practices. In the wake of the HUD suspension and the alleged Ginnie Mae and Freddie Mac terminations on August 4, 2009, these and other states filed cease and desist actions against TBW (and, in a few cases, certain individual employees) following the August 5, 2009 shutdown of TBW's lending operations. The cease and desist actions are more fully described in Section IV.H.10.d.

Beginning on or about August 5, 2009, Colonial froze all of TBW's accounts and refused to honor checks, receive wire transfers, or permit disbursements (referred to as the Administrative Freeze). As a result, TBW was unable to conduct business and meet its servicing obligations.

The HUD suspension and the alleged Ginnie Mae and Freddie Mac terminations on August 4, 2009, caused a ripple effect throughout TBW's business. TBW received termination letters from hedge counterparties[16] and parties for whom TBW serviced mortgage loans,[17] resulting in a significant loss of revenue and substantially damaging TBW's business prospects. Additionally, demand letters were received, including a demand letter from Bank of America as Indenture Trustee accelerating and demanding payment for all principal and interest owing under

---

[16]     Termination letters for hedging contracts were issued by BNP Paribas, Citigroup Global Markets, Inc., Deutsche Bank, AG, Deutche Bank, AG (London Branch), among others.

[17]     Servicing termination letters were sent by Bank of America (for the Ocala Funding Facility), Bayview or U.S. Bank (for the Bayview/U.S. Bank Securitizations), Colonial (for the Repurchase Agreement, the AOT Facility and COLB Facility), Colonial, as agent for other purchasers of participations under facilities similar to AOT and COLB (including the AOT/Cole Taylor Facility, the AOT/U.S. AmeriBank Facility, and the COLB/Seaside Bank Facility), and Wells Fargo (as indenture trustee for various non-affiliated securitization conduits sponsored by banks, such as Credit Suisse, BNP Paribas, Lehman Brothers and UBS).

the Notes owed by Ocala Funding. Shortly after the Petition Date, allegations began to surface that TBW had "double pledged" or sold loans to more than one investor.

A meeting of the TBW Board of Directors was called on August 20, 2009 to authorize the filing of the bankruptcy petition for TBW to stop the freefall in demand and termination letters, and to preserve TBW's servicing and loan origination businesses, in order to achieve a maximum recovery for all creditors. Following the meeting, all senior officers except Jeffery W. Cavender, TBW's General Counsel, and Stuart Scott, TBW's Chief Operating Officer, resigned. On August 23, 2009, following approval being given by the Office of Thrift Supervision of the proposed new directors and Neil Luria as CRO, the board appointed two new independent directors, William L. Maloney and R. Bruce Layman, to comprise the board and all previous members of the Board of Directors resigned. The new board then approved the prior board resolutions authorizing the bankruptcy filing and appointed Neil Luria to serve as CRO for TBW and its subsidiaries on August 23, 2009.

G.    **Impact of Pre-Filing Events Upon TBW's Assets and Liabilities**

Through the process resulting in the Reconciliation and other activities undertaken by the Debtor since the Petition Date, it is now evident that by the time that the events described in the preceding subsection F of this Section actually occurred, TBW's liabilities far exceeded its assets. While TBW was engaged in significant, legitimate business activity, it did not generate sufficient profit or have the resources and financing available to fund its operations. In fact, it now appears that TBW operated at a significant loss for a number of years and that as the company grew in recent years, those losses were exacerbated.

As indicated by the results of the Asset Reconciliation, TBW covered its operating losses, as well as its obligations to mortgage investors, by misappropriating and misusing funds and funding sources over which it exercised control – primarily the COLB, the AOT and the Ocala Funding Facilities. At the same time, TBW was originating a significant number of loans that mortgage investors now contend were not eligible for sale under the relevant controlling agreements and, therefore, should be repurchased by TBW. The combination of these factors resulted in TBW having relatively little Cash and other assets at the Petition Date as compared to billions of dollars in Claims.

H.    **These Chapter 11 Cases**

TBW filed for Chapter 11 protection on August 24, 2009, in order to preserve its remaining business operations and effectuate an orderly liquidation of its property for the benefit of creditors. As discussed below, the Debtor has worked diligently to protect, preserve, and ultimately administer properly its property for the benefit of Creditors.

These Chapter 11 Cases have been complicated by the fact that it is now evident that TBW used the proceeds of mortgage loan sales and other funding sources in a manner that was inconsistent with the nature, purpose and provisions of agreements with certain lenders and other stakeholders. During TBW's Chapter 11 Case, the Debtor and its Professionals performed an