Colonial was the subject of civil and criminal investigations by the Department of Justice, as well as other federal agencies.

By a press release issued July 31, 2009, Colonial announced that the $300 million equity investment transaction would not close and that "substantial doubt" existed about its continued viability as a going concern. The following day, Saturday, August 1, 2009, a search warrant was issued for the search of TBW's headquarters in Ocala, Florida. Federal agents executed the search warrant at TBW's headquarters the following Monday, August 3, 2009. On that same day, federal agents executed a search warrant at Colonial's offices in Orlando, Florida.

Though not a cause of TBW's collapse, it should also be noted that on June 22, 2009, TBW entered into a Settlement Agreement and Consent Order with state regulators from 14 states regarding its loan origination and underwriting practices. In the wake of the HUD suspension and the alleged Ginnie Mae and Freddie Mac terminations on August 4, 2009, these and other states filed cease and desist actions against TBW (and, in a few cases, certain individual employees) following the August 5, 2009 shutdown of TBW's lending operations. The cease and desist actions are more fully described in Section IV.H.10.d.

Beginning on or about August 5, 2009, Colonial froze all of TBW's accounts and refused to honor checks, receive wire transfers, or permit disbursements (referred to as the Administrative Freeze). As a result, TBW was unable to conduct business and meet its servicing obligations.

The HUD suspension and the alleged Ginnie Mae and Freddie Mac terminations on August 4, 2009, caused a ripple effect throughout TBW's business. TBW received termination letters from hedge counterparties[19] and parties for whom TBW serviced mortgage loans,[20] resulting in a significant loss of revenue and substantially damaging TBW's business prospects. Additionally, demand letters were received, including a demand letter from Bank of America as Indenture Trustee accelerating and demanding payment for all principal and interest owing under the Notes owed by Ocala Funding. Shortly after the Petition Date, allegations began to surface that TBW had "double pledged" or sold loans to more than one investor.

A meeting of the TBW Board of Directors was called on August 20, 2009 to authorize the filing of the bankruptcy petition for TBW to stop the freefall in demand and termination letters, and to preserve TBW's servicing and loan origination businesses, in order to achieve a maximum recovery for all creditors. Following the meeting, all senior officers except Jeffery W. Cavender, TBW's General Counsel, and Stuart Scott, TBW's Chief Operating Officer, resigned.

---

[19]   Termination letters for hedging contracts were issued by BNP Paribas, Citigroup Global Markets, Inc., Deutsche Bank, AG, Deutche Bank, AG (London Branch), among others.
[20]   Servicing termination letters were sent by Bank of America (for the Ocala Funding Facility), Bayview or U.S. Bank (for the Bayview Securitizations), Colonial (for the Repurchase Agreement, the AOT Facility and COLB Facility), Colonial, as agent for other purchasers of participations under facilities similar to AOT and COLB (including the AOT/Cole Taylor Facility, the AOT/U.S. AmeriBank Facility, and the COLB/Seaside Bank Facility), and Wells Fargo (as master servicer for various non-affiliated securitization conduits sponsored by banks, such as Credit Suisse, BNP Paribas, Lehman Brothers and UBS).

On August 23, 2009, following approval being given by the Office of Thrift Supervision of the proposed new directors and Neil Luria as CRO, the board appointed two new independent directors, William L. Maloney and R. Bruce Layman, to comprise the board and all previous members of the Board of Directors resigned.  The new board then approved the prior board resolutions authorizing the bankruptcy filing and appointed Neil Luria to serve as CRO for TBW and its subsidiaries on August 23, 2009.

### G.    **Impact of Pre-Filing Events Upon TBW's Assets and Liabilities**

Through the process resulting in the Reconciliation and other activities undertaken by the Debtor since the Petition Date, it is now evident that by the time that the events described in the preceding subsection F of this Section actually occurred, TBW's liabilities far exceeded its assets.  While TBW was engaged in significant, legitimate business activity, it did not generate sufficient profit or have the resources and financing available to fund its operations.  In fact, it now appears that TBW operated at a significant loss for a number of years and that as the company grew in recent years, those losses were exacerbated.

As indicated by the results of the Asset Reconciliation, TBW covered its operating losses, as well as its obligations to mortgage investors, by misappropriating and misusing funds and funding sources over which it exercised control – primarily the COLB, the AOT and the Ocala Funding Facilities.  At the same time, TBW was originating a significant number of loans that mortgage investors now contend were not eligible for sale under the relevant controlling agreements and, therefore, should be repurchased by TBW.  The combination of these factors resulted in TBW having relatively little Cash and other assets at the Petition Date as compared to billions of dollars in Claims.

### H.    **These Chapter 11 Cases**

TBW filed for Chapter 11 protection on August 24, 2009, in order to preserve its remaining business operations and effectuate an orderly liquidation of its property for the benefit of creditors.  As discussed below, the Debtor has worked diligently to protect, preserve, and ultimately administer properly its property for the benefit of Creditors.

These Chapter 11 Cases have been complicated by the fact that it is now evident that TBW used the proceeds of mortgage loan sales and other funding sources in a manner that was inconsistent with the nature, purpose and provisions of agreements with certain lenders and other stakeholders.  During TBW's Chapter 11 Case, the Debtor and its Professionals performed an extensive investigation of certain related issues, which are set forth in the Reconciliation Report filed on July 1, 2010.

As discussed below, by using the tools available to them as debtors in possession under Chapter 11 of the Bankruptcy Code, the Debtors were able to impose a measure of order on the chaos which, outside of bankruptcy, would likely have resulted in an inequality of Distribution among creditors, arguably a diminished recovery to secured Creditors and, in all likelihood, no recovery whatsoever for the Debtors' unsecured Creditors.

### 1.    Debtor in Possession Status

Since filing for bankruptcy protection, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code [Docket #s 15 and 16].

### 2.    Entry of TBW's First Day Orders and Other Administrative Orders

Concurrently with filing its bankruptcy petition, the Debtor filed several motions with the Bankruptcy Court that were intended to stabilize the Debtor and enable it to continue certain limited operations. Pursuant to its First Day Motions, the Debtor sought and obtained from the Bankruptcy Court, among other relief, approval of the appointment of BMC as claims, notice, and balloting agent in these Chapter 11 Cases [Docket #s 9 and 130]. The Debtor also sought and was initially denied relief to establish adequate assurance procedures with respect to utility providers [Docket #s 6 and 129]. However, the Court thereafter approved TBW's *Compromise Related to Payments of Adequate Assurance for Utility Service with the City of Ocala* [Docket #s 536 and 696].

Shortly after the Petition Date, the Debtor filed other administrative motions with the Bankruptcy Court, including: (i) a motion authorizing TBW to pay certain pre-petition obligations for wages, salaries, and other employee benefits [Docket #s 93 and 168]; (ii) a motion seeking to extend the deadline for filing the Schedules [Docket #s 121 and 307]; and (iii) a motion establishing interim compensation procedures for professionals employed by TBW's Estate [Docket # 443]. Each of these motions was granted by the Bankruptcy Court [respectively, Docket #s 325, 213[21], 322[22], and 620].

In addition, the Debtor sought and obtained authority to jointly administer TBW's Chapter 11 Case with the later-filed cases of REO Specialists (09-10022) and Home America Mortgage (09-10023) [Docket #s 730 and 921].

### 3.    Retention of Professionals

Neil Luria of Navigant was approved as the Chief Restructuring Officer for the Debtor and Navigant was employed pursuant to § 363 of the Bankruptcy Code to provide additional support staff. The final order approving the employment of the CRO and Navigant was entered by the Bankruptcy Court on November 12, 2009 [Docket # 635]. In addition, the Debtor retained professionals to assist in managing the Chapter 11 Cases, including Stichter, Riedel, Blain & Prosser as TBW's general bankruptcy counsel [Docket # 525], and Troutman Sanders LLP, as Debtors' special bankruptcy counsel [Docket # 173].

---

[21]    Specifically, TBW's *Motion to Extend Deadline to File Schedules or Provide Required Information* was in fact granted in part and denied in part, as the Court extended the deadline to September 22, 2009 rather than to September 24, 2009 [Docket # 213].

[22]    TBW's *Motion for Further Extension of Time to File Schedules and Statement of Financial Affairs* was unopposed and the Court ultimately set the deadline as October 20, 2009 [Docket # 322].

The Debtor also sought and obtained authority to continue to employ professionals, including attorneys, that TBW employed pre-petition in the ordinary course of its business (Ordinary Course Professionals),[23] without having to file formal retention applications with the Bankruptcy Court [Docket # 1477]. The Ordinary Course Professionals primarily handle matters related to foreclosure, lawsuits by certain borrowers, labor and employment benefits, local real estate, environmental, and accounting. Each Ordinary Course Professional is entitled to be paid monthly 100% of fees and disbursements incurred post-petition subject to approval of a monthly invoice by TBW, the Creditors' Committee, and the U.S. Trustee's Office. Any Ordinary Course Professional whose fees and disbursements exceed a total of $25,000 per month is required to prepare and file a fee application for that month. Any Ordinary Course Professional who receives fees and disbursements in excess of $100,000 during the pendency of the Bankruptcy is required to file a final fee application.

### 4.    Appointment of Official Committee of Unsecured Creditors

On September 11, 2009, the United States Trustee appointed the Creditors' Committee [Docket # 203]. Since its formation, the Creditors' Committee has participated in virtually every aspect of these Chapter 11 Cases.

On December 11, 2009 and March 25, 2010, the U.S. Trustee reconstituted the Creditors' Committee [Docket #s 761 and 1235]. As of the date of this Disclosure Statement, the following are members of the Creditors' Committee:[24]

> First American Real Estate Tax Service, LLC
> American Express
> Lender Processing Services, Inc. and related affiliates
> ICBA Mortgage, Inc.

The Creditors' Committee retained the law firm of Berger Singerman, P.A. as its counsel [Docket #s 486 and 917].

On March 2, 2010, the Court granted the Creditors' Committee's *Motion for Derivative Standing to Prosecute Litigation in the Name of the Debtor* [Docket # 1108]. As discussed below, the Creditors' Committee has brought multiple adversary proceedings in the name of TBW.

---

[23]    To date, TBW's Ordinary Course Professionals include: (i) Butler Snow; (ii) Crowe Horwath LLP; (iii) Gray, Ackerman & Haines, P.A.; (iv) James Moore & Co.; (v) Ray & Sherman, LLC; (vi) R. William Futch, P.A.; (vii) Codilis & Associates P.C.; (viii) Phelan Hallinan & Schmieg, LLP; (ix) Heather Linn Rosing, Esq.; and (x) Drew W. Gilliland, Esq.
[24]    James Gregory Hicks, the former owner of HAM, who was represented on the Creditors' Committee by the law firm of Marchman, Kasraie & Fodor LLC, resigned from the Creditors' Committee on December 11, 2009. At the same time, ICBA Mortgage, Inc. was appointed to the Creditors' Committee [Docket # 486]. Nationwide Title Clearing, Inc. resigned on March 25, 2010 [Docket # 1235].

### 5.  Debtor in Possession Financing and Use of Cash Collateral

Also on the first day of these Chapter 11 Cases, the Debtor sought approval to use cash collateral for, among other things, (i) care, maintenance, and preservation of Assets; (ii) payment of necessary business expenses; and (iii) costs of administration of these Chapter 11 Cases [Docket # 5]. The cash collateral consisted of funds on deposit in various bank accounts, as well as various accounts and notes receivables. In return for use of the cash collateral, the Debtor proposed to grant replacement liens to certain secured creditors as adequate protection. The Court approved the Debtor's use of the cash collateral on an interim basis [Docket # 172]. The Court extended authorization to use cash collateral and overruled any pending objections in three subsequent orders. [Docket #s 357, 603, and 634]. The replacement Liens granted to any Secured Creditor in these cash collateral orders will be treated as a part of such Creditor's Secured Claim.

In addition, the Debtor sought approval for debtor-in-possession financing to maintain and stabilize its business and commence an orderly liquidation of Assets [Docket # 498, the DIP Financing Motion]. Specifically, the Debtor sought authorization to enter into a debtor-in-possession financing facility agreement with Selene Residential Mortgage Opportunity Fund, L.P. and other potential lenders approved by Selene Residential. The DIP Facility would be secured by a first priority lien on a discrete portfolio of REO residential properties and would have a principal maximum amount of $25 million, plus an additional potential $175,000. The DIP Facility was expressly conditioned on naming Selene RMOF REO Acquisition II LLC, an affiliate of Selene Residential, as the Stalking Horse Bidder for the bulk REO Sale (discussed in detail, *infra* in § IV.H.12.A). Allowed claims under the DIP Facility were granted priority over other Administrative Expense Claims, except for the payment of up to $2.5 million comprising a "carve-out," which includes fees and expense reimbursements owed to certain professionals in these Chapter 11 Cases.

The Court approved the DIP Financing Motion, subject to one condition [Docket # 617]. The FDIC and Freddie Mac both claimed ownership and/or a perfected lien in certain of the real estate Assets that the Debtor proposed as collateral for the DIP Facility. As a result, the Court ordered that the FDIC and Freddie Mac had nine days to provide a list and supporting statement of specific items of DIP Facility collateral as to which they claimed an interest [Docket # 617, ¶ 28]. Neither the FDIC nor Freddie Mac provided such documentation, and the hearing to settle any disputes regarding the DIP Facility collateral was cancelled [Docket #s 654 and 674]. Notwithstanding approval of the DIP Facility by the Bankruptcy Court, the Debtor never drew down on the DIP Facility.

On October 29, 2009, the Debtor filed a thirteen-week budget as required by the cash collateral orders [Docket # 547]. On February 2, 2010, the Debtor filed a *Notice Regarding Cash Collateral Budgets* in which the Debtor gave notice that as of December 23, 2009, it ceased using the cash collateral due to the success of the REO bulk sale (discussed in detail, *infra* in § IV.H.12.A.) [Docket # 1018]. Accordingly, as discussed in the Notice, the Debtor and the Creditors' Committee agreed that the Debtor was no longer required to prepare and serve cash collateral budgets.

6.    **Termination of TBW as Servicer and Transfer of Servicing to Other Entities**

Beginning almost immediately after commencement of these Chapter 11 Cases, the Debtor was beset with motions seeking relief from the automatic stay to terminate TBW's servicing rights (in addition to those that were purportedly terminated pre-petition).  The Debtor was largely successful in reaching a consensual compromise of these matters, which afforded the Debtor necessary breathing room to focus on maintaining and stabilizing its business for an orderly liquidation.  While the compromises resulted in transition of the servicing rights to other entities, the Debtor was able to arrange for such turnover on terms that minimized the impact on borrowers and the disruption of its remaining business operations and, at certain times, in exchange for Cash or other consideration beneficial to its Estate. Cooperation between the Debtor and the creditors to orderly transition servicing also minimized the potential for claims against the Debtor (including, possibly, Administrative Expense Claims) that might have resulted from a less orderly transition.

As summarized in the following schedule, the servicing of all mortgage Assets has been transferred to subsequent servicers (except for 749 of the "net-funded loans" described in subsection 8, issue four, below).

| TBW Loan Service Release Schedule by Investor | | | |
|---|---|---|---|
| Investor | Successor Servicer | Dates | # of Loans |
| Henley Holdings | 21st Mort Corp | 8/18/09 | 2,946 |
| Bank of America | Bank of America | 8/10/09 - 8/18/09 | 2,920 |
| Bayview | Bayview / M&T | 9/1/09 | 2,021 |
| Colonial | RoundPoint | 9/4/09 - 12/14/09 | 7,709 |
| FHLMC | Cenlar | 8/12/09 | 266,183 |
| FHLMC | Ocwen | 8/12/09 | 24,305 |
| FHLMC | Saxon | 8/12/09 | 4,991 |
| GNMA | BOA | 8/10/09 - 8/21/09 | 180,205 |
| Ocala Funding[25] | RoundPoint | 9/18/09 | 183 |
| Platinum Community Bank | Dovenmuehle / RoundPoint | 8/27/09 | 1,518 |
| Seaside | RoundPoint | 9/4/09 | 538 |
| TBW | Selene Finance | 11/6/09 - 5/12/10 | 1,060 |
| Wells Fargo | American Home Mtge | 10/19/09 | 15,996 |
| Various | Various | Aug - Dec 09 | 711 |
| Total | | | 511,286 |

7.    **The Reconciliation; Net Affected Funds on Deposit**

From the very beginning of this Case, there have been significant questions about the nature, location, and ownership of certain mortgage assets originated, sold, and/or serviced by TBW.  As a result, on or about September 10, 2009, the Debtor and the FDIC entered into a written stipulation (FDIC Stipulation) [Docket # 222] that: (1) provided a framework for the

---

[25]    Bank of America, as trustee, asserts that Ocala Funding is entitled to the proceeds of the 183 loans serviced by RoundPoint since September 2009.

interface between the TBW bankruptcy estate and the Colonial receivership; and, (2) defined a reconciliation process designed to identify and address issues regarding the appropriate allocation, receipt and disbursement of borrower funds and other cash, as well as questions regarding the nature and ownership of the mortgages and other related Assets under TBW's management and control as of early August 2009.

The FDIC Stipulation is a result of the Debtor's and FDIC's desire to resolve the issues raised in the FDIC's *Motion for Relief from the Automatic Stay* [Docket # 64] and the Debtor's *Emergency Motion for Turnover, Approval of Procedures for the Maintenance and Use of Borrower Payments, and Immediate Resolution of Related Issues* [Docket # 83]. It was preliminarily approved in an order of this Court dated September 29, 2009 [Docket # 348] with objections filed. In accordance with consensual modifications intended to address the fundamental points raised by the objections, the FDIC Stipulation was approved in an order entered on October 16, 2009 [Docket # 468].[26]

The FDIC Stipulation provided that the Debtor would perform a "Servicing Reconciliation" and an "Asset Reconciliation." Exhibit A to the Reconciliation Report generally describes the activities undertaken in the performance of the Servicing Reconciliation, and Exhibit B describes the activities undertaken in the performance of the Asset Reconciliation.

The Servicing Reconciliation, as more fully described in Exhibit A to the FDIC Stipulation, included a full and complete reconciliation of all servicing issues of: (a) all bank accounts maintained by TBW at Colonial as of August 6, 2009; (b) all borrower payments received by and currently held in the Colonial lock box; (c) all borrower payments received by and currently under the control of the Debtor; and (d) all payments received from parties other than borrowers that are related to the mortgage servicing activities of the Debtor (*e.g.*, tax and insurance refunds).

The Asset Reconciliation, as more fully described in Exhibit B to the FDIC Stipulation, required the resolution and reconciliation of issues regarding ownership and other rights in mortgages, REO and other related Assets that were serviced, maintained and controlled by TBW as of August 3, 2009.

The FDIC Stipulation further provided that upon completion of the Servicing Reconciliation and the Asset Reconciliation, the Debtor would file a report describing the results of the reconciliation process. The FDIC Stipulation established a target of October 30, 2009 for the completion of the Servicing Reconciliation but provided for the possibility of a longer process, which was necessary. The Debtor's First Interim Reconciliation Report [Docket # 555] provided general background information regarding TBW's business operation and the events surrounding the filing of the Petition on August 24, 2009. The Debtor's Second Interim Reconciliation Report, filed on December 15, 2009 [Docket # 776], provided a reconciliation and allocation of $811,748,402 in borrower-related funds that were affected by the Administrative

---

[26] Additional modifications to the Stipulation were subsequently approved [Docket #s 648, 974, 1308, 1513].

Freeze Colonial imposed on TBW's deposit accounts on August 5, 2009, Colonial's subsequent failure and TBW's bankruptcy.

The final reconciliation (referred to as the Reconciliation) is set forth in the Final Reconciliation Report prepared by the Debtor and filed with the Bankruptcy Court on July 1, 2010 [Docket # 1644] (referred to as the Reconciliation Report). The Reconciliation Report provides to the Court, mortgage investors, creditors, borrowers, and other stakeholders in these Cases the final results of the Servicing and the Asset Reconciliation performed by the Debtor pursuant to the terms of the FDIC Stipulation.[27] The information set forth in the Reconciliation Report is the result of work performed by the Debtor, as debtor in possession, the CRO, and associated support staff and legal counsel.

While the Debtor's analysis is set forth in detail in the Reconciliation Report, the fundamental findings can be summarized as follows:

### Servicing Reconciliation

- The cumulative amount of servicing-related funds affected by the abruptness of TBW's collapse was $860,642,822 (referred to as the Gross Affected Funds). These Gross Affected Funds included: (a) deposits in servicing-related accounts at Colonial, Regions, Seaside and Platinum Bank; (b) certain money that the Debtor and the FDIC have turned over to mortgage investors since August 5, 2009, including checks in the lockbox at Colonial; and, (c) electronic payments that were in process, but not completed, as of August 5, 2009. The Gross Affected Funds do not include additional borrower payments received by the Debtor and forwarded to new servicers after servicing transfers were accomplished.

- As of April 30, 2010, a total of $396,014,173 in servicing-related monies were on deposit at the following banks:

  | | |
  |---|---|
  | Colonial | $242,304,743 |
  | Regions | $148,709,430 |
  | Seaside | $5,000,000 |

- As of August 4, 2009 (the day before the Administrative Freeze), there was $25,145,274 less Cash on deposit in the Colonial servicing-related accounts than TBW's books indicated should have been in place, indicating a Cash shortfall in the servicing accounts in this amount. Approximately $19 million of this shortfall is in tax and insurance "escrow" accounts that had not been funded as of that date

---

[27]    Due to the time and expense required, the Debtor has not undertaken a comprehensive analysis of all receipts and disbursements of money by TBW in the course of its business operation. It may be necessary and appropriate to perform such an analysis, at least for specific time periods, at some future stage of these Chapter 11 Cases.

due to TBW's business custom and practice regarding the funding of these accounts.

- As of the filing of the Reconciliation Report, the cumulative balance of the Debtor's unreimbursed Servicing Advances, Corporate Advances and unpaid Servicing Fees was $263,993,800.

*Asset Reconciliation*

- As of August 24, 2009, Ocala Funding owed approximately $1.68 billion to Deutsche Bank and BNP Paribas pursuant to promissory notes issued as part of its commercial paper facility. As of that date, the UPB of the collateral in the possession of Bank of America, as collateral agent for the Ocala Funding Facility, comprised of Cash and 693 loans, was less than $165 million. Eighty-six (86) of these loans are assigned the Ocala Funding investor code in the TBW servicing system, but 25 of these have either been "deleted" or paid off.

- According to Bank of America's records, there were 9,111 mortgage loans that were collateral securing the amounts owed on the Ocala Funding Facility as of August 24, 2009. However, it is now evident that Ocala Funding or TBW had previously sold and been paid for more than 8,600 of these loans, with 7,192 having been sold to Freddie Mac. Another 301 of the loans that were purportedly collateral for the facility, were either very old, had never closed, had been paid off, or were sold prior to 2007. Only 183 loans (including the 86 described in Paragraph 1, above) are assigned the Ocala Funding investor code in the TBW servicing system, and 23 of these loans were apparently sold to and paid for by Freddie Mac.

- In the months preceding TBW's collapse, the exclusive source for funding individual loan closings was the Colonial COLB Facility. As loans were funded, they were assigned to that facility and then sold. As of August 24, 2009, Colonial's records indicate that there were 8,714 loans assigned to the COLB Facility, with an associated advance balance in excess of $1.7 billion. Of this total, there were 4,928 loans, with a cumulative advance balance of $909.6 million, that had been "sold" to Ocala Funding and delivered to Bank of America, its collateral agent, for which Colonial had not been paid. In addition, Ocala Funding or TBW had previously sold 4,856 of the 8,714 loans to third-party mortgage investors such as Freddie Mac, which included 4,254 of the loans that had been sold to Ocala Funding (for which Colonial had not been paid). The result is that the respective records of Colonial, Ocala Funding, and Freddie Mac (and other investors) each indicate that they are the "owner" of the same 4,254 mortgages.

- As of August 24, 2009, there were 124 pools of loans assigned to the Colonial AOT Facility with a purported cumulative balance of $1,473,868,368. None of these "trades" was an actual, pending transaction, and 112 were "duplicative" of

actual trades assigned to the Bank of America Early Purchase Facility (wholly unrelated to Ocala Funding), described *infra* in Section IV.D.1.c. Hence, there is no value in the 124 trades assigned to the AOT Facility. Thus, TBW presented fictitious trades or re-presented prior trades from the AOT Facility, seeking to present a legitimate forward trade with a take-out buyer for the purchase of qualifying pools of mortgage loans, when in fact it did not have a legitimate forward trade.

- In addition to the "trades," there were 9,304 individual loans assigned to the AOT Facility. As of August 24, 2009, a significant portion of these loans had been sold to other mortgage investors, had been paid off or otherwise had been charged off. Of the remainder, 1,837 had been foreclosed, with 1,197 of the underlying properties on hand on the Petition Date. The net result is that there are 3,278 loans, having a cumulative UPB of $488.5 million, assigned to the AOT that had not been sold and/or foreclosed as of August 24, 2009. The actual value of these loans is substantially less than the UPB, which means that the AOT Facility is likely under-collateralized by more than $1 billion.

- While the amounts have not been quantified precisely, it is evident that since June 30, 2008, hundreds of millions of dollars in proceeds from the Colonial AOT Facility and proceeds of loan sales by Ocala Funding and TBW were used to pay Servicing Advances and loan repurchases, pay off worthless trades assigned to the AOT Facility, and fund other aspects of TBW's business operations. These uses were inconsistent with the controlling agreements governing the facilities.

### *Net Affected Funds on Deposit*

- As indicated in the Reconciliation Report, there are monies on deposit at Colonial Bank and at Regions that have been allocated to investors and others, including the Debtor (the "**Net Affected Funds On Deposit**"). The deposits at Colonial Bank totaled $242,304,744 as of April 30, 2010 and are under the control of the FDIC. As indicated in the FDIC Settlement Agreement, the timing and manner of distribution of these Net Affected Funds on Deposit is within the exclusive jurisdiction and discretion of the FDIC.[28]

- The deposits at Regions, which are under the control of the Debtor, include $148,709,430 in Net Affected Funds On Deposit as of April 30, 2010.[29] As provided in Paragraph 10 of the FDIC Stipulation, these monies cannot be disbursed or used by the Debtor except by an order of the Bankruptcy Court. The Debtor anticipates that, in most instances, the distribution or use of the Net Affected Funds On Deposit at Regions will be resolved by agreement between the Debtor and the investor or other party to whom the funds are allocated. In all

---

[28] As of September 30, 2010, the Net Affected Funds on Deposit at Colonial totaled $242,272,214.

[29] As of September 30, 2010, the Net Affected Funds on Deposit at Regions totaled $156,349,085.

likelihood, the disbursement of certain of these funds will be authorized and approved in conjunction with the confirmation of the Plan. As other agreements are reached (likely as of or after the date that a Plan is confirmed), the Debtor will seek approval of the Bankruptcy Court for the agreed upon disbursement or other use of the Net Affected Funds on Deposit. If agreements cannot be reached, then the Debtor will commence one or more proceedings to have unresolved issues adjudicated prior to disbursement of any disputed deposits.

8.    **Borrower Protocol Issues**

As the Debtor gained a better understanding of the facts and circumstances related to TBW's business operation and continued to work with the FDIC in the reconciliation efforts, it became apparent that the Servicing Reconciliation and the Asset Reconciliation were more complicated than first appeared in September 2009. Moreover, it became abundantly clear that additional work not specifically addressed by the FDIC Stipulation was necessary. As a result of the collaborative efforts of the Debtor and the FDIC to define the specific issues and identify affected borrowers, on January 21, 2010, the Debtor filed a *Motion for Approval of Borrower Protocol to Resolve Borrower Issues* [Docket # 927].

In sum, there were more than 16,000 borrowers affected by one of the following four issues:

- Issue 1: *Insurance Proceeds* (referred to as "Loss Drafts") – monies received by TBW from property insurance companies based on payment of individual borrower claims for loss or damage to property, but not paid to the borrower as of the date of the Administrative Freeze.

- Issue 2: *Tax and Insurance Escrow Proceeds* – T&I monies owed, but not paid, to borrowers who had paid off their mortgages as of the date of the Administrative Freeze.

- Issue 3: *Bounced Checks Written on Platinum EDCA* – checks written by TBW to borrowers that were not honored. The total amount of cash required to resolve this issue and the two issues noted above was $25,636,418 (*i.e.*, the cumulative amount owed to borrowers).

- Issue 4: *Net Funded Loans*. As more fully described in the motion, TBW had developed a custom and practice of refinancing certain mortgages, but waiting until the new loan was sold before paying off the old mortgage (rather than paying the old mortgage off at closing). As a result of the events of early August, 2009, 788[30] borrowers with "net funded loans" have two mortgages outstanding because the old loan has not been paid off.

---

[30]    Of the 788 "net funded loans," TBW was servicer for 749.

In its motion, the Debtor proposed a protocol for addressing each of the four issues. After a hearing held on February 19, 2010, this Court granted the motion and approved the recommended Borrower Protocol by an Order entered on February 24, 2010 [Docket. No. 1079]. A summary of the resolution of the Borrower Protocol issues is set forth in the Reconciliation Report, discussed *supra* in § IV.H.7.

### 9.    Claims, Demands Made or Litigation Commenced by TBW, or on behalf of TBW, Seeking to Recover Property of the Estate

The Plan Proponents have initiated numerous adversary proceedings seeking to enforce Debtor Claims against non-Debtor parties, in order to enhance the recovery for Holders of Unsecured Claims. The Plan Proponents, if prior to the Effective Date, and the Plan Trustee, if on or after the Effective Date, intend to pursue all Causes of Action and Claim recoveries as appropriate.

As of the date of the filing of this Disclosure Statement, the Plan Proponents have filed numerous demands and lawsuits. As an example, the Creditors' Committee has sued multiple borrowers to enforce the respective notes (10-ap-00126; 10-ap-00127; 10-ap-00128; 10-ap-00129; 10-ap-00130). The Creditors' Committee also has turnover actions pending against Bank of America (10-ap-00100) and Banc of America Securities (10-ap-00096) to recover property of the Debtor's Estate. The Debtor also reached a settlement agreement with Cantor Fitzgerald, Co., which brought close out proceeds under the Master Securities Forward Transaction Agreement into the estate in the amount of $347,968 relating to netting payments thereunder. [Docket # 1210]. Sovereign claims a Lien in proceeds from the termination of hedging agreements. The Debtors are evaluating this claim and reserve the right to challenge the Lien claimed by Sovereign in all proceeds from hedging agreements.

In addition, a significant amount of money was recovered without a formal adversary proceeding. For example, the Debtor recovered an estimated $ 2 million in funds remitted to brokerage accounts at The Bank of New York Mellon, UBS and Wells Fargo relating to mortgage-backed securitizations.

### 10.    Litigation against TBW

#### a.    WARN Act Class Action Adversary Proceeding

On August 24, 2009, certain former employees of TBW, on their own behalf and on behalf of other similarly situated former employees, filed a complaint for damages on account of alleged violations of the WARN Act, resulting from TBW's August 5, 2009 reduction in workforce [Bankruptcy Docket # 2, Adversary Proceeding No. 09-00439]. On September 27, 2010, the Bankruptcy Court granted the WARN Act plaintiffs' motion for class certification. [Adv. Pro. Docket # 74].[31]

---

[31]    WARN Act plaintiffs filed a motion to enlarge the Bar Date, which the Court denied [Docket #s 1496 and 1539, respectively].

The WARN Act plaintiffs seek payment of up to 60 days' wages and benefits to class members as an administrative expense pursuant to § 503(b)(I) of the Bankruptcy Code or, alternatively, with priority under § 507(b)(4) and/or (5) of the Bankruptcy Code (with the balance not entitled to priority payable as a general unsecured claim). The WARN Act plaintiffs have asserted that the class they represent includes more than 2000 similarly situated members.

The Debtor contends that no WARN Act liability exists and disputes that any violation of the WARN Act occurred. However, if the WARN Act plaintiffs were to prevail, there may be a material impact on the estimated recoveries to creditors under the Plan.

b.      Fidelity Bond Litigation

Litigation relating to TBW's officer and director policies is discussed below in subsection 17 of this Section IV.H.

c.      Joe Johnson

On or about March 1, 2010, Joe Johnson filed a complaint against Debtor and certain other defendants in the Circuit Court for Prince George's County, Maryland for Debtor's post-petition sale of certain REO property.   As part of an effort to liquidate its portfolio of REO property, Debtor and Johnson entered into negotiations for the sale of certain property. Debtor asserts, however, that the contract entered between Debtor and Johnson did not close. Accordingly, the property was eventually sold pursuant to 11 U.S.C. § 363 to a third party as part of a larger portfolio of REO property.   Johnson, however, seeks recovery for, among other things, unfair or deceptive trade practice, breach of good faith and fair dealing, and misrepresentation for damages allegedly sustained as a result of Debtor's actions surrounding negotiations for the sale of the REO property.

The case was removed to the United States Bankruptcy Court for the District of Maryland, and subsequently transferred to the United States Bankruptcy Court for the Middle District of Florida [a.p. 10-00405, Docket # 1].   Debtor's Motion to Dismiss [# 16] and Johnson's Motion to Remand [Docket # 7] are pending.

d.      State Regulatory Actions

TBW held mortgage licenses with states nationwide.   The events in August 2009, including HUD's suspension of TBW's HUD/FHA origination and underwriting approval, Ginnie Mae's and Freddie Mac's purported terminations of TBW as servicer, and Colonial's freeze of all TBW's accounts, caused TBW to allegedly violate various state regulations for these mortgage licenses.

Upon Confirmation of the Plan, neither the Plan Trust nor the Plan Trust Assets shall be subject to any administrative proceeding, cease and desist order, or civil penalty relating to any alleged pre-petition violation by any Debtor of any law or regulation of any Governmental Authority, including the following:

(i)    Administrative Actions; Cease and Desist Orders

TBW's alleged violations of various state regulations, including its failure to fund residential mortgage loans secured by first mortgages on residential property and its failure to pay loan proceeds, caused many states, approximately twenty-four (24), to file administrative actions and/or enter cease and desist orders against TBW.  On August 5, 2009, Michigan entered the first Order to Cease and Desist from Violating the Mortgage Brokers, Lenders, and Servicers Licensing Act against TBW.  Actions by other states followed.  The Debtor, if before the Effective Date, and the Plan Trustee, if after the Effective Date, reserves the right to challenge the relief sought in these administrative proceedings.  An overview of these state administrative proceedings and cease and desist orders is set forth in the table below:

| State | Date Issued | Action(s) Issued |
|---|---|---|
| Arizona | August 20, 2009 | Cease and Desist Order |
| Arkansas | August 18, 2009 | Order Summarily Suspending License |
| Connecticut | August 10, 2009 | Temporary Order to Cease and Desist (Origination) |
| | August 21, 2009 | Amended and Restated Temporary Order to Cease and Desist |
| | September 25, 2009 | Temporary Order to Cease and Desist (Servicing) |
| | October 27, 2009 | Temporary Order to Cease and Desist (Bond) |
| Florida | August 7, 2009 | Emergency Order to Cease and Desist |
| | August 10, 2009 | Administrative Complaint |
| | August 21, 2009 | Second Emergency Order to Cease and Desist |
| | September 28, 2009 | Amended Administrative Complaint |
| Georgia | August 10, 2009 | Order to Cease and Desist |
| Illinois | August 6, 2009 | Order to Cease and Desist |
| | August 21, 2009 | Amended Order to Cease and Desist |
| Kentucky | August 17, 2009 | Order to Cease and Desist |
| | August 21, 2009 | Administrative Complaint |
| | September 8, 2009 | Supplemental Order to Cease and Desist |
| Louisiana | September 17, 2009 | Notice of Immediate Suspension |
| Maryland | August 10, 2009 | Summary Order to Cease and Desist |
| Massachusetts | August 6, 2009 | Temporary Order to Cease and Desist |
| Michigan | August 5, 2009 | Cease and Desist Order |
| Mississippi | August 7, 2009 | Cease and Desist Order |
| Nebraska | August 24, 2009 | Cease and Desist Order |
| New Hampshire | August 11, 2009 | Cease and Desist Order |
| New Jersey | August 6, 2009 | Cease and Desist Order |
| North Carolina | August 7, 2009 | Cease and Desist Order |
| Ohio | September 28, 2009 | Order of Summary Suspension |
| Oregon | September 9, 2009 | Order of Emergency Suspension |
| | December 24, 2009 | Final Order of Suspension |
| | December 30, 2009 | Order of Mortgage Broker License Revocation |
| Pennsylvania | August 6, 2009 | Order |
| | August 21, 2009 | Amended Order |
| Rhode Island | August 20, 2009 | Emergency Order Revoking Lender License |
| South Dakota | November 2, 2009 | Notice of Suspension |
| Tennessee | August 7, 2009 | Emergency Cease and Desist Order |
| Washington | August 7, 2009 | Cease and Desist Order |
| Wisconsin | September 14, 2009 | Notice of Pending License Revocation |
| | October 2, 2009 | Order Revoking Registration |

      (ii)    Civil Penalties

Six states indicated their intent to impose, or have already imposed, a civil penalty on TBW.[32] These states include: Connecticut, Illinois, Kentucky, Maryland, New Hampshire, and Wisconsin. Nearly all of the orders imposing penalties or considering the assessment of penalties were entered prior to August 24, 2009. Wisconsin entered its order post-petition (on October 2, 2009).

The Illinois Department of Financial and Professional Regulation, Division of Banking, assessed two $20,000 fines against TBW. These fines were recovered through TBW's surety bonds.

Kentucky's Department of Financial Institutions seeks to recover a total of $220,694.27 in fines and restitution. A hearing was held on March 25, 2010. Subsequent to the hearing, Hearing Officer Michael Head transmitted recommended orders to Commissioner Charles A. Vice. These recommended orders, consistent with Kentucky's Department of Financial Institutions' objective, assess a fine in the amount of $200,000.00 and restitution for consumer harm in the amount of $20,694.27. TBW has filed exceptions to these recommended orders. Final orders resolving these administrative actions have not yet been entered by Commissioner Vice.

Connecticut's civil penalty has not been affirmatively assessed because the number of alleged violations by TBW has not been determined; however, the cease and desist order indicates that the Commissioner of the State of Connecticut's Department of Banking has the authority to impose a civil penalty, not to exceed $600,000.00, for various alleged violations.

Similar to Connecticut, the orders and administrative actions instituted in Maryland and New Hampshire indicate that penalties may be imposed, but the total amount assessed has not been provided. The Maryland Commissioner of Financial Regulation may impose a civil penalty up to $1,000.00 for each violation of Maryland Mortgage Lender Law, up to $1,000.00 for each violation of a regulation, and up to $5,000.00 for each subsequent violation of these laws or regulations. Moreover, pursuant to FI § 11-517(c), the Maryland Commissioner may impose a civil penalty up to $5,000.00 for each violation of the Maryland Mortgage Lender Law and up to $5,000.00 for each violation of a regulation promulgated pursuant to the Maryland Mortgage Lender Law.[33]

The Wisconsin Department of Financial Institutions, Division of Banking's Order, which was entered after TBW sought Chapter 11 relief, provides that the Division may assess a forfeiture of not more than $2,000.00 for each violation.

---

[32] TBW reserves all of its defenses to the imposition of such penalties, including the effect of the automatic stay under § 362 of the Bankruptcy Code.

[33] The New Hampshire Order states that TBW shall show cause why penalties in the amount of $2,500.00 for each violation should not be imposed against it.

(iii)    Settled Actions

TBW negotiated settlements with Arizona, Florida, Michigan, Oregon, and Pennsylvania, thereby resolving the administrative actions and/or cease and desist orders entered against TBW. Civil penalties were not assessed, but TBW's licenses were surrendered or revoked. The states reserved their right to pursue additional actions or reinstitute the underlying actions if TBW were to violate the terms and conditions set forth in the consent orders or other state laws, rules, or regulations.

Settlement negotiations are actively underway with several other states; however, most states are reluctant to agree to a consent order before all outstanding consumer issues have been resolved.

(iv)    Consumer Complaints

Nationwide consumers filed complaints against TBW with their respective states' financial institutions. Complaints were filed pre- and post-petition and continue to be filed with financial institutions today. Consumer complaints allege, *inter alia*, (1) that checks were issued by TBW, which consumers attempted to process, but would not clear because of insufficient funds; (2) late fees were inappropriately assessed; (3) consumers were required to make mortgage payments to TBW, as well as a third party servicer to avoid negative credit reporting; and (4) that TBW was inappropriately reporting consumers to credit bureaus because of consumers' alleged failure to pay mortgages or their alleged failure to pay in a timely manner.[34]

It is difficult to identify all of the consumer complaints and discern the exact dates they were filed because often these complaints were not served directly on TBW. Rather, the complaints were filed with various financial departments nationwide and brought to the company's attention through state regulators at a later point in time. To date, the Debtor is aware of approximately 60 consumer complaints in Connecticut, Louisiana, Kentucky, Arizona, Tennessee, New Hampshire, Alabama, Arkansas, and Illinois. However, because Connecticut, Maryland, and New Hampshire have not established the number of alleged violations committed by TBW and because the exact universe of consumer complaints is unknown, it is impossible to calculate the exact amount of pre-petition civil penalties that could be assessed against the Debtor.

**11.    Asset Sales**

a.    REO Sale

Soon after the Petition Date, the Debtor determined that a bulk sale of certain of its REO properties, referred to as the REO Sale, was appropriate to facilitate an orderly wind-down and liquidation that would maximize value for the estate. To that end, the Debtor commenced negotiations with a number of prospective purchasers, and on October 21, 2009, the Debtor and

---

[34]    A majority of these issues involve net-funded loans or other matters that were addressed in the Reconciliation Report.

Selene REO entered into a Real Estate Purchase and Sale Agreement, referred to as the REO Sale Agreement. To ensure maximum value, the REO Sale Agreement allowed the Debtor to continue selling REO in the normal course of business and to exclude such REO from the REO Sale Agreement. Further, the REO Sale Agreement was subject to higher or better offers to be received at an auction. Also on October 21, 2009, the Debtor filed a motion requesting that the Bankruptcy Court, *inter alia*, approve bidding procedures to govern an auction and approve the REO Sale. By Order dated November 10, 2009 [Docket # 621], the Bankruptcy Court established bidding procedures and the terms of an auction for the REO Sale.

On December 11, 2009, the Debtor conducted an auction in accordance with the bidding procedures. In total, the Debtor offered 1046 REO properties at the auction, and, pursuant to the REO Sale Agreement, Selene REO's aggregate "stalking horse" bid was $74,222,849. Two other bidders, DLJ Mortgage Capital, Inc. and William Blake Street LLC, appeared at the auction. After eight (8) rounds of bidding, Selene REO was the winning bidder with a bid amount of $81,222,849.

On December 15, 2009, the Bankruptcy Court held a hearing on the motion to approve the REO Sale, and by Order dated December 17, 2009 [Docket # 802], the Bankruptcy Court overruled all outstanding objections to the motion and approved the REO Sale. Further, the Bankruptcy Court provided for a Supplemental Sale Hearing held on January 8, 2010, to give certain parties further opportunity to object to the motion. By Order dated January 11, 2010 [Docket # 859], the Bankruptcy Court overruled the only additional objection filed and finally approved the REO Sale. Over the course of four (4) separate closings in December, January, and February of 2010, the Debtor and Selene REO ultimately closed on the sale of 901 individual REO properties for an aggregate purchase price of approximately $67,307,396.[35]

  b.  MBS Sale

TBW owned residual and other interests in seven trusts that issued securities backed by mortgage loans. The Debtor offered to sell its interests in the mortgage-backed securities to AG Mortgage, the stalking horse bidder, in a § 363 sale for $8,760,000, subject to higher and better offers. On April 22, 2010, the Debtor conducted an auction in accordance with bidding procedures approved by the Bankruptcy Court. In addition to AG Mortgage, two other bidders appeared at the auction: (1) Centerbridge Credit Partners L.P. and (2) Diocese of Rockville Centre Lay Pension Plan. After seven (7) rounds of bidding, AG Mortgage was the winning bidder with a bid of $9,675,000. The Bankruptcy Court held a hearing on the Debtor's motion to approve the MBS Sale on April 27, 2010, and by Order dated April 27, 2010 [Docket # 1351], the Bankruptcy Court approved the MBS Sale. The sale closed on April 28, 2010, for a total purchase price of $9,675,000. The FDIC had asserted a Claim to these proceeds, and that Claim was released by the FDIC as part of the negotiations leading to the FDIC Settlement Agreement.

---

[35]  The purchase price differs from the final bid because, among other reasons, certain properties fell out of the bulk sale due to title and related issues.

c.    Sale of Reverse Mortgages

TBW owned twenty-three reverse mortgages with a collective UPB of approximately $2,763,817.89.[36]  The Debtor's support staff marketed the Reverse Mortgages to previous purchasers of reverse mortgages from TBW and potential purchasers known by the Debtor's support staff to be in the reverse mortgage business.  Upon completion of the competitive bidding process, the Debtor accepted an offer made by Urban Financial Group, Inc.  The parties entered into a Mortgage Loan Purchase and Sale Agreement dated May 25, 2010 by which Urban Financial Group, Inc. agreed to pay $1,135,178.30 for the Reverse Mortgages.  On June 30, 2010, the Court approved a § 363 sale of the Reverse Mortgages pursuant to the terms of the Mortgage Loan Purchase and Sale Agreement [Docket # 1642].

d.    Ordinary Course REO Sales

In addition to the bulk sale, in the period from August 3, 2009 through August 31, 2010, the Debtor has sold 1,100 properties in the ordinary course, resulting in net proceeds of $98.0 million, of which approximately $44.3 million has been reimbursed to the Estate for advances on the AOT and Overline and homes owned by TBW.

**12.    Schedules and Statements of Financial Affairs; Claims Bar Dates and Aggregate Claims Asserted**

The Debtor filed a Summary of Schedules and a Statement of Financial Affairs on October 20, 2009 [Docket #s 481 and 482].  On January 12, 2010 and January 26, 2010, TBW amended certain of its Schedules [respectively, Docket #s 869 and 949].

On February 22, 2010, the Bankruptcy Court entered an Order establishing bar dates for filing proofs of claim and approving the form and manner of notice thereof (General Bar Date Order) [Docket # 1067].  Pursuant to the General Bar Date Order, the deadline for both non-Governmental Authorities and Governmental Authorities to submit Proofs of Claim in these Chapter 11 Cases was set at June 15, 2010.  Subject to certain limited exceptions contained in the Bankruptcy Code and in the General Bar Date Order (including with respect to Claims arising from the rejection of executory contracts or unexpired leases),[37] all Proofs of Claim filed against the Debtor were required to be submitted by the General Bar Date.  Notice of the General Bar Date was sent to all parties as required in the General Bar Date Order, including but not limited to: (i) all known Creditors; (ii) all parties to executory contracts and unexpired leases; (iii) all parties to litigation; and (iv) all current and former recent employees.  Notice of the General Bar Date was also published in The Florida-Times Union and The Wall Street Journal.  The General Bar Date Order did not affect the previous deadlines set for HAM and REO Specialists, which remained April 6, 2010 for non-Governmental Authorities and May 4, 2010 for Governmental Authorities.

---

[36]    UPB as of April 27, 2010.
[37]    The Court ordered that proofs of claim for rejection damages for executory contracts or unexpired leases shall be filed by the later of: (i) 30 days after the effective date of rejection, or (ii) the General Bar Date [Docket # 1067].

As of July 1, 2010, 3,257 Proofs of Claim, asserting liquidated Claims totaling approximately $9,132,252,053 in the aggregate against the Debtor, had been filed.[38]

As of September 20, 2010, Administrative Expense Claims (exclusive of DIP Financing, Professional Claims (including Claims for substantial contribution), and Claims asserted in the WARN Act litigation discussed *supra* at § IV.H.10.a.) of approximately $1,300,000 had been asserted against the Estate of TBW, including:

     (i)     $27,778.81 asserted by Dell Marketing L.P. [Docket # 583];

     (ii)     $68,392.61 asserted by Premier Corporate Centre, LLC [Docket # 580];

     (iii)     $993,836.54 asserted by AT&T Corp. [Docket # 1114] of which $100,000 has previously been paid by the Debtor in accordance with an Order of the Bankruptcy Court [Docket # 1540];

     (iv)     $45,437.96 asserted by Hill Office Park [Docket # 1489]; and

     (v)     $159,500 asserted by Michael C. Cabassol [Docket # 1892].

No Order has been entered establishing a bar date for filing Administrative Expense Claims. The Debtor has generally been paying undisputed Administrative Expense Claims in the ordinary course post-petition. However, upon establishment of the Administrative Bar Date, the Debtor expects that additional Administrative Expense Claims may be filed.

In sum, filed Claims against the Debtor as of July 1, 2010 (exclusive of DIP Financing, Professional Claims (including Claims for substantial contribution), and Claims asserted in the WARN Act Litigation) were as follows:

| Claim Type [A] | TBW # | TBW $ Amount | HAM # | HAM $ Amount | REO # | REO $ Amount | TOTAL # | TOTAL $ Amount |
|---|---|---|---|---|---|---|---|---|
| Secured | 23 | $5,360,192,898 | 1 | $175,182,045 | 1 | 175,182,045.38 | 25 | $5,710,556,989 |
| Administrative [B] | 5 | $1,294,446 | 0 | $0 | 0 | $0 | 5 | $1,294,446 |
| Priority Tax | 91 | $1,967,480 | 5 | $14,586 | 1 | 18,047.13 | 97 | $2,000,113 |
| Priority Non-Tax | 1472 | $14,012,080 | 0 | $0 | 0 | $0 | 1472 | $14,012,080 |
| Unsecured | 1,629 | $3,754,949,149 | 2 | $276,702 | 6 | 1,428,929.63 | 1637 | $3,756,654,781 |
| Total | 3,220 | $9,132,416,053 | 8 | $175,473,333 | 8 | $176,629,022 | 3236 | $9,484,518,408 |

Notes:
[A] Classification of the Claims are based on Claims Filed. As of September 20, 2010, the Debtor has not confirmed the validity of such Claims.
[B] TBW figure does not include DIP Financing, Professional Claims (including Claims for substantial contribution), and Claims asserted in the WARN Act litigation.

---

[38]     The Plan Proponents make no admission as to the timeliness or merits of any Filed Proof of Claim and, on behalf of themselves and the Plan Trustee, reserve all rights to object to all Proofs of Claim.

### 13.    Abandonment of Certain Non-Essential Records and Property

On September 25, 2009, the Debtor filed a motion requesting authority to abandon certain non-essential records, computer equipment, furniture, and fixtures [Docket #s 330 and 414]. The Court entered an Order approving Debtor's abandonment, subject to certain minor conditions raised in Freddie Mac's objection [Docket # 397] and Dell Marketing, L.P.'s objection [Docket # 450].

### 14.    Rejection of Leases and Executory Contracts

At the time of filing of this Disclosure Statement, the Debtor has filed eight motions seeking authority to reject certain non-residential real property leases, equipment leases, and/or executory contracts in order to avoid burdening TBW's estate with any unnecessary post-petition obligations [Docket #s 146, 227, 818, 898, 1274, 1275, 1276[39], 1353]. The Bankruptcy Court has approved each of the Debtor's rejection motions [Docket #s 516, 514, 984, 1468]. Pursuant to the Rejection Orders, the Debtor has rejected hundreds of leases and executory contracts. On May 6, 2010, the Debtor obtained an order to extend the deadline to assume or reject its Ocala headquarters and certain other leases until confirmation of its Chapter 11 plan. [Docket # 1408].

Moreover, the Debtor sought and obtained approval to reject a burdensome pre-petition executory Real Estate Purchase and Sale Agreement with Centurion [Docket #s 532 and 623]. The contract with Centurion, entered into on or about August 21, 2009, proposed that TBW sell to Centurion certain REO owned by TBW that TBW wished to sell as part of a bulk sale pursuant to § 363 of the Bankruptcy Code. The Debtor conducted extensive negotiations with Centurion to convert the agreement with Centurion into a "stalking horse" bid to sell the REO pursuant to § 363. Through the course of the negotiations, however, the Debtor determined, in its business judgment, the agreement with Centurion was not in the best interest of the Estate. From the beginning of the negotiations, Centurion expressed concern regarding the price of the REO, and the amount Centurion indicated it would be willing to pay dramatically decreased. The agreement with Centurion called for an unrealistic closing date as well as indemnities, warranties, and repurchase obligations. It became clear that Centurion's funding sources, not Centurion, controlled the amount that Centurion would be able to pay for the REO. Further, in connection with the agreement with Centurion, TBW had also entered into 1) a Master Fee Agreement with certain individuals whereby such individuals would receive "intermediary fees" upon the sale of the REO, and 2) an REO Bulk Package Sale/Escrow Instructions. The Debtor determined both contracts to be burdensome to its estate and obtained approval to reject them.

The Debtor also sought and obtained approval to reject an executory Reverse Mortgage Subservicing Agreement with Compu-Link Corporation d/b/a Celink [Docket #s 593 and 686]. Under the executory contract, Celink acted as servicer for approximately twenty-three reverse mortgages. The Debtor, however, had previously sought and obtained approval to transfer all servicing rights with respect to those reverse mortgages to Selene Financial LP to assist in the orderly liquidation of the estate [Docket #s 537 and 622].

---

[39]    The motions appearing at Docket #s 1274, 1275, and 1276 were granted at the hearing on May 7, 2010.

### 15.    Extension of Exclusivity

By Order dated February 4, 2010, the Bankruptcy Court extended the 120 day exclusivity period during which only the Debtor may file a Chapter 11 plan through June 21, 2010, and the 180 day exclusivity period during which the Debtor solicits acceptances of a Chapter 11 plan through August 20, 2010 [Docket # 997]. On June 20, 2010, Debtors' filed a second motion to extend the exclusivity period during which only the Debtor may file a Chapter 11 plan through September 21, 2010, and the 180 day exclusivity period during which the Debtor solicits acceptances of a Chapter 11 plan through November 23, 2010 [Docket # 1573]. [Order entered on August 4, 2010, Docket # 1760.]

On September 21, 2010, before expiration of the Exclusive Filing Period, the Debtors and the Creditors' Committee filed the Plan [Docket # 1966] and the Debtors filed this Disclosure Statement with respect thereto.

### 16.    Cash Position; Sources and Uses of Cash

The Cash Position of Debtors is set forth in the Liquidation Analysis, attached hereto as Exhibit C.

The Debtors' sources and uses of Cash in connection with the administration of these Chapter 11 Cases from the Petition Date through September 30, 2010 is reflected on chart attached hereto as Exhibit D.

### 17.    Insurance Assets

The Debtors' Assets include their rights under certain insurance policies that may respond to a variety of Claims. These coverages include director & officer liability coverage, errors & omissions and fidelity coverage, comprehensive general liability coverage, and state licensing authority surety bonds. Pursuant to the terms of the Plan, the Debtors will file lists of Designated Insurance Policies and Designated Non-Executory Insurance Policies as exhibits to the Plan Supplement. The Debtors do not know the extent to which any such insurance will be available to respond to particular Claims. Upon information and belief, apart from the payment of defense costs to individual insureds under the policies, proceeds of the policies have not been earmarked to any particular Claims, groups of Claims or classes of Claims.

Post-Petition, TBW made a Claim for $90 million under its fidelity insurance bond provided by Lloyd's of London. In response, Lloyd's filed a declaratory judgment action in these Chapter 11 Cases seeking to rescind the coverage on the ground that TBW had knowledge of the fraud on which the Claim was based when TBW reapplied for insurance in 2007 and 2008. The complaint seeks a declaratory judgment on the fraud allegation. TBW through the Creditors' Committee is defending that litigation.

### 18.    Payments to Creditors Within 90 Days of Petition Date

As reflected in the Debtors' Statements of Financial Affairs, as amended [Docket #s 481, 482, 869, and 949], the aggregate number and amount of payments by each Debtor to creditors within the 90 days immediately preceding the Petition Date are as follows:

| Debtor | # of Payments | Approximate $ Amount |
|---|---|---|
| TBW | 9,343 | $114,139,712[40] |
| Home America Mortgage | 0 | 0 |
| REO Specialists | 3 | $53,531.42 |

**The amounts set forth in the foregoing table are for informational purposes only and do not constitute a statement or estimate as to the existence or value of any valid Avoidance Action relating to any of the foregoing transfers. Whether a transfer gives rise to a valid Avoidance Action, and whether any such Avoidance Action has any realizable value for the Debtors' Estates, will depend on a number of factors not discussed herein, including (but not limited to) (a) for preference actions, the extent to which the Transferee has an unavoidable perfected security interest in collateral and the existence of defenses (including that the challenged transfer was made in the ordinary course of business or is protected by statutory "safe harbor" provisions, e.g., in § 546(e)-(g) of the Bankruptcy Code), and (b) for fraudulent conveyance actions, whether the Debtor received reasonably equivalent value and was insolvent or undercapitalized at the time of the payment.**

### 19.    Other Secured Claims Filed Against the Debtors

Each Secured Claim against a Debtor that is not separately classified will be classified in TBW Class 7, HAM Class 2 and REO Class 2, as applicable, and afforded the treatment provided to such Class under the Plan with respect to such Allowed Other Secured Claim. If more than one Secured Claim is classified as an Other Secured Claim in TBW Class 7, HAM Class 2 or REO Class 2, a separate subclass will be established for each such Other Secured Claim.

As of the date of this Disclosure Statement, TBW Class 7 will include, without limitation, a Claim asserted by Deutsche Bank AG (referred to as Deutsche Bank) pursuant to a swap agreement dated as of June 30, 2008 between Deutsche Bank, London Branch and TBW. Deutsche Bank filed a Proof of Claim (#2926) in respect of this Claim. Deutsche Bank alleges that it is in control of a deposit account in the approximate amount of $5 million U.S. Dollars, over which Deutsche Bank asserts a Lien in connection with this Claim. To the extent that Deutsche Bank's claim is an Allowed Secured Claim, it is included in TBW Class 7.

---

[40]    This number reflects transfers from TBW's operating accounts and does not reflect transfers that occurred from TBW's servicing related accounts.

### 20.    EPD Claims and Breach of Warranty Claims

EPD Claims and Breach of Warranty Claims both constitute General Unsecured Claims against the Debtor. EPD Claims are triggered by a default by the underlying borrower shortly after a sale of a mortgage loan, and under certain loan sale transactions to which TBW was a party, gave rise to a Claim. In contrast, Breach of Warranty Claims are claims asserted against the Debtor for breach of a representation or warranty relating to the sale of mortgage loans, generally that pertain to the characteristics of the mortgage loans. Determining whether the Debtor breached a representation or warranty in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific allegations, which would necessarily entail a degree of subjectivity because some of the industry-standard representations and warranties are not susceptible to clear, objective assessment. In addition, secondary loan buyers might assert in their proofs of claim that they would not be able to liquidate their Breach of Warranty Claims fully for years, since there often would be no reason to expend time and resources ferreting out potential breaches of representations and warranties on a given loan unless and until the borrower defaulted. And even if it were possible to identify loans for which a breach of a representation or warranty occurred, assessing the damages that resulted from the Debtor's inability to repurchase the loans would entail difficulties, e.g., whether the amount of a "loss" realized by a claimant was the result of the Debtor's failure to repurchase loans or some combination of deteriorating market conditions, how the claimant dealt with the loan, and the "value" of the loan at a historical moment in time. In estimating Breach of Warranty Claims, the Plan Proponents or the Plan Trustee will have to make assumptions as to (i) the likelihood there had been material breaches of representations or warranties in connection with a given sale of loans (hereinafter referred to as the "incidence of breach"), (ii) the likelihood a Breach of Warranty claimant would ultimately suffer a loss as a result of the Debtors' failure to repurchase loans for which there had been a material breach of representations or warranties (referred to as the "loss frequency"); and (iii) the presumed amount of any such losses (referred to as the "loss severity").

Under the Plan, EPD Claims and Breach of Warranty Claims are treated as a General Unsecured Claims. The Plan Proponents, if prior to the Effective Date, and the Plan Trustee, if on or after the Effective Date, shall have the right to estimate EPD Claims and Breach of Warranty Claims, just as they have the right to estimate Claims generally. Further, they will determine whether a party or multiple parties have assert EPD Claims or Breach of Warranty Claims against the Debtor on account of the same loans, and object to such Claims as duplicative and/or to seek judicial determination of the parties' standing to assert such Claims under the governing documents and applicable law.

## V.    GLOBAL SETTLEMENT WITH THE FDIC

The Debtor proposes in the Plan to effectuate a settlement it has reached with the FDIC. This settlement offers the Debtors substantial advantages to resolving the disputes that facilitate their ability to propose a Plan.

First, litigating the issues relating to the settlement described below in this Section V would involve complexity, inherent delay and substantial expense.  This settlement permits administration of the Plan free from litigation delay, expense and uncertainty that would delay and reduce distributions to Creditors.  In light of the anticipated recoveries to Creditors in these Chapter 11 Cases, the Debtors determined that the alternatives to settlement through a plan would be prohibitively expensive and would substantially decrease recoveries to Unsecured Creditors.  The Debtor determined that, after reviewing the merits of its legal position, it was not likely to achieve in any material respect more by litigation to a judicial resolution than it would by settlement.  The Debtor believes that the compromise reflected in this settlement is fair and reasonable, and in the best interests of the Debtors, the Debtors' Estates and its Creditors.  Thus, the settlement with the FDIC benefits all of the Debtors' Estates and all Unsecured Creditors.

Second, as with any negotiated compromise, settlement avoids uncertainty and delay.  Further legal discovery, and judicial resolution of these disputes, would be prohibitively expensive for all involved.

For the foregoing reasons, among others, the Debtors determined it was prudent to pursue comprehensive settlement with the FDIC.  The following summary explains how the settlement with the FDIC impacts the Plan:

A.    **Summary of FDIC Settlement Agreement**

As more fully described in Section IV.D.1 of this Disclosure Statement, TBW had several financial arrangements with Colonial pre-petition:  the COLB Facility, the AOT Facility, the Overline Facility, and related custodial, servicing and banking arrangements, among others.  TBW's collapse, coupled with the Administrative Freeze of TBW's accounts at Colonial, created numerous problems for the borrowers, TBW, and the FDIC.  As a result, as more fully described in Section IV.H.7, the FDIC and the Debtor entered into the FDIC Stipulation, which, among other things, sought to address the questions regarding the nature and ownership of the mortgages and other related Assets under TBW's management.  During the course of this reconciliation process, the Debtor and the FDIC developed differing positions regarding how certain of these issues should be resolved, including which party had rights in which Assets.  Through ongoing negotiations, the Debtor and the FDIC (as receiver for Colonial) resolved all issues between the parties in the FDIC Settlement Agreement, the material terms of which are summarized below.

The FDIC filed a Claim against the Debtor asserting a Claim in the amount of $3,253,622,510.  That Claim amount is by far the largest Claim filed in these Chapter 11 Cases.  The Debtors believe that the FDIC is the largest unsecured Creditor of the Debtor, and therefore its support of the Debtors' Plan is a significant achievement for these Cases.  Without a compromise with the FDIC, the Debtors would be forced to expend significant resources on protracted litigation, which would likely result in a significantly diminished Distribution to Creditors.  That is, without the cooperation of the FDIC, the Debtor believes there can be no plan of liquidation on terms as favorable to the Debtors' Estates as the current Plan.

The FDIC Settlement Agreement contains three stages of execution. First, certain provisions become effective upon execution of the FDIC Settlement Agreement. Others become effective upon an Order of the Bankruptcy Court approving the FDIC Settlement Agreement, herein referred to as the "FDIC Settlement Date."[41]    Finally, certain provisions of the FDIC Settlement Agreement become effective upon the Effective Date of the Plan. The mutual provisions that have become effective, or will become effective in the future, are summarized below.[42]

### 1.    TBW Whole Loans

As of the date of execution of the FDIC Settlement Agreement, the FDIC released any and all interest it had in mortgage loans serviced by Selene Residential, approximately 910 loans, totaling approximately $125 million of UPB. The FDIC turned over to the Debtor all promissory notes, mortgages and other collateral documents relating to the TBW Whole Loans.

### 2.    AOT Facility

Effective upon the FDIC Settlement Date, the FDIC conveyed to the Debtor all of the FDIC's right, title and interest in and to the AOT Loans, and was granted by the Debtor a first-priority perfected security interest in the AOT Loans and the AOT Reserve and the proceeds thereof to secure the AOT pre-petition balance. The FDIC shall not object to any sale of the AOT Loans by the Debtor or the Plan Trust under § 363 of the Bankruptcy Code, except as to the adequacy of price and at such sale may credit bid its debt up to the AOT pre-petition balance. The Debtor or the Plan Trustee shall oversee servicing the AOT Loans from the FDIC Settlement Date until sold under market terms. All proceeds received on the AOT Loans from time to time (including P&I payments and REO sale proceeds) shall be applied to pay the following claims, in the following priority, as more fully set forth in Section 1.3 of the FDIC Settlement Agreement:

a.    Repayment of all of the Debtor's out of pocket costs incurred from and after August 16, 2010 directly related to the Debtor's oversight of the servicing of the AOT Loans and sale of the AOT loans;

b.    Payment of a 1.0% disposition fee to the Debtor based upon net realized value from AOT Loans disposed of after the transfer of the AOT Loans from the FDIC to the Debtor; provided, however, that for the purpose of this subparagraph b., "net realized value" shall mean gross proceeds received from the sale or liquidation of loans less transaction costs related to the sale of such loans;

c.    Funding of the AOT Reserve, which shall be used to fund servicing advances on the AOT Loans and the Debtor's servicing fees and out of pocket costs related to the AOT Loans. The terms

---

[41]    The FDIC Settlement Agreement refers to this date as the "AOT Effective Date."
[42]    A copy of the FDIC Settlement Agreement, as amended by the First Amendment thereto, will appear as an exhibit to the Plan Supplement and should be consulted as to the precise terms of the FDIC Settlement Agreement.

of the AOT Reserve balance are further discussed in Section 1.3(a)(iii) of the FDIC Settlement Agreement;

d.  Repayment of any servicing advances made prior to September 8, 2009 by the Debtor on the AOT Loans or any other loans that were "on the AOT" and were transferred by the Debtor to RoundPoint and which have been liquidated after September 8, 2009 (to the extent not previously recovered by or on behalf of the Debtor). Such amount is currently estimated to be $5,734,668;

e.  Repayment to the FDIC of $5,744,885, which represents the amount of the escrow shortfalls in the Debtor's Colonial accounts related to the COLB Loans, the AOT Loans and the Overline Loans;

f.  Repayment to the FDIC of any advances (to the extent not previously recovered) made by the FDIC from September 8, 2009 through the date of transfer of oversight of servicing of the AOT Loans to the Debtor.  Such amount is currently estimated to be $5,867,633;

g.  Repayment to the FDIC of the outstanding AOT Balance; and

h.  Payment to the Debtor of any remaining funds. The Debtor does not estimate that it will recover anything.

3.  **Overline Facility**

Also as of the FDIC Settlement Date, the Debtor was deemed to have full legal and beneficial title to all loans assigned to the Overline Facility. The FDIC maintains its first-priority perfected security interest in the Overline Loans to secure its Claim and retains possession of the Overline Loans.  The FDIC shall relinquish possession of the notes and mortgages evidencing the Overline Loans as and when the Overline Loans are sold by the Debtor or the Plan Trust or the date the Overline balance is paid in full (as of the execution of the FDIC Settlement Agreement, such balance was approximately $13.8 million).  If the Debtor or the Plan Trust sells the Overline Loans at one or more 363 sales, the FDIC will not object to the sale(s) or credit bid at the sale(s).  The Debtor or the Plan Trust shall oversee servicing the Overline Loans from the FDIC Settlement Date until sold.  Until the Overline pre-petition balance is paid in full, all cash payments received on the Overline Loans from time to time (including P&I payments and loan sale proceeds) shall be applied to pay the following Claims, in the following priority, as more fully set forth in Section 1.4 of the FDIC Settlement Agreement:

a.  Repayment of all of the Debtor's out of pocket costs incurred from and after August 16, 2010 directly related to the Debtor's oversight of the servicing of the Overline Loans and sale of the Overline loans;

b.      Payment of a 1.0% disposition fee to the Debtor based upon net realized value from the Overline Loans disposed of after the transfer of the Overline Loans from the FDIC to the Debtor; provided, however, that for the purpose of this subparagraph b., "net realized value" shall mean gross proceeds received from the sale or liquidation of loans less transaction costs related to the sale of such loans;

c.      Funding of the Overline Reserve, which shall be used to fund servicing advances on the Overline Loans and the Debtor's servicing fees and out of pocket costs related to the Overline Loans. The terms of the Overline Reserve balance are further discussed in Section 1.4(a)(iii) of the FDIC Settlement Agreement;

d.      Repayment of any servicing advances made prior to September 8, 2009 by the Debtor on the Overline Loans or any Overline Facility related loans that were transferred to RoundPoint and subsequently liquidated after September 8, 2009 (to the extent not previously recovered by or on behalf of the Debtor). Such amount is currently estimated to be $1,706,751.00;

e.      Repayment to the FDIC of any advances (to the extent not previously recovered) made by the FDIC from September 8, 2009 through the date of transfer of oversight of servicing of the Overline Loans to the Debtor. Such amount is currently estimated to be $1,181,879;

f.      Repayment to the FDIC of the outstanding Overline Balance; and

g.      Payment to the Debtor of any remaining funds. The Debtor does not estimate that it will recover anything.

**4.    Ocala Funding Loans**

As of the FDIC Settlement Date, the FDIC disclaimed any interest in the 160 loans related to Ocala Funding described on Exhibit L to the FDIC Settlement Agreement. As of June 30, 2010, the UPB of these loans is approximately $31,195,113. Moreover, the FDIC has no objection to the Debtor assuming responsibility for overseeing the servicing of these loans. Bank of America, as trustee, asserts an ownership interest or priority Lien in these 160 loans. 154 of the 160 loans are currently being held by the Debtor in "escrow" (as of sometime in September 2010), and proceeds since the transfer to the Debtor will be held in "escrow" pending determination of ownership. Collections prior to the transfer to the Debtor (including the payoffs on the other 6 loans) are currently being held by the FDIC and will be turned over to the Debtor to also be held in "escrow."

### 5.    COLB Facility

Pursuant to § 1123(a)(5) of the Bankruptcy Code, the Debtor shall on the Effective Date convey to the FDIC the Debtor's legal title to the COLB Loans, having a UPB of $577,571,094.79 as of June 30, 2010, free and clear of all Liens, subject to the FDIC's 99% participation interest.  As a result, the FDIC will be vested with legal title to the COLB Loans and will be permitted to sell or dispose of the COLB Loans on an arms-length basis.  The FDIC shall pay to the Plan Trust 1% of the Net Proceeds of such disposition, or any other proceeds collected with respect to the COLB Loans after the date of the FDIC Settlement Agreement.  In addition to the transfer of the COLB Loans, the Debtor shall also transfer all mortgage servicing rights without restriction to the FDIC.

### 6.    REO

On the Effective Date, in exchange for the treatment specified in the FDIC Settlement Agreement, the FDIC will be deemed to have disclaimed its interest, if any, in any owned real estate titled in the name of the Debtor related to the AOT Loans for which the FDIC does not hold valid mortgage liens properly perfected and which are not avoidable under chapter 5 of the Bankruptcy Code (referred to as the AOT REO), as well as the proceeds of all past or future sales of the AOT REO, and shall execute all documents and take other steps as may be reasonably necessary to transfer its interest, without representation or warranty, in the AOT REO to the Debtor.  In addition, as of the Effective Date, in exchange for the treatment specified in the FDIC Settlement Agreement, the FDIC will be deemed to have disclaimed its interest, if any, in any owned real estate titled in the name of the Debtor related to the Overline Loans (referred to as the Overline REO).  As of June 30, 2010, the loans associated with AOT REO and Overline REO had a total UPB of $124,671,763.18.   Transfer of 51 of the 1,572 specific REO properties occurred on the FDIC Settlement Date, which REO properties are marked by an * on Exhibit J to the FDIC Settlement Agreement.

### 7.    TBW Funding Company II LLC Account

TBW Funding II is a special purpose entity that is a wholly-owned subsidiary of TBW. At the Petition Date, it maintained a deposit Account No. 8037244491 with Colonial.  As more fully set forth in Section 1.7 of the FDIC Settlement Agreement, on the Effective Date, the FDIC will release its hold on the balance of the account, which is approximately $13.8 million.

### 8.    BB&T Funds

TBW maintained corporate operating accounts on deposit at BB&T, aggregating approximately $13.8 million as of April 30, 2010 (referred to as the BB&T Funds). The FDIC will continue to have control over the BB&T Funds for a period of eight months after the Effective Date (referred to in the FDIC Settlement Agreement as the "Extension").  Upon mutual written agreement of the FDIC and the Debtor, payments will be made from the BB&T Funds to (i) borrowers harmed by the Debtor and Colonial as a result of the Debtor's insolvency, as such borrower issues are more fully described in the Reconciliation Report and the Debtor's *Motion for Approval of Protocol to Resolve Borrower Issues* [Docket # 927], approved by the

Bankruptcy Court by Order entered on February 24, 2010 [Docket # 1079] or (ii) investors to the extent any of the BB&T Funds are determined by the FDIC and the Debtor to be based on loans funded by an investor that did not close. Upon expiration of the Extension and in consultation with the FDIC, the remaining BB&T Funds will be transferred to the Debtor's Estate, provided that the Plan shall require that such funds be used by the Debtor or Plan Trustee for the same express purposes until such borrower and investor issues are resolved. The Plan shall further provide that the Debtor's or Plan Trustee's requirement to use BB&T Funds for the express purposes described above shall terminate three (3) years from the Effective Date, whereupon any remaining funds shall be available for general administration under the Plan.

### 9.    Payments from Certain TBW Accounts at Colonial

By the Effective Date, all custodial accounts relating to TBW's servicing operations at Colonial and TBW's operating accounts at Colonial will be distributed in accordance with the Reconciliation Report.

As soon as reasonably practicable after the Effective Date, the FDIC will remit to the Debtor all funds on deposit in the REO Proceeds Clearing Account that the Reconciliation provides are to be allocated to the Debtor, which are estimated at over $1.5 million. In addition, funds in the Custodial Funds Clearing Account, estimated at over $5.6 million, will be distributed as follows: (a) to the extent related to COLB Loans, paid directly to the FDIC; (b) to the extent related to AOT Loans or Overline Loans, distributed in accordance with the priority scheme described in subsections (2) and (3), respectively, of this Section V.A, and (c) to the extent related to Ocala Loans, TBW Whole Loans or the proceeds from the sale of any REO, distributed to the Debtor or the Plan Trust.

### 10.    FDIC Substantial Contribution Claim

Also on the Effective Date, the FDIC shall be granted a Claim in the amount of $1.75 million having the priority set forth under § 503(b)(3)(D) of the Bankruptcy Code in recognition of its substantial contribution to these Chapter 11 Cases through the Reconciliation. The FDIC Substantial Contribution Claim recognizes the extent to which the FDIC's actions made possible the efforts of the Debtors, the CRO, and the Creditors' Committee to achieve an orderly liquidation of TBW that maximized the recovery for all Creditors.

### 11.    FDIC GUC Claim

Under the Plan, the FDIC shall have an Allowed Unsecured Claim in the amount set forth in Section 1.9 of the FDIC Settlement Agreement (referred to as the FDIC GUC Claim). The Debtor estimates that the FDIC GUC Claim is approximately $2.265 billion. This estimate is derived by totaling all Claims held by the FDIC, the gross amount of which is approximately $3.254 billion, and subtracting reductions aggregating approximately $988 million in accordance with the FDIC Settlement Agreement with respect to the COLB Loans ($827,058,800), AOT Loans ($145,000,000) and Overline Loans ($16,129,897), yielding the estimated $2.265 billion. To the extent the FDIC GUC Claim varies from the estimated $2.265 billion, the Debtor

anticipates that it would be due to a variance in the amounts realized in the sale or liquidation of AOT Loans or the Overline Loans from the Debtor's estimate.

### 12.    FDIC Payment to Trade Creditors

The FDIC shall, as a condition of confirmation of the Plan, pay over to the Liquidating Trust for the exclusive benefit of Trade Creditors an amount equal to the Trade Creditor Recovery as such term is defined in Section 1.10 of the FDIC Settlement Agreement (which is capped at $15 million).

### 13.    Colonial Receivership

Upon confirmation and consummation of the Plan, the Debtor shall withdraw all claims it filed in the Colonial Receivership.

### 14.    General Release by FDIC

The FDIC Settlement Agreement (Section 2.2) provides for release by the FDIC of the Debtor and related Persons and Entities, as more fully described in Section VI.H.4 of this Disclosure Statement.

### 15.    General Release by TBW

The FDIC Settlement Agreement (Section 2.1) provides for release of the FDIC, in its capacity as receiver for Colonial and in its corporate capacity, as more fully set forth in Section VI.H.3 of this Disclosure Statement.

## VI.    THE PLAN

The following summary of certain principal provisions of the Plan is qualified in its entirety by reference to the Plan, which is attached as Exhibit A to this Disclosure Statement. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan, the Plan Trust Agreement, the FDIC Settlement Agreement or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions. The Plan does not effect a substantive consolidation of the Debtors.

### A.    Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims (except for Administrative Expense Claims (including DIP Facility Claims) and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan. As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article 3 of the Plan. Consistent with § 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is

within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| **Unclassified Claims Against All Debtors** | | |
| n/a | Administrative Expense Claims and Priority Tax Claims (§ 507(a)(8)) against all Debtors | Unimpaired - not entitled to vote |
| **Claims Against TBW** | | |
| TBW Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| TBW Class 2 | FDIC Secured Claim (AOT Facility) | Impaired - entitled to vote |
| TBW Class 3 | FDIC Secured Claim (Overline Facility) | Impaired - entitled to vote |
| TBW Class 4 | Sovereign Secured Claim (Sovereign Facility) | Impaired - entitled to vote |
| TBW Class 5 | Natixis Secured Claim (Natixis Facility) | Impaired - entitled to vote |
| TBW Class 6 | Plainfield Secured Claim (Plainfield Term Loan) | Impaired - entitled to vote |
| TBW Class 7 | Other Secured Claims | Impaired - entitled to vote |
| TBW Class 8 | General Unsecured Claims | Impaired - entitled to vote |
| TBW Class 9 | General Unsecured Claims (Trade Creditors) | Impaired - entitled to vote |
| TBW Class 10 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) and Claims, if any, subordinated by an Order of the Bankruptcy Court pursuant to § 510 | Impaired - not entitled to vote |
| TBW Class 11 | Interests | Impaired - not entitled to vote |

| Claims Against HAM | | |
|---|---|---|
| HAM Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| HAM Class 2 | Other Secured Claims | Impaired - entitled to vote |
| HAM Class 3 | General Unsecured Claims | Impaired - entitled to vote |
| HAM Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) and Claims, if any, subordinated by an Order of the Bankruptcy Court pursuant to § 510 | Impaired - not entitled to vote |
| HAM Class 5 | Interests | Impaired - not entitled to vote |

| Claims Against REO Specialists | | |
|---|---|---|
| REO Class 1 | Priority Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| REO Class 2 | Other Secured Claims | Impaired - entitled to vote |
| REO Class 3 | General Unsecured Claims | Impaired - entitled to vote |
| REO Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4)) | Impaired - not entitled to vote |
| REO Class 5 | Equity Interests | Impaired - not entitled to vote |

B.     **Treatment of Claims and Interests**

The treatment of Claims and Interests in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding an Allowed Claim or an Allowed Interest may have in or against the applicable Debtor or its property. This treatment supersedes and replaces any agreements or rights those Entities have in or against the applicable Debtor or its property. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Interest in accordance with the terms of the Plan. **Except as specifically set forth in the Plan, no Distributions will be made and no rights will be retained on account of (i) any Claim that is not an Allowed Claim or (ii) any Interest.**

Allowed Claims against any one Debtor will be satisfied solely from the Assets of such Debtor and its Estate contributed to the Plan Trust. A Claim against multiple Debtors co-liable on such Claim, to the extent allowed in each Debtor's Chapter 11 Case, will be treated as a separate Claim against each Debtor's Estate for all purposes (including, but not limited to, voting and distribution, provided, however, that there shall be only a single recovery on account of such Claim.

1.     **Administrative Expense Claims**

Subject to (a) the bar date provisions in the Plan and (b) additional requirements for Professionals and certain other Persons set forth in the Plan, each Holder of an Allowed Administrative Expense Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, as set forth in Article 7.B.2, Cash equal to the Allowed amount of such Administrative Expense Claim, unless the Holder agrees or shall have agreed to other treatment of such Claim no less favorable to the Debtors; provided, however, that any Administrative Expense Claim (x) incurred post-petition by a Debtor in the ordinary course of its businesses or (y) arising pursuant to one or more post-petition agreements or transactions entered into by any Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the applicable Debtor or the Plan Trustee, on the one hand, and the Holder of such Administrative Expense Claim, on the other. The Holder of an Allowed Administrative Expense Claim shall not be entitled to, and shall not be paid, any interest, penalty, or premium thereon, and any interest, penalty, or premium asserted with respect to an Administrative Expense Claim shall be deemed disallowed and expunged without the need for any further Order of the Bankruptcy Court.

a.     General Administrative Bar Date (excluding Professional Claims)

The Plan requires that requests for payment of Administrative Expense Claims other than Professional Claims be Filed and served on counsel for the Debtors or the Plan Trustee (as applicable) no later than (a) thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court and served, or (b) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period referred to as the Administrative Expense Claim Bar Date). Holders of Administrative Expense Claims (including, without limitation, the Holders of any Claims for federal, state or local taxes, but excluding Professional

Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust or any of their property. Notwithstanding the foregoing, any bar dates established during the course of these Chapter 11 Cases shall remain in full force and effect.

All objections to allowance of Administrative Expense Claims (excluding Professional Claims) must be Filed by any parties in interest no later than ninety (90) days after the Administrative Expense Claim Bar Date (defined as the Administrative Expense Claim Objection Deadline). The Administrative Expense Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole discretion of the Plan Trustee upon the filing of a notice of the extended Administrative Expense Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Administrative Expense Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any Creditors. If no objection to the applicable Administrative Expense Claim is filed on or before the Administrative Expense Claim Objection Deadline, as may be extended, such Administrative Expense Claim will be deemed Allowed, subject to the Bankruptcy Court's discretion to extend such bar date retroactively.

> b.      Professional Claims Bar Date

The Plan requires all Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date (including, *inter alia,* any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Cases) to File and serve on counsel for the Debtors or the Plan Trustee (as applicable) an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Confirmation Date, no later than (a) sixty (60) days after a notice of the Effective Date is Filed with the Bankruptcy Court, or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 60-day period (referred to as the Professional Claims Bar Date). Notwithstanding the foregoing, the FDIC shall not be required to file an application to obtain the approval of the Bankruptcy Court for the FDIC Substantial Contribution Claim or payment of such Claim on the Effective Date of the Plan.

Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be Filed and served on counsel for the Debtors or the Plan Trustee (as applicable), and the Professionals or other Persons to whose application the objections are addressed on or before (a) forty-five (45) days after the Professional Claims Bar Date or (b) such later date as (i) the Bankruptcy Court shall order upon application made prior to the end of such 45-day period or (ii) is agreed between the Debtors or the Plan Trustee, as applicable, and the affected Professional or other Person.

Any Professional fees incurred by the Debtors or the Creditors' Committee subsequent to the Confirmation Date may be paid by the Debtors or the Plan Trust without application to or Order of the Bankruptcy Court. The costs of the Plan Trust, including without limitation, the

fees and expenses of the Plan Trustee and any Professionals retained by the Plan Trustee, shall be borne entirely by the Plan Trust.

### 2.    DIP Facility Claims

TBW never drew on the DIP Loan and does not believe that the DIP Lender has any Claims. However, if any do exist, all Allowed DIP Facility Claims against the Debtor shall be treated as Administrative Expense Claims and shall be satisfied (a) on or before the Effective Date in full in Cash, or in a manner otherwise permitted or requited pursuant to the terms of the DIP Order and the DIP Loan Agreement, or (b) on such other terms as may be mutually agreed upon among (i) the Holders of the DIP Facility Claims and (ii) TBW or the Plan Trustee.

### 3.    Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash. After the Effective Date, the Plan Trustee shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case for each applicable Debtor is (i) closed and a final decree is entered, (ii) converted to a case under Chapter 7 of the Bankruptcy Code, or (iii) dismissed. In addition, the Plan Trust shall file post-Confirmation quarterly reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which will be deemed Administrative Expense Claims against the applicable Debtors and their Estates.

### 4.    Priority Tax Claims

With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, at the sole option of the Plan Trustee, the Plan Trustee shall pay to each Holder of an Allowed Priority Tax Claim on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, and release of such Allowed Priority Tax Claim, in Cash, (a) in accordance with Bankruptcy Code § 1129(a)(9)(C) and (D), equal Cash payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance of such Allowed Priority Tax Claim, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code; (b) or pursuant to such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors or the Plan Trustee in writing, provided such treatment is no less favorable to the liable Debtor or the Plan Trust than the treatment set forth in clause (a) hereof, or (c) payment in full as set forth in Article 7.B.2 of the Plan.

The Holder of an Allowed Priority Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court. The Plan Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

### 5.    Other Priority Claims

Each of TBW Class 1, HAM Class 1, and REO Class 1, which are Unimpaired, consist of all Allowed Priority Claims against a particular Debtor.  Unless the Holder of an Allowed Priority Claim and the Debtor against which such Claim is asserted (if prior to or on the Effective Date) or the Plan Trustee (if after the Effective Date) agree to a different treatment, the Plan Trustee shall pay each such Holder of an Allowed Priority Claim in full, in Cash, without interest.

### 6.    FDIC Secured Claims

TBW Classes 2 and 3, which are Impaired, consist of the Allowed FDIC Secured Claims against TBW.  The FDIC Secured Claims are secured by first-priority Liens in certain assets of TBW as provided in the FDIC Settlement Agreement.

In full satisfaction, settlement, and release of, and in exchange for, each Allowed FDIC Secured Claim, the Holder of such Claim shall receive the treatment set forth the FDIC Settlement Agreement.

### 7.    Sovereign Secured Claim

TBW Class 4, which is Impaired, consists of any Allowed Sovereign Secured Claim against TBW.  Sovereign asserts a Secured Claim based upon an asserted Lien in TBW's rights under certain servicing agreements and all Cash proceeds thereof.

On the later of the Effective Date (or as soon thereafter as practicable) and the date the Sovereign Secured Claim becomes an Allowed Sovereign Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), at the sole option of the Plan Trustee, the Holder of such Allowed Sovereign Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Sovereign Secured Claim, one or a combination of the following:  (a) payment in Cash up to the Allowed amount of the Sovereign Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) all or any portion of the Assets securing the Allowed Sovereign Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Sovereign Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

### 8.    Natixis Secured Claim

TBW Class 5, which is Impaired, consists of any Allowed Natixis Secured Claim against TBW.  Natixis asserts a Secured Claim based upon an asserted Lien in TBW's rights under certain servicing agreements and all Cash proceeds thereof.

On the later of the Effective Date (or as soon thereafter as practicable) and the date the Natixis Secured Claim becomes an Allowed Natixis Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), at the sole option of the Plan Trustee, the Holder of such Allowed Natixis Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Natixis Secured Claim, one or a combination of the following:  (a) payment in Cash up to the Allowed amount of the Natixis Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) all or any portion of the Assets securing the Allowed Natixis Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Natixis Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

### 9.    Plainfield Secured Claim

TBW Class 6, which is Impaired, consists of any Allowed Plainfield Secured Claim against TBW.  The Plainfield Claim is secured by a junior Lien in certain Assets of TBW, pursuant to the Plainfield Term Loan.  The Assets securing the Plainfield Secured Claim are subject to an alleged first-priority Lien securing the Sovereign Secured Claim.

If the Plainfield Secured Claim becomes an Allowed Plainfield Secured Claim, then, on the later of the Effective Date (or as soon thereafter as practicable) and the date of such allowance pursuant to a Final Order (or as soon thereafter as practicable), at the sole option of the Plan Trustee, the Holder of such Allowed Plainfield Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Plainfield Secured Claim, one or a combination of the following:  (a) payment in Cash up to the Allowed amount of the Plainfield Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) all or any portion of the Assets securing the Allowed Plainfield Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Plainfield Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

### 10.    Other Secured Claims

TBW Class 7, HAM Class 2, and REO Class 2, which may be Impaired, comprise, respectively, all Allowed Other Secured Claims against a particular Debtor.  These Classes comprise Secured Claims other than those that are separately classified.  If more than one Secured Claim is classified as an Other Secured Claim in TBW Class 7, HAM Class 2 or REO Class 2, a separate subclass will be established for each such Other Secured Claim.

On the later of the Effective Date (or as soon thereafter as practicable) and the date that an Other Secured Claim becomes an Allowed Other Secured Claim pursuant to a Final Order (or

as soon thereafter as practicable), with respect to each Allowed Other Secured Claim, at the sole option of the Plan Trustee: (i) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed Other Secured Claim shall be reinstated in full as of the Effective Date and remain unaltered; or (ii) the Holder of such Allowed Other Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Other Secured Claim, one or a combination of the following: (a) payment in Cash up to the amount of the Allowed Other Secured Claim after the Assets securing such claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all its Liquidation Expenses and paid the Sharing Percentage; (b) all or any portion of the Assets securing the Allowed Other Secured Claim; (c) deferred Cash payments having a present value on the Effective Date equal to the amount of the Allowed Other Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim; (d) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Other Secured Claim; or (e) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed Other Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

To the extent that the value of the Assets securing any Allowed Other Secured Claim exceeds the Allowed Amount of such Claim, then, as contemplated by § 506(b) of the Bankruptcy Code, the Holder of such Claim shall be entitled: (a) if the Other Secured Claim arises from a written agreement, to interest accrued (i) from the Petition Date to the Maturity Date at the non-default rate of interest under such agreement and (ii) from the Maturity Date to the Effective Date at the lesser of (A) the non-default rate of interest under the agreement and (B) the federal judgment rate of interest; (b) if the Other Secured Claim is a tax claim, interest at a rate to be determined pursuant to § 511 of the Bankruptcy Code; and (c) any reasonable fees, costs, or charges payable under the agreement or state statute giving rise to such Other Secured Claim.

### 11. General Unsecured Claims Against all Debtors, Other than Trade Claims and Subordinated Claims

TBW Class 8, HAM Class 3, and REO Class 3, which are Impaired, consist of all Allowed Unsecured Claims against each Debtor, respectively, other than Trade Claims against TBW and Subordinated Claims. Claims in TBW Class 8, Ham Class 3 and REO Class 3 shall include, without limitation, intercompany Claims among the Debtors and EPD Claims and Breach of Warranty Claims. For the avoidance of doubt, Claims in TBW Class 8 shall include, without limitation, (a) the FDIC's General Unsecured Claim (referred to in this Plan as the FDIC GUC Claim), as provided for in the FDIC Settlement Agreement; (b) the unsecured portion of any Claim secured by a Lien, and (c) Allowed Unsecured Claims of (i) any Insider of TBW; (ii) any institutional or non-institutional lender to TBW, including, but not limited to, warehouse and non-warehouse-line lenders and lenders asserting security interests in mortgage loans (or related debt or equity securities) or servicing rights or revenue related to mortgage loans; and (iii) any institutional or non-institutional investor in mortgage loans (or related debt or equity securities).

Freddie Mac has Filed a Proof of Claim for approximately $1.782 billion. Freddie Mac was placed into conservatorship by the Director of the Federal Housing Finance Agency (the "Conservator") on September 6, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"). Freddie Mac and its Conservator assert that the subject Claim is provided priority status pursuant to 12 U.S.C. §§ 4617(b)(15)(A) & (D), which are provisions of HERA. If all or a substantial part of Freddie Mac's Claim has priority status, Freddie Mac asserts that the Plan Proponents' Plan may not be feasible.

The Plan Proponents do not believe that the Sections of HERA provide Freddie Mac with a priority claim in these Chapter 11 Cases. Rather, the Plan Proponents believe that the statute provides that the Conservator's right to recover for certain transfers made with the actual intent to hinder, delay or defraud the Conservator or Freddie Mac may be superior to the Debtor's competing rights with respect to such transfers. Accordingly, the Plan Proponents will classify Freddie Mac's entire Claim as a Class 8 Unsecured Claim. The Plan Proponents reserve all of their respective rights and defenses with respect to Freddie Mac's assertions regarding HERA.

Each Holder of an Allowed Unsecured Claim in TBW Class 8, HAM Class 3, and REO Class 3 shall receive its *pro rata* share of the Net Distributable Assets of the applicable Estate. With respect to TBW Class 8, the *pro rata* share shall be calculated by including with the TBW Class 8 Allowed Claims all the Allowed Trade Claims in TBW Class 9.

### 12.    General Unsecured Claims (Trade Creditors) Against TBW (TBW Class 9)

TBW Class 9, which is Impaired, consists of Holders (referred to as Trade Creditors) of Trade Claims. The term "Trade Claims" is defined in the Plan to mean Allowed Unsecured Claims for goods or services provided to or performed for or on behalf of TBW but specifically excluding Claims of (a) any insider of TBW; (b) any institutional or non-institutional lender to TBW, including but not limited to warehouse and non-warehouse-line lenders and lenders asserting security interests in mortgage loans (or related debt or equity securities) or servicing rights or revenue related to mortgage loans; and (c) any institutional or non-institutional investor in mortgage loans (or related debt or equity securities). The Plan Trustee shall disburse, on behalf of the FDIC, to each Holder of an Allowed Trade Claim its *pro rata* share of (a) 10% of the first $100 million available for Distribution in respect of the FDIC GUC Claim, plus (b) 5% of all amounts thereafter available for Distribution in respect of the FDIC GUC Claim until a total of $15 million (referred to as the Trade Creditor Recovery) is received by the Holders of Allowed Trade Claims. The *pro rata* share which each Holder of a Trade Claim shall receive shall be based on the total amount of the Allowed Trade Claims.

The terms of payment of the Trade Creditor Recovery from Cash available for Distribution in respect of the FDIC GUC Claim shall be as set forth in the FDIC Settlement Agreement. As provided therein, the FDIC shall have no obligation to share recoveries with the Trade Creditors after a total of $15 million is paid by the FDIC to the Plan Trust for the benefit of Trade Creditors. Neither the FDIC GUC Claim nor any Claims other than those of Trade Creditors shall receive any Distribution from the Trade Creditor Recovery. The justification for the receipt by Trade Creditors of the Trade Creditor Recovery set forth in this Plan and the FDIC

Settlement is that Trade Creditors did not have the level of visibility into the operations of TBW as the Class 8 Creditors. Further, the Cash comprising the Trade Creditor Recovery is not proceeds of the Debtors' Estates, and in making Distributions on Claims included in this TBW Class 9 the Plan Trustee shall be acting solely in its capacity as disbursing agent for the FDIC.

Notwithstanding anything contained in Article 4.G of the Plan to the contrary, the Holders of TBW Class 9 Claims shall also receive a *pro rata* share of the Net Distributable Assets. This *pro rata* share shall be calculated by including with the TBW Class 8 Allowed Claims all the Allowed Trade Claims in TBW Class 9.

Prior to service of the Ballots, the Plan Proponents shall publish their determination as to which Holders of General Unsecured Claims are entitled to treatment as Holders of TBW Class 9 Claims. **Upon service of the Ballots, the list of the General Unsecured Claims included in TBW Class 9 (titled General Unsecured Claims (Trade Creditors) Against TBW) may be viewed online, free of charge, by accessing www.bmcgroup.com/tbwmortgage and following the links to information regarding TBW Class 9.**

If the Holder of a Claim disagrees with the determination of the Plan Proponents as to TBW Class 9 status, then the Holder of such Claim may seek a final determination of the proper classification of its Claim by the Bankruptcy Court by filing a motion seeking such relief not later than 14 days after issuance of service of the Ballot upon the Holder of the Claim. In adjudicating whether a Claim is properly classified as a TBW Class 8 Claim or a TBW Class 9 Claim, the Court will consider the intent of the Plan Proponents by the description of the Classes, as set forth above. If a Claim is in TBW Class 8 then it is not in TBW Class 9, and vice versa.

### 13.    Subordinated Claims

TBW Class 10, HAM Class 4, and REO Class 4, which are Impaired, consist of all Subordinated Claims against all of the Debtors. Holders of Claims in these Classes are expected to receive no Distribution on account of such Claims because the Net Distributable Assets are expected to be insufficient to satisfy Unsecured Claims senior to the Subordinated Claims.

### 14.    Interests

Each of TBW Class 11, HAM Class 5, and REO Class 5, which are Impaired, consist of Interests in all of the Debtors. Holders of Interests in these Classes shall receive no Distribution or dividend on account of such Interests because the Net Distributable Assets are expected to be insufficient to satisfy Unsecured Claims. The entry of the Confirmation Order shall act as an Order approving and effecting the cancellation of all Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Interests) outstanding immediately prior to the Effective Date, without any conversion thereof or Distribution with respect thereto.

C.    **Acceptance or Rejection of the Plan; Nonconsensual Confirmation**

    1.    **Ability to Vote on the Plan**

As set forth above, TBW Class 1, HAM Class 1, and REO Class 1 are Unimpaired by the Plan. Pursuant to § 1126(f) of the Bankruptcy Code, each of these Classes of Claims is conclusively presumed to have accepted the Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited. If and to the extent any Class identified as being Unimpaired is Impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), the Holders of Claims in such Class shall be entitled to vote to accept or reject the Plan.

TBW Classes 2, 3, 4, 5, 6, 7, 8 and 9; HAM Classes 2 and 3; and REO Classes 2 and 3 are (or may be) Impaired by the Plan, and Holders of Claims in these Classes shall be entitled to vote to accept or reject the Plan.

TBW Classes 10 and 11; HAM Classes 4 and 5; and REO Classes 4 and 5 are Impaired by the Plan, but Holders of Claims and Interests in these Classes are not expected to retain or receive any property under the Plan on account of such Claims and Interests. Pursuant to § 1126(g) of the Bankruptcy Code, these Classes are conclusively presumed to have rejected the Plan, and the votes of Holders of Claims or Interests in such Classes therefore will not be solicited.

    2.    **Non-Consensual Confirmation**

As set forth in Article 14 of the Plan, if any Impaired Class fails to accept the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan as a Cramdown Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to such Class.

D.    **Means of Implementing the Plan**

    1.    **Corporate Action; Dissolution of Debtors**

On the Effective Date, (i) the matters under the Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries, and (ii) the officers and directors of the Debtors shall immediately cease to serve and the Plan Trustee shall be deemed the sole director and officer of each of the Debtors for all purposes, without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries.

On and after the Effective Date, (i) the Plan Trustee shall be authorized, in his sole and absolute discretion, to take all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including the laws of the jurisdictions in which they may

be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or Filing any necessary paperwork or documentation. The Plan Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

## 2.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms.

## 3.    Consummation of FDIC Settlement Agreement

The FDIC Settlement Agreement provides that certain of its provisions are to be set forth in the Plan. Article 6.E. of the Plan sets forth certain of those provisions, which are summarized below in this subsection D.3. Certain other provisions of the FDIC Settlement are incorporated into other Articles of the Plan, including Article 4, titled Treatment of Classified Claims and Interests, and Article 10, titled Exculpations and Releases.

Pursuant to the FDIC Settlement Agreement, the FDIC's ownership of 99% participation interests in the mortgage loans purchased pursuant to the COLB Documents for which there are no conflicting claims of ownership with third parties or for which Colonial is determined to have superior ownership rights, shall be recognized. A list of the COLB Loans for which the FDIC's superior rights shall be recognized shall be attached as an exhibit to the FDIC Settlement Agreement or filed separately as a document included in the Plan Supplement. On the Effective Date, TBW shall transfer all right, title, and interest of TBW and Affiliates in and to such COLB Loans to the FDIC, free and clear of all Claims, encumbrances, liens, and interests in and to such COLB Loans of any kind or nature, subject to the 99% participation interest therein held by the FDIC such that, as of the Effective Date, the FDIC shall have the right to sell, securitize, syndicate or otherwise dispose of such COLB Loans or any interest therein or any interest created thereby resulting from the COLB Loans into a securitization. The FDIC shall pay the Debtor 1% of the net proceeds of any such disposition from the COLB Loans, in whole or in part, or any other proceeds collected with respect to the COLB Loans, as and when and in the same manner that the FDIC receives payment for such disposition or collection.

Pursuant to the FDIC Settlement Agreement, the FDIC shall be granted an Administrative Expense Claim in the amount of $1.75 million in recognition of the FDIC's substantial contribution to TBW's Chapter 11 Case through the Reconciliation, as an actual, necessary cost and expense of preserving TBW's estate pursuant to Bankruptcy Code section 503(b)(3)(D).

The FDIC shall have an Allowed General Unsecured Claim in the amount set forth in Section 1.9 of the FDIC Settlement Agreement (referred to in this Plan as the FDIC GUC Claim).

Pursuant to Section 1.10 of the FDIC Settlement Agreement, the FDIC has assigned, for the benefit of the Trade Creditors (TBW Class 9), the Trade Creditor Recovery, which represents a portion of the Distribution to which the FDIC is entitled by virtue of the FDIC GUC Claim. The treatment of TBW Class 9 Claims reflects this partial assignment.

All terms and conditions of the FDIC Settlement Agreement, a copy of which is Filed as an exhibit to the Plan Supplement, are incorporated by reference as terms and conditions of the Plan.  In case of conflict between the Plan and the FDIC Settlement Agreement, the terms of the FDIC Settlement Agreement shall control.

On or before November 30, 2010, the Debtor will file a motion to establish procedures for determining rights in certain loan Assets related to the FDIC Settlement Agreement, the Plan or other aspects of these Estates.   To the extent not resolved pursuant to such motion or otherwise prior to the Confirmation Hearing, the rights of all parties in interest to such Assets are reserved until the Confirmation Hearing.

## 4.      The Plan Trust; Assumption of Plan Obligations

On or prior to the Effective Date, the Plan Trust shall be formed.  The Holders of Allowed Claims (whether Allowed before or after the Effective Date) shall be the sole Beneficiaries of the Plan Trust.

On or before the Effective Date the Plan Trust will be formed and on the Effective Date all Assets of the Estates shall vest in, and constitute Assets of, the Plan Trust, as more particularly described in subsection 5 below of this Section VI.D.  All of the Debtors' rights and obligations under the Plan with respect to each and every Administrative Expense Claim, Priority Tax Claim, Priority Claim, and Secured Claim, and all other rights and obligations of the Debtors under the Plan, will be assigned to and assumed by the Plan Trust on the Effective Date.

The Plan Trust shall be administered in accordance with the Plan Trust Agreement.  The Plan Trust Agreement shall set forth the provisions necessary to govern the rights, powers, obligations, appointment and removal of the Plan Trustee and to ensure the treatment of the Plan Trust as a liquidating trust for federal income tax purposes.  The following provisions provide a general overview of the Plan Trust Agreement, but are subject to change as the Plan Trust Agreement is finalized or amended.   The Plan Trust Agreement shall be Filed with the Bankruptcy Court as an exhibit to the Plan Supplement.  In the event that the description of the Plan Trust Agreement in the Plan or this Disclosure Statement conflicts with any provision of the Plan Trust Agreement, the provision of the Plan Trust Agreement shall control.

### a.      The Plan Trustee

On the Effective Date, the appointment of Neil Luria (the CRO during these Chapter 11 Cases) as Plan Trustee shall become effective.  The Plan Trustee may be removed or replaced by

the Plan Advisory Committee for Cause shown, in accordance with the procedures in the Plan Trust Agreement, in which case the Plan Advisory Committee shall have the authority to appoint a successor trustee. If the Bankruptcy Court so orders, the Plan Trustee shall serve with a bond, the costs and expenses of which shall be paid by the Plan Trust.

The Plan Trustee shall be compensated as set forth in the Plan Trust Agreement (which compensation may be revised as agreed upon by the Plan Trust and the Plan Advisory Committee) and shall not be required to file a fee application to receive compensation. The Plan Trustee's compensation shall, however, be subject to review and, if appropriate, objection by the Plan Advisory Committee as set forth in the Plan Trust Agreement.

b.      Distributions from Liquidation of Plan Trust Assets

As a general charge, the Plan Trustee shall, in his reasonable business judgment and in an expeditious but orderly manner, liquidate and convert to Cash the Plan Trust Assets, make timely Distributions, and not unduly prolong the duration of the Plan Trust. The Plan Trust shall make Distributions to Holders of Allowed Claims in accordance with the Plan and the Plan Trust Agreement.

c.      Responsibilities of Plan Trustee

(i)      Powers

The Plan Trustee shall be deemed the Estates' representative in accordance with § 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Plan Trust Agreement, including, without limitation, the powers of a trustee under §§ 704, 1106 and 108 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting defenses, offsets and privileges), to the extent not inconsistent with the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation § 301.7701-4(d), except as otherwise provided for U.S. federal income tax purposes in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations.

(ii)      Valuation of Assets

As soon as practicable after the Effective Date, the Plan Trustee shall apprise each of the Beneficiaries in writing of the value of the Plan Trust Assets by Filing such valuation with the Bankruptcy Court. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Trustee, and Holders of Unsecured Claims) for all federal income tax purposes.

(iii)      Decisions Requiring Plan Advisory Committee Vote

Notwithstanding the foregoing powers, the Plan Trustee shall consult with and obtain the approval of the Plan Advisory Committee before making any Material Decisions. Further, the Plan Advisory Committee, and not the Plan Trustee, shall have the sole power to make any

Unanimous Decision.   See subsection 6.c below of this Section VI.D for a summary of all Material Decisions and Unanimous Decisions.

        d.        Distributions and Reserves

The Plan Trustee shall make Distributions to Holders of Allowed Claims in accordance with Article 7 of the Plan and the Plan Trust Agreement, and shall establish Reserves for all Plan Trust Operating Expenses, Administrative Claims, Priority Tax Claims, Priority Claims and Disputed Unsecured Claims.

        e.        Investment Powers and Permitted Cash Expenditures

All funds held by the Plan Trustee shall be invested in Cash or in demand and time deposits, such as certificates of deposit and U.S. Treasury Bills having maturities of not more than one year, or other temporary liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Plan Trust Agreement; provided, however, that the right and power of the Plan Trustee to invest Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or as set forth in IRS rulings, notices, guidelines or other IRS pronouncements, and as provided by Bankruptcy Code § 345. The Plan Trustee may expend the Cash of the Plan Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective Assets of the Plan Trust during liquidation, (y) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust), and (z) to satisfy other liabilities incurred by the Plan Trust in accordance with the Plan or the Plan Trust Agreement.

        f.        Disputed Ownership Fund.

The Plan Trustee shall be permitted to make the election described in § 1.468B-9(c)(2)(ii) of the Treasury Regulations to treat any portion of the Plan Trust subject to Disputed Claims as a "disputed ownership fund."  The Plan Trustee may also, to the extent permitted by law, make such an election for state and local income tax purposes.  If the election is made to treat any Disputed Claims as a "disputed ownership fund," then the Plan Trust may (i) allocate taxable income or loss to the Disputed Claims, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (ii) distribute Assets from the Disputed Claims Reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved. The Beneficiaries will be bound by such election, if made by the Plan Trustee and, as such, will, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

        g.        Reporting Duties

        (i)        Quarterly Filings with Bankruptcy Court and U.S. Trustee

From the Effective Date until a Final Decree is entered, the Trustee shall, within 30 days of the end of each calendar quarter, File with the Bankruptcy Court and submit to the U.S.

Trustee quarterly reports setting forth all receipts and disbursements of the Plan Trust as required by the U.S. Trustee guidelines.

### (ii)    Tax Reporting

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulations § 1.671-4(a), giving effect to any timely elections made by the Plan Trustee to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to Section 1.468B-9(c)(2)(ii) of the Treasury Regulations.

### (iii)    Annual Statements to Beneficiaries

The Plan Trustee shall also send to each Holder of a beneficial interest in the Plan Trust (referred to as Beneficiaries) an annual statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and provide to all such Holders information for reporting such items on their federal income tax returns, as described in the Plan Trust Agreement, except as otherwise provided for U.S. federal income tax purposes in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to Section 1.468B-9(c)(2)(ii) of the Treasury Regulations.

### (iv)    Quarterly Reports to Plan Advisory Committee

The Plan Trustee shall submit reports as it deems advisable to the Advisory Committee not less frequently than each quarter, which shall include reports on the commencement and prosecution of Causes of Action and the proceeds of liquidation of Plan Trust Assets.

### (v)    Allocation of Plan Trust Taxable Income

Allocations of Plan Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described in the Plan or the Plan Trust Agreement) if, immediately prior to such deemed Distribution, the Plan Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the beneficial interests in the Plan Trust (treating any holder of a Disputed Claim, for this purpose, as a current Holder of a beneficial interest in the Plan Trust entitled to Distributions), taking into account all prior and concurrent Distributions from the Plan Trust and all Reserve allocations (including all Reserves established pending the resolution of Disputed Claims). Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Plan Trust Assets. For this purpose, the tax book value of the Plan Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Plan Trust, adjusted in either case in accordance

with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(vi) Other Filings

The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by the Plan Trust Agreement or any Governmental Authority.

(vii) Disputed Ownership Fund – Tax Effect

Notwithstanding the foregoing, in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust subject to disputed claims as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations, any Holders of Claims who as of the Effective Date are Holders of Disputed Claims shall, to the extent of such Disputed Claims, be subject to U.S. federal income taxation in accordance with rules set forth in Section 468B of the Internal Revenue Code and the Treasury Regulations thereunder.

h. Registry of Beneficial Interests; Non-Transferability

To evidence the beneficial interest in the Plan Trust of each Holder of such an interest, the Plan Trustee shall maintain a registry of such Holders.

Upon issuance thereof, interests in the Plan Trust shall be transferable after written notice to the Plan Trustee only: (a) pursuant to applicable laws of descent and distribution (as in the case of a deceased individual Beneficiary); or (b) by operation of law (as in the case of merger of a corporate Beneficiary).

i. Retention of Professionals

The Plan Trustee may retain professionals, including but not limited to, attorneys, accountants, investment advisors, auditors and other agents on behalf of the Plan Trust, as necessary or desirable to carry out the obligations of the Plan Trustee hereunder and under the Plan Trust Agreement. More specifically, the Plan Trustee may retain counsel in any matter related to administration of the Plan, including counsel that has acted as counsel for the Debtors, the Creditors' Committee, or its members in the Chapter 11 Cases. Approval of the Bankruptcy Court shall not be required to retain or pay any such professionals.

j. Termination

The Plan Trust shall terminate after it liquidates and distributes the Plan Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Plan or in the Plan Trust Agreement, or as otherwise ordered by the Bankruptcy Court. The Plan Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Plan Trust for a finite period if it is necessary to the liquidating purpose thereof. Multiple extensions can be obtained. Any extension shall be obtained within the six (6) month period

prior to the fifth (5th) anniversary or the end of the immediately preceding extension, as applicable.

> k.    Purpose of the Plan Trust

The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets in accordance with Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the IRS, all parties shall treat the Plan Trust as a liquidating trust for all federal income tax purposes. The Plan Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the Assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of § 1123(b)(3) of the Bankruptcy Code.

> **5.    Vesting of Assets**

On the Effective Date, all Assets of the Estates shall vest in the Plan Trust and constitute Plan Trust Assets, and each Debtor shall be deemed for all purposes to have transferred legal and equitable title of all Assets of its Estate to the Plan Trust for the benefit of the Holders of Claims against its Estate, whether or not such Claims are Allowed Claims as of the Effective Date, subject, however, to the Plan Liabilities (described in the following paragraph). In accordance with § 1123(b) of the Bankruptcy Code, the Plan Trust is vested with, retain and may exclusively enforce, prosecute and resolve any or all Causes of Action that the Debtors, the Estates, or the Creditors' Committee may have against any Person.

The Trust Assets are transferred to the Plan Trust subject to the following liabilities, if any, which arise out of or relate to any known or unknown Claim or Cause of Action against the respective Debtors or their Estates: (i) Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims that have not been paid as of the Effective Date or that are subsequently Allowed; (ii) all U.S. Trustee fees until such time as the Bankruptcy Court enters a final decree closing each Debtor's Chapter 11 Case; and (iii) any obligations owing to Secured Creditors under the Plan or the Confirmation Order; but (iv) specifically excluding any Claims that have been barred by, or satisfied under, the Plan.

Between the Confirmation Date and the Effective Date, the Debtors will execute all documentation required (i) to transfer control of the Plan Trust Assets to the Plan Trustee, (i`) to consummate the Plan and (iii) to effectuate the terms of the FDIC Settlement Agreement and any other settlement agreement approved by the Bankruptcy Court. After the Effective Date, all payments and property that any Debtor or its Estate is to receive under the Plan or under any such settlement shall be transferred and conveyed directly to the Plan Trust rather than to the respective Debtor. On the Effective Date, the Debtors shall have no further interest in the Plan Trust Assets.

> **6.    Plan Advisory Committee**

On or before the Effective Date, the Plan Advisory Committee shall be deemed appointed and may promptly adopt bylaws to govern the actions of the Plan Advisory Committee. The Plan Advisory Committee shall represent the interests of the Holders of Beneficial Interests

during the existence of the Plan Trust, and shall have the obligation to undertake in good faith each of the acts and responsibilities set forth for the Plan Advisory Committee in the Plan Trust Agreement or in the Plan for the benefit of the Beneficiaries.

### a.    Membership; Voting

The Plan Advisory Committee shall consist of three (3) members of the Creditors' Committee.  In the event that less than three (3) of the members of the Creditors' Committee notify counsel to the Creditors' Committee of their intent to serve on the Plan Advisory Committee within fifteen (15) days prior to the Confirmation Hearing, then members shall be chosen as provided in the Plan Trust Agreement.  In the event of the resignation of a member of the Advisory Committee, their replacements shall be chosen as provided in the Plan Trust Agreement.

A majority of the members of the Advisory Committee shall constitute a quorum.  Except with regard to a Unanimous Decision, a majority vote is required for the Advisory Committee to act on matters before it.  In the case of a tie vote, including a tie vote on any Material Decision, the vote of the Plan Trustee shall be taken to break the tie.

### b.    Fiduciary Duties

The fiduciary duties that applied to the Creditors' Committee prior to the Effective Date, as limited by the exculpations, indemnifications, releases and other protections provided in the Plan, the Plan Trust Agreement, and the Confirmation Order, shall apply to the Plan Advisory Committee.  The duties, rights and powers of the Plan Advisory Committee shall terminate upon the termination of the Plan Trust.

### c.    Rights and Duties

The Plan Advisory Committee's role shall be to consult with the Plan Trustee in the liquidation of the Plan Trust Assets, as more particularly set forth in the Plan Trust Agreement.  The Plan Advisory Committee shall have the rights and duties set forth in the Plan Trust Agreement.  The rights and powers of the Plan Advisory Committee shall include, but not be limited to, approving all Material Decisions, including the following:

- the Plan Trustee's commencement or continuation of the prosecution of (i) any Cause of Action in which the amount sought to be recovered exceeds $1 million, or (ii) any objection to a Claim having a stated amount greater than $1 million;

- the Plan Trustee's determination not to object to a Claim having a stated amount in excess of $1 million;

- the settlement of (i) any Cause of Action in which the amount sought to be recovered exceeds $1 million or (ii) any Disputed Claim having a stated amount in excess of $1 million and to approve any release or

indemnification to be given by the Plan Trustee in connection with any such settlement;

- any sale of any Assets for a price in excess of $500,000, but no consent or approval of the Plan Advisory Committee is required for any sale of REO or for any release of any individual mortgage loan, including any release for an amount which is less than the outstanding balance of the loan;

- the investment of Cash or other Plan Trust Assets, except for investments in demand and time deposits, such as certificates of deposit, having maturities of less than one year and in U.S. Treasury bills;

- the dissolution of any Debtor;

- the waiver of the attorney-client privilege by the Plan Trustee with respect to any Cause of Action or other litigation related matter, as described in the Plan Trust Agreement;

- the election to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations; and

- the election described in Article 7.J. of the Plan as regards undeliverable Distributions.

In addition to approving all Material Decisions, the Plan Advisory Committee shall have the absolute right and power to determine the following by the unanimous vote of all the members of the Advisory Committee (referred to in the Plan Trust Agreement as a "Unanimous Decision"):

- to change the initial bond to be posted by the Plan Trustee; and

- to petition the Bankruptcy Court to remove the Plan Trustee for Cause, or to select a successor Trustee when a successor is required.

    d.    No Compensation: Reimbursement and Retention of Professionals

The members of the Plan Advisory Committee shall serve without compensation, except for reimbursement of fees and expenses as provided for in the Plan and the Plan Trust Agreement. The Plan Trust shall reimburse the Plan Trustee and each member of the Plan Advisory Committee for its respective reasonable and documented expenses, including out-of-pocket expenses relating to airfare, hotel, meals and other travel costs, and postage, telephone and facsimile charges, for work performed on behalf of or relating to the administration of the Plan Trust or the Advisory Committee, and other necessary expenses. Reimbursement shall include expenses incurred for fees and expenses of counsel to the Plan Trustee, and with respect to the Plan Advisory Committee, to counsel to any member of the Plan Advisory Committee engaged to assist such member to perform its duties hereunder. Reimbursement for fees and