## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **TAYLOR, BEAN & WHITAKER MORTGAGE CORP., REO SPECIALISTS, LLC, and HOME AMERICA MORTGAGE, INC.,** | **Case No. 3:09-bk-07047-JAF** **Case No. 3:09-bk-10022-JAF** **Case No. 3:09-bk-10023-JAF** |
| **Debtors.** | **Jointly Administered Under** **Case No. 3:09-bk-07047-JAF** |

## THIRD AMENDED AND RESTATED JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**TROUTMAN SANDERS LLP**
Jeffrey W. Kelley (GA Bar No. 412296)
jeff.kelley@troutmansanders.com
J. David Dantzler, Jr. (GA Bar No. 205125)
david.dantzler@troutmansanders.com
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
Telephone No:   404-885-3358
Facsimile No.:   404-885-3995
**SPECIAL COUNSEL FOR THE DEBTOR AND DEBTOR IN POSSESSION TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**

**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone No.:   813-229-0144
Facsimile No.:   813-229-1811
**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**BERGER SINGERMAN PA**
Paul Steven Singerman (Fla. Bar No. 378860)
singerman@bergersingerman.com
Arthur J. Spector (Fla. Bar No. 620777)
aspector@bergersingerman.com
200 South Biscayne Boulevard
Suite 1000
Miami, Florida 33131
Telephone No.:   305-755-9500
Facsimile No.:   305-714-4340
**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**

2282374v6

# TABLE OF CONTENTS

**Page**

ARTICLE 1.  DEFINITIONS ................................................................................... 1
    A.  DEFINED TERMS ........................................................................... 1
    B.  INTERPRETATION .......................................................................... 1
    C.  TIME PERIODS ................................................................................ 1
    D.  EXHIBITS AND APPENDICES ...................................................... 2

ARTICLE 2.  CLASSIFICATION OF CLAIMS AND INTERESTS ....................... 2
    A.  SUMMARY ........................................................................................ 2
    B.  CLASSIFICATION ........................................................................... 4

ARTICLE 3.  TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
(INCLUDING DIP FACILITY CLAIMS), STATUTORY FEES, AND
PRIORITY TAX CLAIMS ................................................................ 5
    A.  ADMINISTRATIVE EXPENSE CLAIMS ..................................... 5
    B.  DIP FACILITY CLAIMS .................................................................. 7
    C.  STATUTORY FEES .......................................................................... 7
    D.  PRIORITY TAX CLAIMS ................................................................ 8

ARTICLE 4.  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ......... 8
    A.  PRIORITY CLAIMS AGAINST ALL DEBTORS (TBW Class 1, HAM
Class 1, and REO Class 1) ................................................................ 9
    B.  FDIC SECURED CLAIMS (TBW Classes 2 and 3) ........................ 9
    C.  SOVEREIGN SECURED CLAIM AGAINST TBW (TBW Class 4) ................. 9
    D.  NATIXIS SECURED CLAIM AGAINST TBW (TBW Class 5) ....................... 9
    E.  PLAINFIELD SECURED CLAIM AGAINST TBW (TBW Classes 6) .......... 10
    F.  OTHER SECURED CLAIMS AGAINST ALL DEBTORS (TBW Class
7, HAM Class 2, and REO Class 2) ................................................ 10
    G.  GENERAL UNSECURED CLAIMS AGAINST ALL DEBTORS (TBW
Class 8, HAM Class 3, and REO Class 3) ...................................... 11
    H.  GENERAL UNSECURED CLAIMS (TRADE CREDITORS) AGAINST
TBW (TBW Class 9) ........................................................................ 11
    I.  SUBORDINATED CLAIMS AGAINST ALL DEBTORS (TBW Class
10, HAM Class 4, REO Class 4 ...................................................... 13
    J.  INTERESTS IN ALL DEBTORS (TBW Class 11, HAM Class 5, and
REO Class 5) .................................................................................... 13

ARTICLE 5.  ACCEPTANCE OR REJECTION OF THIS PLAN ......................... 13
    A.  IMPAIRED CLASSES OF CLAIMS ENTITLED TO VOTE .......... 13

## TABLE OF CONTENTS

**Page**

B.    CLASSES DEEMED TO ACCEPT THIS PLAN ............................................... 14

C.    CLASSES DEEMED TO REJECT THIS PLAN ................................................ 14

D.    NONCONSENSUAL CONFIRMATION ........................................................... 15

ARTICLE 6.   MEANS OF IMPLEMENTING THIS PLAN ...................................... 15

A.    IMPLEMENTATION OF PLAN ..................................................................... 15

B.    CORPORATE ACTION .................................................................................. 15

C.    DISSOLUTION OF DEBTORS ....................................................................... 16

D.    DISSOLUTION OF CREDITORS' COMMITTEE ........................................ 16

E.    CONSUMMATION OF GLOBAL SETTLEMENTS ...................................... 16

F.    VESTING OF ASSETS IN PLAN TRUST; ASSUMPTION OF PLAN OBLIGATIONS .............................................................................................. 25

G.    PLAN TRUST ................................................................................................ 26

H.    PLAN ADVISORY COMMITTEE ................................................................. 31

I.    LIMITATION OF LIABILITY FOR PLAN TRUST EXCULPATED PARTIES ......................................................................................................... 33

J.    INDEMNIFICATION OF PLAN TRUST EXCULPATED PARTIES ............. 34

K.    RETENTION OF PROFESSIONALS ............................................................. 34

L.    PRESERVATION OF ALL CAUSES OF ACTION ....................................... 34

M.    SUCCESSORS; PRESERVATION OF PRIVILEGE ..................................... 34

ARTICLE 7.   DISTRIBUTIONS UNDER THIS PLAN ......................................... 35

A.    GENERALLY ................................................................................................. 35

B.    TIMING OF DISTRIBUTIONS ..................................................................... 35

C.    RESERVES .................................................................................................... 36

D.    DISTRIBUTION CALCULATIONS ............................................................. 37

E.    PRIORITY OF DISTRIBUTIONS ................................................................ 38

F.    CALCULATION OF UNSECURED CLAIMS ............................................. 38

G.    MANNER OF DISTRIBUTION .................................................................... 39

H.    DE MINIMIS DISTRIBUTIONS .................................................................. 39

I.    DELIVERY OF DISTRIBUTIONS ............................................................... 40

J.    UNDELIVERABLE DISTRIBUTIONS ........................................................ 40

K.    SETOFFS AND RECOUPMENTS ................................................................ 40

L.    DISTRIBUTIONS IN SATISFACTION; ALLOCATION ............................. 41

# TABLE OF CONTENTS

**Page**

M.    CANCELLATION OF NOTES AND INTERESTS ........................................... 41

N.    NO INTEREST ON CLAIMS ................................................................ 41

O.    WITHHOLDING TAXES .................................................................... 41

P.    REPORTS ..................................................................................... 42

ARTICLE 8.  PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS ..................................................................................... 42

A.    RESERVATION OF RIGHT TO OBJECT TO CLAIMS AND INTERESTS ................................................................................. 42

B.    OBJECTIONS TO CLAIMS AND INTERESTS ............................................. 42

C.    SERVICE OF OBJECTIONS ................................................................ 43

D.    DETERMINATION OF CLAIMS .......................................................... 43

E.    NO DISTRIBUTIONS ON DISPUTED CLAIMS PENDING ALLOWANCE ................................................................................ 43

F.    CLAIMS ESTIMATION FOR DISPUTED CLAIMS ..................................... 44

G.    ALLOWANCE OF CLAIMS SUBJECT TO § 502 OF THE BANKRUPTCY CODE ....................................................................... 44

ARTICLE 9.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES; EMPLOYEE BENEFIT PLANS ............................................................... 44

A.    REJECTION OF UNASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................................................... 44

B.    EMPLOYEE BENEFIT PLANS ............................................................ 44

C.    REJECTION DAMAGES BAR DATE ..................................................... 45

D.    INSURANCE POLICIES .................................................................... 45

ARTICLE 10.  EXCULPATIONS AND RELEASES, AND RELATED INJUNCTIONS ....... 46

A.    DEBTORS' EXCULPATION AND RELEASE OF CHAPTER 11 PROTECTED PARTIES ..................................................................... 46

B.    FURTHER EXCULPATION AND RELEASE OF CHAPTER 11 PROTECTED PARTIES ..................................................................... 46

C.    RELEASE OF THE FEDERAL DEPOSIT INSURANCE CORPORATION ............................................................................. 47

D.    RELEASE BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ............................................................................. 48

E.    RELEASE BY PLAN RELEASING PARTIES OF REMIC TRUST RELEASED PARTIES, AND RELATED INJUNCTION ................................ 49

# TABLE OF CONTENTS

F. RELEASE BY REMIC CERTIFICATEHOLDERS OF REMIC CERTIFICATEHOLDER RELEASEES, AND RELATED INJUNCTION .....50

G. RELEASE BY REMIC TRUST RELEASING PARTIES OF PLAN PROPONENT RELEASED PARTIES, AND RELATED INJUNCTION ........51

H. EXCULPATIONS AND RELEASES, AND RELATED INJUNCTIONS--RELEASE OF AND BY FREDDIE MAC AND RELATED PARTIES .........52

I. RELEASE BY PLAN PROPONENT RELEASING PARTIES (BAYVIEW) OF BAYVIEW TRUST RELEASED PARTIES ........................55

J. RELEASE BY BAYVIEW CERTIFICATEHOLDERS OF BAYVIEW CERTIFICATEHOLDER RELEASEES ...............................................56

K. RELEASE BY BAYVIEW TRUST RELEASING PARTIES OF PLAN PROPONENT RELEASED PARTIES (BAYVIEW) .......................57

L. LIMITATION ON RELEASES ...............................................................59

ARTICLE 11. EFFECT OF CONFIRMATION AND INJUNCTION ...................................60

A. PLAN INJUNCTION ...........................................................................60

B. CONTINUATION OF EXISTING INJUNCTIONS AND STAYS .................60

C. BINDING EFFECT OF PLAN ...............................................................61

D. NO EFFECT ON OBJECTIONS TO FEE APPLICATIONS ...........................61

ARTICLE 12. CONDITIONS PRECEDENT ...............................................................61

A. CONDITIONS PRECEDENT TO EFFECTIVE DATE ...................................61

B. REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION OF PLAN ...............................................................................................62

ARTICLE 13. ADMINISTRATIVE PROVISIONS ........................................................62

A. RETENTION OF JURISDICTION ...........................................................62

B. GENERAL AUTHORITY .......................................................................64

C. FINAL ORDER ...................................................................................64

D. AMENDMENTS AND MODIFICATIONS ..................................................65

E. PAYMENT DATE .................................................................................65

F. WITHHOLDING AND REPORTING REQUIREMENTS ..............................65

G. NO WAIVER .......................................................................................65

H. TAX EXEMPTION ...............................................................................65

I. NON-SEVERABILITY ...........................................................................66

J. REVOCATION .....................................................................................66

K. CONTROLLING DOCUMENTS .............................................................66

## TABLE OF CONTENTS

**Page**

L.      GOVERNING LAW ............................................................................. 68

M.     NOTICES ........................................................................................... 68

N.      FILING OF ADDITIONAL DOCUMENTS ...................................... 69

O.      DIRECTION TO A PARTY ................................................................ 69

P.      SUCCESSORS AND ASSIGNS ......................................................... 69

Q.     FINAL DECREE ................................................................................ 69

ARTICLE 14. CONFIRMATION REQUEST .................................................... 70

ARTICLE 15. BANKRUPTCY RULE 9019 REQUEST ........................................ 70

DEFINITIONS ANNEX

## INTRODUCTION

Taylor, Bean & Whitaker Mortgage Corp., Home America Mortgage, Inc., and REO Specialists, LLC, the debtors and debtors in possession in the above-captioned chapter 11 cases, together with the Official Committee of Unsecured Creditors appointed in the chapter 11 case of TBW (collectively, the "**Plan Proponents**"), propose this Plan of Liquidation pursuant to the provisions of the Bankruptcy Code.  The Debtors and the Creditors' Committee (as defined herein) have engaged in extensive collaborative efforts on all material aspects of this Plan, and the Creditors' Committee has approved this Plan.

## ARTICLE 1.

## DEFINITIONS

### A.    DEFINED TERMS

Capitalized terms used in this Plan shall have the meaning given to such terms in the Definitions Annex attached hereto.

### B.    INTERPRETATION

For purposes of this Plan: (a) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (c) unless otherwise specified, all references in the Plan to Articles, Sections, Schedules and Exhibits are references to Articles, Sections, Schedules and Exhibits of or to the Plan; (d) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles and Sections are inserted for ease of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) unless otherwise specified, the term "including" is intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" whenever possible; and (g) the rules of construction set forth in § 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

### C.    TIME PERIODS

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any act under this Plan is required to be made or performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

D.      **EXHIBITS AND APPENDICES**

All exhibits and appendices to this Plan (including, without limitation, the Plan Supplement) are hereby incorporated by reference and made part of this Plan as if set forth fully herein.

## ARTICLE 2.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.      **SUMMARY**

The chart below lists the classification of Claims (except for Administrative Expense Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and Distribution pursuant to this Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| **Unclassified Claims Against All Debtors** | | |
| n/a | Administrative Expense Claims and Priority Tax Claims (§ 507(a)(8)) against all Debtors | Unimpaired - not entitled to vote |
| **Claims Against TBW** | | |
| TBW Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| TBW Class 2 | FDIC Secured Claim (AOT Facility) | Impaired - entitled to vote |
| TBW Class 3 | FDIC Secured Claim (Overline Facility) | Impaired - entitled to vote |
| TBW Class 4 | Sovereign Secured Claim (Sovereign Facility) | Impaired - entitled to vote |
| TBW Class 5 | Natixis Secured Claim (Natixis Facility) | Impaired - entitled to vote |
| TBW Class 6 | Plainfield Secured Claim (Plainfield Term Loan) | Impaired - entitled to vote |
| TBW Class 7 | Other Secured Claims | Impaired – entitled to vote |

| TBW Class 8 | General Unsecured Claims | Impaired - entitled to vote |
| TBW Class 9 | General Unsecured Claims (Trade Creditors) | Impaired - entitled to vote |
| TBW Class 10 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4) and Claims, if any, subordinated by an Order of the Bankruptcy Court pursuant to § 510(c)) | Impaired- not entitled to vote |
| TBW Class 11 | Interests | Impaired - not entitled to vote |

| **Claims Against Home America Mortgage** | | |
| HAM Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired – not entitled to vote |
| HAM Class 2 | Other Secured Claims | Impaired – entitled to vote |
| HAM Class 3 | General Unsecured Claims | Impaired – entitled to vote |
| HAM Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4) and Claims, if any, subordinated by an Order of the Bankruptcy Court pursuant to § 510(c)) | Impaired –not entitled to vote |
| HAM Class 5 | Interests | Impaired – not entitled to vote |

| **Claims Against REO Specialists** | | |
| REO Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) | Unimpaired - not entitled to vote |
| REO Class 2 | Other Secured Claims. | Impaired - entitled to vote |
| REO Class 3 | General Unsecured Claims | Impaired - entitled to vote |

| REO Class 4 | Subordinated Claims (including Claims for fines, penalties, forfeitures and punitive damages, as described in § 726(a)(4) and Claims, if any, subordinated by an Order of the Bankruptcy Court pursuant to § 510(c)) | Impaired – not entitled to vote |
|---|---|---|
| REO Class 5 | Interests | Impaired – not entitled to vote |

## B.     CLASSIFICATION

The Claims against and Interests in the Debtors shall be classified as specified above (other than Administrative Expense Claims, including DIP Facility Claims, and Priority Tax Claims, which shall be treated in accordance with Article 3 below).  Consistent with § 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent that the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class.

**1.     Impaired and Unimpaired Classes**.  As set forth above, Classes TBW 1, HAM 1, and REO 1 are Unimpaired by the Plan and Holders of Claims in these Classes are conclusively presumed to have accepted the Plan.  TBW Classes 2 through 9, HAM Classes 2 and 3, and REO Classes 2 and 3 are (or may be) Impaired by the Plan, and Holders of Claims or Interests in these Classes shall be entitled to vote to accept or reject the Plan.  TBW Classes 10 and 11, HAM Classes 4 and 5, and REO Classes 4 and 5 are Impaired by the Plan, but because Holders of Claims and Interests in these Classes are not expected to retain or receive any property under the Plan on account of such Claims and Interests, these Classes are deemed to have rejected the Plan.  No Class, member of any Class, or Holder of any Claim against any Debtor shall be entitled to or receive Cash or other property allocated for Distribution to any other Class or to a Holder of any other Claim, except as expressly specified in the Plan, the FDIC Settlement Agreement, or the Confirmation Order.

**2.     Plan Treatment is in Full Satisfaction of Claims and Interests**.  The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding an Allowed Claim or an Allowed Interest may have in or against the Plan Trust or the Assets contributed to the Plan Trust by the applicable Debtor, including all Liens held by such Person.  This treatment supersedes and replaces any agreements or rights those Persons have in or against the applicable Debtor or its property, including all Lien rights of such Persons.  No Holder of a Claim shall receive more than 100% of its Allowed Claim.  To the extent that asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Claims or Interests that is not expected to retain anything under the Plan, the Plan Trustee shall give effect to the priority scheme under the Bankruptcy Code and file a motion on notice to interested Holders of Claims or Interests to effectuate such Distributions.  All Distributions under the Plan will be tendered to the Holder of the Allowed

Claim or Allowed Interest in accordance with the terms of this Plan. Except as specifically set forth in this Plan, no Distributions will be made and no rights will be retained on account of (i) any Claim that is not an Allowed Claim or (ii) any Interest.

> **3.      No Substantive Consolidation**.  This Plan does not effect a substantive consolidation of the Debtors.  Allowed Claims against any one Debtor will be satisfied solely from the Assets of such Debtor and its Estate contributed to the Plan Trust.  Nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor.  A Claim against multiple Debtors co-liable on such Claim, to the extent allowed in each Debtor's case, will be treated as a separate Claim against each Debtor's Estate for all purposes (including, but not limited to, voting and Distribution; provided, however, that there shall be only a single recovery on account of such Claim and any Distribution from an Estate on account of such Claim shall take into account the legal effect, if any, of Distributions made or to be made by other Estates on account of such Claim pursuant to the Plan), and such Claim will be administered and treated in the manner provided in the Plan.  No holder of a Claim against multiple Debtors co-liable on such Claim shall receive more than 100% of the Allowed Amount of such Claim in the aggregate from all Debtors.

> **4.      Intercompany Claims**.  Intercompany Claims between Debtors are classified as General Unsecured Claims.

**ARTICLE 3.**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS (INCLUDING DIP FACILITY CLAIMS), STATUTORY FEES, AND PRIORITY TAX CLAIMS**

As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Statutory Fees, and Priority Tax Claims shall not be classified for the purposes of voting or receiving Distributions under this Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article 3.

**A.      ADMINISTRATIVE EXPENSE CLAIMS**

> **1.      Treatment.**  Subject to (a) the bar date provisions herein and (b) additional requirements for Professionals and certain other Persons set forth below, each Holder of an Allowed Administrative Expense Claim against any of the Debtors shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, as set forth in Article 7.B.2, Cash equal to the Allowed amount of such Administrative Expense Claim, unless the Holder agrees or shall have agreed to other treatment of such Claim no less favorable to the Debtors; provided, however, that any Administrative Expense Claim (x) incurred postpetition by a Debtor in the ordinary course of its businesses or (y) arising pursuant to one or more postpetition agreements or transactions entered into by any Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the applicable Debtor or the Plan Trustee, on the one hand, and the Holder of such Administrative Expense Claim, on the other.  The Holder of an Allowed Administrative

Expense Claim shall not be entitled to, and shall not be paid, any interest, penalty, or premium thereon, and any interest, penalty, or premium asserted with respect to an Administrative Expense Claim shall be deemed disallowed and expunged without the need for any further Order of the Bankruptcy Court.

**2.    Administrative Expense Claim Bar Date (excluding Professional Claims).**

(a)    Except for Professional Claims, which are addressed below, requests for payment of Administrative Expense Claims must be Filed and served on the counsel for the Debtors or the Plan Trustee (as applicable) no later than (a) 30 days after a notice of the Effective Date is Filed with the Bankruptcy Court and served, or (b) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period (referred to as the Administrative Expense Claim Bar Date).  Holders of Administrative Expense Claims (including, without limitation, the Holders of any Claims for federal, state or local taxes, but excluding Professional Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable Bar Date shall be forever barred from asserting such Claims against the Debtors, the Plan Trust or any of their property.  Notwithstanding the foregoing, any Bar Dates established during the course of these Chapter 11 Cases shall remain in full force and effect.

(b)    All objections to allowance of Administrative Expense Claims (excluding Professional Claims) must be Filed by any parties in interest no later than ninety (90) days (referred to as the Administrative Expense Claim Objection Deadline) after the Administrative Expense Claim Bar Date.  The Administrative Expense Claim Objection Deadline may be initially extended for an additional 90 days at the sole discretion of the Plan Trustee upon the Filing of a notice of the extended Administrative Expense Claim Objection Deadline with the Bankruptcy Court.  Thereafter, the Administrative Expense Claim Objection Deadline may be further extended by an Order of the Bankruptcy Court, which Order may be granted without notice to any Creditors.  If no objection to the applicable Administrative Expense Claim is Filed on or before the Administrative Expense Claim Objection Deadline, as may be extended, such Administrative Expense Claim will be deemed Allowed, subject to the Bankruptcy Court's discretion to extend such bar date retroactively.

**3.    Professional Claims Bar Date.**

(a)    All Professionals, other Persons requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, and certain creditors who engaged in conduct, through their counsel, that maximized recovery on Claims in their Class(es) (each, a "Fee Claimant"), seeking payment for services rendered on or before the Confirmation Date (including any compensation requested by any Professional or any Person other than the FDIC for making a substantial contribution in the

Chapter 11 Cases) shall File and serve on counsel for the Debtors or the Plan Trustee (as applicable) an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Confirmation Date, no later than (a) 60 days after a notice of the Effective Date is Filed with the Bankruptcy Court and served or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 60-day period (referred to as the Professional Claims Bar Date). Notwithstanding the foregoing, the FDIC shall not be required to file an application to obtain the approval of the Bankruptcy Court for the FDIC Substantial Contribution Claim or payment of such Claim on the Effective Date of the Plan. Resolution of the requests for reimbursement of fees and expenses of the Fee Claimants in this manner is in the best interests of the Estates.

(b)    Objections to Professional Claims or Claims of other Persons, including Fee Claimants, for compensation or reimbursement of expenses must be Filed and served on counsel for the Debtors or the Plan Trustee (as applicable) and the Professionals or other Persons to whose application the objections are addressed on or before (a) 25 days after the Professional Claims Bar Date or (b) such later date as (i) the Bankruptcy Court shall order upon application made prior to the end of such 25-day period or (ii) is agreed between the Debtors or the Plan Trustee, as applicable, and the affected Professional or other Person.

(c)    Any professional fees incurred by the Debtors or the Creditors' Committee subsequent to the Confirmation Date may be paid by the Debtors or the Plan Trust without application to or Order of the Bankruptcy Court. The costs of the Plan Trust, including without limitation, the fees and expenses of the Plan Trustee and any Professionals retained by the Plan Trustee, shall be borne entirely by the Plan Trust.

## B.    DIP FACILITY CLAIMS

Any Allowed DIP Facility Claims against the Debtors that are parties to the DIP Loan Agreement shall be treated as Administrative Expense Claims and shall be satisfied (i) on or before the Effective Date in full in Cash, or in a manner otherwise permitted or required pursuant to the terms of the DIP Orders and the DIP Loan Agreement, or (ii) on such other terms as may be mutually agreed upon between the Holders of the DIP Facility Claims and TBW or the Plan Trustee. If, as at present, no amount is owed under the DIP Loan Agreement, there shall be no Allowed DIP Facility Claims.

## C.    STATUTORY FEES

All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash. After the Effective Date, the Plan Trustee shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case for each applicable Debtor is closed and a final decree is entered. In addition, the Plan Trust shall file post-Confirmation quarterly reports in conformance with the U.S. Trustee guidelines. The U.S.

Trustee shall not be required to File a request for payment of its quarterly fees, which will be deemed Administrative Expense Claims against the applicable Debtors and their Estates.

## D.    PRIORITY TAX CLAIMS

With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, at the sole option of the Plan Trustee, the Plan Trustee shall pay to each Holder of an Allowed Priority Tax Claim on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, and release of such Allowed Priority Tax Claim, in Cash, (i) in accordance with Bankruptcy Code §§ 1129(a)(9)(C) and (D), equal Cash payments made on or before the last Business Day of every fiscal quarter after the Effective Date, over a period not exceeding five years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance of such Allowed Priority Tax Claim, calculated from the Effective Date at a rate to be determined pursuant to § 511 of the Bankruptcy Code; (ii) or pursuant to such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors or the Plan Trustee in writing, provided such treatment is no less favorable to the applicable Debtor or the Plan Trust than the treatment set forth in clause (a) hereof, or (iii) in full as set forth in Article 7.B.2 of this Plan. The Holder of an Allowed Priority Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court. The Plan Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

## ARTICLE 4.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

As required by the Bankruptcy Code, this Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired and sets forth the treatment each Class will receive. The treatment provided to each Holder of an Allowed Claim under this Plan is in full satisfaction, settlement, and release of, and in exchange for, each Allowed Claim of such Holder and, with respect to each Holder of an Allowed Secured Claim, results in the extinguishment of all Liens held by such Holder that secure such Allowed Secured Claim unless the treatment for such Claim in Article 4 of this Plan specifically provides that such Holder shall retain any such Lien. As provided in Article 8.E of this Plan, to the extent any Assets of any Debtor are subject to conflicting Claims of Creditors asserting Liens against or title to such Assets, no Distribution will be made on account of such Claims until the validity, priority or extent of such Liens or ownership rights are established in accordance with Article 8.D of this Plan.

**A.      PRIORITY CLAIMS AGAINST ALL DEBTORS (TBW Class 1, HAM Class 1, and REO Class 1)**

 **1.**  Each of TBW Class 1, HAM Class 1, and REO Class 1, which are Unimpaired, consists of all Allowed Priority Claims against a particular Debtor.

 **2.**  Unless the Holder of an Allowed Priority Claim and the Debtor against which such Claim is asserted (if prior to or on the Effective Date) or the Plan Trustee (if after the Effective Date) agree to a different treatment, the Plan Trustee shall pay each such Holder of an Allowed Priority Claim in full, in Cash, without interest.

**B.      FDIC SECURED CLAIMS (TBW Classes 2 and 3)**

 **1.**  TBW Classes 2 and 3, which are Impaired, consist of the Allowed FDIC Secured Claims against TBW.  The FDIC Secured Claims are secured by first-priority Liens in certain Assets of TBW as described in the FDIC Settlement Agreement.

 **2.**  In full satisfaction, settlement, and release of, and in exchange for, each Allowed FDIC Secured Claim, the FDIC shall receive the treatment set forth in the FDIC Settlement Agreement.

**C.      SOVEREIGN SECURED CLAIM AGAINST TBW (TBW Class 4)**

 **1.**  TBW Class 4, which is Impaired, consists of any Allowed Sovereign Secured Claim against TBW.  Sovereign asserts a Secured Claim based upon an asserted Lien in TBW's rights under certain servicing agreements and all Cash proceeds thereof.

 **2.**  On the later of the Effective Date and the Sovereign Effective Date (or as soon thereafter as practicable), and with the exception of any additional recovery to which it may become entitled from the Sovereign Adversary Proceeding and the Lloyds Adversary Proceeding, the Holder of such Allowed Sovereign Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Sovereign Secured Claim, the treatment set forth in the Sovereign Settlement Agreement with respect to the Sovereign Secured Claim.

**D.      NATIXIS SECURED CLAIM AGAINST TBW (TBW Class 5)**

 **1.**  TBW Class 5, which is Impaired, consists of any Allowed Natixis Secured Claim against TBW.  Natixis asserts a Secured Claim based upon an asserted Lien in TBW's rights under certain servicing agreements and all Cash proceeds thereof.

 **2.**  On the later of the Effective Date and the Natixis Effective Date (or as soon thereafter as practicable), the Holder of such Allowed Natixis Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Natixis Secured Claim, the treatment set forth in the Natixis Settlement Agreement with respect to the Natixis Secured Claim.

E.    **PLAINFIELD SECURED CLAIM AGAINST TBW (TBW Classes 6)**

1.    TBW Class 6, which is Impaired, consists of any Allowed Plainfield Secured Claim against TBW.  Plainfield asserts a Secured Claim based upon an asserted subordinate Lien in TBW's rights under certain servicing agreements and all Cash proceeds thereof.  The Assets that Plainfield asserts a Lien in as security for the Plainfield Secured Claim are the same Assets that Sovereign alleges is security for the Sovereign Secured Claim.  The Plan Proponents assert that the Lien asserted by Plainfield is of no value and thus Plainfield has no Secured Claim.

2.    If the Plainfield Secured Claim becomes an Allowed Plainfield Secured Claim, then, on the later of the Effective Date (or as soon thereafter as practicable) and the date of such allowance pursuant to a Final Order (or as soon thereafter as practicable), at the sole option of the Plan Trustee, the Holder of such Allowed Plainfield Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Plainfield Secured Claim, one or a combination of the following:  (a) payment in Cash up to the Allowed amount of the Plainfield Secured Claim, after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all Liquidation Expenses and paid the Sharing Percentage; (b) all or any portion of the Assets securing the Allowed Plainfield Secured Claim; (c) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Plainfield Secured Claim; or (d) such other treatment not inconsistent with the Bankruptcy Code as may be agreed by the Holder and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

F.    **OTHER SECURED CLAIMS AGAINST ALL DEBTORS (TBW Class 7, HAM Class 2, and REO Class 2)**

1.    TBW Class 7, HAM Class 2, and REO Class 2, which may be Impaired, comprise, respectively, all Allowed Other Secured Claims against a particular Debtor.  These Classes comprise Secured Claims other than those that are separately classified.  If more than one Secured Claim is classified as an Other Secured Claim in TBW Class 7, HAM Class 2 or REO Class 2, a separate subclass will be established for each such Other Secured Claim.

2.    On the later of the Effective Date (or as soon thereafter as practicable) and the date that an Other Secured Claim becomes an Allowed Other Secured Claim pursuant to a Final Order (or as soon thereafter as practicable), with respect to each Allowed Other Secured Claim, at the sole option of the Plan Trustee: (a) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable, and contractual rights of the Holder of such Allowed Other Secured Claim shall be reinstated in full as of the Effective Date and remain unaltered; or (b) the Holder of such Allowed Other Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Other Secured Claim, one or a combination of the following:  (i) payment in Cash up to the amount of the Allowed Other Secured Claim after the Assets securing such Claim have been liquidated by the Plan Trustee and the Plan Trust is reimbursed for all its Liquidation Expenses and paid the Sharing Percentage; (ii) all or any portion of the Assets securing the Allowed Other Secured Claim; (iii) deferred Cash payments having a present value on the Effective Date equal to the amount

of the Allowed Other Secured Claim that is not otherwise satisfied on the Effective Date, provided that the Holder of such Claim shall retain its Lien in any Assets securing such Claim; (iv) such other treatment as would provide the Holder the indubitable equivalent of its Allowed Other Secured Claim; or (v) such other treatment as may be agreed by the Holder and the Debtor against which the Allowed Other Secured Claim is asserted (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date).

3.      To the extent that the value of the Assets securing any Allowed Other Secured Claim exceeds the Allowed Amount of such Claim, then, as contemplated by § 506(b) of the Bankruptcy Code, the Holder of such Claim shall be entitled:  (a) if the Other Secured Claim arises from a written agreement, to interest accrued (i) from the Petition Date to the Maturity Date at the non-default rate of interest under such agreement and (ii) from the Maturity Date to the Effective Date at the lesser of (A) the non-default rate of interest under the agreement and (B) the federal judgment rate of interest; (b) if the Other Secured Claim is a tax claim, interest at a rate to be determined pursuant to § 511 of the Bankruptcy Code; and (c) any reasonable fees, costs, or charges payable under the agreement or State statute giving rise to such Other Secured Claim.

## G.      GENERAL UNSECURED CLAIMS AGAINST ALL DEBTORS (TBW Class 8, HAM Class 3, and REO Class 3)

1.      TBW Class 8, HAM Class 3, and REO Class 3, which are Impaired, consist of all Allowed Unsecured Claims against each Debtor, respectively, other than Trade Claims against TBW and Subordinated Claims.  Claims in TBW Class 8, Ham Class 3 and REO Class 3 shall include, without limitation, intercompany Claims among the Debtors and EPD Claims and Breach of Warranty Claims.  For the avoidance of doubt, Claims in TBW Class 8 shall include, without limitation, (a) the FDIC's General Unsecured Claim (referred to in this Plan as the FDIC GUC Claim), as provided for in the FDIC Settlement Agreement; (b) the unsecured portion of any Claim secured by a Lien and (c) Allowed Unsecured Claims of (i) any Insider of TBW; (ii) any institutional or non-institutional lender to TBW, including, but not limited to, warehouse and non-warehouse-line lenders and lenders asserting security interests in mortgage loans (or related debt or equity securities) or servicing rights or revenue related to mortgage loans; and (iii) any institutional or non-institutional investor in mortgage loans (or related debt or equity securities).

2.      Each Holder of an Allowed Unsecured Claim in TBW Class 8, HAM Class 3, and REO Class 3 shall receive its *pro rata* share of the Net Distributable Assets of the applicable Estate.  With respect to TBW Class 8, the *pro rata* share shall be calculated by including with the TBW Class 8 Allowed Claims all the Allowed Trade Claims in TBW Class 9.

## H.      GENERAL UNSECURED CLAIMS (TRADE CREDITORS) AGAINST TBW (TBW Class 9)

1.      TBW Class 9, which is Impaired, consists of Holders (referred to as Trade Creditors) of Trade Claims.  The term "Trade Claims" shall mean Allowed Unsecured Claims for goods or services provided to or performed for or on behalf of TBW but specifically excluding Claims of (a) any insider of TBW; (b) any institutional or non-institutional lender to

TBW, including but not limited to warehouse and non-warehouse-line lenders and lenders asserting security interests in mortgage loans (or related debt or equity securities) or servicing rights or revenue related to mortgage loans; and (c) any institutional or non-institutional investor in mortgage loans (or related debt or equity securities). The Plan Trustee shall disburse, on behalf of the FDIC, Freddie Mac, Sovereign and Natixis, and with respect to the Bayview Proofs of Claim, respectively, to each Holder of an Allowed Trade Claim its *pro rata* share of the following amounts.

(i)       On behalf of the FDIC, 10% of the first $100 million available for Distribution in respect of the FDIC GUC Claim, plus (b) 5% of all amounts thereafter available for Distribution in respect of the FDIC GUC Claim until a total of $15 million (referred to as the Trade Creditor Recovery) is received by the Holders of Allowed Trade Claims. The *pro rata* share which each Holder of a Trade Claim shall receive shall be based on the total amount of the Allowed Trade Claims. The terms of payment of the Trade Creditor Recovery from Cash available for Distribution in respect of the FDIC GUC Claim are as set forth in the FDIC Settlement Agreement. As provided therein, the FDIC shall have no obligation to share recoveries with the Trade Creditors after a total of $15 million is paid by the FDIC to the Plan Trust for the benefit of Trade Creditors. Neither the FDIC GUC Claim nor any Claims other than those of Trade Creditors shall receive any Distribution from the Trade Creditor Recovery.

(ii)      On behalf of Freddie Mac, the first $6,250,000 to which Freddie Mac would otherwise receive on account of its Allowed Freddie Mac Claim, if the Freddie Mac Effective Date occurs.

(iii)     On behalf of Sovereign, $2,355,000, representing 15% of the Sovereign Allocation, as set forth in the Sovereign Settlement Agreement, if the Sovereign Effective Date occurs.

(iv)      On behalf of Natixis, $5,145,000, representing 15% of the Natixis Allocation, as set forth in the Natixis Settlement Agreement, if the Natixis Effective Date occurs.

(v)       All distributions made on account of the Bayview Proofs of Claim, as set forth in the Bayview Settlement Agreement, if the Bayview Effective Date occurs (the amounts described in parts (ii) through (v) of this Article 4.H.1 are referred to as the Additional Trade Creditor Recovery).

2.        Notwithstanding anything contained in Article 4.G to the contrary, the Holders of Allowed TBW Class 9 Claims shall also receive a *pro rata* share of the Net Distributable Assets. This *pro rata* share shall be calculated by including with the TBW Class 8 Allowed Claims all the Allowed Trade Claims in TBW Class 9. The Allowed Trade Claims do not include the FDIC-GUC Claim, the Allowed Freddie Mac Claim, the Sovereign Claim, the Natixis Claim, or the Bayview Claim.

**I.    SUBORDINATED CLAIMS AGAINST ALL DEBTORS (TBW Class 10, HAM Class 4, REO Class 4**

**1.**    TBW Class 10, HAM Class 4, and REO Class 4, which are Impaired, consist of all Subordinated Claims against all of the Debtors.  Holders of Claims in these Classes are expected to receive no Distribution on account of such Claims because the Net Distributable Assets are expected to be insufficient to satisfy Unsecured Claims senior to the Subordinated Claims.

**J.    INTERESTS IN ALL DEBTORS (TBW Class 11, HAM Class 5, and REO Class 5)**

**1.**    Each of TBW Class 11, HAM Class 5, and REO Class 5, which are Impaired, consist of Interests in all of the Debtors.

**2.**    Holders of Interests in these Classes shall receive no Distribution or dividend on account of such Interests, because the Net Distributable Assets are expected to be insufficient to satisfy Unsecured Claims.  The entry of the Confirmation Order shall act as an order approving and effecting, as of the Effective Date, the cancellation of all Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Interests) outstanding immediately prior to the Effective Date, without any conversion thereof or Distribution with respect thereto.

**ARTICLE 5.**

**ACCEPTANCE OR REJECTION OF THIS PLAN**

**A.    IMPAIRED CLASSES OF CLAIMS ENTITLED TO VOTE**

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan, the Holders of Claims or Interests in the Classes set forth in the following table are, or may be, Impaired and shall be entitled to vote to accept or reject this Plan:

| Class(es) | Description |
|---|---|
| TBW Class 2 | FDIC Secured Claim (AOT Facility) |
| TBW Class 3 | FDIC Secured Claim (Overline Facility) |
| TBW Class 4 | Sovereign Secured Claim (Sovereign Loan Facility) |
| TBW Class 5 | Natixis Secured Claim (Natixis Facility) |
| TBW Class 6 | Plainfield Secured Claim (Plainfield Term Loan) |
| TBW Class 7 | Other Secured Claims |
| TBW Class 8 | General Unsecured Claims |
| TBW Class 9 | General Unsecured Claims (Trade Creditors) |

| Class(es) | Description |
|---|---|
| HAM Class 2 | Other Secured Claims |
| HAM Class 3 | General Unsecured Claims |
| REO Class 2 | Other Secured Claims |
| REO Class 3 | General Unsecured Claims |

Each of the above-referenced Classes of Claims shall be considered a separate Class for purposes of voting to accept or reject this Plan.  If and to the extent any Class identified as being Unimpaired is actually Impaired (whether as a result of the terms of this Plan or any modification or amendment thereto), the Holders of Claims in such Class shall be entitled to vote to accept or reject this Plan.

**B.      CLASSES DEEMED TO ACCEPT THIS PLAN**

The Holders of Claims in the Classes set forth in the following table are Unimpaired and shall be deemed to accept this Plan:

| Class | Description |
|---|---|
| TBW Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) |
| HAM Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) |
| REO Class 1 | Priority Non-Tax Claims (including Claims for wages under § 507(a)(4) for contribution to employee benefit plans under § 507(a)(5) and for consumer deposits under § 507(a)(7)) |

Pursuant to § 1126(f) of the Bankruptcy Code, each of the above-referenced Classes of Claims is conclusively presumed to have accepted this Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited.

**C.      CLASSES DEEMED TO REJECT THIS PLAN**

Holders of Claims or Interests in the Classes set forth in the following table are not expected to receive or retain any property under this Plan on account of such Claims or Interests:

| Class | Description |
|-------|-------------|
| TBW Class 10 | Subordinated Claims |
| TBW Class 11 | Interests |
| HAM Class 4 | Subordinated Claims |
| Ham Class 5 | Interests |
| REO Class 4 | Subordinated Claims |
| REO Class 5 | Interests |

Pursuant to § 1126(g) of the Bankruptcy Code, the above-referenced Classes are Impaired and are deemed to have rejected this Plan.  Therefore, the votes of Holders of Claims or Interests in such Classes will not be solicited.

## D.    NONCONSENSUAL CONFIRMATION

As set forth in Article 14, if any Impaired Class fails to accept this Plan, the Plan Proponents hereby request that the Bankruptcy Court confirm this Plan as a Cramdown Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to any such Class.

## ARTICLE 6.

## MEANS OF IMPLEMENTING THIS PLAN

## A.    IMPLEMENTATION OF PLAN

The Plan shall be implemented and consummated through the means contemplated by §§ 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2)(b)(3) and (b)(4) of the Bankruptcy Code on and after the Effective Date.

## B.    CORPORATE ACTION

On the Effective Date, (i) the matters under this Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to this Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries, and (ii) the officers and directors of the Debtors shall immediately cease to serve and the Plan Trustee shall be deemed the sole director and officer of each of the Debtors for all purposes, without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries.

C.      **DISSOLUTION OF DEBTORS**

On and after the Effective Date, (i) the Plan Trustee shall be authorized, in his sole and absolute discretion, to take all actions reasonably necessary to dissolve the Debtors and their subsidiaries under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or Filing any necessary paperwork or documentation.  The Plan Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries.  Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan.

D.      **DISSOLUTION OF CREDITORS' COMMITTEE**

On the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms.

E.      **CONSUMMATION OF GLOBAL SETTLEMENTS**

1.      **Consummation of FDIC Settlement Agreement.**

(a)     Pursuant to the FDIC Settlement Agreement, the FDIC's ownership of 99% participation interests in the mortgage loans purchased pursuant to the COLB Documents for which there are no conflicting claims of ownership with third parties or for which Colonial Bank is determined to have superior ownership rights shall be recognized.  To the extent any Person makes a competing Claim of ownership in any COLB Loans, such Claim shall be determined at or prior to the Confirmation Hearing.  A list of the COLB Loans for which the FDIC's superior rights shall be recognized is attached as an exhibit to the FDIC Settlement Agreement, which shall be supplemented by any Order issued by the Bankruptcy Court if the FDIC's superior right to any such COLB Loan is contested in a timely manner by any Person and such Person's Claim is determined by the Bankruptcy Court to be senior to the FDIC's Claim.  On the Effective Date, TBW shall transfer all right, title, and interest of TBW and affiliates in and to such COLB Loans to the FDIC, free and clear of all claims, encumbrances, liens, and interests in and to such COLB Loans of any kind or nature pursuant to § 1123(a)(5) of the Bankruptcy Code, subject to the 99% participation interest therein held by the FDIC such that, as of the Effective Date, the FDIC shall have the right to sell, securitize, syndicate or otherwise dispose of such COLB Loans or any interest therein or any interest created thereby resulting from the COLB Loans into a securitization.  The FDIC shall pay the Debtor 1% of the net proceeds of any such disposition from the COLB Loans, in whole or in part, or any other proceeds

collected with respect to the COLB Loans, as and when and in the same manner that the FDIC receives payment for such disposition or collection.

(b)    The FDIC Documents relating to the vesting of title to the COLB Loans in, or the grant or perfection of a security interest in the AOT Loans or Overline Loans in favor of, the FDIC shall be attached as exhibits to the Plan Supplement.

(c)    The FDIC shall be granted, and paid on or about the Effective Date, an Administrative Claim in the amount of $1.75 million in recognition of FDIC's substantial contribution to TBW's Chapter 11 Case through the Reconciliations, as an actual, necessary cost and expense of preserving TBW's estate pursuant to Bankruptcy Code § 503(b)(3)(D).

(d)    The FDIC shall have an Allowed General Unsecured Claim in the amount set forth in Section 1.9 of the FDIC Settlement Agreement (referred to in this Plan as the FDIC GUC Claim).

(e)    Pursuant to Section 1.10 of the FDIC Settlement Agreement, the FDIC has assigned, for the benefit of the Trade Creditors (TBW Class 9), the Trade Creditor Recovery, which is not an asset of the Estate and which represents a portion of the Distribution to which the FDIC is entitled by virtue of the FDIC GUC Claim.  The treatment of TBW Class 9 Claims reflects this partial assignment.

(f)    Certain other provisions of the FDIC Settlement Agreement are incorporated into other Articles of this Plan, including Article 4, titled Treatment of Claims and Interests, and Article 10, titled Exculpations and Releases.

(g)    All terms and conditions of the FDIC Settlement Agreement, a copy of which will be attached as an exhibit to the Plan Supplement, are incorporated by reference as terms and conditions of the Plan.  As provided in Article 13.K of this Plan, in case of conflict between the Plan and the FDIC Settlement Agreement, the terms of the FDIC Settlement Agreement shall control.

**2.    Consummation of REMIC Settlement Agreements.**

(a)    The Plan Trustee shall implement and consummate the REMIC Settlement Agreements when they become effective.  There are three conditions to their effectiveness.  One condition is that an order approving the REMIC Settlements under Bankruptcy Rule 9019 becomes Final (unless the requirement of finality is waived).  The second condition is that the Confirmation Order becomes Final (unless the requirement of finality is waived).  The third condition is that the FDIC releases to Wells Fargo, as successor servicer, master servicer and trust administrator, funds totaling $25,775.292 that were in custodial accounts at Colonial for the benefit of the REMIC Trusts.

(b)    When a REMIC Settlement Agreement becomes effective, the Plan Trustee shall release to Wells Fargo, funds from the custodial accounts at Regions. The funds to be released are those shown on Exhibit G of the Disclosure Statement as

the net due that REMIC Trust from those accounts at Regions, after deduction for Servicing Fees.  As shown on that Exhibit G, for all of the REMIC Settlement Agreements the net amount due all the REMIC Trusts from funds in the custodial accounts at Regions is $70,559,392, with the Debtor to retain $5,431,457 in satisfaction of the Servicing Fee portion of the TBW REMIC Claims.  The REMIC Damage Claim shall be satisfied by recoupment from Eligible Funds, and the remaining TBW REMIC Claims shall be paid from Eligible Funds, as and to the extent provided for in the REMIC Settlement Agreements.  In addition to the REMIC Damage Claim, with respect to three REMIC Settlement Agreements, Wells Fargo shall deduct from amounts to be paid to the Debtor specified amounts, which total $451,764, for these three REMIC Trusts.  The deduction of these specified amounts is to resolve issues with respect to two net funded loans and the proceeds of collateral referred to as the Medford Condos.

(c)    Integral to the REMIC Settlement Agreements are the releases and injunctions provided therein and set forth in Article 10E, 10F and 10G.  The releases and injunctions set forth therein to each of the REMIC Settlement Agreements.  There are twelve REMIC Settlement Agreements, one for each of the twelve REMIC Securitizations.  These releases and injunctions will be effective for each REMIC Settlement Agreement on the effective date of each, without the need for execution or delivery of additional documentation or the entry of any additional Orders of the Bankruptcy Court.

In each of the REMIC Securitizations, the Debtor was the servicer and Wells Fargo is the master servicer, as well as trust administrator and successor servicer.  Thus, the Debtor and Wells Fargo are parties to each REMIC Settlement Agreement, and the release and injunction provisions of each REMIC Settlement Agreement apply to each of them.  Also, the release and injunction provisions of each REMIC Settlement Agreement apply to the Creditors' Committee, because it is a party to each of them.

There is some variation in the other parties to the twelve REMIC Settlement Agreements.  Certain parties are involved in some of the REMIC Securitizations but not in others.  The release and injunction provisions of each REMIC Settlement Agreement apply only to the parties to thereto with respect to the corresponding REMIC Securitization.

One variation is with respect to the REMIC Trustee.  U.S. Bank National Association is the REMIC Trustee in all of the REMIC Securitizations except TBW Mortgage-Backed Trust Series 2007-1, in which Bank of New York Mellon serves as REMIC Trustee.

Another variation is with respect to the REMIC Insurer.  MBIA Insurance Corporation is the REMIC Insurer in two of the REMIC Securitizations: TBW Mortgaged-Backed Trust Series 2006-6 and TBW Mortgage–Backed Trust Series 2007-1.  Assured Guaranty Corporation is as REMIC Insurer in TBW Mortgage–

Backed Trust Series 2007-2.  There is no REMIC Insurer in the other REMIC Securitizations.

Another variation is with respect to REMIC Certificateholders.  All of the REMIC Securitizations do not have the same REMIC Certificateholders.

**3.     Consummation of Freddie Mac Settlement Agreement.**

(a)     The Plan Trustee shall implement and consummate the Freddie Mac Settlement Agreement when it becomes effective.  In conjunction therewith, as outlined below, the Plan Trustee shall implement and consummate the Sovereign Settlement Agreement and the Natixis Settlement Agreement.  These three settlement agreements are interrelated because, among other reasons, Sovereign and Natixis claim security interests in, among other things, the Freddie Mac Settlement Proceeds and the Freddie Mac MSRs, both of which are dealt with in the Freddie Mac Settlement Agreement.

(b)     The terms of the Freddie Mac Settlement Agreement are described generally herein.  However, all of its terms are incorporated by reference as terms and conditions of the Plan.  As provided in Article 13 of this Plan, in case of conflict between the Plan and the Freddie Mac Settlement Agreement, the terms of the Freddie Mac Settlement Agreement control.

(c)     The Freddie Mac Settlement Agreement is intended to resolve disputes between the Debtor and the Creditors' Committee on one hand and Freddie Mac on the other hand, with respect to the Chapter 11 Cases.  Freddie Mac represents and warrants that its conservator, the Federal Housing Finance Agency, has reviewed and approved the Freddie Mac Settlement Agreement and that Freddie Mac has full requisite authority to execute and deliver it and perform its obligations thereunder.

(d)     The Freddie Mac Settlement Agreement provides that it is to be approved by the Bankruptcy Court pursuant to a motion under Bankruptcy Rule 9019.  It is contemplated that such approval will be obtained at or before the commencement of the Confirmation Hearing.  Freddie Mac agrees that when such approval is obtained, it will support the Plan, as hereby amended to reflect the terms of the Freddie Mac Settlement Agreement.

(e)     The Freddie Mac Settlement Agreement will not be effective until the Freddie Mac Effective Date.  That date will be the first date on which each of the following has occurred: (1) Bankruptcy Court approval of the Freddie Mac Settlement Agreement pursuant to Bankruptcy Rule 9019 and pursuant to an order in a form and substance reasonably satisfactory to Freddie Mac, the Debtor, and the Creditors' Committee, (2) the Effective Date, and (3) Freddie Mac's receipt from the FDIC of $150,257,776, which is identified on the Reconciliation Report as allocated to Freddie Mac, as well as any interest accrued on that sum.

(f)     On the Freddie Mac Effective Date (or as soon thereafter as possible), the following shall occur:  (1) Freddie Mac will transfer to the Debtor or the Plan

Trustee, as successor to the Debtor's Estate, all of its rights in and to $53,041,337 on deposit at Regions Bank (the "Freddie Mac Regions Funds"), plus any interest actually accrued on that amount; (2) Freddie Mac will transfer or make available to the Debtor or the Plan Trustee an amount equal to $450,922.86, less the amount of interest accrued on the Freddie Mac Regions Funds (the amounts described in clauses (1) and (2) of this Article 6.E.3(f) are collectively, the "Freddie Mac Settlement Proceeds"); (3) Freddie Mac will continue to perform obligations under the Borrower Protocol and to resolve issues identified in paragraph 93 of the Reconciliation Report; (4) the Plan Trustee will make $6,121,244 available to Freddie Mac with respect to "net-funded" loans allocated to Freddie Mac pursuant to the Borrower Protocol, as well as any funds that may be subsequently collected that relate to payment of "net-funded loans"; (5) Freddie Mac will be deemed the sole and exclusive owner of Freddie Mac MSRs, which shall not be deemed property of the Estate; (6) the Freddie Mac MSRs will be marketed for sale to a qualified servicer approved by Freddie Mac in accordance with the terms of the Freddie Mac Settlement Agreement; (7) Freddie Mac will seek to engage Navigant and Milestone Advisors, LLC as co-brokers in connection with the sale, and to that end will waive any assertion of a conflict of interest, in accordance with the terms of the Freddie Mac Settlement Agreement in connection with their serving as co-brokers; (8) the Debtor and the Creditors' Committee disclaim any ownership interest in any and all loans held by Freddie Mac and will further acknowledge and agree that Freddie Mac is the sole and exclusive owner of 7,790 mortgage loans allocated to Freddie Mac in the Reconciliation Report, as set forth in Exhibit B to the Freddie Mac Settlement Agreement; (9) Freddie Mac will acknowledge that it has no rights in 165 mortgage loans which it earlier identified as possibly its assets; (10) Freddie Mac will be allowed a TBW Class 8 Claim in the amount of $1,022,000,000 (referred to as the Allowed Freddie Mac Claim), which shall not be entitled to priority or subject to reconsideration, subordination, reduction, offset, or other diminution in amount or classification, and with no portion allowed as a Trade Claim; and (11) the Plan Trustee will withhold from the distribution due to Freddie Mac on account of its Allowed Freddie Mac Claim the first $6,250,000 to which Freddie Mac would be otherwise entitled and disburse this sum *pro* rata to Holders of Allowed Trade Claims in TBW Class 9.

(g)     Article II of the Freddie Mac Settlement Agreement and Article 10.H of the Plan provide for certain releases of the parties to the Freddie Mac Settlement Agreement and certain related parties.

(h)     Exhibits A and B to the Freddie Mac Settlement Agreement, Exhibit A to the Sovereign Settlement Agreement and Exhibit A to the Natixis Settlement Agreement are confidential documents which have not been filed therewith. These exhibits set forth the terms upon which Freddie Mac will consent to a sale of the Freddie Mac MSRs and the formula for determining the amount of the net sale proceeds, if any, to which the Estate, Sovereign, and Natixis shall jointly be entitled. This amount, if any, will range from $5 million to $30 million. Freddie Mac's undertakings with respect to the sale of Freddie Mac MSRs as to which Sovereign claims a security interest are conditioned on Sovereign's release of Claims against Freddie Mac with respect to the Freddie Mac MSRs, except for Sovereign's Claim to

the sale proceeds allocated to it, as described in Exhibit A to the Freddie Mac Settlement Agreement.  Freddie Mac's undertakings with respect to the sale of Freddie Mac MSRs as to which Natixis claims a security interest are likewise conditioned on Natixis' release of Claims against Freddie Mac with respect to the Freddie Mac MSRs, except for Natixis' Claim to the sale proceeds allocated to it as described in such Exhibit A.

(i)     The Sovereign Settlement Agreement and the Natixis Settlement Agreement provide for the releases in favor of Freddie Mac, and obtaining those releases is a condition to Freddie Mac's obligation to sell the applicable portion(s) of the Freddie Mac MSR's.  Those settlement agreements also provide for an agreement as among the Debtor's Estate, Sovereign, and Natixis for the division of the Freddie Mac Settlement Proceeds and of any sale proceeds payable by Freddie Mac pursuant to Exhibit A.

**4.      Consummation of Sovereign Settlement Agreement**

(a)     The Plan Trustee shall consummate and implement the Sovereign Settlement Agreement.  As noted above, the Sovereign Settlement Agreement is interrelated with the Freddie Mac Settlement Agreement and the Natixis Settlement Agreement.

(b)     The terms of the Sovereign Settlement Agreement are described generally herein.  However, all of its terms are incorporated by reference as terms and conditions of the Plan.  As provided in Article 13 of this Plan, in case of conflict between the Plan and the Sovereign Settlement Agreement, the terms of the Sovereign Settlement Agreement control.

(c)     The Sovereign Settlement Agreement is intended to resolve some, but not all, of the disputes between the Debtor and the Creditors' Committee on the one hand and, on the other hand, Sovereign, for itself and as agent for all other lenders under the Sovereign Loan Agreement.  The Sovereign Settlement Agreement provides that a condition to its effectiveness is its approval by the Bankruptcy Court pursuant to a motion under Bankruptcy Rule 9019.  It is contemplated that such approval will be obtained at or before the commencement of the Confirmation Hearing.

(d)     Sovereign agrees that when such approval is obtained, it will support the Plan, as hereby amended to reflect the terms of the Sovereign Settlement Agreement.  Also when such approval is obtained, Sovereign will not object to approval, pursuant to Bankruptcy Rule 9019, of the Freddie Mac Settlement Agreement.  Also, when such approval is obtained, Sovereign will not object to Bankruptcy Court approval, pursuant to Bankruptcy Rule 9019, of the REMIC Settlement Agreements and the Bayview Settlement Agreement, provided however, that the Debtor, the Creditors' Committee, and Sovereign hereby agree that the proceeds of the REMIC Settlement Agreements and the Bayview Settlement Agreement should be segregated, as provided in Sovereign's pending objections to

approval of those settlement agreements, until Sovereign's claims to those proceeds can be resolved.

(e)     Material provisions of the Sovereign Settlement Agreement will not be effective until the Sovereign Effective Date.  That date will be the first date on which each of the following has occurred: (1) the Sovereign Settlement Agreement and the Freddie Mac Settlement Agreement have been approved under Bankruptcy Rule 9019 by Orders which have become final and not subject to appeal and (2) the Plan, as amended, has been confirmed by a Confirmation Order which has become final.

(f)     As of the Sovereign Effective Date, Sovereign and Freddie Mac will enter a mutual release of all Claims relating to the Freddie Mac MSRs except as provided in Exhibit A to the Freddie Mac Settlement Agreement, and Sovereign will consent to the sale of the Freddie Mac MSRs on the terms set forth therein.  The Sovereign MSR Participation, which defines Sovereign's share of the Participation provided for in Exhibit A of the Freddie Mac Settlement Agreement, is 31.4% of the amount of the Participation.

(g)     Also, within ten business days after the Plan Trustee's receipt of the Freddie Mac Settlement Proceeds, Sovereign will be entitled to the Sovereign Allocation, comprised of $15,700,000 of those proceeds, in partial satisfaction of Sovereign's TBW Class 4 claim.  However, Sovereign authorizes the Plan Trustee to disburse 15%, or $2,355,000, of that amount, for the exclusive benefit of Holders of Allowed TBW Class 9 Claims,

(h)     The Sovereign Settlement Agreement does not resolve the Sovereign Adversary Proceeding or Sovereign Avoidance Claims.  In the Sovereign Adversary Proceeding, the validity and extent of Sovereign's security interest in property other than the Freddie Mac Settlement Proceeds and the Freddie Mac MSRs will be determined.  Nothing in the Sovereign Settlement Agreement waives any defense or Claim with respect to the Sovereign Adversary Proceeding or the Sovereign Avoidance Claims.  With the exception of any valid security interest in property other than Freddie Mac Settlement Proceeds and the Freddie Mac MSRs and any successful Claim in the Lloyd's Adversary Proceeding, the Sovereign Allocation and the Sovereign MSR Participation will constitute the entire distribution to which Sovereign is entitled by virtue of its TBW Class 4 Claim.  Any unsecured amount of the Sovereign's Allowed Claim will be a TBW Class 8 Claim.

5.     **Consummation of Natixis Settlement Agreement**

(a)     The Plan Trustee shall consummate and implement the Natixis Settlement Agreement.  As noted above, the Natixis Settlement Agreement is interrelated with the Freddie Mac Settlement Agreement and the Sovereign Settlement Agreement.

(b)     The terms of the Natixis Settlement Agreement are described generally herein.  However, all of its terms are incorporated by reference as terms and conditions

of the Plan. As provided in Article 13 of this Plan, in case of conflict between the Plan and the Natixis Settlement Agreement, the terms of the Natixis Settlement Agreement control.

(c)     The Natixis Settlement Agreement is intended to resolve disputes between the Debtor and the Creditors' Committee on the one hand and Natixis on the other hand. The Natixis Settlement Agreement provides that a condition to its effectiveness is its approval by the Bankruptcy Court pursuant to a motion under Bankruptcy Rule 9019. It is contemplated that such approval will be obtained at or before the commencement of the Confirmation Hearing.

(d)     Natixis agrees that when such approval is obtained, it will support the Plan, as hereby amended to reflect the terms of the Natixis Settlement Agreement. Also when such approval is obtained, Natixis will not object to approval, pursuant to Bankruptcy Rule 9019, of the Freddie Mac Settlement Agreement.

(e)     Material provisions of the Natixis Settlement Agreement will not be effective until the Natixis Effective Date. That date will be the first date on which (1) the Natixis Settlement Agreement and the Freddie Mac Settlement Agreement have been approved under Bankruptcy Rule 9019 by Orders which have become final and not subject to appeal, (2) the Effective Date of the Plan has occurred, and (3) the Plan Trustee, as successor to TBW, has received the Freddie Mac Settlement Proceeds.

(f)     As of the Natixis Effective Date, Natixis and Freddie Mac will enter a mutual release of all Claims relating to Freddie Mac MSRs except as provided in Exhibit A to the Freddie Mac Settlement Agreement, and Natixis will consent to the sale of the Freddie Mac MSRs on the terms set forth therein. The Natixis MSR Participation, which defines Natixis' share of the Participation under and as such term is defined in Exhibit A of the Freddie Mac Settlement Agreement, is 68.6% of the amount of such Participation.

(g)     Also, within two business days after the Plan Trustee's receipt of the Freddie Mac Settlement Proceeds, Natixis will be entitled to the Natixis Allocation, comprised of $34,300,000 of those proceeds, in partial satisfaction of Natixis' TBW Class 5 claim. From the Natixis Allocation, Natixis authorizes the Plan Trustee to disburse 15%, or $5,145,000 of that amount, for the exclusive benefit of Holders of Allowed TBW Class 9 Claims. Also, within two business days after the Plan Trustee's receipt of the Freddie Mac Settlement Proceeds, the Plan Trustee shall pay to Natixis the Natixis Refunds, totaling $3,000,000, in settlement of Natixis' rights, if any, to force-placed insurance premiums and to property tax refunds which were received by the Debtor and as to which Natixis claims a prior right.

(h)     On the Natixis Effective Date, Natixis will be deemed to have valid and perfected liens in the Natixis Allocation, the Natixis Refunds, and the Natixis MSR Participation. The funds distributable by virtue of the Natixis Allocation, the Natixis Refunds, and the Natixis MSR Participation will constitute the entire distribution to which Natixis is entitled under the Plan as the Holder of the TBW Class 5 Claim. Any

Allowed Natixis Claim in excess of this distribution will be an Allowed TBW Class 8 Claim.

**6.      Consummation of Bayview Settlement Agreement**

(a)      The Bayview Settlement Agreement shall be implemented and consummated on the date (referred to as the Bayview Effective Date) on which the following four conditions have occurred:  (1) the Bankruptcy Court has entered an order approving the Bayview Settlement Agreement, (2) the entry of the Confirmation Order (which shall implement the terms of the Bayview Settlement Agreement), and (3) such orders become Final Orders, or the parties to the Bayview Settlement Agreement nevertheless agree to consummate the settlement.

(b)      The terms of the Bayview Settlement Agreement are described generally herein.  However, all of its terms are incorporated by reference as terms and conditions of the Plan.  As provided in Article 13 of this Plan, in case of conflict between the Plan and the Bayview Settlement Agreement, the terms of the Bayview Settlement Agreement control.

(c)      As set forth in the Bayview Settlement Agreement:

(i)      In settlement and full release of the TBW Bayview Claim, no later than two Business Days after the Bayview Effective Date, the Bayview Trustee shall pay to the Debtor the Bayview Settlement Payment of $6.5 million, as described on Schedule I to the Bayview Settlement Agreement. The balance of any funds then held by the Bayview Trusts in respect of Servicing Advances or otherwise, and any funds received by the Bayview Trusts in the future in respect of Servicing Advances related to the Bayview Securitizations, will be remitted to the Bayview Trusts and applied in accordance with the Bayview Securitization Documents.

(ii)     Within two Business Days after the Bayview Effective Date, the Bayview Trustee shall pay, or cause to be paid, to Magnolia Funding or TBW Funding II, as applicable, the amounts payable in respect of the Bayview B Certificates as set forth on Schedule I to the Bayview Settlement Agreement (which aggregate $3,095,185.08), plus any amounts payable on account of such Bayview B Certificates prior to the Bayview Effective Date which are not reflected in such schedule.

(iii)    On or before the Bayview Effective Date, the Debtor shall distribute to Bayview Servicing the "Regions Funds" described on Schedule II to the Bayview Settlement Agreement ($544,649.00), which will be applied in accordance with the Bayview Securitization Documents.

(iv) On and as of the Bayview Effective Date, the Bayview Trustee for itself and on behalf of each of the Bayview Asset-Backed Securities, Series 2007-13(1) and 2007-13(2) Trusts, shall release any right, title and interest it may have in and to the Medford Assets, as defined in the Bayview Settlement Agreement.

(v) On and as of the Bayview Effective Date, the Bayview Trustee, on behalf of itself and the Bayview Trust Parties, shall assign to TBW Class 9 its rights in and to the Bayview Proofs of Claim which it filed against the Debtor. Such assignment is made without any representation or warranty of any kind, express or implied except as set forth in section 3.07(f) of the Bayview Settlement Agreement.

(vi) On and as of the Bayview Effective Date, the Bayview Setoff Motion filed by the Bayview Trustee, and any other pleading filed in connection therewith, or with any other contested matter relating to the Bayview Securitizations, shall be deemed withdrawn with prejudice.

(vii) On and as of the Bayview Effective Date, the Bayview Servicing Agreements, to the extent they remain extant and subject to section 365 of the Bankruptcy Code, shall be deemed rejected, and the Debtor shall have no interest in the Bayview Servicing Agreements or any related servicing rights.

(d) The Bayview Settlement Agreement provides that the releases and injunctions set forth in Article 10.I through 10.K of this Plan shall become effective on the Bayview Effective Date.

## F. VESTING OF ASSETS IN PLAN TRUST; ASSUMPTION OF PLAN OBLIGATIONS

**1.** **Vesting of Assets in the Plan Trust.**  On the Effective Date, all Assets of the Estates shall vest in the Plan Trust and constitute Plan Trust Assets, and each Debtor shall be deemed for all purposes to have transferred legal and equitable title of all Assets of its Estate to the Plan Trust for the benefit of the Holders of Claims against its Estate, whether or not such Claims are Allowed Claims as of the Effective Date, provided however, with respect to any Assets that the Plan Trustee has elected to retain in any Debtor for convenience purposes (referred to in the Plan Trust Agreement as the Retained Assets), beneficial ownership of, but not legal title to, such Assets shall be transferred to the Plan Trust (such Assets, including beneficial ownership of such Retained Assets, are collectively referred to as the "**Plan Trust Assets**").  The Plan Trust Assets are conveyed to the Plan Trust subject, however, to the Plan Liabilities.  In accordance with § 1123(b) of the Bankruptcy Code, the Plan Trust shall be vested with, retain and may exclusively enforce, prosecute, and resolve any or all Causes of Action that the Debtors, the Estates, or the Creditors' Committee may have against any Person.

2.    **Transfer of Plan Trust Assets by the Debtors.**  On the Effective Date or as soon as practicable thereafter, the Debtors shall take all actions reasonably necessary to transfer control of the Plan Trust Assets to the Plan Trustee.  Upon the transfer of control of the Plan Trust Assets in accordance with this Section, the Debtors shall have no further interest in or with respect to the Plan Trust Assets or the Plan Trust.

3.    **Assumption of Plan Obligations.**  On the Effective Date, all of the Debtors' rights and obligations with respect to each and every Administrative Expense Claim, Priority Tax Claim, Priority Claim, and Secured Claim, and all other rights and obligations of the Debtors under this Plan, shall be assigned to and assumed by the Plan Trust.

4.    **Transfer of Plan Trust Assets - Tax Treatment.**  For federal income tax purposes, all parties (including the Debtors, the Plan Trustee, and the Holders of Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust in accordance with the terms of this Plan as a transfer to the Holders of the Claims that have a beneficial interest in the Plan Trust, with the Holders of Claims receiving an undivided interest in the Plan Trust Assets attributable to the Debtor with respect to which their Claims relate, followed by a transfer of the Plan Trust Assets by such Holders to the Plan Trust, and the beneficiaries of the Plan Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Plan Trust. Notwithstanding the foregoing, in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust subject to disputed claims as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations, any Holders of Claims who, as of the Effective Date, are holders of Disputed Claims shall, to the extent of such Disputed Claims, be subject to U.S. federal income taxation in accordance with rules set forth in § 468B of the Internal Revenue Code and the Treasury Regulations thereunder.

## G.    PLAN TRUST

1.    **Formation of Plan Trust.**  The Plan Trust shall be formed on or prior to the Effective Date.  The Holders of Claims shall be the sole beneficiaries of the Plan Trust.  The Plan Trust shall hold legal title to, or beneficial ownership of, the Plan Trust Assets.  The Plan Trust shall be established for the primary purpose of liquidating and distributing the Plan Trust Assets.

2.    **Plan Trust Agreement.**  The form of the Plan Trust Agreement to be executed following Confirmation of the Plan shall be attached as an exhibit to the Plan Supplement.  The Plan Trust Agreement shall set forth the provisions necessary to govern the rights, powers, and obligations of the Plan Trustee and his appointment and removal, as well as to ensure the treatment of the Plan Trust as a liquidating trust for federal income tax purposes.

3.    **Appointment of the Plan Trustee.**

(a)    Neil F. Luria, currently TBW's Chief Restructuring Officer, shall serve as the initial Plan Trustee.  The Plan Trustee shall commence serving as the Plan Trustee on the Effective Date.

(b)     The Plan Trustee shall be deemed the Estates' representative in accordance with § 1123(b) of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in this Plan and the Plan Trust Agreement, including, without limitation, the powers of a trustee under §§ 704, 1106 and 108 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting defenses, offsets and privileges), to the extent not inconsistent with the status of the Plan Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation § 301.7701-4(d), except as otherwise provided for U.S. federal income tax purposes in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations.

(c)     The Confirmation Order shall state that without a Final Order of the Bankruptcy Court so providing, no judicial, administrative, arbitral, or other action or proceeding shall be commenced in any forum other than the Bankruptcy Court against the Plan Trustee in his official capacity, with respect to his status, duties, powers, acts, or omissions as Plan Trustee.

(d)     The Confirmation Order shall set the amount of any initial bond to be maintained by the Plan Trustee.

**4.     Term and Compensation of the Plan Trustee.**

(a)     The Plan Trustee shall initially be compensated as set forth in the Plan Trust Agreement (which compensation may be revised by agreement between the Plan Trustee and the Plan Advisory Committee without further Order of the Bankruptcy Court), and he shall not be required to file a fee application to receive compensation.  The Plan Trustee's compensation shall, however, be subject to review and, if appropriate, objection by the Plan Advisory Committee as set forth in the Plan Trust Agreement.

(b)     The Plan Trustee may be removed by the Bankruptcy Court upon petition made by the Plan Advisory Committee for Cause.  The Plan Advisory Committee shall have the authority to appoint a successor trustee as set forth in the Plan Trust Agreement.

**5.     Liquidation of Plan Trust Assets; Responsibilities of Plan Trustee.**

(a)     The Plan Trustee shall be vested with the rights, powers and benefits set forth in the Plan Trust Agreement.  The Plan Trustee shall consult with the Plan Advisory Committee generally and shall obtain the consent or approval of the Plan Advisory Committee in connection with all Material Decisions (as such term is defined in the Plan Trust Agreement).

(b)     The Plan Trustee, in his reasonable business judgment and in an expeditious but orderly manner, shall liquidate and convert to Cash the Plan Trust

Assets, make timely Distributions and not unduly prolong the duration of the Plan Trust. The liquidation of the Plan Trust Assets may be accomplished, either in whole or in combination, by the prosecution, settlement, or sale of Plan Trust Assets, including Causes of Action, or any other means permitted by law. The Plan Trustee shall distribute the proceeds of liquidation of the Plan Trust Assets among the Estates in accordance with this Plan.

(c)      The Plan Trustee shall be empowered to retain professionals, including but not limited to, attorneys, accountants, investment advisors, auditors and other agents on behalf of the Plan Trust, as necessary or desirable to carry out the obligations of the Plan Trustee under the Plan Trust Agreement. The Plan Trustee may retain counsel in any matter related to the administration of the Plan or the Plan Trust Assets, including counsel that has acted as counsel for the Debtors or the Creditors' Committee or its members in the Chapter 11 Cases. Approval of the Bankruptcy Court shall not be required for the Plan Trustee to retain or pay any such professionals. The Plan Trustee may appoint one or more Plan Trust Administrators to assist the Plan Trustee in the performance of the Trustee's routine and administrative duties.

(d)      Subject to any Bankruptcy Code or Bankruptcy Rule provisions regarding the retention of estate professionals that may be applicable in any subsequent bankruptcy case or cases of the Debtor's subsidiaries, the Plan Trustee may serve as a director, officer or manager of TBW and its subsidiaries with respect to any matters that may impact TBW or any of its subsidiaries after the Effective Date.

6.      **Valuation of Assets.**  As soon as practicable after the Effective Date, the Plan Trustee shall apprise each of the Beneficiaries in writing of the value of the Plan Trust Assets by Filing such valuation with the Bankruptcy Court. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Plan Trustee, and Holders of Unsecured Claims) for all federal income tax purposes.

7.      **Payments by the Plan Trust.**  The Plan Trustee shall make Distributions to Holders of Allowed Claims in accordance with Article 7 of this Plan, and may act as disbursing agent for any Creditor of a Debtor in connection with any settlement agreement to which a Debtor or the Plan Trust is a party.

8.      **Investment Powers of the Plan Trustee.**  All funds held by the Plan Trustee shall be held in Cash or invested in demand and time deposits, such as certificates of deposit, having maturities of not more than one year, U.S. Treasury bills, or other temporary liquid investments all as more particularly described in the Plan Trust Agreement consistent with § 345 of the Code; provided, however, that the right and power of the Plan Trustee to invest Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations or as set forth in IRS rulings, notices, or other IRS pronouncements. The Plan Trustee may expend the Cash of the Plan Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the Plan Trust Assets during liquidation, (y) to pay reasonable administrative expenses (including,

but not limited to, any taxes imposed on the Plan Trust) and (z) to satisfy other liabilities incurred by the Plan Trust in accordance with this Plan or the Plan Trust Agreement.

9. **Disputed Ownership Funds.** With the approval of the Plan Advisory Committee, the Plan Trustee may make the election described in § 1.468B-9(c)(2)(ii) of the Treasury Regulations to treat any portion of the Plan Trust subject to Disputed Unsecured Claims as a "disputed ownership fund." The Plan Trustee may establish one or more disputed ownership funds with respect to Disputed Claims. The Plan Trustee may also, to the extent permitted by law, make such an election for state and local income tax purposes. If the election is made to treat any Disputed Claims as a "disputed ownership fund," then the Plan Trust may (a) allocate taxable income or loss to the Disputed Claims, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (b) distribute assets from the Disputed Claims Reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved, subject to such approval of the Bankruptcy Court, if any, as may be required. The Beneficiaries will be bound by such election, if made by the Plan Trustee, and, as such, will, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

10. **Qualified Settlement Funds.** The Plan Trustee shall be permitted to establish one or more "qualified settlement funds" within the meaning of the Internal Revenue Code and related Treasury Regulations with respect to any WARN Act Claims, or any other Claims for which a "qualified settlement fund" is required or permitted by law.

11. **Reporting Duties.**

(a) **Tax Reporting.** Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulations § 1.671-4(a), giving effect to any timely elections made by the Plan Trustee to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations.

(b) **Annual Financial Statements and Statements to Beneficiaries.** The Plan Trustee shall also send to each Holder of a beneficial interest in the Plan Trust (referred to as Beneficiaries) an annual statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and provide to all such Holders information for reporting such items on their federal income tax returns, as described in the Plan Trust Agreement, except as otherwise provided for U.S. federal income tax purposes in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations. The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by any Governmental Authority.

(c)    **Quarterly Filings with Bankruptcy Court and U.S. Trustee.**  From the Effective Date until a Final Decree is entered, the Plan Trustee shall, within 45 days of the end of each calendar quarter, File with the Bankruptcy Court and submit to the U.S. Trustee quarterly reports setting forth all receipts and disbursements of the Plan Trust as required by the U.S. Trustee guidelines.

(d)    **Allocation of Plan Trust Taxable Income**.  Subject to the terms of paragraph (e) below, allocations of Plan Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described herein) if, immediately prior to such deemed Distribution, the Plan Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the beneficial interests in the Plan Trust (treating any holder of a Disputed Claim, solely for the purpose of making such allocations, as a current Holder of a beneficial interest in the Plan Trust entitled to Distributions), taking into account all prior and concurrent Distributions from the Plan Trust and all Reserve allocations (including all Reserves established pending the resolution of Disputed Claims).  Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Plan Trust Assets.  For this purpose, the tax book value of the Plan Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Plan Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(e)    **Other Filings**.  The Plan Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Plan Trust that are required by the Plan Trust Agreement or any Governmental Authority.

(f)    **Disputed Ownership Fund – Tax Effect**.  Notwithstanding the foregoing, in the event that the Plan Trustee timely elects to treat any portion of the Plan Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations, any Holders of Claims who, as of the Effective Date, are Holders of Disputed Claims shall, to the extent of such Disputed Claims, be subject to U.S. federal income taxation in accordance with rules set forth in Section 468B of the Internal Revenue Code and the Treasury Regulations thereunder.

(g)    **Qualified Settlement Fund – Tax Effect.**  In the event that any portion of the Pan Trust is treated as a "qualified settlement fund" pursuant to § 1.468B-1 of the Treasury Regulations, the U.S. federal income tax consequences shall be determined in accordance with rules set forth in Section 468B of the Internal Revenue Code and the Treasury Regulations thereunder.

**12.     Registry of Beneficial Interests.**  To evidence the beneficial interest in the Plan Trust of each Holder of such an interest, the Plan Trustee shall maintain a registry of such Holders.

**13.     Non-Transferable.**  Upon issuance thereof, interests in the Plan Trust shall be transferable only (a) after written notice to the Plan Trustee if the transfer is pursuant to applicable laws of descent and distribution (as in the case of a deceased individual Beneficiary); (b) after written notice to the Plan Trustee if the transfer is by operation of law (as in the case of merger of a corporate Beneficiary); or (c) pursuant to any applicable rights of the Federal Housing Finance Agency under the Housing and Economic Recovery Act of 2008 as Conservator of Freddie Mac.

**14.     Termination.**  The Plan Trust shall terminate after the Distribution of all Plan Trust Assets and the full performance of all other duties and functions of the Plan Trustee set forth herein and in the Plan Trust Agreement, or as otherwise ordered by the Bankruptcy Court.  The Plan Trust shall terminate no later than the fifth anniversary of the Effective Date; provided, however, that, within six months prior to such date or any extended termination date, the Bankruptcy Court, upon motion by the Plan Trustee or other party in interest, may extend the term of the Plan Trust for a finite period if it is necessary to the liquidating purpose thereof.

**15.     Purpose of the Plan Trust.**  The Plan Trust shall be established for the sole purpose of liquidating and distributing the Plan Trust Assets in accordance with Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  Subject to definitive direction to the contrary from the IRS (but subject to the rights of the Plan Trustee to seek administrative and judicial review of any such direction), all parties shall treat the Plan Trust as a liquidating trust for all federal income tax purposes, except as otherwise provided for U.S. federal income tax purposes in the event the Plan Trustee timely elects to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to Section 1.468B-9(c)(2)(ii) of the Treasury Regulations.  The Plan Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of certain assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of § 1123(b)(3) of the Bankruptcy Code.

## H.     PLAN ADVISORY COMMITTEE

**1.     Appointment.**  The Confirmation Order shall confirm the appointment of the Plan Advisory Committee, which shall begin to act on the Effective Date.  The Plan Advisory Committee shall consist of three Creditors' Committee members chosen from those members willing to serve on the Plan Advisory Committee.  In the event of resignation of any member of the Plan Advisory Committee, the remaining members shall designate a successor from among the Holders of Unsecured Claims and shall re-constitute itself as a committee of three.  Until any such vacancy is filled, the Plan Advisory Committee shall function with reduced membership.

**2.     Fiduciary Duties.**  The fiduciary duties that applied to the Creditors' Committee prior to the Effective Date, as limited by the exculpations, indemnifications, releases and other protections provided in this Plan, the Plan Trust Agreement, and the Confirmation Order, shall

apply to the Plan Advisory Committee.  The duties, rights and powers of the Plan Advisory Committee shall terminate upon the termination of the Plan Trust.

      **3.**      **Rights and Powers**.  The Plan Advisory Committee shall oversee the actions of the Plan Trustee in accordance with the terms of the Plan Trust Agreement.  The Plan Advisory Committee shall have the rights and powers set forth in the Plan Trust Agreement.  The rights and powers shall include, but not be limited to, approving or consenting to all Material Decisions (certain of which approvals or consents may be obtained by notice and without the formality of a written approval or resolution of the Plan Advisory Committee, as more particularly set forth in the Plan Trust Agreement), including the following:

(a)      the Plan Trustee's commencement or continuation of the prosecution of (i) any Cause of Action in which the amount sought to be recovered exceeds $1 million, or (ii) any objection to a Claim having a stated amount greater than $1 million;

(b)      the Plan Trustee's determination not to object to a Claim having a stated amount in excess of $1 million;

(c)      the settlement of (i) any Cause of Action in which the amount sought to be recovered exceeds $1 million or (ii) any Disputed Claim having a stated amount in excess of $1 million and to approve any release or indemnification to be given by the Plan Trustee in connection with any such settlement;

(d)      any sale of any Assets for a price in excess of $500,000, but no consent or approval of the Plan Advisory Committee is required for any sale of REO or for any release of any individual mortgage loan, including any release for an amount which is less than the outstanding balance of the loan;

(e)      all Distributions proposed by the Plan Trustee;

(f)      the investment of Cash or other Plan Trust Assets, except for investments in demand and time deposits, such as certificates of deposit, having maturities of less than one year and in U.S. Treasury bills;

(g)      the dissolution of any Debtor;

(h)      the waiver of the attorney-client privilege by the Plan Trustee with respect to any Cause of Action or other litigation related matter, as described in Section XI.C of the Plan Trust Agreement;

(i)      the election to treat any portion of the Plan Trust as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations;

(j)      the election described in Article 7.J. of this Plan as regards undeliverable Distributions.

4.    **Unanimous Decisions**.  The Plan Advisory Committee shall also have the absolute right and power to determine the following by the unanimous vote of all the members of the Plan Advisory Committee:

(a)    to change the initial bond to be posted by the Plan Trustee; and

(b)    to petition the Bankruptcy Court to remove the Plan Trustee for Cause, or to select a successor Plan Trustee when a successor is required.

5.    **No Compensation**.  Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Advisory Committee, including reasonable attorneys' fees subject to review by the Plan Advisory Committee, the members of the Plan Advisory Committee shall serve without compensation.  Such reasonable actual costs and expenses may be paid by the Plan Trust without approval by the Bankruptcy Court.

6.    **Objection to Fees.**  The Plan Advisory Committee shall have the right, within 7 days from the delivery of a fee statement, to object to the fees of any professional retained by either the Plan Trust or the Plan Advisory Committee.  The objection shall be lodged by giving notice of any such objection to the professional seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved 15 days after it is made may be submitted to the Bankruptcy Court for resolution.  The uncontested portion of each invoice shall be paid within 20 days after its delivery to the Plan Advisory Committee and the Plan Trustee.

7.    **Removal of Plan Trustee.**  The Plan Advisory Committee shall have the right to petition the Bankruptcy Court to remove the Plan Trustee for Cause. Upon such removal or upon the resignation or death of the Plan Trustee, the Plan Advisory Committee may appoint a successor Plan Trustee, and, in that event, the Plan Advisory Committee shall File with the Bankruptcy Court a notice of the appointment of the successor Plan Trustee.

I.    **LIMITATION OF LIABILITY FOR PLAN TRUST EXCULPATED PARTIES**

Neither the Plan Trustee nor any member of the Plan Advisory Committee, nor their respective employees, professionals, agents, representatives or designees, including any Plan Trust Administrator, nor any director, officer or manager of TBW or any of its subsidiaries who held such position on or after the Effective Date (referred to as the Plan Trust Exculpated Parties), shall be liable for any Claims, Causes of Action, liabilities, obligations, losses, damages, costs and expenses (including attorneys' fees and expenses), and other assertions of liability (referred to as the Plan Trust Released Claims) arising out of the discharge of the powers and duties conferred upon the Plan Trustee or the Plan Advisory Committee by the Plan Trust Agreement, this Plan or any Order, or requested to be performed by the Plan Trustee or any member of the Plan Advisory Committee, other than for Plan Trust Released Claims determined by a Final Order to have arisen or resulted solely from such Plan Trust Exculpated Party's gross negligence or willful misconduct.  Any action taken or omitted to be taken with the approval of the Bankruptcy Court or the Plan Advisory Committee will conclusively be deemed not to

constitute gross negligence or willful misconduct. No Holder of a Claim or other Person will have or be permitted to pursue any Claim or cause of action against any Plan Trust Exculpated Party for making or approving, or not making or approving, payments or Distributions in accordance with the Plan or for implementing the provisions of the Plan.

## J.    INDEMNIFICATION OF PLAN TRUST EXCULPATED PARTIES

To the fullest extent permitted by applicable law, the Plan Trust shall indemnify, defend and hold harmless each Plan Trust Exculpated Party from and against any and all Plan Trust Released Claims arising out of or resulting from such Exculpated Party's acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan Trust or the Plan or the discharge of its duties thereunder or under the Plan Trust Agreement; provided, however, that no such indemnification will be made to such Exculpated Party for Plan Trust Released Claims determined by a Final Order to have arisen or resulted solely from such Exculpated Party's gross negligence or willful misconduct. All fees, costs and expenses, including without limitation attorneys' fees and expert witness fees, incurred by a Plan Trust Exculpated Party in defending a civil or criminal action, suit or proceeding shall be paid by the Plan Trust in advance of the final disposition of such action, suit or proceeding.

## K.    RETENTION OF PROFESSIONALS

The Plan Trustee may retain professionals, including but not limited to, attorneys, accountants, investment advisors, auditors and other agents on behalf of the Plan Trust as necessary or desirable to carry out the obligations of the Plan Trustee hereunder and under the Plan Trust Agreement. More specifically, the Plan Trustee may retain counsel in any matter related to administration of the Plan, including counsel that has acted counsel for the Debtors, the Creditors' Committee, or the members of the Creditors' Committee.

## L.    PRESERVATION OF ALL CAUSES OF ACTION

Except as otherwise provided in the Plan or expressly in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with § 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall be vested with and may exclusively enforce and prosecute any Causes of Action that the Debtors, the Estates, the Creditors' Committee or the Plan Trust may have against any Person. The Plan Trustee may pursue such retained Causes of Action in accordance with the best interests of the Plan Trust and its Beneficiaries.

## M.    SUCCESSORS; PRESERVATION OF PRIVILEGE

The Plan Trust shall be the successor to the Debtors and/or the Creditors' Committee for the purposes of §§ 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all Causes of Action and other litigation-related matters. The Plan Trust shall succeed to the attorney-client privilege of the Debtors with respect to all Causes of Action and other litigation-related matters, and the Plan Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Plan Trustee's discretion, subject to the approval of the Plan Advisory Committee.

# ARTICLE 7.

# DISTRIBUTIONS UNDER THIS PLAN

## A.    GENERALLY

The Plan Trustee shall apply the Plan Trust Assets only in accordance with this Plan and the Plan Trust Agreement.  The Plan Trustee shall make all Distributions provided for in the Plan from the Plan Trust Assets, including those to be paid on the Effective Date.  The Plan Trustee shall not be required to seek approval of the Bankruptcy Court or any other court with respect to the administration of the Plan Trust, or as a condition to making any payment or Distribution out of the Plan Trust Assets; provided, however, that, with respect to any Distribution from any "disputed ownership fund" that the Plan Trustee may establish under § 1.468B-9(c)(2)(ii) of the Treasury Regulations, the Plan Trustee shall obtain Bankruptcy Court approval to the extent necessary to comply with the requirements of such Treasury Regulation.  All Distributions and the Reserves described in this Article 7 shall be managed by the Plan Trustee in a manner that accounts for the priority of Distributions described in part E of this Article 7.

## B.    TIMING OF DISTRIBUTIONS

**1.    Distributions on Secured Claims.**  The Plan Trustee shall not distribute Cash as to which a Creditor claims a Lien until the validity, extent, and priority of the Lien has been determined by a Final Order.  To the extent that a Lien is adjudicated in favor of such Creditor, it shall be entitled to a Distribution of such Cash in accordance with such Final Order and the treatment of such Secured Creditor's Allowed Claim under this Plan.  The FDIC Secured Claims shall be deemed Allowed Claims by virtue of the Confirmation Order, and Distributions shall be made to the FDIC in conformance with this Plan and the FDIC Settlement Agreement as soon as practicable after the Confirmation Order becomes a Final Order.

**2.    Distributions on Allowed Administrative Expense Claims, Priority Tax Claims and Priority Claims.**  Except as otherwise provided in this Plan, each Holder of an Allowed Administrative Expense Claim, Priority Tax Claim and Priority Claim against any Debtor shall be entitled to a Distribution from Unencumbered Cash as soon as practicable after the later of (a) the Effective Date, and (b) the date upon which any such Claim becomes an Allowed Claim.

**3.    Interim Distributions on Allowed Unsecured Claims.**  Holders of Allowed Unsecured Claims shall be entitled to annual interim Distributions and may also receive more frequent interim Distributions on account of their respective Allowed Unsecured Claims from the Net Distributable Assets, the Trade Creditor Recovery, and the Additional Trade Creditor Recovery, as applicable, of the applicable Estate then available, provided that, in either case, each of the following conditions precedent is satisfied: (a) any such Distribution is warranted, economical and not unduly burdensome to the Plan Trust; (b) the Plan Trust has paid all current and outstanding Plan Trust Operating Expenses, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Claims; and (c) the Plan Trust has allocated adequate funds to the Plan Trust Operating Expense Reserve, the Administrative and Priority Claims Reserve, and the Disputed Claims Reserve of the applicable Estate, and such

Reserves will remain adequate after any such interim Distribution is made.  This paragraph shall be interpreted to be consistent with Revenue Procedure 94-45 § 3.10.

**4.    Final Distributions on Allowed Unsecured Claims.**  After (a) the payment of all Plan Trust Operating Expenses, Administrative Expense Claims, Priority Tax Claims and Priority Claims, (b) the prosecution, settlement, or abandonment of all Causes of Action, (c) the allowance or disallowance of all Claims against the Estates, and (d) the liquidation or abandonment of all other Plan Trust Assets, the Holders of all Allowed Unsecured Claims shall be entitled to a Distribution of all remaining Plan Trust Assets pursuant to the terms of this Plan and the Plan Trust Agreement.

## C.    RESERVES

**1.    Plan Trust Operating Expense Reserve.**  On the Effective Date, the Plan Trustee shall establish the Plan Trust Operating Expense Reserve to ensure that the Plan Trust will have sufficient funds to pay all Plan Trust Operating Expenses that may arise at any time in connection with the administration of the Plan Trust.  The amount of the Plan Trust Operating Expense Reserve shall be based on the Plan Trustee's good faith estimate of the amount necessary to complete the Plan Trust's obligations under this Plan and the Plan Trust Agreement.

**2.    Administrative and Priority Claims Reserves.**  On the Effective Date, the Plan Trustee shall establish for each Debtor's Estate an Administrative and Priority Claims Reserve to fund all Administrative Expense Claims, Priority Tax Claims and Priority Claims that are Disputed Claims or that are Allowed but unpaid, regardless of whether such Claim is Allowed before, on or after the Effective Date.  The amount of each Administrative and Priority Claims Reserve shall be based on the Plan Trustee's good faith estimate of the amount necessary to pay all present and anticipated Allowed Administrative Expense Claims, Priority Tax Claims and Priority Claims against such Estate.

The amount reserved for each such Administrative Expense Claim that is a Disputed Claim shall be the lower of (i) the amount set forth in the request for payment of Administrative Expense Claim Filed by the Holder of such Claim, or, if no such request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for Distribution purposes, as determined by the Bankruptcy Court as set forth in Article 8.F of this Plan.

The amount reserved for a Priority Tax Claim or a Priority Claim that is a Disputed Claim shall be the lower of (i) the amount set forth in the Proof of Claim Filed by the Holder of such Claim, or, if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed, and (ii) the estimated amount of such Claim for Distribution purposes, as determined by the Bankruptcy Court pursuant to Article 8.F of this Plan.

**3.    Disputed Claims Reserves.**  Prior to making any Distributions on account of Unsecured Claims, the Plan Trustee shall establish a Disputed Claims Reserve for each Debtor's Estate.  Each Disputed Claims Reserve shall be for the payment of any Unsecured Claim that is a

Disputed Claim, to the extent such Disputed Unsecured Claim becomes an Allowed Unsecured Claim against such Debtor.

With respect to any interim Distribution made to Holders of Allowed Unsecured Claims, the amount reserved for each such Disputed Claim against any Debtor shall be the amount that would be distributed on account of such Claim if it were an Allowed Unsecured Claim in the lower of (a) the amount set forth in the Proof of Claim Filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed, and (b) the estimated amount of such Claim for Distribution purposes, as determined by the Bankruptcy Court pursuant to Article 8.F of this Plan.

**4.    General Provisions Governing All Reserves**.  Each Reserve shall represent an allocation of Unencumbered Plan Trust Assets of the applicable Debtor's Estate consisting of Cash; provided, however, that the Plan Trust Operating Expense Reserve shall represent an allocation of Unencumbered Plan Trust Assets of TBW's Estate consisting of Cash.  The Plan Trustee shall not be required to establish and fund any Reserve with a separate deposit or investment account into which is deposited Unencumbered Plan Trust Assets of the applicable Estate.  The Plan Trustee may, but shall not be required to, request that the Bankruptcy Court estimate the value of any Claim for purposes of setting the amount of any Reserve.  If at any time the Plan Trustee determines that the amount allocated to any Reserve is insufficient to satisfy all Claims for which it is established, the Plan Trustee may allocate additional amounts to it from other Reserves for the applicable Debtor's Estate or from Unencumbered Plan Trust Assets of such Debtor's Estate consisting of Cash, without further notice or motion.  The Plan Trustee may also decrease the amount of any Reserve established for any Estate as the Plan Trustee determines is appropriate; provided, however, the Plan Trustee shall not decrease the amount allocated to the Administrative and Priority Claims Reserve or any Disputed Claims Reserve without providing to all parties in interest prior notice and an opportunity to be heard.  If any Creditor asserts that more than one Debtor is liable for an Administrative Expense Claim, Priority Tax Claim, Priority Claim or Disputed Claim, the Plan Trustee may allocate to the Reserve it deems appropriate on account of only one such Claim.  All amounts allocated to any Reserve following the payment or resolution of all Claims for which such Reserve was established shall be available for Distribution to other claimants of such Debtor's Estate pursuant to the terms of the Plan and the Plan Trust Agreement.

**D.    DISTRIBUTION CALCULATIONS**

**1.    Calculation of Net Distributable Assets.**  The "Net Distributable Assets" of each Estate as of any date of determination shall be calculated as follows:  the total gross Unencumbered Cash proceeds of the Plan Trust Assets allocated to such Estate as of such date, less, to the extent applicable, the Plan Trust Operating Expenses that are outstanding and have not been paid and amounts allocated to the Plan Trust Operating Expense Reserve for such Estate, less the Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims that are outstanding and have not been paid and amounts allocated to the Administrative and Priority Claims Reserve for such Estate, and less the amounts allocated to the Disputed Claims Reserve for such Estate.  For avoidance of

doubt, the Trade Creditor Recovery and the Additional Trade Creditor Recovery do not constitute Cash proceeds of Plan Trust Assets and shall not constitute Unencumbered Cash.

      **2.**      **Calculation of Interim Distributions.**  The Plan Trustee may make interim Distributions:

      (a)      from Net Distributable Assets allocated to any Debtor's Estate, to Holders of Allowed Unsecured Claims against such Debtor, calculated as of the date of the interim Distribution;

      (b)      from amounts available for Distribution in respect of the FDIC GUC Claim, to Holders of Allowed Trade Claims up to the amount of the Trade Creditor Recovery, calculated as of the date of the interim Distribution; and

      (c)      from amounts available for Distribution in respect of the Additional Trade Creditor Recovery, to Holders of Allowed Trade Claims, calculated as of the date of the interim Distribution.

## E.      PRIORITY OF DISTRIBUTIONS

      Unencumbered Cash available for interim Distributions pursuant to this Plan shall, with respect to each Debtor's Estate and subject to the terms of this Plan and the Plan Trust Agreement, be paid or allocated to Reserves established by the Plan Trustee in the following order of priority:

      **First**,    to pay all outstanding Plan Trust Operating Expenses, and to allocate to the Plan Trust Operating Expense Reserve as provided for in Article 7.C.1 of this Plan;

      **Second**, to pay all Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Claims against such Debtor's Estate, and to allocate to the Administrative and Priority Claims Reserve for such Debtor's Estate as provided for in Article 7.C.2 of this Plan; and

      **Third**,    to pay Net Distributable Assets to all Holders of Allowed Unsecured Claims against such Debtor's Estate in accordance with the Distribution Calculation in Article 7.D.2 above, and to allocate to the Disputed Claims Reserve for such Debtor's Estate as provided for in Article 7.C.3 of this Plan.

## F.      CALCULATION OF UNSECURED CLAIMS

      **1.**      **Payment in Full.**  Any Allowed Unsecured Claim is paid in full under this Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the Allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is liable, whether jointly, as co-obligor, pursuant to a Guaranty or otherwise, such Creditor is not entitled to receive

Distributions under this Plan in excess of the Allowed amount of such Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claim for which more than one Debtor is liable shall be deemed paid in full at such time as the Creditor has been paid the Allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

   **2.**  **Payment of Interest.**  If, and only if, all Holders of Allowed Unsecured Claims against an applicable Debtor have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of such Debtor; provided, however, that with respect to Allowed Unsecured Claims for which more than one Debtor is liable, interest is payable on such Claims based on the Allowed amount of the joint liability fixed by such Claims.

   **3.**  **Payment in Full of Allowed Unsecured Claims for Which More Than One Debtor is Liable.**  To the extent that a Holder of Allowed Unsecured Claims for which more than one Debtor is liable is paid 100% of the Allowed amount of the joint liability fixed by such Claims through interim Distributions, the Plan Trustee shall retain any further interim Distributions that would be made on account of such Claims as if only one Debtor were liable for such Claim until the Plan Trustee makes a final Distribution under this Plan.  Prior to making a final Distribution under this Plan, the Plan Trustee shall determine (with respect to every Allowed Unsecured Claim for which more than one Debtor is liable that has been paid 100% of the Allowed amount of the joint liability fixed by such Claim) the amount of Distributions in respect of such Claim made on account of such Debtor's Estate.  The Plan Trustee shall reallocate the excess Distributions, if any, that it has retained among the liable Estates in proportion to the amount of Distributions made to Claims from such Estates on account of such joint liability.

## G.  MANNER OF DISTRIBUTION

   Notwithstanding any other provisions of this Plan or the Plan Trust Agreement providing for a Distribution or payment in Cash, at the option of the Plan Trustee, any Distributions under this Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH.  Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan.  Any Cash Distributions or payments will be issued to Holders in whole cents (rounded to the nearest whole cent when and as necessary).

## H.  *DE MINIMIS* DISTRIBUTIONS

   All *De Minimis* Distributions may be held by the Plan Trust for the benefit of the Holders of Allowed Claims entitled to *De Minimis* Distributions.  When the aggregate amount of *De Minimis* Distributions held by the Plan Trust for the benefit of a Creditor exceeds $50.00, the Plan Trust may distribute such *De Minimis* Distributions to such Creditor.  If, at the time that the final Distribution under this Plan is to be made, the *De Minimis*

Distributions held by the Plan Trust for the benefit of a Creditor total less than $50.00, such funds shall be not distributed to such Creditor, but rather, shall constitute Plan Trust Assets and thus eligible to be to distributed to other Creditors.

## I.    DELIVERY OF DISTRIBUTIONS

Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made by the Debtors, if before the Effective Date, or the Plan Trustee, if on or after the Effective Date, (i) at the addresses set forth on any Proof of Claim Filed by such Holder (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is Filed or the Debtors or the Plan Trustee have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes Filed with the Bankruptcy Court and served on the Plan Trustee by such Holder after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and no written notice of address change has been Filed by such Holder with the Bankruptcy Court and served on the Plan Trustee.

## J.    UNDELIVERABLE DISTRIBUTIONS

If any Distribution or other payment to the Holder of an Allowed Claim under this Plan is returned for lack of a current address for the Holder or otherwise, the Plan Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment.  If, after the passage of 90 days, the Distribution or payment still cannot be made, the Plan Advisory Committee may elect either (i) that any further Distribution or payment to the Holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes or (ii) donated to a not-for-profit, non-religious organization approved by the Plan Advisory Committee.  In either event, the Allowed Claim shall be deemed satisfied and released, with no recourse to the Plan Trust, the Plan Trustee or the Plan Trust Assets, to the same extent as if the Distribution or payment had been made to the Holder of the Allowed Claim.

## K.    SETOFFS AND RECOUPMENTS

The Debtors, if before the Effective Date, or the Plan Trustee, if on or after the Effective Date, may, to the extent permitted by §§ 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to this Plan, any Causes of Action of any nature whatsoever that the Debtors, the Estates, the Creditors' Committee or the Plan Trust may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, the Creditors' Committee or the Plan Trust of any right of setoff or recoupment that the Debtors, the Creditors' Committee, the Plan Trust or the Estates may have against the Holder of such Claim, nor of any other Cause of Action.

L.      **DISTRIBUTIONS IN SATISFACTION; ALLOCATION**

Except for the obligations expressly imposed by this Plan and the property and rights expressly retained under this Plan, if any, the Distributions and rights that are provided in this Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Plan Trust or the Plan Trust Assets, whether known or unknown, that arose or existed prior to the Effective Date. Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

M.      **CANCELLATION OF NOTES AND INTERESTS**

1.      As of the Effective Date, all notes and securities evidencing Claims or Interests and the rights thereunder of the Holders thereof shall, with respect to the Debtors, the Estates or the Plan Trust, be deemed canceled, null and void, and of no further force and effect, and the Holders thereof shall have no rights against the Debtors, the Estates or the Plan Trust, except the right to receive the Distributions provided for in this Plan.

2.      From and after the Effective Date, the Plan Trust shall be deemed the sole capital stockholder, shareholder or managing member, as applicable, of each of the Debtors and shall be vested with all the rights and powers exercisable by a sole capital stockholder, shareholder or managing member, as applicable, under the respective Debtor's governance documents and applicable law.

N.      **NO INTEREST ON CLAIMS**

Unless otherwise specifically provided for in this Plan and except as set forth in Article 7 hereof, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

O.      **WITHHOLDING TAXES**

The Debtors, if before the Effective Date, and the Plan Trustee, if on or after the Effective Date, shall be entitled to deduct any federal, state or local withholding taxes from any payments under this Plan. As a condition to making any Distribution under this Plan, the Debtors, if before the Effective Date, and the Plan Trustee, if on or after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors, if before the Effective Date, and the Plan Trustee, if on or after the Effective Date, to comply with applicable tax reporting and withholding laws. Failure of a Holder of any Allowed Claim to provide such Holder's taxpayer identification number and such other information

and certification may result in forfeiture of such Holder's right to Distributions in respect of its Claim.

## P. REPORTS

From the Effective Date until a Final Decree is entered, the Plan Trustee shall, within 45 days of the end of each fiscal quarter, file with the Court and submit to the U.S. Trustee quarterly reports setting forth all receipts and disbursements of the Plan Trust as required by the U.S. Trustee guidelines.

## ARTICLE 8.

## PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

## A. RESERVATION OF RIGHT TO OBJECT TO CLAIMS AND INTERESTS

Unless a Claim or Interest is expressly described as an Allowed Claim or Allowed Interest pursuant to or under this Plan, or otherwise becomes an Allowed Claim or Allowed Interest prior to the Effective Date, upon the Effective Date, the Plan Trustee shall be deemed to have a reservation of any and all rights, interests and objections of the Debtors, the Creditors' Committee or the Estates to any and all Claims or Interests and motions or requests for payment. This reservation includes, without limitation, any and all rights, interests and objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, Subordinated Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Plan Proponents' failure to object to any Claim or Interest in the Chapter 11 Cases shall be without prejudice to the Plan Trustee's rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim or Interest.

## B. OBJECTIONS TO CLAIMS AND INTERESTS

Prior to the Effective Date, the Plan Proponents shall be responsible for pursuing any objection to the allowance of any Claim or Interest. From and after the Effective Date, the Plan Trustee shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving Claims and Interests and making Distributions, if any, with respect to all Claims and Interests (including those Claims or Interests that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Advisory Committee that may be required. Unless otherwise provided in this Plan or by Order of the Bankruptcy Court, any objections to Claims or Interests by the Plan Trustee shall be Filed and served on or before the later of (i) one year after the Effective Date, or (ii) 2 years after the Petition Date, provided that the Plan Trustee may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by Filing a motion with the Bankruptcy Court without any requirement to provide notice to any party, based upon a reasonable exercise of the Plan Trustee's business judgment.

A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to this Plan.

## C.    SERVICE OF OBJECTIONS

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if the Plan Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of such Holder in the Chapter 11 Cases.

## D.    DETERMINATION OF CLAIMS

Except as otherwise agreed by the Plan Proponents or the Plan Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely Filed in the Chapter 11 Cases, or deemed timely Filed by Order of the Bankruptcy Court, may be adjudicated or otherwise liquidated pursuant to (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties without the need for Bankruptcy Court approval, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim or (c) an application to otherwise limit recovery with respect to such Claim, Filed by any of the Plan Proponents, the Plan Trustee, or any other party in interest on or prior to any applicable deadline for Filing such objection or application with respect to such Claim.  Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Plan.  Nothing contained in this Article 8 shall constitute or be deemed a waiver of any rights, interests, objections or Causes of Action that any of the Plan Proponents or the Plan Trustee may have against any Person in connection with or arising out of any Claim, including without limitation any rights under 28 U.S.C. § 157.

## E.    NO DISTRIBUTIONS ON DISPUTED CLAIMS PENDING ALLOWANCE

No payments or Distributions shall be made with respect to all or any portion of a Disputed Claim, including any Distribution of Assets securing such Disputed Claim or as to which there are competing claims of ownership, unless and until (i) all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, (ii) the Disputed Claim has become an Allowed Claim, and (iii) all conflicting Lien or ownership rights in any Assets securing or evidencing such Allowed Claim have been settled or withdrawn or have been determined by a Final Order; provided, however, that in the event that (a) a portion of such Claim is an Allowed Claim, or (b) a portion of the Assets securing or evidencing any Claim is not subject of conflicting Claims of Lien or ownership rights, the Plan Trustee may, in his discretion, make a Distribution pursuant to the Plan on account of the portion of such Claim that is an Allowed Claim and the portion of such Assets as to which there are no conflicting Claims.

## F.    CLAIMS ESTIMATION FOR DISPUTED CLAIMS

In order to effectuate Distributions pursuant to this Plan and avoid undue delay in the administration of the Chapter 11 Cases, any of the Plan Proponents (if before the Effective Date) and the Plan Trustee (if on or after the Effective Date), after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for Distribution purposes on account of any Disputed Claim, (ii) such Claim for Claim allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

## G.    ALLOWANCE OF CLAIMS SUBJECT TO § 502 OF THE BANKRUPTCY CODE

Allowance of Claims shall be in all respects subject to the provisions of § 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

## ARTICLE 9.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES; EMPLOYEE BENEFIT PLANS

## A.    REJECTION OF UNASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, except for any Executory Contract (i) that was previously assumed or rejected by an Order of the Bankruptcy Court or otherwise pursuant to § 365 of the Bankruptcy Code or (ii) that is subject to a pending motion to assume or reject before the Bankruptcy Court, each Executory Contract entered into by any of the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejection pursuant to §§ 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

## B.    EMPLOYEE BENEFIT PLANS

Without limiting the generality of Article 9.A above, and for the avoidance of doubt, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, retirees and non-employee directors and the employees and retirees of their subsidiaries, including all savings plans, retirement plans, pension plans, ESOP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment

insurance plans, shall be deemed and treated as Executory Contracts that are rejected by the Debtors pursuant to the Plan and § 365 of the Bankruptcy Code as of the Effective Date.

## C.    REJECTION DAMAGES BAR DATE

Except to the extent that another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under this Plan (including Claims under § 365(d)(3) of the Bankruptcy Code) must be Filed by (i) regular mail to BMC Group, Inc. Attn: Taylor Bean & Whitaker Mortgage Corp. Claims Processing, P.O. Box 3020, Chanhassen MN 55317-3020, or (ii) by hand, courier, or overnight delivery to BMC Group, Inc. Attn:  Taylor, Bean & Whitaker Mortgage Corp., Claims Processing, 18750 Lake Drive East, Chanhassen, MN 55317, within 30 days after the Effective Date, or such Claim shall not be entitled to a Distribution and shall not be enforceable against the Debtors' Estates, the Plan Trust, the Plan Trustee, their successors, their assigns, or their Assets.  Any Allowed Claim arising from the rejection of an Executory Contract shall be treated as a Claim in TBW Class 8, HAM Class 3 or REO Class 3 (General Unsecured Claims), as applicable.  Nothing in this Plan extends or modifies any previously applicable Bar Date.

## D.    INSURANCE POLICIES

**1.    Assumption or Rejection.**  To the extent that any or all of the insurance policies described in the Plan Supplement (the "Designated Insurance Policies") are considered to be Executory Contracts, then notwithstanding anything contained in this Plan to the contrary, this Plan shall constitute a motion to assume the Designated Insurance Policies in connection with this Plan and to assign them to the Plan Trust.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to § 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each Designated Insurance Policy.  To the extent that the Bankruptcy Court determines otherwise with respect to any Designated Insurance Policy, the Debtors reserve the right to seek rejection of such insurance policy or other available relief.  The Plan shall not affect contracts that have been assumed and assigned by Order of the Bankruptcy Court prior to the Confirmation Date.

**2.    Vest as Plan Trust Assets.**  For the avoidance of doubt, all rights under any Designated Insurance Policy that is not considered to be an Executory Contract, and all rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute and benefit from claims), shall be preserved and shall vest in the Plan Trust pursuant to Article 6.F.1 hereof and § 1123(a)(5)(B) of the Bankruptcy Code.

# ARTICLE 10.

## EXCULPATIONS AND RELEASES, AND RELATED INJUNCTIONS

**A.    DEBTORS' EXCULPATION AND RELEASE OF CHAPTER 11 PROTECTED PARTIES**

Except as otherwise specifically provided in this Plan, pursuant to § 1123(b)(3)of the Bankruptcy Code, as of the Effective Date, the Debtors and their Estates exculpate, release and discharge the following (collectively the "**Chapter 11 Protected Parties**"): (1) Neil F. Luria, Jeffery W. Cavender, Matthew E. Rubin, William Maloney and R. Bruce Layman, each of whom serves as a current officer or director of one or more of the Debtors, (2) TBW's Creditors' Committee, its members, and their respective directors, officers, employers, employees, and counsel, (3) Navigant, Stichter Riedel, Troutman Sanders, and Berger Singerman, and their respective officers, directors, partners, employees and equity holders.  The exculpation, release and discharge by the Debtors and their Estates of the Chapter 11 Protected Parties is from any Claim, obligation, Cause of Action or liability, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law or in equity, which is based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Chapter 11 Cases, except those resulting solely from such Person's gross negligence or willful misconduct, as adjudicated by a Final Order, and including but not limited to acts or omissions in connection with the commencement and administration of the Chapter 11 Cases, the Investigation, the sale of assets, the arranging for postpetition financing, the prosecution and defense of contested matters and adversary proceedings, the settlement of Claims and the disbursement of funds, the administration of TBW'S ESOP, and the promulgation of the Plan and solicitation of acceptances thereto (collectively the "**Chapter 11 Released Claims**").  The scope of the Debtors' exculpation, release and discharge includes Chapter 11 Released Claims that could have been asserted derivatively on behalf of the Debtors or their Estates, but does not include any Avoidance Action or any prepetition Claim, obligation, Cause of Action or liability based on money borrowed from or owed to the Debtors as set forth in the Debtors' books and records.

**B.    FURTHER EXCULPATION AND RELEASE OF CHAPTER 11 PROTECTED PARTIES**

Except as otherwise specifically provided in this Plan, pursuant to § 1123(b)(3) of the Bankruptcy Code, as of the Effective Date, the Chapter 11 Protected Parties shall be exculpated, and released from all Chapter 11 Released Claims by each other, by any Holder of a Claim or Interest, by any party in interest, and by their respective agents, employees, successors and assigns.  Without limiting the generality of the foregoing, each Chapter 11 Protected Party shall be entitled to and granted the protections and benefits of § 1125(e) of the Bankruptcy Code.

C.    **RELEASE OF THE FEDERAL DEPOSIT INSURANCE CORPORATION**

On and effective as of the Effective Date, (a) the Debtor, the Debtor's Estate, all of the Debtor's creditors, and any other parties in interest, each of their respective subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively, and (b) the Creditors' Committee (collectively, the "Non-FDIC Releasors") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the Federal Deposit Insurance Corporation in its capacity as receiver of Colonial Bank and in its corporate capacity, their respective past or present parent entities, subsidiaries, affiliates, directors, officers, employees, professionals and the predecessors, successors and assigns of any of these (collectively, the "FDIC Releasees") from any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which the Non-FDIC Releasors, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any FDIC Releasee (i) that are released or deemed to be released pursuant to the Plan, (ii) any and all Claims that arise in, relate to or have been or could have been asserted in the Chapter 11 Case, the FDIC Stipulation, the Motion for Relief from the Automatic Stay Pursuant to § 362, filed by FDIC in the Chapter 11 Case on August 28, 2009 (the "Stay Relief Motion"), the Emergency Motion for Turnover, Approval of Procedures for the Maintenance and Use of Borrower Payments, and Immediate Resolution of Related Issues, filed by the Debtor in the Chapter 11 Case on August 31, 2009 (the "Turnover Motion" and together with the Stay Relief Motion, the "Actions"), the Plan and the negotiations and compromises set forth in the FDIC Settlement Agreement and the Plan, or otherwise that are based upon, related to, or arise out of or in connection with the Actions or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Actions, including, without limitation, any such Claim, demand, right, liability, or Cause of Action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred by the Non-FDIC Releasors arising directly or indirectly from or otherwise relating to the Actions (collectively, the "FDIC Released Claims"). Notwithstanding anything in this Article 10.C to the contrary, (A) the foregoing is not intended to release, nor shall it have the effect of releasing, the FDIC Releasees from the performance of their obligations in accordance with the FDIC Settlement Agreement or the FDIC Stipulation, (B) each Non-FDIC Releasor shall retain the right to assert any and all FDIC Released Claims by way of setoff, contribution, contributory or comparative fault or in any other defensive manner in the event that such Non-FDIC Releasor is sued on any FDIC Released Claim by an FDIC Releasee or any other Person (but solely as a defense against the Claims of such Person and not for purposes of obtaining an affirmative recovery for the benefit of the Non-FDIC Releasor) and such FDIC Released Claim shall be determined in connection with any such litigation as if the provisions of this Article 10.C were not effective, (C) the foregoing is not intended to release, nor shall it have the effect of releasing, the FDIC Releasees from matters related to Platinum Community Bank, including, without limitation, issues associated with Platinum bank accounts and the Platinum related loans service released after September 4,

2009, (D) the foregoing is not intended to release, nor shall it have the effect of releasing, any releasee or any Person of Claims that may be held or asserted by the Federal Deposit Insurance Corporation in any capacity (including, without limitation, as regulator or as receiver for any failed depository institution other than the Debtor), to the extent that any such Claims are unrelated to the Debtor, its Chapter 11 Case, the Debtor Released Claims (defined below) or the FDIC Released Claims, and (E) the foregoing release is not intended to release, nor shall it have the effect of releasing, any claims filed in the FDIC receivership of Colonial Bank.  Notwithstanding anything herein to the contrary, the term FDIC Releasee shall not include, and the release contemplated hereby shall not release, the Federal Deposit Insurance Corporation in its capacity as a receiver of, or in connection with its oversight of, any financial institution other than Colonial Bank.

## D.    RELEASE BY THE FEDERAL DEPOSIT INSURANCE CORPORATION

On and effective as of the Effective Date, the FDIC in its capacity as Receiver of Colonial Bank and its subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any other person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively (collectively, the "FDIC Releasors"), shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the Debtor, the Debtor's Estate, the Debtor's current directors, officers, employees and professionals, the Creditors' Committee, and the Creditors' Committee's professionals (collectively, the "Debtor Releasees") from any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which the FDIC Releasors or any of them, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Debtor Releasee (i) that are released or deemed to be released pursuant to the Plan, (ii) any and all Claims that arise in, relate to or have been or could have been asserted in the Chapter 11 Case, the FDIC Stipulation, the Actions, the Plan and the negotiations and compromises set forth in the FDIC Settlement Agreement and the Plan, or otherwise are based upon, related to, or arise out of or in connection with any of the Debtor's assets or any assets to be received by the Debtor as provided in the FDIC Settlement Agreement, or otherwise are based upon, related to, or arise out of or in connection with the Actions or any Claim, act, fact, transaction, occurrence, statement or omission in connection with, or alleged or that could have been alleged in the Actions, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred by the FDIC Releasors arising directly or indirectly from or otherwise relating to the Actions (collectively, the "Debtor Released Claims").  Notwithstanding anything contained in this Article 10.D or elsewhere to the contrary, (i) the foregoing is not intended to release, nor shall it have the effect of releasing, (a) the Debtor Releasees from the performance of their obligations in accordance with the FDIC Settlement Agreement, (b) any Claims against any former (*i.e.*, not current) officers, directors, employees, agents, fiduciaries, subsidiaries, accountants, auditors, attorneys, appraisers, joint tortfeasors, or contractors of TBW, including without limitation Lee Farkas, Desiree Brown, Paul Allen, Delton DeArmas, or their insurers, based upon alleged conduct that caused the damages set forth in the FDIC Proof of Claim, (c) any Claims against Bank of America, N.A., and Bank

of America, N.A., as successor by merger to LaSalle Bank, N.A. and LaSalle Global Trust Services, Ocala Funding, LLC, any Person to which TBW or any of its employees, officers, directors, or subsidiaries transferred any asset or interest in any asset, or their insurers, (d) any Claims or prospective Claims which may be asserted by an insurer of Colonial Bank, including without limitation Federal Insurance Company, by way of subrogation or assignment pursuant to any insurance policy or financial institution bond, including those Claims arising out of conduct described in the Proof of Loss submitted to Federal Insurance Company on February 1, 2010 or (e) any Claims described in Section 1.3(b)(i) of the FDIC Settlement Agreement.  Further, notwithstanding anything contained in this Article 10.D or elsewhere to the contrary, (ii) each FDIC Releasor shall retain the right to assert any and all Debtor Released Claims by way of setoff, contribution, contributory or comparative fault or in any other defensive manner in the event that such FDIC Releasor is sued on any Debtor Released Claim by a Debtor Releasee or any other Person (but solely as a defense against the Claims of such Person and not for purposes of obtaining an affirmative recovery for the benefit of the FDIC Releasor) and such Debtor Released Claim shall be determined in connection with any such litigation as if the provisions of this Article 10.D were not effective.

E.    **RELEASE BY PLAN RELEASING PARTIES OF REMIC TRUST RELEASED PARTIES, AND RELATED INJUNCTION**

1.    When a REMIC Settlement Agreement becomes effective, then with respect to the corresponding REMIC Securitization, the Debtor, the Debtor's Estate, all the Debtor's Creditors, each of their respective subsidiaries and Affiliates and the predecessors, successors and assigns of any of them and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively, and (b) the Creditors' Committee (collectively, the "**Plan Releasing Parties**") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Wells Fargo, the REMIC Trustee, any REMIC Insurer, the past, present and future REMIC Certificateholders, and the REMIC Trust, their respective past or present parent entities, subsidiaries, affiliates, agents, directors, officers, employees, professionals and the predecessors, successors and assigns of any of these (collectively, the "**REMIC Trust Released Parties**") from any and all Claims, demands, rights, obligations, liabilities, promises, agreements, damages, actions, suits, losses, expenses (including attorney's fees) or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, now accrued or which may hereafter accrue, whether asserted or unasserted (each a "**REMIC Trust Released Claim**" and collectively, the "**REMIC Trust Released Claims**"), which the Plan Releasing Parties or any of them have or may have, or claim to have, now or in the future, against any REMIC Trust Released Party based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the effective date of the REMIC Settlement Agreement that (i) relate to or arise  from or in connection with the Debtor's rights to fees incurred or reimbursement of advances made by the Debtor in connection with the REMIC Trust, in its role as servicer or otherwise, or the termination or attempted termination of the Debtor as servicer by Wells Fargo, or for interest on such fees or advances; (ii) relate to or arise out of the Debtor's failure to

perform any of its undertakings, obligations, covenants, representations, warranties, and agreements under the REMIC Servicing Agreement, or to third parties; (iii) relate to or arise under §§ 547 or 548 of the Bankruptcy Code or any other avoiding powers under the Bankruptcy Code or similar federal or state laws which arise out of or are related to any obligations or transfers made to, from, or in connection with the REMIC Trust; (iv) relate to or arise under any other federal or state laws (including common law claims or equitable remedies) which arise out of or are related to any obligations or transfers made to, from, or in connection with the REMIC Trust; or (v) were asserted or could have been asserted by any Plan Releasing Party in or in connection with the Chapter 11 Cases, the REMIC Trust Stipulation (or were reserved in the REMIC Trust Stipulation), the Plan or during the negotiations that preceded the compromises set forth in the REMIC Settlement Agreement[1] (any of the foregoing, individually, a "**Debtor Released REMIC Claim**", or collectively, the "**Debtor Released REMIC Claims**"); and all Plan Releasing Parties will be permanently enjoined, except as expressly contemplated by Article 10.E.2 hereto, from taking any of the following actions against any REMIC Trust Released Party or any property of a REMIC Trust Released Party on account of any Debtor Released REMIC Claims:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any Debtor Released REMIC Claim; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order with respect to any Debtor Released REMIC Claim; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien with respect to any Debtor Released REMIC Claim; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a REMIC Trust Released Party with respect to any Debtor Released REMIC Claim; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the REMIC Settlement Agreement.

2. The Release is not intended to release, nor shall it have the effect of releasing, Wells Fargo, the REMIC Trustee or any REMIC Insurer from the performance of its obligations in accordance with the REMIC Settlement Agreement.

F.    **RELEASE BY REMIC CERTIFICATEHOLDERS OF REMIC CERTIFICATEHOLDER RELEASEES, AND RELATED INJUNCTION**

When a REMIC Settlement Agreement becomes effective, then with respect to the corresponding REMIC Securitization, the past, present and future REMIC Certificateholders of the REMIC Trust, each of their respective subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively (collectively, the "**REMIC Releasing Certificateholders**") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Wells Fargo, the REMIC Trustee, any REMIC Insurer, and the REMIC Trust, their respective past or present parent entities, subsidiaries, affiliates, agents, directors, officers, employees, professionals and the predecessors,

---

[1] This subsection (v) releases Claims only to the extent they arise out of or are related to a REMIC Trust.

successors and assigns of any of them (each, a "<u>REMIC Certificateholder Releasee</u>"), from any and all Claims which the REMIC Releasing Certificateholders or any of them have or may have, or claim to have, now or in the future, against any Certificateholder Releasee based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the effective date of the REMIC Settlement Agreement, that relate to the negotiations and compromises set forth in the REMIC Settlement Agreement; and all REMIC Releasing Certificateholders will be permanently enjoined from taking any of the following actions against any REMIC Certificateholder Releasee or any property of a REMIC Certificateholder Releasee on account of or with respect to any such REMIC Claims released hereunder: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a REMIC Certificateholder Releasee; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the REMIC Settlement Agreement.

G.    **RELEASE BY REMIC TRUST RELEASING PARTIES OF PLAN PROPONENT RELEASED PARTIES, AND RELATED INJUNCTION**

1.    When a REMIC Settlement Agreement becomes effective, then, with respect to the corresponding REMIC Securitization, Wells Fargo, the REMIC Trustee, any REMIC Insurer, the REMIC Trust, each of the past, present and future REMIC Certificateholders, each of their respective subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any other person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively (collectively, the "<u>REMIC Trust Releasing Parties</u>") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the Debtor, the Debtor's Estate, the Debtor's current directors, officers, employees, agents and professionals, the Creditors' Committee and the Creditors' Committee's professionals (collectively, the "<u>Plan Proponent Released Parties</u>") from any and all Claims which the Trust Releasing Parties or any of them have or may have, or claim to have, now or in the future, against any Plan Proponent Released Party based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the effective date of the REMIC Settlement Agreement, that relate to or arise out of the REMIC Trust, the REMIC Servicing Agreement or the REMIC Pooling Agreement, specifically including but not limited to (i) any post-petition Claims relating thereto, and (ii) the REMIC Damage Claims (individually, a "<u>REMIC Trust Released Claim</u>" and collectively, the "<u>REMIC Trust Released Claims</u>"); and all REMIC Trust Releasing Parties will be permanently enjoined, except as expressly contemplated by Article 10.G.2 hereto from taking any of the following actions against any Plan Proponent Released Party or any property of a Plan Proponent Released Party on account of such released REMIC Trust Released Claims: (i)

commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any REMIC Trust Released Claim; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order with respect to any REMIC Trust Released Claim; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien with respect to any REMIC Trust Released Claim; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Plan Proponent Released Party with respect to any REMIC Trust Released Claim; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the REMIC Settlement Agreement.

2.      This release is not intended to release, nor shall it have the effect of releasing, the Debtor or the Creditors' Committee from the performance of their obligations pursuant to, or in accordance with, the REMIC Settlement Agreement. Also, this release is not intended to release, nor shall it have the effect of releasing, the REMIC Initial Purchaser, the REMIC Depositor, or any of their respective past or present parent entities, subsidiaries, affiliates, agents, underwriters, directors, officers, employees, professionals and the predecessors, successors and assigns of any of them and any other Person that might be liable through any of the foregoing, whether directly or derivatively (the "<u>REMIC Transferor Parties</u>"), from any Claims that the REMIC Trust Releasing Parties or any of them have or may have, or claim to have, now or in the future, in their individual or representative capacities or as assignee or subrogee, against the REMIC Transferor Parties either at law, in equity, pursuant to contract, whether arising under and in connection with the REMIC Pooling Agreement, the REMIC Servicing Agreement or otherwise.

## H.    EXCULPATIONS AND RELEASES, AND RELATED INJUNCTIONS--<br>RELEASE OF AND BY FREDDIE MAC AND RELATED PARTIES

1.      <u>Release of Freddie Mac and Related Parties</u>.  Upon the Freddie Mac Effective Date and subject to Article 10.H.3 below, the Debtor and the Debtor's Estate, on behalf of themselves, each of their respective subsidiaries and affiliates (except as provided in Article 10.H.3 below with respect to Ocala Funding) and their respective predecessors, successors and assigns, and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively, and the Creditors' Committee (collectively the "<u>Estate Releasors (Freddie Mac)</u>")) irrevocably and unconditionally, fully, finally, and forever waive, release, acquit and discharge Freddie Mac, its current and former subsidiaries, affiliates, directors, officers, employees, conservator, liquidator, receiver, trustee, professionals and the predecessors, successors and assigns of any of these (collectively the "<u>Freddie Mac Releasees</u>") from any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which the Estate Releasors (Freddie Mac), or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any of the Freddie Mac Releasees that: (i) arise in, relate to or have been or could have been asserted in the Chapter 11 Case or otherwise are based upon,

related to, or arise out of or in connection with any of the Debtor's Assets or any Assets to be received by the Debtor as provided herein; (ii) concern any and all rights, Claims or interests that TBW has or may have had in the MSRs; or, (iii) are based upon, related to, or arise out of or in connection with any Claim, act, fact, transaction, occurrence, statement or omission in connection with, or alleged or that could have been alleged in connection with the relationship between Freddie Mac and TBW, including without limitation, the Debtor's Claims and any other such Claim, demand, right, liability, or Cause of Action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred by the Estate Releasors (Freddie Mac).

2.      **Release by Freddie Mac of the Estate Releasees (Freddie Mac)** .  Upon the Freddie Mac Effective Date and subject to Article 10.H.3 below, Freddie Mac, on behalf of itself, its subsidiaries and affiliates, its predecessors, successors and assigns, and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing (other than the Federal Housing and Finance Agency, which has provided a separate release to the Estate Releasees(Freddie Mac) as of the Effective Date), whether directly or derivatively, irrevocably and unconditionally, fully, finally, and forever waives, releases, acquits and discharges the Debtor, the Debtor's Estate, the Debtor's current directors, officers, employees and professionals, the Debtor's subsidiaries and affiliates (except as provided in Article 10.H.3 below with respect to Ocala Funding, LLC), the Creditors' Committee and its professionals (collectively, the "Estate Releasees (Freddie Mac)") from any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which Freddie Mac, or anyone claiming through it, on its behalf or for its benefit, has or may have or claim to have, now or in the future, against any Estate Releasee (Freddie Mac) that: (i) are released or deemed to be released pursuant to this Plan; (ii) arise in, relate to or have been or could have been asserted in the Chapter 11 Cases or otherwise are based upon, related to, or arise out of or in connection with any of the Debtor's Assets or any Assets to be received by the Debtor as provided in the Freddie Mac Settlement Agreement; or, (iii) are based upon, related to, or arise out of or in connection with any Claim, act, fact, transaction, occurrence, statement or omission in connection with, or alleged or that could have been alleged in connection with the relationship between Freddie Mac and TBW, including without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred by Freddie Mac.

3.      Notwithstanding anything to the contrary:

(a)      The releases set forth in Article 10.H.1 and 2 above are not intended to release, nor shall they have the effect of releasing, Freddie Mac, the Estates, or the Creditors' Committee from the performance of their obligations in accordance with the Freddie Mac Settlement Agreement or any other rights, Claims or defenses expressly reserved in this Agreement.

(b)      Nothing herein is intended to release any Claims that Freddie Mac, the Estates or the Creditors' Committee may have against any former (i.e., not current) officers, directors, employees, agents, fiduciaries, subsidiaries,

accountants, auditors, attorneys, appraisers, joint tortfeasors, or contractors of TBW who or which are not a party to the Freddie Mac Settlement Agreement, including without limitation Lee Farkas, Desiree Brown, Paul Allen, Delton DeArmas, Raymond Bowman or their insurers.

(c)     Nothing herein shall be construed to limit, waive or release any Claim that Freddie Mac, the Estates or the Creditors' Committee has or may have under the fidelity bonds or as to any recovery under the fidelity bonds that are currently the subject of litigation in the Lloyd's Adversary Proceeding or any other insurance coverage or indemnities that might apply.  The parties to the Freddie Mac Settlement Agreement, as appropriate, reserve any and all of their rights, Claims and title to any recovery under the fidelity bonds, including disputes concerning any such recovery among the Settling Parties or the Plan Trust (as defined in the Amended Plan), and any other insurance coverage or indemnities that might apply.  Nothing herein shall be construed to limit, waive or release any claim that Freddie Mac may have to any recovery under the Fidelity Bonds by the Debtor or the Plan Trust.

(d)     Nothing herein shall be construed to limit, waive or release any Claims, demands, rights, liabilities or causes of action that Ocala Funding may have against Freddie Mac, except for the Debtor's Claims (as defined in the Freddie Mac Settlement Agreement) based on tax and insurance servicing advances for the benefit of Freddie Mac, the Debtor's Claims based on unpaid servicing fees owed to TBW, and the Debtor's Claims based on repurchase payments made to Freddie Mac.  Nothing in this Plan or in any other provision of the Freddie Mac Settlement Agreement is intended or should be construed to limit, waive or release any Claims, demands, rights, liabilities or causes of action that Ocala Funding or its creditors (except for the Debtor) may have arising from or relating to transfers of money from Ocala Funding to custodial accounts maintained at Colonial Bank on behalf of Freddie Mac.

(e)     Nothing herein shall be construed to limit, waive or release any Claim or defense that Freddie Mac may have against Ocala Funding, its officers, directors, employees, agents, fiduciaries, accountants, auditors, attorneys, appraisers, joint tortfeasors, creditors, or contractors; provided, however, that nothing in this subparagraph (e) shall be construed to limit the release of Debtor and the Debtor's Estate set forth in Article H.2 of the Plan, but further provided that the release of Debtor and the Debtor's Estate in Article H2. of the Plan shall not preclude any defense that Freddie Mac may assert in response to any of Ocala Funding's or any other non-debtor third-party claims, demands, rights, liabilities or causes of action including without limitation any defenses that may pertain to the Debtor or the Debtor's Estate.

(f)     Nothing herein or in any other provision of the Freddie Mac Settlement Agreement is intended or should be construed to limit, waive or release any Claims, demands, rights, liabilities or causes of action that Freddie

**Mac, Navigant, and Milestone Advisors, LLC may have under the brokerage agreements described in the Freddie Mac Settlement Agreement.**

(g)     **Except as set forth in the Freddie Mac Settlement Agreement, nothing in the Plan shall affect, limit or otherwise prejudice Federal Housing Finance Agency's rights, powers and privileges under the Housing and Economic Recovery Act of 2008 as Conservator of Freddie Mac.**

I.     **RELEASE BY PLAN PROPONENT RELEASING PARTIES (BAYVIEW) OF BAYVIEW TRUST RELEASED PARTIES**

(a)     **Subject to the limitations set forth in the Bayview Settlement Agreement, on and effective as of the Bayview Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, (a) the Debtor, the Debtor's Estate, any plan trustee appointed in respect of a confirmed plan of liquidation of the Debtor, all the Debtor's creditors, each of their respective subsidiaries (including, for the avoidance of doubt, Magnolia Funding, Magnolia Funding II and TBW Funding II), and affiliates and the predecessors, successors and assigns of any of them and any other person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively, and (b) the Creditors' Committee (collectively, the "Plan Proponent Releasing Parties (Bayview)") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Bayview, Bayview Servicing, M&T, the Bayview Trustee, the past, present and future Bayview Certificateholders and the Bayview Trusts, their respective past or present parent entities, subsidiaries, affiliates, agents, directors, officers, employees, professionals and the predecessors, successors and assigns of any of them (collectively, the "Bayview Trust Released Parties") from any and all claims, demands, rights, obligations, liabilities, promises, agreements, damages, actions, suits, losses, expenses (including attorney's fees) or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, now accrued or which may hereafter accrue, whether asserted or unasserted (each referred to as a "Bayview Claim" and collectively, the "Bayview Claims"), which the Plan Proponent Releasing Parties (Bayview) or any of them have or may have, or claim to have, now or in the future, against any Bayview Trust Released Party based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the date hereof that (i) relate to or arise from or in connection with TBW's rights to fees incurred or reimbursement of advances made by TBW in connection with the Bayview Trusts, in its role as servicer or otherwise; (ii) relate to or arise out of TBW's failure to perform any of its undertakings, obligations, covenants, representations, warranties, and agreements under the Bayview Servicing Agreements and/or Bayview Sale Agreements, or to third parties; (iii) relate to or arise under 11 U.S.C. § § 542, 544, 547, 548, 549, 550 or 553 or any**

- 55 -

similar state laws, which arise out of or are related to any obligations or transfers made to, from, or in connection with the Bayview Trusts; (iv) relate to or arise under any other federal or state laws (including common law claims or equitable remedies) which arise out of or are related to any obligations or transfers made to, from, or in connection with the Bayview Trusts; or (v) were asserted or could have been asserted with respect to the Bayview Trusts, the Bayview Securitizations or the Bayview Securitization Documents by any Plan Proponent Releasing Party (Bayview) in or in connection with the Debtor's Chapter 11 Case, the Plan or during the negotiations that preceded the compromises set forth in the Bayview Settlement Agreement (any of the foregoing, individually, a "<u>Plan Proponent Released Claim (Bayview)</u>", or collectively, the "<u>Plan Proponent Released Claims (Bayview)</u>"); and all Plan Proponent Releasing Parties (Bayview) will be permanently enjoined, except as expressly contemplated by clause (b) of this Article 10.I, from taking any of the following actions against any Bayview Trust Released Party or any property of a Bayview Trust Released Party on account of Plan Proponent Released Claims (Bayview): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any Plan Proponent Released Claim (Bayview); (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order with respect to any Plan Proponent Released Claim (Bayview); (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien with respect to any Plan Proponent Released Claim (Bayview); (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Bayview Trust Released Party with respect to any Plan Proponent Released Claim (Bayview); and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Bayview Settlement Agreement.

(b)     Notwithstanding anything contained in clause (a) of this Article 10.I, the foregoing is not intended to release, nor shall it have the effect of releasing, any Bayview Trust Party from (i) the performance of their obligations in accordance with the Bayview Settlement Agreement, and (ii) any obligations with respect to, or which otherwise arises out of or relates to, the Bayview B Certificates from and after the Bayview Effective Date.

## J.    RELEASE BY BAYVIEW CERTIFICATEHOLDERS OF BAYVIEW CERTIFICATEHOLDER RELEASEES

(a)     On and effective as of the Bayview Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, the past, present and future Bayview Certificateholders (including, for the avoidance of doubt, Magnolia Funding, TBW Funding II, and to the extent it is a Bayview Certificate holder, Magnolia Funding II), each of their respective subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any other person that

claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively (collectively, the "<u>Bayview Releasing Certificateholders</u>") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Bayview, Bayview Servicing, M&T, the Bayview Trustee, and the Bayview Trusts, their respective past or present parent entities, subsidiaries, affiliates, agents, directors, officers, employees, professionals and the predecessors, successors and assigns of any of them (each, a "<u>Bayview Certificateholder Releasee</u>"), from any and all claims which the Bayview Releasing Certificateholders or any of them have or may have, or claim to have, now or in the future, against any Bayview Certificateholder Releasee based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the date hereof, that relate to the negotiations and compromises set forth in the Bayview Settlement Agreement; and all Bayview Releasing Certificateholders will be permanently enjoined from taking any of the following actions against any Bayview Certificateholder Releasee or any property of a Bayview Certificateholder Releasee on account of or with respect to any such Bayview Claims released hereunder: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Bayview Certificateholder Releasee; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Bayview Settlement Agreement.

(b)    Notwithstanding anything contained in clause (a) of this Article 10.J, the foregoing is not intended to release, nor shall it have the effect of releasing, any Bayview Trust Party from (i) the performance of their obligations in accordance with the Bayview Settlement Agreement, and (ii) any obligations with respect to, or which otherwise arises out of or relates to, the Bayview B Certificates from and after the Bayview Effective Date of the Bayview Settlement Agreement.

K.    **RELEASE BY BAYVIEW TRUST RELEASING PARTIES OF PLAN PROPONENT RELEASED PARTIES (BAYVIEW)**

(a)    On and effective as of the Bayview Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, Bayview, Bayview Servicing, M&T, the Bayview Trustee, the Bayview Trusts, each of the past, present and future Bayview Certificateholders, each of their respective subsidiaries and affiliates and the predecessors, successors and assigns of any of them and any

other person that claims or might claim through, on behalf of or for the benefit of any of the foregoing, whether directly or derivatively (collectively, the "Bayview Trust Releasing Parties") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the Debtor, Magnolia Funding, Magnolia Funding II, TBW Funding II, the Debtor's Estate, the Debtor's, Magnolia Funding's, Magnolia Funding II's, and TBW Funding II's current subsidiaries, directors, officers, employees, agents and professionals, the Creditors' Committee and the Creditors' Committee's professionals (collectively, the "Plan Proponent Released Parties (Bayview)") from any and all claims which the Bayview Trust Releasing Parties or any of them have or may have, or claim to have, now or in the future, against any Plan Proponent Released Party (Bayview) based in whole or in part on any facts, conduct, activities, transactions, events, or occurrences, known or unknown, which have or allegedly have existed, occurred, happened, arisen, or transpired from the beginning of time to the date hereof, that relate to or arise out of the Bayview Trusts or the Bayview Securitization Documents, specifically including but not limited to (i) any post-petition claims relating thereto, and (ii) the Bayview Damage Claims (individually, a "Bayview Trust Released Claim" and collectively, the "Bayview Trust Released Claims"); and all Bayview Trust Releasing Parties will be permanently enjoined except as expressly contemplated by clause (b) of this Article 10.K from taking any of the following actions against any Plan Proponent Released Party (Bayview) or any property of a Plan Proponent Released Party (Bayview) on account of such released Bayview Trust Released Claims: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to any Bayview Trust Released Claim; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order with respect to any Bayview Trust Released Claim; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien with respect to any Bayview Trust Released Claim; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Plan Proponent Released Party (Bayview) with respect to any Bayview Trust Released Claim; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Bayview Settlement Agreement.

(b)     Notwithstanding anything contained in this Article 10.K, (i) the foregoing is not intended to release, nor shall it have the effect of releasing, the Debtor or the Creditors' Committee from the performance of their obligations pursuant to or in accordance with the Bayview Settlement Agreement, and (ii) with respect to Claims represented by the Bayview Proofs of Claim assigned to TBW Class 9 pursuant to the Bayview Settlement Agreement and as set forth in Article 6.E.6.(c)(v) above, the release set forth in Article 10.K shall become effective immediately after such assignment is made to TBW Class 9.

(c)    Notwithstanding anything herein to the contrary, so long as it does not result in any costs to the Bayview Trust Parties, the Debtor reserves the right to review, assess and challenge each and every Bayview Proof of Claim and any damage element contained therein; *provided, however,* that the Bayview Trust Parties shall have no obligations (whether financial or otherwise) and shall incur no costs in connection with any such review, assessment, or challenge. TBW, on behalf of itself and any party acting on behalf of its Estate (including, without limitation, the Plan Trustee appointed in connection with the Plan), and each of Magnolia Funding, Magnolia Funding II, TBW Funding II, and the Creditors' Committee, on behalf of itself and any entity acting on its behalf, irrevocably waives any and all rights of discovery against any of the Bayview Trust Parties arising from or related to any such review, assessment or challenge, whether under Bankruptcy Rule 2004(a), 9014(c), non-bankruptcy law, or otherwise.  For the avoidance of doubt, such waiver shall be effective and binding upon any agents, successors, transferees, or assigns of any of the foregoing entities.  In the event that, notwithstanding the foregoing waiver, the Bayview Trust Parties, under compulsion of court order, responds or otherwise participates in any discovery conducted by TBW, Magnolia Funding, Magnolia Funding II, TBW Funding II or the Creditors' Committee in respect of the Bayview Proofs of Claim or any objections thereto, then TBW shall, within five (5) business days of each demand, reimburse the Bayview Trust Parties for any out-of-pocket expenses and charges, including fees and costs of counsel, incurred in connection with such discovery.

## L.    LIMITATION ON RELEASES

1.    Except as provided in Articles 10.A, 10.B, 10.C, 10.E, 10.H.1, and 10.I above, no provision of this Plan shall be deemed to release any Claims (other than the Chapter 11 Released Claims) or Causes of Action that the Plan Trust or the Estates may have against any Person for any act, omission, or failure to act that occurred prior to the Petition Date .

2.    Notwithstanding any provision herein to the contrary, no provision of the Plan or the Confirmation Order shall (i) discharge or release the Debtor or any other Person from any right, Claim, cause of action, or power or interest held or assertable by the United States Securities and Exchange Commission or (ii) enjoin, impair or delay the United States Securities and Exchange Commission from commencing or continuing any Claims, causes of action, proceedings or investigations against the Debtor or any other Person in any non-bankruptcy forum.

## ARTICLE 11.

### EFFECT OF CONFIRMATION AND INJUNCTION

**A.    PLAN INJUNCTION**

**Except as otherwise expressly provided in this Plan, the documents executed pursuant to this Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including all Governmental Authorities) shall be permanently enjoined from, on account of such Claims or Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, any Chapter 11 Protected Party, any Plan Trust Exculpated Party, the Plan Trust, or any Plan Trust Entity, or any of their respective properties: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, executing, collecting, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (v) enjoining or invalidating any foreclosure or other conveyance of a Plan Trust Asset or Asset of any Debtor; and (vi) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of this Plan. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. This injunction shall not enjoin or prohibit (i) the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of this Plan or (ii) any party at interest from seeking the interpretation or enforcement of any of the obligations of the Debtors, the Plan Trustee, or the Plan Trust under this Plan. The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any Claim or cause of action against any Debtor, any Estate, any Chapter 11 Protected Party, any Plan Trust Exculpated Party, the Plan Trust, or any Plan Trust Entity, or any of their respective properties, based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under this Plan have been made or are not yet due.**

**B.    CONTINUATION OF EXISTING INJUNCTIONS AND STAYS**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under §§ 105 or 362 of the Bankruptcy Code, this Plan, by Orders of the Bankruptcy Court, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Plan Trust.

## C.    BINDING EFFECT OF PLAN

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, subject to the occurrence of the Effective Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under this Plan, whether or not such Holder has accepted this Plan and whether or not the Holder has Filed a Claim. The rights, benefits and obligations of any Person named or referred to in this Plan, whose actions may be required to effectuate the terms of this Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

## D.    NO EFFECT ON OBJECTIONS TO FEE APPLICATIONS

Except as provided in Article 3.A.3(ii) hereof, nothing contained in this Plan shall affect the rights of parties in interest to object to Fee Applications or the power of the Bankruptcy Court to issue Orders with respect to Fee Applications.

## ARTICLE 12.

## CONDITIONS PRECEDENT

## A.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

This Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

**1.    Approval of Disclosure Statement.** The Bankruptcy Court shall have approved a disclosure statement pertaining to this Plan in form and substance acceptable to the Plan Proponents.

**2.    Approval of Plan Compromises.** The compromises and settlements contained in this Plan shall be approved without material modification by a Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of this Plan.

**3.    Form of Confirmation Order.** The Confirmation Order shall be in form and substance acceptable to the Plan Proponents and, as to Freddie Mac, consistent with the provisions of Section 5.1(b) of the Freddie Mac Settlement Agreement.

**4.    Entry of Confirmation Order.** (a) The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a Final Order, (b) the Confirmation Date shall have occurred, and (c) no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

5.      **Plan Trust.**  The Plan Trust shall have been formed, and all formation documents for the Plan Trust shall have been properly executed and Filed as required by this Plan and applicable law.

6.      **Plan Trustee and Plan Advisory Committee.**  The appointment of the Plan Trustee and the formation of the Plan Advisory Committee shall have been approved in the Confirmation Order.

7.      **Payment by FDIC to Freddie Mac.**  The FDIC, as receiver for Colonial Bank, shall have paid Freddie Mac $150,257,776 plus accrued interest, if any, as set forth in the Freddie Mac Settlement Agreement.

## B.      REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION OF PLAN

If, after the Confirmation Order is entered, each of the conditions to effectiveness cannot be satisfied or has not been waived by the Plan Proponents, then upon motion by the Plan Proponents, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an Order granting the relief requested in such motion.  As used in the preceding sentence, a condition to effectiveness may be waived only by a writing executed by the Plan Proponents.  If the Confirmation Order is vacated pursuant to this Article 12.B, this Plan shall be null and void in all respects, and nothing contained in this Plan, the Disclosure Statement, or any pleadings Filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors, (iii) prejudice in any manner the rights of the Debtors or the Creditors' Committee in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

## ARTICLE 13.

## ADMINISTRATIVE PROVISIONS

## A.      RETENTION OF JURISDICTION

Pursuant to §§ 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, on and after the Confirmation Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by 28 U.S.C. §§ 1334 and 157, including jurisdiction for the following purposes: (i) to hear and determine the Chapter 11 Cases and all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Cases, including, without limitation, matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan, the Plan Trust Agreement or the Confirmation Order, and (ii) to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Cases.  Without limiting the generality of the

foregoing, the Bankruptcy Court's post-Confirmation Date jurisdiction shall include jurisdiction:

1.        over all Causes of Action (including, without limitation, Avoidance Actions and Designated Causes of Action) and proceedings to recover Assets of the Estates or of the Plan Trust, wherever located;

2.        over motions to assume, reject, or assume and assign executory contracts or unexpired leases, and the allowance or disallowance of any Claims resulting therefrom;

3.        over disputes concerning the ownership of Claims or Interests;

4.        over disputes concerning any Distribution under this Plan;

5.        over objections to Claims, motions to allow late-Filed Claims, and motions to estimate Claims;

6.        over proceedings to determine the validity, priority or extent of any Lien asserted against property of the Debtors, the Estates, or the Plan Trust, or property abandoned or transferred by the Debtors, the Estates, or the Plan Trustee;

7.        over proceedings to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims, if any Allowed Unsecured Claims are paid in full pursuant to the terms of this Plan;

8.        over matters related to the assets of the Estates, the Plan Trust, or any Plan Trust Entity, including, without limitation, liquidation of Plan Trust Assets; provided, however, that subject to the terms of the Plan Trust Agreement and any requisite approval of the Plan Advisory Committee, the Plan Trustee shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or other disposition of Plan Trust Assets; and provided, further, that the Plan Trustee may seek Orders of the Bankruptcy Court approving the sale, transfer, assignment or other disposition of Plan Trust Assets as appropriate to facilitate such transactions;

9.        over matters relating to the subordination of Claims or Interests;

10.        to enter and implement such Orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

11.        to consider and approve modifications of or amendments to this Plan, to cure any defects or omissions, or to reconcile any inconsistencies in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

12.        to issue Orders in aid of execution, implementation, or consummation of this Plan;

**13.**     over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith;

**14.**     over requests for allowance or payment of Claims entitled to priority under § 507(a)(2) of the Bankruptcy Code and any objections thereto;

**15.**     over all Fee Applications;

**16.**     over matters concerning state, local or federal taxes in accordance with §§ 346, 505, and 1146 of the Bankruptcy Code;

**17.**     over conflicts and disputes between the Plan Trustee, the Plan Trust, the Plan Advisory Committee, and Holders of Claims or Interests;

**18.**     over disputes concerning the existence, nature or scope of the liability of any Person entitled to an injunction under Article 11.A. above, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

**19.**     over matters concerning the Debtors' insurance policies, if any, including jurisdiction to re-impose the automatic stay or its applicable equivalent provided in this Plan;

**20.**     to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with this Plan, the Debtors and the Estates or their respective property, the Creditors' Committee, the Plan Trust and any Plan Trust Entity or their respective property, the Plan Trustee, the Plan Advisory Committee, any Professional, or the Confirmation Order;

**21.**     to enter a Final Decree closing the Chapter 11 Cases;

**22.**     to enforce all Orders previously entered by the Bankruptcy Court; and

**23.**     over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan.

## B.     GENERAL AUTHORITY

The Debtors, if before the Effective Date, and the Plan Trustee, if on or after the Effective Date, shall execute such documents, and take such other actions, as are necessary to effectuate the transactions provided for in this Plan.

## C.     FINAL ORDER

Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Plan Proponents (if prior to the Effective Date) or

the Plan Trustee (if after the Effective Date) upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

## D.    AMENDMENTS AND MODIFICATIONS

The Plan Proponents may modify this Plan at any time prior to the Confirmation Hearing in accordance with § 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in § 1101(2) of the Bankruptcy Code) of this Plan with respect to any Debtor, the Plan Proponents or the proposed Plan Trustee, as appropriate, may modify this Plan in accordance with § 1127(b) of the Bankruptcy Code by Filing a motion on notice to only the Persons listed on the service list established by the Bankruptcy Court pursuant to Bankruptcy Rule 2002, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.

## E.    PAYMENT DATE

Whenever any Distribution or payment to be made under this Plan shall be due on a day other than a Business Day, such Distribution or payment shall instead be made, without interest, on the immediately following Business Day.

## F.    WITHHOLDING AND REPORTING REQUIREMENTS

In connection with this Plan and all instruments issued in connection therewith and Distributions thereon, the Debtors (if before the Effective Date) or the Plan Trustee (if on or after the Effective Date) shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority.

## G.    NO WAIVER

The failure of the Plan Proponents or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtors' or the Plan Trust's right to object to or examine such Claim, in whole or in part.

## H.    TAX EXEMPTION

Pursuant to § 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the execution, delivery or recording of an instrument of transfer on or after the Confirmation Date shall be deemed to be made pursuant to and under this Plan, including, without limitation, any such acts by the Debtors, if before the Effective Date, and the Plan Trustee, if on or after the Effective Date (including, without limitation, any subsequent transfers of property by the Plan Trust or the Plan Trustee), and shall not be taxed under any law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental authority in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan,

be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

## I.    NON-SEVERABILITY

Except as specifically provided herein, the terms of this Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated, except by amendment of the Plan by the Plan Proponents.

## J.    REVOCATION

The Plan Proponents reserve the right to revoke and withdraw this Plan prior to the Confirmation Date in whole or in part as to any one or more of the Debtors.  Without limiting the foregoing, if the Plan Proponents withdraw this Plan as to either Debtor/REO Specialists or Debtor/HAM, then TBW and any remaining co-Debtor, with the consent of the Creditors' Committee, may proceed to seek confirmation of the Plan as to them.  If the Plan is revoked or withdrawn for all the Debtors, this Plan shall be null and void.  If the Plan is null and void as to any or all of the Debtors, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Creditors' Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, or any other Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors or the Creditors' Committee, including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

## K.    CONTROLLING DOCUMENTS

**1.**    In the event and to the extent that any provision of this Plan or the Plan Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or Plan Trust Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Plan Trust Agreement (including any amendments thereto), the Plan Trust Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Plan Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

**2.**    In the event and to the extent that any provision of this Plan or the FDIC Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or FDIC Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the FDIC Settlement Agreement, the FDIC Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the FDIC Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

**3.**    In the event and to the extent that any provision of this Plan or any REMIC Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the

provisions of this Plan or the REMIC Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the REMIC Settlement Agreement, the REMIC Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the REMIC Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

4.      In the event and to the extent that any provision of this Plan or the Freddie Mac Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or the Freddie Mac Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Freddie Mac Settlement Agreement, the Freddie Mac Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Freddie Mac Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

5.      In the event and to the extent that any provision of this Plan or the Sovereign Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or the Sovereign Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Sovereign Settlement Agreement, the Sovereign Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Sovereign Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

6.      In the event and to the extent that any provision of this Plan or the Natixis Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or the Natixis Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Natixis Settlement Agreement, the Natixis Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Natixis Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

7.      In the event and to the extent that any provision of this Plan or the Bayview Settlement Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan or the Bayview Settlement Agreement, as applicable, shall control and take precedence.  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Bayview Settlement Agreement, the Bayview Settlement Agreement shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of this Plan or the Bayview Settlement Agreement, the provisions of the Confirmation Order shall control and take precedence.

## L.    GOVERNING LAW

Except to the extent that a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically stated, the rights, duties, and obligations arising under this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and, with respect to the Debtors' corporate governance matters shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to conflicts of law principles.

## M.    NOTICES

Any notices to or requests of the Debtors, the Creditors' Committee or the Plan Trust by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

**If to the Debtors:**

**Stichter, Riedel, Blain & Prosser, P.A.**
110 East Madison Street
Suite 200
Tampa, FL  33602
Telephone:  (813) 229-0144
Attn:   Russell M. Blain
        Edward J. Peterson

-            and

**Troutman Sanders LLP**
600 Peachtree Street
Suite 5200
Atlanta, GA  30308
Telephone: (404) 885-3000
Attn:   Jeffrey W. Kelley
        J. David Dantzler, Jr.

**If to the Creditors' Committee:**

**Berger Singerman, P.A.**
200 S. Biscayne Boulevard
Suite 1000
Miami, FL  33131
Telephone:  (305) 714-4343
Attn:   Paul Steven Singerman

-                       and

350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301
Telephone:  (954) 627-9901
Attn:   James L. Berger

**If to the Plan Trust or the Plan Trustee:**

Neil F. Luria.
Suite 120, Millenia Park One
4901 Vineland Road
Orlando, FL 32811
Telephone:  (321) 710-0187

## N.    FILING OF ADDITIONAL DOCUMENTS

On or before "substantial consummation" (as such term is defined in § 1101(2) of the Bankruptcy Code) of this Plan, the Plan Proponents may File with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to further evidence the terms and conditions of this Plan.

## O.    DIRECTION TO A PARTY

From and after the Effective Date, the Plan Proponents or the Plan Trustee may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Plan.

## P.    SUCCESSORS AND ASSIGNS

The rights, benefits, duties, and obligations of any Person named or referred to in this Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

## Q.    FINAL DECREE

Once any of the Estates has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan Trust or another party, as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case of the applicable Debtor(s).

# ARTICLE 14.

## CONFIRMATION REQUEST

The Plan Proponents hereby request confirmation of this Plan as a Cramdown Plan with respect to any Impaired Class that does not accept this Plan or is deemed to have rejected this Plan.  If confirmation in the case of REO Specialists and Home America Mortgage or both is denied, confirmation is requested with respect to TBW and any Debtor as to which confirmation is not denied.

# ARTICLE 15.

## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019, the Debtors hereby request approval of all compromises and settlements included in this Plan.

Dated: June 22, 2011

[Signatures on following page]

Respectfully submitted,

**TAYLOR, BEAN & WHITAKER MORTGAGE
CORP.
REO SPECIALIST, LLC
HOME AMERICA MORTGAGE, INC.**

By: /s/ Neil F. Luria
     Neil F. Luria
     Chief Restructuring Officer

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS**

By: /s/ Sheryl L. Newman
     Sheryl L. Newman
     Chairperson

/s/ Jeffrey W. Kelley
Jeffrey W. Kelley (GA Bar No. 412296)
jeff.kelley@troutmansanders.com
J. David Dantzler, Jr. (GA Bar No. 205125)
david.dantzler@troutmansanders.com
**TROUTMAN SANDERS LLP**
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
Telephone No:404-885-3358
Facsimile No.:404-885-3995
**SPECIAL COUNSEL FOR THE DEBTOR AND DEBTOR IN
POSSESSION TAYLOR, BEAN & WHITAKER MORTGAGE
CORP.**


Russell M. Blain (FBN 236314)
rblain@srbp.com
Edward J. Peterson, III (FBN 014612)
epeterson@srbp.com
**STICHTER, RIEDEL, BLAIN & PROSSER, P.A.**
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone No.:      813-229-0144
Facsimile No.:813-229-1811
**COUNSEL FOR THE DEBTORS AND DEBTORS IN
POSSESSION**


Paul Steven Singerman (Fla. Bar No. 378860)
singerman@bergersingerman.com
Arthur J. Spector (Fla. Bar No. 620777)
aspector@bergersingerman.com
**BERGER SINGERMAN PA**
200 South Biscayne Boulevard
Suite 1000
Miami, Florida 33131
Telephone No.:      305-755-9500
Facsimile No.:305-714-4340
**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TAYLOR, BEAN & WHITAKER MORTGAGE
CORP.**

## DEFINITIONS ANNEX

The following terms used in the Joint Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors (defined below as the "Plan") and the accompanying Disclosure Statement (defined below as the "Disclosure Statement") shall have the meanings set forth below. Each term used in the Plan or the Disclosure Statement and not defined herein shall have the meaning given to such term in the Bankruptcy Code.

"**Accelerated Reimbursement Amount**" means the sum of $1,300,000, which Wells Fargo, in its capacity as master servicer and successor servicer, advanced to the Debtor on or about October 15, 2009 pursuant to the REMIC Trust Stipulation to assist the Debtor with the expenses of its Chapter 11 Case.

"**ACH**" means an automated clearing house transfer from a domestic bank.

"**Additional Trade Creditor Recovery**" means the amounts to be disbursed by the Plan Trustee to Holders of Allowed Trade Claims pursuant to Article 4.H.1(ii) through (v) of the Plan.

"**Administrative and Priority Claims Reserve**" means the reserve established in accordance with Article 7.B.2 of the Plan for the payment of Administrative Expense Claims, Priority Tax Claims, and Priority Claims, which reserve may be augmented by the Plan Trustee as set forth in the Plan and the Plan Trust Agreement.

"**Administrative Expense Claim**" means a Claim for costs and expenses of administration that is allowable and entitled to priority under §§ 503, 507(a)(2) and/or 507(b) of the Bankruptcy Code, including, without limitation, any post-petition tax claims, any actual and necessary expenses of preserving the Estate of any of the Debtors, any actual and necessary expenses of operating the business of any of the Debtors, all Professional Claims, and any fees or charges assessed against the Estate of any of the Debtors under 28 U.S.C. § 1930.

"**Administrative Expense Claim Bar Date**" means the date or dates fixed by the Bankruptcy Court as the last date for filing a request for payment of an Administrative Expense Claim (excluding any Professional Claim), as set forth in Article 3.A.2 of the Plan, that is not subject to any other Bar Date Orders or any other Order that establishes the last date for filing such Administrative Expense Claim. The Plan does not affect or extend any Administrative Expense Claim deadline established by any other Order and the earliest Administrative Expense Claim deadline applicable to any Administrative Expense Claim shall govern and control.

"**Administrative Expense Claim Objection Deadline**" shall mean ninety (90) days after the Administrative Expense Claim Bar Date, or as extended pursuant to Article 3.A.2(b) of the Plan.

"**Administrative Freeze**" means the freeze put on all of TBW's accounts on or about August 5, 2009, in which Colonial refused to honor checks, receive wire transfers, or permit disbursements.

"**Affiliate**" means any Person that is an "affiliate" of any of the Debtors within the meaning of § 101(2) of the Bankruptcy Code.

"**Allowed**" when used with respect to a Claim against a Debtor or property of a Debtor, means a Claim: (a) which has been listed on the Schedules of any of the Debtors as other than disputed, contingent or unliquidated and as to which no Proof of Claim or objection has been timely filed; (b) as to which a Proof of Claim has been timely filed, or deemed timely filed by Order of the Bankruptcy Court, and either (i) no objection thereto has been timely filed, or application to subordinate or otherwise limit recovery has been made or (ii) the Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court; (c) which has been allowed under the provisions of the Plan; (d) which is a Professional Claim for which a fee award amount has been approved by Final Order of the Bankruptcy Court; or (e) which is allowed pursuant to any stipulation of amount and nature of Claim executed by the Plan Trustee and Holder of the Claim on or after the Effective Date.  To the extent the term "Allowed" is used in the Plan with respect to a specified Class of Claims or an unclassified category of Claims (*i.e.*, "Allowed [Class designation/unclassified Claim category] Claim"), the resulting phrase shall mean an Allowed Claim of the specified Class or unclassified category of Claims.

"**Allowed Freddie Mac Claim**" has the meaning given to such term in the Freddie Mac Settlement Agreement.

"**AOT/Cole Taylor Facility**" means the mortgage loan participation facility in which Colonial purchased participation interests on behalf of and as agent for Cole Taylor Bank, and evidenced by the Mortgage Loan Participation Sale Agreement (AOT Program – Agency Securities) dated as of July 30, 2009 among TBW, as Seller, and Colonial and Cole Taylor Bank, as Purchasers, and Colonial, as Administrative Agent and Custodian.

"**AOT Documents**" means (i) the Mortgage Loan Participation Sale Agreement (AOT Program – Agency Securities) dated as of April 1, 2007 between TBW, as Seller, and Colonial, as Purchaser (used for take-out buyers and banks or private securities dealers) and (ii) the Mortgage Loan Participation Sale Agreement (AOT Program – Whole Loan Trades and Private Issue Securities) dated as of April 1, 2007 between TBW, as Seller, and Colonial, as Purchaser (used for take-out buyers and banks or private securities dealers), and all transaction documents related thereto.

"**AOT Facility**" means the financing facilities established under the AOT Documents, which was documented as a loan participation facility but in practice operated as a secured line of credit.

"**AOT Loans**" means the residential mortgage loans that are assigned to the AOT Facility and are listed on Exhibit F to the FDIC Settlement Agreement.

"**AOT REO**" means the REO related to the AOT Facility and listed on Exhibit J to the FDIC Settlement Agreement.

"**AOT Reserve**" means a $10 million reserve established under the FDIC Settlement Agreement to fund Corporate Advances, fees and costs related to the AOT Loans, as reduced from time to time to reflect reductions in the UPB on the AOT Loans.

"**AOT/USAmeriBank Facility**" means the mortgage loan participation facility in which Colonial purchased participation interests on behalf of and as agent for USAmeriBank, and evidenced by the Mortgage Loan Participation Sale Agreement (AOT Program – Agency Securities) dated as of June 30, 2009 among TBW, as Seller, and Colonial and USAmeriBank, as Purchasers, and Colonial, as Administrative Agent and Custodian.

"**Asset Reconciliation**" means that certain reconciliation performed by the Debtor in accordance with the terms of the FDIC Stipulation relating to competing claims of ownership with respect to certain mortgage loans, as more particularly described in the Reconciliation Report.

"**Assets**" means with respect to any Debtor, collectively, any and all property of such Debtor or its Estates, of every kind and character, wherever located, whether real or personal, tangible or intangible, and including, without limitation: (i) Cash (including, without limitation, the residual balance of any reserves established under the Plan), (ii) Causes of Action (including, without limitation Avoidance Actions and Designated Causes of Action), (iii) stock membership, partnership, or beneficial interests in such Debtor or any non-Debtor entity, (iv) mortgage loans and servicing rights, (v) mortgage-backed securities and any residual interest therein, or any securitization trust issuing such securities, and (vii) all files, books, and records relating to such Debtor's business, the Plan Trust, or the administration of the Plan, including without limitation, the product of any analysis or investigation by such Debtor or the Creditors Committee.  Unless the context otherwise requires, all references to Assets means the Assets of the Debtors, collectively.

"**Avoidance Action**" means all Claims and Causes of Action arising or brought under §§ 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

"**Ballot**" means a ballot for acceptance or rejection of the Plan for Holders of Impaired Claims entitled to vote to accept or reject the Plan.

"**Bank of America**" means Bank of America, N.A., either in its individual capacity or in its capacity as trustee, as the context shall require.

"**Bank of America Securities**" means Bank of America Securities, L.L.C.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division.

"**Bankruptcy Rules**" means, as the context requires, the Federal Rules of Bankruptcy Procedure applicable to these Chapter 11 Cases and/or the local bankruptcy rules for the Bankruptcy Court as now in effect or as the same may from time to time hereafter be amended.

"**Bar Date**" means any date set forth in the applicable Bar Date Order for filing Administrative Expense Claims, Professional Claims, rejection damages, or Proofs of Claim by non-Governmental Authorities and Governmental Authorities.

"**Bar Date Orders**" means any Order setting a bar date for Administrative Expense Claims, Professional Claims, rejection damages, or Proofs of Claim by non-Governmental Authorities and Governmental Authorities.

"**Bayview**" means Bayview Financial Trading Group, L.P., n/k/a Bayview Financial, L.P. a Delaware limited partnership.

"**Bayview B Certificates**" means the junior certificates or notes which were issued in the Bayview Securitizations, which are defined in the Bayview Settlement Agreement as the "B Certificates."

"**Bayview Certificateholders**" means, with respect to each Bayview Securitization, the holders of notes or certificates issued to investors in that securitization, including for avoidance of doubt, Bayview B Certificates.

"**Bayview Certificateholder Releasee**" has the meaning given to such term in Article 10.J of the Plan.

"**Bayview Claim**" has the meaning given to such term in Article 10.I of the Plan.

"**Bayview Damage Claim**" means the claims set out in the Bayview Proofs of Claim, including, without limitation, any and all claims in respect of breaches of representations, warranties or indemnity obligations of TBW relating to any Bayview Sale Agreement.

"**Bayview Effective Date**" means the Effective Date as such term is defined in the Bayview Settlement Agreement.

"**Bayview Proofs of Claim**" means the proofs of claim, more particularly described on Exhibit A to the Bayview Settlement Agreement, filed in these Chapter 11 Cases by the Bayview Trustee in respect of the Bayview Securitizations, and excludes, for the avoidance of doubt, the Other POCs (as such term is defined in the Bayview Settlement Agreement).

"**Bayview Releasing Certificateholders**" has the meaning given to such term in Article 10.J of the Plan.

"**Bayview Sale Agreements**" means (i) that certain Mortgage Loan Sale Agreement dated as of November 1, 2003 between TBW, as seller, and Magnolia Funding, as purchaser, (ii) that certain Mortgage Loan Sale Agreement dated as of March 1, 2004 between TBW, as seller, and Magnolia Funding II, as purchaser, and (iii) those certain Mortgage Loan Sale Agreements dated as of May 1, 2007 between TBW, as seller, and TBW Funding II, as purchaser.

"**Bayview Securitization Documents**" means the transaction documents evidencing the Bayview Securitizations and includes, without limitation, the "Servicing Agreements," "Trust

Agreements," and "Transaction Documents" as such terms are defined in the Bayview Settlement Agreement.

"**Bayview Securitizations**" means the mortgage loan securitization transactions described as Series 2003-6, 2004-1, 2007-13, 2007-13(1), 2007-13(2), 2007-13(3), 2007-13(4) and 2007-13NP, established under the Bayview Securitization Documents, as more particularly described in Section IV.C.2.a of the Disclosure Statement.

"**Bayview Servicing**" means Bayview Loan Servicing, LLC, a Delaware limited liability company, as successor servicer or subservicer, as applicable.

"**Bayview Servicing Agreements**" means (i) those certain Servicing Agreements, dated as of November 1, 2003 and March 1, 2004, respectively, between TBW and Bayview; and (ii) those six Servicing Agreements, dated as of May 1, 2007, between TBW and the Bayview Trustee.

"**Bayview Setoff Motion**" means the *Motion of U.S. Bank National Association as Trustee for Relief from Stay to Permit Setoff*, filed in the Chapter 11 Case on July 15, 2010 [Docket # 1698].

"**Bayview Settlement Agreement**" means the Settlement Agreement among the Debtor, Magnolia Funding, Magnolia Funding II, TBW Funding II, the Creditors' Committee, Bayview, Bayview Servicing, M&T, the Bayview Trustee, and the Bayview Trusts.

"**Bayview Settlement Payment**" means the "Settlement Payment" of $6.5 million to be paid to the Estate, as provided on Schedule I to the Bayview Settlement Agreement.

"**Bayview Trust**" means the trusts or indentures created as part of the Bayview Securitizations with respect to which U.S. Bank National Association acts as Bayview Trustee.

"**Bayview Trust Parties**" means Bayview, Bayview Servicing, M&T, the Bayview Trustee, and the Bayview Trusts.

"**Bayview Trust Released Claims**" has the meaning given to such term in Article 10.K of the Plan.

"**Bayview Trust Released Parties**" has the meaning given to such term in Section 10.I of the Plan.

"**Bayview Trust Releasing Parties**" has the meaning given to such term in Article 10.K of the Plan.

"**Bayview Trustee**" means U.S. Bank National Association, in its capacity as trustee or indenture trustee under the Bayview Securitization Documents.

"**BB&T**" means Branch Banking & Trust Company.

"**BB&T Funds**" means TBW's corporate operating accounts on deposit at BB&T, Winston-Salem, North Carolina.

"**Beneficiaries**" means the Holders of Allowed Claims of the Debtors (whether such Claims are Allowed as of or subsequent to the Effective Date), each of which is a beneficiary of the Plan Trust as provided for in the Plan Trust Agreement.

"**Berger Singerman**" means Berger Singerman P.A.

"**Best Interests Test**" has the meaning given to such term in Section X.A of the Disclosure Statement.

"**BMC**" means BMC Group, Inc., the Debtors' claims, notice, and balloting agent.

"**BNP Paribas**" means BNP Paribas Securities Corp.

"**Borrower Protocol**" means the protocol set forth in the *Order Establishing Protocol to Resolve Borrower Issues* (Docket # 1079).

"**Breach Determination Date**" means, with respect to a given pool of loans, (a) the date such loans were purchased from a Debtor or (b) for loans purchased from a non-Debtor entity, the date the claimant obtained rights to enforce a Debtor's sale representations and warranties with respect to such pool of loans.

"**Breach of Warranty Claim**" means a Claim (other than an EPD Claim) for breach of a representation or warranty arising under any provision or provisions of a loan purchase agreement with respect to a given loan.

"**Business Day**" means any day that is not a Saturday, a Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

"**Cash**" means cash or cash equivalents, including but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

"**Cause**" means any of the following actions or omissions of the Plan Trustee in connection with his serving in his capacity as Plan Trustee for the Plan Trust: (i) the commission of an act of fraud, misappropriation, dishonesty, embezzlement, gross negligence or willful misconduct which is materially injurious to the Plan Trust or any Beneficiary; (ii) criminal felony indictment; or (iii) the continuing and/or willful failure to perform the duties or obligations of the Plan Trustee as set forth in the Plan Trust Agreement, if such failure is not cured within fifteen (15) days after written notice from the Plan Advisory Committee.

"**Causes of Action**" means, except as provided otherwise in the Plan, the Confirmation Order or any document, instrument, release or other agreement entered into in connection with the Plan, all Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances,

trespasses, damages, judgments, third-party claims, counterclaims and cross claims of the Debtors and/or their Estates, the Creditors' Committee or the Plan Trustee, as successor to the Debtors and/or their Estates or the Creditors' Committee, including without limitation, an action that is or may be pending on the Effective Date or instituted by the Plan Trustee after the Effective Date against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, including, without limitation, Designated Causes of Action and Avoidance Actions; provided, however, that any affirmative defense or crossclaim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

**"Chapter 11 Cases"** means case number 3:09-bk-07047 (TBW), case number 3:09-bk-10023 (HAM), and case number 3:09-bk-10022 (REO), pending in the Bankruptcy Court and as to which Jerry A. Funk is the presiding bankruptcy judge.

**"Chapter 11 Protected Parties"** has the meaning given to such term in Article 10.A of the Plan.

**"Chapter 11 Released Claims"** has the meaning given to such term in Article 10.A of the Plan.

**"Claim"** means "claim" as such term is defined in § 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and including, without limitation, any Claim which any affiliate may have against another affiliate.

**"Claims Administrator"** means BMC.

**"Claims Objection Deadline"** means the date by which objections to Claims must be Filed and served on the Holders of such Claims.

**"Claims Register"** means, with respect to any Debtor, the claims register for such Debtor maintained by the Claims Administrator.

**"Class"** means a category of Holders of Claims or Interests as set forth in Article 2 of the Plan pursuant to § 1122 of the Bankruptcy Code.

**"COLB Documents"** means (i) the Loan Participation Sale Agreement (COLB Wet & Dry Mortgage Loans Program) dated December 18, 2007 between TBW, as Seller, and Colonial, as Buyer, and (ii) the Loan Participation Sale Agreement (COLB Wet & Dry Mortgage Loans Program – Construction Agreement), dated as of December 18, 2007, between TBW, as Seller, and Colonial, as Buyer, and all transaction documents related thereto.

**"COLB Facility"** means the loan participation facilities established under the COLB Documents.

**"COLB Loans"** means the residential mortgage loans that are assigned to the COLB Facility and are listed on Exhibit E to the FDIC Settlement Agreement.

**"COLB/Seaside Bank Facility"** means the mortgage loan participation facility in which Colonial purchased participation interests on behalf of and as agent for Seaside Bank, and evidenced by the Amended and Restated Loan Participation Sale Agreement (COLB Wet & Dry Mortgage Loans Program) dated December 10, 2008 among TBW, as Seller, and Colonial and Seaside Bank, as Buyers, and Colonial, as Agent and Custodian.

**"Colonial"** means Colonial Bank, an Alabama banking corporation, f/k/a Colonial Bank, N.A., a national banking association.

**"Colonial BancGroup"** means Colonial BancGroup, Inc., the holding company of Colonial.

**"Colonial Bank Receivership"** means the receivership estate of Colonial for which the FDIC was appointed as receiver in accordance with the statutory receivership process provided for in 12 U.S.C. §1821 *et seq.*

**"Confirmation"** means the entry of the Confirmation Order by the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing or hearings before the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan.

**"Confirmation Order"** means the Order of the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code, as such Order may be amended, modified or supplemented.

**"Corporate Advances"** means all customary, reasonable and necessary "out of pocket" costs and expenses incurred in the performance by TBW, as servicer, of its servicing obligations.

**"Cramdown Plan"** means the Plan if confirmed by the Bankruptcy Court pursuant to § 1129(b) of the Bankruptcy Code.

**"Credit Suisse"** means Credit Suisse First Boston Mortgage Securities Corp.

**"Creditor"** means "creditor" as defined in § 101(10) of the Bankruptcy Code and shall refer to any Holder of a Claim against any Debtor or Holder of any Claim against property of any Debtor as defined in § 102(2) of the Bankruptcy Code.

**"Creditors' Committee"** means the Official Committee of Unsecured Creditors of the Debtor.

"**Creditors' Committee's Counsel**" means Berger Singerman PA.

**"CRO"** means Neil Luria, a Managing Director of Navigant, in his capacity as Chief Restructuring Officer of TBW.

**"Custodial Funds Clearing Account"** means TBW's Account No. 8037152645 at Colonial.

**"Debt"** means liability on a Claim.

"**Debtor**" means, unless otherwise specified, TBW as a Debtor in these Chapter 11 Cases.

"**Debtor/HAM**" means Home America Mortgage as a Debtor in these Chapter 11 Cases.

**"Debtor Released Claims"** has the meaning given to such term in Article 10.D of the Plan.

**"Debtor Released REMIC Claim"** has the meaning given to such term in Article 10.E.1 of the Plan.

**"Debtor Releasees"** has the meaning given to such term in Article 10.D of the Plan.

"**Debtor/REO**" means REO Specialists as a Debtor in these Chapter 11 Cases.

**"Debtors"** means, collectively, TBW, Home America Mortgage and REO Specialists as Debtors in these Chapter 11 Cases.

"**Debtors' Chapter 11 Counsel**" means Troutman Sanders LLP and Stichter, Reidel, Blain & Prosser, P.A.

**"Debtors in Possession"** means the Debtors in the capacity and with the status and rights conferred by §§ 1107 and 1108 of the Bankruptcy Code.

**"Deficiency Claim"** means, with respect to a Claim that is partially secured by a Lien on, or security interest in, property of any of the Debtors, or that has the benefit of partial rights of setoff under § 553 of the Bankruptcy Code, the amount by which the Allowed amount of such Claim exceeds the value of the property of the Debtors securing such Claim or the amount subject to setoff, as applicable, as determined by the Bankruptcy Court pursuant to §§ 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code.

**"Deloitte"** means Deloitte & Touche LLP, the Debtors' certified public accountants and auditors.

"**De Minimis Distribution**" means any Distribution (other than a Distribution on an Allowed Secured Claim) in an amount less than $50.

"**Designated Causes of Action**" has the meaning given to such term in Section VI.K.1 of the Disclosure Statement.

"**Designated Insurance Policy**" has the meaning given to such term in Article 9.D.1 of the Plan, which policies are to be identified in an exhibit to the Plan Supplement.

"**Designated Non-Executory Insurance Policy**" means any insurance policy to which any Debtor is a party that is not executory in nature within the meaning of § 365 of the Bankruptcy Code, which policies are to be identified in an exhibit to the Plan Supplement.

"**Deutsche Bank**" means Deutsche bank AG.

"**DIP Facility**" means the debtor-in-possession financing facility provided by Selene Residential, created pursuant to the terms of the debtor-in-possession financing agreement attached as Exhibit A to Docket # 498.

"**DIP Facility Claim**" means any claim held by the DIP Lender under the DIP Facility.

"**DIP Financing Motion**" means the *Motion of the Debtor Seeking Order: (A) Authorizing the Debtor to Obtain Postpetition Financing From the DIP Lender on a Final Basis Pursuant to  §§ 105 and 364 of the Bankruptcy Code; (B) Providing Liens, Security Interests and Superpriority Claims to the DIP Lender; and (C) Approving The Form and Method of Notice Thereof* [Docket # 498].

"**DIP Lender**" means Selene Residential, in its capacity as lender under the DIP Loan Agreement, and such other lenders that may be parties to the DIP Loan Agreement.

"**DIP Loan Agreement**" means the Debtor-In-Possession Loan Agreement dated as of October 21, 2009, as amended, supplemented or modified from time to time, by and among TBW and the DIP Lender.

"**DIP Order**" means the *Order (A) Authorizing the Debtor to Obtain Postpetition Financing From the DIP Lender on a Final Basis Pursuant to §§ 105 and 364 of the Bankruptcy Code; (B) Providing Liens, Security Interests and Superpriority Claims to the DIP Lender; and (C) Approving The Form and Method of Notice Thereof* [Docket # 617].

"**Disclosure Statement**" means the disclosure statement Filed with respect to the Plan, either in its present form or as the disclosure statement may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

"**Disputed Claim**" means any Claim other than (i) an Allowed Claim or (ii) a Claim that has been disallowed by the Court under § 502 of the Bankruptcy Code.

**"Disputed Claims Reserve"** means the reserve established in accordance with Article 7.C.3 of the Plan for the payment of Disputed Claims that are Unsecured Claims, which reserve may be augmented by the Plan Trustee as set forth in the Plan and the Plan Trust Agreement.

**"Distribution"** means any distribution to or on account of the Holder of a Claim against a Debtor.

**"Early Payment Default"** or **"EPD"** means a payment default that occurs early in the life of the loan.

**"Early Purchase Facility"** means a mortgage loan participation facility in which Bank of America purchased 100% participation interests in mortgage loans from TBW pursuant to the Mortgage Loan Participation Purchase and Sale Agreement dated March 31, 2009 between TBW, as Seller, and Bank of America, as Purchaser.

**"Effective Date"** means the Business Day on which the Plan becomes effective pursuant to Article 12 of the Plan; provided however, that if any stay or injunction against enforcement or execution of the Confirmation Order is issued prior to the date that would otherwise be the Effective Date, the Effective Date shall be the first Business Day after all such stays or injunctions are no longer in effect.

**"Eligible REMIC Funds"** means funds obtained from sources designated in the REMIC Servicing Agreements and/or the REMIC Pooling and Servicing Agreements as permissible sources of reimbursement of Servicing Advances thereunder.

**"Entity"** means an "entity" as defined in § 101(15) of the Bankruptcy Code.

**"ESOP"** means the Taylor Bean & Whitaker Employee Stock Ownership Plan and all amendments thereto.

**"Estate"** means the bankruptcy estate created in the Chapter 11 Cases for each respective Debtor pursuant to § 541 of the Bankruptcy Code.

**"Estate Releasees (Freddie Mac)"** has the meaning given to such term in Article 10.H.2 of the Plan.

**"Estate Releasors (Freddie Mac")"** has the meaning given to such term in Article 10.H.1 of the Plan. has the meaning given to such term in Article 10.H.1 of the Plan.

**"Exclusive Filing Period"** means the exclusivity period during which only the Debtors may file a Chapter 11 plan.

**"Exclusive Solicitation Period"** means the exclusivity period during which the Debtors may solicit acceptances of the Plan.

**"FDIC"** means the Federal Deposit Insurance Corporation.  Unless otherwise indicated, all references to the FDIC are to the FDIC in its capacity as receiver for Colonial.

"**FDIC Documents**" means the bills of sale, security agreements, financing statements and any other documents or certificates to be executed and delivered or recorded by the Debtors, if before the Effective Date, or the Plan Trustee, if on or after the Effective Date, on behalf of the Plan Trust pursuant to the FDIC Settlement Agreement to vest title to the COLB Loans in, or grant and perfect a security interest in the AOT Loans or Overline Loans in favor of, the FDIC, a copy of which shall be attached as an exhibit to the Plan Supplement.

"**FDIC GUC Claim**" means the Allowed General Unsecured Claim of the FDIC against TBW in the amount set forth in Section 1.9 of the FDIC Settlement Agreement and referred to therein as the "FDIC-R GUC Claim."

"**FDIC Released Claims**" has the meaning given to such term in Article 10.C of the Plan.

"**FDIC Releasees**" has the meaning given to such term in Article 10.C of the Plan.

"**FDIC Releasors**" has the meaning given to such term in Article 10.D of the Plan.

"**FDIC Settlement Agreement**" means the Settlement Agreement dated as of August 11, 2010 between the Debtor, the Creditors' Committee and the FDIC, as amended by the First Amendment to the FDIC Settlement Agreement filed on August 31, 2010, and approved by the Bankruptcy Court on September 14, 2010 [Docket # 1936].

"**FDIC Settlement Date**" means September 14, 2010, which is the date the Bankruptcy Court's Order approving the FDIC Settlement Agreement was entered in these Chapter 11 Cases [Docket # 1936].

"**FDIC Stipulation**" means the written agreement entered into on or about September 10, 2009 between the Debtor and the FDIC [Docket # 222], approved by the Bankruptcy Court on October 16, 2009 [Docket # 468].

"**FDIC Substantial Contribution Claim**" the claim awarded by the Bankruptcy Court to the FDIC in the amount of $1.75 million under § 503(b)(3)(D) of the Bankruptcy Code pursuant to the Plan and the FDIC Settlement Agreement.

"**FDIC Trade Carve-out**" means the amount agreed to be paid to the Trade Creditors from the FDIC GUC Claim, as described in Section 1.10 of the FDIC Settlement Agreement, and also referred to as the Trade Creditor Recovery.

"**Feasibility Test**" has the meaning given to such term in Section X.B of the Disclosure Statement.

"**Fee Application**" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

"**FHA**" means Federal Housing Administration, a government agency that is part of the Department of Housing and Urban Development, which was established for the purpose of

encouraging home ownership and which, among other things, provides mortgage insurance on loans made by FHA-approved lenders, mitigating the risk on those loans for the originators.

"**File**," "**Filed**" **or** "**Filing**" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"**Final Decree**" means, with respect to each Debtor, respectively, the decree contemplated under Bankruptcy Rule 3022.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Bankruptcy Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

"**Freddie Mac**" or "**FHLMC**" means the Federal Home Loan Mortgage Corporation, a congressionally chartered corporation that purchases residential mortgages in the secondary market from mortgage bankers, banks, and savings and loan associations and then packages the mortgages into guarantied securities that are sold to investors in the capital markets.

"**Freddie Mac MSRs**" means mortgage servicing rights related to the Freddie Mac loan portfolio previously serviced by TBW.

"**Freddie Mac Regions Funds**" has the meaning given to such term in Article 6.E.3(f) of the Plan.

"**Freddie Mac Releasees**" has the meaning given to such term in Article 10.H.1 of the Plan

"**Freddie Mac Settlement Agreement**" means the Settlement Agreement among Freddie Mac, the Debtor, and the Creditors' Committee.

"**Freddie Mac Settlement Proceeds**" has the meaning given to such term in Article 6.E.3(f) of the Plan.

"**Freddie Mac Effective Date**" means the date on which the Freddie Mac Settlement Agreement becomes effective, as set forth in the Freddie Mac Settlement Agreement.

"**General Bar Date**" means the deadline for both non-Governmental Authorities and Governmental Authorities to submit Proofs of Claim in these Chapter 11 Cases.

"**General Bar Date Order**" means the Order entered by the Bankruptcy Court on February 22, 2010 [Docket # 1067] that established bar dates for filing proofs of claim and approved the form and manner of notice thereof.

"**General Unsecured Claims**" means all Unsecured Claims including the FDIC GUC Claim other than (and excluding) Trade Claims and Subordinated Claims.

"**General Unsecured Claims (Trade Creditors)**" means all Unsecured Claims held by Trade Creditors.

"**Ginnie Mae**" **or** "**GNMA**" means Government National Mortgage Association, a congressionally chartered corporation that buys mortgages insured by both the Federal Housing and Veterans Administrations and then pools them into a government-guaranteed investment vehicle called a mortgage-backed security.

"**Governmental Authority**" means any federal, state, provincial, municipal, national or other government, governmental department, commission, board, bureau, court, tribunal, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Gross Affected Funds**" means cumulative amount of servicing–related funds affected by TBW's collapse, as defined in the Servicing Reconciliation.

"**Henley Holdings**" means Henley Holdings LLC, a Delaware limited liability company, and the purchaser under the Henley Holdings Documents.

"**Henley Holdings Documents**" means that certain Mortgage Loan Sales and Servicing Agreement dated October 17, 2007 by and between TBW, Henley Holdings LLC, and TBW Funding III, and all transaction documents related thereto.

"**Holder**" means an Entity holding a Claim or Interest or any authorized agent who has completed, executed and delivered a Ballot in accordance with the applicable voting instructions.   All references to Holders of an Interest in the Plan Trust shall mean the Beneficiaries described in the Plan Trust Agreement.

"**Home America Mortgage**" or "**HAM**" means Home America Mortgage, Inc., a Florida corporation, and a wholly-owned subsidiary of TBW.

"**HUD**" mean the U.S. Department of Housing and Urban Development.

"**Impaired**" means "impaired" within the meaning of § 1124 of the Bankruptcy Code.

"**Insider**" means any "insider" of any of the Debtors within the meaning of § 101(31) of the Bankruptcy Code.

14

**"Intercompany Claim"** means any Claim of a Debtor against another Debtor, whether accruing before or after the Petition Date, (ii) any Claim for reimbursement arising from one Debtor's (A) payment as guarantor or surety, of the Debt(s) of another Debtor, or (B) payment or other satisfaction of the Debt(s) or expense(s) of another Debtor, and (iii) any Claim for contribution of a Debtor arising from such Debtor's payment of a disproportionate share of (A) a joint-and-several liability with one or more other Debtor(s) or (B) expenses that were properly allocable between multiple Debtors.

**"Interest"** means, with respect to any Debtor, any "equity security," as such term is defined in Bankruptcy Code § 101(16).  Interests shall also include, without limitation, all stock, partnership, membership interest, warrants, options, or other rights to purchase or acquire any equity interest in any Debtor.

**"Investigation"** means the internal investigation into the accounting practices of TBW, which was undertaken by TBW and conducted by Troutman Sanders in the summer of 2009.

**"IRC"** means Title 26 of the United States Code.

**"IRS"** means the U.S. Internal Revenue Service.

"**LBF Holdings LLC**" means LBF Holdings LLC, a Florida limited liability company that is owned and controlled by Lee Farkas.

**"Lehman Brothers"** means Lehman Brothers Holdings, Inc.

**"Lien"** means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of a Debtor as contemplated by § 101(37) of the Bankruptcy Code.

**"Liquidation Analysis"** means the liquidation analysis annexed to or incorporated into the Disclosure Statement.

**"Liquidation Expenses"** means, with respect to any Allowed Secured Claim, all costs and expenses incurred by or on behalf of the Plan Trust in preserving or disposing of the Assets securing the Allowed Secured Claim, including, in the case of collection of choses in action, the costs and expenses of attorneys, expert witnesses, and consultants employed by the Plan Trust in prosecuting or otherwise resolving such choses in action.

**"Liquidation Value"** has the meaning given to such term in Section X.A of the Disclosure Statement.

**"Lloyd's Adversary Proceeding"** means adversary proceeding no.3:10-ap-00243-JAF, commenced by Complaint for Declaratory Judgment and styled *Certain Underwriters at Lloyd's, London and London Market Insurance Companies That Subscribe to Certificate No. B0621PTAY00207001 v. Taylor Bean & Whitaker Corporation, Federal Home Loan Mortgage Corporation, National Mortgage Association and Sovereign Bank.*

"**Manufacturers and Traders Trust**" or "**M&T**" means Manufacturers and Traders Trust Co.

"**Magnolia Funding**" means Magnolia Street Funding, Inc., a Delaware corporation, which is a special-purpose entity that is a wholly-owned subsidiary of TBW, and was the securitization conduit for the Series 2003-6 Bayview Securitization.

"**Magnolia Funding II**" means Magnolia Street Funding II, Inc., a Delaware corporation, which is a special-purpose entity that is a wholly-owned subsidiary of TBW, and was the securitization conduit for the Series 2004-1 Bayview Securitization.

"**Material Decisions**" has the meaning given to such term in the Plan Trust Agreement.

"**Medford Assets**" shall mean the "Medford Assets" as defined in the Bayview Settlement Agreement.

"**Maturity Date**" means, with respect to any Claim arising pursuant to a written agreement, the maturity date of such Claim under such agreement, without acceleration, and determined without reference to any default under such agreement(s).

"**MBS Sale**" means the § 363 sale by TBW to AG Mortgage of TBW's residual and other interests in seven trusts that issued securities backed by mortgage loans.

"**Mortgage Bankers Bonds**" has the meaning given to such term in Exhibit F to the Disclosure Statement (setting forth Designated Causes of Action).

"**M&T**" means Manufacturers and Traders Trust Co., as successor servicer with respect to certain of the Bayview Servicing Agreements.

"**Natixis**" means Natixis Real Estate Holdings, LLC, successor-by-merger to Natixis Real Estate Capital, Inc., f/k/a IXIS Real Estate Capital, Inc.

"**Natixis Effective Date**" means the date on which the Natixis Settlement Agreement becomes effective, as set forth in the Natixis Settlement Agreement.

"**Natixis Facility**" means the $133 million revolving credit facility evidenced by the Natixis Loan Agreement.

"**Natixis Loan Agreement**" means the Second Amended and Restated Loan and Security Agreement dated as of November 28, 2008, as amended by Amendment No. 1 and No. 2 thereto.

"**Natixis MSR Participation**" means Natixis share (68.6%) of any Participation, as defined in Exhibit A to the Freddie Mac Settlement Agreement, the Sovereign Settlement Agreement and the Natixis Settlement Agreement.

"**Natixis Refunds**" means the sum of $3 million payable to Natixis in settlement of Natixis' rights, if any, to force-placed insurance premiums and property tax refunds received by the Debtor, as set forth in the Natixis Settlement Agreement.

"**Natixis Settlement Agreement**" means the Settlement Agreement among Natixis, the Debtor and the Creditors' Committee.

"**Navigant**" means Navigant Capital Advisors, LLC.

"**Net Affected Funds on Deposit**" has the meaning given to such term in Section IV.H.7 of the Disclosure Statement.

"**Net Distributable Assets**" means, with respect to each Debtor's respective Estate, the calculation described in Article 7.D.1 of the Plan.

"**Net Proceeds**" means with respect to any asset sale, the cash proceeds paid by the purchaser in such sale, less the reasonable costs, fees and expenses incurred by the seller to negotiate and close such asset sale.

"**Non-FDIC Releasors**" has the meaning given to such term in Article 10.C of the Plan.

"**Notice Approval**" has the meaning given to such term in Section V.D of the Plan Trust Agreement.

"**Ocala Funding**" means Ocala Funding, LLC, a Delaware limited liability company and a wholly-owned subsidiary of TBW, which was a securitization conduit that issued commercial paper backed by the mortgage loans it purchased from TBW.

"**Ocala Funding Facility**" means Ocala Funding's commercial paper facility that was created in 2005, ultimately expanded to a $4 billion facility, and was restructured in June 2008 and reduced to a $1.75 billion facility.

"**Order**" means any order entered by the Bankruptcy Court in connection with the Debtors' Chapter 11 Cases.

"**Ordinary Course Professionals**" means professionals that TBW employed pre-petition in the ordinary course of its business and retained without having to file formal retention applications with the Bankruptcy Court, in accordance with the terms of the Bankruptcy Court's Order entered on May 25, 2010 [Docket # 1477].

"**OTS**" means the Office of Thrift Supervision, an office within the U.S. Department of Treasury.

"**Overline Facility**" means the $19.8 million facility provided by Colonial under (i) the Repurchase Agreement to purchase mortgage loans from TBW and (ii) the REO Line of Credit to fund advances against eligible REO owned by TBW.

"**Overline Loans**" means the mortgage loans assigned to the Overline Facility and listed on Exhibit H to the FDIC Settlement Agreement.

"**Overline REO**" means the REO related to the Overline Facility and listed on Exhibit J to the FDIC Settlement Agreement.

"**P&I Advances**" means all funds paid by TBW, in its capacity as servicer, for principal and interest owed by borrowers on mortgage loans.

"**Person**" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Authority, or other Entity.

"**Petition Date**" means August 24, 2009, the date TBW filed its Chapter 11 bankruptcy petition. With respect to HAM and REO, "Petition Date" means November 25, 2009.

"**Plainfield**" means Plainfield Specialty Holdings II Inc., and its successors in interest.

"**Plan**" means the Chapter 11 liquidating plan Filed by the Plan Proponents, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

"**Plan Advisory Committee**" means the post-confirmation committee formed on the Effective Date, selected by the Creditors' Committee and identified by the Plan Proponents in the Plan Supplement.

"**Plan Liabilities**" means the "Liabilities" as defined in the Plan Trust Agreement.

"**Plan Notice**" means the Order Approving: (I) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan and Limited Waiver of Local rule 3018-1; (II) Related Notice and Objection Procedures; (III) Procedures to Determine Holders of Claims in TBW Class 9; and (IV) Waiver of Local Rule 3071-1(b), which was entered November 10, 2010 [Docket # 2137] and which is included in the solicitation information for voting on the Plan.

"**Plan Proponent Released Parties**" has the meaning given to such term in Article 10.G.1 of the Plan.

"**Plan Proponent Released Parties (Bayview)**" has the meaning given to such term in Section 10.I of the Plan.

"**Plan Proponent Released Claims (Bayview)**" has the meaning given to such term in Article 10.I of the Plan.

"**Plan Proponent Released Parties (Bayview)**" has the meaning given to such term in Article 10.K of the Plan.

"**Plan Proponent Releasing Parties (Bayview)**" has the meaning given to such term in Article 10.I of the Plan.

"**Plan Proponents**" means the Debtors and the Creditors' Committee.

"**Plan Releasing Parties**" has the meaning given to such term in Article 10.E.1 of the Plan.

"**Plan Summary Table**" means the summary of classification and treatment of Claims and Interests under the Plan, and is set forth in Section II.B of the Disclosure Statement.

"**Plan Supplement**" means the document to be Filed with the Bankruptcy Court at least three (3) days prior to the Confirmation Hearing, to which shall be attached exhibits that contain, among other things, a list of the members of the Plan Advisory Committee, a copy of the Plan Trust Agreement, and the FDIC Documents (unless the Debtor and the FDIC agree to file the FDIC Documents at a later date, which may be on or after the Effective Date).

"**Plan Trust**" means the trust known as "The Taylor, Bean & Whitaker Plan Trust" created pursuant to the Plan Trust Agreement on the Effective Date in accordance with the Plan, the Confirmation Order and the Plan Trust Agreement, the purposes of which include, without limitation: (i) to receive the Assets of each Debtor for the benefit of the Holders of Claims against each of the Debtors under the Plan and otherwise to act as a "liquidating trust" within the meaning of Treasury Regulations § 301.7701-4(d); (ii) to collect and sell, dispose, or otherwise realize value of any kind whatsoever in respect of each Debtor's Assets; (iii) to preserve and distribute the consideration to be distributed to Holders of Claims against each of the Debtors pursuant to the Plan, the Plan Trust Agreement, the Confirmation Order, and such other Orders as may be entered by the Bankruptcy Court; (iv) to prosecute or settle objections to Disputed Claims against each of the Debtors; (v) to prosecute or settle Causes of Action (including, without limitation, Designated Causes of Action and Avoidance Actions) for the benefit of Creditors of each of the Debtors; and (vi) to perform all other obligations pursuant to the Plan, the Plan Trust Agreement, and any Orders entered by the Bankruptcy Court. For the avoidance of doubt, references in the Plan to "the Plan Trust" may also be construed as "the Plan Trustee, for the benefit of Holders of beneficial interests in the Plan Trust," as the context requires.

"**Plan Trust Administrator**" means any Trust Administrator as such term is defined in the Plan Trust Agreement.

"**Plan Trust Agreement**" means the trust agreement for the Plan Trust, as in effect from time to time.

"**Plan Trust Assets**" means, collectively, (i) the Assets of the Debtors contributed to the Plan Trust in accordance with Article 6.F.1 of the Plan and in accordance with the Plan Trust Agreement, and (ii) any proceeds of any other property to which the Debtors' Estates are or become entitled pursuant to any settlement, stipulation, Order of the Bankruptcy Court, or otherwise.

"**Plan Trust Entity**" means any Entity which the Plan Trustee creates as permitted by the Plan Trust Agreement, or causes to be created as a subsidiary of a Debtor.

"**Plan Trust Exculpated Parties**" has the meaning given to such term in the Plan Trust Agreement.

"**Plan Trust Operating Expense Reserve**" means the reserve established in accordance with Article 7.C.1 of the Plan for the payment of Plan Trust Operating Expenses, which reserve may be augmented by the Plan Trustee as set forth in the Plan and the Plan Trust Agreement.

"**Plan Trust Operating Expenses**" means any and all costs, expenses and other liabilities incurred or anticipated to be incurred in connection with the administration of the Plan Trust and the maintenance, liquidation and Distribution of Plan Trust Assets, including, without limitation, (1) amounts due to the Plan Trustee and its professionals, agents and advisors, (2) amounts due to the Plan Advisory Committee and its members and their respective professionals, (3) amounts due to any Plan Trust Exculpated Party, and (4) U.S. Trustee fees due under Article 3.C of the Plan or the U.S. Trustee's guidelines, in each case whether incurred or asserted pursuant to the Plan, the Confirmation Order, the Plan Trust Agreement or otherwise.

"**Plan Trust Professionals**" means the Plan Trustee, counsel to the Plan Trustee, and such other professionals retained by the Plan Trustee to assist in the administration and all other duties of the Plan Trust, including, without limitation, commencing and prosecuting the Causes of Action and Claims reconciliation process.

"**Plan Trust Released Claims**" has the meaning given to such term in the Plan Trust Agreement.

"**Plan Trustee**" means Neil F. Luria or any successor appointed to serve as trustee of the Plan Trust in accordance with the terms of the Plan, Confirmation Order and the Plan Trust Agreement.

"**Platinum Bancshares**" means Platinum Bancshares, Inc., an Illinois corporation and a subsidiary of TBW.

"**Platinum Bank**" means Platinum Community Bank, a federally chartered thrift and a wholly-owned subsidiary of Platinum Bancshares.

"**Priority Claim**" means a Claim to the extent that it is of the kind described in, and entitled to priority under § 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

"**Priority Tax Claim**" means a Claim of a Governmental Authority of the kind specified in § 507(a)(8) of the Bankruptcy Code.

"**pro rata**" means, with respect to any Distribution on account of any Allowed Claim in any Class, the ratio of (a) the amount of such Allowed Claim to (b) the sum of (i) all

Allowed Claims in such Class and (ii) the aggregate maximum allowable amount of all Disputed Claims in such Class for which a Reserve must be established under the Plan.

"**Professional**" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

"**Professional Claim**" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases.

"**Professional Claim Bar Date**" means the date or dates fixed by the Bankruptcy Court as the last date for filing a request for payment of a Professional Claim, as set forth in Article 3.A.3 of the Plan, that is not subject to any other Bar Date Orders or any other Order that establishes the last date for filing such Professional Claim.  The Plan does not affect or extend any Professional Claim deadline established by any other Order and the earliest Professional Claim deadline applicable to any Professional Claim shall govern and control.

"**Professional Claim Objection Deadline**" means twenty-five (25) days after the Professional Claim Bar Date, or as extended pursuant to Article 3.A.3(b) of the Plan.

"**Proof of Claim**" means a proof of claim filed in the Chapter 11 Cases pursuant to § 501 of the Bankruptcy Code and/or pursuant to any Order of the Bankruptcy Court, together with supporting documents.

"**Purchased Loan**" means a mortgage loan that was purchased by a buyer under the Repurchase Agreement.

"**Reconciliation**" means collectively the Asset Reconciliation and the Servicing Reconciliation conducted by the Debtor, the results of which are set forth in the Reconciliation Report, as more particularly described in Section IV.H.7 of the Disclosure Statement.

"**Reconciliation Report**" means the Final Reconciliation Report dated July 1, 2010 prepared by the Debtors, as more particularly described in Section IV.H.7 of the Disclosure Statement.

"**Regions**" means Regions Bank.

"**Rejection Orders**" means the Orders of the Bankruptcy Court approving the Debtor's motions seeking authority to reject certain non-residential real property leases, equipment leases, and/or executory contracts.

"**REMIC**" means a real estate mortgage investment conduit within the meaning of the Internal Revenue Code.

"**REMIC Certificateholder**" means, with respect to each REMIC Securitization, the holders of certificates issued by the applicable REMIC Trust to investors in that securitization.

"**REMIC Certificateholder Releasee**" has the meaning given to such term in Article 10.F of the Plan.

"**REMIC Damage Claims**" means the claim of the REMIC Trusts, the REMIC Trustees, Wells Fargo and the REMIC Insurers, in connection with the REMIC Securitizations, in the aggregate amount of $10,150,060.

"**REMIC Depositor**" means the Entity that acquired pools of mortgage loans from the REMIC Initial Purchaser and conveyed such loans to the REMIC Trust in connection with a REMIC Securitization.  The REMIC Depositors are comprised of BNP Paribas Mortgage Securities LLC, Credit Suisse First Boston Mortgage Securities Corp., Mortgage Asset Securitization Transactions, Inc., and Structured Asset Securities Corp.

"**REMIC Initial Purchaser**" means the Entity that purchased pools of mortgage loans from TBW and conveyed such loans to the REMIC Depositor in connection with a REMIC Securitization. The REMIC Initial Purchasers are comprised of BNP Paribas Mortgage Corp., DLJ Mortgage Capital, Inc., Lehman Brothers Holdings Inc. and UBS Real Estate Securities Inc.

"**REMIC Insurer**" means, with respect to each REMIC Securitization, the Entity that guaranteed payments to any REMIC Certificateholder.

"**REMIC Pooling and Servicing Agreement**" means, with respect to each REMIC Securitization, the pooling and servicing agreement governing such REMIC Securitization, which, among other things, establishes the REMIC Trust, appoints the REMIC Trustee and delineates its duties, rights and responsibilities, appoints Wells Fargo as master servicer, successor servicer and trust administrator and delineates its duties, rights and responsibilities, provides for the issuance of certificates by the REMIC Trust, and provides for the priority of distributions of assets of the REMIC Trust.

"**REMIC Releasing Certificateholders**" has the meaning given to such term in Article 10.F of the Plan.

"**REMIC Securitizations**" has the meaning given to such terms in Section IV.C.2.b of the Disclosure Statement.

"**REMIC Servicing Agreement**" means, with respect to each REMIC Securitization, the servicing agreement between TBW, as servicer, and Wells Fargo, as master servicer, providing for the terms under which TBW serviced the mortgage loans owned by the respective REMIC Trust.

"**REMIC Settlement Agreement**" means, with respect to each REMIC Securitization, the Settlement Agreement dated as of November 11, 2010 between the Debtor, the Creditors' Committee, Wells Fargo, in its capacities as master servicer, successor servicer and trust administrator, the REMIC Trustee, and the REMIC Insurer, if any. There are twelve REMIC Settlement Agreements, one for each REMIC Securitization.

"**REMIC Transferor Parties**" has the meaning given to such term in Article 10.G.2 of the Plan.

"**REMIC Trust**" means, with respect to each REMIC Securitization, the trust established under the REMIC Pooling and Servicing Agreement for such securitization, the names of which are set forth in footnote 11 to the Disclosure Statement.

"**REMIC Trust Released Claims**" has the meaning given to such term in Article 10.E.1 of the Plan.

"**REMIC Trust Released Parties**" has the meaning given to such term in Article 10.E.1 of the Plan.

"**REMIC Trust Stipulation**" means the Stipulation Between Taylor, Bean & Whitaker Mortgage Corp., Debtor, And Wells Fargo Bank, National Association, Filed with the Bankruptcy Court on October 7, 2009 [Docket # 412], and approved by the Bankruptcy Court by Order entered on October 15, 2009 [Docket # 456].

"**REMIC Trustee**" means, with respect to each REMIC Securitization other than TBW Mortgage-Backed Trust Series 2007-1, U.S. Bank, and with respect to TBW Mortgage-Backed Trust Series 2007-1, The Bank of New York Mellon, in each case in its capacity as trustee under the REMIC Pooling and Servicing Agreement for the related REMIC Trust.

"**REO**" means real estate owned, a term typically used for how an asset was held following foreclosure of the mortgage loan by the record owner of the loan or its agent.

"**REO Line of Credit**" means the committed line of credit provided to TBW by Colonial under the REO Loan and Security Agreement.

"**REO Loan and Security Agreement**" means the Amended and Restated Mortgage Warehouse Loan and Security Agreement (REO Line of Credit), dated as of June 30, 2009 between TBW, as borrower, and Colonial, as Lender.

"**REO Proceeds Clearing Account**" means TBW's Account No. 8037245423 at Colonial into which proceeds from the sale of REO were deposited and disbursements relating to preservation of REO were made.

"**REO Sale**" means the § 363 bulk sale of approximately 901 REO properties by TBW to Selene REO approved by the Bankruptcy Court pursuant to Orders entered on December 17, 2009 and January 11, 2010.

"**REO Sale Agreement**" means the Real Estate Purchase and Sale Agreement dated October 21, 2009 between TBW and Selene REO.

"**REO Specialists**" means REO Specialists, LLC, a Florida limited liability company, and a wholly-owned subsidiary of TBW.

"**Repo Line**" means the committed mortgage loan purchase facility established under the Repurchase Agreement.

**"Repurchase Agreement"** means the Amended and Restated Master Repurchase Agreement dated as of October 31, 2008 and/or June 30, 2009 between the buyers party thereto, their agent named therein, and TBW, as the seller.

**"Repurchase Facility"** means the facility established under the Repurchase Agreement.

**"Reserves"** means the Plan Trust Operating Expense Reserve, the Administrative and Priority Claims Reserve, and the Disputed Claims Reserve, as the context shall require.

"**Reverse Mortgages**" means the twenty-three reverse mortgages subject to the *Order Approving the Debtor's Sale of Reverse Mortgages and Granting Related Relief*, entered June 30, 2010 [Docket # 1642].

**"RoundPoint"** means RoundPoint Mortgage Servicing Corporation, a Florida corporation.

**"Schedules"** means, collectively, the Debtors' respective Statements of Financial Affairs and Schedules of Assets and Liabilities.

**"Seaside"** means Seaside Bank.

**"SEC"** means the United States Securities and Exchange Commission.

**"Secured Claim"** means a Claim that is secured by a Lien on, or security interest in, property of any of the Debtors, or that has the benefit of rights of setoff under § 553 of the Bankruptcy Code, but only to the extent of the value of the Creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined by the Bankruptcy Court pursuant to §§ 506(a), 553, and/or 1129(b)(2)(A)(i)(11) of the Bankruptcy Code, as applicable.

"**Selene Finance**" means Selene Finance, LP.

"**Selene REO**" means Selene RMOF REO Acquisition II LLC, a Delaware limited liability company.

**"Selene Residential"** means Selene Residential Mortgage Opportunity Fund, L.P., lender for TBW's debtor-in-possession financing.

"**Servicing Advance**" "means any P&I Advance, T&I Advance or Corporate Advance.

**"Servicing Fees"** means (i) with respect to any mortgage loan or any subset thereof, the servicing fees and any and all income, revenue, fees, expenses, charges or other moneys permitted to be received, collected, and retained by TBW, as servicer, pursuant to the applicable mortgage loan servicing agreement, and (ii) with respect to residential mortgage loans owned by a non-Debtor Entity but for which one or more Debtors holds the Servicing Rights, the servicing fees and any and all income, revenue, fees, expenses, charges or other moneys permitted to be received, collected, and retained by TBW, as servicer, pursuant to the agreement governing such Servicing Rights.

**"Servicing Reconciliation"** means the reconciliation performed by the Debtor in accordance with the terms of the FDIC Stipulation relating to borrower funds and other servicing related monies that were affected by the collapse of TBW and the failure of Colonial, as more particularly described in the Reconciliation Report.

**"Servicing Rights"** means, (i) with respect to any mortgage loans or any subset thereof, the right to service such mortgage loans, or to designate the servicer of such Mortgage Loans, on substantially the same terms and conditions set forth in the applicable mortgage loan servicing agreement, and (ii) with respect to residential mortgage loans owned by a non-Debtor Entity, the right to service and/or designate the servicer or sub-servicer of such loans on the terms set forth in the agreement governing the servicing of such loans.

**"Sharing Percentage"** means, with respect to any Allowed Secured Claim against any Debtor, the percentage of the net recovery on such Claim that will be paid to the Plan Trust as compensation for prosecuting, collecting, settling or otherwise monetizing such Claim.  The Sharing Percentage will either (a) be agreed to in writing by the Holder of such Claim and the Plan Proponents (if prior to the Effective Date) or the Plan Trustee (if on or after the Effective Date), or (b) set forth by the Plan Proponents in the Plan Supplement.  The Sharing Percentage shall be multiplied by the net recovery on such Claim to determine the dollar amount or value of such recovery that is payable to the Plan Trustee.  The net recovery on such Claim shall equal the total recovery on such Claim *minus* the Liquidation Expenses applicable to such Claim.

**"Sovereign"** means Sovereign Bank, a Federal Savings Bank, in its capacity as Agent for the Lenders under the Sovereign Facility.

**"Sovereign Adversary Proceeding"** means adversary proceeding no.3:10-ap-00644-JAF, commenced by *Complaint to Determine Extent of Liens* and styled Taylor Bean &Whitaker Mortgage Corp. v. Sovereign Bank.

**"Sovereign Allocation"** has the meaning given to such term in the Sovereign Settlement Agreement.

**"Sovereign Avoidance Claims"** means the Debtors' claims against Sovereign for the recovery of preferential transfers and fraudulent transfers.

**"Sovereign Effective Date"** means the date on which the Sovereign Settlement Agreement becomes effective, as set forth in the Sovereign Settlement Agreement.

**"Sovereign Facility"** means the $236 million revolving credit facility evidenced by the Sovereign Loan Agreement.

**"Sovereign Loan Agreement"** means the Sixth Amended and Restated Servicing Facility Loan and Security Agreement dated May 15, 2009 between TBW, as borrower, Sovereign, as agent, and the other lenders party thereto.

"**Sovereign MSR Participation**" means Sovereign's share (31.4%) of any Participation, as defined in Exhibit A to the Freddie Mac Settlement Agreement, the Sovereign Settlement Agreement and the Natixis Settlement Agreement.

"**Sovereign Settlement Agreement**" means the date on which the Sovereign Settlement Agreement becomes effective, as set forth in the Sovereign Settlement Agreement.

"**Stichter Riedel**" means Stichter, Riedel, Blain & Prosser, P.A., a Florida professional association, counsel to the Debtors.

"**Subordinated Claim**" means any Claim that (i) is subordinate in right of payment to another Class of Claims by (a) an agreement that is enforceable pursuant to § 510(a) of the Bankruptcy Code or (b) Order of the Bankruptcy Court pursuant to §§ 509(c) or 510(e) of the Bankruptcy Code, (ii) arises from rescission of a purchase or sale of a security of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement of contribution allowed under § 502 of the Bankruptcy Code on account of such a Claim, or (iii) is for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim.

"**T&I Advances**" means advances for taxes and insurance made by TBW as servicer for a mortgage loan.

"**TARP**" means Troubled Asset Relief Program.

"**TBW**" means Taylor, Bean & Whitaker Mortgage Corp., a Florida corporation.

"**TBW Bayview Claim**" means collectively the Debtor's Claims for amounts which the Debtor asserts are owed it by the Bayview Trusts, and which are defined in the Bayview Settlement Agreement as the "TBW Claim."

"**TBW REMIC Claims**" means the Debtor's Claims for reimbursement of Servicing Advances and payment of Servicing Fees owed to it under the REMIC Servicing Agreements.

"**TBW Funding II**" means TBW Funding Company II LLC, a Delaware limited liability company, which is a special-purchase entity that is a wholly-owned subsidiary of TBW and was established as the securitization conduit for certain of the Bayview Securitizations.

"**TBW Whole Loans**" means the mortgage loans listed on Exhibit K to the FDIC Settlement Agreement.

"**Trade Claims**" has the meaning given to such term in Article 4.H.1 of the Plan.

"**Trade Creditor**" means each Holder of a Trade Claim.

"**Trade Creditor Recovery**" has the meaning given to such term in Section 1.10 of the FDIC Settlement Agreement.

"**Treasury Regulations**" means the regulations promulgated from time to time by the IRS or the Department of the Treasury, as amended, supplemented or modified from time to time.

"**Troutman Sanders**" means Troutman Sanders LLP, a Georgia limited liability partnership, special counsel to the Debtor.

"**UBS**" means UBS Securities, LLC.

"**U.C.C.**" means the Uniform Commercial Code, as enacted in the applicable state.

"**Unanimous Decision**" has the meaning given to such term in the Plan Trust Agreement.

"**Unimpaired**" means, with respect to a Class of Claims, that such Class is not Impaired.

"**Unencumbered**" means, with respect to any Asset or other property, not subject to (i) a Lien or (ii) a charge to use such Asset or other property for a particular purpose to which the Debtors or the Plan Trustee have agreed or are bound.

"**Unsecured Claim**" means a Claim that is not a DIP Facility Claim, Secured Claim, Administrative Expense Claim, Priority Tax Claim, Priority Claim, or Subordinated Claim, and shall include, without limitation, any Deficiency Claim.

"**UPB**" means unpaid principal balance.

"**U.S. Bank**" means U.S. Bank, National Association, in its capacity as trustee or indenture trustee under the Bayview Securitization Documents.

"**U.S. Trustee**" means the Office of the United States Trustee for the Middle District of Florida.

"**VA**" means U.S. Department of Veterans Affairs.

"**WARN Act**" means Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101, *et seq.*

"**Wells Fargo**" means Wells Fargo Bank, N.A., in its capacity as master servicer, successor servicer or trust administrator, as the context shall require.

References to an "Article," "Section," "§," "Exhibit," or "Annex" shall be to an Article, Section, §, Exhibit, or Annex to the Plan or the Disclosure Statement unless otherwise specifically provided. Any term defined therein may be used in the singular or plural. Thus, for example, the term "Chapter 11 Protected Party" means any of the "Chapter 11 Protected Parties." The terms "include," "includes" and "including" shall be deemed to be followed by "without limitation." All pronouns used therein shall be deemed to cover all genders. Except as otherwise specified or limited therein, references to any Person include the successors and assigns of such

Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including," respectively.  Unless otherwise specified therein, all payments described or references to "$" therein shall refer to United States Dollars.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.